**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*, <br><br>       *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*, <br><br>       *Defendants*. | Case No. 26-cv-436-MSM-AEM |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR STAY UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Introduction..................................................................................................... 1

Background ...................................................................................................... 3

    A.  The CoC Program ...................................................................................... 3

        1.  Congress designed the CoC program to implement a community-driven approach to ending homelessness............................................ 3

        2.  The statute prioritizes permanent housing ........................................ 4

        3.  The statute protects renewal funding ................................................ 5

        4.  Congress appropriates FY 2026 funding for the CoC program ........ 6

    B.  HUD's FY 2026 NOFO .......................................................................... 7

        1.  Overview of the selection process .................................................... 7

        2.  A massive set-aside for new transitional housing and supportive-services-only projects would defund permanent housing and renewals........... 9

        3.  Selection criteria effectively force communities to abandon proven strategies ......................................................................................... 10

            a.  Criteria mandating service requirements.............................. 11

            b.  Criteria seeking to eliminate harm reduction approaches to drug use ................................................................................ 12

            c.  Criteria promoting unproductively punitive law enforcement responses to homelessness.................................................. 13

        4.  Other provisions disqualify or disadvantage applicants on improper grounds............................................................................................ 14

            a.  Amorphous "risk review" and additional criteria through which HUD threatens to reject projects on virtually any grounds ................. 14

            b.  Criteria adopting a conception of "self-sufficiency" at odds with the statute............................................................................ 15

            c.  Preference for people with particular types of disabilities ... 16

            d.  Inequitable eligibility for CoC Bonus funding..................... 16

            e.  Non-Statutory Threshold Criteria that improperly disqualify Tier 1 projects..................................................................... 17

        5.  Post-award conditions impose ideological and policy restrictions that HUD lacks authority to impose......................................................... 18

    C.  The FY 2026 NOFO Threatens Devastating Harms to Plaintiffs and the Communities They Serve.......................................................................... 19

i

Legal Standards ................................................................................................................ 21

Argument ......................................................................................................................... 22

I.    Plaintiffs Are Likely to Succeed on the Merits ......................................................... 22

    A.  The FY 2026 NOFO Exceeds Defendants' Authority ................................................ 22

    B.  The FY 2026 NOFO Is Contrary to Law ................................................................. 23

        1.  Set-Aside ......................................................................................................... 23

        2.  Discriminatory Disability Priority ................................................................. 24

        3.  Non-Statutory Threshold Criteria ................................................................. 25

        4.  E.O. Conditions .............................................................................................. 25

    C.  The FY 2026 NOFO's Challenged Provisions Are Arbitrary and Capricious ........... 26

        1.  Set-Aside ......................................................................................................... 27

        2.  Service Requirements Criteria ....................................................................... 29

        3.  Other Provisions ............................................................................................. 32

    D.  The Set-Aside Violates Notice-and-Comment Requirements ................................... 35

II.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ...................... 37

    A.  The FY 2026 NOFO Is Forcing CoCs to Make Impossible Choices, Draining Resources, and Fracturing Relationships ................................................................. 37

    B.  Concluding the Local Application Process Will Cause Long-Term and Irreversible Consequences as Programs Withdraw and Begin to Wind Down .......... 39

    C.  Awarding Funds Under the FY 2026 NOFO Would Cause Tremendous Harm to Plaintiffs, Their Members, and Communities .......................................................... 40

III. The Balance of Equities and the Public Interest Favor Plaintiffs ........................... 41

Conclusion ....................................................................................................................... 42

ii

**INTRODUCTION**

The Department of Housing and Urban Development (HUD) has once again taken action to radically upend the Continuum of Care (CoC) program, the federal government's flagship program to address homelessness. It has issued a notice of funding opportunity (NOFO) for FY 2026 that categorically withholds funding for a significant number of existing permanent housing projects, no matter how successful, and that pushes unproven and harmful approaches—all contrary to Congress's design. If implemented, this NOFO would threaten to force 97,000 people or more back into homelessness.

This Court recently set aside NOFOs for last year that would have stripped funding from permanent housing projects and pushed mandates to participate in services, contrary to HUD's longstanding and proven "Housing First" approach. This new NOFO is more of the same. It is riddled with unlawful provisions—any one of which is reason enough alone for the Court to block HUD from proceeding under it.

Most concerningly, without authorization, the FY 2026 NOFO sets aside a whopping $1.3 billion—nearly one-third of available funds—for new projects only, despite Congress's command that appropriated funds be available to renew existing projects. Worse, the NOFO heavily prioritizes new transitional housing and supportive-services-only projects for that $1.3 billion set-aside: New permanent housing projects can receive a share only in the unlikely event that money remains after HUD makes awards to *all* transitional housing and supportive-services-only projects that applied. This approach flies in the face of Congress's express requirement that incentives like that be available only to two specified permanent housing activities that Congress deemed to have proven effective, unless HUD undertakes notice and comment and determines, based on research, that other strategies have also proven effective—a step HUD has never taken.

1

The NOFO also adopts a host of selection criteria that will effectively force communities to abandon evidence-based strategies in favor of unproven, ineffective, and even harmful ones. And it forces grantees to agree to comply with requirements that have little or nothing to do with the CoC program—including by committing to adhere to executive orders that, among other things, seek to eradicate lawful diversity, equity, and inclusion initiatives; reject transgender and nonbinary individuals' right to safely exist; and coerce jurisdictions to help with federal immigration enforcement.

This new NOFO is threatening devastating harm. If HUD makes awards under it, countless programs will lose funding they rely on to house vulnerable members of their communities—forcing them to reduce or even shut down programs, lay off staff, and end the stable housing for the people they serve. Even before then, the NOFO threatens irreversible consequences. As communities have digested the NOFO's byzantine provisions and gamed out how to respond, some providers have realized there is no viable path forward and are already withdrawing from the program—forcing some Plaintiffs and members to divert resources to identify and train other organizations that can step in. These problems will multiply by August 11, the date by which local CoCs—the bodies responsible for submitting an application to HUD on behalf of their entire community—must announce which projects they will include in their communities' applications. CoCs, including Plaintiffs and their members, will have to make impossible choices by then about which existing projects to prioritize for the limited funding that HUD has made available, and which to sacrifice. In addition to damaging CoCs' relationships with critical partners, the announcement of these choices will sound the death knell for some projects, and cause them to act accordingly—in some cases, halting new enrollments, laying off staff, and beginning to transition formerly homeless individuals and families out of their homes.

2

Plaintiffs respectfully request that the Court preliminarily stay and enjoin HUD from implementing the FY 2026 NOFO, and that it grant this relief by August 10. Relief by then is necessary to protect Plaintiffs and their members from having to finalize the results of their local competitions and thereby set off cascading consequences for the projects that CoCs were forced to exclude and for the people those projects serve. Plaintiffs also intend to request that the Court set an expedited schedule for summary judgment so that the Court can conclusively adjudicate the unlawfulness of the FY 2026 NOFO as quickly as possible and require HUD to proceed under a lawful NOFO that faithfully implements the program that Congress created.

## BACKGROUND

### A.  The CoC Program

#### 1.    Congress designed the CoC program to implement a community-driven approach to ending homelessness

Congress enacted what became known as the McKinney-Vento Homeless Assistance Act in 1987 to establish a coordinated federal response to homelessness, and the HEARTH Act later amended that Act to formally create the Continuum of Care (CoC) program. Pub. L. No. 100-77, § 102, 101 Stat. 482, 484-85 (1987); *see also* Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, Pub. L. No. 111-22, §§ 1301-1306, 123 Stat. 1632, 1680–96 (2009), *codified at* 42 U.S.C. §§ 11381–11388. The CoC program funds a variety of projects that support homeless individuals and families, including by providing housing, rental assistance, and supportive services that help participants maintain housing long-term—such as childcare, job and life skills training, healthcare, substance use treatment, and trauma counseling. 42 U.S.C. §§ 11360(29), 11383. Today, the CoC program is the largest federal grant program dedicated to addressing homelessness.

3

The statute supports a local, community-based approach to addressing homelessness. To that end, the statute recognizes local or regional "continuums of care"—coalitions composed of representatives of various entities involved in addressing homelessness as well as people with lived experience of homelessness—that are responsible for coordinating local strategies to address homelessness within their geographic areas. *See* 42 U.S.C. § 11360a(a); *see also* 24 C.F.R. §§ 578.3, 578.5(a). Those continuums apply for funding on behalf of the whole community. 42 U.S.C. § 11360a; *see also* 24 C.F.R. § 578.7. In particular, each continuum, or "CoC," must designate a "collaborative applicant" to run a local competition to determine what projects to seek funding for and then submit a CoC-wide application to HUD on behalf of the entire geographic area. 42 U.S.C. §§ 11360a(a), (f); *see also* 24 C.F.R. § 578.9. Projects generally must apply through this locally run competitive CoC process and cannot apply on their own. *See* 42 U.S.C. § 11382(i) (permitting "solo" applications only where an entity "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner"). HUD then awards funds through a national competition that considers criteria that are largely based on the CoC's application overall. *See id.* §§ 11386a(b)(1), (b)(2).

### 2. The statute prioritizes permanent housing

In creating the CoC program, Congress prioritized permanent housing. A stated purpose of the HEARTH Act was "to establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." Pub. L. No. 111-22, § 1002, 123 Stat. at 1664, *codified at* 42 U.S.C. § 11301 Note. To that end, the Act establishes minimum amounts that HUD must allocate to permanent housing projects for certain communities. *See* 42 U.S.C. §§ 11386b(a), (b). And it also requires HUD to "provide bonuses or other incentives" for activities "that have been proven to be effective at reducing homelessness," and to consider "the extent to which the recipient will . . . incorporate" such activities when awarding grants. 42

4

U.S.C. §§ 11386b(d)(1)–(2), 11386a(b)(1)(B)(iv)(II). Congress identified two—and only two—such "proven" strategies, and both are permanent housing strategies: "permanent supportive housing for chronically homeless individuals and families" and, for families, "rapid rehousing"[1] paired with services to help improve stability and incomes. *Id.* §§ 11386b(d)(2)(A), (B). Congress authorized HUD to identify other proven effective strategies "based on research and after notice and comment to the public," *id.* § 11386b(d)(2)(C), but HUD has never used this process and therefore has never identified additional strategies eligible for incentives.

### 3. The statute protects renewal funding

Congress also took steps to protect the ability of successful projects to obtain renewal funding. For one, in establishing the "estimated grant amount" for each CoC's geographic area, the statute ensures that that amount must be at least enough "to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that area. 42 U.S.C. § 11386a(b)(2)(B)(iii).

The statute also provides special protection for existing projects that provide permanent housing. The Act specifies that appropriated funds "shall be available for the renewal of contracts" for certain costs "associated with permanent housing projects"—thereby ensuring that permanent housing projects have an opportunity to compete for all appropriated funds. 42 U.S.C. § 11386c(b). And it cabins HUD's discretion to refuse to renew existing permanent housing projects. The statute identifies two—and only two—factors that HUD must consider when determining whether to renew a permanent housing project: (1) whether "there is a demonstrated need for the project" and (2) whether it "complies with program requirements and appropriate standards of housing quality and habitability, as determined by [HUD]." *Id.*

---

[1] Rapid rehousing is a type of permanent housing. 24 C.F.R. § 578.3.

5

### 4.    Congress appropriates FY 2026 funding for the CoC program

For FY 2026, Congress has appropriated over $4 billion for the CoC program. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399 (2026 Appropriations Act). The 2026 Appropriations Act establishes some new requirements for FY 2026 awards. It set concrete deadlines: HUD was required to issue a NOFO for those funds by June 1, 2026, and must make awards by December 1, 2026. *Id.* at 400. The Act also requires HUD to make a significant portion of FY 2026 awards based on the projects that the local continuums of care select in their local competitions, without those projects needing to compete against projects in other geographic areas. In particular, HUD must "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"—that is, at least 60 percent of the amount needed to provide one-year renewals of each CoC's expiring grants—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" *Id.* at 399.

The 2026 Appropriations Act also authorizes funding recipients, when implementing the program, to "establish preferences for elderly individuals or families" and for "disabled individuals or families as defined by [42 U.S.C. § 11360(10)]"—a definition that covers people with a wide range of disabilities, including physical, mental, emotional, and developmental impairments, impairments arising from substance use, and HIV/AIDS. *Id.* at 401; *see also* 42 U.S.C. § 11360(10). Neither the 2026 Appropriations Act nor any other statute authorizes HUD or funding recipients to establish priorities for people with physical or developmental disabilities over people with other disabilities. On the contrary, binding HUD regulations bar HUD funding recipients from "subject[ing]" individuals "to discrimination" based on "handicap"—which the regulations define to include both physical and mental disabilities, including substance use disorder. 24 C.F.R. §§ 8.3, 8.4(a).

### B. HUD's FY 2026 NOFO

On June 1, 2026, HUD issued the NOFO for FY 2026 CoC funding. *FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO*, CPD-2600-DC-0025 (HUD June 1, 2026), https://perma.cc/RUD8-XHJB (NOFO) (attached as Exhibit A). Although it issued the NOFO, it did not—and still has not—posted the detailed instructions or actual application with the specific questions that CoCs must answer, nor has it informed CoCs of the amounts for which they are eligible to apply. Declaration of Ann Marie Oliva ¶ 39 (Oliva Decl.) (attached as Exhibit B). CoCs and local providers have submitted many questions about unclear and contradictory aspects of the NOFO, but HUD has left those questions unanswered for weeks. *Id.* ¶ 39.

The new NOFO once again threatens to upend the CoC program. Through a complex web of unlawful and unreasoned provisions (Challenged Provisions), HUD has created a selection process that categorically cuts off renewal funding for a significant number of projects, forces communities to abandon proven strategies, and otherwise disqualifies or disadvantages projects on improper grounds.

#### 1. Overview of the selection process

The NOFO sets forth an extraordinarily complex selection process. That process includes four stages of review that look at both each CoC's application overall and the individual projects included within those applications. First, at the "threshold review" stage, HUD determines if each individual project is eligible for funding on a pass/fail basis. NOFO at 59. The NOFO identifies statutory and regulatory requirements that projects must satisfy at this stage, but also imposes additional policy-based criteria. *Id.* at 58–69.

Second is a "merit review" stage. *Id.* at 69. This step evaluates the CoC overall, not individual projects—but the score each CoC receives then factors into a separate score that HUD

7

assigns to individual projects. *See id.* at 90. At this step, HUD scores each CoC by assigning points for various "merit criteria" that generally look to the CoC's approach to homelessness and the overall composition of the projects within its application. As a result, projects on a CoC's application are interdependent, and if a CoC includes disfavored projects on its application, that can drag down the entire CoC's score and thus reduce the entire community's chances of receiving funding.

Third, HUD conducts a "risk review." At this step, HUD looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project"—but that, as explained further below, in reality attempt to leave HUD with free rein to reject projects on virtually any ground. *See id.* at 86. Under the NOFO, HUD purports to retain discretion to reject awards that do not pass "risk review." *Id.* at 87.

Finally, the NOFO states that—after all the other steps—HUD may also consider additional factors like "the overall projected impact on the … priorities in this NOFO." *Id.* The NOFO states that, "[t]o the extent allowed by law, HUD may exercise its discretion" to make or reject awards based on these additional factors. *Id.*

Layered on top of this, the NOFO establishes a waterfall that designates which types of projects will be funded first. *See id.* at 88–89. Broadly speaking, the NOFO establishes a two-tier system for project applications. Under that system, each CoC's application provides a priority listing of projects, which are grouped in a "Tier 1" and "Tier 2," with Tier 1 being the higher priority. After allocating funds for certain grants for CoC administration, HUD will next consider the projects that CoCs listed in Tier 1. *See id.* at 88. Those projects are not subject to "merit review" and do not compete against other CoCs' projects. Rather, projects in Tier 1 will be funded so long as they pass threshold review, and so long as HUD does not disqualify them based on the risk review or the other additional factors. In the 2026 Appropriations Act,

8

Congress required that, for FY 2026 funding, Tier 1 be at least 60 percent of each CoC's annual renewal demand, *i.e.*, at least 60 percent of the amount needed to renew for one year all expiring grants in the CoC's area. *See* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399; 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(b)(2). The NOFO sets the Tier 1 amount at the statutory minimum. NOFO at 90.

The subsequent levels of the waterfall are all at Tier 2 and cover different types of projects. Tier 2 projects are subject to "merit review" in addition to the other review steps, and those projects compete nationally. At the "merit review" stage, Tier 2 projects receive individual project scores that take into account three factors: the score the CoC received at the "merit review" stage (worth 50 percent of the project's score), how highly the project was ranked in the CoC's application (worth 40 percent of the project's score), and whether the project mandates participation in supportive services (worth 10 percent of the project's score). *Id.* at 90. That score then factors into which projects receive funding. In particular, at each level of the waterfall after Tier 1, projects are generally selected in order of score, unless they are disqualified based on HUD's review of "risk" or additional factors. *See id.* at 89.

### 2. A massive set-aside for new transitional housing and supportive-services-only projects would defund permanent housing and renewals

The FY 2026 NOFO sets aside $1.3 billion—nearly a third of the available funding—for new projects only (Set-Aside). NOFO at 35–36. By setting aside these funds for new projects only, the NOFO categorically makes existing projects ineligible for that funding. Given the size of the Set-Aside, the inevitable result is that many effective existing projects will not be renewed, threatening to force tens of thousands of people back into homelessness.

Moreover, HUD designed the $1.3 billion set-aside to go principally or exclusively to new transitional housing and supportive-services-only projects, and not permanent housing.

9

Under the selection process that the NOFO establishes, HUD will first fund *all* transitional housing and supportive-services-only projects that apply. *Id.* at 89. Then, if and only if any of the $1.3 billion remains, HUD will allocate funds to other types of new projects (such as permanent housing). *See id.* In other words, transitional housing and supportive-services-only projects receive funding first, even if permanent housing or other projects score higher on merit-based criteria. This set-up creates a significant incentive for CoCs to apply for transitional housing and supportive-services-only projects—even if those projects are less effective or less suited to local needs—as CoCs are otherwise unlikely to receive any portion of the $1.3 billion set-aside. Under the HEARTH Act, HUD can offer incentives like that only if it first determines—"based on research and after notice and comment to the public"—that the incentivized activity has "proven effective" at reducing homelessness. 42 U.S.C. § 11386b(d)(2)(C). HUD has never identified transitional housing or supportive-services-only projects as proven strategies pursuant to that required process.

### 3. Selection criteria effectively force communities to abandon proven strategies

The NOFO contains a host of criteria that, individually and in combination, effectively force communities to defund proven strategies in favor of unproven and ineffective ones. Among other things, the NOFO pushes CoCs to abandon the proven "Housing First" approach—which prioritizes providing housing to people without any preconditions like sobriety, employment, or participating in treatment or other services—and to impose service requirements instead; to stop all harm reduction activities in their communities; and to promote unproductively punitive law enforcement responses to homelessness. *See* NOFO at 28–34. The NOFO broadly warns that applications "must support th[ose] goals," *id.* at 11, and also establishes specific criteria advancing them.

### a. *Criteria mandating service requirements*

Various NOFO criteria (Service Requirements Criteria) pressure CoCs to abandon "Housing First" and instead impose preconditions for people to obtain housing. The NOFO proclaims (incorrectly) that "'Housing First' has been a profound failure." NOFO at 28. Without grappling with the considerable evidence that Housing First models are effective, *see* Oliva Decl. ¶ 101, the NOFO imposes a host of criteria that push CoCs to put forth projects that mandate services—and exclude projects that do not. The NOFO makes mandating services the largest single scoring factor affecting projects' likelihood of selection within each level of the waterfall at Tier 2. In particular, out of the 100 possible points available to a project, projects will receive up to 10 points if "they have or will incorporate supportive service participation requirements." NOFO at 90. By comparison, projects can receive a total of 50 points for their CoC's score on the dozens of other merit criteria combined. *See id.*

In addition, multiple merit criteria that govern the CoC's score pressure CoCs to favor projects that eschew Housing First approaches. For instance, the NOFO assigns points for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, *id.* at 79; for demonstrating certain numbers of CoC-funded units mandate substance abuse treatment as a condition of participation in the program, *id.* at 78; and for not restricting CoC-funded housing projects from requiring treatment or sobriety as a condition of assistance, *id.* at 85.

Multiple factors at the threshold review stage also pressure CoCs to put forth projects that mandate services, to reduce the risk that projects will be disqualified at the outset. In particular, the NOFO includes threshold criteria that look to the results that the project will achieve—criteria that necessarily involve subjective assessments and that HUD will evaluate through its pro-service-mandates lens. *See, e.g.*, *id.* at 63–64 (assessing whether project "will result in at

11

least 20 hours per week of engagement in services, activities or employment for all participants"); *id.* at 67–68 (looking to whether the services offered "will ensure" certain outcomes). Given the NOFO's strong signals that HUD does not believe Housing First can achieve favorable outcomes, these criteria put pressure on CoCs to select projects that mandate services to increase their chances that HUD will consider them to satisfy these threshold criteria.

### b.   *Criteria seeking to eliminate harm reduction approaches to drug use*

The NOFO's threshold and scoring criteria also include several provisions (Anti-Harm Reduction Criteria) that seek to eliminate harm reduction programs generally, even independently funded ones. Harm reduction is an approach to reducing the negative consequences associated with drug use through public health interventions like needle exchanges and methadone treatment. Harm reduction has been shown to reduce the risk of overdose and to improve housing stability and health outcomes, particularly when compared to abstinence-contingent services. Oliva Decl. ¶¶ 106–07. Nonetheless, the NOFO pressures CoCs and applicants to end such programs.

For example, to get 10 points on merit review, a CoC must "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" NOFO at 85. In other words, to avoid losing out on 10 points, CoCs may not seek funding for any projects that operate harm reduction services, even with the provider's own, non-federal funding.

At the threshold review stage, the NOFO also disqualifies applicants that do not certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under

12

their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863" (Safe Drug Use Certification). NOFO at 60; *see also id.* at 108. While the condition states only that grantees may not engage in activity that other laws already prohibit, Defendants have an expansive view of what those laws prohibit. For instance, the NOFO states that this condition "is not a requirement that program participants ... be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement"—a clarification that strongly implies that HUD deems it a violation to continue serving participants with more than one violation. *See id.* at 60, 85, 108. This certification—and the threat of resulting liability—deters lawful harm reduction activities.

### c. *Criteria promoting unproductively punitive law enforcement responses to homelessness*

Various NOFO criteria (Law Enforcement Criteria) pressure CoCs—and states and localities—to adopt and express support for unproductively punitive law enforcement responses to homelessness. For example, various criteria require projects to cooperate with law enforcement in enforcing local laws prohibiting public camping and public drug use and in connecting unhoused people with services—even though in some communities a law enforcement-based approach can erode trust and make providers less effective. *See* NOFO at 65, 80; Oliva Decl. ¶ 110. In addition, to receive certain merit points, CoCs also cannot take actions that (in HUD's judgment) "interfere with" local efforts to advance the objectives of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)" (Local Policies Criterion). NOFO at 80–81. That restriction threatens to unconstitutionally disadvantage CoCs that advocate against the enforcement-centered local policies that the NOFO favors.

13

**4.      Other provisions disqualify or disadvantage applicants on improper grounds**

The NOFO also includes other provisions that disqualify or disadvantage applicants on improper grounds.

### a.      Amorphous "risk review" and additional criteria through which HUD threatens to reject projects on virtually any grounds

The NOFO provides that HUD retains discretion to reject applications based on a host of amorphous factors ("Risk Review" and "Additional Factor" Criteria) that effectively give HUD free rein to deny awards on virtually any grounds. For one, the NOFO states that all projects must pass "risk review," which looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project." NOFO at 86. The NOFO provides various undefined criteria for assessing that, such as the applicant's "[a]bility to promote self-sufficiency and economic independence," as well as criteria that look to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal" and with no explanation of what HUD deems "illegal." *See id.* at 87. The NOFO also states that HUD will rely on potentially unverified information, such as "news reports," to assess applicants' past performance. *Id.* This "risk review" gives HUD substantially more unfettered discretion than ever before to reject an application on these grounds alone.

On top of that, the NOFO reserves to HUD the option to consider—and reject projects based on—amorphous additional factors after completing all other review steps. *Id.* at 87. These other factors include things like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a "[b]road range of recipients beyond recurrent recipients." *Id.* Although the NOFO says that HUD will

14

consider these additional factors "to the extent allowed by law," it does not explain what HUD believes that means.

The unclear and undefined "risk review" criteria and additional factors further distort CoCs' decision-making in selecting the projects to include on their applications. Rather than focus just on projects' effectiveness and ability to meet local needs as Congress intended, the amorphous criteria put additional pressure on CoCs to screen out projects that HUD might reject for ideological reasons (such as a history of promoting diversity, equity, and inclusion) and to otherwise conform to HUD's wishes.

### b. *Criteria adopting a conception of "self-sufficiency" at odds with the statute*

The NOFO also adopts multiple criteria (Self-Sufficiency Criteria) that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"—which the NOFO (improperly) defines as "the ability to meet basic needs, including a place to live, *without public or private assistance*." NOFO at 6 (emphasis added). In particular, for renewal projects to pass threshold review, the NOFO states that HUD will assess the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." *Id.* at 61. Projects that fail HUD's assessment will be disqualified from consideration. Similarly, at the "Risk Review" stage, HUD identifies a project's "[a]bility to promote self-sufficiency and economic independence" as a "sufficient and independent basis" to reject an application. *Id.* at 87. In imposing these criteria—and the conception of "self-sufficiency" they adopt—HUD disregards the statute's express support for helping people get assistance from mainstream programs (like SNAP or Medicaid). *See* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(A)(v), 11386a(b)(1)(D), 11386b(d)(2)(B). It also ignores the realities of serving

15

communities with disabilities or other needs that make it difficult or impossible to achieve the type of self-sufficiency the NOFO envisions.

### c. *Preference for people with particular types of disabilities*

The NOFO also announces a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority). In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." NOFO at 30. Based on that discriminatory premise, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities and creates a second-class tier of disabilities that excludes and harms individuals with mental health disabilities including substance use disorders. Although the NOFO does not award points based on this priority, the statement that this population "should be prioritized" pressures applicants to do just that, given that HUD requires applications to "support the goals of this NOFO" and retains discretion to reject or select projects based on their "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected." *Id.* at 11, 87.

### d. *Inequitable eligibility for CoC Bonus funding*

The NOFO also systematically disadvantages communities with higher relative need in favor of communities with lower relative need though arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits). Bonus funding is an amount that CoCs can apply for on top of their statutorily defined need. In particular, the statute requires HUD to take account of the "need within the geographic area for homeless services" when making awards and provides that this need amount is either an amount determined by a regulatory formula based on factors related to

16

population size and poverty or the amount "necessary to provide 1 year of renewal funding for all expiring" CoC grants, whichever is higher. 42 U.S.C. §§ 11386a(b)(2)(B), (c)(1); *see also* 24 C.F.R. § 578.17(a)(3). Under binding regulations, this need amount is the base amount CoCs can apply for—but CoCs can also apply for any "available bonuses" on top. 24 C.F.R. § 578.17(b)(3)–(4).

The FY 2026 NOFO provides for a "CoC Bonus" for "new project applications" but sets inequitable limits on the amounts for which CoCs can apply. NOFO at 11–12. In particular, the NOFO provides that each CoC can apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need—but further establishes that, absent special circumstances, CoCs can apply for a minimum of $500,000 and a maximum of $5 million in bonus money. *Id.* As a result, the amounts CoCs can apply for bear little relation to their actual need. With these inequitable Bonus Limits, CoCs with lower relative need are eligible for extra funding equal to as much as 61.2 percent of their need, while CoCs with higher relative need are eligible for an amount equal to only as little as 3.5 percent of their need. Oliva Decl. ¶ 115. These Bonus Limits will cause communities with higher rates of homelessness—communities that represent more than 40 percent of the total homeless population—to lose access to nearly $93 million in funding. *Id.*

### e. *Non-Statutory Threshold Criteria that improperly disqualify Tier 1 projects*

The NOFO also includes threshold review criteria that have no grounding in statutory or regulatory requirements (Non-Statutory Threshold Criteria) and that improperly disqualify Tier 1 projects. In the 2026 Appropriations Act, Congress required that HUD award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of

17

funding, CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. This corresponds to the projects that CoCs list on "Tier 1" of their applications.

Despite the 2026 Appropriations Act's mandate, the NOFO requires *all* new projects, including those listed in Tier 1, to pass a threshold review that is not limited to requirements imposed by statute and regulation, but rather also includes multiple policy-based criteria imposed by the NOFO alone. For example, to obtain certain points toward meeting the minimum required to pass threshold review, projects must have a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark; must provide services in a way "that will result in" *all* program participants participating in services at least 20 hours per week; must "partner[] with first responders and law enforcement" and "cooperate … with the enforcement" of public camping and public drug use laws; and must show that the support offered will help participants achieve "self-sufficiency" (meaning no reliance on any public or private assistance, even from mainstream programs) within 24 months. NOFO at 6, 63–65, 67–68. These criteria threaten to disqualify projects that are eligible under the statute and regulations and that Congress mandated that HUD fund if CoCs included them in their Tier 1.

### 5. Post-award conditions impose ideological and policy restrictions that HUD lacks authority to impose

The FY 2026 NOFO requires successful grantees to agree to award conditions (Post-Award Conditions), many of which are the same as or similar to conditions that courts have repeatedly held likely invalid. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 200–01 (D.R.I. Oct. 23, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F.

Supp. 3d 863, 888–89 (W.D. Wash. 2025), *appeal filed*, No. 25-3664.[2] For one, like the FY 2025 NOFOs that this Court recently set aside, the FY 2026 NOFO requires grantees to follow a long list of executive orders, including orders targeting diversity, equity, and inclusion; the rights and identities of transgender and gender-nonconforming people; undocumented immigrants; abortion; and housing first policies (E.O. Conditions). NOFO at 106–07. In addition, the NOFO includes a post-award condition (Safe Drug Use Condition) that mirrors the Safe Drug Use Certification described above. That condition aims to deter lawful harm reduction activities and to force grantees to discontinue assistance to any participant who violates a drug-related rule more than once. Finally, in a brazen separation-of-powers violation, the NOFO also includes a provision (Judicial Restriction) that purports to restrict courts' ability to grant relief that would extend beyond the boundaries of that court's district. In particular, the NOFO provides that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective *as to such jurisdiction*." NOFO at 108 (emphasis added).

### C. The FY 2026 NOFO Threatens Devastating Harms to Plaintiffs and the Communities They Serve

If HUD is permitted to make awards under this NOFO, that will strip funding from many existing permanent housing and other projects—forcing them to shut down and withdraw support for the formerly homeless individuals and families that rely on them. The NOFO threatens to cause 97,000 people or more to lose housing. Oliva Decl. ¶ 157. The loss of housing threatens catastrophic follow-on consequences as well: exposure to extreme weather events; life-threatening infections; unmanaged chronic illnesses; predatory violence; sexual assault; and the escalation of behavioral health crises. *Id.* ¶ 10. The defunding of existing permanent housing

---

[2] Local government plaintiffs are also plaintiffs in *King County v. Turner*.

projects will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life. *Id.*

Moreover, Plaintiffs and their members face harm even more imminently, during the application phase. Those harms were not immediately apparent but have become clear as communities have parsed the extraordinarily complex NOFO and played out how they can respond. *Id.* ¶ 40. CoCs are forced to spend their limited resources responding to this unlawful NOFO, and are having to make devastating choices about which projects to prioritize for funding. Because the Set-Aside earmarks almost all Tier 2 funding for new projects only, existing projects that CoCs rank in Tier 2 are unlikely to receive funding. *Id.* ¶ 133. CoCs must decide which projects to try to protect and which projects to sacrifice—a task made all the more complicated by HUD's thinly veiled threats to reject even Tier 1 projects if HUD sees something it does not like in conducting its amorphous "risk" and additional-factor review. *Id.* ¶ 138. Worse, the decisions CoCs make now will have long-lasting consequences well beyond FY 2026's funding: If a CoC takes a gamble and seeks funding for a likely disfavored project, a rejection will not only reduce the funding the community gets in FY 2026, but also reduce the amounts it is even eligible to apply for in the years after that. *Id.* ¶ 136. Making these impossible choices is draining resources, causing distress, and jeopardizing the goodwill CoCs have in their communities. *Id.* ¶¶ 141–44.

The problem will get worse by August 11, the date by which CoCs must announce the results of their local competitions. *See* NOFO at 96. At that point, some providers who are not selected for their CoC's application, or who are ranked lower down, will begin preparing to shut down their programs, given the certainty or near certainty that those projects will not receive

20

funding. Oliva Decl. ¶¶ 145–48. This will include stopping enrollments and freezing wait lists, preparing clients for the upcoming loss of housing, and laying off staff. *Id.* ¶ 149.

Some providers are already withdrawing from the program because they see that they are unlikely to be selected or because they cannot operate under the NOFO's unlawful ideological or other restraints. *Id.* ¶¶ 126–28, 131–32. This makes CoCs' homelessness response systems less effective and diverts CoCs' scarce resources away from their primary mission to managing this crisis. *Id.* ¶ 126. CoCs must spend their time finding, and in some instances training, suitable organizations to fill in to meet the community's needs. *Id.* ¶ 130. The further along the FY 2026 NOFO process gets, more providers are likely to drop out—particularly once CoCs announce their local competition results. *Id.* ¶ 132. Providers who make that decision are likely to walk away for good given all the resources it takes for an organization to pivot. *Id.*

## LEGAL STANDARDS

The Administrative Procedure Act authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant a preliminary injunction. *See* The Judiciary Act, ch. 20, § 11, 1 Stat. 73, 78 (1789). The same standards apply to both types of preliminary relief. *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025) ("Although not definitively decided by the Supreme Court or the First Circuit, it is accepted that Section 705 'stays' under the APA turn on the same factors as preliminary injunctions." (internal quotation marks and citation omitted)).

To obtain preliminary relief of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely "irreparable harm … absen[t] preliminary relief," (3) "that the balance of equities tips in [the movant's] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the government

21

is the opposing party," the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs satisfy all four requirements.

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on the Merits

The FY 2026 NOFO is unlawful for a host of different reasons, any one of which alone is sufficient ground to grant Plaintiffs preliminary relief pausing the NOFO.

#### A.  The FY 2026 NOFO Exceeds Defendants' Authority

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority . . . violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (cleaned up). Many elements of the FY 2026 NOFO exceed Defendants' statutory authority.

To begin, no statute authorizes Defendants to set aside funds for new projects, let alone new transitional housing and supportive-services-only projects, as the Set-Aside does. The statute requires HUD to award funds "based on criteria" that HUD establishes pursuant to the statute. 42 U.S.C. § 11386a(a). It does not permit HUD to categorically limit certain kinds of projects regardless of how they would rank under the criteria—and it certainly does not permit HUD to divert funds away from the renewals and permanent housing that Congress prioritized. *See supra* Background section A.2–A.3.

Nor does any statute authorize HUD to impose many of the other selection criteria and conditions—including the Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, Judicial Restriction, and Non-Statutory Threshold Criteria for Tier 1 projects. The statute prescribes a detailed list of "[r]equired criteria" HUD must consider when awarding

grants—including things like the applicant's "previous performance . . . regarding homelessness," its plan for reducing the existence and duration of homelessness, its coordination with other entities, and its ability to obtain supplemental funding. 42 U.S.C. § 11386a(b)(1). And the statute identifies the conditions to which grantees must agree—things like involving unhoused individuals in project operations and ensuring children are enrolled in school. *Id.* § 11386(b). HUD may also establish additional criteria and conditions to carry out the program "in an effective and efficient manner," *id.* §§ 11386a(b)(1)(G), 11386(b)(8), but the NOFO's criteria and conditions do nothing to serve efficacy and efficiency goals.

Indeed, in many instances, they advance wholly unrelated ideological and policy goals on topics like race, gender identity, abortion, or "harm reduction" activities the grantee conducts outside the scope of the funded program. *See, e.g.*, NOFO at 85, 106. Such criteria and conditions are not even "of the same kind" as the ones the statute specifies—all of which involve ways to effectively address homelessness—and the statute cannot be read to authorize conditions that are different in kind from the ones the statute imposes. *King Cnty.*, 785 F. Supp. 3d at 886 (concluding that CoC statute did not authorize DEI, gender-related, and other ideological conditions).

## B. The FY 2026 NOFO Is Contrary to Law

Multiple provisions of the FY 2026 NOFO are also outright contrary to binding law.

### 1. Set-Aside

The Set-Aside conflicts with the statute in three separate ways. First, it conflicts with the requirement in 42 U.S.C. § 11386c(b) that funds appropriated for the CoC program "shall be available for the renewal of [permanent housing] contracts" for terms of specified durations. The Set-Aside limits the amounts that can be awarded for existing permanent housing—and thereby

23

unlawfully ensures that "[t]he sums" appropriated will not in fact "be available" to renew permanent housing contracts.

Second, the Set-Aside conflicts with the same provision's mandate that HUD "determine whether to renew" permanent housing projects "on the basis of" the CoC's certification as to two (and only two) things: that "there is a demonstrated need" and that "the project complies with program requirements and appropriate standards of housing quality and habitability." 42 U.S.C. § 11386c(b). The Set-Aside ensures that HUD will determine whether to renew permanent housing projects based not on the two statutorily identified factors but based on whether the limited funding HUD has made available for existing projects has been exhausted.

Third, the Set-Aside impermissibly creates incentives for new transitional housing and supportive-services-only projects—contrary to statutory limits on when HUD can provide such incentives. In particular, the HEARTH Act requires HUD to provide "incentives" for specified activities that have proven effective in combatting homelessness, and it identifies two (and only two) strategies that Congress deemed to have "proven to be effective"—two types of permanent housing. *Id.* § 11386b(d)(2)(A)–(B). The provision also allows HUD to identify additional proven strategies "based on research and after notice and comment to the public." *Id.* § 11386b(d)(2)(C). But HUD has never done so. The Set-Aside therefore violates this provision by providing an unlawful incentive for communities to apply for these unproven projects.

### 2. Discriminatory Disability Priority

The Discriminatory Disability Priority conflicts with multiple statutes and regulations by directing projects and CoCs to "prioritize[]" individuals with physical and developmental disabilities—but not mental health disabilities—for permanent supportive housing. NOFO at 30. This express preference for some types of disabilities over others violates the Rehabilitation Act of 1973, 29 U.S.C. § 794. And projects that follow this directive would engage in discrimination

24

in violation of the Americans with Disabilities Act. 42 U.S.C. §§ 12131–12134, 12181–12189; *see Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 149 (D. Mass. 2004) (holding that the ADA "forbids discrimination between mentally disabled and physically disabled people").

The Discriminatory Disability Priority is also contrary to HUD's own regulations, which prohibit excluding otherwise eligible individuals "on the grounds that they do not have a *particular* disability," 24 C.F.R. § 578.93(b)(7) (emphasis added), and which bar grantees from discriminating on the basis of disability, which the regulations broadly define to include not only physical and developmental disabilities but also mental health disabilities and addiction. *See* 24 C.F.R. § 8.4(b)(1)(ii) (barring grantees from "afford[ing] a qualified individual with handicaps an opportunity to participate in" the grant-funded service "that is not equal to that afforded to others"); *see also id.* § 9.130(b)(1)(ii) (same); *id.* § 8.3(a)(2) (defining disability); *see also id.* § 9.103 (same).

### 3.    Non-Statutory Threshold Criteria

As applied to Tier 1 projects, the Non-Statutory Threshold Criteria conflict with the 2026 Appropriations Act's requirement that HUD award a specified amount of funds "based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, 140 Stat. at 399. This provision requires HUD to make awards to projects that CoCs place in Tier 1 of their community-wide applications, so long as those projects meet statutory requirements. Yet the Non-Statutory Threshold Criteria threaten to disqualify Tier 1 projects even if they meet statutory requirements.

### 4.    E.O. Conditions

The E.O. Conditions are contrary to law insofar as some require grantees to comply with executive orders imposing the view that sex is binary and immutable and that people's gender identities should not be recognized. *See Defending Women from Gender Ideology Extremism and*

25

*Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025) (Grantmaking Executive Order). In particular, the Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, which includes gender identity. 42 U.S.C. §§ 3604(a)–(b), 2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106. Yet these E.O. Conditions would require grantees to commit to treating sex as binary— which would apparently preclude them from acknowledging transgender individuals' gender identity or treating them in accordance with that identity. Thus, these E.O. Conditions would improperly compel organizations to violate the Fair Housing Act, Title VII, and/or HUD's nondiscrimination regulations.

### C. The FY 2026 NOFO's Challenged Provisions Are Arbitrary and Capricious

This Court recently held that, in withdrawing funding from proven permanent housing approaches and abandoning Housing First in the FY 2025 NOFOs, HUD had acted arbitrarily and capriciously. *Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886, at *3–4 (D.R.I. June 29, 2026). The FY 2026 NOFO suffers from the same problem.

Foundational principles of administrative law forbid agencies from making "arbitrary" or "capricious" decisions. 5 U.S.C. § 706(2). For an agency action to pass muster, the agency must have offered "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n of the U.S. v. State*

26

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* An agency must genuinely consider relevant evidence and factors; merely "stating that a factor was considered— or found—is not a substitute for considering or finding it." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (cleaned up). And when an agency changes policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009), and the agency "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (cleaned up). The FY 2026 NOFO flunks these basic standards.

### 1. Set-Aside

First and foremost, in establishing the Set-Aside, HUD overlooked the reality that categorically cutting off funding for existing permanent housing projects will cause those projects to shutter and force formerly homeless individuals and families out of their homes. HUD suggests that these individuals can move to transitional housing, *see* NOFO at 36, but that overlooks the hurdles that will make that impossible in many instances. For one, statutory and regulatory eligibility requirements block many permanent housing residents from transferring to transitional housing. Because transitional housing programs can only serve individuals who meet the definition of "homeless" in statute and regulation, permanent housing residents do not qualify unless they suffer the trauma of becoming homeless again. *See* 24 C.F.R. § 578.3; 42 U.S.C. § 11302(a)(1)–(4); Oliva Decl. ¶¶ 88–91. In addition, communities do not have sufficient

existing shelters, let alone other temporary housing options, to serve everyone who will be thrust out of permanent housing and into homelessness once again—and creating those would take significant time and resources to establish. *See* Oliva Decl. ¶¶ 88, 93–94.

HUD also failed to consider that many existing providers would face significant barriers to offering transitional housing. In particular, providers often assist with housing by offering tenant-based rental assistance—that is, funds to subsidize rent (as opposed to providing physical units that the provider itself owns or leases). *See* Oliva Decl. ¶¶ 85–87. But binding regulations preclude nonprofit organizations from administering such rental assistance for transitional housing projects, even though they can for permanent housing projects. *Compare* 24 C.F.R. § 578.51(b), *with* 42 U.S.C. § 11383(g). Thus, by diverting funds to transitional housing, the Set-Aside makes it very difficult for nonprofits to continue serving their clients—further destabilizing the program for participants and providers alike.

Likewise, HUD did not sufficiently account for the "serious reliance interests" of providers and the individuals and families they serve. *See Regents*, 591 U.S. at 30. Plaintiffs and their members and constituents, along with countless providers around the country, developed supportive housing systems, invested significantly in building permanent housing—including with their own funds—all in reliance on the longstanding and consistent directives from HUD. *See, e.g.*, Oliva Decl. ¶¶ 25, 85–87, 93, 95, 97. And the individuals and families in permanent housing rely on the stable living environment that meets their unique needs. HUD did not adequately consider the harm that will befall them when they lose housing, or the resulting consequences for the communities in which they live. *See, e.g.*, Oliva Decl. ¶¶ 94–97. HUD also failed to consider the research showing that transitional housing is the most expensive model for individuals, and often a less effective approach to addressing homelessness. *See* Oliva Decl. ¶ 95.

HUD's proffered justifications for the Set-Aside do not hold up. HUD asserts that more transitional housing and services-only projects, and less permanent housing, will help "able-bodied people move to self-sufficiency." NOFO at 30. But it does not consider that many people in permanent housing have severe and persistent disabilities or other challenges that require the intensive support that permanent supportive housing provides and those people cannot be effectively served through transitional housing. Oliva Decl. ¶¶ 97, 111.

HUD also asserts that the NOFO will "expand competition." NOFO at 28–29. But it restricts, not expands, competition to make almost a third of the program's funding available only to limited types of projects. HUD did not consider this impact, nor did it consider the obvious alternative of allowing all projects to compete on equal footing, let alone "give a reasoned explanation for its rejection of such [an] alternative[]." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (explaining that failure to consider alternatives renders action arbitrary and capricious).

Finally, HUD asserts that the Set-Aside will restore "balance" in the CoC program. But Congress did not seek "balance"; Congress sought to promote effective strategies to address homelessness—and identified permanent housing as what had proven effective. *See* 42 U.S.C. § 11386b(d)(2)(A), (B). Setting aside Congress's goals in favor of balance for balance's sake is arbitrary and capricious. *See State Farm*, 463 U.S. at 55 (explaining that agency, when making decision, must "bear in mind" what "Congress intended … to be the preeminent factor").

### 2.    Service Requirements Criteria

The NOFO's Service Requirements Criteria are also arbitrary and capricious. As before, HUD offers reasoning that runs counter to the evidence and, as before, "gives little to no thought or analysis to the negative externalities created by its transition from a Housing First approach to one that mandates" services. *Washington v. HUD*, 2026 WL 1863886, at *4.

29

To begin, HUD's reasoning distorts or outright ignores the evidence. HUD decries the Housing First approach as a "failure" and recites statistics showing that various homelessness metrics had gotten worse since HUD implemented a Housing First policy. NOFO at 28. However, the source HUD cites attributes the rise in homelessness to factors like the "national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism"—*not* the availability of housing without service mandates.[3] *See also* Oliva Decl. ¶¶ 76–77. Indeed, Congress itself found that "a lack of affordable housing and limited scale of housing assistance programs are the primary causes of homelessness." Pub. L. 111-22, div. B, § 1002, 123 Stat. 1632, 1664 (2009). And HUD failed to consider that just days before the NOFO's release, HUD quietly published a report showing that, between 2024 and 2025, while Housing First remained HUD's approach, homelessness *decreased* by 3.3 percent.[4] *See also* Oliva Decl. ¶ 75.

Defendants likewise failed to consider the significant evidence that Housing First and voluntary services are effective. HUD itself, in 2023, highlighted a series of studies that found Housing First programs to be more effective than programs that mandate services—at boosting housing stability, quickly helping people out of homelessness, reducing costs, and more. *See* Oliva Decl. ¶¶ 98, 100–01.[5] HUD also did not consider evidence showing that requiring treatment can counterproductively cause individuals experiencing homelessness to "disengage[]

---

[3] The 2024 Annual Homelessness Assessment Report (AHAR) to Congress, HUD, v (Dec. 2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf; *see also id* at 10, 22, 34, 45, 64.

[4] The 2025 Annual Homelessness Assessment Report (AHAR) to Congress, HUD, 2 (May 2026), https://www.huduser.gov/portal/sites/default/files/pdf/2025-AHAR-Part-1.pdf.

[5] U.S. Dep't of Housing and Urban Development Office of Policy Development and Research, Housing First and Homelessness, Evidence Matters, at 11 (Spring/Summer 2023).

from critical services."[6] Disregarding these "facts and circumstances that underlay" HUD's prior longstanding support of Housing First itself renders the Service Requirements Criteria arbitrary and capricious. *See Fox*, 556 U.S. at 515–16.

HUD also fails to consider the consequences of the Service Requirements Criteria on providers and the communities they serve. Service requirements are coercive and erode client trust and choice, which can lead to client disengagement and is detrimental to Plaintiffs' missions. Oliva Decl. ¶¶ 98–99. If providers implement these service mandates to remain competitive and secure CoC funds, many people will refuse services, and providers will be forced to exit those individuals, resulting in more unhoused people—not less. *See* Oliva Decl. ¶ 99.

HUD also failed to adequately account for the impact on providers who must comply with conflicting laws. For instance, the CoC program is a vital source of funding to entities that provide housing to survivors of domestic violence and sexual assault. *See* Oliva Decl. ¶¶ 42. But those entities' programs frequently also rely on funding under the Violence Against Women Act and other federal laws that outright prohibit grantees from mandating services. 34 U.S.C. § 12351(b)(3); 42 U.S.C. § 10408(d)(2). Those providers cannot lawfully change their policies to earn the (significant) points the NOFO assigns for service requirements. And CoCs are disincentivized from including such providers in their applications because that will drag down the CoC's overall score as well, thereby jeopardizing the whole community's funding. *See* NOFO at 79, 90; *see also* Oliva Decl. ¶¶ 102–03. This systematically disadvantages domestic violence services. The NOFO clarifies that providers cannot deny assistance to an otherwise-eligible participant "on the basis or as a direct result of the fact that the participant is or has been

---

[6] *Id.* at 13; *see also* Oliva Decl. ¶¶ 99, 101.

31

a victim of domestic violence" or a related crime. NOFO at 79, 90. But it says nothing about denying assistance on the ground that a client chooses not to participate in services—and does not allow providers to earn these points if, as required by law, they decline to mandate services. *See id.*

HUD similarly did not consider that the Service Requirements Criteria would also systematically disadvantage providers and CoCs that are also funded by states, such as California, that have prohibited service or program compliance as a condition of housing. *See* Cal. Welf. & Inst. Code § 8256. HUD did not consider or address how these entities could compete under the NOFO while also complying with other binding federal and state requirements. *See* Oliva Decl. ¶ 105.

### 3.    Other Provisions

Other criteria and provisions fail arbitrary-and-capriciousness review as well.

***Law Enforcement Criteria.*** The FY 2026 NOFO provisions that pressure CoCs to adopt and express support for unproductively punitive law enforcement responses to homelessness ignore Congress's goals and lack support in evidence. To begin, Congress urged development of "constructive alternatives to criminalizing homelessness," but these provisions push criminalization. 24 U.S.C. § 11313(a)(12).

These criteria promote aggressively clearing encampments, but HUD offers no evidence that clearing encampments alone effectively transitions unsheltered individuals into housing. While HUD claims that vigorous public camping enforcement reduced the number of unsheltered individuals in Austin, NOFO at 33, HUD's cited source shows that unsheltered

32

homelessness actually increased—just with the people farther from the city center.[7] Further, HUD offers no support for its assertion that an aggressive law enforcement-focused response contributes to ending homelessness, NOFO at 33, and overlooks evidence finding that criminalization policies do not work. *See* Oliva Decl. ¶¶ 108–110. It also entirely fails to acknowledge or consider the impacts of exposing more people to criminal legal system interactions for nonviolent offenses. *Id.* ¶ 109.

*Anti-Harm Reduction Criteria.* HUD failed to provide any rational justification for the criteria that require or encourage CoCs and providers to eliminate harm reduction activities, even those conducted with their own funds. In addition to mischaracterizing studies that it claims support its new approach, HUD fails to address the significant research that demonstrates that harm reduction is effective in both preventing overdoses and addressing homelessness. *See* Oliva Decl. ¶¶ 106–07. HUD also fails to consider that the requirement that applicants not operate "illegal" safe consumption sites—with no explanation of what that means—will deter legal harm reduction efforts.

*Self-Sufficiency Criteria.* The NOFO also arbitrarily and capriciously requires projects to promote "self-sufficiency," defined in the NOFO as the ability to meet basic needs "without public or private assistance." NOFO at 6. That fails to account for Congress's direction, throughout the statute establishing the CoC program, that providers should "*promote* access to, and effective utilization of" mainstream benefits programs. 42 U.S.C. § 11381(3) (emphasis added); *see also id.* §§ 11313(a)(7), 11386a(b)(1)(A)(v), 11386a(b)(1)(D), 11386b(d)(2)(B). Further, HUD failed to consider that rewarding projects that achieve this type of self-sufficiency

---

[7]    Ben Thompson & Katy McAfee, *Austin's homeless population dispersing after 2 years of camping ban enforcement*, Community Impact (May 25, 2023), https://communityimpact.com/austin/central-austin/city-county/2023/05/25/austins-homeless-population-dispersing-after-2-years-of-camping-ban-enforcement/.

disincentivizes CoCs from serving people with severe disabilities and others facing the most obstacles to self-sufficiency and who are in greatest need of support. *See* Oliva Decl. ¶ 111.

*Discriminatory Disability Priority.* HUD relies on baseless stereotypes, not evidence, in prioritizing individuals with physical and developmental disabilities over those with mental, emotional, or substance abuse disorders. HUD suggests that "able-bodied people" can "move to self-sufficiency" while individuals with other types of disabilities cannot. *See* NOFO at 30. But it cites no evidence to support that premise. Instead, it relies on baseless stereotypes, which cannot satisfy the requirement for reasoned decisionmaking. *Cf., e.g.*, *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 160 (D. Me. 2019) (holding that defendant could not base policy decisions on stereotypes). HUD, moreover, failed to consider that grantees cannot prioritize one class of disabilities over another while also complying with federal law, HUD's own regulations, and local and state laws that prohibit unequal treatment on the basis of disability. *See supra* Section I.B.2. Nor did it consider the reliance interests of individuals who are currently in permanent supportive housing but who do not have a "prioritized" physical or developmental disability; this provision risks jeopardizing their stable housing simply based on stigma-based judgment. *See* Oliva Decl. ¶ 112.

*Amorphous "Risk Review" Criteria and Additional Factors.* HUD did not consider how the amorphous "risk review" criteria and additional factors distort the CoC competition. With these factors, HUD signals it might reject awards for virtually any reason at all. This in turn pushes CoCs to select and prioritize projects based on predictions about what HUD might reject based on ideological or other grounds. For example, these factors create cause for concern that HUD might reject applicants whose conduct the Administration disfavors—like those who "deny the sex binary in humans" or who engage in diversity, equity, and inclusion activities the Administration views as suspect. *See Improving Oversight of Federal Grantmaking*, Exec. Order

No. 14332 of August 7, 2025, 90 Fed. Reg. 38929 (Aug. 12, 2025) (mandating that grants should not promote such activities). HUD does not appear to have considered that this would in some instances push CoCs to make selections based on these irrelevant ideological considerations rather than on the project's effectiveness or community need. *See* Oliva Decl. ¶ 114.

*Bonus Limits.* HUD failed to consider that the limits on CoC Bonus funding will arbitrarily shift funding away from communities with higher relative need to communities with lower relative need. The NOFO asserts that the limits "afford[] all CoCs a more equitable opportunity to compete for bonus funds," but does not explain why it is "equitable" to allow some communities to apply for an extra 61 percent of their need while allowing others to apply for less than 4 percent of their need. *See* NOFO at 36; *see also* Oliva Decl. ¶¶ 64–66, 115.

*E.O. Conditions.* The E.O. Conditions are indistinguishable from conditions that courts, including this one, have held likely arbitrary and capricious.[8] Here, as in those cases, HUD has provided no reasoned explanation and has failed to consider important aspects of the problem. It will be difficult for grantees to understand what these conditions require of them given that executive orders typically provide instructions to federal agencies, not the public. These conditions, moreover, will improperly chill grantees from engaging in lawful activities—like recognizing people's gender identities or promoting DEI—that are inconsistent with the executive orders' announced policies. HUD did not address these consequences.

### D. The Set-Aside Violates Notice-and-Comment Requirements

On top of its other problems, the Set-Aside was also adopted "without observance of procedure required by law" and must be vacated for that reason as well. 5 U.S.C. § 706(2)(D).

---

[8] *See, e.g.*, *R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 186, 200–01; *King Cnty.*, 785 F. Supp. 3d at 888–89.

For two separate reasons, Defendants were required to undertake notice and comment before adopting the Set-Aside.

First, longstanding HUD regulations require the agency to undertake notice and comment before taking action that qualifies as a substantive rule under the APA. *See* 24 C.F.R. § 10.1. While the APA itself exempts matters relating to grants from notice-and-comment requirements, 5 U.S.C. § 553(a)(2), HUD regulations require notice-and-comment for substantive rules despite that exemption, 24 C.F.R. § 10.1. The Set-Aside constitutes a substantive rule: It categorically makes $1.3 billion unavailable for existing projects and further makes those funds unavailable for permanent housing unless all transitional housing and supportive-services-only applications have been funded first. *See* NOFO at 89. That has "binding" effect and "restrain[s] the discretion of officials and [is] therefore subject to the notice-and-comment procedures." *See Caribbean Produce Exch., Inc. v. Sec'y of Health and Human Servs.*, 893 F.2d 3, 7 (1st Cir. 1989); *accord, e.g.*, *Clarian Health West, LLC v. Hargan*, 878 F.3d 346, 358–59 (D.C. Cir. 2017) (explaining that actions with "binding effect" are "legislative rule[s]").

Second, 42 U.S.C. § 11386b(d) requires HUD to undertake notice and comment before it can provide incentives for activities (other than the two permanent housing activities that Congress itself identified has having been proven effective). The Set-Aside creates a hefty incentive for CoCs to create new transitional housing and supportive-services-only projects, because those projects automatically win out over other types of projects. But, by statute, HUD can only create such incentives for "activities that have been proven to be effective"—and can only designate activities as meeting that standard "based on research and after notice and comment to the public." 42 U.S.C. § 11386b(d)(1), (2)(C).

Defendants' failure to undertake notice and comment violated both 24 C.F.R. § 10.1 and 42 U.S.C. § 11386b(d)(2)(C)—and the Set-Aside is therefore procedurally invalid.

36

## II.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

The FY 2026 NOFO is causing and threatening to cause Plaintiffs and their members irreparable harm—including some of the same types of irreparable harm that led this Court to preliminarily enjoin last year's NOFOs and that the First Circuit affirmed warranted preliminary relief. *See* Order, *Nat'l Alliance to End Homelessness v. HUD*, No. 25-cv-636 (Dkt. No. 52); *Washington v. HUD*, 171 F.4th 473, 491–92 (1st Cir. 2026). As communities have deciphered the NOFO and gamed out how they can apply, it has become clear that the NOFO is causing irreparable harm already, at the application stage. The NOFO is forcing Plaintiffs and their members to make impossible choices, jeopardizing their goodwill in their communities, and draining CoCs' limited resources. It is also causing some experienced providers to withdraw. These problems will multiply by August 11, when CoCs must announce which projects they will include in their applications—as that will force some projects that do not make the cut to immediately begin winding down their programs. And, of course, if HUD is permitted to make awards under the NOFO, that will cause a devastating loss of funding to permanent housing and other projects on which individuals and families rely—and threaten to force tens of thousands of people back into homelessness.

### A.  The FY 2026 NOFO Is Forcing CoCs to Make Impossible Choices, Draining Resources, and Fracturing Relationships

The FY 2026 NOFO is forcing Plaintiffs and members to make impossible choices, draining their resources, and fracturing relationships. CoCs are running their local competitions now to determine which projects to put forward in their community-wide applications, and how to rank them—and they must announce their decisions by August 11 (15 days before CoCs' applications are due to HUD). NOFO at 96. Given that the Set-Aside funnels virtually all Tier 2 funding to new projects, existing projects placed in Tier 2 have almost no shot at receiving

37

funding. Oliva Decl. ¶ 133. This makes the local CoCs' decisions now incredibly consequential for the existing projects in their communities—it is the difference between presumptively receiving funding and almost certainly being rejected.

These choices require devastating tradeoffs, as communities will generally not be able to include all their high-performing projects in Tier 1. *See id.* ¶¶ 134, 137. How, for example, will a CoC decide between a project serving domestic violence survivors and a project that houses individuals with disabilities who are likely to become hospitalized if they lose stable housing? That is a particularly fraught choice given that including domestic violence projects drags down the whole CoCs' chances of receiving funding because those projects, by law, generally cannot impose the service requirements that the NOFO heavily advantages. *See id.* ¶ 103.

Further complicating matters, CoCs cannot even rest assured that the projects they list in Tier 1 will be funded as Congress directed given that HUD has reserved the right to reject them based on its amorphous "risk" review or consideration of additional factors. So, for example, a CoC might think twice about ranking a high-performing project serving LGBTQ+ youth given the risk that HUD might reject it based on its politicized risk review. *See id.* ¶ 138.

Making things worse, these choices will affect funding well beyond FY 2026. *Id.* ¶ 136. If a CoC puts forth projects that HUD does not fund, that reduces the amount that the CoC is eligible to even apply for next year, and likely for years after that, meaning that risky choices now could impact CoCs' ability to provide critical housing and services for years down the road. *Id.* Having to make this "choice itself demonstrates irreparable harm." *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017); *accord, e.g.*, *R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 198 (holding that putting plaintiffs "between a rock and a hard place … constitutes irreparable harm").

38

Undertaking this process is a significant drain on CoCs' resources. As the First Circuit made clear in Plaintiffs' case challenging last year's NOFO, this "diversion of resources" is also itself irreparable harm. *Washington*, 171 F.4th at 492. Even in a normal year, running a competition is a massive undertaking. Oliva Decl. ¶ 124. Now, the NOFO's radical (and unlawful) shift is forcing CoCs and their member agencies to divert significant resources to figure out how to apply and how to ameliorate the harms for projects that are at risk of losing funding. *Id.* ¶¶ 117–18, 124–25. This is all exacerbated by HUD's failure to adequately provide CoCs with information necessary to running a competition: HUD has not notified CoCs how much they are eligible to apply for, nor has HUD even posted the application with the questions grantees must address. *Id.* ¶¶ 119–22. Plaintiffs and their members have many questions about unclear aspects of the NOFO and its radically new criteria, but HUD has not responded to many CoCs' and providers' emails, even ones sent weeks ago. *Id.* ¶ 122. This "confusion and chaos" causes still more "irreparable harm." *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025).

The choices CoCs must make now, moreover, jeopardize CoCs' relationships with the providers who are not prioritized, and will pressure local governments to find replacement funding beyond their capacity to provide. This, in turn, will erode the goodwill that CoCs have built in their communities—another irreparable harm. Oliva Decl. ¶¶ 143–44; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (holding that "injury to goodwill" can be irreparable).

### B. Concluding the Local Application Process Will Cause Long-Term and Irreversible Consequences as Programs Withdraw and Begin to Wind Down

The harms will compound when CoCs conclude their local application processes, as the NOFO requires them to do by August 11. The NOFO is already causing some providers to

39

withdraw from the program because they see the writing on the wall. Oliva Decl. ¶¶ 126–28. Once CoCs announce their selections and rankings, existing projects listed in Tier 2 (or not included at all) will know they are highly unlikely to receive funding. This will cause still more providers to disengage from the CoC program—a move that will be hard for them to reverse even if the NOFO is blocked later on. *Id.* ¶¶ 132, 145–49. That, in turn, results in loss of institutional knowledge and experience in the community—and forces CoCs to spend limited resources finding, and in some instances training, suitable replacements. *Id.* ¶¶ 129–30.

Having to announce local competition results will also set off the same kinds of cascading consequences that Plaintiffs faced in the last case: Providers "must make long-term decisions today … based on projections of funding months down the road." *Washington v. HUD*, 171 F.4th at 492; Oliva Decl. ¶¶ 145–49. Once providers hear that they have not been prioritized for funding, some will "be forced to close or prepare to close their programs immediately," causing the same irreparable harm as before. *Washington v. HUD*, 171 F.4th at 492; Oliva Decl. ¶ 148. They will reduce staffing, stop enrolling new clients, move existing clients out to other locations or prepare them for the upcoming loss of housing. Oliva Decl. ¶ 146. Once these plans are in place, they cannot easily be unwound, and providers may not be able to return to the CoC if the NOFO is later invalidated. *Id.* ¶¶ 93, 149.

### C. Awarding Funds Under the FY 2026 NOFO Would Cause Tremendous Harm to Plaintiffs, Their Members, and Communities

If HUD is ultimately permitted to make awards under the FY 2026 NOFO, Plaintiffs and their members will face a cascading crisis: CoCs will have to eliminate longstanding and high-performing permanent housing programs, existing sites will face shortfalls, and at least 97,000 people who currently have stable housing risk losing their homes. *Id.* ¶¶ 150, 157. And CoCs

40

themselves will have to redirect limited funds and resources into emergency stabilization efforts instead of long-term and proactive engagement. *Id.* ¶ 150.

The impact of these changes will hit individuals currently in permanent supportive housing the hardest. *Id.* ¶ 154. These individuals, who have disabilities and chronic health conditions, need a high level of intervention and have long been prioritized because they are the most vulnerable. *Id.* ¶ 161. The loss of funding for permanent supportive housing renewals means that these individuals will be forced onto the street or into shelters that are unable to provide the stability and intensive services they need, increasing strain on social and emergency services networks. *Id.* ¶ 151. And people who currently have stable housing will face increased risk of mortality and heightened exposure once they lose their homes, threatening the safety and lives of individuals these programs were designed to protect. *Id.* ¶ 161.

## III. The Balance of Equities and the Public Interest Favor Plaintiffs

The equities and public interest, which merge when the government is a party, tip sharply in Plaintiffs' favor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs face immediate and irreparable harm from implementation of the FY 2026 NOFO. If the application deadline is not stayed, Plaintiffs and their members will be forced to make impossible choices among the existing projects in their communities, irreversibly damaging relationships, causing more providers to exit the CoC program for good, and leading some to begin winding down their programs immediately. And the harms multiply if Defendants make awards under the FY 2026 NOFO and commit funds to new, unproven programs at the expense of existing programs that tens of thousands of people rely on for support. As this Court has held before, in the context of "homelessness," "it practically goes without saying that there can be no do over and no redress if services are unlawfully denied and someone suffers for it." *New York*, 804 F. Supp. 3d at 330. Absent intervention by the Court, that harm will happen here.

By contrast, the government faces no harm from pausing the application process now. After all, an agency is not harmed by an order prohibiting it from violating the law. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025). Defendants, moreover, cannot validly complain that a pause will delay when they can make awards. Plaintiffs intend to press forward with seeking final judgment as quickly as possible so that the FY 2026 NOFO's lawfulness can be conclusively adjudicated and HUD will be required to issue and implement a new, lawful NOFO. Any complaints of delay, moreover, ring hollow given that HUD itself is unready to complete the application process—as it has not yet even provided the information or detailed application that communities need to actually apply. Oliva Decl. ¶ 39. The equities tilt strongly in favor of Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court stay the FY 2026 NOFO under 5 U.S.C. § 705 and preliminarily enjoin HUD from implementing it.

July 2, 2026                                  Respectfully submitted,

Amy R. Romero                                 /s/ Kristin Bateman
  (RI Bar No. 8262)                           Kristin Bateman *
Kevin Love Hubbard +                            (DC Bar No. 90037068)
  (MA Bar No. 704772)                         Madeline H. Gitomer +
DeLuca, Weizenbaum,                             (DC Bar No. 1023447)
 Barry & Revens, Ltd.                         Christine L. Coogle +
199 North Main Street                           (DC Bar No. 1738913)
Providence, RI 02903                          Carrie Y. Flaxman +
(401) 453-1500                                  (DC Bar No. 458681)
amy@dwbrlaw.com                               Robin Thurston +
kevin@dwbrlaw.com                               (DC Bar No. 1531399)
Cooperating counsel,                          Democracy Forward Foundation
 Lawyers' Committee for RI                    P.O. Box 34553
                                              Washington, DC 20043
*Counsel for All Plaintiffs*                  (202) 448-9090

Toby Merrill +^
 (MA Bar No. 601071)
Cassandra Crawford +^
 (NC Bar No. 45396)
Graham Provost +^
 (DC Bar No. 1780222)
Kayla Svihovec +^
 (DC Bar No. 1735588)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

Tony LoPresti +
  (CA Bar No. 289269)
County Counsel
Kavita Narayan +
  (CA Bar No. 264191)
Chief Assistant County Counsel
Meredith A. Johnson +
  (CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson +
  (CA Bar No. 314899)
Deputy County Counsel
Leily Arzy +
  (CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770

kbateman@democracyforward.org
mgitomer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Lynette Labinger
 (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation
 of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Antonia K. Fasanelli +
 (DC Bar No. 481856)
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Christopher M. Sanders +
 (WA Bar No. 47518)
General Counsel to the King County Executive
Cristy J. Craig +
 (WA Bar No. 27451)

43

(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of
Santa Clara*

John K. Whitaker +
 (TN BPR No. 039207)
Senior Counsel
Abby Greer +
 (TN BPR No. 041470)
Assistant Metropolitan Attorney
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government
of Nashville and Davidson County*

Senior Deputy Prosecuting Attorney
Office of the King County Prosecuting
Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr.
County*

\* Admitted *pro hac vice*
\+ *Pro hac vice* motion forthcoming
^ Admitted in listed states but not licensed to
practice law in California.

44