**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

NATIONAL ALLIANCE TO END
HOMELESSNESS *et al.*,

   *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
*et al.*,

   *Defendants*.

Case No. 26-cv-436-MSM-AEM

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AND/OR PRELIMINARY RELIEF**

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................... iii

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 3

    A.  The CoC Program ............................................................................................ 3

        1.  Congress designed the CoC program to implement a community-driven
            approach to ending homelessness ...................................................... 3

        2.  The statute prioritizes permanent housing ....................................... 4

        3.  The statute protects renewal funding ................................................ 5

        4.  Congress appropriates FY 2026 funding for the CoC program ....... 5

    B.  The Office of Management and Budget restricts HUD's ability to award funds as
       Congress intended .......................................................................................... 7

    C.  HUD issues the FY 2026 NOFO for the CoC Program .................................. 9

        1.  Overview of the selection process ................................................... 10

        2.  A massive set-aside for new transitional housing and supportive-services-only
            projects would defund permanent housing and renewals .......................... 12

        3.  Selection criteria effectively force communities to abandon proven strategies ......... 13

            a.  Criteria mandating service requirements ......................................... 13

            b.  Criteria seeking to eliminate harm reduction approaches to drug use ............ 15

            c.  Criteria promoting unproductively punitive law enforcement responses to
               homelessness .................................................................................... 16

        4.  Other provisions disqualify or disadvantage applicants on improper grounds ........... 16

            a.  Amorphous "risk review" and additional criteria through which HUD
               threatens to reject projects on virtually any grounds ...................... 17

            b.  Criteria adopting a conception of "self-sufficiency" at odds with the statute 18

            c.  Preference for people with particular types of disabilities ............................. 19

            d.  Inequitable eligibility for CoC Bonus funding ............................... 19

            e.  Non-Statutory Threshold Criteria that improperly disqualify Tier 1 projects 20

        5.  Post-award conditions impose ideological and policy restrictions that HUD
            lacks authority to impose ................................................................. 21

    D.  The FY 2026 NOFO threatens devastating harms to Plaintiffs and the
       communities they serve ................................................................................. 22

Legal Standards ............................................................................................................ 25

Argument ..................................................................................................................... 26

I.   The FY 2026 NOFO and its Challenged Provisions Are Invalid under the APA and
    the Constitution (Counts 1-4, 8-11) ....................................................................... 26

A. The FY 2026 NOFO and its Challenged Provisions must be set aside under the APA................................................................................................................................. 26

   1. Multiple Challenged Provisions exceed Defendants' statutory authority................... 26

   2. Multiple Challenged Provisions are contrary to law....................................................... 27

      a. Set-Aside........................................................................................................ 27

      b. Discriminatory Disability Priority ................................................................. 28

      c. Non-Statutory Threshold Criteria ................................................................. 29

      d. E.O. Conditions.............................................................................................. 30

   3. The FY 2026 NOFO is arbitrary and capricious.......................................................... 30

      a. Set-Aside........................................................................................................ 31

      b. Service Requirements Criteria ....................................................................... 34

      c. Other Provisions............................................................................................. 38

   4. The Set-Aside Violates Notice-and-Comment Requirements ..................................... 41

B. Multiple Challenged Provisions are unconstitutional ........................................................ 42

   1. The Local Policies Criterion and "Gender Ideology" E.O. Conditions violate the First Amendment.................................................................................................... 43

   2. Multiple provisions violate the Spending Clause and other separation-of-powers provisions ............................................................................................................. 45

II. HUD Has Unlawfully Failed To Provide CoCs Statutorily Mandated Information Necessary for Them To Apply (Count 5) ................................................................................ 46

III. OMB Has Unlawfully Restricted CoC Funding (Counts 6-7, 8-10) ..................................... 47

IV. The Court Should Grant Relief Promptly To Prevent Irreparable Harm.............................. 49

A. The Court should grant summary judgment to Plaintiffs expeditiously ........................... 49

B. On summary judgment, the Court should order remedies to fully redress Defendants' myriad violations........................................................................................... 50

   1. The Court should vacate the FY 2026 NOFO, declare Challenged Provisions unlawful, and permanently enjoin HUD from reimposing them ............................... 51

   2. The Court should vacate the Apportionment Footnotes, declare them unlawful, and permanently enjoin OMB Defendants from reimposing them ............ 54

   3. The Court should compel HUD to promptly provide CoCs with their estimated grant amounts as required by statute ........................................................ 54

C. If the Court requires more time to consider summary judgment, it should stay the FY 2026 NOFO by August 10 and preliminarily enjoin Defendants from implementing it ................................................................................................................... 55

Conclusion ....................................................................................................................................... 59

**TABLE OF AUTHORITIES**

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........................ 43, 44

*Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871 (7th Cir. 2013) ...................................................................................................................... 29

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42 (1st Cir. 2016) ............................... 25

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) .......................................................................... 30

*California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291 (D.R.I. 2025) ................................. 46, 51

*Caribbean Produce Exch., Inc. v. Sec'y of Health and Human Servs.*, 893 F.2d 3 (1st Cir. 1989) ...................................................................................................................... 42

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......................................................................... 26

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) ........................................................... 45, 48

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ........................................... 47

*City of Phila. v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ................................................. 57

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ............................................................ 26

*Clarian Health W., LLC v. Hargan*, 878 F.3d 346 (D.C. Cir. 2017) ........................................... 42

*Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799 (2024) ........................... 51

*DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020) ...................................................... 31, 34

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) .............................................................. 52

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................................................. 31, 35

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) .................................................... 47

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) .................................................................. 43, 49

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ...................................................................... 31

*Harrington v. Chao*, 280 F.3d 50 (1st Cir. 2002) ....................................................................... 51

*Illinois v. Noem*, 813 F. Supp. 3d 282 (D.R.I. 2025) .............................................................. 51, 53

*Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................... 48

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025) .. 21, 27, 41, 48

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)..................................................... 52

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................................................................................................................................... 31

*Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025) .................................. 48

*NEA v. Finley*, 524 U.S. 569 (1998) ......................................................................................... 43

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025) .......................................................... 54

*New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294 (D.R.I. 2025)..................................... 54, 57

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 26

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................................................ 47

*Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1 (1981) ............................................ 45

*R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58 (D.R.I. 2025) ..................... 25

*R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180 (D.R.I. Oct. 23, 2025) ......................................................................................................... 21, 41, 43, 57

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ............................ 58

*Rust v. Sullivan*, 500 U.S. 173 (1991)....................................................................................... 44

*S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ......................................... 44

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69 (1st Cir. 2020) ...................... 25

*Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146 (D. Me. 2019) .................................................... 39

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018).................................................. 55

*South Dakota v. Dole*, 483 U.S. 203 (1987) ......................................................................... 45, 46

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247 (D.C. Cir. 2021) ........................... 32

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015)................................................................................................................................ 30

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ....................................................... 52

*Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78 (1st Cir. 2022)...............................................25

*Washington v. HUD*, 171 F.4th 473 (1st Cir. 2026) ...................................37, 55, 57, 58

*Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886 (D.R.I. June 29, 2026)..................30, 34

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..........................................26

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025)..........................................................................48

## US CONSTITUTIONAL PROVISIONS

U.S. Const. art. I
  § 1.....................................................................................................45
  § 7 cl. 2...........................................................................................45
  § 8 cl. 1...........................................................................................45
  § 9 cl. 7...........................................................................................45

## FEDERAL STATUTES

5 U.S.C.
  § 553................................................................................................42
  § 703................................................................................................52
  § 705.........................................................................................25, 55
  § 706.................................................31, 41, 42, 47, 48, 49, 54, 55

29 U.S.C.
  § 794................................................................................................29

31 U.S.C.
  § 1512..........................................................................................7, 47
  § 1513..........................................................................................7, 47
  § 1517......................................................................................7, 9, 47

34 U.S.C.
  § 12351............................................................................................35

42 U.S.C.
  § 2000e–2.......................................................................................30
  § 3604..............................................................................................30
  § 10408............................................................................................35
  § 11302............................................................................................32
  § 11313...................................................................................18, 38, 39
  § 11360............................................................................................3, 6

§ 11360a......................................................................................................................... 4

§ 11381............................................................................................................. 3, 6, 18, 39

§ 11382......................................................................................................................... 4

§ 11383................................................................................................................... 3, 34

§ 11386....................................................................................................................... 27

§ 11386a.............................................................. 4, 5, 11, 18, 19, 26, 27, 39, 46, 47, 54

§ 11386b............................................................... 4, 5, 13, 18, 27, 28, 31, 39, 42

§ 11386c................................................................................................................. 5, 28

§ 12131–12134......................................................................................................... 29

§ 12181–12189......................................................................................................... 29

2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173 (2026).......................... 5, 11, 20, 29

Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act,
Pub. L. No.  111-22, 123 Stat. 1632 (2009)........................................................... 3, 4, 36

McKinney-Vento Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (1987)............... 3

The Judiciary Act, 1 Stat. 73 (1789) ............................................................................... 25

**FEDERAL REGULATIONS**

24 C.F.R.

§ 5.106 .......................................................................................................................... 30

§ 8.3 ................................................................................................................................ 6

§ 8.4 ................................................................................................................................ 6

§ 10.1 ............................................................................................................................ 42

§ 578.3 ....................................................................................................................... 4, 5

§ 578.5 ........................................................................................................................... 4

§ 578.7 ........................................................................................................................... 4

§ 578.9 ........................................................................................................................... 4

§ 578.17 ................................................................................................................. 11, 19

§ 578.37 ....................................................................................................................... 38

§ 578.51 ....................................................................................................................... 34

§ 578.93 ....................................................................................................................... 29

28 C.F.R.

§ 35.130....................................................................................................................... 29

§ 36.301....................................................................................................................... 29

**OTHER AUTHORITIES AND SOURCES**

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth
to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30,
2025) .......................................................................................................................... 30

*Ending Crime and Disorder on America's Streets*, Exec. Order No. 14321, 90 Fed.
Reg. 35817 (Jul. 24, 2025) .................................................................................................. 9

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec.
Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ...................................................... 8

*Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg.
38929 (Aug. 12, 2025) ............................................................................................ 8, 30, 40

*Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025).............. 7, 47

*Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-Veterans
Affairs Supportive Housing Program*, 89 Fed. Reg. 65769(2024) ............................................... 38

OMB Circular No. A-11 § 120.34 (Aug. 2025), https://perma.cc/897F-UUQK ........................... 9

OMB, Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN ................ 7, 8, 9

Russ Vought, *Executive Office of the President of the United States*, *in Mandate for
Leadership: The Conservative Promise* at 45 (2023) (Project 2025),
https://perma.cc/7GM8-AGXE ................................................................................................ 7

**INTRODUCTION**

The Department of Housing and Urban Development (HUD) has once again taken action to radically upend the Continuum of Care (CoC) program, the federal government's flagship program to address homelessness. It has issued a notice of funding opportunity (NOFO) for FY 2026 that categorically withholds funding for a significant number of existing permanent housing projects, no matter how successful, and that pushes unproven and harmful approaches—all contrary to Congress's design. If implemented, this NOFO would threaten to force 97,000 people or more back into homelessness.

This Court recently set aside NOFOs for last year that would have stripped funding from permanent housing projects and pushed mandates for participants to take part in services to retain their housing, contrary to HUD's longstanding and proven "Housing First" approach. This new NOFO is more of the same.

Most concerningly, without authorization, the FY 2026 NOFO sets aside a whopping $1.3 billion—nearly one-third of available funds—for new projects only, despite Congress's command that appropriated funds be available to renew existing projects. Worse, the NOFO heavily prioritizes new transitional housing and supportive-services-only projects over new permanent projects for that $1.3 billion set-aside: New permanent housing projects can receive a share only in the unlikely event that money remains after HUD makes awards to *all* transitional housing and supportive-services-only projects that applied. This approach flies in the face of Congress's express requirement that incentives like that be available only to two specified permanent housing activities, unless HUD undertakes notice and comment and determines, based on research, that other strategies have also proven effective—a step HUD has never taken.

The NOFO also adopts a host of selection criteria that will effectively force communities to abandon evidence-based strategies in favor of unproven, ineffective, and even harmful ones.

1

And it forces grantees to agree to comply with requirements that have little or nothing to do with the CoC program—including by committing to adhere to executive orders that, among other things, seek to eradicate lawful diversity, equity, and inclusion initiatives; reject transgender and nonbinary individuals' right to safely exist; and coerce jurisdictions to help with federal immigration enforcement.

This new NOFO is threatening devastating harm. If HUD proceeds with it, programs across the country will lose funding they rely on to house vulnerable members of their communities—forcing them to end stable housing for the people they serve. At the same time, CoCs and providers cannot afford substantial delays in HUD's making awards—their communities rely on the funding Congress guaranteed them and will struggle to bridge the funding gaps that will inevitably result if HUD does not move forward with awarding funds under a lawful NOFO promptly. To protect Plaintiffs from substantial delays, Plaintiffs respectfully request that the Court enter summary judgment expeditiously, so that the NOFO's unlawfulness can be conclusively resolved and HUD can get on with issuing—and making awards under—a lawful replacement.

In all events, Plaintiffs request relief by August 10—either final relief or, if the Court requires more time to fully consider summary judgment, preliminary relief blocking the NOFO and its deadlines. Plaintiffs and Plaintiff Associations' members need relief by then to protect them from the cascading harms that will occur come August 11, the date by which the NOFO requires local CoCs—the bodies responsible for submitting an application to HUD on behalf of their entire community—to announce which projects they will include in their communities' applications. CoCs, including Plaintiffs and Plaintiff Associations' members, will have to make impossible choices by then about which existing projects to prioritize for the limited funding that HUD has made available, and which to sacrifice. In addition to damaging CoCs' relationships

2

with critical partners, the announcement of these choices will sound the death knell for some projects and cause them to act accordingly—in some cases, halting new enrollments, laying off staff, and beginning to transition formerly homeless individuals and families out of their homes.

HUD's latest CoC Program NOFO violates the Administrative Procedure Act and the Constitution several times over, and the Court should declare it unlawful and set it aside.

## BACKGROUND

### A. The CoC Program

#### 1. Congress designed the CoC program to implement a community-driven approach to ending homelessness

Congress enacted what became known as the McKinney-Vento Homeless Assistance Act in 1987 to establish a coordinated federal response to homelessness, and the HEARTH Act later amended that Act to formally create the Continuum of Care (CoC) program. Pub. L. No. 100-77, § 102, 101 Stat. 482, 484-85 (1987); *see also* Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, Pub. L. No. 111-22, §§ 1301-1306, 123 Stat. 1632, 1680–96 (2009), *codified at* 42 U.S.C. §§ 11381–11388. The CoC program funds a variety of projects that support homeless individuals and families, including by providing housing, rental assistance, and supportive services that help participants maintain housing long-term—such as childcare, job and life skills training, healthcare, substance use treatment, and trauma counseling. 42 U.S.C. §§ 11360(29), 11383. Today, the CoC program is the largest federal grant program dedicated to addressing homelessness.

The statute supports a local, community-based approach to addressing homelessness. To that end, the statute recognizes local or regional "continuums of care"—coalitions composed of representatives of various entities involved in addressing homelessness, as well as people with lived experience of homelessness—that are responsible for coordinating local strategies to

3

address homelessness within their geographic areas. *See* 42 U.S.C. § 11360a(a); *see also* 24 C.F.R. §§ 578.3, 578.5(a). Those continuums apply for funding on behalf of the whole community. 42 U.S.C. § 11360a; *see also* 24 C.F.R. § 578.7. In particular, each continuum, or "CoC," must designate a "collaborative applicant" to run a local competition to determine what projects to seek funding for and then submit a CoC-wide application to HUD on behalf of the entire geographic area. 42 U.S.C. §§ 11360a(a), (f); *see also* 24 C.F.R. § 578.9. Projects generally must apply through this locally run competitive CoC process and cannot apply on their own. *See* 42 U.S.C. § 11382(i) (permitting "solo" applications only where an entity "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner"). HUD then awards funds through a national competition that considers criteria that are largely based on the CoC's application overall. *See id.* §§ 11386a(b)(1), (b)(2).

### 2. The statute prioritizes permanent housing

In creating the CoC program, Congress prioritized permanent housing. A stated purpose of the HEARTH Act was "to establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." Pub. L. No. 111-22, § 1002, 123 Stat. at 1664, *codified at* 42 U.S.C. § 11301 Note. To that end, the Act establishes minimum amounts that HUD must allocate to permanent housing projects for certain communities. *See* 42 U.S.C. §§ 11386b(a), (b). And it also requires HUD to "provide bonuses or other incentives" for activities "that have been proven to be effective at reducing homelessness," and to consider "the extent to which the recipient will . . . incorporate" such activities when awarding grants. *Id*. §§ 11386b(d)(1)–(2), 11386a(b)(1)(B)(iv)(II). Congress identified two—and only two—such "proven" strategies, and both are permanent housing strategies: "permanent supportive housing

for chronically homeless individuals and families" and, for families, "rapid rehousing"[1] paired with services to help improve stability and incomes. *Id.* §§ 11386b(d)(2)(A), (B). Congress authorized HUD to identify other proven effective strategies "based on research and after notice and comment to the public," *id.* § 11386b(d)(2)(C), but HUD has never used this process and therefore has never identified additional strategies eligible for incentives.

### 3.    The statute protects renewal funding

Congress also took steps to protect the ability of successful projects to obtain renewal funding. For one, in establishing the "estimated grant amount" for each CoC's geographic area, the statute ensures that that amount must be at least enough "to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that area. 42 U.S.C. § 11386a(b)(2)(B)(iii).

The statute also provides special protection for existing projects that provide permanent housing. The Act specifies that appropriated funds "shall be available for the renewal of contracts" for certain costs "associated with permanent housing projects"—thereby ensuring that permanent housing projects have an opportunity to compete for all appropriated funds. 42 U.S.C. § 11386c(b). And it cabins HUD's discretion to refuse to renew existing permanent housing projects. The statute identifies two—and only two—factors that HUD must consider when determining whether to renew a permanent housing project: (1) whether "there is a demonstrated need for the project" and (2) whether it "complies with program requirements and appropriate standards of housing quality and habitability, as determined by [HUD]." *Id.*

### 4.    Congress appropriates FY 2026 funding for the CoC program

For FY 2026, Congress has appropriated over $4 billion for the CoC program. 2026 Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026). The 2026

---

[1] Rapid rehousing is a type of permanent housing. 24 C.F.R. § 578.3.

Appropriations Act establishes some new requirements for FY 2026 awards. It set concrete deadlines: HUD was required to issue a NOFO for those funds by June 1, 2026, and must make awards by December 1, 2026. *Id.* at 400. The Act also requires HUD to make a significant portion of FY 2026 awards based on the projects that the local continuums of care select in their local competitions, without those projects needing to compete against projects in other geographic areas. In particular, HUD must "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"—that is, at least 60 percent of the amount needed to provide one-year renewals of each CoC's expiring grants—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" *Id.* at 399.

The 2026 Appropriations Act also authorizes funding recipients, when implementing the program, to "establish preferences for elderly individuals or families" and for "disabled individuals or families as defined by [42 U.S.C. § 11360(10)]"—a definition that covers people with a wide range of disabilities, including physical, mental, emotional, and developmental impairments, impairments arising from substance use, and HIV/AIDS. *Id.* at 401; *see also* 42 U.S.C. § 11360(10). Neither the 2026 Appropriations Act nor any other statute authorizes HUD or funding recipients to establish priorities for people with physical or developmental disabilities over people with other disabilities. On the contrary, binding HUD regulations bar HUD funding recipients from "subject[ing]" individuals "to discrimination" based on "handicap"—which the regulations define to include both physical and mental disabilities, including substance use disorder. 24 C.F.R. §§ 8.3, 8.4(a).

**B. The Office of Management and Budget restricts HUD's ability to award funds as Congress intended**

President Trump has issued a host of executive orders that aim to leverage federal funding to advance the Administration's own ideological and policy agenda, without Congress's involvement. And the Office of Management and Budget (OMB) has used its administrative budgeting functions to implement these orders. By law, OMB must apportion appropriated funds—*i.e.*, make funds available to an agency—before the agency can obligate them. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025) (noting that the President has delegated responsibility for apportioning funds to the Director of OMB). This is meant to ensure that agencies do not overspend. *See* 31 U.S.C. § 1512(a). OMB cannot thwart Congress's will by withholding funds and must make an apportionment within 30 days after an appropriation is enacted (or earlier in some circumstances). *Id.* § 1513(b)(2). Yet the Director of OMB has taken the position that OMB can and should be "aggressive in wielding" apportionments "on behalf of the President's agenda." Russ Vought, *Executive Office of the President of the United States*, *in Mandate for Leadership: The Conservative Promise* at 45 (2023) (Project 2025), https://perma.cc/7GM8-AGXE.

OMB has done just that with its apportionment of FY 2026 funds for the CoC program. On May 22, 2026, just before HUD's deadline to issue the FY 2026 CoC NOFO, OMB apportioned approximately $4 billion that Congress appropriated for the CoC program in FY 2026. Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN (last accessed July 17, 2026). OMB's apportionment, however, contains two footnotes (Apportionment Footnotes) that restrict HUD from obligating the funds unless HUD complies with certain conditions. *Id.*

7

The first footnote (Grantmaking E.O. Footnote) requires grants to conform to Executive Order 14332, "Improving Oversight of Federal Grantmaking" (Grantmaking E.O.). *Id.* ("As permissible by law, amounts apportioned for competitive grants only shall be obligated with award agreements that include terms and conditions consistent with the directives provided in: [the Grantmaking E.O.]."). The Grantmaking E.O. directs agencies to ensure that competitive awards do not "promote, encourage, subsidize, or facilitate" disfavored activities, including "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic." *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 § 4(b)(ii)(B), 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025). It also directs agencies to ensure grants do not promote "illegal immigration" or "racial discrimination"—which the Administration has signaled means grantees should not provide any assistance to undocumented immigrants at all and should end all manner of diversity, equity, and inclusion activities (even ones long considered lawful). *Id.* § 4(b)(ii)(A), (C), 90 Fed. Reg. at 38931; *see also, e.g.*, *id.* § 1, 90 Fed. Reg. at 38929 (noting that "provid[ing] free services to illegal immigrants" has "worsen[ed] the border crisis"); *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, § 2(b), 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (directing agencies to terminate all DEI offices, all "equity" programs, and all "equity-related" grants or contracts).

The second footnote (Homelessness E.O. Footnote) requires grants to conform to Executive Order 14321, "Ending Crime and Disorder on America's Streets" (Homelessness E.O.). Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN ("As permissible by law, amounts apportioned, but not yet obligated as of the date of this apportionment, shall be obligated consistent with the directives provided in: [the Homelessness E.O.]."). That executive order calls for HUD (1) to "end[] support for 'housing first' policies"

and to require grantees to "increase requirements" for participants to "use substance abuse treatment or mental health services as a condition of participation"; (2) to freeze funding for organizations that operate safe drug use sites; and (3) to give "priority" to grantees in states and municipalities that enforce laws criminalizing homelessness (including prohibitions on "urban camping and loitering," "urban squatting," and "open illicit drug use"), that have maximalist involuntary commitment standards, and that substantially implement the Sex Offender Registry and Notification Act. *Ending Crime and Disorder on America's Streets*, Exec. Order No. 14321 §§ 3, 5(a)–(c), 90 Fed. Reg. 35817, 35817–19 (Jul. 24, 2025).

OMB designated these footnotes as legally binding, meaning that HUD would violate the Antideficiency Act—and the relevant officials could face administrative and criminal penalties— if they do not follow the footnotes. *See* Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN; OMB Circular No. A-11 § 120.34 (Aug. 2025), https://perma.cc/897F-UUQK; 31 U.S.C. §§ 1517–1519.

### C.  HUD issues the FY 2026 NOFO for the CoC Program

On June 1, 2026, HUD issued the NOFO for FY 2026 CoC funding. Administrative Record (AR) 5006–5133.[2] Although it issued the NOFO, HUD did not—and still has not— posted the detailed instructions or actual application with the specific questions that CoCs must answer, nor has it informed CoCs of the amounts for which they are eligible to apply. Declaration of Ann Marie Oliva ¶¶ 40–41 (Oliva Decl.). CoCs and local providers have submitted many questions about unclear and contradictory aspects of the NOFO, but HUD left those questions unanswered for weeks. *Id.* ¶ 42. Compounding the chaos, on July 16 (the afternoon before this brief was due), HUD announced its "intent to modify" the FY 2026 NOFO

---

[2] The certification and index of HUD's administrative record are at Dkt. No. 29. Relevant Excerpts of Administrative Record are included as an attachment to this memorandum.

and posted a "preview" version that HUD emphasized was "not effective" and still subject to "further agency deliberation." *Id.* ¶ 44. Based on Plaintiffs' initial review in the limited time available, the potential new version does not appear to alter (or clarify) the provisions that Plaintiffs challenge here.

The FY 2026 NOFO once again threatens to upend the CoC program. Through a complex web of unlawful and unreasoned provisions (Challenged Provisions), HUD has created a selection process that categorically cuts off renewal funding for a significant number of projects, forces communities to abandon proven strategies, and otherwise disqualifies or disadvantages projects on improper grounds.

### 1. Overview of the selection process

The NOFO sets forth an extraordinarily complex selection process. That process includes four stages of review that look at each CoC's application overall and at the individual projects included within those applications. First, at the "threshold review" stage, HUD determines if each individual project is eligible for funding on a pass/fail basis. AR 5064. The NOFO identifies statutory and regulatory requirements that projects must satisfy at this stage, but also imposes additional policy-based criteria. AR 5063–74.

Second is a "merit review" stage. AR 5074. This step evaluates the CoC overall, not individual projects—and then the score that each CoC receives factors into a separate score that HUD assigns to individual projects. *See* AR 5095. At this step, HUD scores each CoC by assigning points for various "merit criteria" that generally look to the CoC's approach to homelessness and the overall composition of the projects within its application. *See* AR 5074–91. As a result, projects on a CoC's application are interdependent, and if a CoC includes disfavored projects on its application, that can drag down the entire CoC's score and thus reduce the entire community's chances of receiving funding.

10

Third, HUD conducts a "risk review." At this step, HUD looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project"—but that, in reality, attempt to leave HUD with free rein to reject projects on virtually any ground, as explained further below. *See* AR 5091. Under the NOFO, HUD purports to retain discretion to reject awards that do not pass "risk review." AR 5092.

Finally, the NOFO states that—after all the other steps—HUD may also consider additional factors like "the overall projected impact on the … priorities in this NOFO." *Id.* The NOFO states that, "[t]o the extent allowed by law, HUD may exercise its discretion" to make or reject awards based on these additional factors. *Id.*

Layered on top of this, the NOFO establishes a waterfall that designates which types of projects will be funded first. AR 5093–94. Broadly speaking, the NOFO establishes a two-tier system for project applications. Under that system, each CoC's application provides a priority listing of projects, which are grouped in a "Tier 1" and "Tier 2," with Tier 1 being the higher priority. After allocating funds for certain grants for CoC administration, HUD will next consider the projects that CoCs listed in Tier 1. *See* AR 5093. Those projects are not subject to "merit review" and do not compete against other CoCs' projects. Rather, projects in Tier 1 will be funded so long as they pass threshold review, and so long as HUD does not disqualify them based on the risk review or the other additional factors. *See* AR 5091–93. In the 2026 Appropriations Act, Congress required that, for FY 2026 funding, Tier 1 be at least 60 percent of each CoC's annual renewal demand, *i.e.*, at least 60 percent of the amount needed to renew for one year all expiring grants in the CoC's area. *See* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399; 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(b)(2). The NOFO sets the Tier 1 amount at the statutory minimum. AR 5095.

11

The subsequent levels of the waterfall are all at Tier 2 and cover different types of projects. Tier 2 projects are subject to "merit review" in addition to the other review steps, and those projects compete nationally. At the "merit review" stage, Tier 2 projects receive individual project scores that take into account three factors: the score the CoC received at the "merit review" stage (worth 50 percent of the project's score), how highly the project was ranked in the CoC's application (worth 40 percent of the project's score), and whether the project mandates participation in supportive services (worth 10 percent of the project's score). AR 5095. That score then factors into which projects receive funding. In particular, at each level of the waterfall after Tier 1, projects are generally selected in order of score, unless they are disqualified based on HUD's review of "risk" or additional factors. *See* AR 5094.

### 2. A massive set-aside for new transitional housing and supportive-services-only projects would defund permanent housing and renewals

The FY 2026 NOFO sets aside $1.3 billion—nearly a third of the available funding—for new projects only (Set-Aside). AR 5040–41. By setting aside these funds for new projects only, the NOFO categorically makes existing projects ineligible for that funding. Given the size of the Set-Aside, the inevitable result is that many effective existing projects will not be renewed, threatening to force tens of thousands of people back into homelessness.

Moreover, HUD designed the $1.3 billion set-aside to go principally or exclusively to new transitional housing and supportive-services-only projects, and not permanent housing. Under the selection process that the NOFO establishes, HUD will first fund *all* new transitional housing and supportive-services-only projects that apply. AR 5094. Then, if and only if any of the $1.3 billion remains, HUD will allocate funds to other types of new projects (such as permanent housing). *See id.* In other words, transitional housing and supportive-services-only projects receive funding first, even if permanent housing or other projects score higher on merit-

12

based criteria. This set-up creates a significant incentive for CoCs to apply for transitional housing and supportive-services-only projects—even if those projects are less effective or less suited to local needs—as CoCs are otherwise unlikely to receive any portion of the $1.3 billion set-aside. Under the HEARTH Act, HUD can offer incentives like that only if it first determines—"based on research and after notice and comment to the public"—that the incentivized activity has "proven effective" at reducing homelessness. 42 U.S.C. § 11386b(d)(2)(C). HUD has never identified transitional housing or supportive-services-only projects as proven strategies pursuant to that required process.

### 3.  Selection criteria effectively force communities to abandon proven strategies

The NOFO contains a host of criteria that, individually and in combination, effectively force communities to defund proven strategies in favor of unproven and ineffective ones. Among other things, the NOFO pushes CoCs to abandon the proven "Housing First" approach—which prioritizes providing housing to people without any conditions like sobriety, employment, or participating in treatment or other services—and to impose service requirements instead; to stop all harm reduction activities in their communities; and to promote unproductively punitive law enforcement responses to homelessness. *See* AR 5022–39. The NOFO broadly warns that applications "must support th[ose] goals," AR 5016, and also establishes specific criteria advancing them.

#### a.  *Criteria mandating service requirements*

Various NOFO criteria (Service Requirements Criteria) pressure CoCs to abandon "Housing First" and instead impose preconditions for people to obtain housing. The NOFO proclaims (incorrectly) that "'Housing First' has been a profound failure." AR 5033. Without grappling with the considerable evidence that Housing First models are effective, *see* Oliva Decl.

13

¶ 119, the NOFO imposes a host of criteria that push CoCs to put forth projects that mandate services—and exclude projects that do not. The NOFO makes mandating services the largest single scoring factor affecting projects' likelihood of selection within each level of the waterfall at Tier 2. In particular, out of the 100 possible points available to a project, projects will receive up to 10 points if "they have or will incorporate supportive service participation requirements." AR 5095. By comparison, projects can receive a total of 50 points for their CoC's score on the dozens of other merit criteria combined. *See id.*

In addition, multiple merit criteria that govern the CoC's score pressure CoCs to favor projects that eschew Housing First approaches. For instance, the NOFO assigns points for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, AR 5084, and for demonstrating certain numbers of CoC-funded units mandate substance abuse treatment as a condition of participation in the program, AR 5083.

Multiple factors at the threshold review stage also pressure CoCs to put forth projects that mandate services, to reduce the risk that projects will be disqualified at the outset. In particular, the NOFO includes threshold criteria that look to the results that the project will achieve—criteria that necessarily involve subjective assessments and that HUD will evaluate through its pro-service-mandates lens. *See, e.g.*, AR 5068–69 (assessing whether the project "will result in at least 20 hours per week of engagement in services, activities or employment for all program participants"); *see also* AR 5072–73 (looking to whether the services offered "will ensure" certain outcomes). Given the NOFO's strong signals that HUD does not believe Housing First can achieve favorable outcomes, these criteria put pressure on CoCs to select projects that mandate services to increase their chances that HUD will consider them to satisfy these threshold criteria.

14

### b.  *Criteria seeking to eliminate harm reduction approaches to drug use*

The NOFO's threshold and scoring criteria also include several provisions (Anti-Harm Reduction Criteria) that seek to eliminate harm reduction programs generally, even independently funded ones. Harm reduction is an approach to reducing the negative consequences associated with drug use through public health interventions like needle exchanges and methadone treatment. Harm reduction has been shown to reduce the risk of overdose and to improve housing stability and health outcomes, particularly when compared to abstinence-contingent services. Oliva Decl. ¶¶ 132–33. Nonetheless, the NOFO pressures CoCs and applicants to end such programs.

For example, to get 10 points on merit review, a CoC must "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" AR 5090. In other words, to avoid losing out on 10 points, CoCs may not seek funding for any projects that operate harm reduction services, even with the provider's own, non-federal funding.

At the threshold review stage, the NOFO also disqualifies applicants that do not certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863" (Safe Drug Use Certification). AR 5065; *see also* AR 5113. While the condition states only that grantees may not engage in activity that other laws already prohibit, Defendants have an expansive view of what those laws prohibit. For instance, the NOFO states that this condition "is not a requirement that program participants … be evicted or exited from

15

assistance for a first-time violation of a drug-related program policy or lease requirement"—a clarification that strongly implies that HUD deems it a violation to continue serving participants with more than one violation. AR 5065, 5090, 5113. This certification—and the threat of resulting liability—deters lawful harm reduction activities.

### c. Criteria promoting unproductively punitive law enforcement responses to homelessness

Various NOFO criteria (Law Enforcement Criteria) pressure CoCs—and states and localities—to adopt and express support for unproductively punitive law enforcement responses to homelessness. For example, various criteria require cooperation with law enforcement in enforcing local laws prohibiting public camping and public drug use and in connecting unhoused people with services—even though in some communities a law enforcement-based approach can erode trust and make providers less effective. *See* AR 5070, 5085; Oliva Decl. ¶¶ 134, 136. In addition, to receive certain merit points, CoCs also cannot take actions that (in HUD's judgment) "interfere with … local efforts to advance the objectives" of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)" (Local Policies Criterion). AR 5085–86. That restriction threatens to unconstitutionally disadvantage CoCs that advocate against the enforcement-centered local policies that the NOFO favors.

### 4. Other provisions disqualify or disadvantage applicants on improper grounds

The NOFO also includes other provisions that disqualify or disadvantage applicants on improper grounds.

16

### a. Amorphous "risk review" and additional criteria through which HUD threatens to reject projects on virtually any grounds

The NOFO provides that HUD retains discretion to reject applications based on a host of amorphous factors ("Risk Review" and "Additional Factor" Criteria) that effectively give HUD free rein to deny awards on virtually any grounds. For one, the NOFO states that all projects must pass "risk review," which looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project." AR 5091. The NOFO provides various undefined criteria for assessing that, such as the applicant's "[a]bility to promote self-sufficiency and economic independence," as well as criteria that look to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal" and with no explanation of what HUD deems "illegal." *See* AR 5092. The NOFO also states that HUD will rely on potentially unverified information, such as "news reports," to assess applicants' past performance. AR 5091. This "risk review" gives HUD substantially more unfettered discretion than ever before to reject an application on these grounds alone.

On top of that, the NOFO reserves to HUD the option to consider—and reject projects based on—amorphous additional factors after completing all other review steps. AR 5092. These other factors include things like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a "[b]road range of recipients beyond recurrent recipients." *Id.* Although the NOFO says that HUD will consider these additional factors "to the extent allowed by law," it does not explain what HUD believes that means. *Id.*

17

The unclear and undefined "risk review" criteria and additional factors further distort CoCs' decision-making in selecting the projects to include on their applications. Rather than focus just on projects' effectiveness and ability to meet local needs as Congress intended, the amorphous criteria put additional pressure on CoCs to screen out projects that HUD might reject for ideological reasons (such as a history of promoting diversity, equity, and inclusion) and to otherwise conform to HUD's wishes.

### b. Criteria adopting a conception of "self-sufficiency" at odds with the statute

The NOFO also adopts multiple criteria (Self-Sufficiency Criteria) that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"— which the NOFO (improperly) defines as "the ability to meet basic needs, including a place to live, *without public or private assistance*." AR 5011 (emphasis added). In particular, for renewal projects to pass threshold review, the NOFO states that HUD will assess the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." AR 5066. Projects that fail HUD's assessment will be disqualified from consideration. Similarly, at the "Risk Review" stage, HUD identifies a project's "[a]bility to promote self-sufficiency and economic independence" as a "sufficient and independent basis" to reject an application. AR 5092. In imposing these criteria—and the conception of "self-sufficiency" they adopt—HUD disregards the statute's express support for helping people get assistance from mainstream programs (like SNAP or Medicaid). *See* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(A)(v), 11386a(b)(1)(D), 11386b(d)(2)(B). It also ignores the realities of serving communities with disabilities or other needs that make it difficult or impossible to achieve the type of self-sufficiency the NOFO envisions. Declaration of Renee M. Willis ¶¶ 54, 81 (Willis Decl.).

18

### c. Preference for people with particular types of disabilities

The NOFO also announces a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority). In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." AR 5035. Based on that discriminatory premise, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities and creates a second-class tier of disabilities that excludes and harms individuals with mental health disabilities including substance use disorders. Although the NOFO does not award points based on this priority, the statement that this population "should be prioritized" pressures applicants to do just that, given that HUD requires applications to "support the goals of this NOFO" and retains discretion to reject or select projects based on their "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected." AR 5016, 5092; *see also* Willis Decl. ¶ 53.

### d. Inequitable eligibility for CoC Bonus funding

The NOFO also systematically disadvantages communities with higher relative need in favor of communities with lower relative need though arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits). Bonus funding is an amount that CoCs can apply for on top of their statutorily defined need. In particular, the statute requires HUD to take account of the "need within the geographic area for homeless services" when making awards and provides that this need amount is either an amount determined by a regulatory formula based on factors related to population size and poverty or the amount "necessary to provide 1 year of renewal funding for all expiring" CoC grants, whichever is higher. 42 U.S.C. §§ 11386a(b)(2)(B), (c)(1); *see also* 24

19

C.F.R. § 578.17(a)(3). Under binding regulations, this need amount is the base amount CoCs can apply for—but CoCs can also apply for any "available bonuses" on top. 24 C.F.R. § 578.17(b)(3)–(4).

The FY 2026 NOFO provides for a "CoC Bonus" for "new project applications" but sets inequitable limits on the amounts for which CoCs can apply. AR 5016–17. In particular, the NOFO provides that each CoC can apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need—but further establishes that, absent special circumstances, CoCs can apply for a minimum of $500,000 and a maximum of $5 million in bonus money. *Id.* As a result, the amounts CoCs can apply for bear little relation to their actual need. This hits larger CoCs with a double whammy. The Limits make larger CoCs eligible for only a small amount of bonus funding relative to their need. Oliva Decl. ¶¶ 70–71, 142. And, given how the Limits interact with the NOFO's incredibly complex mechanism for scoring applications, the Limits also systematically disadvantage CoCs with higher relative need in competing for *all* Tier 2 funding needed to maintain services in their communities. Oliva Decl. ¶¶ 73–75, 142.

### e. Non-Statutory Threshold Criteria that improperly disqualify Tier 1 projects

The NOFO also includes threshold review criteria that have no grounding in statutory or regulatory requirements (Non-Statutory Threshold Criteria) and that improperly disqualify Tier 1 projects. In the 2026 Appropriations Act, Congress required that HUD award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of funding, CoCs get to decide which projects receive awards, so long as they are "consistent with"

20

statutory requirements. This corresponds to the projects that CoCs list on "Tier 1" of their applications.

Despite the 2026 Appropriations Act's mandate, the NOFO requires *all* new projects, including those listed in Tier 1, to pass a threshold review that is not limited to requirements imposed by statute and regulation, but rather also includes multiple policy-based criteria imposed by the NOFO alone. For example, to obtain certain points toward meeting the minimum required to pass threshold review, projects must have a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark; must provide services in a way "that will result in" *all* program participants participating in services at least 20 hours per week; must "partner[] with first responders and law enforcement" and "cooperate … with the enforcement" of public camping and public drug use laws; and must show that the support offered will help participants achieve "self-sufficiency" (meaning no reliance on any public or private assistance, even from mainstream programs) within 24 months. AR 5011, 5068–70, 5072–73. These criteria threaten to disqualify projects that are eligible under the statute and regulations and that Congress mandated that HUD fund if CoCs included them in their Tier 1.

### 5. Post-award conditions impose ideological and policy restrictions that HUD lacks authority to impose

The FY 2026 NOFO requires successful grantees to agree to award conditions (Post-Award Conditions), many of which are the same as or similar to conditions that courts have repeatedly held likely invalid. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 200–01 (D.R.I. Oct. 23, 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 888–89 (W.D. Wash. 2025), *appeal pending*, No. 25-3664.[3] For one, like the FY

---

[3] The local government plaintiffs here are also plaintiffs in *King County v. Turner*.

2025 NOFOs that this Court recently set aside, the FY 2026 NOFO requires grantees to follow a long list of executive orders, including orders targeting diversity, equity, and inclusion; the rights and identities of transgender and gender-nonconforming people; undocumented immigrants; abortion; and Housing First policies (E.O. Conditions). AR 5111–12. In addition, the NOFO includes a post-award condition (Safe Drug Use Condition) that mirrors the Safe Drug Use Certification described above. AR 5113. That condition aims to deter lawful harm reduction activities and to force grantees to discontinue assistance to any participant who violates a drug-related rule more than once. Finally, in a brazen separation-of-powers violation, the NOFO also includes a provision (Judicial Restriction) that purports to restrict courts' ability to grant relief that would extend beyond the boundaries of that court's district. In particular, the NOFO provides that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective *as to such jurisdiction*." AR 5113 (emphasis added).

### D. The FY 2026 NOFO threatens devastating harms to Plaintiffs and the communities they serve

If HUD is permitted to make awards under this NOFO, that will strip funding from many existing permanent housing and other projects—forcing those projects to withdraw support for the formerly homeless individuals and families that rely on them. The NOFO threatens to cause 97,000 people or more to lose their housing. Oliva Decl. ¶ 186. The loss of housing threatens catastrophic follow-on consequences as well: exposure to extreme weather; life-threatening infections; unmanaged chronic illnesses; predatory violence; sexual assault; and the escalation of behavioral health crises. Oliva Decl. ¶ 9; Declaration of Ann Chanecka ¶ 29 (Chanecka Decl.). The defunding of existing permanent housing projects will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in

22

avoidable medical crises, suffering, and preventable loss of life. Oliva Decl. ¶ 9; Declaration of Jelani Jackson ¶ 17 (Jackson Decl.); Declaration of Sheila A. Dillon ¶ 25 (Dillon Decl.).

The NOFO is also forcing CoCs to make other devastating shifts. Take just a few examples. Some CoCs will shift away from serving the highest-need populations who stand little chance of achieving the wholly-assistance-free version of self-sufficiency that the NOFO rewards. Oliva Decl. ¶ 167; Willis Decl. ¶ 56. Some will shift resources away from people with mental health and substance use disorders to meet the NOFO's discriminatory preference. Oliva Decl. ¶ 167; Willis Decl. ¶ 53. Some will be chilled from putting forward projects that respect transgender people's identities or engage in other disfavored activities, for fear of rejection under the amorphous "risk" or additional-factor review. Oliva Decl. ¶ 166; Declaration of Elizabeth Mengers Magargee ¶ 22 (Magargee Decl.). And domestic violence projects are dropping out because, by law, they cannot impose the service requirements that the NOFO heavily favors— and including them would drag down the entire CoC's chances. Oliva Decl. ¶¶ 128–29, 169. These shifts will erode the effectiveness of communities' responses to homelessness, defund proven strategies, and leave vulnerable individuals and families without needed support. Oliva Decl. ¶ 171.

The NOFO is already causing harm, during the application phase. Not only are CoCs forced to spend their limited resources responding to this unlawful NOFO, they are having to make devastating choices *now* about which projects to prioritize for funding. *See, e.g.*, Declaration of Kathryn J. Kaminski ¶ 21 (Kaminski Decl.); Jackson Decl. ¶¶ 28–29; Declaration of April Calvin ¶¶ 24, 28 (Calvin Decl.); Chanecka Decl. ¶¶ 26, 32; Magargee Decl. ¶ 31; Dillon Decl. ¶ 31. Because the Set-Aside earmarks almost all Tier 2 funding for new projects only, existing projects that CoCs rank in Tier 2 are unlikely to receive funding. Oliva Decl. ¶ 161. CoCs must decide which projects to try to protect and which projects to sacrifice—a task made

23

all the more complicated by HUD's thinly veiled threats to reject even Tier 1 projects if HUD sees something it does not like in conducting its amorphous "risk" and additional-factor review. Oliva Decl. ¶¶ 162, 166; Jackson Decl. ¶ 26; Kaminski Decl. ¶ 39. Worse, the decisions CoCs make now will have long-lasting consequences well beyond FY 2026's funding: If a CoC takes a gamble and seeks funding for a likely disfavored project, a rejection will not only reduce the funding the community gets in FY 2026, but also reduce the amounts it is even eligible to apply for in the years after that. Oliva Decl. ¶ 164. Making these impossible choices is draining resources, causing distress, and jeopardizing the goodwill CoCs have in their communities. *E.g.*, Oliva Decl. ¶¶ 143–46, 170, 172–73; Kaminski Decl. ¶¶ 21–22, 36–39; Dillon Decl. ¶ 30.

The problem will get worse by August 11, the date by which CoCs must announce the results of their local competitions—who they are prioritizing for funding and who they are not. *See* AR 5101. At that point, some providers who are not selected for their CoC's application, or who are ranked lower down, will begin preparing to shut down their programs, given the certainty or near certainty that those projects will not receive funding. Oliva Decl. ¶¶ 174–78; Jackson Decl. ¶ 28; Calvin Decl. ¶ 28; Dillon Decl. ¶ 31; Magargee Decl. ¶ 31; Kaminski Decl. ¶ 25. This will include stopping enrollments and freezing wait lists, preparing clients for the upcoming loss of housing, and laying off staff. *E.g.*, Oliva Decl. ¶ 175; Chanecka Decl. ¶ 32.

Some providers are already withdrawing from the program because they see that they are unlikely to be selected or because they cannot operate under the NOFO's unlawful ideological or other restraints. Oliva Decl. ¶¶ 153–55; Kaminski Decl. ¶ 31. This makes CoCs' homelessness response systems less effective and diverts CoCs' scarce resources away from their primary mission to managing this crisis. Oliva Decl. ¶¶ 153, 156. CoCs must spend their time finding, and in some instances training, suitable organizations to fill in to meet the community's needs. Oliva Decl. ¶ 158; Chanecka Decl. ¶ 15; Magargee Decl. ¶ 12. Once CoCs announce their local

24

competition results, more providers are likely to give up on the program for good. Oliva Decl.
¶ 160.

## LEGAL STANDARDS

***Summary judgment.*** Summary judgment "is appropriate when there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito
v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotations omitted). "On cross-motions for
summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of
the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st
Cir. 2020). For APA claims, "a motion for summary judgment is simply a vehicle to tee up a
case for judicial review and, thus, an inquiring court must review an agency action not to
determine whether a dispute of fact remains but, rather, to determine whether the agency action"
violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

***Preliminary relief.*** The Administrative Procedure Act authorizes courts "to postpone the
effective date of an agency action" or "preserve status or rights" pending resolution of the
proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have
equitable authority to grant a preliminary injunction. *See* The Judiciary Act, ch. 20, § 11, 1 Stat.
73, 78 (1789). The same standards apply to both types of preliminary relief. *R.I. Coal. Against
Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025). To obtain preliminary relief
of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely
"irreparable harm … absen[t] preliminary relief," (3) "that the balance of equities tips in [the
movant's] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def.*

25

*Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the [g]overnment is the opposing party," the final

two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.  **The FY 2026 NOFO and its Challenged Provisions Are Invalid under the APA and the Constitution (Counts 1-4, 8-11)**

A.  **The FY 2026 NOFO and its Challenged Provisions must be set aside under the APA**

1.  **Multiple Challenged Provisions exceed Defendants' statutory authority**

For agencies charged with administering statutes, "[b]oth their power to act and how they

are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297

(2013). "Any action that an agency takes outside the bounds of its statutory authority . . . violates

the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020)

(cleaned up). Many elements of the FY 2026 NOFO exceed Defendants' statutory authority.

To begin, no statute authorizes Defendants to set aside funds for new projects, let alone

new transitional housing and supportive-services-only projects, as the Set-Aside does. The

statute requires HUD to award funds "based on criteria" that HUD establishes pursuant to the

statute. 42 U.S.C. § 11386a(a). It does not permit HUD to categorically limit certain kinds of

projects regardless of how they would rank under the criteria—and it certainly does not permit

HUD to divert funds away from the renewals and permanent housing that Congress prioritized.

*See supra* Background Section A.2–A.3.

Nor does any statute authorize HUD to impose many of the other selection criteria and

conditions—including the Safe Drug Use Condition and Certification, Discriminatory Disability

Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria,

E.O. Conditions, Judicial Restriction, and Non-Statutory Threshold Criteria for Tier 1 projects.

The statute prescribes a detailed list of "[r]equired criteria" HUD must consider when awarding

26

grants—including things like the applicant's "previous performance . . . regarding homelessness," its plan for reducing the existence and duration of homelessness, its coordination with other entities, and its ability to obtain supplemental funding. 42 U.S.C. § 11386a(b)(1). And the statute identifies the conditions to which grantees must agree—things like involving unhoused individuals in project operations and ensuring children are enrolled in school. *Id.* § 11386(b). HUD may also establish additional criteria and conditions to carry out the program "in an effective and efficient manner," *id.* §§ 11386a(b)(1)(G), 11386(b)(8), but the NOFO's criteria and conditions do nothing to serve efficacy and efficiency goals.

Indeed, in many instances, they advance wholly unrelated ideological and policy goals on topics like race, gender identity, abortion, or "harm reduction" activities the grantee conducts outside the scope of the funded program. *See, e.g.*, AR 5090, 5111. Such criteria and conditions are not even "of the same kind" as the ones the statute specifies—all of which involve ways to effectively address homelessness—and the statute cannot be read to authorize conditions that are different in kind from the ones the statute imposes. *King Cnty.*, 785 F. Supp. 3d at 886 (concluding that CoC statute did not authorize DEI, gender-related, and other ideological conditions).

### 2. Multiple Challenged Provisions are contrary to law

Multiple provisions of the FY 2026 NOFO are also outright contrary to binding law.

#### a. Set-Aside

The Set-Aside conflicts with the statute in three separate ways. First, it impermissibly creates incentives for new transitional housing and supportive-services-only projects—contrary to limits in 42 U.S.C. § 11386b(d) on when HUD can provide such incentives. In particular, the HEARTH Act requires HUD to provide "incentives" for specified activities that "have been proven to be effective" in combatting homelessness, and it identifies two (and only two)

27

strategies that Congress deemed to have proven effective—two types of permanent housing. *Id.* § 11386b(d)(2)(A)–(B). The provision also allows HUD to identify additional proven strategies "based on research and after notice and comment to the public." *Id.* § 11386b(d)(2)(C). But HUD has never done so. The Set-Aside therefore violates this provision by providing an incentive for communities to apply for transitional housing and supportive-services-only activities, even though they have not "been proven to be effective," *id.*

Second, the Set-Aside conflicts with the requirement in 42 U.S.C. § 11386c(b) that funds appropriated for the CoC program "shall be available for the renewal of [permanent housing] contracts" for terms of specified durations. The Set-Aside limits the amounts that can be awarded for existing permanent housing—and thereby unlawfully ensures that "[t]he sums" appropriated will not in fact "be available" to renew permanent housing contracts, *id.*

Third, the Set-Aside conflicts with the same provision's mandate that HUD "determine whether to renew" permanent housing projects "on the basis of" the CoC's certification as to two (and only two) things: that "there is a demonstrated need" and that "the project complies with program requirements and appropriate standards of housing quality and habitability." 42 U.S.C. § 11386c(b). The Set-Aside ensures that HUD will determine whether to renew permanent housing projects based not on the two statutorily identified factors but based on whether the limited funding HUD has made available for existing projects has been exhausted.

### b. *Discriminatory Disability Priority*

The Discriminatory Disability Priority conflicts with multiple statutes and regulations by directing projects and CoCs to "prioritize[]" individuals with physical and developmental disabilities—but not mental health disabilities—for permanent supportive housing. AR 5035. This express preference for some types of disabilities over others violates the Rehabilitation Act of 1973, which bars federal agencies from discriminating against people "solely by reason of her

28

or his disability." 29 U.S.C. § 794(a). And projects that follow this directive would engage in discrimination in violation of the Americans with Disabilities Act. 42 U.S.C. §§ 12131–12134, 12181–12189; 28 C.F.R. §§ 35.130(b)(8) & 36.301; *see Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (concluding that treating individuals with one type of disability "worse than persons with other disabilities" is unlawful).

The Discriminatory Disability Priority is also contrary to HUD's own regulations, which prohibit excluding otherwise eligible individuals "on the grounds that they do not have a *particular* disability," 24 C.F.R. § 578.93(b)(7) (emphasis added), and which bar grantees from discriminating on the basis of disability, *id.* § 8.4(b)(1)(ii) (barring grantees from "afford[ing] a qualified individual with handicaps an opportunity to participate in" the grant-funded service "that is not equal to that afforded to others"); *id.* § 9.130(b)(1)(ii) (same). The regulations broadly cover not only physical and developmental disabilities but also mental health disabilities and substance use disorders, so favoring one type of disability over others violates these regulations' non-discrimination mandates. *See id.* §§ 8.3(a)(2), 9.103.

### c.   *Non-Statutory Threshold Criteria*

As applied to Tier 1 projects, the Non-Statutory Threshold Criteria conflict with the 2026 Appropriations Act's requirement that HUD award a specified amount of funds (the amount corresponding to CoCs' Tier 1) "based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, 140 Stat. at 399. This provision requires HUD to make awards to projects that CoCs place in Tier 1 of their community-wide applications, so long as those projects meet statutory requirements. The Non-Statutory Threshold Criteria impermissibly threaten to disqualify Tier 1 projects even if they meet statutory requirements.

29

#### d. E.O. Conditions

The E.O. Conditions are contrary to law insofar as some require grantees to comply with executive orders imposing the view that sex is binary and immutable and that people's gender identities should not be recognized. *See Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025). In particular, the Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, which includes gender identity. 42 U.S.C. §§ 3604(a)–(b), 2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106. Yet these E.O. Conditions would require grantees to commit to treating sex as binary—which would apparently preclude them from acknowledging transgender individuals' gender identity or treating them in accordance with that identity. Thus, these E.O. Conditions would improperly compel organizations to violate the Fair Housing Act, Title VII, and/or HUD's nondiscrimination regulations.

### 3.    The FY 2026 NOFO is arbitrary and capricious

This Court recently held that, in withdrawing funding from proven permanent housing approaches and abandoning Housing First in the FY 2025 NOFOs, HUD had acted arbitrarily and capriciously. *Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886, at \*3–4 (D.R.I. June 29, 2026). The FY 2026 NOFO suffers from the same problem.

30

Foundational principles of administrative law forbid agencies from making "arbitrary" or "capricious" decisions. 5 U.S.C. § 706(2). For an agency action to pass muster, the agency must have offered "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* An agency must genuinely consider relevant evidence and factors; merely "stating that a factor was considered—or found—is not a substitute for considering or finding it." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (cleaned up). And when an agency changes policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009), and the agency "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (cleaned up). The FY 2026 NOFO flunks these basic standards.

### a. Set-Aside

First and foremost, HUD fails to articulate "a rational connection between the facts found and the choice made" in adopting the Set-Aside. *See State Farm*, 463 U.S. at 43. HUD adopted the Set-Aside to "restore balance" to the Continuum of Care. AR 5040–41. But Congress did not seek "balance"; Congress sought to promote effective strategies to address homelessness—and identified permanent housing as what had proven effective. *See* 42 U.S.C. § 11386b(d)(2)(A), (B). Disregarding Congress's goals is arbitrary and capricious. *See State Farm*, 463 U.S. at 55

31

(explaining that agency, when making decision, must "bear in mind" what "Congress intended … to be the preeminent factor").

HUD, moreover, claims that the Set-Aside is needed to "expand opportunities" for transitional housing and supportive-services-only projects to receive funding. AR 51. But HUD did not need to give those projects a conclusive preference in the competition to expand their "opportunities"—and, in fact, doing so flatly conflicts with HUD's other primary goal of promoting "competition." *See* AR 48–50. Making almost a third of the program's funding available only to limited types of projects restricts, not promotes, competition. HUD did not explain or justify the anti-competitive impacts of the Set-Aside. Nor did it consider the obvious alternative of allowing all projects to compete on equal footing, let alone "give a reasoned explanation for its rejection of such [an] alternative[]." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (explaining that failure to consider alternatives renders action arbitrary and capricious).

In addition, HUD disregards the reality that categorically cutting off funding for existing permanent housing projects will cause those projects to shutter and force formerly homeless individuals and families out of their homes. HUD claims it has "provide[d] a path" for "current participants to maintain … assistance," but by and large it has not. AR 54. HUD's chief (purported) solution is that residents of defunded permanent housing can just move to transitional housing. *See* AR 54–55, 5041. But that is generally not practicable. Because transitional housing programs can only serve individuals who meet the definition of "homeless" in statute and regulation, permanent housing residents do not qualify unless they suffer the trauma of becoming homeless again. *See* 24 C.F.R. § 578.3; 42 U.S.C. § 11302(a)(1)–(4); Oliva Decl. ¶¶ 106–08. HUD points out that permanent housing residents can qualify if they are at "imminent risk of homelessness," but it ignores that a person fits in that regulatory category only

32

if they are going to lose their residence within 14 days—and that it is far from guaranteed that this timing will line up with a transitional housing spot being available. AR 55; Oliva Decl. ¶ 108; Willis Decl ¶ 51. After all, communities do not have sufficient available resources to serve everyone who will be thrust out of permanent housing and into homelessness once again. *See* Oliva Decl. ¶¶ 99, 108; Willis Decl. ¶ 24; Kaminski Decl. ¶¶ 32–34; Chanecka Decl. ¶ 29.

The new transitional housing that the NOFO aims to fund does not solve that problem. For one, that housing may not be in the same geographic area as the permanent housing projects that are defunded. And, in any event, the new transitional housing will not be able to house all the people as are displaced from permanent housing because transitional housing is more expensive and the same level of funding therefore houses fewer people. Oliva Decl. ¶ 112. HUD baldly asserts that the shift to transitional housing "should not change the number of people who can be served," but that is incorrect, and cannot be squared with HUD's own acknowledgment that transitional housing costs more. *Compare* AR 55, *with* AR 52, 53.

The NOFO's "transition grants" do not solve the problem either. *Contra* AR 55. While those grants in theory enable existing providers to transition a permanent housing project to a transitional housing project over the course of the year, they are not a practicable option in many circumstances. For one, providers must convert their *entire* project to transitional housing to be eligible for the grant—and could not take advantage of the transition grant option while also trying to protect permanent support for residents with serious disabilities or others for whom transitional housing would not work. Oliva Decl. ¶ 104. Moreover, many existing providers would face significant barriers to offering transitional housing. Willis Decl. ¶ 79; Calvin Decl. ¶ 16. In particular, providers often assist with housing by offering tenant-based rental assistance—that is, funds to subsidize rent (as opposed to providing physical units that the provider itself owns or leases, which is more burdensome to do). *See* Oliva Decl. ¶¶ 101–03;

33

Willis Decl. ¶ 79a. But binding regulations preclude nonprofit organizations from administering such rental assistance for transitional housing projects, even though they can for permanent housing projects. *Compare* 24 C.F.R. § 578.51(b), *with* 42 U.S.C. § 11383(g); *see also* Oliva Decl. ¶ 101. In other instances, providers have properties with population- and use-restrictions that cannot easily be converted away from permanent supportive housing. Jackson Decl. ¶ 20. In still other instances, insurers have refused to insure projects operating as transitional (as opposed to permanent) housing. Oliva Decl. ¶ 154. Thus, for many existing providers, seeking a transition grant to convert to transitional housing is not a viable option—and they will not be able to keep their participants housed.

HUD did not sufficiently account for the "serious reliance interests" of providers and the individuals and families they serve. *See Regents*, 591 U.S. at 30. Plaintiffs and their members and constituents, along with countless providers around the country, developed supportive housing systems, invested significantly in building permanent housing—including with their own funds—all in reliance on the longstanding and consistent directives from HUD. *See, e.g.*, Oliva Decl. ¶¶ 26, 110, 188; *see also* Kaminski Decl. ¶¶ 14–18; Jackson Decl. ¶¶ 19–20; Dillon Decl. ¶¶ 19–20. And the individuals and families in permanent housing rely on the stable living environment that meets their unique needs. HUD did not adequately consider the harm that will befall them when they lose housing, or the resulting consequences for the communities in which they live. *See, e.g.*, Oliva Decl. ¶¶ 111–14; Chanecka Decl. ¶ 21.

### b. *Service Requirements Criteria*

The NOFO's Service Requirements Criteria are also arbitrary and capricious for multiple reasons. To start, as with last year's NOFO, HUD "gives little to no thought or analysis to the negative externalities created by its transition from a Housing First approach to one that mandates" services. *Washington v. HUD*, 2026 WL 1863886, at *4. As HUD previously

determined, requiring treatment can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services." AR 1153; *see also* Oliva Decl. ¶¶ 115–16, 123. HUD fails to consider that detrimental impact now, and fails to explain its departure from these "facts and circumstances that underlay" HUD's prior longstanding support of Housing First—a failure that in itself renders the Service Requirements Criteria arbitrary and capricious. *See Fox*, 556 U.S. at 515–16.

HUD also fails to consider that service requirements erode client trust and choice, which can lead to client disengagement and make it harder to give them help. Oliva Decl. ¶¶ 115–16, 123; Willis Decl. ¶ 85. HUD likewise does not consider that many people will refuse services, and, with service mandates, providers will be forced to exit those individuals, resulting in more unhoused people—not less. *See* Oliva Decl. ¶¶ 115–16; Declaration of Michelle M. Wilcox ¶¶ 28–29 (Wilcox Decl.). HUD emphasizes troubling statistics about drug use and overdoses among certain homeless populations, but offers no evidence that service requirements will do better than Housing First in addressing those problems. *See, e.g.*, AR 59; *see also* Oliva Decl. ¶ 86.

HUD also failed to adequately account for the impact on entities that provide housing to survivors of domestic violence and sexual assault—who generally cannot mandate services. While CoC funding is a key source of funding for those entities, their programs also frequently rely on funding under the Violence Against Women Act and other federal laws that outright prohibit grantees from mandating services. 34 U.S.C. § 12351(b)(3); 42 U.S.C. § 10408(d)(2); Oliva Decl. ¶¶ 128–29. Those providers cannot lawfully change their policies to earn the (significant) points the NOFO assigns for service requirements. And CoCs are disincentivized from including such providers in their applications because that will drag down the CoC's overall score as well, thereby jeopardizing the whole community's funding. *See* AR 5084, 5095;

*see also* Oliva Decl. ¶¶ 128–29. This systematically disadvantages domestic violence services. HUD ensured that these providers would not be penalized for denying assistance to an otherwise-eligible participant "on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence" or a related crime. AR 63, 5084, 5095. But the NOFO still penalizes DV providers for not mandating services—a serious impact that HUD apparently did not even consider. *See* AR 63.

HUD also distorts or outright ignores the evidence to justify its departure from Housing First. HUD decries the Housing First approach as a "failure" and recites statistics showing that various homelessness metrics had gotten worse since HUD implemented a Housing First policy. AR 42, 5033. But as HUD itself previously concluded, the rise in homelessness is attributable to factors like the "national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism"—*not* the availability of housing without service mandates. AR 902; *see also* AR 921, 933, 945, 956, 975; Oliva Decl. ¶¶ 90–93; Willis Decl. ¶¶ 21–25. Congress likewise found that "a lack of affordable housing and limited scale of housing assistance programs are the primary causes of homelessness." Pub. L. 111-22, div. B, § 1002, 123 Stat. 1632, 1664 (2009). HUD now pays lip service to the "multitude of factors" likely driving increases in homelessness, AR 48, but ultimately just asserts without evidence that Housing First policies are to blame, *see* AR 41–48. HUD also failed to consider that just days before the NOFO's release, HUD quietly published a report showing that, between 2024 and 2025, while Housing First remained HUD's approach, homelessness *decreased* by 3.3 percent. AR 1025; s*ee also* Oliva Decl. ¶ 91.

HUD also dismisses the large body of evidence showing that Housing First is effective, while at the same time pointing to no valid evidence that service requirements are effective. As the First Circuit recently noted, the "Housing First model is evidence-based, with studies

36

consistently showing that people are more likely to maintain their housing and avoid a return to homelessness when they live in a Housing First facility." *Washington v. HUD*, 171 F.4th 473, 480 n.1 (1st Cir. 2026). HUD acknowledges a 2021 systematic review of 26 studies that concluded that "Housing First programs are more effective in reducing homelessness and improving housing stability than Treatment First programs," AR 1180—but disregards it because of various nitpicked limitations. *See* AR 44–45; *see also* Oliva Decl. ¶¶ 124–25. It also brushes aside a HUD publication highlighting numerous studies that found Housing First programs to be more effective than Treatment First—at boosting housing stability, quickly helping people out of homelessness, reducing costs, and more. *See* AR 44, 1151; Oliva Decl. ¶¶ 123–27; *see also* Jackson Decl. ¶¶ 23–24 (PSH participants in MLK County showed decline in emergency room visits and jail bookings); Dillon Decl. ¶ 18 (citing a study in Massachusetts that concluded that permanent supportive housing programs save taxpayers over $13,000 per person per year). On this one, HUD asserts that the studies focused on the lack of "preconditions" as opposed to the lack of service requirements, AR 44—when, in fact, they actually considered the "voluntary" nature of services as well. AR 1143–44. This approach—dismissing or mischaracterizing evidence that does not support HUD's policy preferences—pervades HUD's attempt to justify its departure from Housing First. *See* AR 44–48; *see also* Oliva Decl. ¶ 115–127.

At the same time, HUD fails to point to any evidence that service requirements are effective in addressing homelessness, and instead points to studies that show that robust *voluntary* services contribute to housing retention. AR 45; Oliva Decl. ¶¶ 126–27. HUD also claims that the HUD-VASH program—a very successful program serving homeless veterans—demonstrates the effectiveness of service requirements. AR 46–47. But although that program requires participants to "receive case management services … as needed," that requirement is consistent with Housing First and in fact is something that all rapid rehousing requires—and the

HUD-VASH program offers services on a *voluntary* basis. *See* 89 Fed. Reg. 65769, 65775 (2024); 24 C.F.R. § 578.37(a)(1)(ii)(F); *see also* Oliva Decl. ¶ 127.

### c. Other Provisions

Other criteria and provisions fail arbitrary-and-capriciousness review as well.

*Anti-Harm Reduction Criteria.* HUD's justification for the criteria that require or encourage CoCs and providers to eliminate harm reduction activities, even those conducted with their own funds, is unsupported by the evidence HUD presents. AR 59–62; *see also* Oliva Decl. ¶¶ 132–33. In addition to mischaracterizing studies that it claims support its new approach, HUD fails to address the significant research that demonstrates that harm reduction is effective in both preventing overdoses and addressing homelessness. *See* Oliva Decl. ¶ 133. HUD also fails to consider that the requirement that applicants not operate "illegal" safe consumption sites—with no explanation of what that means—will deter legal harm reduction efforts.

*Law Enforcement Criteria.* The FY 2026 NOFO provisions that pressure CoCs to adopt and express support for unproductively punitive law enforcement responses to homelessness ignore Congress's goals and lack support in evidence. To begin, Congress urged development of "constructive alternatives to criminalizing homelessness," but these provisions push criminalization. 42 U.S.C. § 11313(a)(12).

These criteria promote aggressively clearing encampments, but HUD offers no evidence that clearing encampments alone effectively transitions unsheltered individuals into housing. *See* AR 64–70. HUD again mischaracterizes the studies and data it sets forth. *See* Oliva Decl. ¶ 134. HUD states that the NOFO's focus is not "to jail, fine, or endlessly move unsheltered individuals," AR 67, but it fails to consider that the evidence shows these are exactly the effects that requiring punitive law enforcement responses to homelessness will have. Oliva Decl. ¶ 135. Further, HUD overlooks evidence finding that criminalization policies do not work. *See* Oliva

Decl. ¶¶ 134–35. It also entirely fails to consider the impacts of exposing more people to criminal legal system interactions for nonviolent offenses. *Id*.

**Self-Sufficiency Criteria.** The NOFO also arbitrarily and capriciously requires projects to promote "self-sufficiency," defined in the NOFO as the ability to meet basic needs "without public or private assistance." AR 5011. That fails to account for Congress's direction, throughout the statute establishing the CoC program, that providers should "*promote* access to, and effective utilization of" mainstream benefits programs. 42 U.S.C. § 11381(3) (emphasis added); *see also id.* §§ 11313(a)(7), 11386a(b)(1)(A)(v), 11386a(b)(1)(D), 11386b(d)(2)(B). Further, HUD failed to consider that rewarding projects that achieve this type of self-sufficiency disincentivizes CoCs from serving people with severe disabilities and others facing the most obstacles to self-sufficiency and who are in greatest need of support. *See* Oliva Decl. ¶ 138; Willis Decl. ¶ 55.

**Discriminatory Disability Priority.** HUD relies on baseless stereotypes, not evidence, in prioritizing individuals with physical and developmental disabilities over those with mental, emotional, or substance use disorders. HUD suggests that "able-bodied people" can "move to self-sufficiency" while individuals with other types of disabilities cannot. *See* AR 5035. But it cites no evidence to support that premise. Instead, it ignores completely individuals with mental and emotional disabilities, and repeatedly treats substance use disorders as an issue of a lack of "accountability and structure," as opposed to the disability that it is. AR 44. HUD's reliance on baseless stereotypes with respect to substance use disorders (and apparently mental health disabilities as well) cannot satisfy the requirement for reasoned decisionmaking. *Cf., e.g.*, *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 160 (D. Me. 2019) (holding that defendant could not base policy decisions on stereotypes).

HUD, moreover, failed to consider that grantees cannot prioritize one class of disabilities over another while also complying with federal law, HUD's own regulations, and local and state

39

laws that prohibit unequal treatment on the basis of disability. *See supra* Section I.A.2.b. Nor did it consider the reliance interests of individuals who are currently in permanent supportive housing but who do not have a "prioritized" physical or developmental disability; this provision risks jeopardizing their stable housing simply based on stigma-based judgment. *See* Oliva Decl. ¶ 139; Calvin Decl. ¶ 22; Willis Decl. ¶ 53.

*Amorphous "Risk Review" Criteria and Additional Factors.* HUD did not consider how the amorphous "risk review" criteria and additional factors distort the CoC competition—there is no mention of them in the relevant memo explaining the NOFO. *See* AR 39–74. With these factors, HUD signals it might reject awards for virtually any reason at all. This in turn pushes CoCs to select and prioritize projects based on predictions about what HUD might reject based on ideological or other grounds. For example, these factors create cause for concern that HUD might reject applicants whose conduct the Administration disfavors—like those who "deny the sex binary in humans" or who engage in diversity, equity, and inclusion activities the Administration views as suspect. *See Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 of August 7, 2025, 90 Fed. Reg. 38929 (Aug. 12, 2025) (mandating that grants should not promote such activities). HUD did not consider that this would in some instances push CoCs to make selections based on these irrelevant ideological considerations rather than on the project's effectiveness or community need. *See* Oliva Decl. ¶¶ 140–41.

*Bonus Limits.* HUD failed to consider that the limits on CoC Bonus funding will arbitrarily and inequitably shift funding away from communities with higher relative need to communities with lower relative need. *See* Oliva Decl. ¶¶ 70–75, 142. HUD claims that the limits ensure that awards are made based "on merit" and not on the CoC's "existing resources." AR 73. But CoCs compete for bonus funding, so awards are necessarily already made based on merit. HUD, moreover, entirely failed to consider how the Bonus Limits interact with the

40

complex system for scoring Tier 2 projects—and how that interaction would systematically disadvantage CoCs with higher relative need in competing for *all* Tier 2 funding needed to maintain services in their communities, not just in competing for bonus funding. Oliva Decl. ¶¶ 71–75.

*E.O. Conditions.* The E.O. Conditions are indistinguishable from conditions that courts, including this one, have held likely arbitrary and capricious. *See, e.g.*, *R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 186, 200–01; *King Cnty.*, 785 F. Supp. 3d at 888–89. Here, as in those cases, HUD has provided no reasoned explanation—indeed, the memo explaining the basis for the NOFO does not mention those conditions at all. AR 39–74. HUD, moreover, has failed to consider important aspects of the problem, including that it will be difficult for grantees to understand what these conditions require of them given that executive orders typically provide instructions to federal agencies, not the public. These conditions, moreover, will improperly chill grantees from engaging in lawful activities—like recognizing people's gender identities or promoting DEI—that are inconsistent with the executive orders' announced policies. *See* Frazier Decl. ¶¶ 12–19; Willis Decl. ¶¶ 57, 58, 83. HUD did not address these consequences.

### 4.    The Set-Aside Violates Notice-and-Comment Requirements

On top of its other problems, the Set-Aside was also adopted "without observance of procedure required by law" and must be vacated for that reason as well. 5 U.S.C. § 706(2)(D). For two separate reasons, Defendants were required to undertake notice and comment before adopting the Set-Aside.

First, longstanding HUD regulations require the agency to undertake notice and comment before taking action that qualifies as a substantive rule under the APA. *See* 24 C.F.R. § 10.1. While the APA itself exempts matters relating to grants from notice-and-comment requirements,

41

5 U.S.C. § 553(a)(2), HUD regulations require notice-and-comment for substantive grant-related rules despite that exemption, 24 C.F.R. § 10.1. Agency actions with "binding effect" qualify as substantive (also known as "legislative") rules, *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 358–59 (D.C. Cir. 2017), and the Set-Aside easily meets that standard: It categorically makes $1.3 billion unavailable for existing projects and further makes those funds unavailable for permanent housing unless all transitional housing and supportive-services-only applications have been funded first. *See* AR 5094. That has "binding" effect and "restrain[s] the discretion of officials and [is] therefore subject to the notice-and-comment procedures." *See Caribbean Produce Exch., Inc. v. Sec'y of Health and Human Servs.*, 893 F.2d 3, 7 (1st Cir. 1989).

Second, 42 U.S.C. § 11386b(d) requires HUD to undertake notice and comment before it can provide incentives for activities (other than the two permanent housing activities that Congress itself identified has having been proven effective). The Set-Aside creates a hefty incentive for CoCs to create new transitional housing and supportive-services-only projects, because those projects automatically win out over other types of projects. But, by statute, HUD can only create such incentives for "activities that have been proven to be effective"—and can only designate activities as meeting that standard "based on research and after notice and comment to the public." 42 U.S.C. § 11386b(d)(1), (2)(C). It has not undertaken that required process.

Defendants' failure to undertake notice and comment violated both 24 C.F.R. § 10.1 and 42 U.S.C. § 11386b(d)(2)(C)—and the Set-Aside is therefore procedurally invalid.

### B. Multiple Challenged Provisions are unconstitutional

Multiple Challenged Provisions also violate the Constitution. That provides additional grounds to set them aside under the APA. *See* 5 U.S.C. § 706(2)(B). And it is also grounds to enjoin Defendants from implementing the provisions. *See Free Enter. Fund v. PCAOB*, 561 U.S.

42

477, 491 n.2 (2010) (recognizing courts' power to "issue injunctions to protect rights safeguarded by the Constitution" (cleaned up)).

### 1. The Local Policies Criterion and "Gender Ideology" E.O. Conditions violate the First Amendment

The Local Policies Criterion and the "Gender Ideology" E.O. Conditions both violate the First Amendment by disadvantaging applicants that express a disfavored viewpoint—whether the view that opposes aggressive enforcement of public camping bans or other local policies that HUD favors (in the case of the Local Policies Criterion) or the view that a person can have a gender identity distinct from their sex assigned at birth (in the case of the "Gender Ideology" E.O. Conditions).[4] While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," it can only do so within constitutional limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). These conditions transgress those limits several times over.

For one, the government may not leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). But, by awarding points to CoCs that commit not to "interfere with or impede" local policies that HUD favors, the Local Policies Criterion aims at suppressing opposition to those local policies. Similarly, by requiring grantees to adhere to the view that sex is binary and immutable, the "Gender Ideology" E.O. Conditions aim to suppress the view that gender can be distinct from sex assigned at birth— just the sort of problem that led another judge in this district to find that a similar grant condition likely violated the First Amendment. *See R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 194–95, 200 (addressing prohibition on "using grant funds to promote 'gender ideology'").

---

[4] The First Amendment claim is brought by Plaintiffs the National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads Rhode Island, and Youth Pride, Inc.

Second, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Agency for Int'l Dev.*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). The Local Policies Criterion straightforwardly oversteps that limit by penalizing CoCs for their speech, whether within or outside the scope of the HUD-funded program. *See* AR 5085–86. In addition, as the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Agency for Int'l Devl.*, 570 U.S. at 218 (quoting *Rust*, 500 U.S. at 197). The "Gender Ideology" E.O. Conditions do just that. Under those conditions, a grantee apparently must use language that acknowledges only sex assigned at birth, and not gender, and thus effectively must express the government's views on gender as if they were the grantee's own.

Finally, the government can also violate the First Amendment by imposing a funding condition "not relevant to the objectives of the program." *Agency for Int'l Dev.*, 570 U.S. at 214. The "Gender Ideology" E.O. Conditions are "entirely untethered to any 'legitimate objective[s]'" of the program. *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1218 (N.D. Cal. 2025) (holding that it likely violated the First Amendment to bar grantees from "promot[ing] gender ideology"). Instead, they are "directed . . . towards disfavored speech." *Id.* at 1219. Under those Conditions, a grantee apparently could not "refer to the clients they serve . . . by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the grant program's purpose of providing permanent supportive housing to help people overcome homelessness.

44

### 2. Multiple provisions violate the Spending Clause and other separation-of-powers provisions

The Challenged Provisions violate the separation of powers. Imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of . . . the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020). Defendants have done precisely that here. As explained above, *supra* Section I.A.1–I.A.2, Congress has not authorized Defendants to impose the Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Local Policies Criterion, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, and (as applied to Tier 1 projects) the Non-Statutory Threshold Criteria. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles, including the Legislative Vesting Clause, Appropriations Clause, and requirement that laws be passed through bicameralism and presentment, not unilateral executive action. *See* U.S. Const. art. 1, § 1, § 7 cl. 2, § 9 cl. 7. Defendants also trench on Article III powers by purporting to limit the scope of relief that courts can order. *See* AR 5113.

The Challenged Provisions of the FY NOFOs also violate the Spending Clause. *See* U.S. Const. art. I, § 8, cl. 1. Under the Spending Clause, Congress can "condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives"—but conditions on receipt of funds must be "unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (cleaned up). Several of the Challenged Provisions transgress that limit, leaving recipients unable to "exercise their choice knowingly." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). It is not clear, for example, what it means to comply with executive orders that impose no explicit requirements on the public and instead just announce

45

general policies, nor is it clear what HUD intends to prohibit in barring supposedly "illegal" safe-consumption sites that have long been considered legal. *See* AR 5065, 5111–12, 5113.

Challenged Provisions also transgress the Spending Clause's requirement that conditions on federal funding be "reasonably calculated" to advance "a purpose for which the funds are expended." *Dole*, 483 U.S. at 207, 209. For example, requiring grantees to adopt the Administration's views on gender or to facilitate immigration enforcement, as the E.O. Condition appears to do, is not even loosely tied to the goal of ending homelessness. *Cf. California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 311 (D.R.I. 2025) (concluding that condition on transportation grants requiring cooperation with federal immigration enforcement "blatantly violates the Spending Clause" because it "bears no reasonable relationship to the" grant programs).

## II.   HUD Has Unlawfully Failed To Provide CoCs Statutorily Mandated Information Necessary for Them To Apply (Count 5)

HUD Defendants have unlawfully failed to provide CoCs with information they need to apply for CoC program funding. Under the statute, HUD must "inform each collaborative applicant, at a time concurrent with the release of the notice of funding availability for the grants, of the pro rata estimated grant amount under this part for the geographic area represented by the collaborative applicant." 42 U.S.C. § 11386a(b)(2)(A). That "estimated grant amount" is either an amount determined by formula under the governing regulations or the amount "necessary to provide 1 year of renewal funding for all expiring" awards for that area, whichever is higher. *See id.* § 11386a(b)(2)(B). This information is critical because it governs how much funding CoCs can apply for. *See, e.g.*, AR 5016–17, 5030, 5095; *see also* Oliva Decl. ¶¶ 32, 40. HUD did not provide this information concurrently with the release of the NOFO, nor has it provided it to date. Oliva Decl. ¶ 40.

The APA entitles Plaintiffs to an order compelling Defendants to provide this information. Under 5 U.S.C. § 706(1), a court "shall … compel agency action unlawfully withheld" where an agency was "required to take" a "discrete agency action" but has not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). There can be no reasonable dispute that relief is warranted here. Informing collaborative applicants of their pro rata estimated grant amounts is a "discrete" action, and the statute required HUD to complete that action when it issued the NOFO, 42 U.S.C. § 11386a(b)(2)(A). HUD has "unlawfully withheld" that action by "fail[ing] to meet [the] concrete statutory deadline"—so Section 706(1) "requires [the Court] to compel" Defendants to take that action. *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191–92 (10th Cir. 1999).

## III.    OMB Has Unlawfully Restricted CoC Funding (Counts 6-7, 8-10)

OMB has also improperly restricted CoC funding in violation of the APA and the Constitution by imposing the Apportionment Footnotes.

To begin, the Apportionment Footnotes must be set aside because they exceed OMB's statutory authority. *See* 5 U.S.C. § 706(2)(C). No statute confers on OMB the authority to impose extra-statutory ideological and policy restrictions on how agencies can use appropriated funds. OMB has authority to apportion appropriated funds—that is, make them available—before an agency can obligate them. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025) (noting that the President has delegated responsibility for apportioning funds to the Director of OMB). But that is an administrative power that is meant to ensure that agencies do not spend funds in excess of what Congress appropriated. *See* 31 U.S.C. § 1512(a). Nothing in the statute authorizes OMB to use this power to implement policy objectives. *See City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987) (noting that Congress amended apportionment provisions to

47

preclude the executive branch from using them "as authority for implementing 'policy' impoundments").

The Apportionment Footnotes must also be set aside for the independent reason that they are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). The administrative record shows that OMB considered nothing more than the two executive orders in compelling HUD to abide by them. OMB Administrative Record 1–9.[5] It therefore necessarily failed to consider any aspects of the problem, including the restrictions' impacts on providers, CoCs, and program participants. And, as court after court has made clear, that "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal pending*, No. 25-1428; *see also, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888–89 ("[R]ote incorporation of executive orders … does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (W.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

Finally, the Apportionment Footnotes violate the Spending Clause and other separation-of-powers provisions because, as with the various NOFO provisions discussed above, imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of . . . the separation of powers." *City of Chicago*, 961 F.3d at 892. This constitutional problem provides additional grounds to set the

---

[5] The OMB Administrative Record is included in the Excerpts of Administrative Record included as an attachment to this memorandum.

Apportionment Footnotes aside under the APA and is also grounds to enjoin OMB Defendants from implementing them. *See* 5 U.S.C. § 706(2)(B); *Free Enter. Fund*, 561 U.S. at 491 n.2.

## IV.   The Court Should Grant Relief Promptly To Prevent Irreparable Harm

The FY 2026 NOFO puts Plaintiffs and Plaintiff Associations' members in a terrible position. If Defendants proceed with that NOFO, Plaintiffs and their members will suffer devastating harm, not least because a substantial number of existing projects are guaranteed to lose funding, threatening the housing of 97,000 people or more. Oliva Decl. ¶ 186; Wilcox Decl. ¶ 56; Chanecka Decl. ¶ 29; Magargee Decl. ¶ 23; Dillon Decl. ¶ 24; Willis Decl. ¶¶ 48, 75–76. At the same time, blocking the NOFO will cause delays in HUD's making FY 2026 awards— delays that, if substantial, themselves seriously jeopardize Plaintiffs' and their members' ability to continue their critical work. To guard against the harm that substantial delays would cause, Plaintiffs respectfully request that the Court enter summary judgment expeditiously, so that the unlawfulness of the FY 2026 NOFO can be conclusively determined and HUD can reissue a valid NOFO and promptly move forward with making awards under a fair and lawful process. If the Court cannot rule on summary judgment by August 10, Plaintiffs respectfully request that the Court enter preliminary relief by then to guard against the irreversible consequences that will multiply come August 11, the NOFO's deadline for CoCs to announce their local competition results.

### A.  The Court should grant summary judgment to Plaintiffs expeditiously

The Court should grant summary judgment expeditiously to minimize delays in HUD's making FY 2026 awards.[6] Once the FY 2026 NOFO is set aside, HUD will need to reissue a

---

[6] Plaintiffs have moved for partial summary judgment. Their motion covers all claims relating to the FY 2026 NOFO, but does not cover Count 12, which relates to HUD's ongoing delays in making FY 2025 renewal awards. If those delays continue, Plaintiffs will separately seek relief on that claim at an appropriate time.

new, lawful NOFO; CoCs will need to apply; and HUD will need to make awards pursuant to a lawful process. Under the timelines the FY 2026 NOFO itself projects, that process will take at least 5 months. *See* AR 5042. FY 2025 grants will begin expiring in January 2027, and more and more projects' awards will expire in the months that follow. Oliva Decl. ¶ 194; Jackson Decl. ¶ 27; Calvin Decl. ¶ 27. That will leave projects with the same types of funding gaps that HUD caused last year, and that this Court took action to mitigate. *See* Order, *Nat'l Alliance to End Homelessness v. HUD*, No. 25-cv-636 (D.R.I. Dec. 23, 2025) (Dkt. No. 52).

Some Plaintiffs and members will face tremendous obstacles in securing alternative funding to maintain their housing projects and retain their staff. Oliva Decl. ¶¶ 196; Chanecka Decl. ¶¶ 29, 32; Jackson Decl. ¶ 27; Dillon Decl. ¶ 28; Willis Decl ¶ 43. And even where they can temporarily fill gaps, they must divert resources away from other critical services and programs, such as public health, public safety, and social services programs, harming their local communities. Oliva Decl. ¶ 196; Magargee Decl. ¶ 26. Moreover, while the status of continued funding remains unclear, many projects will in some instances need to stop accepting new clients, as they cannot responsibly offer help to people if they risk having to withdraw that support all too soon, thereby retraumatizing those individuals and causing lasting harm to the trust needed to serve those individuals effectively. Oliva Decl. ¶¶ 195. For all these reasons, Plaintiffs respectfully request an expeditious final ruling in this case.

**B. On summary judgment, the Court should order remedies to fully redress Defendants' myriad violations**

On summary judgment, the Court should enter appropriate remedies to address HUD Defendants' unlawful issuance of the FY 2026 NOFO, OMB's unlawful imposition of the Apportionment Footnotes, and HUD's unlawful failure to inform CoCs of their estimated grant amounts.

50

**1.    The Court should vacate the FY 2026 NOFO, declare Challenged Provisions unlawful, and permanently enjoin HUD from reimposing them**

As remedies for the myriad problems with the FY 2026 NOFO, the Court should vacate the NOFO under the APA; declare the Challenged Provisions unlawful; and permanently enjoin HUD from reimposing those Provisions that exceed HUD's authority, are contrary to law, or violate the Constitution.

*Vacatur.* First, vacating the FY 2026 NOFO is warranted. Vacatur is the ordinary remedy when a court determines that an agency action violates the APA. *See, e.g.*, *California v. U.S. DOT*, 808 F. Supp. 3d at 312 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring)); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002). Because vacatur "acts directly" on the agency action under review, *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring), it is not a party-specific remedy. And, indeed, a party-specific remedy would not even be workable in this case, where all CoCs compete for funding from the same pot of money.

*Declaratory Relief.* Second, declaratory relief—declaring the FY 2026 NOFO and its Challenged Provisions unlawful—is also appropriate. As this Court has recognized, where Plaintiffs establish that agency action is "unlawful, declaratory relief is clearly warranted." *Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025).

*Permanent Injunction.* Third, a permanent injunction is also warranted to block HUD from reimposing the Challenged Provisions whose unlawfulness HUD cannot cure—namely, those that exceed HUD's authority, are contrary to law, and/or are unconstitutional.[7] The APA

---

[7] Those Challenged Provisions are the Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, Judicial Restriction, Local Policies Criterion, and (as applied to Tier 1 projects) the Non-Statutory Threshold Criteria.

authorizes courts to issue "writs of prohibitory or mandatory injunction." 5 U.S.C. § 703. Although an injunction is not necessary where it would "not have any meaningful practical effect independent of" vacatur of the challenged agency action, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), an injunction may be warranted where the agency could attempt to take a similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) (enjoining defendants from "implementing or enforcing" the guidance documents at issue against plaintiffs, as well as any future guidance documents adopting a similar interpretation). Injunctive relief is warranted here to prevent Defendants from making an "end-run" around the Court's decision by attempting to reimpose the same unlawful provisions in the new NOFO it will have to issue for FY 2026.

In addition, the traditional factors pertinent to injunctive relief support entry of a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs prevail on the merits for the reasons discussed above.

And, without an injunction, Plaintiffs face "irreparable injury" that could not be adequately redressed through "remedies available at law." *Id.* If HUD pursues another NOFO with the Challenged Provisions, Plaintiffs and their members would again be thrown into crisis. The Set-Aside would force CoCs to eliminate longstanding and high-performing permanent housing programs, leave existing sites with shortfalls, and threaten the housing of tens of thousands of people. Oliva Decl. ¶¶ 186, 190; Wilcox Decl. ¶¶ 56–57; Jackson Decl. ¶¶ 15–20; Calvin Decl. ¶¶ 12–15, 19; Chanecka Decl. ¶¶ 21–22; Dillon Decl. ¶¶ 14, 19; Magargee Decl. ¶ 15; Willis Decl. ¶¶ 48, 75–76. And CoCs would again have to redirect limited funds and resources into emergency stabilization efforts instead of long-term and proactive engagement. Oliva Decl. ¶ 179; Jackson Decl. ¶ 18; Chanecka Decl. ¶ 21; Magargee Decl. ¶¶ 17, 26. With other Provisions too, CoCs would be forced to make impossible choices—like by favoring

people with physical disabilities over other types of disabilities (to comply the Discriminatory Disability Priority), by withdrawing support for the neediest individuals (to increase the chances of meeting the Self-Sufficiency Criteria), refusing to seek funding for any organizations that engage in life-saving harm reduction or other disfavored activities that could lead HUD to reject them. Oliva Decl. ¶ 167; Wilcox Decl. ¶¶ 34–38, 40–42, 51–52; Jackson Decl. ¶¶ 25, 29; Calvin Decl. ¶ 20; Magargee Decl. ¶ 21; Willis Decl. ¶¶ 53, 55–56. And organizations would suffer harm to their First Amendment rights to acknowledge and affirm gender nonconformity and to express their views on local policies. Oliva Decl. ¶ 167; Wilcox Decl. ¶¶ 45, 61–63; Frazier Decl. ¶¶ 13–19; Magargee Decl. ¶ 22; Willis Decl. ¶ 57. Plaintiffs would be forced to return to court yet again to stop HUD's unlawful actions, losing valuable time—and suffering further funding delays—in the process.

The "balance of equities" and "public interest," which "merge" when the government is a party, also favor a permanent injunction. *See Illinois v. Noem*, 813 F. Supp. 3d at 310. If HUD reimposed these provisions, funds could go to new, unproven programs at the expense of existing programs that tens of thousands of people rely on for support. The impact would hit individuals currently in permanent supportive housing the hardest. Oliva Decl. ¶ 181. These individuals, who have disabilities and chronic health conditions, need a high level of intervention and have long been prioritized because they are the most vulnerable. Oliva Decl. ¶ 190; Chanecka Decl. ¶ 22; Jackson Decl. ¶ 17; Kaminski Decl. ¶¶ 32–34 & n.7. The loss of funding means that these individuals will be forced onto the street or into shelters that are unable to provide the stability and intensive services they need, increasing strain on social and emergency services networks. Oliva Decl. ¶ 180; Calvin Decl. ¶¶ 15, 22; Chanecka Decl. ¶ 21; Jackson Decl. ¶ 18; Kaminski Decl. ¶¶ 34–35; Dillon Decl. ¶ 18; Willis Decl. ¶ 56. And people who currently have stable housing will face increased risk of mortality and heightened exposure once they lose their

53

homes, threatening the safety and lives of individuals these programs were designed to protect. Oliva Decl. ¶ 190; Jackson Decl. ¶ 17; Chanecka Decl. ¶ 29; Magargee Decl. ¶¶ 19–20. As this Court has held before, in the context of "homelessness," "it practically goes without saying that there can be no do over and no redress if services are unlawfully denied and someone suffers for it." *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025).

By contrast, the government faces no harm from an injunction blocking the unlawful Challenged Provisions. After all, an agency is not harmed by an order prohibiting it from violating the law. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025). The equities thus strongly favor Plaintiffs and warrant a permanent injunction.

### 2. The Court should vacate the Apportionment Footnotes, declare them unlawful, and permanently enjoin OMB Defendants from reimposing them

For the same reasons, the Court should vacate and declare unlawful the Apportionment Footnotes and permanently enjoin OMB Defendants from reimposing them. If OMB again attempts to restrict CoC funds, that will again lead to the same sorts of unlawful provisions and again force Plaintiffs back into Court to challenge them, causing delays in ultimately getting needed funding out to communities.

### 3. The Court should compel HUD to promptly provide CoCs with their estimated grant amounts as required by statute

As a remedy for HUD's failure to inform CoCs of their estimated grant amounts as required by 42 U.S.C. § 11386a(b)(2)(A), the Court should order HUD to promptly provide CoCs that information. The remedy for an unlawfully withheld agency action is an order "compel[ling]" that action. 5 U.S.C. § 706(1). Plaintiffs are entitled to such an order under 5 U.S.C. § 706(1) regardless of the equitable factors that traditionally govern injunctions. *See South Carolina v. United States*, 907 F.3d 742, 761 (4th Cir. 2018) (concluding that "the general

rules for injunctive relief, derived from equity, do not control relief under § 706(1)"). In any event, the equitable factors overwhelmingly favor Plaintiffs, as Plaintiffs cannot apply without this information. *See* Oliva Decl. ¶ 40.

### C. If the Court requires more time to consider summary judgment, it should stay the FY 2026 NOFO by August 10 and preliminarily enjoin Defendants from implementing it

If the Court cannot rule on summary judgment by August 10, Plaintiffs request that the Court enter preliminary relief by then—by staying the FY 2026 NOFO and its deadlines under 5 U.S.C. § 705 and preliminarily enjoining HUD from implementing them. The FY 2026 NOFO is already causing Plaintiffs and their members irreparable harm—including some of the same types of irreparable harm that led this Court to preliminarily enjoin last year's NOFOs and that the First Circuit affirmed warranted preliminary relief. *See* Order, *Nat'l Alliance to End Homelessness v. HUD*, No. 25-cv-636 (Dkt. No. 52); *Washington v. HUD*, 171 F.4th 473, 491–92 (1st Cir. 2026). Those harms will get worse come August 11, when the NOFO requires CoCs to announce which projects they will include in their applications to HUD. Preliminary relief is warranted to guard against those harms.

Plaintiffs meet all the factors necessary for preliminary relief. They are likely to succeed on the merits for all the reasons explained above. *See supra* Section I. And the balance of equities strongly favor Plaintiffs for the same reasons they support a permanent injunction. *See supra* Section IV.B.1.

Plaintiffs will also suffer increasing irreparable harm if the NOFO is not stopped before August 11. As communities have deciphered the NOFO and gamed out how they can apply, it has become clear that the NOFO is causing irreparable harm already, even before HUD makes the awards. CoCs are running their local competitions now to determine which projects to put forward in their community-wide applications, and how to rank them—and they must announce

55

their decisions by August 11 (15 days before CoCs' applications are due to HUD). AR 5101.

Given that the Set-Aside funnels virtually all Tier 2 funding to new projects, existing projects placed in Tier 2 have almost no shot at receiving funding. Oliva Decl. ¶ 161; Willis Decl. ¶ 45. This makes the local CoCs' decisions now incredibly consequential for the existing projects in their communities—it is the difference between presumptively receiving funding and almost certainly being rejected. This, in turn, will cause irreversible consequences.

For one, it is forcing CoCs (including Plaintiffs and members) to make impossible choices, as communities generally are not able to include all their high-performing projects in Tier 1. *See* Oliva Decl. ¶¶ 161–65; Jackson Decl. ¶¶ 28–29; Chanecka Decl. ¶¶ 32, 36; Calvin Decl. ¶¶ 12–16, 28; Dillon Decl. ¶ 21; Kaminski Decl. ¶¶ 21, 23; Willis Decl. ¶¶ 44–52. How, for example, will a CoC decide between a project serving domestic violence survivors and a project that houses individuals with disabilities who are likely to become hospitalized if they lose stable housing? That is a particularly fraught choice given that including domestic violence projects drags down the whole CoCs' chances of receiving funding because those projects, by law, generally cannot impose the service requirements that the NOFO heavily advantages. *See* Oliva Decl. ¶ 129. Further complicating matters, CoCs cannot even rest assured that the projects they list in Tier 1 will be funded as Congress directed given that HUD has reserved the right to reject them based on its amorphous "risk" review or consideration of additional factors. Jackson Decl. ¶ 26; Calvin Decl. ¶ 20; Magargee Decl. ¶¶ 20–21. So, for example, a CoC might think twice about ranking a high-performing project serving LGBTQ+ youth given the risk that HUD might reject it based on its politicized risk review. *See* Oliva Decl. ¶ 141.

Making things worse, these choices will affect funding well beyond FY 2026. Oliva Decl. ¶ 164. If a CoC puts forth projects that HUD does not fund, that reduces the amount that the CoC is eligible to even apply for next year, and likely for years after that, meaning that risky choices

56

now could impact CoCs' ability to provide critical housing and services for years down the road. Oliva Decl. ¶ 164; Calvin Decl. ¶¶ 7, 20. Having to make this "choice itself demonstrates irreparable harm." *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017); *accord, e.g.*, *R.I. Coal. Against Domestic Violence*, 812 F. Supp. 3d at 198 (holding that putting plaintiffs "between a rock and a hard place … constitutes irreparable harm").

Second, undertaking this process is also a significant drain on CoCs' resources. As the First Circuit made clear in Plaintiffs' case challenging last year's NOFO, this "diversion of resources" is also itself irreparable harm. *Washington*, 171 F.4th at 492. Even in a normal year, running a competition is a massive undertaking. Oliva Decl. ¶ 151. Now, the NOFO's radical (and unlawful) shift is forcing CoCs and their member agencies to divert significant resources to figure out how to apply and how to ameliorate the harms for projects that are at risk of losing funding. Oliva Decl. ¶¶ 145, 148–49, 151–52; Chanecka Decl. ¶ 25, 30–36; Calvin Decl. ¶¶ 21–26; Jackson Decl. ¶ 29; Magargee Decl. ¶ 26; Kaminski Decl. ¶¶ 21–22; Willis Decl. ¶ 49. This is all exacerbated by HUD's failure to adequately provide CoCs with information necessary to running a competition: HUD has not notified CoCs how much they are eligible to apply for, nor has HUD even posted the application with the questions grantees must address. Oliva Decl. ¶¶ 146–48; Chanecka Decl. ¶ 34; Dillon Decl. ¶ 11; Kaminski Decl. ¶ 43. Plaintiffs and their members have many questions about unclear aspects of the NOFO and its radically new criteria, but HUD failed to provide timely or complete responses to many CoCs' and providers' emails. Oliva Decl. ¶¶ 42, 149; Willis Decl. ¶¶ 39, 50. This "confusion and chaos" causes still more "irreparable harm." *New York*, 804 F. Supp. 3d at 330.

Third, the choices CoCs must make now jeopardize CoCs' relationships with the providers who are not prioritized, and will pressure local governments to find replacement funding beyond their capacity to provide. Calvin Decl. ¶ 25; Dillon Decl. ¶¶ 16–17, 30;

57

Kaminski Decl. ¶ 37; Magargee Decl. ¶ 23. This, in turn, will erode the goodwill that CoCs have built in their communities—another irreparable harm. Oliva Decl. ¶¶ 172–73; Dillon Decl. ¶ 29; Kaminski Decl. ¶ 37; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (holding that "injury to goodwill" can be irreparable).

Finally, the choices that CoCs make in their local competitions will cause some providers to wind down. The NOFO is already causing some providers to withdraw from the program because they see the writing on the wall. Oliva Decl. ¶ 153. Once CoCs announce their selections and rankings, existing projects listed in Tier 2 (or not included at all) will know they are highly unlikely to receive funding. This will cause still more providers to give up on the CoC program—and not try to apply again, given all the resources it takes for an organization to pivot and given the burnout HUD's chaos has caused. Oliva Decl. ¶ 160; *see also id.* ¶¶ 191–92. That, in turn, results in loss of institutional knowledge and experience in the community—and forces CoCs to spend limited resources finding, and in some instances training, suitable replacements. Oliva Decl. ¶¶ 158–59; Calvin Decl. ¶ 26; Chanecka Decl. ¶ 15; Dillon Decl. ¶¶ 16–17.

Having to announce local competition results will also set off the same kinds of cascading consequences that Plaintiffs faced in the last case: Providers "must make long-term decisions today … based on projections of funding months down the road." *Washington v. HUD*, 171 F.4th at 492; Oliva Decl. ¶¶ 161–69; Jackson Decl. ¶¶ 20, 28–29; Chanecka Decl. ¶¶ 32, 36; Calvin Decl. ¶¶ 24, 28–29; Magargee Decl. ¶ 31; Willis Decl. ¶ 60. Once providers hear that they have not been prioritized for funding, some will "be forced to close or prepare to close their programs immediately," causing the same irreparable harm as before. *Washington v. HUD*, 171 F.4th at 492; Oliva Decl. ¶¶ 174–78; Chanecka Decl. ¶ 32; Calvin Decl. ¶ 28; Dillon Decl. ¶ 31; Kaminski Decl. ¶ 25. They will reduce staffing, stop enrolling new clients, move existing clients out to other locations or prepare them for the upcoming loss of housing. Oliva Decl. ¶¶ 175, 178;

58

Chanecka Decl. ¶ 32. Once these plans are in place, they cannot easily be unwound, and providers may not be able to return to the CoC if the NOFO is invalidated later. Oliva Decl. ¶¶ 160, 178; Magargee Decl. ¶ 31.

For all these reasons, Plaintiffs request preliminary relief by August 10—the day before CoCs' deadline to announce local competition results that will trigger these cascading harms—if the Court cannot rule on summary judgment by then.

**CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs.

July 17, 2026

Amy R. Romero
  (RI Bar No. 8262)
Kevin Love Hubbard *
  (MA Bar No. 704772)
DeLuca, Weizenbaum,
  Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*

Toby Merrill *^
  (MA Bar No. 601071)
Cassandra Crawford *^
  (NC Bar No. 45396)
Graham Provost *^
  (DC Bar No. 1780222)
Kayla Svihovec *^
  (DC Bar No. 1735588)
Public Rights Project

Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman *
  (DC Bar No. 90037068)
Madeline H. Gitomer *
  (DC Bar No. 1023447)
Christine L. Coogle *
  (DC Bar No. 1738913)
Carrie Y. Flaxman *
  (DC Bar No. 458681)
Robin Thurston *
  (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

Tony LoPresti *
  (CA Bar No. 289269)
County Counsel
Kavita Narayan *
  (CA Bar No. 264191)
Chief Assistant County Counsel
Meredith A. Johnson *
  (CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson *
  (CA Bar No. 314899)
Deputy County Counsel
Leily Arzy *
  (CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

John K. Whitaker *
 (TN BPR No. 039207)
Senior Counsel

Lynette Labinger
 (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation
 of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Antonia K. Fasanelli *
 (DC Bar No. 481856)
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Christopher M. Sanders *
 (WA Bar No. 47518)
General Counsel to the King County
 Executive
Cristy J. Craig *
 (WA Bar No. 27451)
Senior Deputy Prosecuting Attorney
Mika Rothman *
 (WA Bar No. 55870)
Deputy General Counsel
Office of the King County Prosecuting
 Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163

60

109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov
mrothman@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

\* Admitted *pro hac vice*
^ Admitted in listed states but not licensed to practice law in California.