**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>　　　　*Defendants*. | Case No. 1:26-cv-00436-MSM-AEM |

**PLAINTIFFS' EXCERPTS OF ADMINISTRATIVE RECORD**

**INDEX TO ADMINISTRATIVE RECORD EXCERPTS**

| HUD's ADMINISTRATIVE RECORD | | |
|---|---|---|
| **File** | **Beginning Page** | **Ending Page** |
| Memorandum from Robert Marbut, Senior Policy Advisor, to Caitlyn McKenney, Deputy Assistant Secretary for Community Planning & Development's Office of Special Needs, *Homelessness Policy Forums –CoC Program*. | HUD-AR-00001 | HUD-AR-00007 |
| The State of Homelessness in America (PowerPoint presentation, Homelessness Policy Forums). | HUD-AR-00011 | HUD-AR-00018 |
| Memorandum from Caitlyn McKenney, Deputy Assistant Secretary for Community Planning & Development's Office of Special Needs, to Ronnie Kurtz, Assistant Secretary for Community Planning & Development, *Review FY26 CoC NOFO* (June 1, 2026). | HUD-AR-00039 | HUD-AR-00074 |
| U.S. Dep't of Hous. & Urb. Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress: Part 1* (2024). | HUD-AR-00898 | HUD-AR-01014 |
| U.S. Dep't of Hous. & Urb. Dev., *The 2025 Annual Homelessness Assessment Report (AHAR) to Congress: Part 1* (2026). | HUD-AR-01015 | HUD-AR01139 |
| Office of Policy Dev. & Research, HUD, *Evidence Matters: Transforming Knowledge into Housing and Community Development Policy* (Spring/Summer 2023), https://docs.huduser.gov/archives/portal/sites/default/files/pdf/EMNewsletter-spring-summer-2023.pdf. | HUD-AR-01141 | HUD-AR-01172 |
| Yinan Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review*, 26 J. Pub. Health Mgmt. & Prac. 404 (2020). | HUD-AR-01173 | HUD-AR-01186 |
| U.S. Dep't of Hous. & Urb. Dev., FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO, No. CPD-2600-DC-0025 (June 1, 2026) (FY 2026 NOFO). | HUD-AR-05006 | HUD-AR-5133 |

| OMB'S ADMINISTRATIVE RECORD | | |
|---|---|---|
| **File** | **Beginning Page** | **Ending Page** |
| Office of Management and Budget's Certification of the Administrative Record | n/a | n/a |
| Exec. Order No. 14321, *Ending Crime and Disorder on America's Streets*, 90 Fed. Reg. 35,817 (July 29, 2025). | OMB-AR-00001 | OMB-AR-00004 |
| Exec. Order No. 14332, *Improving Oversight of Federal Grantmaking*, 90 Fed. Reg. 38929 (Aug. 12, 2025). | OMB-AR-00005 | OMB-AR-00009 |

# HUD'S ADMINISTRATIVE RECORD

**For: Caitlyn McKenney, DAS for Community Planning and Development's Office of Special Needs**

**From: Dr. Robert Marbut, Senior Policy Advisor**

**Regarding: Homelessness Policy Forums – CoC Program**

The Office of Community Planning and Development (CPD) has coordinated closely with the Office of Field Policy and Management (FPM) to convene a diverse group of CoC stakeholders at in-person discussions across the nation. I have personally led and completed 40 forums on the topic of homelessness and the CoC program, within Washington, DC and 19 of the states that are most negatively impacted by homelessness. The attendees have consistently represented a wide range of stakeholders including current CoC Collaborative Applicants and recipients, local elected officials, privately funded organizations, healthcare partners, local agencies, and law enforcement. Forum attendees have reflected diverse thinking about homelessness policy based on their firsthand perspectives.

The Forums are intimate and quite lengthy, with most going over three hours. Several forums have even lasted longer than four hours due to the amount of conversation. Each forum begins with a presentation I lead on HUD homelessness data over the years using HUD's Annual Homelessness Assessment Report. This part of the forum lasts for about 30 minutes. The remainder—and lion's share—of the time is dedicated to unfiltered Q&A from the audience.  I have consistently answered all questions regardless of question type. The questions I have received have ranged in topic from national trends, to specific questions about the NOFOs, to philosophical issues, and most everything in between.  There has been universal positive feedback for the Forums, with people specifically appreciative of the unlimited nature of the Q&A. In bringing together a wide range of participants, I've also found that many of the relevant stakeholders who are not CoC-recipients appreciate the opportunity to better understand the CoC program and even desire to become applicants for funding. Most of the attendees, including most of the former detractors, agree in conversation that:

- The status quo is not working.
- There is a need to reduce "automatic renewals" and bring back true competition.
- We need to bring back "wraparound services" in the form of treatment and recovery services.

HUD-AR-00001

**Format for the Community Homelessness Forums:**

- Informal pre-Forum meet & greet time (30-minutes).
- Hosted and emceed by a local HUD regional staff member.
- Timing:
    - 20-minute power point by Dr. Robert G. Marbut Jr.
    - Q&A for at least 100 minutes.
    - In all but 2 Forums (due to travel commitments), Forums have been extended past the 2-hour posted time to include additional sharing and Q&A time (adding between 35 and 125 minutes to the program). Most of the Forums have run for about 3 hours with the longest being Miami that went over 4 hours.

Post event: Dr. Marbut and Soledad Ursua have had hundreds of individual meetings with attendees. In some cases, post-Forum meetings have included add-on homelessness service agency site tours.

**Reception:**

The Forums have been very candid and lively, with a lot of honest exchange of information. There has been very positive feedback for doing these localized gatherings. Attendees especially like that fact that HUD staff stays until every last question is answered.

I have found that attendees appreciate the opportunity to have a multitude of homelessness partners in the same room, including stakeholders that are not the usual "players" in the CoC space (e.g. law enforcement and state, county & city departments of health). Several elected officials have remarked to me that they've never seen this diverse of a group in the same room.

At the end of each Forum, there is generally 60-75% percent support for the reforms, with about 15-20% not supportive (the unsupportive group is normally CoCs' staff members and agencies who are fearful of losing funding due to competition). These estimated percentages are based on comments made and questions asked during the Forums, as well as post-Forum individual meetings. I and/or my colleague Soledad Ursua generally visit one-on-one with every attendee.

There is a general consensus among attendees that:

- The status quo of Housing First is not working.

- There is a need to reduce renewals, stop making them automatic, and bring back true competition.

HUD-AR-00002

- HUD and organizations on the ground need to bring back "wraparound services" in the form of treatment and recovery services.

- Fentanyl and Meth have changed the homelessness and recovery landscape drastically in a variety of ways including the size and types of treatment cohorts, as well as the types of treatment services needed. The Housing First principle and practice of no treatment requirements does not align with the reality of the drug crisis in 2026.

- There is agreement that there needs to be more clarity around how a person can move from PSH to TH. People prefer simple, common-sense definitions. For the most part over the last two decades, HUD and/or Congress have artificially changed the technical definitions of different homelessness cohorts. With almost all of these statistical contortions, the reported numbers have skewed downwards to report artificially political favorable lower numbers that do not accurately reflect the real-world condition of homelessness. Even with these changes, "homelessness" has increased.

- Homelessness is more than the loss of housing, it is the loss of finances, credit worthiness, vehicle/transportation, meaningful employment, family, hope and community, and generally includes addiction and untreated mental illness.

There has been less consensus around:

- How should we measure success. Some stakeholders want to use "self-sufficiency" (per the 2009 HEARTH ACT) as the key measure of success, while others want to use retention of CoC-funded housing. Self-sufficiency is one of the key measures Congress asked HUD, CoCs and agencies to ultimately measure success by, but this is a much higher standard to reach than measuring how many people receive subsidized government housing.

- Encampments. The role of law enforcement and local government in clearing encampments draws discussion, specifically around utilization of the provisions of the SCOTUS decision in *City of Grants Pass v. Johnson* to clear encampments?

- Disability and Substance Use Disorder. There is agreement around the obvious distinctions between treatable Substance Use Disorders and disabilities such as physical handicaps or developmental disabilities. There is a lack of consensus around how to address those distinctions in practice within homelessness assistance.

HUD-AR-00003

**<u>Stakeholder Feedback that Informs HUD Policy:</u>**

Dr. Marbut has been tracking comments, inputs and questions, and has in turn passed on this information to Caitlyn McKenney. The dialogue has focused on the following topics:

- Measurement of Success & Data:
    - How to measure success. Attaining self-sufficiency versus retaining subsidized housing.
    - Self-sufficiency. How to accurately measure self-sufficiency and how to advance it within the CoC program.
    - Trends around AHAR, HMIS and PITC data sets.
    - HUD's 2013 policy shift to mandate Housing First. Especially given that homelessness was decreasing between 2007-2013.

- Philosophical and Content Issues:
    - The homelessness reforms being led by the Mayors of San Francisco, Austin, Houston, Philadelphia and Portland in the direction of advancing treatment and recovery and public safety on the streets.
    - The positive role of supportive service participation requirements and the outcomes that were lost when HUD mandated Housing First in 2013.The impact of the loss of HUD investment in wraparound services by shifting the CoC program to focus exclusively on Permanent Housing.
    - The impact of untreated mental illness, Meth, and Fentanyl on homelessness. Both how it has increased the death rate among the homeless population, and how it has changed the types of treatment services that are needed.
    - Encampments and how forceful should the government be in cleaning up encampments
    - Questions around the Clinton welfare reforms (which included program participation requirements, work requirements, transparent measurements and stricter eligibility standards).
    - What can elected officials and homelessness service agencies do about unresponsive CoCs, or CoCs that push away new providers and applicants.
    - The need for investment in Transitional Housing and emergency shelter and services. The problems that have been caused as a result of unbalancing the continuum of care among emergency services/shelter, transitional housing and longer-term housing.

4

HUD-AR-00004

- The exacerbating effect that a rise in addiction and untreated mental illness paired with a reduction in treatment services has had on the homeless population.
- The need for common sense reforms.

- Administrative:
  - The nuances of "Tier 1" and the level of "automatic renewal" versus the need for real competition.
  - Gratitude for the unlimited Q&A with HUD and questions around the lack of HUD engagement with CoCs at the local level in recent years. As a point of reference, HUD has not conducted these kinds of Forums in an organized way on this topic set since 2010.
  - The ability of providers to transition their renewal grants from PSH to TH.
  - The ability of program participants to transition from PSH to TH.
  - The definition of "disability" and how to ensure that individuals with treatable Substance Use Disorders and mental illness receive appropriate care.
  - Questions about SSO, specifically what is included and who can apply for these funds?
  - HUD's Housing Standard requirements and how aspects of these requirements have limited the provision of Transitional Housing (e.g. bathrooms and kitchens in unit).
  - How to help the CoC transition and rebalance their distribution of assistance.
  - The need to modernize the PIT count and HMIS to measure outcomes better.

- Miscellaneous Issues:
  - Why has HUD not presented this data before . . . the conjecture is the data was not supporting the messaging?
  - What are examples of best practice agencies?

HUD-AR-00005

**<u>Forum Attendees Have Included:</u>**

- Mayors and/or mayor staff members.
- City council members.
- City managers and senior staff members (e.g. HHS, community services, etc.).
- Police chiefs, police command staff members and patrol officers.
- Fire fighters and EMTs.
- County administrators and senior staff members.
- County commissioners/supervisors.
- Sheriffs and patrol deputies.
- Medical examiners and coroners.
- Heads of mental health authorities.
- Heads of housing authorities.
- CoC Collaborative Applicant staff members and leaders.
- State and local homelessness agencies.
- Existing CoC awardees (mostly PSH providers).
- Faith based organizations.
- Individuals with lived experience, community advocates and activists.
- SUD treatment providers.
- Business leaders from affected areas of their respective communities.
- District Senate and Congressional staff members.
- Gubernatorial staff members.
- Other decision-making stakeholders.

**<u>Homelessness Forums Hosted to date:</u>**

- San Francisco, CA (2/17/2026).
- Fresno, CA (2/18/2026).
- Bakersfield, CA (2/18/2026).
- Orange County, CA (2/20/2026) Mini-forum.
- National Citygate Meeting (3/3/2026 and 3/4/2026) Mini-forums.
- Charleston, WV (3/6/2026).
- New Orleans, LA (3/11/2026).
- Huntsville, AL (3/12/2026).
- Austin, TX (3/13/2026).
- Portland, OR (3/17/2026).

HUD-AR-00006

- Coeur d'Alene and State, ID (3/18/2026).
- Spokane, OR (3/19/2026).
- Houston, TX (3/23/2026).
- Dallas, TX (3/25/2026).
- Ft. Worth, TX (3/25/2026).
- Detroit, MI (3/31/2026).
- Cleveland, OH (4/1/2026).
- Columbus, OH (4/1/2026).
- Cincinnati, OH (4/2/2026).
- National Best Practices Summit (4/12-14/2026).
- Washington, DC (4/15/2026).
- Baltimore, MD (4/16/2026).
- Philadelphia, PA (4/17/2026).
- Newark, NJ (4/27/2026).
- New York, NY (4/27/2026).
- Rochester, NY (4/29/2026).
- Buffalo, NY (4/30/2026).
- Boston, MA (5/1/2026).
- Orlando, FL (5/11/2026).
- Tampa Bay, FL (5/12/2026).
- Sarasota & Manatee Counties, FL (5/12/2026).
- Miami and the 3 South Counties, FL (5/14/2026).
- Cheyenne and State, WY (5/18/2026).
- Denver and State, CO (5/19/2026).
- Salt Lake City and State, UT (5/21/2026).
- San Diego, CA (5/26/2026).
- Las Ve.g.as, NV (5/28/2026).
- Reno, NV (5/29/2026).

HUD-AR-00007



# THE STATE OF
# HOMELESSNESS
# IN AMERICA

HUD-AR-00011



# PEOPLE EXPERIENCING HOMELESSNESS 2007-2013



# CHANGES MADE IN 2013 CONTINUUM OF CARE PROGRAM COMPETITION NOFA

- Formally Introduces "*Housing First*"
- Formally Introduces "*Rapid Re-Housing*"
- Discontinues "*Service Participation Requirements*"

- Cuts CoC NOFA Funding for Emergency Shelters
- Dramatically Reduces Funding for Treatment Services
- Starts Phasing Out of Funding for Transitional Housing

- Unbalances the Continuum of Care

HUD-AR-00013

# PEOPLE EXPERIENCING HOMELESSNESS 2007-2024



HUD-AR-00014



# PEOPLE EXPERIENCING HOMELESSNESS
# 2007, 2013 AND 2024

HUD-AR-00015



# PEOPLE EXPERIENCING HOMELESSNESS 2007, 2013 AND 2024 WITH TOTAL CoC PROGRAM FUNDING AWARDS





HUD-AR-00016

# SOURCES:



- **The 2024 Annual Homelessness Assessment Report (AHAR) to Congress**
  - *Slides 2, 4, 5 and 6*
- **Notice of Funding Availability (NOFA) for Fiscal Years 2013 and 2014) Continuum of Care Program Competition.**
  - *Slide 3*
- **HUD Exchange – CoC Award Summary Reports by Component and Project Type**
  - *Slide 6*

HUD-AR-00017



# Q & A

HUD-AR-00018

**For: Ronnie Kurtz, Assistant Secretary for Community Planning and Development**

**From: Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Needs**

**Subject: Review FY26 CoC NOFO**

**INTRODUCTION.**

This recommendation memo outlines the policy goals and objectives proposed for the FY26 CoC NOFO as HUD works to reform its homelessness programs. In doing so, I also outline the relevant facts and data that informed the policy decisions. The NOFO has substantial differences compared to CoC NOFOs under previous Administrations.

**BACKGROUND.**

The FY26 appropriation Act directs HUD to publish a FY26 CoC NOFO by June 1, 2026.[1] Between the beginning of this Administration in January 2025 and today, HUD has consistently informed the public—and CoC stakeholders in particular—that HUD is making a "paradigm shift" away from the failures of Housing First policy and towards recovery and self-sufficiency. Further, the President signed two Executive Orders implicating HUD and HUD homelessness programs in particular: *Ending Crime and Disorder on America's Streets*[2] and *Addressing Addiction through the Great American Recovery Initiative*.[3]

One of the primary policy initiatives of HUD, and specifically of CPD, has been to reform homelessness programs, especially the CoC program—the single largest Federal homelessness program. Since the beginning of 2025, CPD leadership has met with numerous stakeholders on the issue of homelessness including while visiting service providers and crisis hotspots such as Skid Row in downtown Los Angeles where thousands of people fill the sidewalks and streets in tents and RVs as gangs and drug traffickers prey on them.[4] Los Angeles City Officials declared Skid Row a "Typhus Zone" in 2018.[5] HUD has also organized and attended 40 local forums across 19 states and the District of Columbia to convene homelessness stakeholders including CoC recipients, law enforcement, local elected officials, and healthcare providers.

---

[1] Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (2026 Appropriations Act), Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, H.R. 7148.
[2] Exec. Order No. 14321, 90 Fed. Reg. 35,817 (July 29, 2025).
[3] Exec. Order No. 14379, 91 Fed. Reg. 5,081 (Feb. 3, 2026).
[4] Jamie Paige, *Gangs Operating Out of Tents, RVs on Skid Row in Los Angeles*, New York Post (May 28, 2026), https://nypost.com/2026/03/01/us-news/gangs-operating-out-of-tents-rvs-on-skid-row-in-los-angeles/.
[5] Dennis Romero & Andrew Blankstein, *'Typhus zone': Rats, trash infest Los Angeles' Skid Row, fueling outbreak*, NBC News (Oct. 15, 2018), https://www.nbcnews.com/news/us-news/typhus-zone-rats-trash-infest-los-angeles-skid-row-fueling-n919856.

1

HUD-AR-00039

Prior to 2025, HUD had routinely "automatically" renewed 85-95% of CoC grants without tie to competitive score every year since 2013.  This was enabled by an approach that shirked accountability and lost its focus on outcomes and merit. The "auto-renewal" approach has caused more harm than good to the most vulnerable Americans, failing to deliver on the purposes it was designed to serve. The data is clear that this approach has failed, and we've been left instead with record high rates of homelessness despite year-over-year increases in funding for the program. This Administration inherited a system that incentivizes the speed at which individuals can receive subsidized housing and the permanency of that subsidy rather than the quality of services that enable individuals and families to reach self-sufficiency.

There are many homeless individuals who will never regain self-sufficiency or independence. HUD acknowledges that this select subpopulation may need long-term government assistance. But there are countless more individuals who can become self-sufficient, and who deserve the opportunity to do so. HUD's past policies have failed to afford them that opportunity, because those policies were predicated on the false assumptions that recovery and self-sufficiency are not possible for the chronically homeless and that the Federal government's best offer is a no-strings-attached, indefinitely subsidized housing unit. This false assumption has caused tremendous harm to vulnerable Americans.

It is evident that the status quo on federal homelessness policy has not resulted in an America with fewer homeless individuals and families. The opposite is true. HUD, and the federal government, are far from the first to recognize this reality and the need for a new approach. Cities and states across the country, and across the political spectrum, have already begun to reevaluate their approaches to homelessness in favor of public safety, accountability, and recovery for those who need it. San Francisco has taken a law-and-order stance on public illicit drug use and invested in housing conditioned on treatment and sobriety.[6] California declared increased efforts to remove homeless encampments across the state.[7] Portland has implemented a camping ban and invested heavily in short-term shelter and housing.[8] Anchorage declared no major homeless encampments for the

---

[6] Luz Pena, *SF Mayor Signs Legislation for Officers to Arrest Drug Users, Send Them to RESET Center*, ABC7 News (Feb. 17, 2026), https://abc7news.com/post/san-francisco-mayor-signs-legislation-police-sheriff-deputies-arrest-drug-users-send-reset-center/18613975/.

[7] Marisa Kendall, *Newsom Launches Task Force to Clear CA Homeless Encampments*, CalMatters (Aug. 29, 2025), https://calmatters.org/housing/homelessness/2025/08/newsom-homeless-encampments-task-force/.

[8] Michaela Bourgeois, Anthony Kustura, *Portland Resumes Homeless Camping Ban Enforcement, Focuses on Connecting Portlanders with Shelter*, KOIN 6 News (Oct. 30, 2025), https://www.koin.com/news/portland/portland-resumes-homeless-camping-ban-enforcement-focuses-on-connecting-portlanders-with-shelter/.

HUD-AR-00040

first time in a decade after investing treatment and public safety partnerships.[9] Houston's Mayor declared he would be "reclaiming our public spaces."[10] Seattle is making new investments, not in permanent supportive housing, but in shelter.[11] Multnomah County, Oregon is funding sobering centers and recovery beds.[12] New York has taken steps to make it "easier to commit people with severe mental illness."[13]

The public has increasingly questioned the approaches and philosophies entrenched in existing homelessness policy.[14] In any major U.S. city, the intertwined realities of homelessness, addiction, and mental illness are inescapable. So is the sense that ever-increasing taxpayer investment in existing approaches has failed to alter the visible crisis on the streets.

HUD's policy changes described below, as implemented in the 2026 CoC NOFO, are grounded in data and consistent with a broad shift in public opinion and with policy changes playing out at the local level across the nation. And importantly, they align with the CoC program's statutory goals of reducing homelessness, mitigating trauma to individuals and the community, and optimizing self-sufficiency. This NOFO also comports with statutory requirements by moving the program toward a true continuum of care that addresses the "many and complex" causes of homelessness instead of limiting to a one-size-fits-all approach.

**THE BIG PICTURE—RATIONALE FOR A SHIFT AWAY FROM "HOUSING FIRST"**

In 2013, HUD made a drastic policy shift to mandate Housing First across the CoC program. While proponents of Housing First disagree on the definition of the policy, HUD has consistently described the policy along the lines of "rapid placement and stability in permanent housing in which admission does not have preconditions . . . and in which

---

[9] Press Release, Anchorage Assembly, Chair Constant Statement on Homelessness Milestone (Mar. 3, 2026), https://www.muni.org/Departments/Assembly/PressReleases/Pages/Chair-Constant-Statement-on-Homelessness-Milestone.aspx.

[10] Dominic Anthony Walsh, *Mayor Whitmire Wants to 'End Homelessness' in Houston This Year. The Effort Faces Challenges*, Houston Public Media (Feb. 28, 2026), https://www.houstonpublicmedia.org/articles/news/city-of-houston/2026/02/28/544667/homeless-houston-mayor-whitmire-policy/.

[11] Stephannie Stokes, *Next Homeless Shelter Village in Wilson's Surge to Be in South Seattle*, Seattle Times (May 7, 2026), https://www.seattletimes.com/seattle-news/homeless/next-homeless-shelter-village-on-wilsons-surge-to-be-in-south-seattle/.

[12] *County Investments Add More Than 250 Recovery and Stabilization Beds*, Multnomah Cnty. (Oct. 28, 2024), https://multco.us/news/county-investments-add-more-250-recovery-and-stabilization-beds.

[13] Maya Kaufman, Katelyn Cordero, & Jason Beeferman, *New York Makes It Easier to Commit People with Severe Mental Illnesses*, POLITICO (May 1, 2025), https://www.politico.com/news/2025/05/01/new-york-makes-it-easier-to-commit-people-with-severe-mental-illnesses-00322145.

[14] Will James, *Homelessness Continues to Get Worse. Should Seattle, and the U.S., Still Embrace 'Housing First'?*, KUOW (Jan. 8, 2025), https://www.kuow.org/stories/housing-first-seattle-history-homelessness-homeless.

3

housing assistance is not conditioned upon participation in services."[15] In the 2013 NOFO, HUD dramatically de-prioritized Transitional Housing and Supportive Service Only (SSO) projects. In recent NOFOs, HUD has simply not allowed any new Transitional Housing or SSO projects.[16] While Housing First may have been well intentioned at its start, in implementation the policy has become "housing only." The 2013 shift in resources and attention away from case management and supportive services towards housing placements and retention is captured well by one family homelessness provider:

> "The [2013] shift in HUD funding to rapid rehousing programs was seismic for nonprofit organizations providing homeless services at the local level … Following the HUD money, emphasis in the field shifted to finding landlords willing to take a risk by renting to referrals from homeless services agencies instead of providing services. Service providers, encouraged by HUD, eliminated case manager positions and hired housing locators instead."[17]

The results have been devastating. While advocates claimed that Housing First would end all types of homelessness by 2020, the approach has profoundly failed to deliver on its promises.[18] After focusing on permanently subsidized housing with no conditions for more than a decade, homelessness reached the highest number ever recorded at the highest rate of increase ever recorded in 2024.[19]

Chronic homelessness, which Permanent Supportive Housing was intended to address, has increased by 80.5% since 2013 to the highest number on record. This is despite a 44% increase nationwide in Permanent Supportive Housing beds during the same time according to HUD's own data in the forthcoming 2025 AHAR.[20]

There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness. According to HUD's own data in the forthcoming 2025 AHAR, the nation's supply of Permanent Supportive Housing has increased by 111%

---

[15] U.S. Dep't of Housing & Urban Dev., *Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2024 and FY 2025 Continuum of Care Competition*, No. FR-6800-N-25, 17 (July 31, 2024), https://www.hud.gov/sites/dfiles/CPD/documents/CoC/Foa_Content_of_FR-6800-N-25_1-9-download.pdf.

[16] Recent NOFOs had no threshold criteria for Transitional Housing or SSO projects other than Coordinated Entry, meaning no new TH or SSO projects were eligible for funding.

[17] Covenant House International, National Network for Youth & School House Connection, *"To Become the Best Version of Myself": Youth-Supportive Transitional Housing Programs as An Essential Resource for Addressing Youth Homelessness* 23 (2021), https://www.covenanthouse.org/sites/default/files/2023-08/Transitional-Housing.pdf.

[18] Tina Trenkner, *Are Cities' Pledges to End Homelessness Working?*, Governing (Mar. 26, 2012), https://www.governing.com/archive/gov-homelessness-rising-decade-after-pledges-to-end-it.html.

[19] U.S. Dep't of Housing & Urban Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress: Part 1: Point-In-Time Estimates of Homelessness* 15 (2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf.

[20] 2025 AHAR part 1.

4

HUD-AR-00042

since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5% (more than half).[21]

One of just four objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381(4), is to optimize self-sufficiency among homeless individuals and families. This objective is aided by Transitional Housing and SSO projects, which are two of just five eligible project types in the Continuum of Care rule that make up a true *continuum* of assistance (24 CFR 578.37) that address the "many and complex" causes of homelessness and serves the "diverse needs" of each Continuum's geographic area. 42 U.S.C. § 11301(a)(3). HUD intends to re-invest in these project types, for the reasons described below, that have been cut out since 2013 and has communicated this to the public repeatedly.[22] Further, the NOFO provides CoCs with new flexibility to prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

HUD's historical implementation of Housing First has funded Permanent Housing to the exclusion of Transitional Housing and Supportive Service Only projects, and mandated "fidelity" to the Housing First model within CoC-funded projects.[23] HUD's use of the term "Housing First" has focused on two key aspects: no participation requirements or preconditions, and indefinite assistance without time limits.

It is important to note that none of the policy changes discussed below or any of the criteria or certifications in the NOFO requires sobriety to obtain assistance, apart from the promotion of recovery housing for individuals in recovery who want a sober-living environment. Aside from creating space for sober living, the NOFO does not advance preconditions for assistance. Further, the NOFO does not include any sweeping requirement for participation in any form of treatment to obtain assistance, apart from encouraging a select number of beds for which treatment is the purpose. Likewise, nothing in the discussion below or the NOFO eliminates the role of Permanent Supportive Housing in the CoC program. HUD's paradigm shift away from Housing First is about *bringing back* a healthy diversity of assistance, level of competition, and focus on services and recovery. It is not about eliminating Permanent Supportive Housing, cutting funding, forcing sobriety

---

[21] *Id.*

[22] Listserv Message from Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., to Stakeholders, *subject:* FY25 CoC NOFO for Public Review (July 3, 2025).

[23] *See* scoring criteria on page 86 of the Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* 86 (2024), https://www.hud.gov/sites/dfiles/CPD/documents/CoC/Foa_Content_of_FR-6800-N-25_1-9-download.pdf.

5

HUD-AR-00043

and treatment, or criminalizing homelessness. Claims to the contrary do not change this fact.

The following discussion will examine HUD's historical stance on Housing First and the body of research on the outcomes of a Housing First approach to homelessness. In 2022, HUD's Office of Policy Development and Research (PD&R) published an issue of its *Evidence Matters* newsletter on the topic of Housing First.[24] When describing Housing First, the authors focus heavily on the "no preconditions" aspect of the model rather than the "no participation requirements." However, today, HUD finds that the weakness in the nation's homelessness system is not that too few entities condition assistance on sobriety, but rather that too few entities create the accountability and structure needed to help an addict recover or a young person finish school and find meaningful employment. Even the *Evidence Matters* report acknowledged that the first program to implement Housing First— Pathways to Housing—initially required program participants to agree to two staff visits per month. This is the kind of participation requirement that HUD seeks to advance now. The study cited by HUD in *Evidence Matters* compared Pathways to Housing to "treatment first" programs that *preconditioned* housing on treatment. As mentioned above, HUD is not advancing preconditions in the NOFO.

Advocates for Housing First claim that the approach is not "one-size-fits-all" because participants get to choose from a range of interventions and services. HUD finds that while this may be the intention of the model, the historical practice of funding housing subsidies to the exclusion of services has resulted in a one-size-fits-all approach on the ground.[25] The NOFO includes rating criteria to incentivize the existence of and investment in these critical services.

Proponents of Housing First often refer to the approach as "evidence-based," but the reality is that a robust body of evidence on homelessness assistance and outcomes is lacking. And what evidence exists is mixed. A 2021 systematic review of 26 studies found that participants in Housing First assistance compared to "treatment first" assistance had an 88% decrease in days spent homeless during the evaluation period (based on one study) and a 41% increase in days spent housed during the evaluation period.[26] Physical health, mental health, alcohol use, and illegal drug use all had unfavorable or negligible outcomes in Housing First assistance compared to "treatment first". Most of the studies assessed

---

[24] Office of Policy Dev. & Research, U.S. Dep't of Housing & Urban Dev., *Evidence Matters: Transforming Knowledge into Housing and Community Development Policy* (Spring/Summer 2023), https://docs.huduser.gov/archives/portal/sites/default/files/pdf/EM-Newsletter-spring-summer-2023.pdf.

[25] See quote above from provider about the "seismic shift" in 2013.

[26] Yinan Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review*, 26 J. Pub. Health Mgmt. Prac. 404 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC8513528/.

6

HUD-AR-00044

participants at two years or less following the receipt of housing. All participants received behavioral healthcare. Only one study compared homelessness outcomes between Housing First and "treatment first." The systematic review did not evaluate a net impact on homelessness within a community. Notwithstanding the short evaluation period, limited number of studies, and lack of community-wide evaluation, the review indicates favorable individual housing outcomes for Housing First assistance. However, this is only in comparison to "treatment first" assistance that "required participants to be in psychiatric treatment and substance-free prior to permanent housing."

Another 2021 study examined the long-term outcomes of permanent supportive housing for the chronically homeless population in Boston across a 14-year period in which 95% of participants had a psychiatric illness and 93% had a substance use disorder.[27] By the end of the 14-year period, 45% of the participants had died while housed. At 1 year, housing retention was at 82% but fell to 36% by 5 years. The authors of this study point out that the "Pathways to Housing" study cited frequently by advocates for Housing First examined a model that provided assertive community treatment (ACT) to tenants 24-hours a day. In that study, the housing retention at five years was 88%. This level of robust, intensive treatment services is exceedingly rare among CoC providers and supports HUD's decision to incentivize a similar level of care in this NOFO.

In the *Evidence Matters* issue, HUD points to an observational 2010 study examining outcomes of clients placed in residential treatment or transitional housing prior to independent housing compared to clients placed directly in independent housing.[28] The authors found that individuals placed directly into independent housing had "more days in their own place...but no differences on other clinical or community adjustment outcomes." The authors further noted that "studies using randomized controlled trials of these conditions are needed to establish causation."

Another example of the lack of strong evidence for Housing First at an individual level, let alone the community level, appears in a 2017 study cited in the *Evidence Matters* newsletter. The study compared client use of mental health treatment services in programs that had a "high fidelity" to Housing First versus those with a "low fidelity."[29] The study found that clients in high fidelity programs had a larger *increase* in outpatient service utilization from pre-enrollment to post-enrollment compared to clients in low fidelity

---

[27] Jill S. Roncarati et al., *Housing Boston's Chronically Homeless Unsheltered Population: 14-Years Later*, 59 Med. Care S170, S171(Supp. 2 2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7958978/.

[28] Jack Tsai, Alvin S. Mares & Robert A. Rosenheck, *A Multi-Site Comparison of Supported Housing for Chronically Homeless Adults: "Housing First" Versus "Residential Treatment First"*, 7 Psychol. Serv. 219 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3151537/.

[29] Todd P. Gilmer et al., *Fidelity to the Housing First Model and Variation in Health Service Use Within Permanent Supportive Housing*, 66 Psychiatric Serv. 1284 (2015), https://psychiatryonline.org/doi/10.1176/appi.ps.201400564.

HUD-AR-00045

programs. Unlike Permanent Supportive Housing writ large, all of the programs in the study were focused on mental health treatment and had 24/7 crisis teams and intensive care teams available to residents. Clients in high fidelity programs had higher use of inpatient, crisis, and residential services pre-enrollment compared to clients in "low fidelity" programs. This fact, in addition to measuring *increases* in service utilization rather than raw service utilization, suggests that the results were driven by client acuity, not the effectiveness of a particular model. As made clear in the study, these programs represented a unique subset of Permanent Supportive Housing in California generally. All of the programs in the study provided the kind of robust, on-site, full-time, clinical treatment that HUD is promoting in the NOFO and that is lacking in existing projects. If the study demonstrates anything, it's that treatment services in housing are beneficial for individuals who need them.

The findings from existing studies on Housing First interventions vary, and the body of literature is not robust. Importantly, none of the studies examine the impact of varying types of assistance on the total homelessness population in a community over time. Most studies focus on "retention" of housing subsidy—the impact of a housing model on the length of time an individual stays there—which HUD does not find to be an indicator of a sustained and meaningful community-wide reduction in homelessness or the optimization of self-sufficiency. The CoC program in its current state "retains" tens of thousands of individuals in taxpayer-funded housing, yet homelessness remains at record high levels. If the purpose of the CoC program is to reduce homelessness for an entire community, not just at the individual level, there is no robust "evidence based" approach to doing so. What does exist is evidence that, despite increasing reliance on Housing First, homelessness has not meaningfully decreased in America over the last decade. Rather, it has increased. This fact is in itself a reason to take a different approach.

HUD's analysis of HUD-VASH in the *Evidence Matters* issue betrays a paradoxical argument made by adherents of Housing First. The analysis points to HUD-VASH, a program distinct from the CoC program, as "one of the more successful demonstrations of the efficacy of the Housing First approach."[30] But as admitted in *Evidence Matters,* HUD-VASH "regulations do require clients to communicate with VA case managers at least once a month." HUD-VASH implementation guidance updated in 2024 directs the provision of "regular ongoing case management, outpatient health services, hospitalization, and other supportive services as needed" and states that, "*as a condition* of rental assistance, a HUD-VASH eligible veteran must receive the case management services noted above, as

---

[30] There is one population for whom homelessness has consistently, significantly decreased—veterans. Veteran homelessness has decreased 42% since 2013 while unsheltered, chronic, and overall homelessness have increased by 36%, 80%, and 27% respectively.

8

needed."[31] Based on HUD's historical definition of "Housing First," HUD-VASH is not a Housing First program. It therefore cannot be evidence that Housing First works at scale. Rather, it even suggests that assistance conditioned on participation in services works, and at a national scale, not just an individual one.

The NOFO maintains a significant focus on Permanent Housing as one part, not the whole, of the Continuum of Care. Nothing in the NOFO eliminates the role of Permanent Supportive Housing, or tenant-based housing subsidies more broadly, in the Continuum of Care. HUD acknowledges that these interventions can be necessary and effective, especially for certain subpopulations such as the elderly (PSH) or families (tenant-based subsidies). The role of short-term financial assistance and subsidy for homeless families is supported by findings in the HUD Family Options Study.[32] HUD's shift away from Housing First is a shift to reintroduce the role of Transitional Housing and robust wraparound services, not to eliminate the roles that PSH and versions of rapid-rehousing may offer.

The *Evidence Matters* issue claims that the "embrace" of Housing First principles "contributed to a 30 percent reduction in homelessness rates between 2005 and 2007." But if this is the case, then it is unclear why the *mandate* of Housing First principles from 2013 to 2024—a much longer time frame with more aggressive implementation —did not deliver a similar reduction. Instead, homelessness *increased* almost 30% across the nation.

In HUD's 2024 Annual Homelessness Assessment Report (AHAR), HUD pointed to several factors that "likely" contributed to the highest number on record since 2007:

> *Our worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism have stretched homelessness services systems to their limits. Additional public health crises, natural disasters that displaced people from their homes, rising numbers of people immigrating to the U.S., and the end to homelessness prevention programs put in place during the COVID-19 pandemic, including the end of the expanded child tax credit, have exacerbated this already stressed system.*[33]

Generally, it's difficult to establish causality behind increasing rates of homelessness. There is evidence to suggest that the 2023-2024 leap in homelessness was driven in large

---

[31] *Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-Veterans Affairs Supportive Housing Program*, 89 Fed. Reg. 65,857 (Aug. 13, 2024) (emphasis added).

[32] *The Family Options Study*, HUD User, https://www.huduser.gov/portal/family_options_study.html.

[33] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress, Part 1: Point-in-Time Estimates of Homelessness* v (2024), huduser.gov.

HUD-AR-00047

part by immigration.[34] However, there is no evidence to support the claim that "systemic racism" existed or had a causal impact on the 2024 increase.

HUD acknowledges that there are likely a multitude of factors driving changes in homelessness across the country. Housing affordability may be one factor, but when analyzed at an individual level, research indicates that homeless individuals point to social factors behind their loss of housing more frequently than economic factors. When asked to report the reasons for leaving their last housing, one study found that 95% report a social or health reason compared to 47% reporting an economic reason. Among economic factors, loss of income is the most commonly cited—almost twice as common as "housing costs were too high."[35]

In the *Evidence Matters* issue, HUD stated that homelessness will be solved when "political will and the investment of resources" is aligned with Housing First. Yet the nation has experienced more than a decade of federal funding dedicated exclusively to the Housing First model that has only increased year-over-year, a 111% increase since 2013.

As described in detail below, this NOFO takes many steps to return the CoC program to its purpose of promoting community-wide efforts to reduce homelessness by restoring true competition and a true continuum of assistance; and prioritizing treatment, economic independence, and public safety to address the diverse root causes of homelessness for an array of subpopulations.

### POLICY RATIONALE FOR NOFO REFORMS

1. **Competition**

Congress requires the Continuum of Care Program to be a "national competition between geographic areas." 42 U.S.C § 11386a. While it is true that CoCs run local competitions within their geographic areas to select projects, this local competition by no means equates to a "national competition between geographic areas." Under the FY24 NOFO, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[36] This means that only about 10% of CoC awards were competed on the basis of merit (CoC score) between geographic areas. For the few

---

[34] Bruce Meyer, *New Research Shows 60% of Historic Homelessness Increase Prompted by Immigration Policy*, Univ. of Chi. Harris Sch. of Pub. Pol'y (May 6, 2025), https://harris.uchicago.edu/news-events/news/new-research-shows-60-historic-homelessness-increase-prompted-immigration-policy.

[35] Margot Kushel & Tiana Moore, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness* 38 (2023), https://homelessness.ucsf.edu/sites/default/files/2026-04/CASPEH_Report_62023_v4.pdf.

[36] U.S. Dep't of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants, at 94 (FR-6800-N-25).Tier 1 of FY24-25 CoC NOFOTier 1 of FY24-25 CoC NOFO

10

HUD-AR-00048

projects that were awarded based on merit, CoC score comprised 50% of the project-level score and a general "commitment to Housing First" comprised 10%.[37] In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Still, the FY 26 appropriations act included a new provision overriding this for FY26 and directing the Secretary to "select projects totaling not less than 60 percent of the annual renewal demand for reach collaborative applicant based on rankings determined by the local continuum of care."[38] With clear direction from Congress, the NOFO sets "Tier 1" funding at 60%.

Competition drives outcomes, effectiveness, innovation, and accountability, which is why this NOFO proposes competing 40% of Annual Renewal Demand on the basis of merit (CoC score) between geographic areas. The CoC program was authorized as a competitive program, not an entitlement program. HUD acknowledges that applicants expect and have previously relied on year-over-year renewal of their projects. Setting Tier 1 at 60% provides reasonable assurance to CoCs that their highest performing renewal projects can reasonably expect renewal funding, while giving meaning to "a national competition between geographic areas."

It's important to note that a decrease in Tier 1 from a historical high of 95% to this year's 60% is not equivalent to cutting funding or projects. The funding available through this NOFO remains at a historic high, and HUD intends to award it in full to every deserving applicant. Tier 1 determines what share of that funding is awarded to projects based on merit, not how many projects are awarded in total.

In previous years, Youth Homelessness Demonstration Program (YHDP) renewal projects have been awarded "noncompetitively," meaning that CoCs do not rank YHDP projects in Tier 1 or Tier 2 at all. The appropriations act expressly provides HUD with the discretion to award YHDP projects "competitively or non-competitively."[39] This NOFO awards YHDP projects competitively in order to further healthy competition and accountability. Given the set-aside for new projects discussed below, making YHDP projects competitive provides CoCs with more flexibility than they would otherwise have to determine which renewal projects to prioritize.

---

[37] U.S. Dep't of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants,. Dep' (FR-6800-N-25).of Hous. & Urb. Dev., Notice of Funding Opportunity: Fiscal Year 2024 and Fiscal Year 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants,*Id.* at 94. (FR-6800-N-25).

[38] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026).

[39] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D (2026)

11

HUD-AR-00049

HUD is aware that some measure of assurance about the future funding status of projects is important to CoC recipients. This is especially true given the typical period of performance of a CoC grant is one year and competition occurs annually. HUD also allows renewal grant recipients to reimburse themselves for eligible costs incurred between the end of the prior year's period of performance and the date a new grant agreement is executed.  At the same time, HUD finds that competitive federal funding with a one-year period of performance should never constitute so significant a portion of a non-profit's resources that loss of that competitive funding would shutter the organization. In fact, the statute directs HUD to score projects on how well they leverage public and private resources and mainstream funding sources and requires at least a 25% funding match from other sources. 42 USC 11386d, 42 USC 11386a(b)(1)(D).

Arguments in favor of setting Tier 1 at a high level favor giving recipients the ability to plan long-term and the assurance that they will receive ongoing funding unless the CoC decides otherwise. For some recipients, CoC funding constitutes a large enough share of their resources that losing a year of funding would be detrimental to the organization. HUD is aware of these challenges but does not find them to outweigh the positives (and the statutory requirement) of healthy national competition. In addition, Congress's decision to set Tier 1 at 60% for this year more than adequately addresses these concerns by providing recipients with a significant level of assurance—the majority of their funding—while still allowing for at least some healthy competition.

## 2.  Restoring Balance to the Continuum of Care.

The NOFO makes changes to restore balance to the Continuum of Care, namely, by creating a significant set-aside for new Transitional Housing and SSO projects. From 2007 to 2009 the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing.[40] During this time, the number of homeless individuals was decreasing consistently.[41] By 2013, the supply of Permanent Supportive Housing beds began to increase dramatically while Transitional Housing supply plummeted. In FY24, as in previous years, 88% of the CoC national award went to Permanent Housing, and only 1% supported Transitional Housing projects.[42]

Despite the fact that Transitional Housing and SSO projects are two of just five eligible project components established in 24 CFR 578.37, the extreme disparity has persisted. By

---

[40] *2024 AHAR Part 1*.

[41] *Id.* at 2.

[42] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *HUD's 2024 Continuum of Care Program Funding Awards* 1, https://files.hudexchange.info/reports/published/CoC_AwardComp_NatlTerrDC_2024.pdf.

12

investing in Transitional Housing and SSO projects, this NOFO restores the "continuum" to the Continuum of Care Program to help individuals and families access a pathway of services based on need and with the goal of self-sufficiency for those who are able. As mentioned above, in prior years HUD has routinely prohibited applications for any new Transitional Housing or SSO projects.[43] This NOFO shifts its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program that have been shut out. At the same time, the NOFO also incentivizes and maintains Permanent Supportive Housing with robust supportive services for chronically homeless individuals.

Transitional Housing is defined by HUD as housing limited to 24 months of assistance with the goal of facilitating movement to permanent housing. HUD has consistently interpreted movement to permanent housing to include housing that is market rate, non-CoC subsidized, or housing with family. Transitional Housing can be tenant-based, sponsor-based, or project-based, providing flexible options for individual needs. Supportive Service Only (SSO) projects are similarly flexible, funding the provision of services in non-CoC funded housing or shelter or in standalone facilities. This includes childcare, workforce development, legal services, behavioral healthcare, street outreach, mobile healthcare clinics, and employment training—a wide array of critical services and care that HUD routinely hears is needed from stakeholders.

As discussed earlier, following HUD's policy change in 2013, Transitional Housing supply has decreased 59% nationwide as Permanent Supportive Housing increased 44%. HUD makes a reasonable inference that there are individuals and families living in PSH now who would have otherwise been served in Transitional Housing prior to HUD's policy decision to remove funding. The data supports this inference. Transitional Housing is limited to two years of assistance, and many individuals and families remain in PSH for a similar amount of time despite its assurance of indefinite assistance. According to HUD's most recent publicly available data, 41.7% of households remain in PSH for less than three years.[44] PSH is also serving youth and families with children who very likely do not need indefinite government subsidized housing and would have been served by Transitional Housing prior to 2013. More than 86% of individuals living in PSH are under age 65, and a significant 17.4% of individuals are children under age 18.[45]

Based on HUD's knowledge, many Transitional Housing providers made changes to reclassify their programs when HUD made its 2013 pivot away from Transitional Housing. In

---

[43] Recent NOFOs have had new project criteria for all components except SSO and TH.

[44] U.S. Dep't of Hous. & Urb. Dev., *The 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2* 8-8 (2022), https://www.huduser.gov/portal/sites/default/files/pdf/AHAR-Part-2-2022.pdf.

[45] *Id.*

13

HUD-AR-00051

August 2013, the National Alliance to End Homelessness shared examples of Transitional Housing providers "that have retooled their transitional housing programs into a different program type," and in 2016 they shared how Transitional Housing projects were being turned into Rapid Rehousing and Permanent Supportive Housing.[46]

By HUD regulation, the main difference between Transitional Housing and PSH is time—24 months of assistance versus indefinite assistance. By HUD regulation, the differences between Transitional Housing and Rapid Rehousing are almost non-existent apart from increased flexibility in the types of rental assistance that can be provided by Transitional Housing. Rapid Rehousing is limited to Tenant Based Rental Assistance, whereas Transitional Housing spans multiple forms of rental assistance and all eligible costs of the CoC program.[47] The distinction is important, because Transitional Housing is more amenable to site-based projects compared to scattered-site Tenant Based Rental Assistance commonly provided through Rapid Rehousing. Site-based housing naturally facilitates concentrated supportive services and engagement with peers and case managers better than Tenant Based Rental Assistance scattered throughout the community. While similar on paper, in practice, the goals of Rapid Rehousing and Transitional Housing differ. Rapid Rehousing is known as having a primary goal of speed—how quickly an individual can sign a lease.[48] Transitional Housing is known for being tied to a more robust provision of supportive services.[49]

The level of service provision, and the associated costs, was one of the primary drivers of HUD's shift away from Transitional Housing. In a 2010 PD&R research report, HUD asked the question, "Should transitional housing continue to be emphasized as an option for all homeless?"[50] The report notes ongoing decreases in chronic homelessness from 2007 to 2009. It also notes that "transitional housing is the most expensive model [compared to shelter and Permanent Supportive Housing], frequently offering more privacy and a

---

[46] Nat'l Alliance to End Homelessness, *Retooling Transitional Housing: Success Stories* (video) (2013), https://endhomelessness.org/resources/videos/retooling-transitional-housing-success-stories/?gad_source=1&gad_campaignid=22810019714&gclid=Cj0KCQjwz9_QBhD_ARIsADnSCfD3rff_GJibnrcfWrSWPwDmlwno09peaD4i1L5OOqCbRk9xK7m02PwaAnKMEALw_wcB; Nat'l Alliance to End Homelessness, *Transitional Housing Conversion: A Building Owner's Toolkit* (2016), https://endhomelessness.org/resources/toolkits-and-training-materials/transitional-housing-conversion-a-building-owners-toolkit/.

[47] U.S. Dep't of Hous. & Urb. Dev., *List of CoC Eligible Activities*, HUD Exch., https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-eligible-activities/coc-eligible-activities-overview/list-of-coc-eligible-activities/.

[48] Nat'l Alliance to End Homelessness, *Rapid Re-Housing: A History and Core Components* (2014), https://endhomelessness.org/resource/rapid-re-housing-a-history-and-core-components/.

[49] *What is a Continuum of Care?*, Nat'l Alliance to End Homelessness (Jan. 14, 2010), https://endhomelessness.org/resources/policy-information/what-is-a-continuum-of-care/.

[50] U.S. Dep't of Hous. & Urb. Dev., *Bridging the Gap: Homelessness Policy*, 1 Insight, no. 1, 2011, at 1, https://www.huduser.gov/portal/periodicals/insight/insight_1.pdf.

14

comprehensive range of on-site services." But as discussed above, it is this level of supportive service provision that HUD finds lacking in the current system and seeks to incentivize and invest in during this competition.

Further, today HUD finds that Transitional Housing is a missing component in the Continuum of Care for helping individuals and families reach self-sufficiency. While the level of service investment may cost more than housing alone, HUD finds that the net results of self-sufficiency over indefinite dependence on a federal housing subsidy are likely to outweigh the initial investment in services. While the 2010 report refers to Transitional Housing as merely a "way station for people waiting for voucher assistance," HUD today finds this to be an unfair characterization both of what Transitional Housing was intended to be and how it operates today. The FY26 NOFO rejects the idea that any form of homelessness assistance should be merely a "way station" for more government assistance or a "hammock" for lifelong government assistance.[51]

Because of the decline in Transitional Housing supply, it's difficult to find recent studies on the effectiveness and outcomes of Transitional Housing compared to other forms of housing assistance. As discussed earlier, a 2010 study of clients placed in treatment or transitional housing prior to independent living compared to clients placed directly in independent living found that individuals placed directly into independent housing had "more days in their own place ... but no differences on other clinical or community adjustment outcomes."[52]

For subpopulations such as homeless youth, data suggests that Transitional Housing has positive outcomes for housing and employment. A study released by Covenant House International found that among youth exiting Transitional Housing programs across 15 U.S. cities, 73% exited to stable housing and 69% were employed or in school upon exit. When youth stayed in transitional housing for at least one year, these percentages increased to 83% and 75% respectively.[53] HUD believes that the provision of structure and quality supportive services driving these outcomes is facilitated in part by the site-based provision of housing that allowed under Transitional Housing and not under Rapid Rehousing.

HUD collects system performance data that tracks outcomes between each of the components of the CoC program. This data indicates that Rapid Rehousing has the highest level of increases in earned income, despite low levels of earned income increases across

---

[51] Sec. Scott Turner (@secretaryturner), *Social Safety Nets*, Instagram (Apr. 21, 2025), https://www.instagram.com/reel/DIufOe8RHe1/.
[52] Jack Tsai, Alvin S. Mares & Robert A. Rosenheck, *A Multi-Site Comparison of Supported Housing for Chronically Homeless Adults: "Housing First" Versus "Residential Treatment First"*, 7 Psychol. Serv. 219 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3151537/.
[53] *See* Covenant House Int'l, Nat'l Network for Youth & Sch. House Connection, *supra* note 17, at 23.

15

all CoC project types. However, HUD finds that differences in performance outcomes are likely to be an artifact of the difference in acuity of needs between participants in Permanent Supportive Housing—where disability is an eligibility requirement—and Rapid Rehousing. By making speed the primary goal, Rapid Rehousing self-selects the easiest to serve populations.

HUD used to support Transitional Housing. In 2010, HUD's PD&R study stated that "Transitional Housing has been an important element of the Department's efforts to respond to the housing needs of homeless families and individuals."[54]

Only three years later, HUD would pivot decisively against Transitional Housing.

HUD finds that the time between 2007 and 2013 (when HUD first started collecting PIT count data and when HUD stopped investing in Transitional Housing) provided only six years to observe the national outcomes of the homelessness response and make a drastic pivot away from Transitional Housing. Now, HUD has two decades of homelessness data and 13 years of data spanning HUD's single-minded investment in Permanent Housing. During those first six years (2007 to 2013), homelessness decreased 8.8%. During the last 23 years (2013 to 2026), homelessness increased 27%,[55] not to mention the other negative outcomes described above. It is well past time for HUD to recognize that funding Transitional Housing is a necessary part of the CoC program.

HUD has carefully considered that, by creating a large set-aside for new TH and SSO projects, renewal projects will be limited. HUD acknowledges that current PSH and RRH renewal projects have historically relied on a near-guarantee of future funding and that a significant investment in new Transitional Housing is likely to impact both existing permanent housing providers and the individuals they serve. HUD has taken numerous steps to provide clarity and guidance that provides a path for both current providers and current participants to maintain funding and assistance under the structure of the NOFO. Again, HUD has organized nearly 40 forums with key stakeholders all over the country and had numerous other discussions with CoC recipients and other homelessness providers. HUD has also issued numerous public statements in national media outlets, social media, and other outlets about HUD's intent to end Housing First and return the program to diverse solutions that incentivize self-sufficiency and recovery. This includes lengthy policy discussion and detailed program requirements contained in the FY25 December NOFO and the forthcoming FY26 NOFO.

---

[54] U.S. Dep't of Hous. & Urb. Dev., *Life After Transitional Housing* (2010), https://www.huduser.gov/portal/publications/pdf/LifeAfterTransition.pdf
[55] 2025 AHAR.

16

The NOFO also makes consistent reference to the "transition grant" opportunity. This option, authorized in the FY26 appropriations act, allows existing Permanent Housing renewal grants to transition from one project component to another (i.e., TH or SSO) over the course of a year.[56] While HUD wants to ensure that existing renewal projects have the opportunity to secure funding as a new type of project, HUD also wants to see the applicant pool broadened to first-time recipients. The transition grant opportunity combined with a generous set-aside for new projects balances these competing interests.

HUD has also published guidance on the eligibility and recordkeeping requirements as they relate to individuals moving from permanent housing to transitional housing.[57] HUD acknowledges the concern that current permanent housing residents would not qualify for transitional housing because they do not meet the definition of "literal homelessness."[58] However, such residents may very well meet the definition of "at imminent risk of homelessness." HUD does not construe any of its regulatory requirements to require an individual in permanent housing to sleep on the street for a night in order to be eligible for transitional housing. According to the guidance, residents currently living in permanent housing projects may be eligible for assistance in transitional housing projects. No one should be prohibited from moving from indefinite government assistance to time-limited government assistance. The NOFO consistently promotes and incentivizes reducing unsheltered homelessness and connecting individuals and families to assistance and services that help those who are able recover and regain self-sufficiency. HUD's proposed investment in *a different form of housing assistance* should not change the number of people who can be served with that assistance while it may change who provides the assistance. The FY26 funding available is more than HUD has ever previously made available, and HUD intends to award it in full.

Because of the set-aside for new TH, the NOFO does not include an option for new "joint TH-RRH" projects. The joint TH-RRH project option is not a component described in statute or regulation and adds unnecessary complexity to an already-complex program and NOFO. The NOFO does not impact existing joint projects but rather encourages TH projects.

The NOFO has a set-aside of $104 million for new Domestic Violence (DV) projects (FY26 and FY25 set-aside authorized by appropriation). The appropriations language allows HUD

---

[56] Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, § 226(a), 140 Stat. 173, 418 (Feb. 3, 2026).

[57] Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* (2024), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.

[58] U.S. Dep't of Hous. & Urb. Dev., *Category 1: Literally Homeless*, HUD Exch., https://www.hudexchange.info/homelessness-assistance/coc-esg-homeless-eligibility/four-categories/category-1/.

17

to add eligible projects based on the Secretary's determination of need.[59] The NOFO allows DV Bonus applications for Transitional Housing. In recent years, DV Bonus projects have been limited to Rapid Re-housing and Coordinated Entry. For the population of individuals and families impacted by DV, Transitional Housing is a key tool for providing community and support to recover and regain self-sufficiency in a safe environment. According to the 2025 National Network to End Domestic Violence National Summary, 71% of programs providing services to victims were providing emergency shelter and 39% were providing "Transitional or Other Housing." The majority of unmet requests for services from victims were for "emergency shelter, hotels, motels, transitional housing, and other housing."[60] The Department of Justice Office on Violence Against Women published a report in January 2025 citing "widespread shortages in emergency shelters, transitional housing, and long term affordable housing."[61] The report also points to the need for partnerships with law enforcement and substance abuse programs to "deliver comprehensive, wraparound services" for DV survivors.[62] Clearly, short-to-medium term shelter and housing assistance is critical for DV survivors and their families. The proposed NOFO promotes more types of DV Bonus projects rather than restricting them.

In addition to the unmet need for Transitional Housing expressed by victim service providers, HUD considered the impact of Tier 1 and the set-aside prioritizing new Transitional Housing and SSO projects on applicants for the DV Bonus. Allowing Transitional Housing for DV Bonus projects ensures that DV projects do not face a competitive disadvantage among other CoC projects.

In addition to the considerations above, HUD considered that state or local governments may have to reallocate local resources in order to maintain consistent levels of funding for existing Permanent Housing providers in the CoC. Shifting local funding priorities in response to changes in federal funding is not new to local government. When HUD made its policy shift in 2013, local funding priorities shifted.

HUD is aware that the statutory definition of "homeless" includes individuals and families living in Transitional Housing but not in Rapid Rehousing despite the similarities. Individuals in Transitional Housing are served for a limited period of time before moving out

---

[59] Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, 140 Stat. 173, 399 (Feb. 3, 2026) (allocating $52,000,000); Consolidated Appropriations Act, 2024, Pub. L. 118-42, div. F, tit. II, 138 Stat. 25, 363 (Mar. 9, 2024) (same).

[60] Nat'l Network to End Domestic Violence, *20th Annual Domestic Violence Counts Report: National Summary* (2026), https://nnedv.org/wp-content/uploads/2026/03/20th-Annual-DV-Counts-Report-National-Summary-FINAL-EN.pdf.

[61] U.S. Dep't of Just., Off. on Violence Against Women, *30 Years of the Violence Against Women Act: A Legacy and Future of Safety and Justice* 14 (2025), https://www.justice.gov/ovw/media/1385701/dl?inline.

[62] *Id.*

18

of homelessness into self-sufficiency or other assistance.  As HUD makes significant investment in Transitional Housing, individuals may move from existing Permanent Housing into Transitional Housing thereby increasing the number of individuals considered homeless. This is, in part, one of the reasons that HUD has chosen to focus on unsheltered homelessness as an indicator of community-wide efforts to reduce homelessness. A well-designed local homelessness system has flow-through, with the number of people in the system staying the same or decreasing. Ultimately, HUD finds that how people are being served by taxpayer dollars is more important than how the government has chosen to count homeless individuals.

HUD has also considered that there may be existing Permanent Housing providers who are not selected in the local CoC competition process due to the priorities of the HUD NOFO, or who are ranked lower by the CoC and do not end up being awarded funding under this NOFO. For those who are heavily reliant on CoC funding, this may result in reductions in capacity or even end the operations of the project entirely. However, for every project that is not selected or awarded, another project will be. HUD has determined that it is important to select projects at the local and federal levels that have merit and the capacity to operate with excellence, rather than continue to fund projects of lesser merit and lesser capacity to operate.

HUD is aware that many providers operate on multi-year timelines. At the same time, HUD knows that communities understand the CoC program is an annual competition. HUD has communicated its shifting priorities for over a year, giving providers sufficient time to adjust their timelines and plan as needed, as described above. HUD will continue, as it has in the past, to incentivize the leveraging of other funding sources so that projects are not fully reliant on federal funding for their existence.

HUD has determined that even though there are existing networks of PSH providers, the competitive opportunity provided in this NOFO will ensure better long term results and stronger relationships within CoCs and with their external partners. Further, the NOFO encourages a wide array of ongoing and new partnerships within communities (e.g., court systems, healthcare providers, family services) that serve to strengthen a true community-wide response to homelessness.

HUD is aware that CoCs that choose to invest in SSO projects over Transitional Housing or other housing-related projects may see a decrease in the number of CoC-funded units. While this is ultimately a matter of CoC choice, HUD finds that the increased investment in Transitional Housing helps alleviate this concern. Transitional Housing is time-limited, allowing for increased throughput and therefore more individuals and families served. Further, SSO projects may help individuals in shelter or on the streets address the

19

HUD-AR-00057

underlying causes of homelessness, facilitating their movement into non-CoC funded permanent housing and increasing availability across CoC-funded units.

HUD is increasing resources available to CoCs. A shift in how and where funding is used, is not necessarily a change in the number of people served. CoCs have significant discretion under the NOFO to balance the types of projects they fund. In any event, HUD is confident that the increased investment in Transitional Housing and SSO projects will increase positive outcomes for individuals and communities. HUD finds that there should be no strain on shelter providers caused by the increased investment in Transitional Housing and services. If anything, the NOFO provides new opportunity for shelter providers to compete for SSO funding or even funding for Transitional Housing, as many shelters operate both emergency shelter and Transitional Housing.

### 3. Optimizing Self-Sufficiency through Supportive Services and Treatment and Recovery.

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. Through the set-aside for new TH and SSO projects, and the merit review scoring criteria, the NOFO offers CoCs opportunities to prioritize and invest in projects that advance economic independence for those who are able to attain it. HUD recognizes that not every homeless individual or recipient of homelessness assistance will be able to return to self-sufficiency. However, everyone deserves an opportunity. Many of the 745,000 homeless individuals and families and 500,000 more living in housing for the homeless can attain self-sufficiency if given the right tools and support, including those who have experienced chronic homelessness.

**Treatment and Recovery**

According to multiple comprehensive studies and HUD's own Point-In-Time Count data, homeless individuals self-report high rates of substance use disorder (SUD) and mental illness—especially the unsheltered population.[63] Within HUD-funded Permanent Supportive Housing, 41% of adult-only households self-report a SUD. One CoC-funded provider in a large urban setting shared with HUD that 68% of residents in CoC-funded housing have a SUD and 97% have a mental health condition or SUD. The opioid overdose fatality rate increased by more than 1400% among the homeless population in Boston between 2013 and 2018.[64] The homeless population's overdose fatality rate was 12 times

---

[63] Janey Rountree et al., *Health Conditions Among Unsheltered Adults in the U.S.* 5 (2025), https://capolicylab.org/wp-content/uploads/2025/11/Health-Conditions-Among-Unsheltered-Adults-in-the-US.pdf ; UCSF Benioff Homelessness & Housing Initiative, *supra* note 33, at 43.

[64] Caroline Cawley et al., *Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic*, 5 JAMA Network Open e221870 (2022).

20

higher than the general population in Massachusetts. In Los Angeles County in 2024, the overdose fatality rate among homeless individuals was 46 times higher than among the population at large.[65] The results of ignoring the prevalence of substance use disorder among homeless individuals are deadly. Every substance use disorder is medically treatable.[66]

According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[67] According to reporting on data from the San Francisco Medical Examiner's Office between 2020 and 2025, 23% of overdose deaths in San Francisco occurred inside Permanent Supportive Housing.[68] In the first four months of 2025, the share of overdose deaths in PSH was 30% compared to 20% outdoors and 3.5% in shelter.[69] According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths." [70]

The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[71] The report states that, in 2023, overdose fatalities in King County among those living in Permanent Supportive Housing for the homeless comprised 21% of total overdose fatalities in the County, just 3% less than unsheltered and emergency shelter combined.[72]

 A 2023 focus group of residents in Permanent Supportive Housing in New York found that overdose was a significant concern within PSH and "created significant trauma for tenants and staff" and that this was true despite "heterogeneity in PSH buildings' current overdose

---

[65] L.A. Cnty. Dep't of Pub. Health, *Final PEH Report 2026 — Lives Lost: Mortality Trends and Prevention Opportunities for People Experiencing Homelessness in LA County, 2015–2024* 2 (2026), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2026.pdf.

[66] Nat'l Inst. on Drug Abuse, *Drugs, Brains, and Behavior: The Science of Addiction: Treatment and Recovery* (2020), https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/treatment-recovery

[67] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-8.

[68] Susan Dyer Reynolds, *Housing First, Morgue Second*, The Voice of San Francisco (Aug. 28, 2025), https://thevoicesf.org/housing-first-morgue-second/.

[69] Matt Dorsey on X: "Fatal drug overdoses in Permanent Supportive Housing now account for nearly 1-in-3 of all drug deaths in San Francisco (up from 1-in-5 last year). We need drug-free/recovery options in our PSH portfolio — and @RafaelMandelman and I are working on legislation to accomplish that." / X.

[70] Cawley et al., *supra* note 47.

[71] Seattle Off. of City Auditor, *Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach* (2024), https://www.seattle.gov/documents/departments/cityauditor/auditreports/overdoseandcrimeconcentrationsaudit.pdf.

[72] *Id.*

21

prevention efforts and adoption of harm reduction principles."[73] The study drew out a subtheme that "tenants using drugs alone behind closed doors was a common factor in overdose deaths."[74]

In 2023, overdoses fatalities in single room occupancies (SROs) or "supportive housing" comprised 10% of all overdose fatalities in New York city, with 13% occurring outdoors and 4% occurring in shelter.[75] Taken together, the data above suggest that overdose fatalities are disproportionately high among homeless individuals and that the PSH environment is more dangerous than shelter settings.[76]

Public reporting has revealed the prevalence of addiction enablement in the name of "harm reduction" within homelessness assistance, and CoC-funded Permanent Supportive Housing in particular.[77] Service providers are known to hand out drug paraphernalia and supervise the use of illicit drugs.[78] Proponents of "harm reduction" argue that lives are saved by supervising drug use, or by providing clean needles and pipes.[79] But while supervision may help reverse an overdose or clean pipe prevent viral infection, its not clear that these practices have actually reduced overdoses and overdose fatalities broadly. In fact, evidence suggests that "safe consumption sites" have had no impact on overdose death rates.[80] Instead, the data above suggests that isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis.[81] HUD finds that HHS's "Dear Colleague" letter on "harm reduction" accurately delineates true lifesaving care (Narcan, medication disposal boxes) from illicit drug use facilitation (pipes, foil, needles.)[82]

---

[73] Marina Gaeta Gazzola et al., *Understanding Overdose Risk and Response in Permanent Supportive Housing: Results of Focus Groups with Tenants, Staff, and Leaders*, 20 Addiction Science & Clinical Practice 91 (2025), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC12664209/.

[74] *Id.*

[75] N.Y.C. Dep't of Health & Mental Hygiene, Epi Data Brief No. 142, *Unintentional Drug Poisoning (Overdose) Deaths in New York City in 2023* 9 (2024), https://www.nyc.gov/assets/doh/downloads/pdf/epi/databrief142.pdf.

[76] By contrast, data in Los Angeles is limited. When evaluating overdose fatalities among homeless individuals in Los Angeles County, the public health department removed fatalities in Permanent Supportive Housing from their findings. *See* Los Angeles County Department of Public Health, *Final PEH Report 2026—Lives Lost: Mortality Trends and Prevention Opportunities For People Experiencing Homelessness in LA County, 2015-2024* (2026), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2026.pdf.

[77] Jonathan Choe, *Devastating Conditions Inside Plymouth Housing Expose Tragic Reality*, Fix Homelessness (Feb. 23, 2024), https://fixhomelessness.org/2024/devastating-conditions-inside-plymouth-housing-expose-tragic-reality/.

[78] Tara Campbell, *Rogue Nonprofit Workers Set Up Pop-Up Safe Injection Site in San Francisco Tenderloin*, ABC7 San Francisco (Sept. 15, 2020), https://abc7news.com/san-francisco-tenderloin-safe-injection-site-pop-up/6424213/.

[79] N.C. Harm Reduction Coalition, *Safer Crack Use*, https://www.nchrc.org/about-2/harm-reduction/crack-use/.

[80] Found. for Drug Policy Sols., *Supervised Consumption Sites: Ineffective and Illegal* 3 (2026), https://gooddrugpolicy.org/wp-content/uploads/2026/04/SCS-Report-April-2026.pdf.

[81] Exec. Order No. 14367, *Designating Fentanyl as a Weapon of Mass Destruction*, 3 C.F.R. (2025), https://www.whitehouse.gov/presidential-actions/2025/12/designating-fentanyl-as-a-weapon-of-mass-destruction/.

[82] Substance Abuse and Mental Health Servs. Admin., *Updated Harm Reduction Funding Guidance* (July 23, 2025), https://www.samhsa.gov/sites/default/files/dear-colleague-letter-upated-hr-funding-guidance.pdf.

22

The NOFO incentivizes CoCs to partner with a wide array of treatment providers to advance treatment and recovery for individuals with a SUD or Serious Mental Illness (SMI). These rating criteria include identifying partnerships with specialty courts and other Assisted Outpatient Treatment (AOT) providers, encouraging the CoC to leverage court orders to advance recovery. It also includes investment and partnerships to provide peer support, counseling, recovery housing, and access to detox support. The NOFO also scores CoCs on their ability to identify barriers to using involuntary commitment as an intervention tool to connect the most hard-to-treat populations with appropriate levels of care.

Proponents of Housing First and "harm reduction" claim that participation in treatment and services must always be voluntary. They argue that treatment that is accepted voluntarily is more effective and leads to better outcomes than mandatory treatment. While HUD is not advancing mandatory treatment in this NOFO generally, there is research that supports the effectiveness of AOT over voluntary treatment. A study in New York found that AOT patients had decreased rates of hospitalization and increased engagement in outpatient treatment.[83] The NOFO does not incentivize, and certainly does not require, treatment requirements across the board. It does incentivize CoCs to use their own PIT count data on the number of individuals who self-report chronic substance abuse to create beds/units dedicated to treatment, in which assistance is conditioned on participation in treatment. CoCs that already have these services and beds in place, or who are willing to create them, indicate to HUD that they are better equipped to serve this subpopulation and optimize self-sufficiency for all subpopulations.

The NOFO advances treatment and recovery by incentivizing CoCs to coordinate with behavioral healthcare providers, provide access to detox beds, invest in on-site treatment provision, create recovery housing, and dedicate units to the purpose of treatment and recovery.

The NOFO also provides bonus points to CoCs whose projects do not permit the use or distribution of illicit drugs on their premises. Critics believe that a restriction on illicit drug use prevents individuals from maintaining housing while in treatment or recovery (including relapse). The data above shows the opposite: enabling drug does not reduce overdose deaths and may contribute to fewer recoveries and more deaths. Further, the NOFO does not create an incentive to require *sobriety* nor to require eviction for first-time violation. Program participants may be at varying stages in their recovery journey, and the taxpayer-funded housing they reside in should support and facilitate that recovery, not enable deadly drug use.

---

[83] Marvin S. Swartz et al., *Assessing Outcomes for Consumers in New York's Assisted Outpatient Treatment Program*, 61 Psychiatric Servs. 976 (2010), https://pubmed.ncbi.nlm.nih.gov/20889634/.

23

The countervailing argument is that PSH without conditions saves money and stabilizes individuals in order to then provide treatment and services. But HUD finds that, broadly, PSH in practice accomplishes neither of those ends. A comprehensive evaluation of the evidence authored by the National Academies "found no substantial evidence that PSH contributes to improved health outcomes" and that "there is insufficient evidence to demonstrate that the PSH model saves health care costs or is cost effective."[84] Spending on the CoC program alone has more than doubled since 2013, with the vast majority of that spending dedicated to PSH and rapid-rehousing (which is by regulation considered permanent housing). Homelessness has reached record high levels, and overdose deaths inside of PSH units are prevalent. Safety and stability *first* does not require a private, isolated, subsidized apartment unit first.

**Self-Sufficiency**

The CoC program has done a poor job of optimizing self-sufficiency. HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[85] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65 and 17.4% under age 18.[86] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of total participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[87]

One way to advance both recovery and self-sufficiency is through participation requirements. Service participation requirements have been successfully employed in many federal social service programs and have strong bipartisan support.[88]

In accordance with 24 CFR 578.75(h), this NOFO encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F). This NOFO provides points to CoCs that can demonstrate a significant investment in supportive services and projects that have supportive service participation requirements, because the

---

[84] Nat'l Acads. of Scis., Eng'g, & Med., *An Evaluation of Permanent Supportive Housing Programs for Homeless Individuals*, Project No. PGA-STS-15-01, https://www.nationalacademies.org/projects/PGA-STS-15-01.

[85] Office of Special Needs Assistance Programs, U.S. Dep't of Housing and Urban Dev., *Continuum of Care (CoC) System Performance Measures Data Since FY 2015* (Excel data file) (2025), https://files.hudexchange.info/resources/documents/System-Performance-Measures-Data.xlsx.

[86] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-3.

[87] U.S. Dep't of Hous. & Urb. Dev., *supra* note 44, at 8-8.

[88] Cicero Inst., *National Crime Poll* (2025), https://ciceroinstitute.org/research/national-crime-poll/.

24

HUD-AR-00062

level of supportive service engagement is indicative of a community's ability to provide the services people need in order to regain self-sufficiency and independent living.

It's worth noting that by existing CoC regulation, all current Rapid Rehousing projects already implement a requirement that residents meet with a case manager at least monthly. 24 C.F.R. 578.37(a)(1)(ii)(F). Under the NOFO, this existing regulatory requirement sufficiently meets the incentives for participation requirements.

The NOFO ensures that DV projects must comply with VAWA's anti-discrimination requirements and that DV projects will not be penalized for adequately protecting their DV program participants under 34 USC 12491; 24 CFR 5.2005(b)(1).

HUD considered promoting investment in supportive services aimed at advancing self-sufficiency without incentives to require participation in those services. Opponents of participation requirements argue that participation is more meaningful if the choice to participate is entirely optional. It is certainly the case that individual choice is critical to success. In fact, HUD finds that well-designed participation requirements empower individual choice while pairing it with accountability, which is critical to achieving personal goals. The HUD-VASH program, serving homeless veterans, is an example of housing assistance tied to participation in case management and supportive services.[89] Veteran homelessness is the only subpopulation of homelessness that has seen significant year-over-year decline for the last two decades.[90]

The NOFO includes threshold criteria for new Transitional Housing projects that can describe how they will provide a level of supportive services that facilitates at least 20 hours per week of program participant engagement in services, activities or employment. HUD's intent is to ensure that taxpayer-funded assistance is being utilized effectively to meet the purposes of Transitional Housing—to facilitate movement to Permanent Housing within 24 months. 42 USC 11360. The 20 hours per week was determined by hearing from numerous stakeholders and evaluating the level of services provided at programs with positive outcomes at optimizing self-sufficiency within 24 months. The rating criteria was designed to allow broad flexibility in meeting the criteria. As indicated in the NOFO, "services and activities" can include a wide array of high to low intensity engagement. The rating criteria also clarifies that employment contributes to the 20 hours per week, and that elderly individuals and those with a handicap or developmental disability are not subject to the 20 hours per week. Because of the flexibility of this criteria, Transitional Housing

---

[89] FR-6476-N-01: "As a condition of HCV rental assistance, both tenant-based voucher and PBV, a HUD-VASH eligible veteran must receive the case management services noted above, as needed, directly from or arranged by the VA."

[90] *2024 AHAR Part 1*, *supra* note 40.

25

applicants in rural areas or other jurisdictions with limited resources should not be disadvantaged.

The NOFO incentivizes CoCs to coordinate and partner in service of specific homelessness subpopulations—families, youth, veterans, chronically homeless, individuals with justice system involvement, and others. The statutory selection criteria direct HUD to measure CoCs based on *the extent to which the recipient will address the needs of all relevant subpopulations.* 42 USC 11386a(b)(1)(B)(iv)(I). HUD finds that robust coordination with partners in the community, both inside and outside of the CoC itself, is indicative of the CoC's ability to promote communitywide commitment to the goal of ending homelessness. 42 USC 11381(1).

HUD has considered that the increased focus on supportive service investment in the NOFO may be difficult to implement in CoCs where existing resources for services are limited. HUD's goal is two-fold—both to see CoCs increase the investment of local resources in supportive services and to increase HUD's investment in supportive services through the CoC Program. The NOFO rating criteria contemplates both non-CoC investment in supportive services and CoC investment in supportive services, and provides points for either, so that CoCs can make investments based on local resources and priorities. In hearing directly from stakeholders, HUD also recognizes that there are many service-rich providers who do not currently receive CoC funding. This NOFO provides opportunities for CoCs to invest in providers that are already operating with high levels of services.

HUD is aware that some states have longstanding state-level Housing First mandates, and that these local laws may create competing obligations for CoC recipients under the NOFO. But every applicant regardless of jurisdiction has the opportunity to compete for and receive funds. HUD cannot accommodate local conditions in a nationwide funding competition—it is up to CoCs to determine the best solutions to ending homelessness within their geographic contexts, which includes applicable state and local law. Further, HUD finds that the benefits of advancing recovery as a means to self-sufficiency across all fifty states outweigh the challenges that applicants in a select few states may face who wish to utilize both local homelessness funding and federal funding.

### 4. Safety and the Impact of Homelessness.

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness and to minimizing the trauma caused to individuals, families, and communities by homelessness. The McKinney-Vento Act names not just the trauma caused to individuals

26

HUD-AR-00064

and families, but also to "communities". 42 USC 11381(2). That's because homelessness does not occur in a vacuum, and its effects—especially unsheltered homelessness in public spaces—impact the entire community.[91] This NOFO encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments and with related public illicit drug use.

The NOFO also puts an increased focus, by way of rating criteria points, on unsheltered homelessness outcomes compared to reductions in sheltered homelessness. The rating criteria provide points both for meaningful, year-over-year reductions in unsheltered homelessness PIT counts (including compared to prior to COVID) and for reductions in homeless encampments. Minimizing trauma caused to families and communities by homelessness is most closely connected to unsheltered homelessness and encampments, where individuals live in dangerous environments and the community faces the impacts of dangerous environments.[92]

Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

The harms of unchecked encampments and public drug use particularly impact the most vulnerable subpopulations such as children and survivors of domestic violence and trafficking.[93] In 2024, there were 18,557 people in families with children experiencing unsheltered homelessness on a single night in January.[94] These are families with children whose primary nighttime location is somewhere such as a car, the street, a public park, a train station, or an encampment. Data shows that adverse childhood experiences, including lack of housing and exposure to substance abuse, are associated with increased occurrences of homelessness in adulthood.[95]

First responders and law enforcement are often the first to encounter homeless individuals in crisis and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the

---

[91] Marc Cota-Robles, *Los Angeles Post Office Parking Lot Overrun by Homeless Encampment*, ABC7 Los Angeles (Apr. 2, 2026), https://abc7.com/post/los-angeles-post-office-parking-lot-overrun-homeless-encampment/18826260/.

[92] Nina Joudeh and Jamie Paige, *Deadly Bacteria at a Bay Area Homeless Encampment Sparks Urgent Calls for Action*, N.Y. Post (Jan. 17, 2026), https://nypost.com/2026/01/17/us-news/deadly-bacteria-at-a-bay-area-homeless-encampment-sparks-urgent-calls-for-action/.

[93] Charlie Harger, *This kid's going to die': Neighbors say 9-year-old abandoned in tent off Aurora. CPS claims he's not in danger*, KIRO (Dec. 19, 2025), https://mynorthwest.com/seattles-morning-news/9-year-old-tent-aurora/4174872; Melissa Henry, *'Prostitution, drugs, human trafficking': Colorado Springs business owner calls on leaders to address homelessness problems*, KKTV (Nov. 7, 2025), https://www.kktv.com/2025/11/08/prostitution-drugs-human-trafficking-colorado-springs-business-owner-calls-leaders-address-homelessness-problems/.

[94] *2024 AHAR Part 1*, *supra* note 40.

[95] Megan Burgasser, *Adverse Childhood Experiences Tied to Higher Homelessness*, UC News (May 12, 2025), https://www.uc.edu/news/articles/2025/05/adverse-childhood-experiences-tied-to-higher-homelessness.html.

27

Continuum of Care. Executive Order 14321 § 3 reflects the need for cooperation. This NOFO encourages COCs to work with law enforcement, first responders, and their state and local governments to assist homeless individuals in encampments or suffering from substance abuse to address barriers to maintaining housing and minimize the trauma associated with homelessness. The NOFO provides points to CoCs that cooperate with first responders including law enforcement to protect public safety and connect individuals to services, because law enforcement involvement is indicative of a community-wide effort to reduce homelessness.

According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of homeless individuals despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among homeless individuals in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[96] One recent study indicates that in some states, as many as half of unsheltered homeless individuals are registered sex offenders.[97]

None of the realities above suggest that the entire homeless population is engaged in criminal or illicit activity despite significant disproportionality, nor that those are cannot be rehabilitated. Data also indicates that homeless individuals are victims of crime at higher rates than the general public.[98] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to homeless individuals and families. Tragically, the violence and harm are so commonplace that outreach providers are left to consider the discovery of human remains in encampments an "expectation."[99]

Public camping and public illicit drug use go hand in hand. "Open air drug markets" threaten public safety and hurt residents, tourists, and local businesses, not to mention

---

[96] Megan Burgasser, *Adverse Childhood Experiences Tied to Higher Homelessness*, UC News (May 12, 2025), https://www.uc.edu/news/articles/2025/05/adverse-childhood-experiences-tied-to-higher-homelessness.html, at 4.
[97] Cicero Inst., *Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless* (2024), https://ciceroinstitute.org/research/sex-offenders-an-overlooked-but-significant-subpopulation-of-the-homeless/.
[98] San Diego Cnty. Dist. Att'y, *DA Shares First-of-Its Kind Crime Data, Proposes Three-Point Plan to Address Intersection of Crime and Homelessness* (Mar. 21, 2022), https://www.sdcda.org/content/MediaRelease/Homeless%20Data%20and%20Plan%20News%20Release%20FINAL%203-21-22.pdf.
[99] Frank Sumrall, *Volunteer Group Finds Human Remains in Seattle Park: 'It's Now an Expectation'*, MyNorthwest (Jan. 9, 2024), https://mynorthwest.com/local/volunteer-group-human-remains-seattle-park-its-now-an-expectation/3947793.

28

HUD-AR-00066

perpetuate harm to the individuals caught in the cycle of addiction.[100] Recently, San Francisco Supervisor Matt Dorsey gave a voice to this reality:[101]

> "Nothing that we are doing as a city to enable or tolerate public drug use is helping anybody. Not our neighborhoods, not our businesses, not our economy. But least of all, not anybody on the streets at the end of the rope addicted to a drug like fentanyl."

While research on the effects on illicit drug decriminalization is unclear, what is clear is that permissive policies towards drug use have not led to a decrease in overdose fatalities in America. Decriminalization advocates rest their case on the premise that law enforcement involvement increases overdose deaths and hinders treatment, but as Charles Fain Lehman puts in, the data simply does not support this premise:

> The argument for decriminalization, after all, wasn't merely that it would have no effect on public health and order. It was that policing drug possession substantially contributed to overdose deaths and other drug-related harms by discouraging people from seeking treatment for fear of legal consequences and by putting them in situations (jail, i.e.) where they would lose tolerance, leading to a fatal overdose. If the evidence is split between "did nothing" and "made things worse," there is almost no reason to conclude that decriminalization made the Pacific Northwest's situation better than it was before decriminalization.[102]

Critics of law enforcement involvement in homelessness and efforts to reduce encampments and public drug use accuse those in favor of "criminalizing" homelessness. But law enforcement involvement can be a positive first step towards assistance, and communities that prioritize safety in public spaces minimize trauma instead of perpetuating harm. The goal of the NOFO's focus on encampments, illicit drug use, and law enforcement involvement is not to jail, fine, or endlessly move unsheltered individuals. None of those things on their own reduces homelessness or provides necessary services. Rather, public safety tools and interventions create additional entry-points to services and care. It is clear that encampments and environments fueled by public illicit drug use are

---

[100] Makenna Marks, *Open-Air Drug Market in Downtown Portland Hurting Local Businesses*, KPTV FOX 12 Oregon (Nov. 22, 2024), https://www.kptv.com/2024/11/22/open-air-drug-market-downtown-portland-hurting-local-businesses/.

[101] Lyanne Melendez, *Fentanyl Crisis: San Francisco Looks to Bring in Expert Drug Market Intervention Strategies with Help of New Nonprofit Funding*, ABC7 News Bay Area (2026), https://abc7news.com/post/fentanyl-crisis-san-francisco-looks-bring-expert-drug-market-intervention-strategies-nonprofit-funding/18397189/.

[102] Charles Fain Lehman, *Did Drug Decriminalization Increase Overdoses?*, The Causal Fallacy (2024), https://thecausalfallacy.com/p/did-drug-decriminalization-increase; Charles Fain Lehman, *Why Drug Decriminalization Failed*, Public (2024), https://www.public.news/p/why-drug-decriminalization-failed.

29

HUD-AR-00067

inherently unsafe. HUD finds that advancing public safety by addressing these realities is critical to minimizing trauma caused to individuals, families, and the community.

Well-designed approaches to disincentive public camping result in treatment and shelter beds filled, not jail cells. Under the Safer Kentucky Act passed in 2024, 92% of unlawful camping charges filed in the first year were non-jailable first offenses.[103] These engagements were opportunities for the provision of services, not efforts to incarcerate. According to one report, 150 cities in 32 states have passed ordinances banning or restricting public camping with California having the largest share.[104] As Devon Kurtz puts it, restrictions on public camping are a tool to match individual needs with appropriate levels of care:[105]

> When cities ban street camping, local courts often set up specialized dockets that focus on homelessness. These dockets, commonly known as "homeless courts," help disentangle vulnerable people (who are often both victims and perpetrators of crimes) from the criminal justice system. Not all homeless people would participate in this program; it would engage only those who have broken the law. Not all homeless people who break the law would be eligible, either. These courts have considerable discretion to match people who are primarily homeless and secondarily criminals with support while ensuring that those who are primarily criminals and secondarily homeless are held fully responsible for their crimes.

The public is supportive of policies that advance public safety related to homelessness. According to national polling in 2025, there is strong bipartisan support for public camping bans and stricter enforcement of drug laws, with 75% of voters in favor of "moving individuals into shelters over allowing camping," and in 2024, 60% of voters were in favor of "stricter drug enforcement near service providers, including penalties for facilities permitting drug activity."[106]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness

---

[103] Paul Webster and Caleb Jacobs, *Safer KY Act isn't cruel. It's a solution that's working. | Opinion*, Courier Journal (Mar. 24, 2026), https://www.courier-journal.com/story/opinion/contributors/2026/03/24/safer-kentucky-act-homelessness-camping-ban-jail-law-enforcement/89199931007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z1188xxp002450n11----l115650c11----e1188xxv003344&gca-ft=142&gca-ds=sophi

[104] Robbie Sequeira, *Many More Cities Ban Sleeping Outside, Despite a Lack of Shelter Space*, Stateline (Jan. 27, 2025), https://stateline.org/2025/01/27/many-more-cities-ban-sleeping-outside-despite-a-lack-of-shelter-space/.

[105] Devon Kurtz, *With Louisiana Homeless Bill, Democrats Once Again Smear Sensible Policy as Jim Crow*, The Federalist (Apr. 27, 2026), https://thefederalist.com/2026/04/27/with-louisiana-homeless-bill-democrats-once-again-smear-sensible-policy-as-jim-crow/.

[106] Cicero Inst., *National Crime Poll* (Oct. 2025), https://ciceroinstitute.org/research/national-crime-poll/.

30

decreased by one-third.[107] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 19%.[108] In March this year, Anchorage leaders announced no major homeless encampments for the first time in over ten years pointing to "a policy choice" to "pair public safety, outreach, shelter access, housing placement, and behavioral health investment."[109]

Firefighters, EMTs, police officers, and co-response social workers and clinicians play a crucial role in meeting individuals where they are in the midst of a mental health or addiction crisis. By providing emergency services, first responders often witness and respond to the impacts of encampments and public drug use in a way that service providers simply do not. Further, first responders witness and respond to the impact of homelessness on non-homeless members of the community.[110] Service providers do not. Research on co-response is evolving, but early adoption in cities like Seattle has had positive results.[111] For these reasons, HUD acknowledges the critical role of first responders in reducing homelessness and mitigating trauma caused by homelessness. The proposed NOFO encourages partnership with first responders, including by representation on the CoC's governing board.

HUD also finds that organizations that operate so-called "safe consumption sites" for illicit drugs, knowingly permit the use or distribution of illicit drugs on property under their control, distribute drug paraphernalia,  or otherwise assist individuals in consuming illicit drugs in the name of "harm reduction" are not only potentially violating criminal federal law (21 U.S.C. 856, 863). Such providers are also perpetuating root causes of homelessness, entrenching barriers to housing stability, and putting vulnerable residents at risk of harm to health and even loss of life. As discussed above, there is data showing a disproportionate rate of fatal overdose inside of Permanent Supportive Housing units, including HUD-funded

---

[107] Katy McAfee, Ben Thompson, *Austin's Homeless Population Dispersing After 2 Years of Camping Ban Enforcement*, Community Impact (May 25, 2023), https://communityimpact.com/austin/central-austin/city-county/2023/05/25/austins-homeless-population-dispersing-after-2-years-of-camping-ban-enforcement/.

[108] Brief of Amicus Curiae Cicero Institute in Support of Petitioner at 14, City of Grants Pass v. Johnson, 603 U.S. 643 (2024) (No. 23-175).

[109] Anchorage Assembly, *Chair Constant Statement on Homelessness Milestone* (Mar. 3, 2026), https://www.muni.org/Departments/Assembly/PressReleases/Pages/Chair-Constant-Statement-on-Homelessness-Milestone.aspx.

[110] Bonny Chu, *Horror Video Captures Repeat Offender Allegedly Attacking 75-Year-Old Woman, Gouging Her Eye With Spiked Stick*, Fox News (May 24, 2026), https://www.foxnews.com/us/horror-video-captures-repeat-offender-allegedly-attacking-75-year-old-woman-gouging-her-eye-spiked-stick.

[111] Acad. Training to Inform Police Responses, *Assessing the Impact of Co-Responder Team Programs: A Review of Research*, Office of Justice Programs (Mar. 2021), https://www.ojp.gov/library/publications/assessing-impact-co-responder-team-programs-review-research; Matthew J. Teti et al., *PROTOCOL: Co-Responding Police-Mental Health Programs and the Impact on Justice and Social Service Outcomes: A Systematic Review*, 21 Campbell Systematic Reviews e70051 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12230866/; Nat'l League of Cities, *Seattle, WA: Community Response Model* (June 30, 2025), https://www.nlc.org/resource/seattle-wa-community-response-model/.

HUD-AR-00069

PSH. Individuals in recovery or working towards sobriety deserve safe living environments that do not immerse them in behavior and surroundings that are counter to recovery. HUD has heard from individuals with lived experience in recovery and from providers, that living environments must be conducive to recovery rather than threatening. Asking applicants, new and renewal, to certify compliance with 21 USC 856 and 863 ensures that funding is utilized to reduce homelessness, not subsidize fatal substance abuse.

HUD acknowledges that for many current CoC recipients, certification of compliance with federal law on Drug Involved Premises may constitute a significant shift away from their core philosophy of operation. However, HUD's position on Drug Involved Premises has been clear to the public both in Executive Order 14321 and prior communications to grantees.[112] Further, HUD finds that there are many homelessness providers that are not currently CoC recipients who operate housing and services that provide safe, drug-free environments. For current providers who are not willing to certify to compliance with federal law, new providers who are willing are welcomed by HUD in their place.

It is important to note that nothing in the NOFO advantages applicants on the basis of location or local law. Instead, the NOFO asks CoCs to share how they intend to overcome impediments or leverage existing capabilities to further safety and connection to assistance for hard-to-reach homeless populations. HUD intends to prioritize federal funding on homelessness where there is good reason to believe it will be most effective, and for the reasons described above, that includes evaluating the status of encampments and public drug use and asking applicants to certify adherence to federal law and not impede law enforcement efforts.

**RATIONALE FOR ADDITIONAL ELEMENTS OF THE NOFO**

**1. Streamlining the CoC Program for More Effective Use of Funding**

The NOFO provides bonus points for CoCs that are Unified Funding Agencies (UFAs) or CoCs that merged in the most recent registration period. In previous NOFOs, HUD has awarded bonus points for merged CoCs to encourage the creation of high-capacity CoCs. There are nearly 400 CoCs across the nation with varying levels of capacity, and merging into higher performing CoCs increases effectiveness. HUD also finds that UFAs improve effectiveness and safeguard taxpayer funding. UFAs enter into a single grant agreement for all the projects in the geographic area and are held by HUD to a higher standard of financial control and capacity. 24 CFR 578.11. For these reasons, HUD is encouraging the formation

---

[112] Stakeholder listserv message announcing the FY25 CoC NOFO explicitly referenced 21 USC 856.

32

of UFAs and the merging of CoCs to streamline the CoC program and ensure the most effective use of funding.

## 2. Accountability to Taxpayers

HUD finds that the structure of the CoC program at times circumvents local elected officials and therefore direct accountability to taxpayers at the local level. HUD has heard from stakeholders that local governing bodies and elected officials often have no authority, or even influence, over the utilization of federal homelessness funding. The NOFO includes rating criteria points for CoCs with governing boards that include elected officials. HUD is aware that, historically, there has been no such incentive for CoCs to involve elected officials in decision-making. However, similar criteria was included in last year's NOFO, giving CoCs ample time to make additions to their governing boards.

## 3. Compliance with Federal Anti-Discrimination Law

HUD has found that CoC-funded homelessness providers have prioritized assistance and contracts on the basis of race.[113] HUD acknowledges that under previous Administrations, racial preferences were allowed or even encouraged.[114] The NOFO requires applicants to certify to compliance with federal law prohibiting illegal discrimination, including illegal racial discrimination.

The NOFO states that HUD will not penalize recipients for adherence to prior year grant terms and conditions.

## 4. Protecting Religious Liberty

The NOFO provides a "level playing field" for faith-based organizations to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[115]

In recent years, the mandate to abide by Housing First has excluded numerous faith-based service providers from even applying to receive CoC funding. Many faith-based homelessness programs require participation in services as a condition of assistance, and these requirements are central to their philosophy of ministry and operation. Some faith-based organizations have reported subrecipient grant conditions imposed at the local level

---

[113] Aaron Sibarium, *EXCLUSIVE: In Cities Across America, Homeless Services Are Doled Out Based on Race and Sexual Identity*, Wash. Free Beacon (Apr. 29, 2026), https://freebeacon.com/america/exclusive-in-cities-across-america-homeless-services-are-doled-out-based-on-race-and-sexual-identity/.

[114] The FY24-25 CoC NOFO required CoCs to affirmatively market assistance to "Black and Brown persons or communities."

[115] *History of The Salvation Army*, Salvation Army USA, https://www.salvationarmyusa.org/about-us/our-history/.

33

that prohibit co-religionist hiring practices. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

### 5. Timing

Congress directed HUD to publish the NOFO by June 1 and announce awards by December 1. In order to provide ample time both for CoCs to solicit and prepare applications and for HUD to sufficiently review applications, the NOFO has an application submission deadline of August 26, 2026. HUD recognizes that a regular competition cadence is beneficial for stakeholders and for HUD. Barring litigation outcomes or congressional directive, HUD intends to follow a June 1/December 1 timeline for remaining CoC competitions during this Administration.

### 6. Award Transfers

Finally, the NOFO puts careful guardrails around the transfer of awards, a type of transfer not contemplated by 24 CFR part 578. HUD is cognizant that the award-transfer process can be used to circumvent the competitive process. HUD's operating procedure for the transfer of CoC awards prior to grant agreement execution was only developed in recent years. HUD recognizes that there are certain circumstances in which changes happen to a previous year grant agreement that necessitate a correction to an CoC award prior to grant agreement execution. The NOFO carefully lays out these specific circumstances and acknowledges that HUD maintains sole discretion on the transfers of awards outside of these explicit circumstances. By providing this information in the NOFO, HUD is ensuring that CoCs and project applicants have ample time to put forward applications that the recipient fully intends to implement and is capable of doing so. At the same time, HUD is also providing clarity around how it treats transfer requests to ensure appropriate use of funding. HUD encourages CoCs in the NOFO to utilize the reallocation process to ensure that funding is going to projects with the capacity to operate in compliance with program requirements.

### 7. Weighing Options for Funding Structure

HUD weighed various options for the funding structure of the NOFO. The funding structure—weighing bonus amounts, types of new projects, and share of renewals—is the most impactful aspect of the CoC NOFO. As discussed above, the CoC NOFO had consistently set Tier 1 at upwards of 85% of CoC Annual Renewal Demand (ARD) and recently prohibited any new Transitional Housing or SSO projects except for Coordinated Entry projects.

34

HUD-AR-00072

Congressional appropriations for this year requires HUD to award at least 60% of each CoC's Annual Renewal Demand based on the ranking determined by the CoC. HUD finds that setting Tier 1 no higher than 60% accomplishes the competitive aims discussed above. HUD considered renewing projects across Tier 1 and Tier 2 at a level consistent with past years. Given that only 3.5% of FY24 funding went towards new projects and 88% went to a form of permanent housing, HUD believes pursuing this funding structure would maintain similar levels of renewal projects and project type, both of which are counter to the benefits of competition, new projects, and a balance of projects discussed above.

HUD considered creating a set-aside for new Permanent Housing reflective of the December 2025 CoC NOFO. However, given the Tier 1 level set by Congress and the high percentage of existing Permanent Housing renewal projects, this option would squeeze out almost any opportunity for new TH and SSO projects, critical to ensuring a diverse set of solutions, optimizing self-sufficiency, and creating meaningful reductions in homelessness.

Consistent with the practice in recent years and with the McKinney-Vento Act, HUD decided to rely on the suspension clause of 42 USC 11386b(a) by making funding available for existing projects at a level that obviates the feasibility of a set-aside for new permanent housing.

In order to balance assurance of funding with healthy competition and a significant investment in project types that rebalance the Continuum of Care and optimize self-sufficiency as described in detail in earlier sections of this memo, HUD decided to create a set-aside for new projects with a preference for Transitional Housing and SSO projects of $1.30 billion (32 percent of the total funding).

Due to the increased level of competition, the NOFO also creates a generous "bonus" opportunity for CoCs to apply for projects in excess of their Final Pro Rata Need (FPRN). The proposed bonus amount is 15% of the CoC's FPRN with limitations that provide the majority of CoCs a minimum amount of $500,000 and a maximum amount of $5,000,000.[116] The limitations prevent the unnecessary incentivization of CoCs splitting to create more, smaller CoCs or the dis-incentivization of CoCs merging. Setting the bonus amount at a percentage of FPRN without a floor and ceiling, as was done in the past, skews bonus awards to be made not on merit but rather on the existing resources of the CoC. This allowed large CoCs to increase their ARD due to bonus awards, with the increase in ARD and bonus opportunity compounding year over year.

---

[116] The exceptions are for CoCs that recently split ($250,000 minimum) and CoCs that recently merged ($10,000,000 maximum.)

35

HUD-AR-00073

While Tier 1 project selections are not evaluated on merit, Tier 2 project selections apply a limited remainder of funding to a pool of project applications that exceed that funding. For this reason, the proportion of the limited remainder of funding that a particular CoC is eligible to apply for in bonus funding is a crucial detail. The more bonus funding a CoC has, the larger their share of the pool of project applications becomes and the more likely they are to be awarded those projects.

But bonus funding amount does not derive from CoC performance, merit, or outcomes—at least not in any direct way. Instead, it's a measure of the existing volume of resources that the CoC has. This preference in prior years for existing capacity and resources has stifled true competition based on merit and minimized the ability of small CoCs to increase their resources. Given these factors, HUD finds that the loss of bonus funding to a small number of CoCs due to a ceiling is outweighed by the more level playing field created as a result.

In recent years, HUD has requested from Congress the use of recaptured Section 231 funds to supplement the funding available in the CoC NOFO. HUD has significant discretion on the use of Section 231 funds under both the Emergency Solutions Grant (ESG) program and the CoC program. HUD considered utilizing a portion of Section 231 funds for the FY26 CoC NOFO. HUD also considered that Section 231 authorizes a narrow set of rural eligible activities for a small set of grants that are not otherwise authorized under the NOFO. HUD decided that the benefits of utilizing the full balance of Section 231 funds at a later date to provide targeted funding outweighed the downsides of lowering ARD amounts across the board by a small percentage and limiting eligible activities to the standard CoC eligible activities for a small number of grants. HUD finds that this downside is mitigated by the set-aside for new projects, which are not reliant on renewal demand, including the impacts of Fair Market Rent (FMR) increases and Cost of Living Adjustments—both of which are used to calculate an updated CoC ARD each year.

36

HUD-AR-00074



The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

# The 2024 Annual Homelessness Assessment Report (AHAR) to Congress



## PART 1: POINT-IN-TIME ESTIMATES OF HOMELESSNESS
### DECEMBER 2024

HUD-AR-00898

# Acknowledgements

**Authors:**

Tanya de Sousa and Meghan Henry, *Abt Global*

**Principal Investigator:**

Jill Khadduri, *Abt Global*

**Data Collection Managers:**

Tanya de Sousa and Giuliana Sciuto, *Abt Global*

**Data Collectors and Reviewers:**

Alyssa Andrichik, Samantha Bolden, Antonio Calbo-Jackson, Jill Cusick, RJ de la Cruz, Tanya de Sousa, Meghan Henry, Makiyah Holder, Charlene Kwan, Victoria Lopez, Andrew McFadden, Sonya Phillips, Hannah Pico, Ed Prestera, Katherine Rush, Giuliana Sciuto, Erica Sewell, Meghan Shea, Melissa Stevenson, and Shantae White, *Abt Global*

**Programmers/Analysts:**

Meghan Shea and Pearl Zheng, *Abt Global* and Jon-Paul Oliva, *GIS and Data Quality Consultant*

**Contributors and Reviewers:**

William Snow, *U.S. Department of Housing and Urban Development*

Robyn Andrews, *Senior Program Manager, CSH; HUD Persons with Lived Experience and Expertise Team*

Emma Beers, *Homebase, HUD Persons with Lived Experience and Expertise Team*

John Harrison, *HUD Persons with Lived Experience and Expertise Team*

Rashema Melson, *CEO and Founder, Pain Into PURPOSE; Lead of HUD Persons with Lived Experience and Expertise Team*

Dr. Rajni Shankar-Brown, MA, M-MA, MBA, PhD, *Past Board President and Racial Equity and Education Chair of the National Coalition for the Homeless; Co-Lead of U.S. Department of Housing and Urban Development (HUD) Equity Team; Member of the HUD People with Lived/Living Experience and Expertise Team; Professor and Chair of Social Justice Education at Stetson University*

Donald Whitehead, Executive Director, *National Coalition for the Homeless*

Dana Woolfolk, *HUD Persons with Lived Experiences and Expertise Team*

Rhie Azzam Morris, *Founder, Rhie Azzam Morris, LLC; HUD Persons with Lived Experiences and Expertise Team*

Additional people with lived experience and expertise of homelessness that remain unnamed also reviewed this report.

**Design and Production:**

David Dupree, *Abt Global*

HUD-AR-00899

# Table of Contents

Acknowledgements ...................................................................................................ii

Table of Contents...................................................................................................iii

Key Findings ..........................................................................................................v

Definition of Terms ..............................................................................................viii

About this Report..................................................................................................xi

1.    Estimates of All People Experiencing Homelessness in the United States .............1

   1.1    National Estimates of Homelessness in the United States .....................................1

   1.2    State-Level Estimates of People Experiencing Homelessness..............................8

   1.3    Estimates of All People Experiencing Homelessness by CoC..............................11

2.    Estimates of Individuals Experiencing Homelessness..................................................14

   2.1    National Estimates of Individuals Experiencing Homelessness............................14

   2.2    State-Level Estimates of Individuals Experiencing Homelessness.......................20

   2.3    CoC-Level Estimates of Individuals Experiencing Homelessness ........................23

3.    Estimates of Families with Children Experiencing Homelessness in the United States ...................................................................................................25

   3.1    National Estimates of Families with Children Experiencing Homelessness in the United States ...................................................................................25

   3.2    Estimates of Homelessness by State....................................................................32

   3.3    Estimates of People in Families with Children Experiencing Homelessness by CoC ...................................................................................................35

4.    Estimates of Unaccompanied Youth Experiencing Homelessness ........................37

   4.1    National Estimates of Unaccompanied Youth Experiencing Homelessness..........37

   4.2    State-Level Estimates of Unaccompanied Youth Experiencing Homelessness .....43

   4.3    CoC-Level Estimates of Unaccompanied Youth Experiencing Homelessness ......46

5.    Estimates of Veterans Experiencing Homelessness in the United States ..............48

   5.1    National Estimates of Veterans Experiencing Homelessness in the United States ...................................................................................................48

   5.2    Estimates of the Number of Veterans Experiencing Homelessness by State ........54

   5.3    Estimates of Veterans Experiencing Homelessness by CoC................................57

6.    Estimates of Individuals Experiencing Chronic Patterns of Homelessness ...........59

   6.1    National Estimates of Individuals Experiencing Chronic Patterns of Homelessness ...................................................................................................59

   6.2    State-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness ...................................................................................................62

   6.3    CoC-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness ...................................................................................................65

7.    National Inventory of Beds for People Currently Experiencing Homelessness and People Transitioning Out of Homelessness ...................................................67

   7.1    Types of Programs in the National Inventory .......................................................67

HUD-AR-00900

7.2    Beds by CoC Category, 2024 .................................................................74

**Appendix A: State-Level Data** .................................................................................**76**

**Appendix B: Additional Data on People Experiencing Homelessness in 2024** .................**80**

Changes to the 2024 PIT Demographic Reporting Options. ..........................................80

B-1: Additional Data on All People Experiencing Homelessness ...................................82

B-2: Additional Data on Individuals Experiencing Homelessness...................................86

B-3: Additional Data on People in Families with Children Experiencing Homelessness ......................................................................................90

B-4: Additional Data on Unaccompanied Youth Experiencing Homelessness...............94

B-5: Additional Data on Veterans Experiencing Homelessness .....................................98

B-6: Additional Data on Individuals with Chronic Patterns of Homelessness ..............102

HUD-AR-00901

# Key Findings

**The number of people experiencing homelessness on a single night in 2024 was the highest ever recorded.** A total of 771,480 people – or about 23 of every 10,000 people in the United States – experienced homelessness in an emergency shelter, safe haven, transitional housing program, or in unsheltered locations across the country. Several factors likely contributed to this historically high number. Our worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism have stretched homelessness services systems to their limits. Additional public health crises, natural disasters that displaced people from their homes, rising numbers of people immigrating to the U.S., and the end to homelessness prevention programs put in place during the COVID-19 pandemic, including the end of the expanded child tax credit, have exacerbated this already stressed system.

**Nearly all populations reached record levels.** Homelessness among people in families with children, individuals, individuals with chronic patterns of homelessness, people staying in unsheltered locations, people staying in sheltered locations, and unaccompanied youth all reached the highest recorded numbers in 2024.

**People in families with children had the largest single year increase in homelessness.** Between 2023 and 2024, 39 percent more people in families with children experienced homelessness. Overall, the number of people experiencing homelessness increased by 18 percent.

**Nearly 150,000 children experienced homelessness on a single night in 2024,** reflecting a 33 percent increase (or 32,618 more children) over 2023. Between 2023 and 2024, children (under the age of 18) were the age group that experienced the largest increase in homelessness.

**Veterans were the only population to report continued declines in homelessness.** Between 2023 and 2024, the number of veterans experiencing homelessness declined by eight percent, or 2,692 fewer veterans. The number of veterans experiencing homelessness has declined by 55 percent since data collection about veteran homelessness began in 2009. The declines in sheltered and unsheltered experiences of homelessness were similar, (56% and 54%). These declines are the result of targeted and sustained funding to reduce veteran homelessness.

**About one in every five people experiencing homelessness on a single night in 2024 was age 55 or older.** More than 104,000 people experiencing homelessness were aged 55 to 64, and just over 42,150 people were over age 64. Nearly half of adults aged 55 or older (46%) were experiencing unsheltered homelessness in places not meant for human habitation.

**People who identify as Black, African American, or African continue to be overrepresented among the population experiencing homelessness.** People who identify as Black made up just 12 percent of the total U.S. population and 21 percent of the U.S. population living in poverty but were 32 percent of all people experiencing homelessness. **However, the share of people experiencing homelessness who identify as Black (of any ethnicity) decreased from 37 percent of all people experiencing homelessness in 2023.**[1]

---

[1] This change could partially be due to changes in the way race and ethnicity was reported this year and the inclusion of additional reporting categories. However, in recent years, many Communities of Care (CoCs) have engaged in additional technical assistance to correct for bias in the allocation of housing and prevention resources. This decline could also reflect the effects of those and other local efforts to more fairly distribute resources.

HUD-AR-00902

**One in every three individuals experiencing homelessness reported having experienced chronic patterns of homelessness, or 152,585 people.** This is the highest number of individuals experiencing chronic patterns of homelessness counted in the PIT. Individuals experiencing chronic patterns of homelessness have increased by 27 percent since data was first collected in 2007. Sixty-five percent of all individuals experiencing chronic patterns of homelessness, or more than 99,500 people, were counted in unsheltered locations. This is also the highest number recorded since data collection began.

**Exhibit A-1: Change in the Number of People Experiencing Homelessness**

|  | 2023-2024 | 2007-2024 |
|---|---|---|
| All People | +18.1% | +19.2% |
| Sheltered | +25.4% | +27.0 |
| Unsheltered | +6.9% | +7.2 |
| Individuals | +9.6% | +24.1% |
| People in Families | +39.4% | +10.6% |
| Unaccompanied Youth* | +10.0% | +3.4% |
| Veterans* | -7.6% | -55.2% |
| Chronic Patterns of Homelessness | +6.6% | +27.4% |

*Baseline comparison year for veterans is 2009; baseline for unaccompanied youth is 2017

**The national inventory of beds for people currently experiencing homelessness increased by 13 percent between 2023 and 2024.** This increase was driven by increases in emergency shelter beds, which increased by 18 percent between 2023 and 2024 and have doubled since 2007. Transitional housing, meanwhile, has steadily decreased over time – declining by 4 percent between 2023 and 2024 and by 60 percent since 2007. However, this reduction since 2007 does not necessarily mean that transitional housing beds were completely removed from the national inventory. Often transitional housing programs realize they function more like emergency shelter and convert their project type to align better with the way they actually function. In other cases, transitional housing programs converted to permanent housing projects, including transition-in-place and rapid rehousing.

**Nearly 60 percent of the national inventory of beds is for people formerly experiencing homelessness.** Rapid rehousing (RRH), permanent supportive housing (PSH), and other permanent housing (OPH) programs make up 57 percent of all beds reported in the housing inventory count (HIC)—people in these programs are not counted as experiencing homelessness in the PIT count data. Between 2023 and 2024 total inventory for these programs increased by 3 percent, with the largest increase among OPH programs (14,735 more beds). This reflects significant investments into OPH through the Emergency Housing Voucher program. PSH makes up the largest share of all inventory for people formerly experiencing homelessness (at 58%). While nationally the supply of PSH beds has more than doubled since 2007, there are still areas where the need for permanent housing has outpaced the supply.

HUD-AR-00903

**Exhibit A-2: Share of Inventory that is Dedicated to Emergency Housing (ES/TH/SH) vs. Permanent Housing (RRH/PSH/OPH), 2007-2024**



KEY: Permanent Housing (PH) = Rapid Rehousing, Permanent Supportive Housing, and Other Permanent Housing; Emergency Housing (EH) = Emergency Shelter (ES), Save Haven (SH), and Transitional Housing (TH).

HUD-AR-00904

# Definition of Terms

**Please note:** Key terms are used for AHAR reporting purposes and accurately reflect the data used in this report. Definitions of these terms may differ in some ways from the definitions found in the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act and in HUD regulations.

**Adults** refers to people age 18 or older.

**Children** refers to people under the age of 18.

**Continuums of Care (CoC)** are local planning bodies responsible for coordinating the full range of homelessness services in a geographic area, which may cover a city, county, metropolitan area, or an entire state.

**Disability** refers to an individual with one or more of the following conditions: (A) A physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse, post-traumatic stress disorder, or brain injury that: (1) Is expected to be long-continuing or of indefinite duration; (2) Substantially impedes the individual's ability to live independently; and (3) Could be improved by the provision of more suitable housing conditions; (B) A developmental disability, as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002); or (C) The disease of Acquired Immunodeficiency Syndrome (AIDS) or any condition arising from the etiologic agency (infectious agent) for Acquired Immunodeficiency Syndrome.

**Emergency Shelter (ES)** is a facility with the primary purpose of providing temporary shelter for people experiencing homelessness.

**Experiencing Homelessness** describes a person who lacks a fixed, regular, and adequate nighttime residence.

**Eviction moratorium** refers to the federal (or state or local) ban on evicting certain tenants from a residential rental property because of non-payment of rent.

**Families Experiencing Chronic Homelessness** refers to people in families with children in which the head of household has a disability and has either been continuously experienced homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

**Family Households** refers to households made up of at least one adult age 18 or older and one child age under 18 that were experiencing homelessness together on the night of the point-in-time count.

**HMIS** stands for homelessness management information system. CoCs use an HMIS to collect data on people who are experiencing sheltered homelessness in their area, including information about their characteristics and service-use patterns over time.

**Housing Inventory Count (HIC)** is produced by each CoC and provides an annual inventory of beds that provide assistance to people in the CoC who are experiencing homelessness or transitioning out of their experience of homelessness.

**Individual** refers to a person who is not part of a family with children during an experience of homelessness (i.e., the person is not experiencing homelessness in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

HUD-AR-00905

**Individual Experiencing Chronic Homelessness** refers to an individual with a disability who has been continuously experiencing homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

**Multiple Races or Multi-Racial** refers to people who self-identify as more than one race (i.e., a person who selects more than one race category from a "select all that apply" option).

**Other Permanent Housing** is housing with or without services that is specifically for people who formerly experienced homelessness but does not require people to have a disability.

**Parenting Children** are people under age 18 who are the parents of one or more children (under age 18) who are present with or sleeping in the same place as the child and without anyone over the age of 18.

**Parenting Child Household** is a household with at least one parenting child and the child or children for whom the parenting child is the parent.

**Parenting Youth** are people under age 25 who are the parents or legal guardians of one or more children (under age 18) who are present with or sleeping in the same place as that youth parent, where there is no person over age 24 in the household.

**Parenting Youth Household** is a household with at least one parenting youth and the child or children for whom the parenting youth is the parent or legal guardian.

**People in Families with Children** are people who are experiencing homelessness as part of a household that has at least one adult (age 18 or older) and one child (under age 18).

**Point-in-Time (PIT) Counts** are unduplicated one-night estimates of both sheltered and unsheltered people experiencing homelessness. The one-night counts are conducted by CoCs nationwide and occur during the last week in January of each year.[2]

**Permanent Supportive Housing (PSH)** is a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were experiencing homelessness when they entered the program and are now considered to have formerly experienced homelessness. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability for eligibility.

**Rapid Re-Housing (RRH)** is a housing model designed to provide temporary housing assistance to people experiencing homelessness, moving them quickly out of their experience of homelessness and into permanent housing in which they may be able to remain after the assistance ends.

**Safe Havens (SH)** are projects that provide private or semi-private temporary shelter and services to people experiencing severe mental illness and are limited to serving no more than 25 people within a facility.

**Sheltered Homelessness** refers to people who are staying in emergency shelters, transitional housing programs, or safe havens.

---

[2] While CoCs are only required to conduct an unsheltered and sheltered PIT count biennially per 24 CFR 578.7(c)(2), most CoCs conduct a PIT count annually.

HUD-AR-00906

**DEFINITION OF TERMS**

**Transitional Housing Programs (TH)** provide people experiencing homelessness a place to stay combined with supportive services for up to 24 months.

**Unaccompanied Youth/Children (under 18)** are people in households with only children under the age of 18 who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness.

**Unaccompanied Youth (18-24)** are young adults in households without children who are not part of a family with children or accompanied by their parent or guardian during their episode of homelessness.

**Unsheltered Homelessness** refers to people whose primary nighttime location is a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for people (for example a car, public park, abandoned building, bus or train station, airport, or camping ground).

**Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

HUD-AR-00907

# About this Report

The US Department of Housing and Urban Development (HUD) releases the Annual Homelessness Assessment Report to Congress (AHAR) in two parts. Part 1 provides Point-in-Time (PIT) estimates, offering a snapshot of experiences of homelessness—both sheltered and unsheltered—on a single night. The PIT counts also provide an estimate of the number of people experiencing homelessness within particular populations such as veterans and individuals experiencing chronic patterns of homelessness. To be included in the PIT count, a person needs to meet the definition of experiencing homelessness used by HUD—which differs from the definition used by other agencies. HUD defines experiences of homelessness as lacking a fixed, regular, and adequate nighttime residence, meaning:

- An individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings such as a car, public park, abandoned building, bus or train station, airport, or camping ground; or
- An individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including congregate shelters, transitional housing, and hotels and motels paid for by charitable organizations or by federal, State, or local government programs for low-income individuals).[3]

People staying in the following locations on the night of the PIT count **_are not_** included in the sheltered or unsheltered PIT count:

- People living in housing provided by permanent supportive housing (PSH) programs, including people using HUD Veterans Affairs Supportive Housing (VASH) vouchers.
- People living in other permanent housing (OPH), including housing supported by the Veteran Affairs Grant and Per Diem Transition in Place (TIP) program and people living in housing supported by the Emergency Housing Voucher program and not considered PSH.
- People living in permanent housing supported by rental assistance from a rapid re-housing (RRH) program.
- People in any housing not listed on the housing inventory count (HIC) because the housing is not dedicated for people experiencing homelessness.
- People temporarily staying with family or friends—sometimes referred to as being "doubled-up" or "couch surfing"—even if their stay may be unstable.

The one-night PIT counts are typically conducted each year during the last 10 days of January. In 2024, just four CoCs conducted counts in February instead of the last 10 days of January.

To understand our nation's capacity to serve people who are currently or formerly experiencing homelessness, this report also has a chapter focusing on the inventory of shelters and housing for people currently experiencing homelessness or transitioning out of their experience of homelessness. Counts of emergency shelters, transitional housing programs, safe havens, rapid rehousing programs, permanent supportive housing programs, and other permanent housing are based on reports by CoCs in the Housing Inventory Count (HIC).

---

[3] For the PIT Count, CoCs must count all individuals or families who meet the criteria in paragraphs (1)(i) and (1)(ii) of the homeless definition in 24 CFR 578.3.

HUD-AR-00908

In 2024, the PIT estimates of people experiencing homelessness in sheltered and unsheltered locations, as well as the number of beds available to serve them, were reported by 385 Continuums of Care (CoC) nationwide. These 385 CoCs covered virtually the entire United States.[4]

To better understand how experiences of homelessness differ by geography, the AHAR study team categorizes CoCs into four groups[5]:

1) Major city CoCs
2) Other largely urban CoCs
3) Largely suburban CoCs
4) Largely rural CoCs

A CoC with a plurality of its population living in rural areas (i.e., more people living in rural areas than in any other defined area) is classified as a "largely rural CoC." That does not mean, however, that all people experiencing homelessness in the largely rural CoC were counted in rural areas. CoCs span large territories (even an entire state in some cases) and may comprise a mixture of urban, suburban, and rural areas. Because PIT estimates are reported for an entire CoC, each person experiencing homelessness in the CoC cannot be classified as staying in an urban, suburban, or rural area. Rather, all people experiencing homelessness in the CoC are classified as staying in a CoC that is largely urban, suburban, or rural.

HUD has technical standards for conducting the PIT counts, and CoCs use a variety of approved methods to produce the counts. The guide for PIT methodologies (i.e., approved approaches for conducting the PIT count) can be found here: https://www.hudexchange.info/resource/4036/point-in-time-count-methodology-guide. While standards exist, each CoC makes choices among the approved methods, so there is no universal method used to collect PIT count data. This results in variations in how CoCs conduct their PIT counts, often reflecting the size and type of the CoC. For example, some CoCs conduct a full census, attempting to capture data on all people experiencing homelessness. Others, often those with large geographic areas, use a sampling approach to count a smaller group of people experiencing homelessness and use that sample to estimate the number and characteristics for the entire population of people experiencing homelessness within their community.

HUD also sets several standards for what types of situations qualify as experiences of unsheltered homelessness. All situations that qualify as experiences of unsheltered homelessness are considered places not meant for human habitation. However, the level of connection to services and resources varies. For example, an experience of unsheltered homelessness can be a situation where a person is sleeping in a public space with no covering or connection to resources. It can also be in an encampment that has water

---

[4] The CoCs that did not participate in the 2024 PIT count were American Samoa and the Northern Mariana Islands.

[5] First, CoCs representing the 50 most populous cities in the United States, based on U.S. Census data, were assigned to the major city CoC category. Next, the study team used geographic data published in the 2021 U.S. Department of Education's National Center for Education Statistics (NCES) data to determine the urbanicity of the remaining CoCs. NCES defines 12 geographic locales, which were collapsed into three distinct categories: urban (mapping to the three NCES "City" locales), suburban (mapping to the three NCES "Suburban" locales, as well as the "Town – Fringe" locale), and rural (mapping to the three NCES "Rural" locales, as well as the "Town – Distant" and "Town – Remote" locales). Using the percentage of each CoC's total population living in urban, suburban, and rural areas, based on the NCES geographic data, CoCs were classified into categories according to their largest percentage among the three. The study team used population counts from the Census Bureau's 2020 block-level data. Census blocks are the smallest geographic unit for which the Census reports population counts, and they are the ideal unit for this CoC analysis. Block-level population data are only available in the decennial census reports.

HUD-AR-00909

or bathroom facilities and is visited by outreach workers who provide connections to supportive services. Experiences of unsheltered homelessness also include people sleeping in cars, trucks, and recreational vehicles when it appears to the people conducting the PIT count that the purpose is not recreational but instead exists because the occupants do not have another place to sleep. Some communities have established "safe parking" programs that have services similar to those found in shelters. They are also considered unsheltered locations.

When collecting demographic data on people experiencing homelessness, the people conducting the PIT count use pre-established categories to collect data on race, ethnicity, and gender. These data are collected from previously administered intake surveys (e.g., for people experiencing sheltered homelessness) or from surveys administered for purposes of the PIT count (e.g., for people experiencing unsheltered homelessness). The demographic categories used in the 2024 PIT count are based on current reporting standards, which are defined in the fiscal year 2024 Homeless Management Information System (HMIS) Data Standards. Those race, ethnicity, and gender response categories were updated for the 2022 PIT count and changed again for the 2024 PIT count to better reflect the ways in which people identify themselves. HUD consulted with advocates, providers, researchers, and people with lived experience of homelessness to arrive at the updated gender and race/ethnicity categories. HUD also took guidance from the White House's *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys* the National Academic of Sciences, Engineering, and Medicine March 2022 report *Measuring Sex, Gender Identity, and Sexual Orientation*.

Beginning in 2023, communities were asked to collect additional information on the ages of people experiencing homelessness. Instead of a single category representing all people over the age of 24, five additional categories were used to provide more detail on the ages of people experiencing homelessness. These categories were 25-34, 35-44, 45-54, 55-64, and 65 or older. As 2023 was the first year these data were reported, comparisons to prior years for the new age categories are not available.

For the AHAR reporting, if a CoC does not conduct an unsheltered count for the reporting year, their prior year's unsheltered data is carried forward to avoid misleading changes in the data. In 2023, 22 CoCs conducted a sheltered-only count, and the 2022 unsheltered count data was carried forward for these CoCs.[6]

In 2024, 22 CoCs conducted a sheltered-only count and the 2023 unsheltered count data was carried forward for these CoCs.[7]

---

[6] To be able to report the age distribution of people over age 24 for these CoCs, the age category breakouts were estimated. To do this estimation, the total number of people aged 24 and older from the reported 2022 unsheltered data was extrapolated (estimated) using the age distribution of comparable CoCs' unsheltered populations in 2023. For example, if 20 percent of people in the 2023 count of unsheltered people over 24 in the comparison CoC(s) fell into the 25-34 age category, 20 percent of the 2022 unsheltered population over age 24 was used to estimate the 25-34 unsheltered population for the CoC. For the 15 California CoCs that did a sheltered-only count, the combined age distribution of all other California CoCs that conducted an unsheltered count in 2023 was used. For other CoCs that did not complete an unsheltered count in 2023, the remainder of CoCs in the same state and geographic category or CoCs from the same geographic category and a similar state were used to impute (estimate) the age distributions. The 22 CoCs that did not conduct an unsheltered count in 2023 included 15 CoCs from California, two CoCs from Georgia, one CoC from Illinois, two CoCs from Michigan, one CoC from Puerto Rico, and one CoC from Washington.

[7] To be able to report the race and ethnicity distribution for these CoCs, the combined race and ethnicity category breakouts were estimated. To do this estimation, we distributed the total reported population in each race category from the reported 2023 unsheltered data by each race and Hispanic/Latina/e/o category in 2024 using the race and Hispanic/Latina/e/o distribution of each CoCs' sheltered populations in 2024. For example, if 20 percent of the total American Indian, Alaska Native, or Indigenous people in the 2024 count of sheltered persons in families in the given CoC were reported as American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o, 20 percent of the 2023 unsheltered population of American Indian,

HUD-AR-00910

The HIC and PIT count are based on data from January 2024. By the time of the 2023 and 2024 HIC and PIT counts, most shelters had resumed operating at full capacity—that is, they no longer practiced the social distancing that had reduced their bed capacity by up to 50 percent in 2021 and 2022—nearly all COVID-era protections such as city, county, or state level eviction moratoriums, had ended; and many communities reported an increased ability to conduct unsheltered counts. However, the COVID-19 pandemic had lasting impacts on levels of experiences of homelessness and characteristics of people experiencing homelessness. Some one-time investments made during the pandemic were coming to an end. Few communities were still spending down the remains of COVID-era funding to support additional shelter and rapid rehousing programming. Most of these funds were exhausted by the time of the 2024 count (see Section 7 for more information). Significant investments in prevention assistance, including through the Emergency Rental Assistance Program that provided rental assistance payments to prevent evictions and entries into homelessness, were also running down. However, some communities were able to expand the amount of other permanent housing (OPH) available in their communities through the use of Emergency Housing Vouchers which provide funding to support OPH for people at-risk of or currently experiencing homelessness or who have a high risk of housing instability. Furthermore, by 2024, the effects of high inflation rates over the past few years, the ending of the expanded child tax credit, alongside with the continued lack of affordable housing across most of the country continued to have a significant impact on rates of homelessness.

In 2024, many of the CoCs that reported the largest increases in sheltered homelessness, reported that they experienced an increase from people who were displaced from natural disasters or due to immigration. For example, in Hawaii, over 5,000 people were in disaster emergency shelter due to the Maui Fire. Another 13 CoCs indicated an increase due to an increase in immigrants or refugees seeking asylum.

In an effort to meaningfully include people with lived experiences and expertise (PLEE) with homelessness as a part of the AHAR process, HUD invited technical assistance (TA) providers with lived experiences to provide a review of the AHAR chapters. This review continued a collaboration between HUD and PLEE that began with the 2020 AHAR Part 2 report. The AHAR is an important source of data used to inform policies, programmatic decisions, and funding. HUD will continue collaboration with PLEE in development of the report as it will strengthen and improve the usefulness of the AHAR. The contents of this report do not necessarily represent the views or opinions of the PLEE.

Alaska Native, or Indigenous persons in families was used to estimate the American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o unsheltered persons in families population for the CoC. We assumed the remainder of the reported 2023 unsheltered population of American Indian, Alaska Native, or Indigenous persons in families were non-Hispanic/Latina/e/o. The 22 CoCs that did not conduct an unsheltered count in 2024 included seven CoCs from California, five CoCs from Oregon, two CoCs from Arkansas, two CoCs from Maryland, and one CoC each from Alabama, Colorado, Florida, New Jersey, Texas, and the Virgin Islands.

HUD-AR-00911

# 1. Estimates of All People Experiencing Homelessness in the United States

## 1.1 National Estimates of Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of people experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**All People Experiencing Homelessness** includes all people who lack a fixed, regular, and adequate nighttime residence. It includes people staying in emergency shelters, safe havens, and transitional housing programs. It also includes people who were experiencing unsheltered homelessness in places not meant for human habitation such as on the streets, in abandoned buildings, bus stations, or in their cars.

HUD-AR-00912

**Exhibit 1-1: PIT Estimates of People Experiencing Homelessness by Sheltered Status, 2007-2024**



Note: The exhibit does not display the total count of people experiencing homelessness in 2021 or the count of all people experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of people experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

**Exhibit 1-2: Experiences of Homelessness by Household Type and Sheltered Status, 2024**



On a single night in January 2024, 771,480 people experienced homelessness in the United States, the largest number since data collection began and an overall increase of 19 percent since 2007. Compared

HUD-AR-00913

with 2007, 124,222 more people experienced homelessness in 2024. Between 2023 and 2024, the increase of 118,376 people was largely driven by an increase in the sheltered population, which rose by 25 percent (100,762 more people). The number of people experiencing sheltered homelessness in 2024 was larger than the pre-pandemic sheltered population.

Two-thirds of all people experiencing homelessness in 2024 were in households without children (i.e., individuals). For further detail on people experiencing homelessness by household type, see Chapters 2 and 3.

**Exhibit 1-3: Change in Number of People Experiencing Homelessness Over Time by Sheltered Status, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Change 2020–2024 | | Change 2023–2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All People Experiencing Homelessness** | 124,222 | 19.2% | 134,403 | 21.1% | 191,014 | 32.9% | 118,376 | 18.1% |
| **Sheltered People** | 105,855 | 27.0% | 93,713 | 23.2% | 142,870 | 40.3% | 100,762 | 25.4% |
| **Unsheltered People** | 18,367 | 7.2% | 40,690 | 17.4% | 48,144 | 21.3% | 17,614 | 6.9% |

[OUR STATE] IS 21,000 HOUSING UNITS SHORT OF PROPERTIES THAT WOULD BE CONSIDERED AFFORDABLE TO EXTREMELY LOW-INCOME RENTERS—THUS WE EXPECT HOMELESSNESS POPULATIONS TO CONTINUE TO INCREASE. PROGRAMS HAVE ALSO HAD INCREASED BED UTILIZATION RATES AS THEY HAVE ROLLED BACK COVID-19 RESTRICTIONS, MAKING MORE BEDS AVAILABLE FOR PEOPLE WHO WOULD OTHERWISE BE UNSHELTERED.

CoC in the Mid-Atlantic

Communities reported that increases in the sheltered population reflected: increased shelter capacity, the ending of eviction moratoria (bans) and other programs designed to prevent experiences of homelessness during the pandemic, a shortage of affordable housing, natural disasters that displaced people from their homes, and rising numbers of people immigrating to the U.S. Increases in the unsheltered population also were connected to a lack of affordable housing and the end of pandemic era protections but also to lack of shelter capacity in some communities.

### *Demographic Characteristics*

In 2024, HUD made significant changes to the way the Point-in-Time count collected data on gender and data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latina/e/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior

HUD-AR-00914

years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in the report.

The demographic characteristics of people experiencing homelessness vary considerably by household type and shelter status and reflect the large percentage of individuals among the total population of people experiencing homelessness. Detailed characteristics are shown separately for individuals in <u>Section 2</u> of this report and for families with children in <u>Section 3</u>.

*Age*

**Exhibit 1-4: Age Distribution of People Experiencing Homelessness, 2024**



In 2024, more than one of every four people experiencing homelessness was a child under the age of 18 (19%) or a young adult between the ages of 18 and 24 (8%). Demographics differ depending on the type of homelessness experienced, with few children experiencing unsheltered homelessness and more middle aged adults making up the unsheltered population. People between the ages of 35 and 54 make up almost half of the total number of people experiencing unsheltered homelessness.

While all populations saw increases in the number of people experiencing homelessness between 2023 and 2024, the largest percentage increases were among children (under the age of 18), which increased by 32 percent, followed by young adults aged 25 to 34 which increased by 24 percent (see Appendix B).

HUD-AR-00915

## *Gender*

Six of every 10 people experiencing homelessness in 2024 were men or boys. This share is even higher in the unsheltered population, where men and boys make up nearly 70 percent of people experiencing unsheltered homelessness.

**Exhibit 1-5: Gender of People Experiencing Homelessness, 2024**

| | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | **#** | **%** | **#** | **%** | **#** | **%** |
| Woman (girl) | 302,660 | 39.2% | 218,628 | 44.0% | 84,032 | 30.6% |
| Man (boy) | 459,568 | 59.6% | 274,680 | 55.2% | 184,888 | 67.4% |
| Transgender | 2,561 | 0.3% | 1,501 | 0.3% | 1,060 | 0.4% |
| Gender Questioning | 383 | <0.1% | 74 | <0.1% | 309 | 0.1% |
| Culturally Specific Identity | 324 | <0.1% | 71 | <0.1% | 253 | 0.1% |
| Different Identity | 720 | 0.1% | 174 | <0.1% | 546 | 0.2% |
| Non Binary | 1,977 | 0.3% | 1,001 | 0.2% | 976 | 0.4% |
| More Than One Gender | 3,287 | 0.4% | 1,127 | 0.2% | 2,160 | 0.8% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

The shelter status of people experiencing homelessness varied considerably within gender categories. People experiencing homelessness identifying as women or girls had the highest sheltered rate (72%), while those identifying as gender questioning – though the number was small – had the highest unsheltered rate (81%).[8]

**Exhibit 1-6: Shelter Status within Gender Identities, 2024**



---

[8] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than man or woman.

HUD-AR-00916

## *Race and Ethnicity*

**Exhibit 1-7: Race/Ethnicity of People Experiencing Homelessness, 2024**

| Race | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All People Experiencing Homelessness** | 771,480 | 100% | 497,256 | 100% | 274,224 | 100% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 4,272 | 0.6% | 2,758 | 0.6% | 1,514 | 0.6% |
| **American Indian, Alaska Native, or Indigenous Only** | 16,894 | 2.2% | 8,074 | 1.6% | 8,820 | 3.2% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 21,166 | 2.7% | 10,832 | 2.2% | 10,334 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 793 | 0.1% | 409 | 0.1% | 384 | 0.1% |
| **Asian or Asian American Only** | 10,401 | 1.3% | 6,315 | 1.3% | 4,086 | 1.5% |
| **Total Asian or Asian American, any ethnicity** | 11,194 | 1.5% | 6,724 | 1.4% | 4,470 | 1.6% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 15,967 | 2.1% | 13,680 | 2.8% | 2,287 | 0.8% |
| **Black, African American, or African Only** | 227,769 | 29.5% | 168,206 | 33.8% | 59,563 | 21.7% |
| **Total Black, African American, or African, any ethnicity** | 243,736 | 31.6% | 181,886 | 36.6% | 61,850 | 22.6% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 499 | 0.1% | 402 | 0.1% | 97 | <0.1% |
| **Middle Eastern or North African Only** | 1,513 | 0.2% | 881 | 0.2% | 632 | 0.2% |
| **Total Middle Eastern or North Africa, any ethnicity** | 2,012 | 0.3% | 1,283 | 0.3% | 729 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 1,071 | 0.1% | 703 | 0.1% | 368 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 10,312 | 1.3% | 5,865 | 1.2% | 4,447 | 1.6% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 11,383 | 1.5% | 6,568 | 1.3% | 4,815 | 1.8% |
| **White and Hispanic/Latina/e/o** | 51,376 | 6.7% | 40,487 | 8.1% | 10,889 | 4.0% |
| **White Only** | 244,280 | 31.7% | 125,971 | 25.3% | 118,309 | 43.1% |
| **Total White, any ethnicity** | 295,656 | 38.3% | 166,458 | 33.5% | 129,198 | 47.1% |
| **Multi-Racial and Hispanic/Latina/e/o** | 6,841 | 0.9% | 3,991 | 0.8% | 2,850 | 1.0% |
| **Multi-Racial All Other** | 24,346 | 3.2% | 13,088 | 2.6% | 11,258 | 4.1% |
| **Total Multi-Racial, any ethnicity** | 31,187 | 4.0% | 17,079 | 3.4% | 14,108 | 5.1% |
| **Hispanic/Latina/e/o Only** | 155,146 | 20.1% | 106,426 | 21.4% | 48,720 | 17.8% |
| **Total Hispanic/Latina/e/o, Any Race** | 235,965 | 30.6% | 168,856 | 34.0% | 67,109 | 24.5% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

Across all people experiencing homelessness, about three in 10 identified as singularly White and 31 percent as Hispanic/Latina/e/o (any race). This reflects a considerable reduction in the number of people experiencing homelessness that identified as white, both by number and percent. It is likely that several people who identified as white in prior years identified as singularly Hispanic/Latina/e/o in 2024.

Close to 32 percent of people experiencing homelessness identified as Black, African American, or African, including just over two percent who identified as Black and Hispanic. The multiracial category is

now greater than 4 percent and is likely to grow as more people choose that identity from among the available categories.

Year to year, there are generally only slight changes in the numbers of people experiencing homelessness by race. However, in 2024, the updates in the race and ethnicity reporting options resulted in the inclusion of three new race/ethnicity categories: Middle Eastern or North African Only, Middle Eastern or North African and Hispanic/Latina/e/o, and Hispanic/Latina/e/o (only). In 2024, 157,158 people (20% of all people experiencing homelessness) reported as one of these new race/ethnicity categories. Along with these changes, the share of people experiencing homelessness who identify as Black (of any ethnicity) decreased from 37 percent of all people experiencing homelessness in 2023 to 32 percent in 2024.[9]

**Exhibit 1-8: Shelter Status within Race and Ethnic Identities, 2024**

| Race and Ethnic Identity | Sheltered | Unsheltered |
|---|---|---|
| American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o | 64.6% | 35.4% |
| American Indian Alaska Native or Indigenous Only | 47.8% | 52.2% |
| Asian or Asian American and Hispanic/Latina/e/o | 51.6% | 48.4% |
| Asian or Asian American Only | 60.7% | 39.3% |
| Black African American or African and Hispanic/Latina/e/o | 85.7% | 14.3% |
| Black African American or African Only | 73.8% | 26.2% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 80.6% | 19.4% |
| Middle Eastern or North African Only | 58.2% | 41.8% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 65.6% | 34.4% |
| Native Hawaiian or Pacific Islander Only | 56.9% | 43.1% |
| White and Hispanic/Latina/e/o | 78.8% | 21.2% |
| White Only | 51.6% | 48.4% |
| Multi-Racial and Hispanic/Latina/e/o | 58.3% | 41.7% |
| Multi-Racial All Other | 53.8% | 46.2% |
| Hispanic/Latina/e/o Only | 68.6% | 31.4% |

Sheltered rates also varied considerably across the racial and ethnic identities of people experiencing homelessness. People who identified as Black, African American, or African and Hispanic/Latina/e/o had the highest sheltered rates at 86 percent. People who identified as American Indian or Alaska Native had the lowest sheltered rates at 48 percent.

---

[9] This change could partially be due to changes in the way race and ethnicity was reported this year and the inclusion of additional reporting categories. However, in recent years, many Communities of Care (CoCs) have engaged in additional technical assistance to correct for bias in the allocation of housing and prevention resources. This decline could also reflect the effects of those and other local efforts to more fairly distribute resources.

HUD-AR-00918

## *1.2   State-Level Estimates of People Experiencing Homelessness*

**Exhibit 1-9: Estimates of People Experiencing Homelessness by State, 2024**



States with the highest number of people experiencing homelessness in 2024 were California and New York. These states also have rates of homelessness higher than the national rate of 23 people experiencing homelessness per 10,000 (48 per 10,000 in CA and 81 per 10,000 in NY).

**Exhibit 1-10: Percentages of People Experiencing Homelessness Who Are Unsheltered by State, 2024**



The point-in-time counts are completed during the coldest time of year in the Unites States. States with the highest rates of unsheltered homelessness during the PIT count tend to be in warmer climates (e.g.,

HUD-AR-00919

California, Alabama, and Georgia). Other factors impacted the number of people who experienced unsheltered homelessness in a state, include but are not limited to policies related to access to shelter, shelter capacity, and local housing markets.

**Exhibit 1-11: Changes in Number of People Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 43 states and the District of Columbia reported increases in the number of people experiencing homelessness. In many of these states, the increases were driven by increases in the sheltered population.

For information on how rates of homelessness have changed by state since 2007 please see Appendix A.

HUD-AR-00920

### *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles three states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

#### *New York (NY)*

New York is composed of 24 CoCs. Twelve (50%) of the CoCs are suburban, 11 (46%) are rural, and one CoC is a major city (New York City). Between 2023 and 2024, New York saw a 53 percent increase in homelessness. Several CoCs in the state again pointed to increased evictions as cities worked through backlogs in evictions that built up during the eviction moratorium, lack of affordable housing, and increased rents as key drivers to this increase, as well as loss of rapid re-housing supported by ESG-CV and other COVID-related funding. These factors led to an increase in shelter stays as people searched for affordable housing. Other drivers that increased the total homelessness count in New York were increased availability of warming shelters in some locations and increased or improved PIT count training. Finally, one CoC, New York City, noted that it continued to experience a significant influx of asylum seekers in 2024. The CoC noted that these households, who were in emergency shelters, accounted for almost 88 percent of the increase in sheltered homelessness in New York City.

#### *Hawaii (HI)*

Hawaii is composed of two CoCs, one suburban CoC covering Oahu, and one rural CoC covering the rest of the state. Between 2023 and 2024, Hawaii had an 87 percent increase in total homelessness. These CoCs attributed this increase in the number of people needing emergency shelter due to the Maui wildfires, which displaced thousands of people from their homes. This added over 5,000 people to Maui's sheltered PIT count as these families were housed in temporary disaster-related emergency shelter housing. Unsheltered homelessness also increased across the state, which the CoCs attributed to the lack of affordable housing, the inability to pay rent, and other financial constraints for households.

#### *Illinois (IL)*

Illinois has 19 CoCs, one major city (Chicago), three other largely urban CoCs, ten suburban CoCs, and five largely rural CoCs. Between 2023 and 2024, Illinois had a 116 percent increase in the number of people experiencing homelessness (13,885 more people). Ninety-one percent of this increase was in Chicago. The Chicago CoC reported that an influx of new arrivals accounted for most of this observed increase. According to the CoC, new arrivals (which included migrant and asylum-seeking families, including those bused or flown to Chicago from other states) accounted for more than 13,600 people in emergency shelters in 2024. While the CoC indicated that new arrivals accounted for most of Chicago's increase in estimated homelessness, the same cannot be said for the 16 other CoCs in Illinois that experienced increases. Many attributed their rises to increased shelter capacity, extreme cold that brought people into shelter, a higher cost of living combined with a rollback of pandemic-related financial supports, and a lack of affordable housing.

HUD-AR-00921

## 1.3    Estimates of All People Experiencing Homelessness by CoC

*Continuums of Care (CoC) were Divided into Four Geographic Categories*

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 1-12: Share of All People Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

More than half of people experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 24 percent. There is some variation by shelter status, where major cities account for a slightly larger share of the sheltered population and rural areas a slightly larger share of the unsheltered population.

HUD-AR-00922

**Exhibit 1-13: Number of People Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

|  | # CoCs | All People | Sheltered | Unsheltered |
|---|---|---|---|---|
| **Total** | **385** | **771,480** | **497,256** | **274,224** |
| Major Cities | 48 | 418,339 | 282,874 | 135,465 |
| Other Urban CoCs | 61 | 45,579 | 29,976 | 15,603 |
| Suburban CoCs | 165 | 181,274 | 114,646 | 66,628 |
| Rural CoCs | 111 | 126,288 | 69,760 | 56,528 |

**Exhibit 1-14: Distribution by Household Type and Sheltered Status by Geography, 2024**









Note: Prior years data did not include U.S. territories

Families with children were most likely to be experiencing unsheltered homelessness in largely rural CoCs, with 6 percent of all people experiencing homelessness in largely rural CoCs being unsheltered families. In all other geographic areas, this share was 2 percent or less. Individuals made up a larger share of people

HUD-AR-00923

experiencing homelessness in other largely urban CoCs (78%) compared to major cities (63%), especially among sheltered individuals (45% vs. 32%).

**Exhibit 1-15: Change in the Number of People Experiencing Homelessness by Sheltered Status and CoC Category, 2023-2024**

|  | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | **118,376** | **18.1%** | **100,762** | **25.4%** | **17,614** | **6.9%** |
| Major Cities | 76,528 | 22.4% | 78,167 | 38.2% | -1,639 | -1.2% |
| Other Largely Urban CoCs | 1,568 | 3.6% | 1,545 | 5.4% | 23 | 0.1% |
| Largely Suburban CoCs | 26,467 | 17.1% | 15,783 | 16.0% | 10,684 | 19.1% |
| Largely Rural CoCs | 13,813 | 12.3% | 5,267 | 8.2% | 8,546 | 17.8% |

Note: Prior years data did not include U.S. territories

While overall the number of people experiencing homelessness increased by 18 percent across the country, CoCs that contained one of the nation's largest cities and those that were composed mostly of suburban areas experienced large increases. Other largely urban areas saw the least increases among people experiencing either sheltered or unsheltered homelessness. Major cities were the only area to report a decrease in unsheltered homelessness between 2023 and 2024.

For more information on people experiencing homelessness at the CoC and geographic level, please see Appendix B.

HUD-AR-00924

# 2. Estimates of Individuals Experiencing Homelessness

### 2.1 National Estimates of Individuals Experiencing Homelessness

The estimates presented in this section reflect national data collected on the number of individuals experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**Individuals Experiencing Homelessness** refers to a people who are not part of a family with children during an experience of homelessness (i.e., the person is not experiencing homelessness in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

HUD-AR-00925

In January of 2024, 512,007 people in households without children—i.e., individuals—experienced homelessness in the United States. This is the largest number of individuals experiencing homelessness since data collection began. About 50 percent of individuals stayed in sheltered locations and 50 percent in unsheltered locations. This section provides information on individuals experiencing homelessness at a single point in time. See Appendix B for detailed tables supporting the exhibits in this chapter.

**Exhibit 2-1: PIT Estimates of Individuals Experiencing Homelessness, 2007-2024**



Note: The exhibit does not display the total count of individuals experiencing homelessness in 2021 or the count of individuals experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of individuals experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

HUD-AR-00926

The number of individuals experiencing homelessness has increased steadily over the last decade after decreasing for several years between 2007 and 2015. Between 2007 and 2024, the number of individuals experiencing homelessness increased by 24 percent.

The 10 percent increase between 2023 and 2024 was observed across both sheltered populations (a 13% increase) and unsheltered populations (a 7% increase).

### Demographic Characteristics

In 2024, HUD made significant changes in the way data on gender and data on race and ethnicity were collected. Individuals were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latina/e/o status, historically collected separately, is now listed among the race categories. Given these changes, comparisons to prior years for gender and race are not included in the report.



**Exhibit 2-2: Percent Change in Individuals Experiencing Homelessness Over Time, 2007-2024**

| | Percent change from 2023 to 2024 | Percent change from 2007 to 2024 |
|---|---|---|
| Total Individuals | 9.6% | 24.1% |
| Sheltered Individuals | 12.5% | 20.3% |
| Unsheltered Individuals | 6.9% | 28.1% |

### Age

Most individuals experiencing homelessness were between the ages of 25 and 64 (84%). The groups most likely to be in shelter rather than observed in unsheltered locations were unaccompanied children (that is, children not experiencing homelessness with a parent or legal guardian age 18 or older), youth, and individuals 55 and older.

The number of individuals experiencing homelessness increased across nearly all age groups and shelter statuses between 2023 and 2024. The only populations to decrease during this period were people in child-only households and unsheltered unaccompanied youth (see Appendix B).



**Exhibit 2-3: Age Distribution of Individuals Experiencing Homelessness, 2024**

| Age | Total | Sheltered | Unsheltered |
|---|---|---|---|
| Under 18 | 0.6% | 0.7% | 0.4% |
| 18 to 24 | 7.7% | 10.1% | 5.2% |
| 25 to 34 | 19.2% | 19.2% | 19.1% |
| 35 to 44 | 23.6% | 20.9% | 26.2% |
| 45 to 54 | 21.2% | 19.3% | 23.1% |
| 55 to 64 | 19.8% | 20.6% | 19.0% |
| Over 64 | 8.1% | 9.2% | 6.9% |

### Gender

In 2024, more than two-thirds of individuals experiencing homelessness identified as men and 30 percent as women. Two percent identified as a gender other than singularly woman or man. A somewhat higher share of unsheltered individuals identified as men and as more than one gender.

HUD-AR-00927

The shelter status of individuals varied considerably within gender categories. Individuals experiencing homelessness identifying as transgender had the highest sheltered rate (58%) while those identifying as a having a culturally specific gender identity – though the number was small – had the highest unsheltered rate (88%). [10]

### Race and Ethnicity

Individuals of color, particularly Black, African American, or African and American Indian, Alaska Native, and Indigenous populations are considerably overrepresented among individuals experiencing homelessness (accounting for 69% of individuals experiencing homelessness).

In 2024, 78,780 people (or 15%) identified as only Hispanic or Latina/e/o, however an additional 9 percent of people identified as Hispanic and some other race.

Black, African, or African American accounted for a higher share of the sheltered population than the unsheltered population (37% vs. 25%). Most other groups comprised a higher share of the unsheltered population than they did the sheltered population. See Appendix B for additional detail.

**Exhibit 2-4: Gender Identity of Individuals Experiencing Homelessness, 2024**

| | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | # | % | # |
| **Woman** | 153,477 | 30.0% | 79,589 | 31.0% | 73,888 | 28.9% |
| **Man** | 350,056 | 68.4% | 173,376 | 67.6% | 176,680 | 69.1% |
| **Transgender** | 2,449 | 0.5% | 1,411 | 0.6% | 1,038 | 0.4% |
| **Gender Questioning** | 356 | 0.1% | 60 | <0.1% | 296 | 0.1% |
| **Culturally Specific Identity** | 280 | 0.1% | 34 | <0.1% | 246 | 0.1% |
| **Different Identity** | 640 | 0.1% | 107 | <0.1% | 533 | 0.2% |
| **Non-Binary** | 1,766 | 0.3% | 824 | 0.3% | 942 | 0.4% |
| **More Than One Gender** | 2,983 | 0.6% | 939 | 0.4% | 2,044 | 0.8% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

**Exhibit 2-5: Shelter Status within Gender Identities of Individuals Experiencing Homelessness**



---

[10] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than man or woman.

HUD-AR-00928

**Exhibit 2-6: Race and Ethnicity of Individuals Experiencing Homelessness, 2024**

| | Total Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All Individuals Experiencing Homelessness** | 512,007 | 100.0% | 256,340 | 100.0% | 255,667 | 100.0% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 3,007 | 0.6% | 1,575 | 0.6% | 1,432 | 0.6% |
| **American Indian, Alaska Native, or Indigenous Only** | 13,708 | 2.7% | 5,388 | 2.1% | 8,320 | 3.3% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 16,715 | 3.3% | 6,963 | 2.7% | 9,752 | 3.9% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 610 | 0.1% | 233 | 0.1% | 377 | 0.1% |
| **Asian or Asian American Only** | 7,652 | 1.5% | 3,765 | 1.5% | 3,887 | 1.5% |
| **Total Asian or Asian American, any ethnicity** | 8,262 | 1.6% | 3,998 | 1.6% | 4,264 | 1.6% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 6,160 | 1.2% | 4,147 | 1.6% | 2,013 | 0.8% |
| **Black, African American, or African Only** | 140,174 | 27.4% | 85,562 | 33.4% | 54,612 | 21.4% |
| **Total Black, African American, or African, any ethnicity** | 146,334 | 28.6% | 89,709 | 35.0% | 56,625 | 22.2% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 418 | 0.1% | 321 | 0.1% | 97 | <0.1% |
| **Middle Eastern or North African Only** | 1,151 | 0.2% | 566 | 0.2% | 585 | 0.2% |
| **Total Middle Eastern or North Africa, any ethnicity** | 1,569 | 0.3% | 887 | 0.3% | 682 | 0.2% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 738 | 0.1% | 389 | 0.2% | 349 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 5,393 | 1.1% | 2,154 | 0.8% | 3,239 | 1.3% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 6,131 | 1.2% | 2,543 | 1.0% | 3,588 | 1.4% |
| **White and Hispanic/Latina/e/o** | 28,912 | 5.6% | 18,885 | 7.4% | 10,027 | 3.9% |
| **White Only** | 204,446 | 39.9% | 92,268 | 36.0% | 112,178 | 43.9% |
| **Total White, any ethnicity** | 233,358 | 45.5% | 111,153 | 43.4% | 122,205 | 47.8% |
| **Multi-Racial and Hispanic/Latina/e/o** | 4,102 | 0.8% | 1,637 | 0.6% | 2,465 | 1.0% |
| **Multi-Racial All Other** | 16,796 | 3.3% | 6,414 | 2.5% | 10,382 | 4.1% |
| **Total Multi-Racial, any ethnicity** | 20,898 | 4.1% | 8,051 | 3.1% | 12,847 | 5.1% |
| **Hispanic/Latina/e/o Only** | 78,740 | 15.4% | 33,036 | 12.9% | 45,704 | 17.9% |
| **Total Hispanic/Latina/e/o, Any Race** | 122,687 | 24.0% | 60,223 | 23.5% | 62,464 | 24.4% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

HUD-AR-00929

> "THE RISE IN UNSHELTERED NUMBERS … CAN BE ATTRIBUTED TO SEVERAL PIVOTAL DEVELOPMENTS. THE END OF THE EVICTION MORATORIUM PLAYED A SIGNIFICANT ROLE, AS MANY INDIVIDUALS WHO HAD BEEN PROTECTED UNDER PANDEMIC-ERA POLICIES SUDDENLY FACED EVICTION PROCEEDINGS. WITH THE LEGAL SYSTEM RESUMING OPERATIONS, THOSE WHO WERE DELAYED IN COURT PROCESSES FOUND THEMSELVES WITHOUT HOUSING. ECONOMIC PRESSURES HAVE ALSO ESCALATED THE SITUATION, PARTICULARLY THE UNPRECEDENTED SPIKES IN RENTAL PRICES, WHICH SAW NEARLY A 23% INCREASE FROM 2020 TO LATE 2023. THIS SURGE IN HOUSING COSTS HAS PUSHED MANY OUT OF AFFORDABILITY, LEADING TO HIGHER RATES OF HOMELESSNESS."
>
> CoC in the Southeast

Sheltered status varied considerably by racial groups. Asian, Indigenous, Pacific Islander, and multi-racial populations had the highest rates of individuals experiencing unsheltered homelessness in 2024, all with rates above 60 percent. Individuals identifying as Middle Eastern and Hispanic or Latina/e/o had the highest rate of individuals experiencing sheltered homelessness at 77 percent.

**Exhibit 2-7: Sheltered Status of Individuals Experiencing Homelessness within Racial Groups, 2024**



HUD-AR-00930

## 2.2    State-Level Estimates of Individuals Experiencing Homelessness

In West Virginia, 89 percent of all people experiencing homelessness at a point-in-time were individuals – the highest rate in the country. California is second, with 86 percent. See Appendix A for more detailed, state-level information.

**Exhibit 2-8: Estimates of Individuals Experiencing Homelessness by State, 2024**



The point-in-time counts are conducted during the coldest time of year in the Unites States. Most of the states with the highest rates of individuals experiencing homelessness in unsheltered locations during the PIT count are in warmer climates (e.g., California, Georgia, and Florida). However, other factors, such as policies related to local housing markets, access to shelter, and shelter capacity also affect the share of people who experience unsheltered homelessness.

HUD-AR-00931

**Exhibit 2-9: Percentages of Individuals Experiencing Homelessness Who Are Unsheltered, 2024**



Between 2023 and 2024, 42 states and the District of Columbia experienced increases in the number of individuals experiencing homelessness. More states experienced increases in unsheltered individuals (43 states and DC) than sheltered individuals (36 states and DC experienced increases).

**Exhibit 2-10: Largest Changes in the Number of Individuals Experiencing Homelessness by State, 2023-2024**



HUD-AR-00932

## *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *New Jersey (NJ)*

New Jersey is composed of 16 largely suburban CoCs. Between 2023 and 2024, the state experienced a 31% rise in homelessness among individuals. Increases in sheltered individuals slightly outpaced increases in unsheltered individuals (33% vs. 23%) in the state. Nearly all communities noted the continued (and in some CoCs, delayed) impact of the expiration of state-level homelessness prevention resources—particularly the eviction moratorium that continued after the federal moratorium expired and ended in 2022. A large number of people in NJ were staying in hotels and motels after being evicted. In addition, the housing market has continued to tighten and become increasingly unaffordable. One community noted the impact of remote work, "Since the landlords were not receiving much of the income they used to receive through rents, the option of asking for higher rents [from people with jobs in NYC]…was preferable to them. The result was that the rents…went far beyond what any available voucher or program might have allowed for our clients trying to move out of the facility [a shelter] for others to move in."

### *North Carolina (NC)*

North Carolina is composed of 12 CoCs, 7 urban, 2 rural, and 3 suburban. Between 2023 and 2024, the number of individuals experiencing homelessness increased by 17%. Increases in unsheltered individuals outpaced increases in sheltered individuals (25% vs. 10%). While housing affordability was noted in some CoCs, most CoCs described the increased use of coordinated entry as both a reason for improved identification and increases in the population. As one CoC put it, "By expanding Coordinated Entry Access Points and enhancing outreach efforts, we identified and assessed more individuals experiencing homelessness. This proactive approach ensured they were connected with shelters or agencies utilizing hotel funds [non-congregate shelters using motels or hotels], thereby increasing shelter capacity during the PIT count." In addition, North Carolina CoCs noted increased capacity for conducting PIT counts, which contributed to more comprehensive counting. "…there has been growth in the number of community partners participating in the…PIT count. These organizations include Peer Support Recovery Programs, Schools, Faith-Based Organizations, the Department of Social Services, Mental Health/Substance Use Providers, Food Pantries, Veterans Organizations, Homeless Coalitions, Law Enforcement, Libraries, Health Departments, Federally Qualified Health Centers, and the Regional Housing Authorities."

HUD-AR-00933

## 2.3    CoC-Level Estimates of Individuals Experiencing Homelessness

***Continuums of Care (CoC) were Divided into Four Geographic Categories***

(1) Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

(2) Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

(3) Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

(4) Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

More than half of individuals experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 24 percent. Rural areas and suburban areas had somewhat larger shares of unsheltered individuals, while major cities had a larger share of sheltered individuals.

**Exhibit 2-11: Share of All Individuals Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

HUD-AR-00934

**Exhibit 2-12: Number of Individuals Experiencing Homelessness by Geography Category and Shelter Status, 2024**

|  | # CoCs | Total Individuals | Sheltered Individuals | Unsheltered Individuals |
|---|---|---|---|---|
| *Total* | *385* | *512,007* | *256,340* | *255,667* |
| Major Cities | 48 | 263,999 | 134,690 | 129,309 |
| Other Urban CoCs | 61 | 35,350 | 20,620 | 14,730 |
| Suburban CoCs | 165 | 121,315 | 58,320 | 62,995 |
| Rural CoCs | 111 | 91,343 | 42,710 | 48,633 |

Note: Prior years data did not include U.S. territories.

Overall, increases occurred across geographic categories. Between 2023 and 2024, major cities experienced a large increase in sheltered individuals (18%) and a small drop in the number of unsheltered individuals. Meanwhile, largely suburban and largely rural CoCs experienced considerable increases in the number of unsheltered individuals during the same period.

**Exhibit 2-13: Change in Individuals Experiencing Homelessness by Sheltered Status and CoC Category, 2023-2024**

|  | Change in Total Individuals | | Change in Sheltered Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | *44,987* | *9.6%* | *28,545* | *12.5%* | *16,442* | *6.9%* |
| Major Cities | 20,025 | 8.2% | 20,253 | 17.7% | -228 | -0.2% |
| Other Urban CoCs | 554 | 1.6% | 629 | 3.1% | -75 | -0.5% |
| Suburban CoCs | 14,937 | 14.0% | 4,645 | 8.7% | 10,292 | 19.5% |
| Rural CoCs | 9,471 | 11.6% | 3,018 | 7.6% | 6,453 | 15.3% |

Note: Prior years data did not include U.S. territories.

HUD-AR-00935

# 3.    Estimates of Families with Children Experiencing Homelessness in the United States

### 3.1    National Estimates of Families with Children Experiencing Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of people in families with children experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered family homelessness consists of people in families with children who were staying in emergency shelters (ES) or transitional housing (TH) programs on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive (PH) housing, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also provides information on the number of people in families with children experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. However, some experiences of unsheltered family homelessness may be difficult to identify, as family members may take turns sleeping in backyards or in vehicles that are also used for transportation. In addition, the strength of the unsheltered count may differ from community to community. For these reasons, the actual number of people experiencing unsheltered family homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflects a return to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**Families with Children Experiencing Homelessness** refers to people in households made up of at least one adult age 18 or older and one child age under 18 that were experiencing homelessness together on the night of the point-in-time count.

HUD-AR-00936

**Exhibit 3-1: PIT Estimates of People in Families with Children Experiencing Homelessness by Sheltered Status, 2007-2024**



Note: The exhibit does not display the total count of people in families with children experiencing homelessness in 2021 or the count of all people in families with children experiencing unsheltered homelessness because of pandemic-related disruptions to PIT counts. Estimates of the number of people in families with children experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

On a single night in January 2024, 259,473 people in families with children were experiencing homelessness in the United States, the largest number since data collection began. Nine in ten people experiencing homelessness as families were sheltered.

IN RESPONSE TO COVID-19, [OUR] CoC SAW AN INFLUX OF RAPID REHOUSING AND PREVENTION RESOURCES, AS WELL AS AN EFFECTIVE STATEWIDE EVICTION MORATORIUM. THESE EFFORTS WERE EFFECTIVE IN KEEPING HOUSEHOLDS FROM ENTERING INTO HOMELESS AND MOVING HOUSEHOLDS OUT OF HOMELESSNESS QUICKLY. SINCE THE SUNSETTING OF THESE RESOURCES AND THE ENDING OF THE [EVICTION] MORATORIUM, [OUR] CoC HAS SEEN A LARGE INFLUX OF NEW FAMILIES AND INDIVIDUALS SEEKING EMERGENCY SHELTER ASSISTANCE. THIS INCLUDES A LARGE NUMBER OF FIRST TIME HOMELESS HOUSEHOLDS UNFAMILIAR TO THE SYSTEM, AS WELL AS A NUMBER OF UNDOCUMENTED HOUSEHOLDS SEEKING ASSISTANCE.

Suburban CoC in the Northeast

HUD-AR-00937

FAMILIES WITH CHILDREN

**Exhibit 3-2: Changes in the Number of People in Families with Children Experiencing Homelessness Over Time by Sheltered Status, 2007-2024**

The progress made towards reducing experiences of family homelessness between 2014 and 2021 has reversed in recent years.

The number of people in families with children experiencing homelessness increased by 39 percent between 2023 and 2024. This increase was largely driven by increases in the sheltered population, which rose by 43 percent (72,217 more people).

Overall, the number of people experiencing homelessness as part of a family with children has



| | Percent Change from 2023 to 2024 | Percent Change from 2007 to 2024 |
|---|---|---|
| All People in Families Experiencing Homelessness | 39.40% | 10.60% |
| Sheltered People in Families | 42.80% | 35.10% |
| Unsheltered People in Families | 6.70% | -67.00% |

increased by 51 percent since its low in 2020—prior to the start of the COVID-19 pandemic.

Parenting youth are also included in the population of families with children experiencing homelessness. About half of 18- to 24-year-olds in families with children experiencing homelessness were parents (49% or 9,053 total parenting youth). Children of parenting youth make up seven percent of all children in families experiencing homelessness (9,911 children).

**Exhibit 3-3: Number of People in Parenting Youth Households, 2024**

| | Parents in Households | Children in Households | Total People in Households |
|---|---|---|---|
| **Parenting Youth (Under 18)** | 125 | 135 | 260 |
| **Parenting Youth (18 to 24)** | 9,052 | 10,211 | 19,263 |
| **Total Parenting Youth** | 9,177 | 10,346 | 19,523 |

HUD-AR-00938

FAMILIES WITH CHILDREN

### Demographic Characteristics

In 2024, HUD made significant changes to the way the Point-in-Time count collects data on gender and data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in this report.

### Age

In 2024, over half of all people in families with children experiencing homelessness were children under the age of 18 (56%). About one of every five was an adult between the ages of 25 to 34. Families with children experiencing unsheltered



**Exhibit 3-4: Age Distribution of People in Families with Children Experiencing Homelessness, 2024**

homelessness were more likely to have an adult aged 45 or older in the household compared with families in shelter.

While all age groups saw increases in the number of people in families with children experiencing homelessness between 2023 and 2024, the largest percentage increases were among adults ages 25 to 34, which saw a 52 percent increase, followed closely by adults ages 35 to 55 which saw a 48 percent increase (see Appendix B).

HUD-AR-00939

**Exhibit 3-5: Gender Identity of People in Families with Children Experiencing Homelessness, 2024**

*Gender*

Women and girls make up 58 percent of all people in families with children experiencing homelessness. This share is slightly lower among families experiencing unsheltered homelessness (55%).

| | All People in Families with Children | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Woman (girl) | 149,183 | 57.5% | 139,039 | 57.7% | 10,144 | 54.7% |
| Man (boy) | 109,512 | 42.2% | 101,304 | 42.0% | 8,208 | 44.2% |
| Transgender | 112 | <0.1% | 90 | <0.1% | 22 | 0.1% |
| Gender Questioning | 27 | <0.1% | 14 | <0.1% | 13 | 0.1% |
| Culturally Specific Identity | 44 | <0.1% | 37 | <0.1% | 7 | <0.1% |
| Different Identity | 80 | <0.1% | 67 | <0.1% | 13 | 0.1% |
| Non Binary | 211 | 0.1% | 177 | 0.1% | 34 | 0.2% |
| More Than One Gender | 304 | 0.1% | 188 | 0.1% | 116 | 0.6% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

**Exhibit 3-6: Shelter Status of People in Families with Children Experiencing Homelessness, within Gender Identities, 2024**

The shelter status of people experiencing homelessness as part of a family with children varied within gender categories. People identifying as men (boys) or women (girls) both had the highest sheltered rates (93%), while those identifying as questioning – though the number was small – had the lowest rate (52%).[11]



---

[11] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than a man or woman.

HUD-AR-00940

*Race and Ethnicity*

**Exhibit 3-7: Race/Ethnicity of People in Families with Children Experiencing Homelessness, 2024**

| | All People Experiencing Homelessness as Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All People in Families with Children Experiencing Homelessness** | 259,473 | 100% | 240,916 | 100% | 18,557 | 100% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 1,265 | 0.5% | 1,183 | 0.5% | 82 | 0.4% |
| **American Indian, Alaska Native, or Indigenous Only** | 3,186 | 1.2% | 2,686 | 1.1% | 500 | 2.7% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 4,451 | 1.7% | 3,869 | 1.6% | 582 | 3.1% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 183 | 0.1% | 176 | 0.1% | 7 | <0.01% |
| **Asian or Asian American Only** | 2,749 | 1.1% | 2,550 | 1.1% | 199 | 1.1% |
| **Total Asian or Asian American, any ethnicity** | 2,932 | 1.1% | 2,726 | 1.1% | 206 | 1.1% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 9,807 | 3.8% | 9,533 | 4.0% | 274 | 1.5% |
| **Black, African American, or African Only** | 87,595 | 33.8% | 82,644 | 34.3% | 4,951 | 26.7% |
| **Total Black, African American, or African, any ethnicity** | 97,402 | 37.5% | 92,177 | 38.3% | 5,225 | 28.2% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 81 | <0.01% | 81 | <0.01% | 0 | 0.0% |
| **Middle Eastern or North African Only** | 362 | 0.1% | 315 | 0.1% | 47 | 0.3% |
| **Total Middle Eastern or North Africa, any ethnicity** | 443 | 0.2% | 396 | 0.2% | 47 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 333 | 0.1% | 314 | 0.1% | 19 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 4,919 | 1.9% | 3,711 | 1.5% | 1,208 | 6.5% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 5,252 | 2.0% | 4,025 | 1.7% | 1,227 | 6.6% |
| **White and Hispanic/Latina/e/o** | 22,464 | 8.7% | 21,602 | 9.0% | 862 | 4.6% |
| **White Only** | 39,834 | 15.4% | 33,703 | 14.0% | 6,131 | 33.0% |
| **Total White, any ethnicity** | 62,298 | 24.0% | 55,305 | 23.0% | 6,993 | 37.7% |
| **Multi-Racial and Hispanic/Latina/e/o** | 2,739 | 1.1% | 2,354 | 1.0% | 385 | 2.1% |
| **Multi-Racial All Other** | 7,550 | 2.9% | 6,674 | 2.8% | 876 | 4.7% |
| **Total Multi-Racial, any ethnicity** | 10,289 | 4.0% | 9,028 | 3.7% | 1,261 | 6.8% |
| **Hispanic/Latina/e/o Only** | 76,406 | 29.4% | 73,390 | 30.5% | 3,016 | 16.3% |
| **Total Hispanic/Latina/e/o, Any Race** | 113,278 | 43.7% | 108,633 | 45.1% | 4,645 | 25.0% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail.

Across all people experiencing homelessness as part of a family with children, about 38 percent identified as Black, African American, or African, including four percent that identified as Black and Hispanic. More than four in every 10 people in families experiencing homelessness identified as Hispanic/Latina/e/o (any race). Three in ten identified as Hispanic only (and no other race). About one quarter of people experiencing homelessness in families with children identified as White (any ethnicity).

The race and ethnicity of people experiencing homelessness in families with children has changed considerably from last year. It is likely that the updates in the race and ethnicity reporting options—which resulted in the inclusion of three new race/ethnicity categories—affected how people identified. In 2024, 76,849 people (30%) identified as one of the newly available racial/ethnic categories.

**Exhibit 3-8: Shelter Status of People in Families with Children Experiencing Homelessness within Racial Groups, 2024**



Sheltered rates also varied considerably across the racial and ethnic identities of people in families with children experiencing homelessness. People who identified as Native Hawaiian or Pacific Islander (only) had the highest unsheltered rates at 25 percent. People who identified as Hispanic or Latina/e/o, regardless of race, tended to have higher sheltered rates than those who identified as non-Hispanic.

[OUR CITY] IS ONE OF THE MOST BURDEN[ED] COMMUNITIES WHEN IT COMES TO COST OF LIVING AND COST FOR RENT. IN ORDER TO MEET THE INCREASING DEMAND OF PEOPLE EXPERIENCING HOMELESSNESS WE PURCHASED ADDITIONAL EMERGENCY SHELTER BEDS TO ADD SYSTEM CAPACITY FOR CRISIS HOUSING. WE ADDED ADDITIONAL HOTEL VENDORS TO MEET DEMAND OF FAMILY PLACEMENTS WHEN EMERGENCY SHELTER IS AT CAPACITY.

Largely Urban CoC in the Southeast

HUD-AR-00942

## *3.2   Estimates of Homelessness by State*

**Exhibit 3-9: State Estimates of People in Families with Children Experiencing Homelessness by State, 2024**



States with the highest number of people in families with children experiencing homelessness in 2024 were New York (95,457 people) and California (25,639 people). However, the states that had the highest share of families with children experiencing homelessness among all people experiencing homelessness were Massachusetts (76%), New York (60%), and Illinois (52%).

**Exhibit 3-10: Percentages of People in Families with Children Experiencing Homelessness Who Are Unsheltered, 2024**



HUD-AR-00943

Across the nation, four states have more than 25 percent of people in families with children experiencing homelessness in places not meant for human habitation: Oregon (56%), Idaho (54%), Alabama (48%), and Tennessee (32%).

**Exhibit 3-11: Changes in the Number of People in Families with Children Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 39 states and the District of Columbia reported increases in the number of people in families with children experiencing homelessness. Four states saw the number of people in families experiencing homelessness more than double: Illinois (234% increase), Wyoming (219% increase), Hawaii (187% increase), and Colorado (134% increase). In many states, the increases were driven by increases in the sheltered population.

For information on how rates of families experiencing homelessness have changed by state since 2007 please see Appendix B.

HUD-AR-00944

## *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *Massachusetts (MA)*

Massachusetts is composed of 11 CoCs. It has one major city (Boston) and one other largely urban CoC (Cambridge); the remaining nine CoCs are largely suburban. Three of every four people experiencing homelessness in Massachusetts (76%) were doing so in families with children, the highest share in the country. Between 2023 and 2024, Massachusetts had a 74 percent increase in family homelessness (9,512 more people). Many of these CoCs attributed this increase to the state's right to shelter law and its application to hundreds of recently arrived migrant families, refugees, and asylum-seekers who did not yet have living arrangements coming to the state. In August 2023, the Governor of Massachusetts declared a state of emergency regarding newly arriving migrant families, unlocking additional shelter beds and other resources to help place these families in emergency shelters. Other factors contributing to the increase related to overall expanded shelter capacity, a high cost of living, inflation, increases in rents, and a lack of affordable housing.

### *Arizona (AZ)*

Arizona is composed of three CoCs. Two of the CoCs are major cities (Tucson and Phoenix) and the other, geographically large, CoC is largely rural. Twenty-one percent of all people experiencing homelessness in Arizona were families with children. Between 2023, and 2024, the number of people in families experiencing homelessness increased by 15 percent (411 more people). All three CoCs reported increases in family homelessness between 2023 and 2024. These increases were driven by: increased PIT count coordination that allowed for expanded surveying in rural parts of the state where more families experiencing unsheltered homelessness were living; an increase in shelter capacity in one major city that allowed programs to serve more families experiencing homelessness; and an undersupply of emergency shelter capacity for families experiencing homelessness in the other major city that resulted in an increase in unsheltered family homelessness.

HUD-AR-00945

## 3.3    Estimates of People in Families with Children Experiencing Homelessness by CoC

### Continuums of Care (CoC) were Divided into Four Geographic Categories

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 3-12: Share of All People in Families Experiencing Homelessness in Each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

Six of every ten people in families with children experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, at 23 percent. There is some variation by shelter status, with major cities accounting for a larger share of the sheltered population and rural areas a larger share of the unsheltered population. Four in ten families experiencing unsheltered homelessness are in rural CoCs.

HUD-AR-00946

**Exhibit 3-13: Number of People in Families with Children Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

| | # CoCs | All People in Families Experiencing Homelessness | Sheltered People in Families | Unsheltered People in Families |
|---|---|---|---|---|
| **Total** | **385** | **259,473** | **240,916** | **18,557** |
| Major Cities | 48 | 154,340 | 148,184 | 6,156 |
| Other Urban CoCs | 61 | 10,229 | 9,356 | 873 |
| Suburban CoCs | 165 | 59,959 | 56,326 | 3,633 |
| Rural CoCs | 111 | 34,945 | 27,050 | 7,895 |

Note: Prior years data did not include U.S. territories.

**Exhibit 3-14: Change in Experiences of Family Homelessness by Sheltered Status and CoC Category, 2023-2024**

| | All People in Families Experiencing Homelessness | | Sheltered Families | | Unsheltered Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | **73,389** | **39.4%** | **72,217** | **42.8%** | **1,172** | **6.7%** |
| Major Cities | 56,503 | 57.8% | 57,914 | 64.2% | -1,411 | -18.6% |
| Other Largely Urban CoCs | 1,014 | 11.0% | 916 | 10.9% | 98 | 12.6% |
| Largely Suburban CoCs | 11,530 | 23.8% | 11,138 | 24.6% | 392 | 12.1% |
| Largely Rural CoCs | 4,342 | 14.2% | 2,249 | 9.1% | 2,093 | 36.1% |

Note: Prior years data did not include U.S. territories.

While overall the number of people in families with children experiencing homelessness increased by 39 percent across the country, CoCs that contained one of the nation's 50 largest cities experienced the greatest increases. This was entirely driven by increases in the sheltered population, which increased by 64 percent. In major cities, unsheltered family homelessness declined by 19 percent, the only region to see declines in unsheltered family homelessness. Largely rural CoCs reported a 36 percent increase in unsheltered family homelessness—the largest increase among all geographies.

HUD-AR-00947

# 4.    Estimates of Unaccompanied Youth Experiencing Homelessness

## *4.1    National Estimates of Unaccompanied Youth Experiencing Homelessness*

The estimates presented in this section reflect national data collected on the number of individuals under the age of 25 (unaccompanied youth) experiencing homelessness during a single point-in-time (PIT) that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of unaccompanied youth experiencing sheltered and unsheltered homelessness without a parent or guardian or a child of their own. Sheltered unaccompanied youth consists of people staying in emergency shelters (ES), safe haven (SH), or transitional housing (TH) programs on the night of the count. It does not include young people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7). In addition, these data do not reflect unaccompanied youth living with friends or family on a temporary basis. Doubling up and couch surfing are more common for youth than for other populations.

The PIT count also includes the number of unaccompanied youth experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unaccompanied youth experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflects a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

> **A Note About Doubling Up and Couch Surfing**
>
> HUD's definition on homelessness does not include situations where people are "doubling up" or temporarily staying with others due to a loss of housing or other hardships. HUD's definition of homelessness also does not include instances of "couch surfing" or staying on someone's couch, floor, or in an extra space in someone else's home due to housing instability or because there are no housing options available to them. This form of housing instability may be more common among youth (ages 18-24). More information on this and other types of housing instability can be found in the AHAR Part 2.

> **Unaccompanied Youth Experiencing Homelessness** are children (under the age of 18) and young adults (ages 18-24) who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness.

HUD-AR-00948

**Exhibit 4-1: PIT Estimates of Unaccompanied Youth Experiencing Homelessness, 2017-2024**



Note: The exhibit does not display the total count of unaccompanied youth experiencing homelessness in 2021 or the count of all unaccompanied youth experiencing unsheltered homelessness because of pandemic-related disruptions to PIT counts. Estimates of the number of unaccompanied youth experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

In January of 2024, 38,170 unaccompanied youth experienced homelessness on a single night in the United States.

After decreasing steadily between 2017 (the first year the data were reported) and 2020, the number of unaccompanied youth experiencing homelessness has risen post-pandemic. Between 2022 and 2023, the number of unaccompanied youth in the U.S. increased by 15 percent. The number increased again between 2023 and 2024, by 10 percent.[12]

**Exhibit 4-2: Percent Change in the Number of Unaccompanied Youth Experiencing Homelessness, 2007-2024**



| | Percent change from 2023 to 2024 | Percent change from 2017 to 2024 |
|---|---|---|
| ■ Unaccompanied youth | 10.0% | -0.3% |
| ■ Sheltered unaccompanied youth | 24.0% | 37.2% |
| ■ Unsheltered unaccompanied youth | -10.3% | -35.6% |

---

[12] Beginning in 2017, HUD began issuing funding to CoCs through the Youth Homelessness Demonstration Program (YHDP). The goal of YHDP is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness.

HUD-AR-00949

### *Demographic Characteristics*

In 2024, HUD made significant changes in the way data on gender and data on race and ethnicity were collected. Individuals were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o status, historically collected separately, is now listed among the race categories. Given these changes, comparisons to prior years for gender and race are not included in the report.

### *Age*

Nearly all unaccompanied youth were between the ages of 18 and 24. Unaccompanied children (under 18), made up a larger share of the unsheltered population than the sheltered population for all unaccompanied youth experiencing homelessness (8% vs. 6%).

The overall increase in the number of unaccompanied youths experiencing homelessness was driven by increases in youth over the age of 18. Unaccompanied youth under the age of 18 decreased across shelter statuses between 2023 and 2024. (see Appendix B).[13]

### *Gender*

In 2024, six of every ten unaccompanied youth identified as men or boys (60%) and 36 percent identified as women or girls. Compared to all individuals, unaccompanied youth were more likely to identify as a gender outside of singularly "men" or "women" (4% vs. 2%).

**Exhibit 4-3: Gender Identity of Unaccompanied Youth Experiencing Homelessness, 2024**

| Gender Identity | Total Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| **Woman or Girl** | 13,607 | 35.6% | 9,266 | 36.4% | 4,341 | 34.1% |
| **Man or Boy** | 22,852 | 59.9% | 15,089 | 59.3% | 7,763 | 61.0% |
| **Transgender** | 551 | 1.4% | 382 | 1.5% | 169 | 1.3% |
| **Gender Questioning** | 82 | 0.2% | 35 | 0.1% | 47 | 0.4% |
| **Culturally Specific Identity** | 50 | 0.1% | 10 | <0.01% | 40 | 0.3% |
| **Different Identity** | 80 | 0.2% | 41 | 0.2% | 39 | 0.3% |
| **Non-Binary** | 530 | 1.4% | 362 | 1.4% | 168 | 1.3% |
| **More Than One Gender** | 418 | 1.1% | 261 | 1.0% | 157 | 1.2% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

[13] This could be due to the greater vulnerability of the youth population, difficulty reaching these populations, increased fear around accessing shelter programs, or difficulty in finding shelter programs specifically for youth.

HUD-AR-00950

The shelter status of unaccompanied youth varied considerably within gender categories. Unaccompanied youth experiencing homelessness identifying as transgender had the highest sheltered rate (69%), followed closely by those identifying as a women (68%), while those identifying as a having a culturally specific gender identity – though the number was small – had the highest unsheltered rate (80%).[14]

**Exhibit 4-4: Shelter Status within Gender Identities**



### *Race and Ethnicity*

Youth of color who are under the age of 25 are considerably overrepresented among individuals experiencing homelessness. Black, African American, or African youth accounted for a higher share of the sheltered population than the unsheltered population (36% vs. 25%). Most other racial groups made up a higher share of the unsheltered population than they did the sheltered population.

---

[14] People self-identify their gender when accessing shelter or when participating the unsheltered count. Some individuals may identify their gender differently or not respond to this question due to shelter requirements or perceived biases, resulting in underreporting of people identifying as a gender other than a man or woman.

HUD-AR-00951

**Exhibit 4-5: Race and Ethnicity of Unaccompanied Youth Experiencing Homelessness, 2024**

| | Total Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Unaccompanied Youth Experiencing Homelessness | 38,170 | 100% | 25,446 | 100% | 12,724 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o | 304 | 0.8% | 169 | 0.7% | 135 | 1.1% |
| American Indian, Alaska Native, or Indigenous Only | 968 | 2.5% | 479 | 1.9% | 489 | 3.8% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 1,272 | 3.3% | 648 | 2.6% | 624 | 4.9% |
| Asian or Asian American and Hispanic/Latina/e/o | 48 | 0.1% | 22 | 0.1% | 26 | 0.2% |
| Asian or Asian American Only | 605 | 1.6% | 270 | 1.1% | 335 | 2.6% |
| Total Asian or Asian American, any ethnicity | 653 | 1.7% | 292 | 1.2% | 361 | 2.8% |
| Black, African American, or African and Hispanic/Latina/e/o | 651 | 1.7% | 493 | 1.9% | 158 | 1.2% |
| Black, African American, or African Only | 11,762 | 30.8% | 8,730 | 34.3% | 3,032 | 23.8% |
| Total Black, African American, or African, any ethnicity | 12,413 | 32.5% | 9,223 | 36.2% | 3,190 | 25.0% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 11 | <0.01% | 2 | <0.01% | 9 | 0.1% |
| Middle Eastern or North African Only | 243 | 0.6% | 196 | 0.8% | 47 | 0.4% |
| Total Middle Eastern or North Africa, any ethnicity | 254 | 0.6% | 198 | 0.8% | 56 | 0.5% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 71 | 0.2% | 35 | 0.1% | 36 | 0.3% |
| Native Hawaiian or Pacific Islander Only | 312 | 0.8% | 167 | 0.7% | 145 | 1.1% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 383 | 1.0% | 202 | 0.8% | 181 | 1.4% |
| White and Hispanic/Latina/e/o | 2,674 | 7.0% | 2,002 | 7.9% | 672 | 5.3% |
| White Only | 10,330 | 27.1% | 5,744 | 22.6% | 4,586 | 36.0% |
| Total White, any ethnicity | 13,004 | 34.1% | 7,746 | 30.5% | 5,258 | 41.3% |
| Multi-Racial and Hispanic/Latina/e/o | 438 | 1.1% | 242 | 1.0% | 196 | 1.5% |
| Multi-Racial All Other | 1,482 | 3.9% | 845 | 3.3% | 637 | 5.0% |
| Total Multi-Racial, any ethnicity | 1,920 | 5.0% | 1,087 | 4.3% | 833 | 6.5% |
| Hispanic/Latina/e/o Only | 8,271 | 21.7% | 6,050 | 23.8% | 2,221 | 17.5% |
| Total Hispanic/Latina/e/o, Any Race | 12,468 | 32.6% | 9,015 | 35.5% | 3,453 | 27.2% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

Sheltered status of unaccompanied youth varied considerably across race and ethnicity. Several groups had unsheltered rates that were higher than the overall unaccompanied youth rate of 33 percent. Unaccompanied youth identifying as Asian, Indigenous, or Native Hawaiian (either alone or also Latina/e/o) had rates that exceeded the national rate. People identifying as Hispanic or Latina/e/o generally had lower rates of unsheltered homelessness.

HUD-AR-00952

**Exhibit 4-6. Sheltered Status of Unaccompanied Youth by Race, 2024**



> WHEN [THE YOUTH HOMELESSNESS DEMONSTRATION PROGRAM (YHDP)] GOT MORE INVOLVED, IT LED TO MORE VOLUNTEERS FROM DIFFERENT COUNTIES JOINING IN. WITH MORE VOLUNTEERS, WE WERE ABLE TO COVER MORE AREAS AND COUNT MORE ACCURATELY. SO, THE CHANGE IN HOW PARTNERS AND PROGRAMS PARTICIPATED, ESPECIALLY WITH YHDP, BROUGHT IN MORE VOLUNTEERS FROM MORE COUNTIES, WHICH HELPED MAKE THE COUNT BETTER THIS YEAR.

CoC in the Southeast

HUD-AR-00953

## 4.2    State-Level Estimates of Unaccompanied Youth Experiencing Homelessness

States with the largest number of unaccompanied youth experiencing homelessness in 2024 were California and New York. In Wyoming, 20 percent of all individuals experiencing homelessness at a point-in-time were unaccompanied youth – the highest rate in the country. Illinois and Minnesota were second, with 16 percent. See Appendix A for more detailed, state-level information.

**Exhibit 4-7: Estimates of Unaccompanied Youth Experiencing Homelessness by State, 2024**



The point-in-time counts are completed during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered youth homelessness are in warmer climates. In 2024, Arkansas had the highest rate of unsheltered unaccompanied youth (66%) on a single night in January followed by California and Oregon (60%).

HUD-AR-00954

**Exhibit 4-8: Percentages of Unaccompanied Youth Experiencing Homelessness Who Are Unsheltered, 2024**



Between 2023 and 2024, 33 states and the District of Columbia experienced increases in the number of unaccompanied youth experiencing homelessness. More states experienced increases in sheltered unaccompanied youth (34 states and DC) than unsheltered unaccompanied youth (28 states and DC).

**Exhibit 4-9: Largest Changes in Unaccompanied Youth Experiencing Homelessness by State, 2023-2024**



HUD-AR-00955

### *Understanding Changes in the Number of Unaccompanied Youth Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *Illinois (IL)*

Illinois has 19 CoCs, one major city (Chicago), three other largely urban CoCs, ten suburban CoCs, and five largely rural CoCs. Between 2023 and 2024, Illinois had a 95 percent increase in the number of unaccompanied youth experiencing homelessness (949 more unaccompanied youth). Ninety percent of this increase was in Chicago. The Chicago CoC reported that an influx of new arrivals accounted for most of this observed increase. According to the CoC, new arrivals (which included migrant and asylum-seeking families) accounted for more than 1,050 sheltered unaccompanied youth in 2024 compared to just over 300 in 2023. All other CoCs in the state reported increases or decreases of less than 20 unaccompanied youth experiencing homelessness.

### *West Virginia (WV)*

West Virginia is composed of 4 CoCs – one largely urban CoC, two rural CoCs, and one largely suburban CoC. Between 2023 and 2024, West Virginia had a 29 percent decrease in the number of unaccompanied youth experiencing homelessness (43 fewer youth). While each CoC experienced a decrease in the number of unaccompanied youth, the largest CoC in the state -- WV Balance of State -- experienced the largest decrease. They noted that there were several new Youth Homelessness Demonstration Program (YHDP) grantees in the state. YHDP grants provide communities resources to develop a coordinated approach to ending youth homelessness, including connection to and provision of permanent housing.

HUD-AR-00956

## 4.3    CoC-Level Estimates of Unaccompanied Youth Experiencing Homelessness

***Continuums of Care (CoC) were Divided into Four Geographic Categories***

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

More than half of unaccompanied youth experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 21 percent. There is some variation by shelter status, with rural areas and suburban areas accounting for larger shares of unsheltered unaccompanied youth and major cities accounting for a larger share of sheltered unaccompanied youth.[15]

**Exhibit 4-10: Share of Unaccompanied Youth Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

---

[15] The number of unaccompanied youth experiencing homelessness in rural areas may be higher than reported due to challenges in completing the unsheltered PIT count in rural communities, especially rural Tribal nations.

HUD-AR-00957

**Exhibit 4-11: Number of Unaccompanied Youth Experiencing Homelessness by Geography Type, 2024**

| | # CoCs | Total Individuals | Sheltered Individuals | Unsheltered Individuals |
|---|---|---|---|---|
| *Total* | *385* | *38,170* | *25,446* | *12,724* |
| Major Cities | 48 | 20,758 | 14,636 | 6,122 |
| Other Urban CoCs | 61 | 2,334 | 1,534 | 800 |
| Suburban CoCs | 165 | 8,083 | 5,027 | 3,056 |
| Rural CoCs | 111 | 6,995 | 4,249 | 2,746 |

Note: Prior years data did not include U.S. territories.

The overall increase in unaccompanied youth experiencing homelessness was largely driven by increases in sheltered youth in major cities. All areas except for suburban areas experienced decreases in unsheltered unaccompanied youth. In suburban areas the number increased by 15 percent.

**Exhibit 4-12: Changes in the Number of Unaccompanied Youth Experiencing Homelessness, 2023-2024**

| | Change in Total Unaccompanied Youth | | Change in Sheltered Unaccompanied Youth | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| *Total* | 3,467 | 10.0% | 4,923 | 24.0% | -1,456 | -10.3% |
| Major Cities | 2,609 | 14.4% | 4,012 | 37.8% | -1,403 | -18.6% |
| Other Urban CoCs | -169 | -6.8% | 14 | 0.9% | -183 | -18.6% |
| Suburban CoCs | 781 | 10.7% | 391 | 8.4% | 390 | 14.6% |
| Rural CoCs | 246 | 3.6% | 506 | 13.5% | -260 | -8.6% |

Note: Prior years data did not include U.S. territories.

HUD-AR-00958

**VETERANS**

# 5. Estimates of Veterans Experiencing Homelessness in the United States

### 5.1 National Estimates of Veterans Experiencing Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of veterans experiencing homelessness during a point-in-time (PIT) count that occurred during the last 10 days of January 2024. The PIT count offers a snapshot of the number of veterans experiencing sheltered and unsheltered homelessness on a single night. Sheltered veteran homelessness includes veterans who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include veterans living in housing supported by rapid rehousing (RRH) programs, veterans living in permanent supportive (PH) housing, and veterans in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of veterans experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of veterans experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

Communities began reporting PIT data on veterans experiencing homelessness in 2009, and this report uses 2009 as the baseline (starting) measure of veterans experiencing homelessness in the United States.

> **Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

HUD-AR-00959

**Exhibit 5-1: PIT Estimates of Veterans Experiencing Homelessness by Sheltered Status, 2009-2024**



Note: The data for 2021 does not display the total count of veterans experiencing homelessness or the count of all veterans experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Also, estimates of the number of veterans experiencing sheltered homelessness at a point in time in 2021 should be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

On a single night in January 2024, 32,882 veterans were experiencing homelessness. About six in every ten veterans experiencing homelessness were sheltered, and the other four in ten were unsheltered.

Veterans made up five percent of all adults experiencing homelessness in the United States. The share was the same across sheltered status.

**Exhibit 5-2: Proportion of Adults Experiencing Homelessness Who are Veterans by Sheltered Status, 2024**

| Sheltered Status | All Veterans Experiencing Homelessness | All Adults Experiencing Homelessness | Percent of Adults Experiencing Homelessness Who Are Veterans |
|---|---|---|---|
| **Total People** | 32,882 | 623,242 | 5.3% |
| Sheltered | 19,031 | 360,097 | 5.3% |
| Unsheltered | 13,851 | 263,145 | 5.3% |

HUD-AR-00960

**Exhibit 5-3: Changes in the Number of Veterans Experiencing
Homelessness Over Time by Sheltered Status, 2009-2024**

Overall, the number of veterans experiencing homelessness decreased by 8 percent between 2023 and 2024. This decrease in the number of veterans experiencing homelessness was the same for the sheltered and unsheltered populations, however, the percentage decline for veterans experiencing unsheltered homelessness was larger, at 11 percent.



*Demographic Characteristics*

In 2024, HUD made significant changes to the way the Point-in-Time count collected data on gender and

> "CHANGE IN PERMANENT SUPPORTIVE HOUSING (PSH) CAPACITY, THE INTRODUCTION OF NEW PSH INITIATIVES, INCLUDING PROGRAMS TARGETED AT VETERANS, CONTRIBUTED TO A 34% INCREASE IN THE NUMBER OF PEOPLE HOUSED COMPARED TO 2022 [FOR OUR COC]. WHILE THESE PROGRAMS DID NOT DIRECTLY AFFECT THE UNSHELTERED COUNT, THEIR IMPACT ON REDUCING … HOMELESSNESS AMONG VETERANS SUGGESTS A BROADER POSITIVE TREND IN ADDRESSING HOMELESSNESS WITHIN THE COMMUNITY."
>
> CoC in the West

data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in the report.

HUD-AR-00961

## *Gender*

Almost nine in every ten veterans experiencing homelessness were men (89%). Veterans who identified as women made up a slightly higher share of veterans experiencing unsheltered homelessness than of veterans experiencing sheltered homelessness (12% vs 9%).

**Exhibit 5-4: Gender Identity of Veterans Experiencing Homelessness, 2024**

| | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Woman** | 3,329 | 10.1% | 1,661 | 8.7% | 1,668 | 12.0% |
| **Man** | 29,189 | 88.8% | 17,252 | 90.7% | 11,937 | 86.2% |
| **Transgender** | 110 | 0.3% | 51 | 0.3% | 59 | 0.4% |
| **Gender Questioning** | 12 | <0.1% | 2 | <0.1% | 10 | 0.1% |
| **Culturally Specific Identity** | 26 | 0.1% | 6 | <0.1% | 20 | 0.1% |
| **Different Identity** | 13 | <0.1% | 1 | <0.1% | 12 | 0.1% |
| **Non-Binary** | 105 | 0.3% | 27 | 0.1% | 78 | 0.6% |
| **More Than One Gender** | 98 | 0.3% | 31 | 0.2% | 67 | 0.5% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

The shelter status of veterans experiencing homelessness varied within gender categories. Veterans identifying as a gender other than woman or man were less likely to be sheltered.[16]

**Exhibit 5-5: Shelter Status within Gender Identities, 2024**



---

[16] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than a man or woman.

HUD-AR-00962

*Race and Ethnicity*

**Exhibit 5-6: Race/Ethnicity of Veterans Experiencing Homelessness, 2024**

| Race | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All Veterans Experiencing Homelessness** | 32,882 | 100% | 19,031 | 100% | 13,851 | 100% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 139 | 0.4% | 59 | 0.3% | 80 | 0.6% |
| **American Indian, Alaska Native, or Indigenous Only** | 898 | 2.7% | 376 | 2.0% | 522 | 3.8% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 1,037 | 3.1% | 435 | 2.3% | 602 | 4.4% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 14 | <0.1% | 5 | <0.1% | 9 | 0.1% |
| **Asian or Asian American Only** | 376 | 1.1% | 152 | 0.8% | 224 | 1.6% |
| **Total Asian or Asian American, any ethnicity** | 390 | 1.1% | 157 | 0.8% | 233 | 1.7% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 298 | 0.9% | 187 | 1.0% | 111 | 0.8% |
| **Black, African American, or African Only** | 9,890 | 30.1% | 6,746 | 35.4% | 3,144 | 22.7% |
| **Total Black, African American, or African, any ethnicity** | 10,188 | 31.0% | 6,933 | 36.4% | 3,255 | 23.5% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 4 | <0.1% | 0 | <0.1% | 4 | <0.1% |
| **Middle Eastern or North African Only** | 53 | 0.2% | 9 | <0.1% | 44 | 0.3% |
| **Total Middle Eastern or North Africa, any ethnicity** | 57 | 0.2% | 9 | <0.1% | 48 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 32 | 0.1% | 21 | 0.1% | 11 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 308 | 0.9% | 120 | 0.6% | 188 | 1.4% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 340 | 1.0% | 141 | 0.7% | 199 | 1.5% |
| **White and Hispanic/Latina/e/o** | 1,094 | 3.3% | 775 | 4.1% | 319 | 2.3% |
| **White Only** | 16,034 | 48.8% | 9,465 | 49.7% | 6,569 | 47.4% |
| **Total White, any ethnicity** | 17,128 | 52.1% | 10,240 | 53.8% | 6,888 | 49.7% |
| **Multi-Racial and Hispanic/Latina/e/o** | 248 | 0.8% | 94 | 0.5% | 154 | 1.1% |
| **Multi-Racial All Other** | 1,291 | 3.9% | 485 | 2.5% | 806 | 5.8% |
| **Total Multi-Racial, any ethnicity** | 1,539 | 4.7% | 579 | 3.0% | 960 | 6.9% |
| **Hispanic/Latina/e/o Only** | 2,203 | 6.7% | 537 | 2.8% | 1,666 | 12.0% |
| **Total Hispanic/Latina/e/o, Any Race** | 4,032 | 12.3% | 1,678 | 8.8% | 2,354 | 17.0% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

HUD-AR-00963

Across all veterans experiencing homelessness, about 49 percent identified as White (only), and 30 percent identified as Black, African American, or African (only). People who identified as Hispanic/Latina/e/o, of any race, were more likely to be experiencing unsheltered homelessness, making up 17 percent of unsheltered veterans compared to nine percent of sheltered veterans.

Based on the new categories, the race and ethnicity of veterans experiencing homelessness changed slightly between 2023 and 2024, showing a reduction in the number of veterans who identified as White (any ethnicity). This may reflect the addition of three new race/ethnicity categories: Middle Eastern or North African Only, Middle Eastern or North African and Hispanic/Latina/e/o, and Hispanic/Latina/e/o (only). In 2024, 2,260 veterans (7%) identified as one of the newly available racial/ethnic categories.

**Exhibit 5-7: Shelter Status within Race and Ethnic Identities, 2024**



Sheltered rates also varied considerably across the racial and ethnic identities of veterans experiencing homelessness. Veterans who identified as White and Hispanic/Latina/e/o had the highest sheltered rate at 71 percent.

HUD-AR-00964

## 5.2    Estimates of the Number of Veterans Experiencing Homelessness by State

**Exhibit 5-8: Percentage of All Veterans Experiencing Homelessness by State, 2024**



California accounted for 28 percent of all veterans experiencing homelessness in the United States. Florida and Texas had the next largest numbers of veterans experiencing homelessness.

**Exhibit 5-9: Percentages of Veterans Experiencing Homelessness Who Are Unsheltered, 2024**



HUD-AR-00965

**VETERANS**

In five states, more than half of all veterans experiencing homelessness were sleeping in places not meant for human habitation. These are California (69%), New Mexico (60%), Washington (59%), Oregon (55%), and Hawaii (51%).

**Exhibit 5-10: Changes in the Number of Veterans Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 28 states and the District of Columbia experienced decreases in the number of veterans experiencing homelessness. The largest percentage decline was in Wyoming (59% fewer veterans experiencing homelessness) and the largest numeric decline was in California (1,279 fewer veterans experiencing homelessness).

For information on how rates of homelessness have changed by state since 2009, please see Appendix B.

HUD-AR-00966

### *Understanding Changes in the Number of Veterans Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *Tennessee (TN)*

Tennessee is composed of ten CoCs. Two are major city CoCs (Memphis and Nashville), one is in another largely urban area, one is a largely suburban area, and the remaining six are largely rural. Between 2023, and 2024, the number of veterans experiencing homelessness decreased by 25 percent across the state (129 fewer veterans). Much of this decline was driven by one CoC, Chattanooga, which experienced a 75 percent decline in veteran homelessness (110 fewer veterans). This CoC attributed the decline to increased collaboration with the Department of Veterans Affairs. Through this collaboration they were able to conduct case conferencing specifically for veterans experiencing homelessness to expedite referrals to permanent housing.

### *Texas (TX)*

Texas is composed of 11 CoCs. It has six major city CoCs (Austin, Dallas, El Paso, Fort Worth and Arlington, Houston, and San Antonio), two other largely urban CoCs, and three largely rural CoCs. Six percent of all veterans experiencing homelessness in the United States were in Texas. Between 2023 and 2024, Texas reported a 10 percent decrease in veteran homelessness (199 fewer veterans). Many of the CoCs attributed this decrease to the Department of Veterans Affairs' programs that place veterans into permanent housing through the Veteran Affairs Supportive Housing (HUD-VASH) and Supportive Services for Veteran Families (SSVF) programs. Some Texas CoCs have added other resources to the efforts to prevent veterans from entering homelessness or to resolve their homelessness quickly.

HUD-AR-00967

## 5.3    Estimates of Veterans Experiencing Homelessness by CoC

### Continuums of Care (CoC) were Divided into Four Geographic Categories

(1) Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

(2) Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

(3) Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

(4) Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

Forty-seven percent of all veterans experiencing homelessness were in one of the nation's 50 largest cities. Suburban areas accounted for the next largest share, with 26 percent of all veterans experiencing homelessness.

There is some variation by shelter status. Major cities accounted for a larger share of the unsheltered veteran population, while suburban and other largely urban areas comprised a larger share of the sheltered population.

**Exhibit 5-11: Share of All Veterans Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



**Exhibit 5-12: Number of Veterans Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

| | # CoCs | All Veterans Experiencing Homelessness | Sheltered Veterans | Unsheltered Veterans |
|---|---|---|---|---|
| **Total** | **385** | **32,882** | **19,031** | **13,851** |
| Major Cities | 48 | 15,361 | 8,351 | 7,010 |
| Other Urban CoCs | 61 | 2,962 | 2,098 | 864 |
| Suburban CoCs | 165 | 8,509 | 5,206 | 3,303 |
| Rural CoCs | 111 | 6,050 | 3,376 | 2,674 |

HUD-AR-00968

Within the different geographies, largely rural CoCs have the largest share of veterans experiencing unsheltered homelessness, with 44 percent of all veterans experiencing homelessness in rural areas being unsheltered.

Between 2023 and 2024, CoCs that contained one of the nation's largest cities experienced the largest numerical (i.e., change in the overall number) and percentage decrease in veteran homelessness (1,678 fewer veterans or a decline of 10%). This overall decline was driven by reductions in unsheltered veteran homelessness, which declined by 17 percent. Largely suburban CoCs were the only geographic area to experience an increase in unsheltered veteran homelessness, with an increase of four percent between 2023 and 2024.

**Exhibit 5-13: Change in Homelessness by Sheltered Status and CoC Category, 2023-2024**

| | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | **-2,692** | **-7.6%** | **-1,036** | **-5.2%** | **-1,656** | **-10.7%** |
| Major Cities | -1,678 | -9.8% | -279 | -3.2% | -1,399 | -16.6% |
| Other Largely Urban CoCs | -208 | -6.6% | -95 | -4.3% | -113 | -11.6% |
| Largely Suburban CoCs | -282 | -3.2% | -406 | -7.2% | 124 | 3.9% |
| Largely Rural CoCs | -524 | -8.0% | -256 | -7.0% | -268 | -9.1% |

Note: Prior years data did not include U.S. territories.

HUD-AR-00969

# 6.    Estimates of Individuals Experiencing Chronic Patterns of Homelessness

## 6.1    National Estimates of Individuals Experiencing Chronic Patterns of Homelessness

The estimates presented in this section reflect national data collected on the number of individuals experiencing chronic patterns of homelessness, experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness. Sheltered chronic homelessness consists of individuals staying in emergency shelters (ES) or safe havens (SH) on the night of the count. It does not include people living in transitional housing (TH), housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

In January of 2024, 152,585 individuals who experienced chronic patterns of homelessness, experienced homelessness on a single night in the United States. This represents the largest number of individuals who experienced chronic homelessness since data collection began. About two-thirds stayed in unsheltered locations and one-third in sheltered locations. This section provides information on individuals who experienced chronic homelessness at a single point in time. See Appendix B for detailed tables supporting the exhibits in this chapter.

**Individual Experiencing Chronic Homelessness** refers to an individual with a disability who has been continuously experiencing homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

HUD-AR-00970

**Exhibit 6-1: PIT Estimates of Individuals Experiencing Chronic Patterns of Homelessness**



Note: The exhibit does not display the total count of individuals experiencing chronic patterns of homelessness in 2021 or the count of unsheltered individuals experiencing chronic patterns of homelessness because of pandemic-related disruptions to counts. Estimates of the number of sheltered individuals experiencing chronic patterns of homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

**Exhibit 6-2. Share of Individuals Experiencing Chronic Patterns of Homelessness, 2007-2024**

In 2024, 30 percent of all individuals who experienced homelessness had chronic patterns of homelessness. The share of all individuals experiencing homelessness with chronic patterns has varied between 2007 and 2024, hitting a low



HUD-AR-00971

of 22 percent in 2018 and a high of 31 percent in 2023.

The number of individuals experiencing homelessness who have experienced chronic patterns of homelessness has increased steadily over the last several years. Increases in individuals experiencing chronic patterns of homelessness persisted through the pandemic, while other populations declined. The number of individuals experiencing chronic homelessness in 2024 was 27 percent higher than in 2007.



**Exhibit 6-3: Change in the Number of Individuals Experiencing Chronic Patterns of Homelessness, 2007-2024**

The most recent change, between 2023 and 2024, was a 7 percent increase in the number of individuals experiencing chronic homelessness across the country. Similar increases were observed across both sheltered populations (a 6% increase) and unsheltered populations (a 7% increase).

Compared to 2020 – just before the start of the Covid-19 pandemic – experiences of chronic homelessness have increased by 38 percent.

> [OUR COMMUNITY'S] COMMITMENT TO HOUSING FIRST RESULTED IN THE CREATION OF SIGNIFICANT NEW PSH FOR THE HIGHEST-NEEDS CLIENTS IN [OUR AREA], INCLUDING PSH FOR FAMILIES WITH CHILDREN, RESULTING IN A DECREASE IN CHRONIC AND FAMILY HOMELESSNESS. [OUR COMMUNITY] ALSO USES THE BY-NAME LIST METHOD TO FIND TARGETED HOUSING SOLUTIONS AND DECREASE OUR TOTAL NUMBER OF HOMELESS VETERANS, FAMILIES, TRANSITION AGE YOUTH, AND [PEOPLE WITH] CHRONIC [PATTERNS OF HOMELESSNESS].

CoC in the South

HUD-AR-00972

## 6.2  State-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness

States with the largest number of individuals experiencing chronic patterns of homelessness in 2024 were California and Washington. California alone accounted for 44 percent of all individuals who experienced chronic homelessness in the country. In Washinton, 49 percent of all individuals had experienced chronic patterns of homelessness – the highest rate in the country. Rhode Island is second, with 48 percent. See Appendix A for more detailed, state-level information.

**Exhibit 6-4: Estimates of Individuals Experiencing Chronic Patterns of Homelessness by State, 2024**



The point-in-time counts are conducted during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered homelessness on a single night in January are in warmer climates (e.g., Mississippi, Hawaii, New Mexico, Alabama, and California). Other factors, such as policies related to access to shelter, shelter capacity, and strength of coordinated entry (CE) in Continuums of Care (CoCs) across the state may affect the unsheltered rate.

HUD-AR-00973

**Exhibit 6-5: Percentages of Individuals Experiencing Chronic Patterns of Homelessness Who Were Unsheltered, 2024**



Between 2023 and 2024, 35 states and the District of Columbia experienced increases in the number of individuals who experienced chronic patterns of homelessness. The largest numeric increase occurred in Washington (4,295) while the largest percentage increase was observed in Vermont (190%).

**Exhibit 6-6: Changes in the Number of Individuals Experiencing Chronic Patterns of Homelessness by State, 2023-2024**



HUD-AR-00974

### *Understanding Changes in the Number of People Who Experienced Chronic Patterns of Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles one state with large changes in their PIT count and the reasons for those changes reported by the CoCs.

### *Washington (WA)*

Washington is composed of six CoCs, one major city (Seattle), one other largely urban CoC, three largely suburban CoCs, and one geographically large, rural CoC. Between 2023 and 2024, Washington reported a 56 percent increase in the number of individuals experiencing chronic patterns of homelessness (4,295 more individuals). CoCs that saw large increases in the number of people experiencing chronic patterns of homelessness attributed the increase to a lack of affordable housing. CoCs noted that housing costs continue to rise across Washington, leading to higher rates of homelessness overall. Another factor that increased the count was associated with outreach efforts to identify people in encampments and move them into temporary shelter. This resulted in identifying more people staying in encampments as having chronic patterns of homelessness.

HUD-AR-00975

## 6.3    CoC-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness

***Continuums of Care (CoC) were Divided into Four Geographic Categories***

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

Just over 56 percent of individuals experiencing chronic patterns of homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 22 percent. There is some variation by shelter status, with major cities and rural areas accounting for larger shares of unsheltered individuals.

**Exhibit 6-7. Share of Individuals Experiencing Chronic Patterns of Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

Nationally, 30 percent of all individuals experiencing homelessness experienced chronic patterns of homelessness. Urban areas – including both major cities and other urban areas – had higher rates of individuals experiencing chronic homelessness than either rural or suburban CoCs.

HUD-AR-00976

**Exhibit 6-8: Percent of Individuals Experiencing Chronic Patterns of Homelessness by Geographic Category, 2024**

|  | Total Individuals Experiencing Homelessness | Percent of Individuals Who Experienced Chronic Patterns of Homelessness |
|---|---|---|
| **Total** | **152,585** | **29.8%** |
| Major Cities | 85,787 | 32.5% |
| Other Urban CoCs | 11,019 | 31.2% |
| Suburban CoCs | 34,003 | 28.0% |
| Rural CoCs | 21,776 | 23.8% |

Note: Prior years data did not include U.S. territories.

While overall chronic homelessness increased by 7 percent across the country, largely suburban CoCs and largely rural CoCs experienced large increases in both the numbers and the percentages of individuals who experienced chronic patterns of homelessness. These increases were largely among people experiencing unsheltered homelessness. In contrast, major cities experienced the largest increases in sheltered individuals experiencing chronic patterns of homelessness.

**Exhibit 6-9: Changes in Individuals Experiencing Chronic Patterns of Homelessness by Geographic Category, 2023-2024**

|  | Change in Total Number of Individuals Experiencing Chronic Patterns of Homelessness | | Change in Sheltered Individuals Experiencing Chronic Patterns of Homelessness | | Change in Unsheltered Individuals Experiencing Chronic Patterns of Homelessness | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | 9,480 | 6.6% | 2,883 | 5.8% | 6,597 | 7.1% |
| Major Cities | 3,509 | 4.3% | 1,982 | 7.6% | 1,527 | 2.7% |
| Other Urban CoCs | 161 | 1.5% | 119 | 2.4% | 42 | 0.7% |
| Suburban CoCs | 3,354 | 10.9% | 958 | 8.2% | 2,396 | 12.7% |
| Rural CoCs | 2,456 | 12.7% | -176 | -2.5% | 2,632 | 21.6% |

Note: Prior years data did not include U.S. territories.

HUD-AR-00977

# 7.   National Inventory of Beds for People Currently Experiencing Homelessness and People Transitioning Out of Homelessness

**Exhibit 7-1: Project Types for People Currently Experiencing Homelessness and People Transitioning Out of Homelessness**

| Shelter for People Experiencing Homelessness | Permanent Housing for People Transitioning Out of Homelessness |
|---|---|
| •**Emergency Shelter (ES):** provides temporary or nightly shelter beds to people experiencing homelessness<br><br>•**Transitional Housing (TH):** provides people experiencing homelessness a place to stay combined with supportive services for up to 24 months<br><br>•**Safe Havens (SH):** provides private or semi-private temporary shelter and services to people with severe mental illness and are limited to serving no more than 25 people within a facility | •**Rapid Rehousing (RRH):** a housing model designed to provide temporary housing assistance to people experiencing homelessness, moving them quickly out of homelessness and into permanent housing<br><br>•**Permanent Supportive Housing (PSH):** a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were experiencing homelessness when they entered the program and are now considered as having formerly experienced homelessness. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability to be eligible.<br><br>•**Other Permanent Housing (OPH):** a housing model with or without services that is designed specifically for people who formerly experienced homelessness. OPH does not have a disability requirement. |

## *7.1     Types of Programs in the National Inventory*

Communities across the country submit data each year on their residential programs for people experiencing homelessness and their programs that help people end their experiences of homelessness and move into housing. The two basic types of programs are shelter programs for people experiencing homelessness and housing programs for people who formerly experienced homelessness. Communities report the number of beds that are available for both types of programs at the same time each January when they conduct Point-in-Time (PIT) counts. The national inventory is the total number of beds in all communities, as reported through the housing inventory count (HIC).

1) **Shelter** is intended to serve people currently experiencing homelessness and is made up of two main types of programs, emergency shelters (ES) and transitional housing programs (TH). By design, ES is shorter-term and provides less intensive services than

HUD-AR-00978

TH.[17] Shelter also includes a small number of programs, called safe havens (SH), for individuals who have been identified as having higher needs such as severe mental illness. The sheltered data only reports on beds that are available during the entire year. While the HIC includes information on beds available during severe weather events (storms, fires, extreme cold), during seasonal timeframes (open only during specific weeks or months), and beds made available when the number of people seeking shelter exceeds capacity (overflow beds), the focus of this analysis is on the year-round inventory. This information reflects the planned capacity communities rely on to meet the current needs of people experiencing homelessness.

2) **Permanent housing** is intended to serve people who were experiencing homelessness at the time they were enrolled in a permanent housing program. Once the program helps a household (an individual or family) find a housing unit, that housing is considered permanent in the sense that the household has a lease (or similar agreement) and may be able to stay in the same housing unit long-term. This category includes rapid rehousing (RRH), a short-term subsidy in a housing unit in which the individual or family may be able to remain after the subsidy ends; permanent supportive housing (PSH), housing with a long-term subsidy and supportive services for people with disabilities; and other permanent housing (OPH), which also is intended for people transitioning out of experiencing homelessness but is not restricted to people with disabilities. The information on permanent housing shows the planned capacity of communities to use these programs to help people no longer experience homelessness. Only programs considered by the Continuum of Care (CoC) to be part of the homelessness services system are included in the HIC as OPH. Communities may use other programs to help people transition out of experiencing homelessness.[18]

> **Data on People Living in Permanent Housing**
>
> People living in permanent housing programs are not included in the PIT count. However, information on the number of people served in rapid rehousing and permanent supportive housing programs over the course of a year can be found in the AHAR Part 2.

---

[17] Some transitional housing programs provide housing in which the individual or family may be able to stay after the transitional period with intensive services ending (sometimes called "transition-in-place"), and some emergency shelters have intensive services. Communities decide how to categorize their programs when reporting data to HUD.

[18] Additional programs or housing supports may house people experiencing homelessness or transitioning out of homelessness. However, to be included on the HIC, the beds and units must be dedicated to serving persons experiencing homelessness, or for permanent housing projects, dedicated for persons who were experiencing homelessness at entry. Beds in institutional settings not specifically dedicated for persons who are experiencing homelessness, including detox facilities, emergency rooms, jails, and acute crisis or treatment centers are not included in the HIC.

HUD-AR-00979

**BED INVENTORY**

**Exhibit 7-2: Distribution of the National Bed Inventory by Program Type, 2024**

A total of 1,190,565 year-round beds in communities across the nation were dedicated to serving people who are currently experiencing homelessness (43% of inventory) or transitioning out of homelessness (57% of inventory).



Note: A small percentage of safe haven beds (0.2%) are in the national inventory but are not included in the exhibit.

HUD-AR-00980

**Exhibit 7-3: Inventory of Beds in Shelters and Permanent Housing, 2007-2024**



Note: The small share of Safe Haven beds (0.2%) is not included in this exhibit.

HUD-AR-00981

The COVID-19 pandemic resulted in significant changes to the national inventory. At the time of the 2021 HIC, precautions taken to reduce the spread of the COVID-19 virus resulted in considerable changes to the capacity of homelessness service providers. Shortly after the onset of the pandemic, Congress appropriated significant funding to support additional inventory (see the box at the end of this chapter for more information).

**Exhibit 7-4: Changes in the Inventory of Beds in Shelters and Permanent Housing, 2007-2024**



The total national inventory for people experiencing homelessness (i.e., the emergency shelter, transitional housing, and safe havens inventory) has increased by about 87,000 beds since 2007. This change was driven by increases in the number of emergency shelter beds (210,522 more beds) that exceeded declines in transitional housing beds (125,720 fewer beds) over the same time period.

Between 2020—the last pre-pandemic housing inventory count—and 2024, the number of available beds for people experiencing homelessness increased by 29 percent (113,561 more beds).

> "EVEN IF ALL OF THE OPH, PSH, ES, AND TH BEDS WERE FULL ON THE NIGHT OF THE COUNT, THERE WOULD BE MORE PEOPLE EXPERIENCING HOMELESSNESS THEN BEDS AVAILABLE TO HOST EVERYONE EXPERIENCING HOMELESSNESS. DUE TO THE ECONOMIC IMPACTS OF INFLATION IN COMBINATION WITH THE LACK OF AFFORDABLE HOUSING, THERE HAS BEEN AN INCREASE IN FOLKS EXPERIENCING HOMELESSNESS, AND THAT HAS RESULTED IN SEEING AN INCREASE IN FOLKS EXPERIENCING UNSHELTERED HOMELESSNESS AS WELL"
>
> CoC in the Midwest

HUD-AR-00982

*Beds Dedicated to Veterans, Youth, and People Experiencing Chronic Patterns of Homelessness*

**Exhibit 7-5: Inventory of Year-Round Beds for Special Populations, 2024**

| Bed Type | Total Beds | Beds for People Experiencing Chronic Patterns of Homelessness | | Beds for Veterans | | Beds for Youth | |
|---|---|---|---|---|---|---|---|
| | # | # | % | # | % | # | % |
| **Emergency Shelter** | 421,973 | | | 3,863 | 0.9% | 7,524 | 1.8% |
| **Transitional Housing** | 85,485 | N/A | | 11,037 | 12.9% | 9,976 | 11.7% |
| **Safe Haven** | 2,252 | | | 1,343 | 59.6% | 10 | 0.4% |
| **Rapid Rehousing** | 146,652 | | | 22,828 | 15.6% | 8,228 | 5.6% |
| **Permanent Supportive Housing** | 397,241 | 160,475 | 40.4% | 109,891 | 27.7% | 4,971 | 1.3% |
| **Other Permanent Housing** | 136,962 | N/A | | 3,681 | 2.7% | 3,170 | 2.3% |
| **Total Beds** | **1,190,565** | **160,475** | **13.5%** | **152,643** | **12.8%** | **33,879** | **2.8%** |

Note: Only PSH programs funded by HUD can report dedicated beds for people experiencing chronic patterns of homelessness on the HIC. According to the Fiscal Year 2024 HMIS data standards, "a dedicated bed is a bed that must be filled by a person in the subpopulation category (or a member of their household) unless there are no persons from the subpopulation who qualify for the project located within the geographic area." Beds can be dedicated to more than one population, for example, a bed may be dedicated to veterans experiencing chronic homelessness. For more information, see pages 40-41 of the HMIS Data Standards Manual: https://files.hudexchange.info/resources/documents/HMIS-Data-Standards-Manual-2024.pdf

Thirteen percent of all beds in the national inventory (152,643 beds) were dedicated to veterans experiencing homelessness and their family members. Housing types with the most beds dedicated to veterans experiencing homelessness were safe havens (60% of all safe haven beds) followed by PSH (28% of all PSH beds).

HUD-AR-00983

**Exhibit 7-6: Inventory of PSH Beds for People Experiencing Chronic Homelessness, 2007-2024**

| Year | Number of Beds |
|------|----------------|
| 2007 | 37,807 |
| 2008 | 42,298 |
| 2009 | 50,602 |
| 2010 | 55,256 |
| 2011 | 67,964 |
| 2012 | 74,693 |
| 2013 | 81,666 |
| 2014 | 94,282 |
| 2015 | 95,066 |
| 2016 | 111,390 |
| 2017 | 149,005 |
| 2018 | 168,503 |
| 2019 | 181,505 |
| 2020 | 179,569 |
| 2021 | 173,457 |
| 2022 | 178,545 |
| 2023 | 178,681 |
| 2024 | 160,475 |

| | Change 2023-2024 | | Change 2007–2024 | |
|---|---|---|---|---|
| | # | % | # | % |
| **PSH Beds for People Experiencing Chronic Homelessness** | -18,206 | -10.1% | 122,668 | 324.5% |

CoCs reported a slight decline in the number of PSH beds for people who experience chronic patterns of homelessness between 2023 and 2024 (a decline of 18,206 beds). Despite this, the PSH inventory has increased over three-fold (325%) since 2007.

HUD-AR-00984

## 7.2    Beds by CoC Category, 2024

***Continuums of Care (CoC) were divided into four geographic categories***

(1) Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

(2) Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

(3) Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

(4) Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 7-7: Inventory of Year-Round Beds by Program Type and CoC Category, 2024\***



\*Excludes safe haven inventory, which accounts for between 0.1% and 0.3% of beds across the four CoC categories.

In rural CoCs, the split of inventory for people currently experiencing homelessness and people transitioning out of homelessness is roughly even (49% vs 51%). Other largely urban CoCs have significantly more bed inventory for people transitioning out of homelessness than for people currently experiencing homelessness (63% vs 37%).

HUD-AR-00985

**Context for Changes in the National Inventory, 2021-2024**

In response to the COVID-19 pandemic, the U.S. Government passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) in March 2020. As part of the CARES Act, Congress appropriated $4 billion to the Emergency Solutions Grants - Coronavirus (ESG-CV) program to help communities support additional homeless assistance and prevention activities. ESG recipients could use ESG-CV funds for additional sponsor-based rental assistance, hotel or motel costs for people experiencing homelessness, and temporary emergency shelters. HUD required that at least 50 percent of funds be drawn by June 2022 and all ESG-CV funds be fully spent by the end of 2023 (with the exception of reallocated funds, which could be spent through June 2024). As such, the impact of ESG-CV funds on bed inventory was greatest in 2021 and 2022. The share of the total inventory for people currently experiencing homelessness that was funded using ESG-CV funds increased from 14 percent in 2021 to 19 percent in 2022 but declined to 8 percent in 2023 and just 3 percent in 2024 as ESG recipients spent down remaining ESG-CV funds in anticipation of the spending deadline. ESG-CV funds were also used to support an increase in the rapid re-housing inventory. In 2021, 10 percent of all rapid re-housing was funded using ESG-CV funds, and by 2022 this had peaked at 34 percent. However, by 2023, the share of rapid rehousing funded by ESG-CV went back down to 10 percent, and by 2024 it was just 1 percent.

In March 2021, Congress passed the American Rescue Plan Act (ARPA) which included $1.1 billion in funding to support Emergency Housing Vouchers (EHV). EHVs are used to provide housing support to people experiencing homelessness or at risk of homelessness. The HIC captures data on OPH and PSH that was supported using EHV funds. CoCs mainly recorded EHV in the HIC as additional OPH inventory. At the time of the 2022 HIC, 34 percent of all OPH and one percent of PSH inventory was supported by EHV funding. In 2023 and 2024, this reached 44 percent for OPH and declined to under one percent for PSH, in accordance with HUD guidance on how to record EHV in the HIC.

**Exhibit 7-8: Inventory of Beds Funded by Coronavirus Relief-Related Funding, 2021-2023**

| | 2021 | | 2022 | | | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bed Inventory (#) | ESG-CV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) |
| Emergency Shelter, Safe Haven, and Transitional Housing Inventory | 396,466 | 14% | 418,642 | 19% | | 449,567 | 8% | | 509,710 | 3% | |
| RRH Inventory | 137,206 | 10% | 149,866 | 34% | | 144,765 | 10% | | 146,652 | 1% | |
| OPH Inventory | 53,856 | | 90,098 | | 34% | 122,227 | | 44% | 136,962 | | 44% |
| PSH Inventory | 376,709 | | 387,305 | | 1% | 395,986 | | 0.5% | 397,241 | | 0.8% |

Note: ESG-CV funding is only available for ES and RRH inventory and was in use by the time of the 2021 HIC. EHV funding can be used to support OPH and PSH housing and was in use by the time of the 2022 HIC. Inventory included is limited to year-round, current inventory.

HUD-AR-00986

## Appendix A: State-Level Data

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 4,601 | 39.3% | -15.6% | 2,698 | 58.6% | 1,903 | 41.4% | 9 | 3,430 | 1,171 | 182 | 291 | 533 |
| Alaska | 2,686 | 2.8% | 63.6% | 479 | 17.8% | 2,207 | 82.2% | 37 | 2,019 | 667 | 197 | 106 | 781 |
| Arizona | 14,737 | 3.5% | 0.6% | 7,291 | 49.5% | 7,446 | 50.5% | 20 | 11,640 | 3,097 | 821 | 994 | 774 |
| Arkansas | 2,783 | 6.7% | -27.5% | 1,334 | 47.9% | 1,449 | 52.1% | 9 | 2,035 | 748 | 125 | 226 | 3,497 |
| California | 187,084 | 3.1% | 34.6% | 123,974 | 66.3% | 63,110 | 33.7% | 48 | 161,445 | 25,639 | 9,052 | 9,310 | 66,548 |
| Colorado | 18,715 | 29.6% | 31.6% | 4,791 | 25.6% | 13,924 | 74.4% | 32 | 10,196 | 8,519 | 591 | 978 | 4,059 |
| Connecticut | 3,410 | 13.1% | -23.9% | 574 | 16.8% | 2,836 | 83.2% | 9 | 2,302 | 1,108 | 174 | 174 | 81 |
| Delaware | 1,358 | 9.1% | 28.0% | 238 | 17.5% | 1,120 | 82.5% | 13 | 803 | 555 | 29 | 89 | 1,386 |
| District of Columbia | 5,616 | 14.1% | 5.6% | 900 | 16.0% | 4,716 | 84.0% | 83 | 3,960 | 1,656 | 420 | 213 | 224 |
| Florida | 31,362 | 2.0% | -34.8% | 16,868 | 53.8% | 14,494 | 46.2% | 14 | 23,799 | 7,563 | 1,367 | 2,333 | 6,100 |
| Georgia | 12,290 | 0.0% | -37.4% | 6,673 | 54.3% | 5,617 | 45.7% | 11 | 9,562 | 2,728 | 578 | 646 | 1,633 |
| Hawaii | 11,637 | 87.0% | 91.7% | 4,042 | 34.7% | 7,595 | 65.3% | 81 | 7,145 | 4,492 | 351 | 283 | 1,567 |
| Idaho | 2,750 | 19.7% | 57.2% | 1,374 | 50.0% | 1,376 | 50.0% | 14 | 1,631 | 1,119 | 88 | 209 | 531 |
| Illinois | 25,832 | 116.2% | 66.8% | 2,664 | 10.3% | 23,168 | 89.7% | 21 | 12,310 | 13,522 | 1,947 | 559 | 381 |

HUD-AR-00987

APPENDIX A

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | 6,285 | 4.5% | -14.6% | 1,477 | 23.5% | 4,808 | 76.5% | 9 | 4,584 | 1,701 | 273 | 422 | 1,884 |
| Iowa | 2,631 | -0.8% | -3.8% | 464 | 17.6% | 2,167 | 82.4% | 8 | 1,903 | 728 | 137 | 135 | 598 |
| Kansas | 2,793 | 6.0% | 32.3% | 904 | 32.4% | 1,889 | 67.6% | 9 | 2,109 | 684 | 156 | 211 | 764 |
| Kentucky | 5,231 | 9.8% | -35.1% | 1,716 | 32.8% | 3,515 | 67.2% | 12 | 4,105 | 1,126 | 290 | 391 | 987 |
| Louisiana | 3,469 | 9.5% | -36.9% | 1,558 | 44.9% | 1,911 | 55.1% | 8 | 2,861 | 608 | 205 | 223 | 446 |
| Maine | 2,702 | -36.5% | 2.4% | 273 | 10.1% | 2,429 | 89.9% | 19 | 1,548 | 1,154 | 181 | 115 | 1,984 |
| Maryland | 6,069 | 3.5% | -37.0% | 1,036 | 17.1% | 5,033 | 82.9% | 10 | 4,126 | 1,943 | 254 | 312 | 789 |
| Massachusetts | 29,360 | 53.4% | 94.1% | 1,635 | 5.6% | 27,725 | 94.4% | 42 | 6,966 | 22,394 | 564 | 550 | 459 |
| Michigan | 9,739 | 8.2% | -65.6% | 1,623 | 16.7% | 8,116 | 83.3% | 10 | 5,882 | 3,857 | 565 | 456 | 976 |
| Minnesota | 9,201 | 9.6% | 25.6% | 2,084 | 22.6% | 7,117 | 77.4% | 16 | 5,013 | 4,188 | 782 | 299 | 1,707 |
| Mississippi | 1,041 | 6.0% | -24.4% | 486 | 46.7% | 555 | 53.3% | 4 | 874 | 167 | 44 | 40 | 1,534 |
| Missouri | 7,312 | 9.0% | 17.0% | 2,384 | 32.6% | 4,928 | 67.4% | 12 | 5,162 | 2,150 | 501 | 513 | 84 |
| Montana | 2,008 | -7.8% | 74.6% | 576 | 28.7% | 1,432 | 71.3% | 18 | 1,466 | 542 | 122 | 168 | 423 |
| Nebraska | 2,720 | 10.5% | -23.0% | 301 | 11.1% | 2,419 | 88.9% | 14 | 2,020 | 700 | 154 | 129 | 1,824 |
| Nevada | 10,106 | 16.6% | 16.9% | 4,914 | 48.6% | 5,192 | 51.4% | 32 | 8,404 | 1,702 | 545 | 644 | 102 |

HUD-AR-00988

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Hampshire | 2,245 | -8.0% | -0.1% | 579 | 25.8% | 1,666 | 74.2% | 16 | 1,516 | 729 | 118 | 128 | 645 |
| New Jersey | 12,762 | 24.3% | -26.3% | 1,767 | 13.8% | 10,995 | 86.2% | 14 | 8,194 | 4,568 | 515 | 521 | 575 |
| New Mexico | 4,631 | 20.5% | 53.6% | 2,242 | 48.4% | 2,389 | 51.6% | 22 | 3,744 | 887 | 207 | 298 | 1,846 |
| New York | 158,019 | 53.1% | 152.4% | 5,638 | 3.6% | 152,381 | 96.4% | 81 | 62,562 | 95,457 | 7,671 | 1,180 | 1,700 |
| North Carolina | 11,626 | 19.2% | -1.5% | 4,523 | 38.9% | 7,103 | 61.1% | 11 | 8,396 | 3,230 | 524 | 688 | 3,093 |
| North Dakota | 865 | 10.3% | 36.0% | 190 | 22.0% | 675 | 78.0% | 11 | 646 | 219 | 83 | 44 | 5,077 |
| Ohio | 11,759 | 3.3% | 4.4% | 2,379 | 20.2% | 9,380 | 79.8% | 10 | 8,402 | 3,357 | 815 | 589 | 1,429 |
| Oklahoma | 5,467 | 17.6% | 29.5% | 2,216 | 40.5% | 3,251 | 59.5% | 13 | 4,407 | 1,060 | 450 | 304 | 1,344 |
| Oregon | 22,875 | 13.6% | 30.0% | 14,191 | 62.0% | 8,684 | 38.0% | 54 | 18,923 | 3,952 | 1,315 | 1,407 | 7,707 |
| Pennsylvania | 14,088 | 12.2% | -13.1% | 2,635 | 18.7% | 11,453 | 81.3% | 11 | 9,524 | 4,564 | 690 | 719 | 2,140 |
| Rhode Island | 2,442 | 34.9% | 78.0% | 534 | 21.9% | 1,908 | 78.1% | 22 | 1,565 | 877 | 73 | 130 | 756 |
| South Carolina | 4,593 | 13.3% | -18.9% | 1,846 | 40.2% | 2,747 | 59.8% | 9 | 3,703 | 890 | 269 | 388 | 894 |
| South Dakota | 1,338 | 4.4% | 131.1% | 227 | 17.0% | 1,111 | 83.0% | 15 | 1,044 | 294 | 147 | 42 | 151 |
| Tennessee | 8,280 | -10.1% | -26.1% | 4,348 | 52.5% | 3,932 | 47.5% | 12 | 6,640 | 1,640 | 399 | 570 | 1,577 |
| Texas | 27,987 | 2.2% | -29.7% | 12,339 | 44.1% | 15,648 | 55.9% | 9 | 21,648 | 6,339 | 1,355 | 1,837 | 5,028 |

HUD-AR-00989

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | 3,869 | 4.9% | 28.5% | 1,008 | 26.1% | 2,861 | 73.9% | 11 | 2,923 | 946 | 240 | 121 | 869 |
| Vermont | 3,458 | 4.9% | 234.1% | 167 | 4.8% | 3,291 | 95.2% | 53 | 2,153 | 1,305 | 131 | 108 | 918 |
| Virginia | 7,141 | 5.6% | -26.7% | 1,581 | 22.1% | 5,560 | 77.9% | 8 | 4,665 | 2,476 | 309 | 389 | 640 |
| Washington | 31,554 | 12.5% | 35.0% | 16,222 | 51.4% | 15,332 | 48.6% | 40 | 24,320 | 7,234 | 1,723 | 1,780 | 11,986 |
| West Virginia | 1,779 | 25.6% | -26.2% | 788 | 44.3% | 991 | 55.7% | 10 | 1,592 | 187 | 108 | 132 | 603 |
| Wisconsin | 5,049 | 3.9% | -10.6% | 510 | 10.1% | 4,539 | 89.9% | 9 | 3,136 | 1,913 | 216 | 351 | 357 |
| Wyoming | 501 | -5.8% | -6.7% | 89 | 17.8% | 412 | 82.2% | 9 | 399 | 102 | 80 | 37 | 94 |

HUD-AR-00990

# Appendix B: Additional Data on People Experiencing Homelessness in 2024

### *Changes to the 2024 PIT Demographic Reporting Options.*

In 2024, HUD changed the way data on race, ethnicity, and gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. These updates in reporting options aligned with updates made to the FY2024 HMIS Data Standards.

### *Updates to Race and Ethnicity Reporting:*

HUD combined the race and ethnicity options into a single element that allowed people to select one or more race and ethnic identities from the list below.

1) American Indian, Alaska Native, or Indigenous
2) Asian or Asian American
3) Black, African American, or African
4) Hispanic/Latina/e/o
5) Middle Eastern or North African
6) Native Hawaiian or Pacific Islander
7) White

When reporting race and ethnicity for the PIT Count, CoCs were required to report race and ethnicity using the following categories. Under these categories, people were only included in a single race/ethnicity if the person identified with only one race/ethnicity identity (e.g., Black, African American, or African). Selecting the multi-racial reporting option indicates that the person identified with more than one race.

1) American Indian, Alaska Native, or Indigenous
2) American Indian, Alaska Native, or Indigenous & Hispanic/Latina/e/o
3) Asian or Asian American
4) Asian or Asian American & Hispanic/Latina/e/o
5) Black, African American, or African
6) Black, African American, or African & Hispanic/Latina/e/o
7) Hispanic/Latina/e/o
8) Middle Eastern or North African
9) Middle Eastern or North African & Hispanic/Latina/e/o
10) Native Hawaiian or Pacific Islander
11) Native Hawaiian or Pacific Islander & Hispanic/Latina/e/o
12) White
13) White & Hispanic/Latina/e/o
14) Multi-Racial & Hispanic/Latina/e/o
15) Multi-Racial (not Hispanic/Latina/e/o)

### *Updates to Gender Reporting*

Following the updates made to the FY2024 HMIS Data Standards, the gender response options were also updated to allow for the following response options:

1) Woman (Girl if child)
2) Man (Boy if child)

HUD-AR-00991

3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity

When reporting gender for the PIT Count, people could select as many response options as applied to their gender identity. When reporting for the PIT count, CoCs were required to report genders based on the following categories. Under these categories, people were only included in a single gender if the person identified with only one gender identity (e.g., Transgender). More than one gender means that the person identified with more than one gender.

1) Woman (Girl if child)
2) Man (Boy if child)
3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity
8) More Than One Gender

HUD-AR-00992

## B-1: Additional Data on All People Experiencing Homelessness

**Exhibit B1-1: Demographic Characteristics of People Experiencing Homelessness, 2024**

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 771,480 | 100% | 497,256 | 100% | 274,224 | 100% |
| **Age** | | | | | | |
| **Under 18** | 148,238 | 19.2% | 137,159 | 27.6% | 11,079 | 4.0% |
| **18 to 24** | 57,640 | 7.5% | 43,232 | 8.7% | 14,408 | 5.3% |
| **25-34** | 146,859 | 19.0% | 95,216 | 19.1% | 51,643 | 18.8% |
| **35-44** | 153,849 | 19.9% | 84,122 | 16.9% | 69,727 | 25.4% |
| **45-54** | 118,740 | 15.4% | 58,215 | 11.7% | 60,525 | 22.1% |
| **55-64** | 104,007 | 13.5% | 54,989 | 11.1% | 49,018 | 17.9% |
| **65 and over** | 42,147 | 5.5% | 24,323 | 4.9% | 17,824 | 6.5% |
| **Gender** | | | | | | |
| **Woman (girl)** | 302,660 | 39.2% | 218,628 | 44.0% | 84,032 | 30.6% |
| **Man (boy)** | 459,568 | 59.6% | 274,680 | 55.2% | 184,888 | 67.4% |
| **Transgender** | 2,561 | 0.3% | 1,501 | 0.3% | 1,060 | 0.4% |
| **Gender Questioning** | 383 | 0.0% | 74 | 0.0% | 309 | 0.1% |
| **Culturally Specific Identity** | 324 | 0.0% | 71 | 0.0% | 253 | 0.1% |
| **Different Identity** | 720 | 0.1% | 174 | 0.0% | 546 | 0.2% |
| **Non Binary** | 1,977 | 0.3% | 1,001 | 0.2% | 976 | 0.4% |
| **More Than One Gender** | 3,287 | 0.4% | 1,127 | 0.2% | 2,160 | 0.8% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 4,272 | 0.6% | 2,758 | 0.6% | 1,514 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 16,894 | 2.2% | 8,074 | 1.6% | 8,820 | 3.2% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 793 | 0.1% | 409 | 0.1% | 384 | 0.1% |
| **Asian or Asian American Only** | 10,401 | 1.3% | 6,315 | 1.3% | 4,086 | 1.5% |
| **Black African American or African and Hispanic/Latina/e/o** | 15,967 | 2.1% | 13,680 | 2.8% | 2,287 | 0.8% |
| **Black African American or African Only** | 227,769 | 29.5% | 168,206 | 33.8% | 59,563 | 21.7% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 499 | 0.1% | 402 | 0.1% | 97 | 0.0% |
| **Middle Eastern or North African Only** | 1,513 | 0.2% | 881 | 0.2% | 632 | 0.2% |

HUD-AR-00993

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 1,071 | 0.1% | 703 | 0.1% | 368 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 10,312 | 1.3% | 5,865 | 1.2% | 4,447 | 1.6% |
| **White and Hispanic/Latina/e/o** | 51,376 | 6.7% | 40,487 | 8.1% | 10,889 | 4.0% |
| **White Only** | 244,280 | 31.7% | 125,971 | 25.3% | 118,309 | 43.1% |
| **Multi-Racial and Hispanic/Latina/e/o** | 6,841 | 0.9% | 3,991 | 0.8% | 2,850 | 1.0% |
| **Multi-Racial All Other** | 24,346 | 3.2% | 13,088 | 2.6% | 11,258 | 4.1% |
| **Hispanic/Latina/e/o Only** | 155,146 | 20.1% | 106,426 | 21.4% | 48,720 | 17.8% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all people experiencing homelessness and people experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

HUD-AR-00994

**Exhibit B1-2: Changes in the Demographic Characteristics of People Experiencing Homelessness, 2023-2024**

| | Change in All People | | Change in Sheltered People | | Change in Unsheltered People | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 118,376 | 18.1% | 100,762 | 25.4% | 17,614 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | 36,618 | 32.8% | 36,087 | 35.7% | 531 | 5.0% |
| **18 to 24** | 10,204 | 21.5% | 10,570 | 32.4% | -366 | -2.5% |
| **25-34** | 27,977 | 23.5% | 25,081 | 35.8% | 2,896 | 5.9% |
| **35-44** | 23,462 | 18.0% | 17,587 | 26.4% | 5,875 | 9.2% |
| **45-54** | 12,050 | 11.3% | 6,590 | 12.8% | 5,460 | 9.9% |
| **55-64** | 5,614 | 5.7% | 2,936 | 5.6% | 2,678 | 5.8% |
| **65 and over** | 2,451 | 6.2% | 1,911 | 8.5% | 540 | 3.1% |
| **Gender** | | | | | | |
| **Woman (girl)** | 52,651 | 21.1% | 45,773 | 26.5% | 6,878 | 8.9% |
| **Man (boy)** | 64,408 | 16.3% | 54,410 | 24.7% | 9,998 | 5.7% |
| **Transgender** | -1,526 | -37.3% | -394 | -20.8% | -1,132 | -51.6% |
| **Gender Questioning** | -376 | -49.5% | -189 | -71.9% | -187 | -37.7% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,112 | -36.0% | -210 | -17.3% | -902 | -48.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 56,629 | 31.6% | 56,418 | 50.2% | 211 | 0.3% |
| **Not Hispanic/Latina/e/o** | 61,747 | 13.0% | 44,344 | 15.6% | 17,403 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,950 | -8.4% | 358 | 3.4% | -2,308 | -18.3% |
| **Asian or Asian American** | -380 | -3.3% | 2,276 | 51.2% | -2,656 | -37.3% |
| **Black African American or African** | 112 | 0.0% | 5,561 | 3.2% | -5,449 | -8.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 671 | 6.3% | 2,054 | 45.5% | -1,383 | -22.3% |
| **White** | -29,198 | -9.0% | -12,324 | -6.9% | -16,874 | -11.6% |
| **Multi-Racial** | -8,037 | -20.5% | -4,872 | -22.2% | -3,165 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

HUD-AR-00995

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B1-3: Largest Changes in People Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| New York | 54,819 | 53.1% | New York | 95,418 | 152.4% |
| Illinois | 13,885 | 116.2% | California | 48,098 | 34.6% |
| Massachusetts | 10,219 | 53.4% | Massachusetts | 14,233 | 94.1% |
| California | 5,685 | 3.1% | Illinois | 10,345 | 66.8% |
| Hawaii | 5,414 | 87.0% | Washington | 8,175 | 35.0% |
| Largest Decreases | | | | | |
| Maine | -1,556 | -36.5% | Florida | -16,707 | -34.8% |
| Tennessee | -935 | -10.1% | Texas | -11,801 | -29.7% |
| New Hampshire | -196 | -8.0% | Georgia | -7,349 | -37.4% |
| Montana | -170 | -7.8% | New Jersey | -4,552 | -26.3% |
| Wyoming | -31 | -5.8% | Maryland | -3,559 | -37.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B1-4: Percent of All People Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-00996

## B-2: Additional Data on Individuals Experiencing Homelessness

**Exhibit B2-1: Changes in Numbers of Individuals Experiencing Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Individuals** | 99,307 | 24.1% | 116,867 | 29.6% | 103,116 | 25.2% | 44,987 | 9.6% |
| **Sheltered Individuals** | 43,267 | 20.3% | 44,122 | 20.8% | 56,862 | 28.5% | 28,545 | 12.5% |
| **Unsheltered Individuals** | 56,040 | 28.1% | 72,745 | 39.8% | 46,254 | 22.1% | 16,442 | 6.9% |

**Exhibit B2-2: Demographic Characteristics of Individuals Experiencing Homelessness, 2024**

|  | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 512,007 | 100% | 256,340 | 100% | 255,667 | 100% |
| **Age** | | | | | | |
| **Under 18** | 2,823 | 0.6% | 1,709 | 0.7% | 1,114 | 0.4% |
| **18 to 24** | 39,267 | 7.7% | 25,957 | 10.1% | 13,310 | 5.2% |
| **25-34** | 98,052 | 19.2% | 49,192 | 19.2% | 48,860 | 19.1% |
| **35-44** | 120,646 | 23.6% | 53,565 | 20.9% | 67,081 | 26.2% |
| **45-54** | 108,668 | 21.2% | 49,491 | 19.3% | 59,177 | 23.1% |
| **55-64** | 101,259 | 19.8% | 52,763 | 20.6% | 48,496 | 19.0% |
| **65 and over** | 41,292 | 8.1% | 23,663 | 9.2% | 17,629 | 6.9% |
| **Gender** | | | | | | |
| **Woman (girl)** | 153,477 | 30.0% | 79,589 | 31.0% | 73,888 | 28.9% |
| **Man (boy)** | 350,056 | 68.4% | 173,376 | 67.6% | 176,680 | 69.1% |
| **Transgender** | 2,449 | 0.5% | 1,411 | 0.6% | 1,038 | 0.4% |
| **Gender Questioning** | 356 | 0.1% | 60 | 0.0% | 296 | 0.1% |
| **Culturally Specific Identity** | 280 | 0.1% | 34 | 0.0% | 246 | 0.1% |
| **Different Identity** | 640 | 0.1% | 107 | 0.0% | 533 | 0.2% |
| **Non Binary** | 1,766 | 0.3% | 824 | 0.3% | 942 | 0.4% |
| **More Than One Gender** | 2,983 | 0.6% | 939 | 0.4% | 2,044 | 0.8% |
| **Race/Ethnicity** | | | | | | |

HUD-AR-00997

| | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 3,007 | 0.6% | 1,575 | 0.6% | 1,432 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 13,708 | 2.7% | 5,388 | 2.1% | 8,320 | 3.3% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 610 | 0.1% | 233 | 0.1% | 377 | 0.1% |
| **Asian or Asian American Only** | 7,652 | 1.5% | 3,765 | 1.5% | 3,887 | 1.5% |
| **Black African American or African and Hispanic/Latina/e/o** | 6,160 | 1.2% | 4,147 | 1.6% | 2,013 | 0.8% |
| **Black African American or African Only** | 140,174 | 27.4% | 85,562 | 33.4% | 54,612 | 21.4% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 418 | 0.1% | 321 | 0.1% | 97 | 0.0% |
| **Middle Eastern or North African Only** | 1,151 | 0.2% | 566 | 0.2% | 585 | 0.2% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 738 | 0.1% | 389 | 0.2% | 349 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 5,393 | 1.1% | 2,154 | 0.8% | 3,239 | 1.3% |
| **White and Hispanic/Latina/e/o** | 28,912 | 5.6% | 18,885 | 7.4% | 10,027 | 3.9% |
| **White Only** | 204,446 | 39.9% | 92,268 | 36.0% | 112,178 | 43.9% |
| **Multi-Racial and Hispanic/Latina/e/o** | 4,102 | 0.8% | 1,637 | 0.6% | 2,465 | 1.0% |
| **Multi-Racial All Other** | 16,796 | 3.3% | 6,414 | 2.5% | 10,382 | 4.1% |
| **Hispanic/Latina/e/o Only** | 78,740 | 15.4% | 33,036 | 12.9% | 45,704 | 17.9% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

HUD-AR-00998

**Exhibit B2-3: Changes in the Demographic Characteristics of Individuals Experiencing Homelessness, 2023-2024**

| | Change in All Individuals | | Change in Sheltered Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 44,987 | 9.6% | 28,545 | 12.5% | 16,442 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | -607 | -17.7% | -145 | -7.8% | -462 | -29.3% |
| **18 to 24** | 5,120 | 15.0% | 5,365 | 26.1% | -245 | -1.8% |
| **25-34** | 11,255 | 13.0% | 8,398 | 20.6% | 2,857 | 6.2% |
| **35-44** | 12,731 | 11.8% | 6,960 | 14.9% | 5,771 | 9.4% |
| **45-54** | 9,185 | 9.2% | 3,923 | 8.6% | 5,262 | 9.8% |
| **55-64** | 5,044 | 5.2% | 2,338 | 4.6% | 2,706 | 5.9% |
| **65 and over** | 2,259 | 5.8% | 1,706 | 7.8% | 553 | 3.2% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,146 | 9.4% | 7,083 | 9.8% | 6,063 | 8.9% |
| **Man (boy)** | 30,780 | 9.6% | 21,103 | 13.9% | 9,677 | 5.8% |
| **Transgender** | -1,435 | -36.9% | -336 | -19.2% | -1,099 | -51.4% |
| **Gender Questioning** | -315 | -46.9% | -146 | -70.9% | -169 | -36.3% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,092 | -38.2% | -239 | -22.5% | -853 | -47.5% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 11,911 | 10.8% | 11,717 | 24.2% | 194 | 0.3% |
| **Not Hispanic/Latina/e/o** | 33,076 | 9.3% | 16,828 | 9.4% | 16,248 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,636 | -8.9% | 309 | 4.6% | -1,945 | -16.6% |
| **Asian or Asian American** | -1,802 | -17.9% | 869 | 27.8% | -2,671 | -38.5% |
| **Black African American or African** | -4,255 | -2.8% | 1,800 | 2.0% | -6,055 | -9.7% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -914 | -13.0% | 666 | 35.5% | -1,580 | -30.6% |
| **White** | -22,516 | -8.8% | -7,709 | -6.5% | -14,807 | -10.8% |
| **Multi-Racial** | -4,199 | -16.7% | -1,313 | -14.0% | -2,886 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in

HUD-AR-00999

this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B2-4: Largest Changes in Individuals Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| New York | 13,057 | 26.4% | California | 50,493 | 45.5% |
| California | 5,529 | 3.5% | New York | 34,506 | 123.0% |
| Illinois | 4,408 | 55.8% | Washington | 11,031 | 83.0% |
| Washington | 3,420 | 16.4% | Oregon | 9,052 | 91.7% |
| Oregon | 2,681 | 16.5% | Hawaii | 3,810 | 114.2% |
| **Largest Decreases** | | | | | |
| Tennessee | -975 | -12.8% | Florida | -9,241 | -28.0% |
| Colorado | -602 | -5.6% | Texas | -4,658 | -17.7% |
| Maine | -410 | -20.9% | Georgia | -2,959 | -23.6% |
| Montana | -218 | -12.9% | Tennessee | -1,822 | -21.5% |
| New Hampshire | -132 | -8.0% | Massachusetts | -1,326 | -16.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B2-5: Percent of Individuals Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-01000

## B-3: Additional Data on People in Families with Children Experiencing Homelessness

**Exhibit B3-1: Changes in Numbers of People in Families with Children Experiencing Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All People in Families** | 24,915 | 10.6% | 17,536 | 7.2% | 87,898 | 51.2% | 73,389 | 39.4% |
| **Sheltered People in Families** | 62,588 | 35.1% | 49,591 | 25.9% | 86,008 | 55.5% | 72,217 | 42.8% |
| **Unsheltered People in Families** | -37,673 | -67.0% | -32,055 | -63.3% | 1,890 | 11.3% | 1,172 | 6.7% |

**Exhibit B3-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

|  | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 259,473 | 100% | 240,916 | 100% | 18,557 | 100% |
| **Age** | | | | | | |
| **Under 18** | 145,415 | 56.0% | 135,450 | 56.2% | 9,965 | 53.7% |
| **18 to 24** | 18,373 | 7.1% | 17,275 | 7.2% | 1,098 | 5.9% |
| **25-34** | 48,807 | 18.8% | 46,024 | 19.1% | 2,783 | 15.0% |
| **35-44** | 33,203 | 12.8% | 30,557 | 12.7% | 2,646 | 14.3% |
| **45-54** | 10,072 | 3.9% | 8,724 | 3.6% | 1,348 | 7.3% |
| **55-64** | 2,748 | 1.1% | 2,226 | 0.9% | 522 | 2.8% |
| **65 and over** | 855 | 0.3% | 660 | 0.3% | 195 | 1.1% |
| **Gender** | | | | | | |
| **Woman (girl)** | 149,183 | 57.5% | 139,039 | 57.7% | 10,144 | 54.7% |
| **Man (boy)** | 109,512 | 42.2% | 101,304 | 42.0% | 8,208 | 44.2% |
| **Transgender** | 112 | 0.0% | 90 | 0.0% | 22 | 0.1% |
| **Gender Questioning** | 27 | 0.0% | 14 | 0.0% | 13 | 0.1% |
| **Culturally Specific Identity** | 44 | 0.0% | 37 | 0.0% | 7 | 0.0% |
| **Different Identity** | 80 | 0.0% | 67 | 0.0% | 13 | 0.1% |
| **Non Binary** | 211 | 0.1% | 177 | 0.1% | 34 | 0.2% |
| **More Than One Gender** | 304 | 0.1% | 188 | 0.1% | 116 | 0.6% |
| **Race/Ethnicity** | | | | | | |

HUD-AR-01001

| | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 1,265 | 0.5% | 1,183 | 0.5% | 82 | 0.4% |
| **American Indian Alaska Native or Indigenous Only** | 3,186 | 1.2% | 2,686 | 1.1% | 500 | 2.7% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 183 | 0.1% | 176 | 0.1% | 7 | 0.0% |
| **Asian or Asian American Only** | 2,749 | 1.1% | 2,550 | 1.1% | 199 | 1.1% |
| **Black African American or African and Hispanic/Latina/e/o** | 9,807 | 3.8% | 9,533 | 4.0% | 274 | 1.5% |
| **Black African American or African Only** | 87,595 | 33.8% | 82,644 | 34.3% | 4,951 | 26.7% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 81 | 0.0% | 81 | 0.0% | 0 | 0.0% |
| **Middle Eastern or North African Only** | 362 | 0.1% | 315 | 0.1% | 47 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 333 | 0.1% | 314 | 0.1% | 19 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 4,919 | 1.9% | 3,711 | 1.5% | 1,208 | 6.5% |
| **White and Hispanic/Latina/e/o** | 22,464 | 8.7% | 21,602 | 9.0% | 862 | 4.6% |
| **White Only** | 39,834 | 15.4% | 33,703 | 14.0% | 6,131 | 33.0% |
| **Multi-Racial and Hispanic/Latina/e/o** | 2,739 | 1.1% | 2,354 | 1.0% | 385 | 2.1% |
| **Multi-Racial All Other** | 7,550 | 2.9% | 6,674 | 2.8% | 876 | 4.7% |
| **Hispanic/Latina/e/o Only** | 76,406 | 29.4% | 73,390 | 30.5% | 3,016 | 16.3% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

HUD-AR-01002

**Exhibit B3-3: Changes in the Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2023-2024**

| | Change in All People in Families | | Change in Sheltered People in Families | | Change in Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 73,389 | 39.4% | 72,217 | 42.8% | 1,172 | 6.7% |
| **Age** | | | | | | |
| **Under 18** | 37,225 | 34.4% | 36,232 | 36.5% | 993 | 11.1% |
| **18 to 24** | 5,084 | 38.3% | 5,205 | 43.1% | -121 | -9.9% |
| **25-34** | 16,722 | 52.1% | 16,683 | 56.9% | 39 | 1.4% |
| **35-44** | 10,731 | 47.8% | 10,627 | 53.3% | 104 | 4.1% |
| **45-54** | 2,865 | 39.8% | 2,667 | 44.0% | 198 | 17.2% |
| **55-64** | 570 | 26.2% | 598 | 36.7% | -28 | -5.1% |
| **65 and over** | 192 | 29.0% | 205 | 45.1% | -13 | -6.3% |
| **Gender** | | | | | | |
| **Woman (girl)** | 39,505 | 36.0% | 38,690 | 38.6% | 815 | 8.7% |
| **Man (boy)** | 33,628 | 44.3% | 33,307 | 49.0% | 321 | 4.1% |
| **Transgender** | -91 | -44.8% | -58 | -39.2% | -33 | -60.0% |
| **Gender Questioning** | -61 | -69.3% | -43 | -75.4% | -18 | -58.1% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -20 | -8.7% | 29 | 19.6% | -49 | -59.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 44,718 | 65.2% | 44,701 | 69.9% | 17 | 0.4% |
| **Not Hispanic/Latina/e/o** | 28,671 | 24.4% | 27,516 | 26.3% | 1,155 | 9.1% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -314 | -6.6% | 49 | 1.3% | -363 | -38.4% |
| **Asian or Asian American** | 1,422 | 94.2% | 1,407 | 106.7% | 15 | 7.9% |
| **Black African American or African** | 4,367 | 4.7% | 3,761 | 4.3% | 606 | 13.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 1,585 | 43.2% | 1,388 | 52.6% | 197 | 19.1% |
| **White** | -6,682 | -9.7% | -4,615 | -7.7% | -2,067 | -22.8% |
| **Multi-Racial** | -3,838 | -27.2% | -3,559 | -28.3% | -279 | -18.1% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

HUD-AR-01003

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B3-4: Largest Changes in People in Families with Children Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| **New York** | 41,762 | 77.8% | **New York** | 60,912 | 176.3% |
| **Massachusetts** | 9,512 | 73.8% | **Massachusetts** | 15,559 | 227.6% |
| **Illinois** | 9,477 | 234.3% | **Illinois** | 6,688 | 97.9% |
| **Colorado** | 4,878 | 134.0% | **Hawaii** | 1,757 | 64.2% |
| **Hawaii** | 2,927 | 187.0% | **Vermont** | 869 | 199.3% |
| **Largest Decreases** | | | | | |
| **Maine** | -1,146 | -49.8% | **Florida** | -7,466 | -49.7% |
| **Georgia** | -784 | -22.3% | **Texas** | -7,143 | -53.0% |
| **Florida** | -268 | -3.4% | **Georgia** | -4,390 | -61.7% |
| **New Mexico** | -144 | -14.0% | **New Jersey** | -3,774 | -45.2% |
| **Indiana** | -133 | -7.3% | **Oregon** | -3,767 | -48.8% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B3-5: Percent of People in Families with Children Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-01004

## B-4: Additional Data on Unaccompanied Youth Experiencing Homelessness

**Exhibit B4-1: Changes in Numbers of Unaccompanied Youth Experiencing Homelessness Over Time, 2017-2024**

|  | Total Change 2017-2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **All Unaccompanied Youth** | -133 | -0.3% | 3,960 | 11.6% | 3,467 | 10.0% |
| **Sheltered Unaccompanied Youth** | 6,904 | 37.2% | 8,175 | 47.3% | 4,923 | 24.0% |
| **Unsheltered Unaccompanied Youth** | -7,037 | -35.6% | -4,215 | -24.9% | -1,456 | -10.3% |

**Exhibit B4-2: Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2024**

|  | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 38,170 | 100% | 25,446 | 100% | 12,724 | 100% |
| **Age** | | | | | | |
| **Under 18** | 2,698 | 7.1% | 1,627 | 6.4% | 1,071 | 8.4% |
| **18 to 24** | 35,472 | 92.9% | 23,819 | 93.6% | 11,653 | 91.6% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,607 | 35.6% | 9,266 | 36.4% | 4,341 | 34.1% |
| **Man (boy)** | 22,852 | 59.9% | 15,089 | 59.3% | 7,763 | 61.0% |
| **Transgender** | 551 | 1.4% | 382 | 1.5% | 169 | 1.3% |
| **Gender Questioning** | 82 | 0.2% | 35 | 0.1% | 47 | 0.4% |
| **Culturally Specific Identity** | 50 | 0.1% | 10 | 0.0% | 40 | 0.3% |
| **Different Identity** | 80 | 0.2% | 41 | 0.2% | 39 | 0.3% |
| **Non Binary** | 530 | 1.4% | 362 | 1.4% | 168 | 1.3% |
| **More Than One Gender** | 418 | 1.1% | 261 | 1.0% | 157 | 1.2% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 304 | 0.8% | 169 | 0.7% | 135 | 1.1% |
| **American Indian Alaska Native or Indigenous Only** | 968 | 2.5% | 479 | 1.9% | 489 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 48 | 0.1% | 22 | 0.1% | 26 | 0.2% |

HUD-AR-01005

| | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Asian or Asian American Only** | 605 | 1.6% | 270 | 1.1% | 335 | 2.6% |
| **Black African American or African and Hispanic/Latina/e/o** | 651 | 1.7% | 493 | 1.9% | 158 | 1.2% |
| **Black African American or African Only** | 11,762 | 30.8% | 8,730 | 34.3% | 3,032 | 23.8% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 11 | 0.0% | 2 | 0.0% | 9 | 0.1% |
| **Middle Eastern or North African Only** | 243 | 0.6% | 196 | 0.8% | 47 | 0.4% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 71 | 0.2% | 35 | 0.1% | 36 | 0.3% |
| **Native Hawaiian or Pacific Islander Only** | 312 | 0.8% | 167 | 0.7% | 145 | 1.1% |
| **White and Hispanic/Latina/e/o** | 2,674 | 7.0% | 2,002 | 7.9% | 672 | 5.3% |
| **White Only** | 10,330 | 27.1% | 5,744 | 22.6% | 4,586 | 36.0% |
| **Multi-Racial and Hispanic/Latina/e/o** | 438 | 1.1% | 242 | 1.0% | 196 | 1.5% |
| **Multi-Racial All Other** | 1,482 | 3.9% | 845 | 3.3% | 637 | 5.0% |
| **Hispanic/Latina/e/o Only** | 8,271 | 21.7% | 6,050 | 23.8% | 2,221 | 17.5% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

HUD-AR-01006

**Exhibit B4-3: Changes in the Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2023-2024**

| | Change in All Unaccompanied Youth | | Change in Sheltered Unaccompanied Youth | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 3,467 | 10.0% | 4,923 | 24.0% | -1,456 | -10.3% |
| **Age** | | | | | | |
| **Under 18** | -542 | -16.7% | -105 | -6.1% | -437 | -29.0% |
| **18-24** | 4,009 | 12.7% | 5,028 | 26.8% | -1,019 | -8.0% |
| **Gender** | | | | | | |
| **Woman (girl)** | 431 | 3.3% | 1,051 | 12.8% | -620 | -12.5% |
| **Man (boy)** | 2,977 | 15.0% | 3,789 | 33.5% | -812 | -9.5% |
| **Transgender** | -168 | -23.4% | -84 | -18.0% | -84 | -33.2% |
| **Gender Questioning** | -75 | -47.8% | -34 | -49.3% | -41 | -46.6% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -246 | -31.7% | -111 | -23.5% | -135 | -44.6% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 1,972 | 18.8% | 3,001 | 49.9% | -1,029 | -23.0% |
| **Not Hispanic/Latina/e/o** | 1,456 | 6.0% | 1,883 | 13.0% | -427 | -4.4% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -449 | -26.1% | -111 | -14.6% | -338 | -35.1% |
| **Asian or Asian American** | 5 | 0.8% | 22 | 8.1% | -17 | -4.5% |
| **Black African American or African** | -28 | -0.2% | 242 | 2.7% | -270 | -7.8% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -96 | -20.0% | 20 | 11.0% | -116 | -39.1% |
| **White** | -4,008 | -23.6% | -1,384 | -15.2% | -2,624 | -33.3% |
| **Multi-Racial** | -482 | -20.1% | -114 | -9.5% | -368 | -30.6% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

HUD-AR-01007

**Exhibit B4-4: Largest Changes in Unaccompanied Youth Experiencing Homelessness by State, 2017-2024**

| Change 2023-2024 | | | Change 2017-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| **New York** | 3,203 | 71.7% | **New York** | 4,842 | 171.2% |
| **Illinois** | 949 | 95.1% | **Illinois** | 1,217 | 166.7% |
| **Hawaii** | 175 | 99.4% | **Arizona** | 243 | 42.0% |
| **Florida** | 154 | 12.7% | **District of Columbia** | 192 | 84.2% |
| **Nevada** | 116 | 27.0% | **Ohio** | 120 | 17.3% |
| **Largest Decreases** | | | | | |
| **California** | -1,121 | -11.0% | **California** | -3,910 | -30.2% |
| **Washington** | -303 | -15.0% | **Nevada** | -1,621 | -74.8% |
| **Tennessee** | -160 | -28.6% | **Florida** | -652 | -32.3% |
| **Oregon** | -109 | -7.7% | **Washington** | -412 | -19.3% |
| **Montana** | -61 | -33.3% | **Colorado** | -172 | -22.5% |

**Exhibit B4-5: Percent of Unaccompanied Youth Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-01008

## B-5: Additional Data on Veterans Experiencing Homelessness

**Exhibit B5-1: Changes in Numbers of Veterans Experiencing Homelessness Over Time, 2009-2024**

|  | Total Change 2009-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Veterans** | -40,485 | -55.2% | -41,205 | -55.6% | -4,370 | -11.7% | -2,692 | -7.6% |
| **Sheltered Veterans** | -24,378 | -56.2% | -24,406 | -56.2% | -3,017 | -13.7% | -1,036 | -5.2% |
| **Unsheltered Veterans** | -16,107 | -53.8% | -16,799 | -54.8% | -1,353 | -8.9% | -1,656 | -10.7% |

**Exhibit B5-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

|  | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 32,882 | 100% | 19,031 | 100% | 13,851 | 100% |
| **Gender** | | | | | | |
| **Woman (girl)** | 3,329 | 10.1% | 1,661 | 8.7% | 1,668 | 12.0% |
| **Man (boy)** | 29,189 | 88.8% | 17,252 | 90.7% | 11,937 | 86.2% |
| **Transgender** | 110 | 0.1% | 51 | 0.0% | 59 | 0.1% |
| **Gender Questioning** | 12 | 0.0% | 2 | 0.0% | 10 | 0.1% |
| **Culturally Specific Identity** | 26 | 0.3% | 6 | 0.1% | 20 | 0.6% |
| **Different Identity** | 13 | 0.3% | 1 | 0.3% | 12 | 0.4% |
| **Non Binary** | 105 | 0.0% | 27 | 0.0% | 78 | 0.1% |
| **More Than One Gender** | 98 | 0.3% | 31 | 0.2% | 67 | 0.5% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 139 | 0.4% | 59 | 0.3% | 80 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 898 | 2.7% | 376 | 2.0% | 522 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 14 | 0.0% | 5 | 0.0% | 9 | 0.1% |
| **Asian or Asian American Only** | 376 | 1.1% | 152 | 0.8% | 224 | 1.6% |
| **Black African American or African and Hispanic/Latina/e/o** | 298 | 0.9% | 187 | 1.0% | 111 | 0.8% |
| **Black African American or African Only** | 9,890 | 30.1% | 6,746 | 35.4% | 3,144 | 22.7% |

HUD-AR-01009

| | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 4 | 0.0% | 0 | 0.0% | 4 | 0.0% |
| **Middle Eastern or North African Only** | 53 | 0.2% | 9 | 0.0% | 44 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 32 | 0.1% | 21 | 0.1% | 11 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 308 | 0.9% | 120 | 0.6% | 188 | 1.4% |
| **White and Hispanic/Latina/e/o** | 1,094 | 3.3% | 775 | 4.1% | 319 | 2.3% |
| **White Only** | 16,034 | 48.8% | 9,465 | 49.7% | 6,569 | 47.4% |
| **Multi-Racial and Hispanic/Latina/e/o** | 248 | 0.8% | 94 | 0.5% | 154 | 1.1% |
| **Multi-Racial All Other** | 1,291 | 3.9% | 485 | 2.5% | 806 | 5.8% |
| **Hispanic/Latina/e/o Only** | 2,203 | 6.7% | 537 | 2.8% | 1,666 | 12.0% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

**Exhibit B5-3: Changes in the Demographic Characteristics of Veterans Experiencing Homelessness, 2023-2024**

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | -2,692 | -7.6% | -1,036 | -5.2% | -1,656 | -10.7% |
| **Gender** | | | | | | |
| **Woman (girl)** | -651 | -16.4% | -154 | -8.5% | -497 | -23.0% |
| **Man (boy)** | -2,042 | -6.5% | -896 | -4.9% | -1,146 | -8.8% |
| **Transgender** | -63 | -36.4% | -23 | -31.1% | -40 | -40.4% |
| **Gender Questioning** | -17 | -58.6% | -7 | -77.8% | -10 | -50.0% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -56 | -34.8% | 6 | 28.6% | -62 | -44.3% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | -657 | -14.0% | -154 | -8.4% | -503 | -17.6% |
| **Not Hispanic/Latina/e/o** | -2,035 | -6.6% | -882 | -4.8% | -1,153 | -9.1% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -232 | -18.3% | -26 | -5.6% | -206 | -25.5% |

HUD-AR-01010

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Asian or Asian American | -218 | -35.9% | -26 | -14.2% | -192 | -45.2% |
| Black African American or African | -948 | -8.5% | -270 | -3.7% | -678 | -17.2% |
| Middle Eastern or North African | N/A | N/A | N/A | N/A | N/A | N/A |
| Native Hawaiian or Pacific Islander | -87 | -20.4% | -28 | -16.6% | -59 | -22.9% |
| White | -3,159 | -15.6% | -1,103 | -9.7% | -2,056 | -23.0% |
| Multi-Racial | -308 | -16.7% | -129 | -18.2% | -179 | -15.7% |
| Hispanic/Latina/e/o Only | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B5-4: Largest Changes in Veterans Experiencing Homelessness by State, 2009-2024**

| Change 2023-2024 | | | Change 2009-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| Washington | 96 | 5.7% | Oregon | 130 | 10.2% |
| New York | 82 | 7.5% | Vermont | 47 | 76.5% |
| New Jersey | 67 | 14.8% | Rhode Island | 10 | 8.3% |
| Arizona | 62 | 6.7% | N/A | -- | -- |
| New Mexico | 42 | 16.4% | N/A | -- | -- |
| Largest Decreases | | | | | |
| California | -1,279 | -12.1% | California | -8,663 | -48.2% |
| Nevada | -450 | -41.1% | Florida | -4,802 | -67.3% |
| Florida | -225 | -8.8% | New York | -4,699 | -79.9% |
| Texas | -199 | -9.8% | Texas | -3,654 | -66.5% |
| Tennessee | -189 | -24.9% | Georgia | -2,114 | -76.6% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2009 and 2024.

HUD-AR-01011

**Exhibit B5-5: Percent of Veterans Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-01012

APPENDIX B

## B-6: Additional Data on Individuals with Chronic Patterns of Homelessness

**Exhibit B6-1: Changes in Numbers of Individuals with Chronic Patterns of Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| All Individuals with Chronic Patterns of Homelessness | 32,772 | 27.4% | 46,523 | 43.9% | 42,057 | 38.1% | 9,480 | 6.6% |
| Sheltered Individuals with Chronic Patterns of Homelessness | 11,252 | 26.9% | 9,691 | 22.4% | 15,909 | 42.9% | 2,883 | 5.8% |
| Unsheltered Individuals with Chronic Patterns of Homelessness | 21,520 | 27.6% | 36,832 | 58.7% | 26,148 | 35.6% | 6,597 | 7.1% |

**Exhibit B6-2: Largest Changes in Individuals with Chronic Patterns of Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| **Largest Increases** | | | | | |
| Washington | 4,295 | 55.8% | California | 26,207 | 65.0% |
| Oregon | 1,423 | 22.6% | Washington | 9,383 | 360.5% |
| Nevada | 715 | 30.1% | Oregon | 4,878 | 172.4% |
| Florida | 700 | 13.0% | Nevada | 2,222 | 255.1% |
| Illinois | 577 | 44.1% | New Mexico | 989 | 139.1% |
| **Largest Decreases** | | | | | |
| California | -962 | -1.4% | Texas | -2,903 | -36.6% |
| New York | -597 | -10.5% | New York | -1,399 | -21.6% |
| Tennessee | -280 | -15.1% | Florida | -1,363 | -18.3% |
| Alaska | -171 | -24.3% | Tennessee | -1,190 | -43.0% |
| Montana | -117 | -21.7% | Virginia | -1,045 | -53.2% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

HUD-AR-01013

APPENDIX B

**Exhibit B6-3: Percent of Individuals with Chronic Patterns of Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



HUD-AR-01014

The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

# The 2025 Annual Homelessness Assessment Report (AHAR) to Congress

## PART 1: POINT-IN-TIME ESTIMATES OF HOMELESSNESS

### MAY 2026

HUD-AR-01015

# Table of Contents

Executive Summary ......................................................................................................... iii

Definition of Terms ........................................................................................................ viii

SECTION 1

Estimates of All Homeless Persons ............................................................................ 1
National Estimates of Homelessness in the United States. . . . . . . . . . . . . . . . . . . . . . . . . . .1
State Estimates of Homelessness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
Understanding Changes in Homelessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Estimates of Homelessness by CoC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

SECTION 2

National Inventory of Beds for Currently Homeless Persons and
Formerly Homeless Persons ........................................................................................ 13
Types of Programs in the National Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Beds by CoC Category . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

SECTION 3

Estimates of Homeless Individuals .......................................................................... 19
National Estimates of Homeless Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
State Estimates of Homeless Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Understanding Changes in the Number of Homeless Individuals . . . . . . . . . . . . . . . . . . 26
Estimates of Homeless Individuals by CoC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

SECTION 4

Estimates of Homeless Families with Children .................................................... 29
National Estimates of Homeless Families with Children . . . . . . . . . . . . . . . . . . . . . . . . . . 29
State Estimates of Homeless Families with Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Understanding Changes in the Number of Homeless Families with Children . . . . . . . . . .37
Estimates of Homeless Families with Children by CoC . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

SECTION 5

Estimates of Unaccompanied Homeless Youth ..................................................... 40
National Estimates of Unaccompanied Homeless Youth . . . . . . . . . . . . . . . . . . . . . . . . . . 40
State Estimates of Unaccompanied Homeless Youth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Understanding Changes in the Number of Unaccompanied Homeless Youth . . . . . . . . .47
Estimates of Unaccompanied Homeless Youth by CoC. . . . . . . . . . . . . . . . . . . . . . . . . . . 48

SECTION 6

Estimates of Homeless Veterans ................................................................................ 50
National Estimates of Homeless Veterans in the United States . . . . . . . . . . . . . . . . . . . . 50
State Estimates of Homeless Veterans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Understanding Changes in the Number of Homeless Veterans . . . . . . . . . . . . . . . . . . . 57
Estimates of Homeless Veterans by CoC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

SECTION 7

Estimates of Individuals with Chronic Patterns of Homelessness ..................... 60
National Estimates of Individuals with Chronic Patterns of Homelessness . . . . . . . . . . 60
State Estimates of Individuals with Chronic Patterns of Homelessness . . . . . . . . . . . . . 63
Understanding Changes in the Number of Individuals with Chronic Patterns of
Homelessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Estimates of Individuals with Chronic Patterns of Homelessness by CoC . . . . . . . . . . . .67

About this Report ........................................................................................................... 69

Appendix A ........................................................................................................................71

Appendix B ...................................................................................................................... 97

# Executive Summary

Literal homelessness is defined by the Department of Housing and Urban Development (HUD) as people staying in emergency shelters (ES), transitional housing programs (TH), safe havens (SH), or unsheltered locations such as staying in cars, on the street, or in encampments. This report does *not* include people who are staying with family or friends (often referred to as "doubling-up" or "couch-surfing") or in other unstable living situations.[1] Point-in-time counts also do not include people living in permanent housing programs, such as permanent supportive housing (PSH), rapid rehousing (RRH), or other permanent housing (OPH) set aside for homeless persons. These housing programs require people to be homeless at the time of enrollment. While people in these programs are not included in the PIT counts, it is possible to understand investment in these homelessness assistance programs using data on beds available through their housing inventory count (HIC) data. Exhibit A-1 shows the number of people in ES, TH, and staying in unsheltered locations as well as the number of beds in RRH, PSH, and OPH.

## EXHIBIT A.1: People Staying in ES, TH, and Unsheltered Locations and RRH Beds, PSH Beds, and OPH Beds
*2007, 2013, 2024, and 2025*



Note: Rapid Rehousing and Other Permanent Housing Beds were not included in data collection until 2014.

---

### SLEEPING LOCATIONS FOR CURRENTLY HOMELESS PERSONS

**Emergency Shelter (ES):** provides temporary or nightly shelter beds to homeless persons.

**Transitional Housing (TH):** provides homeless persons a place to stay combined with supportive services for up to 24 months

**Safe Havens (SH):** provides private or semi-private temporary shelter and services to people with severe mental illness and are limited to serving no more than 25 people within a facility

### TYPES OF PERMANENT HOUSING ASSISTANCE

**Rapid Rehousing (RRH):** a housing model designed to provide temporary housing assistance to homeless persons, moving them quickly out of homelessness and into permanent housing

**Permanent Supportive Housing (PSH):** a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who are homeless upon entry. After entering PSH, clients are considered formerly homeless persons. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability to be eligible.

**Other Permanent Housing (OPH):** a housing model with or without services that is designed specifically for formerly homeless persons. OPH does not have a disability requirement.

---

1    For information on other forms of homelessness and housing instability, please see Part 2 of the Annual Homelessness Assessment Report and Education of Children and Youth Experiencing Homelessness in the United States: Data Summary for School Years 2021-22 to 2023-24 at https://nche.ed.gov/education-of-children-and-youth-experiencing-homelessness-in-the-united-states-data-summary-for-school-years-2021-22-to-2023-24/.

In 2025, 59 percent of all beds across all program types were in permanent housing (PH) programs. Of PH beds, a majority of these beds were used to serve people in PSH (57%). Another 20 percent are beds in "other permanent housing," which are used to serve people who are homeless at entry, but do not require a disability and are mostly funded outside of federal homelessness funding. The last 23 percent of beds were used by people living in rental housing through RRH assistance.

Taken together, the inventory of all year-round beds (that is, beds that are available all year and are not either overflow beds or seasonal beds open for only a few months of the year) available to serve both homeless persons and people living in permanent housing provided through federal, state, or local assistance programs has grown considerably between 2007 and 2025, nearly doubling overall. The total number of beds increased by 98 percent between 2007 and 2025. This is largely due to expansion in ES programs and PSH programs, as well as the addition of RRH and OPH to the community inventory for homeless persons. Meanwhile, the number of TH beds has declined considerably over the same period.

Looking at national inventory slightly differently, the distribution of these beds has also changed considerably. In 2007, 35 percent were dedicated to ES, 35 percent to TH, and 31 percent to PSH. In 2013, these had shifted to 33 percent ES, 25 percent TH, and 39 percent PSH. In 2014, RRH and OPH were added as inventory included in the HIC. In 2025, 34 percent of beds were in ES, 7 percent in TH, 13 percent in RRH, 34 percent in PSH, and 12 percent in OPH (see Exhibit A-3).[2]

### EXHIBIT A.2: Number of Year-Round Beds by Program Type
2007, 2013, 2024, 2025



Note: ES includes a small number of safe haven beds. There were no RRH or OPH beds in 2007 or 2013.

### EXHIBIT A.3: Distribution of Year-Round Beds in ES, TH, RRH, PSH, and OPH in the United States
2007, 2013, 2024, 2025



Note: The small share of safe haven beds (0.2%) are combined with ES. There were no RRH or OPH beds in 2007 or 2013.

---

2    The small share of Safe Haven beds (0.2%) and the people staying in them are not included in Exhibit A-1. Here and throughout this report, SH beds and people in SH beds are combined with ES beds and people in ES.

## Overview of Homelessness by Sleeping Location

*In 2025, there were 745,652 homeless persons (e.g. people living on the street, in emergency shelters, or in transitional housing programs) on a single night in January.* This reflects a slight overall decrease from 2024, when homelessness reached a record high in the United States. While 22 states and DC experienced decreases between 2024 and 2025, New York and Illinois accounted for the largest decreases nationwide (by 12,500 and 11,300, respectively). These declines occurred after New York and Illinois had the largest *increases* in homelessness between 2023 and 2024. In 2024, both states reported these increases were at least in part driven by increases in immigration. In 2025, some CoCs in those states attributed the decreases, in part, to changes in federal immigration policy. A majority of people who were homeless on a single night stayed in emergency shelters (56%). Nearly 36 percent were counted in unsheltered locations, and 8 percent were in transitional housing programs. In addition to collecting and reporting data on the number of homeless persons on a single night in ES, TH, and unsheltered locations, communities also report data on the number of beds available to serve them. In 2025, 82 percent of emergency housing beds were in emergency shelters and 17 percent of beds were in transitional housing programs. Exhibit A-4 includes data on homeless persons on a single night.

The number of homeless persons in the United States has fluctuated over time but has increased considerably in recent years. Compared to 2007, when data were first reported, there were almost 100,000 more homeless persons across the country in 2025 (a 15% increase). Compared to 2013, when considerable changes were made to the Continuum of Care Notice of Funding Available (NOFA), there are about 155,000 more homeless persons (a 26% increase). Over the last year, however, homelessness declined by roughly 25,000 people (or 3%). As shown in Exhibit A-5, changes in the number of homeless persons varied by sleeping location. Overall, the number of people sleeping in emergency shelter grew over time while people staying in transitional housing programs declined.

The change in the number of people staying in emergency shelters drove overall changes, increasing by 91 percent since 2007 and 75 percent since 2013. Meanwhile, the number of people staying in transitional housing programs declined by 64 percent since 2007 and by 60 percent since 2013. The number of people in unsheltered locations is the most volatile as it is often a response to local weather, local policies, and changes in counting methodologies. The number of people counted in unsheltered locations was 4 percent higher in 2025 than it was in 2007, 36 percent higher than it was in 2013, and 3 percent lower than 2024.

### EXHIBIT A.4: Number of Homeless Persons by Sleeping Location
2007, 2013, 2024, 2025



### EXHIBIT A.5: Percentage Change in the Number of Homeless Persons by Sleeping Location
2007-2025



HUD-AR-01019

v

## Overview of Homelessness by Population Type

Communities report data by various population types – individuals, people in families with children, unaccompanied youth, veterans, and people with chronic patterns of (or long-term) homelessness. These populations often have different pathways into homelessness and often need different types of interventions to move them out of homelessness. Exhibit A-6 below shows the number of people belonging to each group in all sleeping locations in 2007, 2013, 2024, and 2025.

### EXHIBIT A.6: Number of People in Emergency Shelter, Transitional Housing, and Unsheltered Locations
By Population Type, 2007-2025

| Population Type | 2007 | 2013 | 2024 | 2025 |
|---|---|---|---|---|
| Individuals | 412,700 | 368,174 | 512,007 | 515,286 |
| People in Families with Children | 234,558 | 222,190 | 259,473 | 230,366 |
| Unaccompanied Youth* | | | 38,170 | 35,159 |
| Chronically Homeless Individuals | 119,813 | 86,289 | 152,585 | 155,750 |
| Veterans* | | 55,619 | 32,882 | 32,495 |

*Data for unaccompanied youth not available before 2017 and data on veterans not available before 2009.

In 2025, individuals, that is, people in households without a child under age 18 present, and individuals with chronic patterns of homelessness were the only two populations to experience increases since 2024. The number of homeless individuals and the number of chronically homeless individuals reached record highs in 2025. The number of people in families with children was roughly the same in 2025 as it was in 2007 when these data were first reported (a less than 2 percent decline). However, the number of homeless people in families with children was 70 percent higher in 2025 than in 2013 (see Exhibit A-7). Between 2024 and 2025, the number of homeless people in families with children decreased by over 29,000 or 11 percent.

### EXHIBIT A.7: Percent Change in the Number of Homeless Persons
By Population Type, 2007-2025



The number of homeless veterans has declined steadily over time. Between 2009, when veteran data was first reported, and 2025, the number dropped by 56 percent. However, among all populations, veterans experienced the smallest decline in homelessness between 2024 and 2025, declining by about 390 veterans, or one percent.

One in every three homeless individuals, or nearly 156,000 people, reported having chronic patterns of homelessness. This is the highest number of individuals with chronic patterns of homelessness ever counted on a single night. Individuals with chronic patterns of homelessness have increased by 30 percent since data was first collected in 2007 and by 81 percent since 2013.

This executive summary provides a high-level overview of data collected by communities across the country. However, these national trends do not always reflect homelessness at a more local level. The following report provides additional detail on the number of homeless persons nationally, by state, and by geographic type (major city, largely urban, rural, suburban) for each of the following populations:

All Homeless Persons (Section 1)

Homeless Individuals (Section 3)

Homeless Families with Children (Section 4)

Unaccompanied Homeless Youth (Section 5)

Homeless Veterans (Section 6)

Individuals with Chronic Patterns of Homelessness (Section 7)

HUD-AR-01020

vi

Section 2 provides detail on how the national inventory of beds is distributed across program type, target population, and geography.

In addition, contextual information collected directly from communities is included throughout the report to help describe the varying local conditions and challenges.

## Data Limitations

This report relies on two sources of data: point-in-time (PIT) counts of people staying in unsheltered locations, emergency shelters, transitional housing programs, and safe havens and housing inventory count (HIC) data. HIC data includes information on the number of beds available in emergency shelters, transitional housing programs, and safe havens. Additionally, it includes beds for people transitioning out of homelessness in rapid rehousing programs, permanent supportive housing programs, and other permanent housing programs. PIT and HIC data are collected on a single night by communities across the country. Several factors can create challenges to data collection for both the PIT and the HIC. For the PIT, factors such as weather, local policies, changing methodologies, public health crises, and CoC capacity can impact the unsheltered count. While the HIC is affected less by external factors, local CoC capacity or HMIS vendor transitions can impact the quality of data on beds.

# Definition of Terms

Please note: Key terms are used for AHAR reporting purposes and accurately reflect the data used in this report. Definitions of these terms may differ in some ways from the definitions found in the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act and in HUD regulations.

*Adults* refers to people age 18 or older.

*Children* refers to people under the age of 18.

*Continuums of Care (CoC)* are local planning bodies responsible for coordinating the full range of homelessness services in a geographic area, which may cover a city, county, metropolitan area, or an entire state.

*Disability* refers to an individual with one or more of the following conditions: (A) A physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse, post-traumatic stress disorder, or brain injury that: (1) Is expected to be long-continuing or of indefinite duration; (2) Substantially impedes the individual's ability to live independently; and (3) Could be improved by the provision of more suitable housing conditions; (B) A developmental disability, as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002); or (C) The disease of Acquired Immunodeficiency Syndrome (AIDS) or any condition arising from the etiologic  agency (infectious agent) for Acquired Immunodeficiency Syndrome.

*Emergency Housing* includes emergency shelter, transitional housing, and safe haven programs.

*Emergency Shelter (ES)* is a facility with the primary purpose of providing temporary shelter for homeless persons.

*Families with Chronic Patterns of Homelessness* refers to people in families with children in which the head of household has a disability and has either been continuously homeless for one year or more or has had at least four episodes of homelessness in the last three years where the combined length of time homeless on those occasions is at least 12 months.

*Family Households* refers to households made up of at least one adult age 18 or older and one child age under 18 that were homeless together on the night of the point-in-time count.

*HMIS* stands for homelessness management information system. CoCs use an HMIS to collect data on homeless persons in sheltered locations in their area, including information about their characteristics and service-use patterns over time.

*Homeless* describes a person who lacks a fixed, regular, and adequate nighttime

*Housing Inventory Count (HIC)* is produced by each CoC and provides an annual inventory of beds that provide assistance to people in the CoC who are homeless or transitioning out of

homelessness.

*Individual* refers to a person who is not part of a family with children during their time homeless (i.e., the person is not homeless in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

*Individual with Chronic Patterns of Homelessness* refers to an individual with a disability who has been continuously homeless for one year or more or has had at least four episodes of homelessness in the last three years where the combined length of time homeless on those occasions is at least 12 months.

*Multiple Races or Multi-Racial* refers to people who self-identify as more than one race (i.e., a person who selects more than one race category from a "select all that apply" option).

*Other Permanent Housing* is housing with or without services that is specifically for people who were formerly homeless but does not require people to have a disability.

*Parenting Children* are people under age 18 who are the parents of one or more children (under age 18) who are present with or sleeping in the same place as the child and without anyone over the age of 18.

*Parenting Child Household* is a household with at least one parenting child and the child or children for whom the parenting child is the parent.

*Parenting Youth* are people under age 25 who are the parents or legal guardians of one or more children (under age 18) who are present with or sleeping in the same place as that youth parent, where there is no person over age 24 in the household.

*Parenting Youth Household* is a household with at least one parenting youth and the child or children for whom the parenting youth is the parent or legal guardian.

*People in Families with Children* are people who are homeless as part of a household that has at least one adult (age 18 or older) and one child (under age 18).

*Permanent Housing (PH)* includes rapid rehousing, permanent supportive housing, and other permanent housing programs.

*Permanent Supportive Housing (PSH)* is a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were homeless when they entered the program and are now considered as formerly homeless. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability for eligibility.

*Point-in-Time (PIT) Counts* are unduplicated one-night estimates of both sheltered and unsheltered homelessness. The one-night counts are conducted by CoCs nationwide and occur during the last week in January of each year.[3]

---

3    While CoCs are only required to conduct an unsheltered and sheltered PIT count biennially per 24 CFR 578.7(c)(2), most CoCs conduct a PIT count annually.

HUD-AR-01022

*Rapid Re-Housing (RRH)* is a housing model designed to provide temporary housing assistance to homeless persons, moving them quickly out of their homelessness and into permanent housing in which they may be able to remain after the assistance ends.

*Safe Havens (SH)* are projects that provide private or semi-private temporary shelter and services to people with severe mental illness and are limited to serving no more than 25 people within a facility.

*Sheltered Homelessness* refers to people who are staying in emergency shelters, transitional housing programs, or safe havens.

*Transitional Housing Programs (TH)* provide homeless persons a place to stay combined with supportive services for up to 24 months.

*Unaccompanied Youth/Children (under 18)* are people in households with only children under the age of 18 who are not part of a family with children or accompanied by their parent or guardian during their episode of homelessness.

*Unaccompanied Youth (18-24)* are young adults in households without children who are not part of a family with children or accompanied by their parent or guardian during their episode of homelessness.

*Unsheltered Homelessness* refers to people whose primary nighttime location is a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for people (for example a car, public park, abandoned building, bus or train station, airport, or camping ground).

*Veteran* refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

HUD-AR-01023          ix

# 1 National Estimates
## Homelessness in the United States

EXHIBIT 1.1: PIT Estimates of Homelessness Persons and the Number of Beds in Permanent Housing
By Sleeping Location, 2007-2025



Note: The exhibit does not display the count of homeless persons in 2021 because of pandemic-related disruptions to counts. A small number of people in SH are combined here with people in ES. RRH and OPH was not included in data collection until 2014.

**All Homeless Persons** includes all people who lack a fixed, regular, and adequate nighttime residence. It includes people staying in emergency shelters, safe havens, and transitional housing programs. It also includes unsheltered homeless persons who were in places not meant for human habitation such as on the streets, in abandoned buildings, bus stations, or in their cars.

The estimates presented in this section reflect national data collected on the number of homeless persons during a single point-in-time (PIT) that occurred during the last 10 days in January 2025. The PIT count offers a snapshot of the number of sheltered and unsheltered homeless persons on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see *Section 2*).

The PIT count also includes the number of unsheltered homeless persons. The Department of Housing and Urban Development (HUD) defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unsheltered homeless persons could be larger than reported.

On a single night in January 2025, *there were 745,652 homeless persons in the United States*, a 3 percent decrease since 2024. This decrease of 25,828 homeless persons was largely driven by a decrease in emergency shelter, which declined by 4 percent (16,931 fewer people). The number unsheltered homeless persons declined by 3 percent, or 7,904 people.

HUD-AR-01024

1

# 1 National Estimates
## Homelessness in the United States

## EXHIBIT 1.2: Change in the Number of Homeless Persons Over Time
### By Sleeping Location, 2007-2025

|  | Change 2007-2025 | | Change 2013–2025 | | Change 2024–2025 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| All Homeless Persons (ES, TH and Unsheltered) | 98,394 | 15.2% | 155,288 | 26.3% | -25,828 | -3.3% |
| Unsheltered People | 10,463 | 4.1% | 70,654 | 36.1% | -7,904 | -2.9% |
| People in Emergency Shelter | 197,888 | 91.3% | 177,889 | 75.2% | -16,931 | -3.9% |
| People in Transitional Housing | -111,925 | -64.1% | -93,198 | -59.7% | -1,013 | -1.6% |
| Rapid Rehousing Beds |  |  |  |  | 13,853 | 9.4% |
| Permanent Supportive Housing Beds | 219,531 | 116.4% | 123,869 | 43.6% | 10,926 | 2.8% |
| Other Permanent Housing Beds |  |  |  |  | 7,605 | 5.6% |

Note: OPH and RRH data are only available starting in 2014.

## EXHIBIT 1.3: Homelessness
### By Household Type and Sleeping Location, 2025



Note: "Sheltered" includes people in ES, TH, and SH.

### Changes Over Time

Exhibit 1-2 shows how the number of homeless persons has changed over time. The number of homeless persons was higher in all sleeping locations except TH in 2025 than in 2007 and 2013. In the last year, however, the number of people staying in ES, TH, and unsheltered locations declined.

### On A Single Night

Exhibit 1-3 shows the distribution of all 746,000 homeless persons in 2025 by whether they were on their own or in a family, and by whether they slept indoors or outdoors on the night of the point-in-time count. As shown, individuals – both unsheltered and sheltered – account for 7 of every 10 homeless persons. For further detail on homeless persons by household type, see Sections 3 and 4.

> "In 2023, there was an unsheltered crisis in our community. This challenged us to address barriers to shelter, expand extreme weather services, and increase capacity. [By 2025,] shifts in [our] coordinated entry system helped our community increase our housing exits through collaboration and increased housing resources. Additionally, we revised homeless prevention and added shelter diversion to our community process though written standards."
>
> -- CoC in the Midwest

HUD-AR-01025

2

# 1 National Estimates
## Homelessness in the United States

EXHIBIT 1.4: Age Distribution of People in ES, TH, and Unsheltered Locations 2025



*transitional housing into one category: Sheltered.*

## Demographic Characteristics[4]

The demographic characteristics of homeless persons vary considerably by household type and shelter status and reflect the large percentage of individuals among the total population of homeless persons. Detailed characteristics are shown separately for individuals in Section 3 of this report and for families with children in Section 4.

## Age

**On A Single Night**

In 2025, 18 percent of homeless persons were children, under the age of 18, and 7 percent were young adults between the ages of 18-24. Demographics differ depending on the type of homelessness, with few unsheltered homeless children (4%). People between the ages of 35-54 make up almost half of the total number of unsheltered homeless persons (49%).

4   In 2024, HUD made significant changes to the way the Point-in-Time count collected data on race and ethnicity by allowing people to select more than a single race. Hispanic/Latina(o) identity, historically collected separately, is now listed among the race categories. Given these changes, comparisons to prior years for race/ethnicity are not included in the report.

# 1 National Estimates
## Homelessness in the United States

## EXHIBIT 1.5: Race/Ethnicity of Homeless Persons 2025

| | All People in ES*, TH, and Unsheltered | | People in ES* and TH | | People in Unsheltered Locations | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All People in ES, TH, and Unsheltered Locations** | **745,652** | **100%** | **479,332** | **100%** | **266,320** | **100%** |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | 3,365 | 0.5% | 2,059 | 0.4% | 1,306 | 0.5% |
| American Indian, Alaska Native, or Indigenous Only | 16,858 | 2.3% | 8,037 | 1.7% | 8,821 | 3.3% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 20,223 | 2.7% | 10,096 | 2.1% | 10,127 | 3.8% |
| Asian or Asian American and Hispanic/Latina(o) | 633 | 0.1% | 293 | 0.1% | 340 | 0.1% |
| Asian or Asian American Only | 9,536 | 1.3% | 5,427 | 1.1% | 4,109 | 1.5% |
| Total Asian or Asian American, any ethnicity | 10,169 | 1.4% | 5,720 | 1.2% | 4,449 | 1.6% |
| Black, African American, or African and Hispanic/Latina(o) | 9,796 | 1.3% | 7,694 | 1.6% | 2,102 | 0.8% |
| Black, African American, or African Only | 233,831 | 31.4% | 177,388 | 37.0% | 56,443 | 21.2% |
| Total Black, African American, or African, any ethnicity | 243,627 | 32.7% | 185,082 | 38.6% | 58,545 | 22.0% |
| Middle Eastern or North African and Hispanic/Latina(o) | 230 | <0.1% | 114 | <0.1% | 116 | <0.1% |
| Middle Eastern or North African Only | 3,793 | 0.5% | 3,064 | 0.6% | 729 | 0.3% |
| Total Middle Eastern or North Africa, any ethnicity | 4,023 | 0.5% | 3,178 | 0.7% | 845 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 874 | 0.1% | 500 | 0.1% | 374 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 8,661 | 1.2% | 4,514 | 0.9% | 4,147 | 1.6% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 9,535 | 1.3% | 5,014 | 1.0% | 4,521 | 1.7% |
| White and Hispanic/Latina(o) | 29,852 | 4.0% | 23,716 | 4.9% | 6,136 | 2.3% |
| White Only | 243,440 | 32.6% | 129,288 | 27.0% | 114,152 | 42.9% |
| Total White, any ethnicity | 273,292 | 36.7% | 153,004 | 31.9% | 120,288 | 45.2% |
| Multi-Racial and Hispanic/Latina(o) | 5,812 | 0.8% | 3,090 | 0.6% | 2,722 | 1.0% |
| Multi-Racial All Other | 24,590 | 3.3% | 13,014 | 2.7% | 11,576 | 4.3% |
| Total Multi-Racial, any ethnicity | 30,402 | 4.1% | 16,104 | 3.4% | 14,298 | 5.3% |
| Hispanic/Latina(o) Only | 154,381 | 20.7% | 101,134 | 21.1% | 53,247 | 20.0% |
| Total Hispanic/Latina(o), Any Race | 204,943 | 27.5% | 138,600 | 28.9% | 6,343 | 24.9% |

### Race and Ethnicity
**On A Single Night**

Across all homeless persons, about one in every three people were singularly White (non-Hispanic/non-Latina/o) and another one in three were Black, African American, or African (of any ethnicity).

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections. See Appendix B for more detail. *Includes a small number of people in safe havens.

HUD-AR-01027

4



# 1 National Estimates
## Homelessness in the United States

EXHIBIT 1.6: Homeless Persons in ES and TH versus Unsheltered within Race and Ethnic Identities
2025



| Category | Sheltered | Unsheltered |
|---|---|---|
| Middle Eastern or North African Only | 80.8% | 19.2% |
| White and Hispanic/Latina(o) | 79.4% | 20.6% |
| Black, African American or African and Hispanic/Latina(o) | 78.5% | 21.5% |
| Black, African American or African Only | 75.9% | 24.1% |
| Hispanic/Latina(o) Only | 65.5% | 34.5% |
| American Indian, Alaska Native or Indigenous and Hispanic/Latina(o) | 61.2% | 38.8% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 57.2% | 42.8% |
| Asian or Asian American Only | 56.9% | 43.1% |
| Multi-Racial and Hispanic/Latina(o) | 53.2% | 46.8% |
| White Only | 53.1% | 46.9% |
| Multi-Racial All Other | 52.9% | 47.1% |
| Native Hawaiian or Pacific Islander Only | 52.1% | 47.9% |
| Middle Eastern or North African and Hispanic/Latina(o) | 49.6% | 50.4% |
| American Indian, Alaska Native or Indigenous Only | 47.7% | 52.3% |
| Asian or Asian American and Hispanic/Latina(o) | 46.3% | 53.7% |

■ Sheltered  ■ Unsheltered

**On A Single Night**

Sheltered rates vary across the racial and ethnic identities of homeless persons. People who were Middle Eastern or North African (non-Hispanic), while making up a small share of the total population of homeless persons, had the highest sheltered rate at 81 percent, followed closely by people who were White and Hispanic/Latina(o) and Black, African American, or African and Hispanic/Latina(o) at 79 percent each.

Homeless persons who were Asian or Asian American and Hispanic/Latina(o); American Indian, Alaska Native or Indigenous (non-Hispanic); or Middle Eastern or North African and Hispanic/Latina(o) were the least likely to be sheltered. All three populations had unsheltered rates over 50 percent.

HUD-AR-01028

# 1 State Estimates
## Homelessness in the United States

## EXHIBIT 1.7: Estimates of People in ES, TH, and Unsheltered Locations By State 2025



**Number of Homeless Persons per 10,000 People**

- Less than 10
- 10-25
- 26-50
- More Than 50

States with the highest number of homeless persons in 2025 were California and New York.

Nationally, about 22 of every 10,000 people were homeless on a single night. Eleven states have rates higher than the national average. New York has the highest rate of homelessness with 73 of every 10,000 people within its jurisdiction counted as homeless.

HUD-AR-01029

6

# 1 State Estimates
## Homelessness in the United States

EXHIBIT 1.8: Percentages of Homeless Persons Who Are Unsheltered
By State, 2025



The point-in-time counts are completed during the coldest time of year in the Unites States. States with the highest rates of unsheltered homelessness during the PIT count tend to be in warmer climates, including California, Hawaii, Arizona, Alabama, and Georgia.

Other factors impact the number of unsheltered homeless persons in a state, including but not limited to policies related to access to shelter, shelter capacity, and local housing markets.

# 1 State Estimates
## Homelessness in the United States

## EXHIBIT 1.9: Changes in Number of People in ES, TH and Unsheltered Locations
### By State, 2024-2025



Between 2024 and 2025, 28 states reported increases in the number of homeless persons. The largest percent increase was in North Carolina (33%), which reported adding over 4,000 disaster-related emergency shelter beds due to the effects of Hurricane Helene.

For information on how rates of homelessness have changed by state since 2007 please see Appendix A.

# 1 Understanding Changes
## Homelessness in the United States

## Understanding Changes in the Number of People in ES, TH, and Unsheltered Locations

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homeless is decreasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### North Carolina (NC)

North Carolina is composed of 12 CoCs. Five of the CoCs are urban, three are rural, two are suburban, and two are major cities (Charlotte and Raleigh). Between 2024 and 2025, North Carolina saw a 33 percent increase in total homelessness. This increase was largely driven by two CoCs: Asheville/Buncombe County and the Balance of State CoC. Asheville and the surrounding areas covered by the Balance of State CoC were significantly impacted by Hurricane Helene. Together these CoCs reported nearly 4,000 people who lost their housing and were enrolled in disaster-related shelter assistance program on the night of the PIT. These individuals displaced by the hurricane accounted for nearly all of Asheville's increase in homelessness in 2025.

### Illinois (IL)

Illinois is composed of 19 CoCs: one major city (Chicago), three other largely urban CoCs, five rural CoCs, and ten suburban CoCs. Between 2024 and 2025, Illinois had a 44 percent decrease in total homelessness. While 11 CoCs reported reductions in the number of homeless persons, the state's overall reduction in homelessness can be largely attributed to an over 11,000-person reduction in total homelessness in Chicago alone (a 60% decline). A reduction in the number of asylum-seeking people to Chicago accounted for the largest decline in homelessness. Other factors included the expansion of short-term rental assistance to people moving out of shelters and increase in permanent housing supports due to the Special NOFO and State-funded units coming online.

HUD-AR-01032      9

# 1

## Estimates by CoC
### Homelessness in the United States

## EXHIBIT 1.10: Number of Homeless Persons
By Geographic Category and Sleeping Location, 2025

|  | # CoCs | All People | Sheltered* | Unsheltered |
|---|---|---|---|---|
| *Total* | 386 | 745,652 | 479,332 | 266,320 |
| Major Cities | 48 | 390,782 | 256,764 | 134,018 |
| Other Urban CoCs | 64 | 51,786 | 32,925 | 18,861 |
| Suburban CoCs | 160 | 179,291 | 119,887 | 59,404 |
| Rural CoCs | 114 | 123,793 | 69,756 | 54,037 |

*Includes people in ES, TH, and SH*

## EXHIBIT 1.11: Share of Homeless Persons in each CoC Category
By Sleeping Location, 2025



Note: "Sheltered" includes people in ES, TH, and SH.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

More than half of homeless persons (390,782 people) were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 24 percent.

There is some variation by shelter status, where major cities account for a slightly larger share of the sheltered population and rural areas a slightly larger share of the unsheltered population.

# 1 Estimates by CoC
## Homelessness in the United States

EXHIBIT 1.12: Distribution of People in ES, TH, and Unsheltered Locations by Household Type and Sleeping Location
by Geography, 2025



**Sheltered Individuals**  **Unsheltered Individuals**
**Sheltered People in Families**  **Unsheltered People in Families**

*Note: "Sheltered" includes people in ES, TH, and SH.*

Families with children accounted for a larger share of unsheltered homelessness in rural CoCs, with five percent of all homeless persons in rural CoCs being unsheltered families. In all other geographic areas, this share was two percent or less.

Individuals made up a larger share of homeless persons in urban CoCs (80%) compared to major cities (67%), especially among sheltered individuals (45% vs. 34%).



# 1 Estimates by CoC
## Homelessness in the United States

EXHIBIT 1.13: Change in the Number of Homeless Persons
By Sleeping Location and CoC Category, 2024-2025

|  | All People in ES, TH and Unsheltered Locations | | Sheltered (ES and TH) | | Unsheltered | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | -25,828 | -3.3% | -17,924 | -3.6% | -7,904 | -2.9% |
| Major Cities | -27,557 | -6.6% | -26,110 | -9.2% | -1,447 | -1.1% |
| Other Urban CoCs | 614 | 1.2% | 918 | 2.9% | -304 | -1.6% |
| Suburban CoCs | 4,083 | 2.3% | 8,897 | 8.0% | -4,814 | -7.5% |
| Rural CoCs | -2,968 | -2.3% | -1,629 | -2.3% | -1,339 | -2.4% |

Note: "Sheltered" includes people in ES, TH, and SH.

Unsheltered homelessness declined in every geographic category over the last year. Between 2024 and 2025, the overall decline in the total number of homeless persons was driven by declines in major city CoCs, where homelessness decreased by seven percent, and rural CoCs, where homelessness decreased by two percent. Other urban CoCs and suburban CoCs reported increases in the number of homeless persons of one to two percent. The rise in sheltered homelessness in other urban and suburban areas outpaced declines in unsheltered homelessness contributing to the overall increase in homelessness in these areas.

For more information on homelessness at the CoC and geographic level, please see Appendix B.

# 2 National Inventory of Beds
## For Homeless Persons and Formerly Homeless Persons

EXHIBIT 2.1: Project Types for Currently Homeless Persons and People Transitioning Out of Homelessness

### SLEEPING LOCATIONS FOR CURRENTLY HOMELESS PERSONS

**Emergency Shelter (ES):** provides temporary or nightly shelter beds to homeless persons

**Transitional Housing (TH):** provides homeless persons a place to stay combined with supportive services for up to 24 months

**Safe Havens (SH):** provides private or semi-private temporary shelter and services to people with severe mental illness and are limited to serving no more than 25 people within a facility

### TYPES OF PERMANENT HOUSING ASSISTANCE

**Rapid Rehousing (RRH):** a housing model designed to provide temporary housing assistance to homeless persons, moving them quickly out of homelessness and into permanent housing

**Permanent Supportive Housing (PSH):** a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were homeless when they entered the program and are now considered as formerly homeless. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability to be eligible.

**Other Permanent Housing (OPH):** a housing model with or without services that is designed specifically for formerly homeless persons. OPH does not have a disability requirement.

**Data on People Living in Permanent Housing:** People living in permanent housing programs are not included in the PIT count. However, information on the number of people served in rapid rehousing and permanent supportive housing programs over the course of a year can be found in the *AHAR Part 2*.

## Types of Programs in the National Inventory

Communities across the country submit data each year on their residential programs for homeless persons and their programs that help people end their homelessness and move into housing. The two basic types of programs are emergency housing for currently homeless persons and permanent housing programs for people who were formerly homelessness. Communities report the number of beds that are available for both types of programs at the same time each January when they conduct Point-in-Time (PIT) counts. The national inventory is the total number of beds in all communities, as reported through the housing inventory count (HIC).

1. **Emergency Housing** is intended to serve currently homeless persons and is made up of two main types of programs, emergency shelters (ES) and transitional housing programs (TH). By design, ES is shorter-term and provides less-intensive services than TH.[5] Shelter also includes a small number of programs, called safe havens (SH), for individuals who have been identified as having higher needs such as severe mental illness. The sheltered data only reports on beds that are available during the entire year. While the HIC includes information on beds available during severe weather events (storms, fires, extreme cold), during seasonal timeframes (open only during specific weeks or months), and beds made available when the number of people seeking shelter exceeds capacity (overflow beds), the focus of this analysis is on the year-round inventory. This information reflects the planned capacity communities rely on to meet the current needs of homeless persons.

2. **Permanent Housing** is intended to serve people who were homeless at the time they were enrolled in a permanent

---

5  Some transitional housing programs provide housing in which the individual or family may be able to stay after the transitional period with intensive services ending (sometimes called "transition-in-place"), and some emergency shelters have intensive services. Communities decide how to categorize their programs when reporting data to HUD.

HUD-AR-01036

13

# 2 National Inventory of Beds
## For Homeless Persons and Formerly Homeless Persons

## EXHIBIT 2.2A: Distribution of the National Bed Inventory by Program Type
### 2025



- Emergency Shelter
- Transitional Housing
- Rapid Rehousing
- Permanent Supportive Housing
- Other Permanent Housing

Note: A small percentage of safe haven beds (0.2%) are included with emergency shelter beds.

## EXHIBIT 2.2B: Distribution of the National Bed Inventory by Program Type
### 2013



- Emergency Shelter
- Transitional Housing
- Permanent Supportive Housing

Note: A small percentage of safe haven beds (0.2%) are included with emergency shelter beds. In 2013, there were no rapid rehousing beds or other permanent housing beds.

housing program. Once the program helps a household (an individual or family) find a housing unit, that housing is considered permanent in the sense that the household has a lease (or similar agreement) and may be able to stay in the same housing unit long-term. This category includes rapid rehousing (RRH), a short-term subsidy in a housing unit in which the individual or family may be able to remain after the subsidy ends; permanent supportive housing (PSH), housing with a long-term subsidy and supportive services for people with disabilities; and other permanent housing (OPH), which is also intended for people transitioning out of homelessness but is not restricted to people with disabilities. The information on permanent housing shows the planned capacity of communities to use these programs to help people no longer be homeless. Only programs considered by the Continuum of Care (CoC) to be part of the homelessness services system are included in the HIC as permanent housing. Communities may use other programs to help people transition out of homelessness.[6]

A total of **1,202,224 year-round beds** in communities across the nation were dedicated to serving people who are currently homeless (41% of inventory) or transitioning out of homelessness (59% of inventory).

Exhibit 2-2a shows the distribution of all beds in the country by program type. Emergency shelters and permanent supportive housing programs have the largest shares of all beds for people who are currently or formerly homeless.

As shown in Exhibit 2-2b, the share of the national inventory that was either emergency shelter or permanent supportive housing has changed only modestly between 2013 and 2025. By comparison, in 2013, one-quarter of the national inventory of beds was in transitional housing programs compared with just 7 percent in 2025.

---

6    Additional programs or housing supports may house currently homeless persons or people transitioning out of homelessness. However, to be included on the HIC, the beds and units must be dedicated to serving homeless persons, or for permanent housing projects, dedicated for persons who were homeless at entry. Beds in institutional settings not specifically dedicated for homeless persons, including detox facilities, emergency rooms, jails, and acute crisis or treatment centers are not included in the HIC.

HUD-AR-01037    14

# 2 National Inventory of Beds
## For Homeless Persons and Formerly Homeless Persons

EXHIBIT 2.4: Changes in the Inventory of Beds in Emergency Housing and Permanent Housing 2007-2025



■ 2007-2025  ■ 2013-2025  ■ 2024-2025

The total national inventory for currently homeless persons (i.e., the emergency shelter, transitional housing, and safe havens inventory) or formerly homeless persons (PSH, RRH, OPH) has increased by about 66,300 beds or 97 percent since 2007.

This change was driven by increases in the number of emergency shelter beds (191,268 more beds or 91%) which outpaced declines in the number of transitional housing beds (127,248 fewer beds or 60%) over the same time period.

> "There was [sic] a number of high-capacity shelters that closed since the 2024 PIT. New shelters in 2025 were not able to provide a similar level of bed capacity. Shelters frequently closed due to the expiration of funding streams."
>
> -- CoC in the Southwest

HUD-AR-01038    16

# 2 National Inventory of Beds
## For Homeless Persons and Formerly Homeless Persons

## EXHIBIT 2.5: Inventory of Year-Round Beds for Special Populations 2025

| | Total Beds | Beds for People with Chronic Patterns of Homelessness | | Beds for Veterans | | Beds for Youth | |
|---|---|---|---|---|---|---|---|
| | # | # | % | # | % | # | % |
| Emergency Shelter* | 405,028 | N/A | | 5,281 | 1.3% | 7,183 | 1.8% |
| Transitional Housing | 83,957 | | | 9,959 | 11.9% | 9,580 | 11.4% |
| Rapid Rehousing | 160,505 | | | 25,211 | 15.7% | 9,285 | 5.8% |
| Permanent Supportive Housing | 408,167 | 173,080 | 40.4% | 113,934 | 27.9% | 5,091 | 1.2% |
| Other Permanent Housing | 144,567 | N/A | | 2,741 | 1.9% | 3,178 | 2.2% |
| Total Beds | 1,202,224 | 173,080 | 13.5% | 157,126 | 13.1% | 34,327 | 2.9% |

*A small number of safe have beds are included with ES beds.

Note: Only PSH programs funded by HUD can report dedicated beds for people with chronic patterns of homelessness on the HIC. According to the Fiscal Year 2024 HMIS data standards, "a dedicated bed is a bed that must be filled by a person in the subpopulation category (or a member of their household) unless there are no persons from the subpopulation who qualify for the project located within the geographic area." Beds can be dedicated to more than one population, for example, a bed may be dedicated to veterans with chronic patterns of homelessness. For more information, see page 41 of the HMIS Data Standards Manual: https://files.hudexchange.info/resources/documents/HMIS-Data-Standards-Manual-2024.pdf

## Beds Dedicated to Veterans, Youth, and People with Chronic Patterns of Homelessness

Thirteen percent of all beds in the national inventory (157,126 beds) were dedicated to homeless veterans and their family members. The housing types with the highest share of beds for veterans was PSH (28% of all PSH beds).

Transitional housing continues to be the main program type offering beds dedicated to homeless youth. Eleven percent of all transitional housing inventory was dedicated to homeless youth. Across all youth-dedicated inventory, nearly three of every ten youth-dedicated beds were from a transitional housing program. Another three in ten were from rapid rehousing programs.

The number of PSH beds for people with chronic patterns of homelessness has grown steadily over time. CoCs reported an eight percent increase in the number of PSH beds for people with chronic patterns of homelessness between 2024 and 2025 (12,533 more beds), and a 112 percent increase over 2013. Total PSH inventory dedicated to people with chronic patterns of homelessness has increased over four-fold since 2007.

## EXHIBIT 2.6: Inventory of PSH Beds for People with Chronic Patterns of Homelessness 2007-2025



# 2 Beds by CoC Category
## For Homeless Persons and Formerly Homeless Persons

## EXHIBIT 2.7: Inventory of Year-Round Beds by Program Type and CoC Category*
### 2025



*A small number of safe haven beds are included with Emergency Shelter.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

# 3 National Estimates
## Homeless Individuals

**EXHIBIT 3.1: PIT Estimates of Homeless Individuals by Sleeping Location and the Number of Beds in Permanent Housing for People Transitioning Out of Homelessness\***
**2007-2025**



Note: The exhibit does not display the count of homeless individuals in 2021 because of pandemic-related disruptions to counts. \*Safe Haven beds have been included in the Emergency Shelter beds.

The estimates presented in this section reflect national data collected on the number of homeless individuals during a single point-in-time (PIT) that occurred during the last 10 days in January 2025. The PIT count offers a snapshot of the number of sheltered and unsheltered homeless individuals on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see Section 2).

The PIT count also includes the number of unsheltered homeless individuals. The Department of Housing and Urban Development (HUD) defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unsheltered homeless individuals could be larger than reported.

**On A Single Night**

In January of 2025, there were *515,286 homeless individuals in the United States*. This is the largest number of homeless individuals—that is, people in households without an adult and child—recorded since data collection began. About 44 percent of individuals stayed in emergency shelter, 14 percent in transitional housing, and 49 percent in unsheltered locations. This section provides information on homeless individuals at a single point in time. See Appendix B for detailed tables supporting the exhibits in this Section.

**Homeless Individuals** refers to a people who are not part of a family with children during their homelessness (i.e., the person is not homeless in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

HUD-AR-01041   19

# 3 National Estimates
## Homeless Individuals

## EXHIBIT 3.2: Change in Number of Homeless Individuals Over Time
### By Sleeping Location, 2007-2025



■ 2007-2025　■ 2013-2025　■ 2024-2025

## EXHIBIT 3.3: Age Distribution of Individuals in ES, TH, and Unsheltered Locations 2025



■ Total Individuals　■ Sheltered Individuals　■ Unsheltered Individuals

Note: "Sheltered" includes people in ES, TH, and SH

### Changes Over Time

Exhibits 3-1 and 3-2 show that homelessness among individuals has increased steadily in recent years. Changes in the number of people staying in emergency shelter and in unsheltered locations drove these increases. In 2025, the number of homeless individuals was 25 percent higher than it was in 2007 and 40 percent higher than it was in 2013.

However, between 2024 and 2025 the number of unsheltered homeless individuals on a single night declined for the first time since 2016.

*To simplify reporting, the remainder of this Section combines people in emergency shelter and people in transitional housing into one category: sheltered.*

## Demographic Characteristics
### Age
**On A Single Night**

Nearly half of all homeless individuals were between the ages of 35 and 54 (46%).

The groups most likely to be in shelter rather than observed in unsheltered locations were children-only households (children not accompanied by their parent or guardian), young adults aged 18 to 24, and individuals 55 and older.

HUD-AR-01042　20

# 3

## National Estimates
### Homeless Individuals

EXHIBIT 3.4: Race and Ethnicity of Homeless Individuals
By Sleeping Location, 2025

| | Total Individuals in ES, TH and Unsheltered | | Individuals in ES* and TH | | Individuals in Unsheltered Locations | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| *All Homeless Individuals* | *515,286* | *100%* | *265,077* | *100%* | *250,209* | *100%* |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | 2,482 | 0.5% | 1,236 | 0.5% | 1,246 | 0.5% |
| American Indian, Alaska Native, or Indigenous Only | 14,015 | 2.7% | 5,691 | 2.1% | 8,324 | 3.3% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 16,497 | 3.2% | 6,927 | 2.6% | 9,570 | 3.8% |
| Asian or Asian American and Hispanic/Latina(o) | 503 | 0.1% | 169 | 0.1% | 334 | 0.1% |
| Asian or Asian American Only | 7,567 | 1.5% | 3,597 | 1.4% | 3,970 | 1.6% |
| Total Asian or Asian American, any ethnicity | 8,070 | 1.6% | 3,766 | 1.5% | 4,304 | 1.7% |
| Black, African American, or African and Hispanic/Latina(o) | 4,881 | 0.9% | 2,994 | 1.1% | 1,887 | 0.8% |
| Black, African American, or African Only | 147,218 | 28.6% | 94,331 | 35.6% | 52,887 | 21.1% |
| Total Black, African American, or African, any ethnicity | 152,099 | 29.5% | 97,325 | 36.7% | 54,774 | 21.9% |
| Middle Eastern or North African and Hispanic/Latina(o) | 175 | <0.1% | 59 | <0.1% | 116 | <0.1% |
| Middle Eastern or North African Only | 3,011 | 0.6% | 2,305 | 0.9% | 706 | 0.3% |
| Total Middle Eastern or North Africa, any ethnicity | 3,186 | 0.6% | 2,364 | 0.9% | 822 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 639 | 0.1% | 324 | 0.1% | 315 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 4,792 | 0.9% | 1,551 | 0.6% | 3,241 | 1.3% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 5,431 | 1.0% | 1,875 | 0.7% | 3,556 | 1.4% |
| White and Hispanic/Latina(o) | 18,936 | 3.7% | 13,295 | 5.0% | 5,641 | 2.3% |
| White Only | 208,062 | 40.4% | 99,185 | 37.4% | 108,877 | 43.5% |
| Total White, any ethnicity | 226,998 | 44.1% | 112,480 | 42.4% | 114,518 | 45.8% |
| Multi-Racial and Hispanic/Latina(o) | 3,844 | 0.7% | 1,394 | 0.5% | 2,450 | 1.0% |
| Multi-Racial All Other | 17,544 | 3.4% | 6,762 | 2.6% | 10,782 | 4.3% |
| Total Multi-Racial, any ethnicity | 21,388 | 4.1% | 8,156 | 3.1% | 13,232 | 5.3% |
| Hispanic/Latina(o) Only | 81,617 | 15.8% | 32,184 | 12.1% | 49,433 | 19.8% |
| Total Hispanic/Latina(o), Any Race | 113,077 | 21.9% | 51,655 | 19.5% | 61,422 | 24.5% |

*Includes a small number of people in safe havens.

### Race and Ethnicity

**On A Single Night**

White people accounted for the largest share of homeless individuals making up 44 percent of all homeless individuals, 42 percent of all sheltered individuals, and 46 percent of all unsheltered individuals.

Regardless of race, people who were Hispanic or Latina(o) made up a little more than two of every ten homeless individuals (22%). People who were Black, African, or African American accounted about three of every ten homeless individuals (30%).

HUD-AR-01043     21

# 3 National Estimates
## Homeless Individuals

**EXHIBIT 3.5:** Sheltered Status of Individuals in ES and TH versus Unsheltered Locations within Racial and Ethnic Groups
2025



Note: "Sheltered" includes people in ES, TH, and SH

**On A Single Night**

Sheltered status varied considerably by racial groups. Native Hawaiian and Pacific Islanders, Asian and Asian Americans, Middle Eastern and North Africans who were also Hispanic/Latina(o), multi-racial individuals regardless of ethnicity, and individuals who are Hispanic or Latina(o) only had the highest rates unsheltered homelessness in 2025, all with rates above 60 percent.

Individuals who are Middle Eastern or North African; White and Hispanic or Latina(o); and Black, African or African American, regardless of ethnicity, had the highest rates of homelessness, all with sheltered rates above 61 percent.

"This community has experienced a steady increase in unsheltered homelessness over several years, and this trend would probably have continued regardless of the [warmer] weather; although the rate of increase might not have been as pronounced. When combining all of the ES, TH, and SH beds available in the community, there were still not enough." -- CoC in the Midwest

# 3 State Estimates
## Homeless Individuals

EXHIBIT 3.6: Estimates of Individuals in ES, TH, and Unsheltered Locations
By State, 2025



In West Virginia, 88 percent of all homeless persons within the state were individuals – the highest rate in the country. Oregon and California are tied for second, with 86 percent.

Across the nation, California made up the highest share of all homeless individuals, with 30 percent of all homeless individuals in the United States located in California.

See Appendix A for more detailed, state-level information.

**Percent of all Homeless Persons that are Individuals**

- ☐ 0-49%
- ☐ 50-64%
- ☐ 65-79%
- ☐ 80-100%

HUD-AR-01045

# 3 State Estimates
## Homeless Individuals

EXHIBIT 3.7: Percent of Homeless Individuals Who Are Unsheltered
By State, 2025



**Percent of Homeless Individuals that are Unsheltered**

- Less than 15%
- 15-30%
- 31-50%
- More than 50%

The point-in-time counts are conducted during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered homeless individuals during the PIT count are in warmer climates (e.g., California, Georgia, and Florida). However, other factors, such as policies related to local housing markets, access to shelter, and shelter capacity also affect the share of unsheltered homelessness.

In 2025, Hawaii, California, Arkansas, Arizona, and Georgia all reported 65 percent or more of all homeless individuals in their state were unsheltered.

HUD-AR-01046   24

# 3 State Estimates
## Homeless Individuals

EXHIBIT 3.8: Largest Changes in the Number of Individuals in ES, TH, or Unsheltered Locations
By State, 2024-2025



**Percent Change in Homeless Individuals, 2024-2025**

- More than 15% decrease
- 0.1-15% decrease
- 0-15% increase
- More than 15% increase

Between 2024 and 2025, 33 states experienced increases in the number of homeless individuals. North Carolina, Oregon, Utah, Mississippi, and Colorado reported increases of 20 percent or higher, with North Carolina reporting the largest percentage increase at 37 percent.

HUD-AR-01047    25

# 3 Understanding Changes
## Homeless Individuals

## Understanding Changes in the Number of Individuals in ES, TH, and Unsheltered Locations

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homelessness is decreasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### Hawaii (HI)

Hawaii is composed of two CoCs: one is suburban and the other rural. Between 2024 and 2025, Hawaii reported a 31 percent reduction in the number of homeless individuals (2,202 fewer individuals), the second largest percent reduction in the county. This decrease was driven by reductions reported by the Balance of State CoC (covering the areas outside of Oahu). The Balance of State attributed this decline primarily to the closing of the disaster-related emergency shelters which housed people displaced by the Maui wildfires of 2023 as well as the closing of some transitional housing facilities.

### Oregon (OR)

Oregon is composed of eight CoCs. Four of the CoCs are suburban, two are rural, one is urban, and one is a major city (Portland). Between 2024 and 2025, Oregon reported a 4,601 person increase in the number of homeless individuals, the largest numerical increase in the country. Seven of the eight CoCs in Oregon reported increases in the number of homeless individuals between 2024 to 2025, with Portland reporting the largest increase at 3,916 individuals. These CoCs attributed the increase to the statewide efforts to increase the capacity of emergency shelters to serve homeless persons, and extremely cold weather on the night of the count which activated cold weather warming centers (which are considered unsheltered situations if beds are not provided) which improved accuracy of the unsheltered count.

# 3 Estimates by CoC
## Homeless Individuals

## EXHIBIT 3.9: Number of Homeless Individuals
By Geographic Category and Sleeping Location, 2025

|  | # CoCs | Total Individuals | Sheltered Individuals* | Unsheltered Individuals |
|---|---|---|---|---|
| *Total* | 386 | 515,286 | 265,077 | 250,209 |
| Major Cities | 48 | 262,435 | 134,085 | 128,350 |
| Other Urban CoCs | 64 | 41,358 | 23,171 | 18,187 |
| Suburban CoCs | 160 | 118,586 | 62,793 | 55,793 |
| Rural CoCs | 114 | 92,907 | 45,028 | 47,879 |

Note: "Sheltered Individuals" includes people in ES, TH, and SH.

## EXHIBIT 3.10: Share of Homeless Individuals in each CoC Category
By Sleeping Location, 2025



Note: Sheltered includes people in ES, TH, and SH.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

Half of homeless individuals were counted in one of the nation's 50 largest cities. Rates of sheltered and unsheltered homelessness were relatively similar across geographic areas.

# 3

## Estimates by CoC
### Homeless Individuals

EXHIBIT 3.11: Change in Individuals in ES, TH, SH, and Unsheltered Locations
By Sleeping Location and CoC Category, 2024-2025

| | Change in Total Individuals | | Change in Sheltered (ES, TH, and SH) Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| *Total* | 3,279 | 0.6% | 8,737 | 3.4% | -5,458 | -2.1% |
| Major Cities | -1,564 | -0.6% | -605 | -0.4% | -959 | -0.7% |
| Other Urban CoCs | 1,152 | 2.9% | 1,215 | 5.5% | -63 | -0.3% |
| Suburban CoCs | 2,549 | 2.2% | 6,644 | 11.8% | -4,095 | -6.8% |
| Rural CoCs | 1,142 | 1.2% | 1,483 | 3.4% | -341 | -0.7% |

Note: "Sheltered Individual" include people in ES, TH, and SH.

Overall, only major cities reported a reduction in the number of homeless individuals overall and within shelters between 2024 and 2025. The number of unsheltered homeless individuals decreased across all geographic areas.

Suburban areas saw both the largest percentage increase in sheltered homelessness (at 12%), and the largest decrease in unsheltered homelessness (-7%).

HUD-AR-01050    28

# 4

## National Estimates
### Homeless Families with Children

EXHIBIT 4.1: PIT Estimates of Homeless Families with Children and the Number of Beds in Permanent Housing Programs for People Transitioning Out of Homelessness*, By Sheltered Status, 2007-2024



Note: The exhibit does not display the count of people in homeless families with children in 2021 because of pandemic-related disruptions to PIT counts.

The estimates presented in this section reflect national data collected on the number of people in homeless families with children during a single point-in-time (PIT) that occurred during the last 10 days in January 2025. The PIT count offers a snapshot of the number of sheltered and unsheltered homeless families with children on a single night. Sheltered family homelessness consists of people in families with children who were staying in emergency shelters (ES) or transitional housing (TH) programs on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive (PH) housing, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 2).

The PIT count also provides information on the number of unsheltered people in families with children. The Department of Housing and Urban Development (HUD) defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. However, some unsheltered families with children may be difficult to identify, as family members may take turns sleeping in backyards or in vehicles that are also used for transportation. In addition, the strength of the unsheltered count may differ from community to community. For these reasons, the actual number of unsheltered people in families with children could be larger than reported.

On a single night in January 2025, there were *230,366 homeless people in families with children in the United States*. Ninety-three percent of all people in homelessness families with children were sheltered.

**Homeless Families with Children** refers to people in households made up of at least one adult age 18 or older and one child age under 18 that were homeless together on the night of the point-in-time count.

# 4 National Estimates
## Homeless Families with Children

## EXHIBIT 4.2: Changes in the Number of People in Homeless Families with Children and Beds for Families Transitioning Out of Homelessness
### 2007-2025



Note: Data on RRH and OPH not available for 2007 or 2013.

## EXHIBIT 4.3: Number of People in Parenting Youth Households in ES, TH, and Unsheltered Locations
### 2025

|  | Parents in Households | Children in Households | Total People in Households |
|---|---|---|---|
| Parenting Youth (Under 18)* | 72 | 72 | 144 |
| Parenting Youth (18 to 24) | 7,361 | 8,644 | 16,005 |
| *Total Parenting Youth* | *7,433* | *8,716* | *16,149* |

*Parenting youth under 18 and their children are considered child-only households and are counted as individuals in the AHAR.

### Changes Over Time

The number of people in homeless families with children was 2 percent lower in 2025 than it was when data were first reported in 2007. Overall, increases in family homelessness were driven by the number of people in families with children staying in emergency shelters.

The total number of people in homeless families with children declined by 29,107 people (an 11% reduction) over the last year.

### On A Single Night

Parenting youth ages 18 to 24 are also included in the population of homeless families with children. About half of 18- to 24-year-olds in homeless families with children were parents (47% or 7,361 total parenting youth). Children of parenting youth ages 18 to 24 make up seven percent of all children in homeless families with children (8,644 children).

# 4 National Estimates
## Homeless Families with Children

EXHIBIT 4.4: Age Distribution of People in Families with Children in ES, TH, and Unsheltered Locations
2025



■ All People in Homeless Families with Children    ■ Sheltered People in Families with Children
■ Unsheltered People in Families with Children

*To simplify reporting, the remainder of this Section combines people in emergency shelter and people in transitional housing into one category: sheltered.*

## Demographic Characteristics
### Age
**On A Single Night**

In 2025, nearly six of every ten people in homeless families with children were children under the age of 18 (57%). Three in ten people in homeless families with children were adults between the ages of 25 to 44. Unsheltered people in families with children remained more likely to have an adult aged 45 or older in the household compared with families in shelter.

# 4 National Estimates
## Homeless Families with Children

## EXHIBIT 4.5: Race/Ethnicity of People in Homeless Families with Children 2025

| | All People in Families in ES, TH and Unsheltered | | People in Families in ES and TH | | People in Families in Unsheltered Locations | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| *All People in Homeless Families with Children* | 230,366 | 100% | 214,255 | 100% | 16,111 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | 883 | 0.4% | 823 | 0.4% | 60 | 0.4% |
| American Indian, Alaska Native, or Indigenous Only | 2,843 | 1.2% | 2,346 | 1.1% | 497 | 3.1% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 3,726 | 1.6% | 3,169 | 1.5% | 557 | 3.5% |
| Asian or Asian American and Hispanic/Latina(o) | 130 | 0.1% | 124 | 0.1% | 6 | <0.1% |
| Asian or Asian American Only | 1,969 | 0.9% | 1,830 | 0.9% | 139 | 0.9% |
| Total Asian or Asian American, any ethnicity | 2,099 | 1.0% | 1,954 | 1.0% | 145 | 0.9% |
| Black, African American, or African and Hispanic/Latina(o) | 4,915 | 2.1% | 4,700 | 2.2% | 215 | 1.3% |
| Black, African American, or African Only | 86,613 | 37.6% | 83,057 | 38.8% | 3,556 | 22.1% |
| Total Black, African American, or African, any ethnicity | 91,528 | 39.7% | 87,757 | 41.0% | 3,771 | 23.4% |
| Middle Eastern or North African and Hispanic/Latina(o) | 55 | <0.1% | 55 | <0.1% | 0 | 0.0% |
| Middle Eastern or North African Only | 782 | 0.3% | 759 | 0.4% | 23 | 0.1% |
| Total Middle Eastern or North Africa, any ethnicity | 837 | 0.3% | 814 | 0.4% | 23 | 0.1% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 235 | 0.1% | 176 | 0.1% | 59 | 0.4% |
| Native Hawaiian or Pacific Islander Only | 3,869 | 1.7% | 2,963 | 1.4% | 906 | 5.6% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 4,104 | 1.8% | 3,139 | 1.5% | 965 | 6.0% |
| White and Hispanic/Latina(o) | 10,916 | 4.7% | 10,421 | 4.9% | 495 | 3.1% |
| White Only | 35,378 | 15.4% | 30,103 | 14.1% | 5,275 | 32.7% |
| Total White, any ethnicity | 46,294 | 20.1% | 40,524 | 19.0% | 5,770 | 35.8% |
| Multi-Racial and Hispanic/Latina(o) | 1,968 | 0.9% | 1,696 | 0.8% | 272 | 1.7% |
| Multi-Racial All Other | 7,046 | 3.1% | 6,252 | 2.9% | 794 | 4.9% |
| Total Multi-Racial, any ethnicity | 9,014 | 4.0% | 7,948 | 3.7% | 1,066 | 6.6% |
| Hispanic/Latina(o) Only | 72,764 | 31.6% | 68,950 | 32.2% | 3,814 | 23.7% |
| Total Hispanic/Latina(o), Any Race | 91,866 | 39.9% | 86,945 | 40.6% | 4,921 | 30.5% |

## Race and Ethnicity

**On A Single Night**

Across all people in homeless families with children, four of every ten people were Black, African American, or African, including two percent that were Black and Hispanic. Three in every ten people in homeless families with children were Hispanic/Latina(o) only. About one in every five people in homeless families with children were White (any ethnicity).

# 4 National Estimates
## Homeless Families with Children

EXHIBIT 4.6: Shelter Status of People in Families with Children Staying in ES and TH versus Unsheltered Locations within Racial and Ethnic Groups
2025



**On A Single Night**

Sheltered rates varied considerably across the races and ethnicities of people in homeless families with children. People who were Native Hawaiian or Pacific Islander, regardless of ethnicity, had the highest unsheltered rates at 23 to 25 percent.

HUD-AR-01055

# 4 State Estimates
## Homeless Families with Children

EXHIBIT 4.7: Estimates of People in Families with Children Staying in ES, TH, and Unsheltered Locations
By State, 2025



**Percent of All Homeless Persons that are in Families with Children**

- 0-15%
- 16-30%
- 31-45%
- 46-100%

States with the highest number of people in homeless families with children in 2025 were New York (84,923 people) and California (26,142 people). However, the states that had the highest share of homeless families with children among all homeless persons were Massachusetts (73%), New York (58%), and Minnesota (45%).

West Virginia, Oregon, California, and Nevada had the smallest share of homeless families with children among all homeless persons in their states, all with rates at or below 15 percent.

# 4

## State Estimates
### Homeless Families with Children

EXHIBIT 4.8: Percent of People in Homeless Families with Children Who Are Unsheltered
By State, 2025



**Percent of all People in Homeless Families with Children that are Unsheltered**
- Less than 5%
- 5-15%
- 16-25%
- More than 25%

Across the country, 21 states and the District of Columbia have less than five percent of people in homeless families with children staying in places not meant for human habitation.

In four states, at least one in every four people in homeless families with children were unsheltered: Idaho (52%), Oregon (38%), Arkansas (25%) and Tennessee (25%).

HUD-AR-01057

# 4 State Estimates
## Homeless Families with Children

EXHIBIT 4.9: Changes in the Number of People in Families with Children in ES, TH, and Unsheltered Locations
By State, 2024-2025



**Percent Change in Persons in Homeless Families with Children, 2024-2025**

- More than 15% decrease
- 0.1-15% decrease
- 0-15% increase
- More than 15% increase

Between 2024 and 2025, 30 states and the District of Columbia reported decreases in the number of people in homeless families with children. Two states saw the number of people in homeless families with children more than halve: Hawaii (58% decrease) and Illinois (54% decrease).

Three states reported increases in family homelessness in excess of 25 percent: South Dakota (40% increase), Maryland (36% increase), and West Virginia (27% increase).

For information on how rates of homelessness among families with children have changed by state since 2007 please see Appendix B.

# 4 Understanding Changes
## Homeless Families with Children

## Understanding Changes in the Number of Families in ES, TH, and Unsheltered Locations

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homelessness is decreasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### Massachusetts (MA)

Massachusetts is made up of 11 CoCs. Eight are suburban, one is urban, one is rural, and one is a major city (Boston). Between 2024 and 2025, Massachusetts reported a seven percent reduction in the number of people in homeless families with children (1,644 fewer people). Eight of the 11 CoCs contributed to this reduction, with the largest reductions reported by the Balance of State CoC. These CoCs reported the decrease was due to a reduction in the number of shelter beds available for use, stricter eligibility rules, and family shelter length of stay limits put into place in late 2024 that required households that were past the time limit to exit shelter.

### Maryland (MD)

Maryland is comprised of ten CoCs: seven suburban, two rural, and one major city (Baltimore). Between 2024 and 2025 family homelessness increased by 36 percent, meaning there were an additional 695 people in homeless families with children across the state in 2025. Nine of the ten CoCs in Maryland reported increases in family homelessness between 2024 and 2025 with Montgomery County, Baltimore City, and the Balance of State contributing most significantly to the increase. CoCs attributed the increase across the state to an expansion of emergency shelter capacity, changes in the housing and employment markets including a shortage of well-paying jobs, lack of affordable childcare, increased rental costs, and cuts to funding available for eviction prevention services.

HUD-AR-01059

# 4 CoC Estimates
## Homeless Families with Children

EXHIBIT 4.10: Share of All People in Homeless Families with Children in Each CoC Category
By Sleeping Location, 2025



■ Major Cities  ■ Other Urban CoCs  ■ Suburban CoCs  ■ Rural CoCs

Note: "Sheltered People in Families with Children" includes families in ES and TH.

EXHIBIT 4.11: Number of People in Homeless Families with Children
By Geographic Category and Sleeping Location, 2025

|  | # CoCs | All People in Homeless Families with Children | Sheltered People in Families with Children | Unsheltered People in Families with Children |
|---|---|---|---|---|
| Total | 386 | 230,366 | 214,255 | 16,111 |
| Major Cities | 48 | 128,347 | 122,679 | 5,668 |
| Other Urban CoCs | 64 | 10,428 | 9,754 | 674 |
| Suburban CoCs | 160 | 60,705 | 57,094 | 3,611 |
| Rural CoCs | 114 | 30,886 | 24,728 | 6,158 |

Note: "Sheltered People in Families with Children" includes families in ES and TH.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

About six of every ten people in homeless families with children were counted in one of the nation's 50 largest cities; another two in every ten were in suburban areas. There is some variation by shelter status, with major cities accounting for a larger share of the sheltered population and rural areas a larger share of the unsheltered population. About every four in ten unsheltered people in families with children are in rural CoCs.

# 4 CoC Estimates
## Homeless Families with Children

EXHIBIT 4.12: Changes in People in Homeless Families with Children
By Sleeping Location and CoC Category, 2024-2025

|  | All People in Homeless Families with Children | | Sheltered People in Families with Children | | Unsheltered People in Families with Children | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | -29,107 | -11.2% | -26,661 | -11.1% | -2,446 | -13.2% |
| Major Cities | -25,993 | -16.8% | -25,505 | -17.2% | -488 | -7.9% |
| Other Urban CoCs | -538 | -4.9% | -297 | -3.0% | -241 | -26.3% |
| Suburban CoCs | 1,534 | 2.6% | 2,253 | 4.1% | -719 | -16.6% |
| Rural CoCs | -4,110 | -11.7% | -3,112 | -11.2% | -998 | -13.9% |

Note: "Sheltered People in Families with Children" includes families in ES and TH.

Major cities, urban CoCs, and rural CoCs all contributed to the overall 11 percent decline in the number of homeless families with children between 2024 and 2025. Major Cities contributed to most of this decline, with a 17 percent decline in family homelessness overall, a 17 percent decline in sheltered family homelessness, and an eight percent decline in unsheltered family homelessness. Only suburban CoCs reported an increase in overall and sheltered family homelessness.

Unsheltered homelessness declined across all geographic categories.

HUD-AR-01061    39

# 5 National Estimates
## Unaccompanied Homeless Youth

EXHIBIT 5.1: PIT Estimates of Unaccompanied Youth in ES, TH, and Unsheltered Locations
2017-2025



Note: The exhibit does not display the count of unaccompanied homeless youth in 2021 because of pandemic-related disruptions to PIT counts.

The estimates presented in this section reflect national data collected on the number of individuals under the age of 25 who are homeless without a parent, guardian or a child of their own (unaccompanied youth) during a single point-in-time (PIT) that occurred during the last 10 days in January 2025. Sheltered unaccompanied youth consists of people staying in emergency shelters (ES), safe haven (SH), or transitional housing (TH) programs on the night of the count. It does not include young people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see *Section 2*). In addition, these data do not reflect unaccompanied youth living with friends or family on a temporary basis such as doubling up or couch surfing – both of which are forms of housing instability more common for youth than for other populations.

The PIT count also includes the number of unsheltered unaccompanied youth. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unsheltered unaccompanied youth could be larger than reported.

In January of 2025, there were *35,159 unaccompanied homeless youth on a single night in the United States*. Nearly half of unaccompanied homeless youth were staying in emergency shelters on the night of the PIT. One in every three unaccompanied homeless youth was unsheltered, and 18 percent were in transitional housing programs.

> **Unaccompanied Homeless Youth** are children (under the age of 18) and young adults (ages 18-24) who are not part of a family with children or accompanied by their parent or guardian during their time homeless.

HUD-AR-01062

# 5 National Estimates
## Unaccompanied Homeless Youth

**EXHIBIT 5.2: Percent Change in the Number of Unaccompanied Youth in ES, TH, and Unsheltered Locations**
**2017-2025**



**EXHIBIT 5.3: Age of Unaccompanied Homeless Youth**
**By Sleeping Location, 2025**



Note: "Sheltered" Includes unaccompanied youth in ES and TH.

## Changes Over Time

Compared to 2017, when data collection first began for unaccompanied homeless youth, there were 41 percent fewer unsheltered homeless youth in 2025. These decreases were largely driven by declines in unsheltered unaccompanied youth (by 41 percent) and, to a lesser extent, declines in youth in transitional housing (by 11%). Meanwhile, unaccompanied youth in emergency shelters increased by 50 percent over the same time period.[7]

Between 2024 and 2025, the number of unaccompanied homeless youth declined by eight percent or 3,011 people.

*To simplify reporting, the remainder of this Section combines people in emergency shelter and people in transitional housing into one category: sheltered.*

## Demographic Characteristics
### Age
**On A Single Night**

Nearly all unaccompanied youth were between the ages of 18 and 24 (93%). Unaccompanied children (under 18) made up a slightly larger share of the unsheltered population than the sheltered population for all unaccompanied homeless youth (8% vs. 7%).

---

7    Beginning in 2017, HUD began issuing funding to CoCs through the Youth Homelessness Demonstration Program (YHDP). The goal of YHDP is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness.

# 5

## National Estimates
### Unaccompanied Homeless Youth

EXHIBIT 5.4: Race and Ethnicity of Unaccompanied Homeless Youth 2025

| | Total Unaccompanied Youth in ES, TH, and Unsheltered | | Unaccompanied Youth in ES and TH | | Unaccompanied Youth in Unsheltered Locations | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| All Unaccompanied Homeless Youth | 35,159 | 100% | 23,552 | 100% | 11,607 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | 196 | 0.6% | 109 | 0.5% | 87 | 0.7% |
| American Indian, Alaska Native, or Indigenous Only | 987 | 2.8% | 548 | 2.3% | 439 | 3.8% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 1,183 | 3.4% | 657 | 2.8% | 526 | 4.5% |
| Asian or Asian American and Hispanic/Latina(o) | 43 | 0.1% | 22 | 0.1% | 21 | 0.2% |
| Asian or Asian American Only | 401 | 1.1% | 231 | 1.0% | 170 | 1.5% |
| Total Asian or Asian American, any ethnicity | 444 | 1.2% | 253 | 1.1% | 191 | 1.7% |
| Black, African American, or African and Hispanic/Latina(o) | 1,073 | 3.1% | 935 | 4.0% | 138 | 1.2% |
| Black, African American, or African Only | 11,793 | 33.5% | 9,239 | 39.2% | 2,554 | 22.0% |
| Total Black, African American, or African, any ethnicity | 12,866 | 36.6% | 10,174 | 43.2% | 2,692 | 23.2% |
| Middle Eastern or North African and Hispanic/Latina(o) | 18 | 0.1% | 11 | <0.1% | 7 | 0.1% |
| Middle Eastern or North African Only | 466 | 1.3% | 421 | 1.8% | 45 | 0.4% |
| Total Middle Eastern or North Africa, any ethnicity | 484 | 1.4% | 432 | 1.8% | 52 | 0.5% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 54 | 0.2% | 27 | 0.1% | 27 | 0.2% |
| Native Hawaiian or Pacific Islander Only | 286 | 0.8% | 126 | 0.5% | 160 | 1.4% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 340 | 1.0% | 153 | 0.6% | 187 | 1.6% |
| White and Hispanic/Latina(o) | 1,338 | 3.8% | 973 | 4.1% | 365 | 3.1% |
| White Only | 10,351 | 29.4% | 5,982 | 25.4% | 4,369 | 37.6% |
| Total White, any ethnicity | 11,689 | 33.2% | 6,955 | 29.5% | 4,734 | 40.7% |
| Multi-Racial and Hispanic/Latina(o) | 421 | 1.2% | 246 | 1.0% | 175 | 1.5% |
| Multi-Racial All Other | 1,648 | 4.7% | 893 | 3.8% | 755 | 6.5% |
| Total Multi-Racial, any ethnicity | 2,069 | 5.9% | 1,139 | 4.8% | 930 | 8.0% |
| Hispanic/Latina(o) Only | 6,084 | 17.3% | 3,789 | 16.1% | 2,295 | 19.8% |
| Total Hispanic/Latina(o), Any Race | 9,227 | 26.2% | 6,112 | 26.0% | 3,115 | 26.8% |

## Race and Ethnicity

**On A Single Night**

Among all unaccompanied homeless youth, about one of every three youth was Black, African American, or African (only) and another one in every three was White (of any ethnicity).

HUD-AR-01064   42

# 5 National Estimates
## Unaccompanied Homeless Youth

## EXHIBIT 5.5: Unaccompanied Youth in ES and TH versus Unsheltered Locations by Racial Category
### 2025



| | Sheltered | Unsheltered |
|---|---|---|
| Middle Eastern or North African Only | 90.3% | 9.7% |
| Black, African American or African and Hispanic/Latina(o) | 87.1% | 12.9% |
| Black, African American or African Only | 78.3% | 21.7% |
| White and Hispanic/Latina(o) | 72.7% | 27.3% |
| Hispanic/Latina(o) Only | 62.3% | 37.7% |
| Middle Eastern or North African and Hispanic/Latina(o) | 61.1% | 38.9% |
| Multi-Racial and Hispanic/Latina(o) | 58.4% | 41.6% |
| White Only | 57.8% | 42.2% |
| Asian or Asian American Only | 57.6% | 42.4% |
| American Indian, Alaska Native or Indigenous and Hispanic/Latina(o) | 55.6% | 44.4% |
| American Indian, Alaska Native or Indigenous Only | 55.5% | 44.5% |
| Multi-Racial All Other | 54.2% | 45.8% |
| Asian or Asian American and Hispanic/Latina(o) | 51.2% | 48.8% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 50.0% | 50.0% |
| Native Hawaiian or Pacific Islander Only | 44.1% | 55.9% |

**On A Single Night**

Sheltered status of unaccompanied youth varied considerably across race and ethnicity. Black unaccompanied homeless youth had one of the highest sheltered rates at 87 percent for those who were also Hispanic/Latina(o) and 78 percent for those who were not Hispanic. While making up a small share of all unaccompanied homeless youth, Middle Eastern and North African youth had the highest sheltered rate at 90 percent.

Several racial and ethnic groups had unsheltered rates that were higher than the overall rate for all unaccompanied youth at 33 percent.

" The youth PIT count can vary significantly since it represents a count on a single day rather than over time. However, the reduction likely reflects progress at the local level. The [local colleges] have been increasing their investments in student housing and services. YHDP programs have been working hard to provide services and stable housing for youth. Family Unification Program (FUP) and Foster Youth to Independence (FYI) voucher expansions have helped provide permanent subsidized housing opportunities for youth in foster care and probation. Youth providers [are also] meeting on a regular basis to improve collaboration and coordination." --CoC in the West

# 5

## State Estimates
### Unaccompanied Homeless Youth

**EXHIBIT 5.6:** Estimates of Unaccompanied Youth in ES, TH, and Unsheltered Locations
By State, 2025



**Percent of All Homeless Individuals that are Unaccompanied Homeless Youth**
- 0-4%
- 5-7%
- 8-10%
- 11% and over

States with the largest number of unaccompanied homeless youth in 2025 were California and New York. Four in every ten unaccompanied homeless youth in the country were in one of these states.

In Wyoming, 17 percent of all homeless individuals at a point-in-time were unaccompanied youth – the highest rate in the country. Minnesota and South Dakota were second and third, with 16 and 13 percent.

See Appendix A for more detailed, state-level information.

HUD-AR-01066

44

# 5 State Estimates
## Unaccompanied Homeless Youth

EXHIBIT 5.7: Percent of Unaccompanied Homeless Youth Who Are Unsheltered By State, 2025



**Percent of All Unaccompanied Homeless Youth that are Unsheltered**
- Less than 15%
- 15-30%
- 31-50%
- More than 50%

The point-in-time counts are completed during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered youth homelessness are in warmer climates.

However, in 2025 Oregon had the highest rate of unsheltered unaccompanied youth (69%) on a single night in January. It was followed by Arkansas (68%), Hawaii (58%), California (57%), and Arizona (51%).

HUD-AR-01067    45



# 5 State Estimates
Unaccompanied Homeless Youth

EXHIBIT 5.8: Largest Changes in Unaccompanied Youth in ES, TH, and Unsheltered Locations
By State, 2024-2025



Percent Change in Unaccompanied Homeless Youth, 2024-2025
- More than 15% decrease
- 0.1-15% decrease
- 0-15% increase
- More than 15% increase

Between 2024 and 2025, 25 states and the District of Columbia experienced decreases in the number of unaccompanied homeless youth.

New York and Illinois experienced the largest decreases in the number of unaccompanied homeless youth, each seeing reductions of over 1,000 youth.

Of the 25 states that observed increases in the number of unaccompanied homeless youth between 2024 and 2025, 19 reported increases of fewer than 50 youth.

HUD-AR-01068

46

# 5 Understanding Changes
## Unaccompanied Homeless Youth

## Understanding Changes in the Number of Unaccompanied Youth in ES, TH, and Unsheltered Locations

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homelessness is decreasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### New York (NY)

New York is comprised of 24 CoCs: 12 suburban CoCs, 11 rural CoCs, and 1 major city (New York City). Between 2024 and 2025, the state of New York reported a 21 percent reduction in the number of unaccompanied homeless youth, or 1,575 fewer people. Fourteen of the 24 CoCs reported a reduction in the number of unaccompanied homeless youth with the largest decline in New York City (1,590 fewer youth). New York attributed the decline in the number of unaccompanied homeless youth to a large reduction in the number of asylum seekers entering the state.

### Florida (FL)

Florida is comprised of 27 CoCs: 17 suburban, five rural, two urban, and three major cities (Tampa, Jacksonville, and Miami). Between 2024 and 2025, Florida reported 289 fewer unaccompanied homeless youth, a 21 percent reduction. Sixteen of the CoCs in the state reported a reduction or no change in the number of unaccompanied homeless youth. These CoCs attributed the decline to increased housing placements and general declines in homeless individuals due to reductions in shelter capacity. One of the CoCs that experienced an increase in their unaccompanied youth counts attributed the rise to an increase in YHDP-funded resources that provided additional shelter and housing options for homeless youth in the area.

# 5 CoC Estimates
## Unaccompanied Homeless Youth

## EXHIBIT 5.9: Number of Unaccompanied Homeless Youth by Sleeping Location and Geography Type, 2025

|  | # CoCs | All Unaccompanied Homeless Youth | Unaccompanied Youth in ES and TH | Unsheltered Unaccompanied Youth |
|---|---|---|---|---|
| Total | 386 | 35,159 | 23,552 | 11,607 |
| Major Cities | 48 | 18,300 | 12,438 | 5,862 |
| Other Urban CoCs | 64 | 2,776 | 1,705 | 1,071 |
| Suburban CoCs | 160 | 7,027 | 5,048 | 1,979 |
| Rural CoCs | 114 | 7,056 | 4,361 | 2,695 |

## EXHIBIT 5.10: Share of Unaccompanied Homeless Youth in each CoC Category
### By Sleeping Location, 2025



Note: "Sheltered Unaccompanied Youth" includes ES, TH and SH.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

More than half of unaccompanied homeless youth were counted in one of the nation's 50 largest cities. Suburban and rural CoCs account for another 20 percent each. There is some variation by shelter status, with rural areas accounting for a slightly larger share of unsheltered unaccompanied youth.[8]

---

8  The number of unaccompanied homeless youth in rural areas may be higher than reported due to challenges in completing the unsheltered PIT count in rural communities, especially rural Tribal nations.

HUD-AR-01070

# 5 CoC Estimates
## Unaccompanied Homeless Youth

EXHIBIT 5.11: Changes in the Number of Unaccompanied Homeless Youth 2024-2025

|  | Change in Total Unaccompanied Youth | | Change in Unaccompanied Youth in ES and TH | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| Total | -3,011 | -7.9% | -1,894 | -7.4% | -1,117 | -8.8% |
| Major Cities | -2,458 | -11.8% | -2,198 | -15.0% | -260 | -4.2% |
| Other Urban CoCs | 84 | 3.1% | 53 | 3.2% | 31 | 3.0% |
| Suburban CoCs | -606 | -7.9% | 204 | 4.2% | -810 | -29.0% |
| Rural CoCs | -31 | -0.4% | 47 | 1.1% | -78 | -2.8% |

The overall decline in the number of unaccompanied homeless youth was largely driven by decreases in sheltered youth in major cities.

Only other urban CoCs reported an increase in the number of unaccompanied homeless youth overall and in unsheltered locations. Only major city CoCs reported a decline in the number of unaccompanied homeless youth in sheltered locations.

HUD-AR-01071

# 6 National Estimates
## Homeless Veterans

## EXHIBIT 6.1: PIT Estimates of Homeless Veterans
### By Sleeping Location, 2009-2025



Note: The exhibit does not display the count of homeless veterans in 2021 because of pandemic-related disruptions to counts.

**Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

The estimates presented in this section reflect national data collected on the number of homeless veterans during a point-in-time (PIT) that occurred during the last 10 days of January 2025. The PIT count offers a snapshot of the number of sheltered and unsheltered homeless veterans on a single night. Sheltered homeless veterans includes veterans who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include veterans living in housing supported by rapid rehousing (RRH) programs, veterans living in permanent supportive (PH) housing, and veterans in other permanent housing programs (OPH). (For more information on these programs, see *Section 2*).

The PIT count also includes the number of unsheltered homeless veterans. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unsheltered veterans could be larger than reported.

Communities began reporting PIT data on homeless veterans in 2009, and this report uses 2009 as the baseline (starting) measure of veteran homelessness in the United States. Between 2009 and 2014, data on homeless veterans in emergency shelter and transitional housing programs was reported in a single category: sheltered.

On a single night in January 2025, there were *32,495 homeless veterans.* About four in every ten homeless veterans were unsheltered.

HUD-AR-01072    50

# 6 National Estimates
## Homeless Veterans

## EXHIBIT 6.2: Proportion of Homeless Adults Who are Veterans
### By Sleeping Location, 2025

|  | All Homeless Veterans | All Homeless Adults in ES and TH and Unsheltered Locations | Percent of Homeless Adults Who Are Veterans |
|---|---|---|---|
| Total People | 32,495 | 611,690 | 5.3% |
| People in ES, TH, and SH | 18,977 | 354,945 | 5.3% |
| Unsheltered Locations | 13,518 | 256,745 | 5.3% |

## EXHIBIT 6.3: Changes in the Number of Homeless Veterans Over Time
### By Sleeping Location, 2009-2025



Note: Data on veterans in emergency shelter and transitional housing is not available prior to 2014.

**On A Single Night**

Veterans made up five percent of all homeless adults in the United States. The share was the same across sheltered status.

**Changes Over Time**

Between 2024 and 2025, the number of homeless veterans decreased by one percent. This decrease in the number of homeless veterans was largely driven by declines in the number of unsheltered veterans, which declined by 333 veterans.

Over the longer term, the number of homeless veterans has declined by 56 percent since the data were first reported in 2009. This represents a total decrease of more than 40,870 homeless veterans in the last sixteen years.

*To simplify reporting, the remainder of this Section combines people in emergency shelter and people in transitional housing into one category: sheltered.*

**"** This reduction [in the number of sheltered veterans] is the result of Emergency Housing Assistance (EHA) [emergency shelter vouchers for veterans waiting rapid rehousing assistance] associated with Supportive Services for Veteran Families (SSVF) projects... SSVF providers reported having far fewer resources for EHA this year and did not report any clients receiving this service.**"**--CoC in the Southwest



# 6 National Estimates
## Homeless Veterans

## EXHIBIT 6.4: Race/Ethnicity of Homeless Veterans
## 2025

| | All Veterans in ES, TH, and Unsheltered | | Veterans in ES and TH | | Veterans in Unsheltered Locations | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| All Homeless Veterans | 32,495 | 100% | 18,977 | 100% | 13,518 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | 99 | 0.3% | 51 | 0.3% | 48 | 0.4% |
| American Indian, Alaska Native, or Indigenous Only | 1,139 | 3.5% | 376 | 2.0% | 763 | 5.6% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 1,238 | 3.8% | 427 | 2.3% | 811 | 6.0% |
| Asian or Asian American and Hispanic/Latina(o) | 19 | 0.1% | 7 | <0.1% | 12 | 0.1% |
| Asian or Asian American Only | 398 | 1.2% | 158 | 0.8% | 240 | 1.8% |
| Total Asian or Asian American, any ethnicity | 417 | 1.3% | 165 | 0.8% | 252 | 1.9% |
| Black, African American, or African and Hispanic/Latina(o) | 197 | 0.6% | 138 | 0.7% | 59 | 0.4% |
| Black, African American, or African Only | 9,483 | 29.2% | 6,627 | 34.9% | 2,856 | 21.1% |
| Total Black, African American, or African, any ethnicity | 9,680 | 29.8% | 6,765 | 35.6% | 2,915 | 21.5% |
| Middle Eastern or North African and Hispanic/Latina(o) | 8 | <0.1% | 3 | <0.1% | 5 | <0.1% |
| Middle Eastern or North African Only | 59 | 0.2% | 16 | 0.1% | 43 | 0.3% |
| Total Middle Eastern or North Africa, any ethnicity | 67 | 0.2% | 19 | 0.1% | 48 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 39 | 0.1% | 18 | 0.1% | 21 | 0.2% |
| Native Hawaiian or Pacific Islander Only | 256 | 0.8% | 102 | 0.5% | 154 | 1.1% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 295 | 0.9% | 120 | 0.6% | 175 | 1.3% |
| White and Hispanic/Latina(o) | 774 | 2.4% | 550 | 2.9% | 224 | 1.7% |
| White Only | 16,216 | 49.9% | 9,599 | 50.6% | 6,617 | 48.9% |
| Total White, any ethnicity | 16,990 | 52.3% | 10,149 | 53.5% | 6,841 | 50.6% |
| Multi-Racial and Hispanic/Latina(o) | 245 | 0.8% | 77 | 0.4% | 168 | 1.2% |
| Multi-Racial All Other | 1,285 | 4.0% | 532 | 2.8% | 753 | 5.6% |
| Total Multi-Racial, any ethnicity | 1,530 | 4.8% | 609 | 3.2% | 921 | 6.8% |
| Hispanic/Latina(o) Only | 2,278 | 7.0% | 723 | 3.8% | 1,555 | 11.5% |
| Total Hispanic/Latina(o), Any Race | 3,659 | 11.3% | 1,567 | 8.3% | 2,092 | 15.5% |

## Demographic Characteristics

### Race and Ethnicity

**On A Single Night**

Across all homeless veterans, half were White (only), and 30 percent were Black, African American, or African (only). Black, non-Hispanic homeless veterans were more likely to be sheltered (35% of the sheltered population) than unsheltered (21% of the unsheltered population). Veterans that were Hispanic (of any race) were more likely to be unsheltered, making up 16 percent of unsheltered veterans compared to eight percent of sheltered veterans.

# 6 National Estimates
## Homeless Veterans

EXHIBIT 6.5: Veterans in ES, TH, and SH versus Unsheltered Locations by Race/Ethnicity 2025



**On A Single Night**

Sheltered rates also varied considerably across the racial and ethnic identities of homeless veterans. Veterans who were White or Black (of any ethnicity) had the highest sheltered rate of all racial and ethnic groups, with sheltered rates ranging from 59 to 71 percent. Veterans who were Middle Eastern or North African (only); Multi-Racial and Hispanic; Hispanic/Latina(o) Only; or American Indian, Alaska Native, or Indigenous (only) had the highest unsheltered rates ranging from 67 to 73 percent.

# 6 State Estimates
## Homeless Veterans

## EXHIBIT 6.6: Estimates of Veterans in ES, TH, SH and Unsheltered Locations
### By State, 2025



Percent of All Homeless Persons that are Veterans
- 0-2%
- 3-5%
- 6-8%
- 9% and over

In two states, New York and Massachusetts, fewer than two percent of all homeless persons in the state were veterans.

Nationwide, California, which has the most homeless veterans of any state, accounted for the largest share of the nation's population of homeless veterans with 27 percent of all homeless veterans in the nation located in California. However, within the state, five percent of all homeless persons in California were veterans.

HUD-AR-01076     54



# 6 State Estimates
## Homeless Veterans

EXHIBIT 6.7: Percentages of Homeless Veterans Who Are Unsheltered 2025



In five states, more than half of all homeless veterans were unsheltered, sleeping in places not meant for human habitation. These are California (71%), Washington (60%), New Mexico (55%), Mississippi (53%), and Georgia (51%).

In two states, North Dakota (100%) and New York (98%), over 95 percent of all homeless veterans were sheltered.

HUD-AR-01077     55



# 6 State Estimates
## Homeless Veterans

EXHIBIT 6.8: Changes in the Number of Veterans in ES, TH, SH and Unsheltered Locations
By State, 2024-2025



**Percent Change in Homeless Veterans, 2024-2025**

- More than 15% decrease
- 0.1-15% decrease
- 0-15% increase
- More than 15% increase

Between 2024 and 2025, 23 states and the District of Columbia experienced decreases in the number of homeless veterans. The largest percentage decline was in North Dakota (36% fewer homeless veterans) and the largest numeric decline was in California (624 fewer homeless veterans).

Oregon experienced the largest increase in homeless veterans (228 more veterans) and Mississippi experienced the largest percentage increase at 88 percent.

For information on how rates of homelessness have changed by state since 2009, please see Appendix B.

# 6 Understanding Estimates
## Homeless Veterans

## Understanding Changes in the Number of Veterans in ES, TH, and Unsheltered Locations

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homelessness is decreasing nationwide, there are distinct factors that impact local changes. This section profiles one state with a large change in its PIT count and the reasons for that change as reported by the CoCs.

 ### Pennsylvania (PA)

Pennsylvania is composed of 16 CoCs: 13 suburban CoCs, two rural, and one major city CoC (Philadelphia). Between 2024 and 2025, Pennsylvania reported 98 more homeless veterans (a 14% increase). This increase was spread across nine of Pennsylvania's 16 CoCs reported. The CoC with the largest percentage increase in the number of homeless veterans attributed the increase to a new veteran-dedicated transitional housing program opening in their county.

# 6 CoC Estimates
## Homeless Veterans

## EXHIBIT 6.9: Number of Homeless Veterans by Geographic Category and Sleeping Location, 2025

|  | # CoCs | All Homeless Veterans | Veterans in ES, SH, and TH | Unsheltered Veterans |
|---|---|---|---|---|
| Total | 386 | 32,495 | 18,977 | 13,518 |
| Major Cities | 48 | 15,566 | 8,195 | 7,371 |
| Other Urban CoCs | 64 | 3,068 | 2,047 | 1,021 |
| Suburban CoCs | 160 | 7,781 | 5,204 | 2,577 |
| Rural CoCs | 114 | 6,080 | 3,531 | 2,549 |

## EXHIBIT 6.10: Share of All Homeless Veterans in each CoC Category
### By Sleeping Location, 2025



Note: "Sheltered Veterans" includes ES, TH, and SH.

## Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

Nearly half of all homeless veterans were in one of the nation's 50 largest cities. However, major cities accounted for a larger share of the unsheltered veteran population, while suburban areas comprised a larger share of the sheltered population.

About one in every five homeless veterans was in a rural area while less than one in every ten was in an urban CoC that did not include one of the nation's largest cities.



# 6 CoC Estimates
## Homeless Veterans

## EXHIBIT 6.11: Change in Veteran Homelessness
### By Sleeping Location and CoC Category, 2024-2025

|  | All Homeless Veterans | | Veterans in ES, SH, and TH | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| Total | -387 | -1.2% | -54 | -0.3% | -333 | -2.4% |
| Major Cities | 205 | 1.3% | -156 | -1.9% | 361 | 5.1% |
| Other Urban CoCs | -200 | -6.1% | -145 | -6.6% | -55 | -5.1% |
| Suburban CoCs | -276 | -3.4% | 250 | 5.0% | -526 | -17.0% |
| Rural CoCs | -116 | -1.9% | -3 | -0.1% | -113 | -4.2% |

Between 2024 and 2025, overall veteran homelessness declined in all areas except major cities, which reported a one percent increase. This was driven by a five percent increase in unsheltered veteran homelessness within major cities.

# 7 National Estimates
## Individuals with Chronic Patterns of Homelessness

**EXHIBIT 7.1:** PIT Estimates of Individuals with Chronic Patterns of Homelessness
By Sleeping Location, 2007-2025



Note: The exhibit does not display the count of individuals with chronic patterns of homelessness in 2021 because of pandemic-related disruptions to counts.

The estimates presented in this section reflect national data collected on the number of individuals with chronic patterns of homelessness during a single point-in-time (PIT) that occurred during the last 10 days in January 2025. The PIT count offers a snapshot of the number of sheltered and unsheltered homeless persons. Sheltered chronic homelessness consists of individuals staying in emergency shelters (ES) or safe havens (SH) on the night of the count. It does not include people living in transitional housing (TH), housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see *Section 2*).

The PIT count also includes the number of unsheltered homeless persons. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unsheltered homeless persons could be larger than reported.

On a single night in January 2025, there were *155,750 individuals with chronic patterns of homelessness.* This is the largest number of reported individuals with chronic patterns of homelessness since data collection began. Six in every ten individuals with chronic patterns of homelessness were unsheltered on the night of the count.

**Individual with Chronic Patterns of Homelessness** refers to an individual with a disability (see Definition of Terms) who has been continuously homeless for one year or more or has had at least four episodes of homelessness in the last three years where the combined length of time homeless on those occasions is at least 12 months. (Note: this does not include people in families with at least one adult and one child who had chronic patterns of homelessness.)

# 7 National Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.2: Share of All Homeless Individuals that have Chronic Patterns of Homelessness in ES versus Unsheltered Locations
2007-2025



■ Percent of Individuals with Chronic Patterns of Homelessness      ■ Percent of Individuals without Chronic Patterns of Homelessness

**Changes Over Time**

In 2025, 30 percent of all homeless individuals had chronic patterns of homelessness. The share of all homeless individuals that had chronic patterns of homelessness has varied between 2007 and 2025, hitting a low of 22 percent in 2016 and a high of 31 percent in 2023.

# 7 National Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.3: Change in the Number of Individuals with Chronic Patterns of Homelessness
2007-2025



■ All Individuals with Chronic Patterns of Homelessness
■ Chronically Homeless Individuals in Emergency Shelter
■ Unsheltered Chronically Homeless Individuals

**Changes Over Time**

The number of homeless individuals who had chronic patterns of homelessness has increased steadily since 2016. Increases in individuals with chronic patterns of homelessness persisted through the pandemic, while other populations declined. The number of individuals with chronic patterns of homelessness in 2025 was 30 percent higher than in 2007.

Between 2024 and 2025, there was a two percent increase in the number of individuals with chronic patterns of homelessness across the country. An 11 percent increase in the number of sheltered individuals with chronic patterns of homelessness outweighed the three percent decline in the number of individuals with chronic patterns of homelessness that were unsheltered on the night of the count.

Compared to 2013, chronic homelessness among individuals has increased by 81 percent.

> **"**The lack of supportive and income-based housing options, combined with rising rents, high utility costs, and stringent landlord screening criteria, has contributed to the increased number of people [with] chronic [patterns of] homelessness.**"**
>
> *-- CoC in the Midwest*

HUD-AR-01084      62

# 7 State Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.4: Estimates of Individuals in ES and Unsheltered Locations with Chronic Patterns of Homelessness
By State, 2025



**Percent of All Homeless Individuals that have Chronic Patterns of Homelessness**

- 0-14%
- 15-29%
- 30-44%
- 45% and over

In two states, Rhode Island and Washington, half of all homeless individuals had chronic patterns of homelessness. However, Rhode Island—one of the smallest states in the country—accounted for less than one percent of all individuals with chronic homelessness in the country while Washington made up eight percent of the national share.

California had the largest share of individuals with chronic patterns of homelessness with 42 percent of all individuals with chronic patterns of homelessness across the country.

See Appendix A for more detailed, state-level information.

# 7 State Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.5: Percent of Individuals with Chronic Patterns of Homelessness Who Were Unsheltered
By State, 2025



**Percent of Chronically Homeless Individuals that are Unsheltered**
- Less than 15%
- 15-30%
- 31-50%
- More than 50%

In 2025, 25 states reported that more than 50 percent of individuals with chronic patterns of homelessness were unsheltered on the night of the count. Mississippi had the highest rate with 94 percent of individuals with chronic patterns of homelessness in the state unsheltered.

One state, Vermont, sheltered 89 percent of the individuals with chronic patterns of homelessness in the state. Maine sheltered the second most, at 82 percent of all individuals with chronic patterns of homelessness.

HUD-AR-01086    64

# 7 State Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.6: Changes in the Number of Individuals in ES and Unsheltered Locations with Chronic Patterns of Homelessness
By State, 2024-2025



**Percent Change in Chronically Homeless Individuals, 2024-2025**

- Any decrease
- 0-10% increase
- 11-25% increase
- More than 25% increase

Between 2024 and 2025, 36 states and the District of Columbia experienced increases in the number of individuals with chronic patterns of homelessness. The largest numeric increase occurred in Oregon (1,909 more individuals) while the largest percentage increase was observed in North Dakota (97% increase).

Between 2024 and 2025, 14 states reported reductions in the number of individuals with chronic patterns of homelessness that were homeless on the night of the count. Among these, California reported the largest decrease with 1,855 fewer individuals with chronic patterns of homelessness (a 3% decline). Arkansas reported a 49 percent decline, the largest in the country.

# 7

## Understanding Estimates
### Individuals with Chronic Patterns of Homelessness

### Understanding Changes in the Number of People in ES and Unsheltered Locations with Chronic Patterns of Homelessness

As a part of the PIT data submission and review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2025 PIT count, the authors of this report reviewed these details. This revealed that while homelessness is decreasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.



#### California (CA)

California is composed of 44 CoCs. Nine of the CoCs are major cities, seven are urban, 16 are suburban, and 12 are rural. Between 2024 and 2025, California reported 1,855 fewer individuals with chronic patterns of homelessness that were homeless on the night of the count (a three percent decline). Seventeen CoCs reported reductions in the number of individuals with chronic patterns of homelessness that were homeless on the night of the count. The largest decline was in Los Angeles, which reported 2,394 fewer chronically homeless individuals. These CoCs attributed the decline to additional projects opening, use of coordinated entry to move unsheltered individuals into affordable housing units, quicker placements into housing, increased outreach to transition chronically homeless individuals into permanent housing, and targeted encampment resolution initiatives.

#### Virginia (VA)

Virginia is composed of 16 CoCs: seven suburban CoCs, four rural, four urban, and one major city (Virginia Beach). Between 2024 and 2025, Virginia reported a 31 percent increase in the number of individuals with chronic patterns of homelessness that were homeless on the night of the count (282 more individuals). Eleven of the 16 CoCs in Virginia reported increases in the number of chronically homeless individuals counted on the night of the PIT count. CoCs attributed the increase in the number of individuals with chronic patterns of homelessness to lack of resources for adult-only households, growing economic instability, improved engagement strategies including coordinated and targeted street outreach which helped to identify more people, and cold temperatures on the night of the count that may have moved more typically unsheltered individuals with chronic patterns of homelessness into the warming centers on the night of the count.

HUD-AR-01088

# 7 CoC Estimates
## Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.7: Percent of Individuals in ES and Unsheltered Locations with Chronic Patterns of Homelessness by Geographic Category, 2025

| | All Homeless Individuals | Percent of All Homeless Individuals with Chronic Patterns of Homelessness |
|---|---|---|
| Total | 515,286 | 30.2% |
| Major Cities | 262,435 | 33.4% |
| Other Urban CoCs | 41,358 | 30.8% |
| Suburban CoCs | 118,586 | 27.2% |
| Rural CoCs | 92,907 | 24.8% |

EXHIBIT 7.8: Share of Individuals in ES and Unsheltered Locations with Chronic Patterns of Homelessness in each CoC Category
By Sleeping Location, 2025



### Continuums of Care (CoC) were Divided into Four Geographic Categories

1. Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

2. Other urban CoCs (n=64) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

3. Suburban CoCs (n=160) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

4. Rural CoCs (n=114) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

Notes: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report. Reports from 2023 and before did not include U.S. territories in the estimates by CoC sections. U.S. territories are included in these estimates from 2024 onward.

# 7

## CoC Estimates
### Individuals with Chronic Patterns of Homelessness

EXHIBIT 7.9: Changes in Individuals in ES and Unsheltered Locations with Chronic Patterns of Homelessness
By Geographic Category, 2024-2025

| | Change in Total Number of Individuals with Chronic Patterns of Homelessness | | Change in Sheltered Individuals with Chronic Patterns of Homelessness | | Change in Unsheltered Individuals with Chronic Patterns of Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 3,165 | 2.1% | 6,019 | 11.4% | -2,854 | -2.9% |
| Major Cities | 1,871 | 2.2% | 3,284 | 11.7% | -1,413 | -2.5% |
| Other Urban CoCs | 588 | 4.8% | 864 | 15.6% | -276 | -4.2% |
| Suburban CoCs | -196 | -0.6% | 1,376 | 11.4% | -1,572 | -7.7% |
| Rural CoCs | 902 | 4.1% | 495 | 6.9% | 407 | 2.7% |

Note: "Sheltered Individuals" refers to people in ES and SH.

While overall chronic homelessness increased by two percent across the country between 2024 and 2025, rural CoCs and other urban CoCs experienced the largest percentage increases. Suburban CoCs were the only type that reported an overall decline in the number of individuals with chronic patterns of homelessness. Likewise, rural CoCs were the only geographic type to report an increase in unsheltered homelessness among individuals with chronic patterns of homelessness.

HUD-AR-01090    68

# About this Report

The US Department of Housing and Urban Development (HUD) releases the Annual Homelessness Assessment Report to Congress (AHAR) in two parts. Part 1 provides Point-in-Time (PIT) estimates, offering a snapshot of homelessness—both sheltered and unsheltered—on a single night. The PIT counts also provide an estimate of the number of homeless persons within particular populations such as veterans and individuals with chronic patterns of homelessness. To be included in the PIT count, a person needs to meet the definition of homelessness used by HUD—which differs from the definition used by other agencies. HUD defines homelessness as lacking a fixed, regular, and adequate nighttime residence, meaning:

- An individual or family with a primary night-time residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings such as a car, public park, abandoned building, bus or train station, airport, or camping ground; or

- An individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including congregate shelters, transitional housing, and hotels and motels paid for by charitable organizations or by federal, State, or local government programs for low-income individuals).[9]

People staying in the following locations on the night of the PIT count *are not* included in the sheltered or unsheltered PIT count:

- People living in housing provided by permanent supportive housing (PSH) programs, including people using HUD Veterans Affairs Supportive Housing (VASH) vouchers.

- People living in other permanent housing (OPH), including housing supported by the Veteran Affairs Grant and Per Diem Transition in Place (TIP) program and people living in housing supported by the Emergency Housing Voucher program and not considered PSH.

- People living in permanent housing supported by rental assistance from a rapid re-housing (RRH) program.

- People in any housing not listed on the housing inventory count (HIC) because the housing is not dedicated for homeless persons.

- People temporarily staying with family or friends—sometimes referred to as being "doubled-up" or "couch surfing"—even if their stay may be unstable.

The one-night PIT counts are typically conducted each year during the last 10 days of January.

To understand our nation's capacity to serve people who are currently or formerly homeless, this report also has a chapter focusing on the inventory of shelters and housing for people who are currently homeless or transitioning out of homelessness. Counts of bed inventory available for use in emergency shelters, transitional housing programs, safe havens, rapid rehousing programs, permanent supportive housing programs, and other permanent housing are based on reports by CoCs in the Housing Inventory Count (HIC).

The HIC and PIT count are based on data from January 2025.[10] In 2025, the PIT estimates of homeless persons in sheltered and unsheltered locations, as well as the number of beds available to serve them, were reported by 386 Continuums of Care (CoC) nationwide. These 386 CoCs covered virtually the entire United States.[11]

To better understand how homelessness differs by geography[12], the AHAR study team categorizes CoCs into four groups:

1. Major City CoCs

2. Other Urban CoCs

3. Suburban CoCs

4. Rural CoCs[13]

A CoC with a plurality of its population living in rural areas (i.e., more people living in rural areas than in any other defined area) is classified as a "rural CoC." That does not mean, however, that all homeless persons in the rural CoC were counted in rural areas. CoCs span large territories (even an entire state in some cases) and may comprise a mixture of urban, suburban, and rural areas. Because PIT estimates are reported for an entire CoC, each homeless person in the CoC cannot be classified as staying in an urban, suburban, or rural area. Rather, all homeless persons in the CoC are classified as staying in a CoC that is urban, suburban, or rural.

HUD has technical standards for conducting the PIT counts, and CoCs use a variety of approved methods to produce the counts. The guide for PIT methodologies (i.e., approved approaches for conducting the PIT count) can be found here: https://www.hudexchange.info/resource/4036/

---

9   For the PIT Count, CoCs must count all individuals or families who meet the criteria in paragraphs (1)(i) and (1)(ii) of the homeless definition in 24 CFR 578.3.

10  In 2025, HUD issued waivers to six CoCs to be able to conduct their PIT counts in February instead of the last 10 days of January due to local circumstances that made it difficult to conduct the count in January.

11  The CoCs that did not participate in the 2025 PIT count were American Samoa and the Northern Mariana Islands. The Augusta-Richmond County CoC in Georgia also did not participate in the 2025 PIT count but their 2024 HIC and PIT Count data were carried over for 2025.

12  The maps used throughout this report were partially created using MapChart.

13  First, CoCs representing the 50 most populous cities in the United States, based on U.S. Census data, were assigned to the major city CoC category. Next, the study team used geographic data published in the 2021 U.S. Department of Education's National Center for Education Statistics (NCES) data to determine the urbanicity of the remaining CoCs. NCES defines 12 geographic locales, which were collapsed into three distinct categories: urban (mapping to the three NCES "City" locales), suburban (mapping to the three NCES "Suburban" locales, as well as the "Town – Fringe" locale), and rural (mapping to the three NCES "Rural" locales, as well as the "Town – Distant" and "Town – Remote" locales). Using the percentage of each CoC's total population living in urban, suburban, and rural areas, based on the NCES geographic data, CoCs were classified into categories according to their largest percentage among the three. The study team used population counts from the Census Bureau's 2020 block-level data. Census blocks are the smallest geographic unit for which the Census reports population counts, and they are the ideal unit for this CoC analysis. Block-level population data are only available in the decennial census reports.

HUD-AR-01091     69

point-in-time-count-methodology-guide. While standards exist, each CoC makes its own choices among the approved methods, so there is no universal method used to collect PIT count data. This results in variations in how CoCs conduct their PIT counts, often reflecting the size and type of the CoC. For example, some CoCs conduct a full census, attempting to capture data on all homeless persons. Others, often those with large geographic areas, use a sampling approach to count a smaller group of homeless persons and use that sample to estimate the number and characteristics for the entire population of homeless persons within their community.

HUD also sets several standards for what types of situations qualify as unsheltered homelessness. All situations that qualify as unsheltered homelessness are considered places not meant for human habitation. However, the level of connection to services and resources varies. For example, unsheltered homelessness can be a situation where a person is sleeping in a public space with no covering or connection to resources. It can also be in an encampment that has water or bathroom facilities and is visited by outreach workers who provide connections to supportive services. Unsheltered homelessness also includes people sleeping in cars, trucks, and recreational vehicles when it appears to the people conducting the PIT count that the purpose is not recreational but instead exists because the occupants do not have another place to sleep. Some communities have established "safe parking" programs that have services similar to those found in shelters. These are also considered unsheltered locations.

When collecting demographic data on homeless persons, the people conducting the PIT count use pre-established categories to collect data on race and ethnicity. These data are collected from previously administered intake surveys (e.g., for sheltered homeless persons) or from surveys administered for purposes of the PIT count (e.g., for unsheltered homeless persons). The demographic categories used in the 2025 PIT count are based on current reporting standards, which are defined in the fiscal year 2024 Homeless Management Information System (HMIS) Data Standards. Those race and ethnicity response categories were updated for the 2022 PIT count and changed again for the 2024 PIT count to better reflect the ways in which people identify themselves.

Beginning in 2023, communities were asked to collect additional information on the ages of homeless persons. Instead of a single category representing all people over the age of 24, five additional categories were used to provide more detail on the ages of homeless persons. These categories were 25-34, 35-44, 45-54, 55-64, and 65 or older. As 2023 was the first year these data were reported, comparisons to prior years for the new age categories are not available.

For the AHAR reporting, if a CoC does not conduct an unsheltered count for the reporting year, their prior year's unsheltered data is carried forward to avoid misleading changes in the data. In 2025, 29 CoCs conducted a sheltered-only count, and the 2024 unsheltered count data was carried forward for these CoCs.[14] In 2024, 22 CoCs conducted a sheltered-only count and the 2023 unsheltered count data was carried forward for these CoCs.[15]

---

14  In addition, the Augusta-Richmond County CoC in Georgia did not participate in the 2025 PIT count. Their 2024 PIT Count was carried over for 2025. This included both a sheltered and unsheltered count.

15  To be able to report the race and ethnicity distribution for these CoCs, the combined race and ethnicity category breakouts were estimated. To do this estimation, we distributed the total reported population in each race category from the reported 2023 unsheltered data by each race and Hispanic/Latina/o category in 2024 using the race and Hispanic/Latina/o distribution of each CoCs' sheltered populations in 2024. For example, if 20 percent of the total American Indian, Alaska Native, or Indigenous people in the 2024 count of sheltered persons in families in the given CoC were reported as American Indian, Alaska Native, or Indigenous and Hispanic/Latina/o, 20 percent of the 2023 unsheltered population of American Indian, Alaska Native, or Indigenous persons in families was used to estimate the American Indian, Alaska Native, or Indigenous and Hispanic/Latina/o unsheltered persons in families population for the CoC. We assumed the remainder of the reported 2023 unsheltered population of American Indian, Alaska Native, or Indigenous persons in families were non-Hispanic/Latina/o. The 22 CoCs that did not conduct an unsheltered count in 2024 included seven CoCs from California, five CoCs from Oregon, two CoCs from Arkansas, two CoCs from Maryland, and one CoC each from Alabama, Colorado, Florida, New Jersey, Texas, and the Virgin Islands.

Appendix A

## ALABAMA



**8** in every **10,000** people were homeless

-10.1%
change from 2024

-24.1%
change from 2007

46.2%
53.8%

■ Sheltered (1,912)
■ Unsheltered (2,225)

Total Homeless, 2025
4,137

### Estimates of Homelessness

**3,347** individuals

**790** people in families with children

**157** unaccompanied homeless youth

**214** veterans

**505** chronically homeless individuals

## ALASKA



**36** in every **10,000** people were homeless

-1.2%
change from 2024

61.7%
change from 2007

21.6%
78.4%

■ Sheltered (2,081)
■ Unsheltered (574)

Total Homeless, 2025
2,655

### Estimates of Homelessness

**2,120** individuals

**535** people in families with children

**245** unaccompanied homeless youth

**106** veterans

**888** chronically homeless individuals

HUD-AR-01093

Appendix A

## ARIZONA



20 in every 10,000 people were homeless

3.5% change from 2024

4.2% change from 2007

44.3% Sheltered
55.7% Unsheltered

■ Sheltered (6,762)
■ Unsheltered (8,497)

Total Homeless, 2025
15,259

### Estimates of Homelessness

12,261 individuals

2,998 people in families with children

763 unaccompanied homeless youth

1,035 veterans

3,353 chronically homeless individuals

## ARKANSAS



9 in every 10,000 people were homeless

-2.3% change from 2024

-29.1% change from 2007

46.8% Sheltered
53.2% Unsheltered

■ Sheltered (1,274)
■ Unsheltered (1,446)

Total Homeless, 2025
2,720

### Estimates of Homelessness

1,853 individuals

867 people in families with children

169 unaccompanied homeless youth

170 veterans

394 chronically homeless individuals

HUD-AR-01094

Appendix A

## CALIFORNIA



46 in every 10,000 people were homeless

-2.8% change from 2024

30.9% change from 2007

36.5%

63.5%

■ Sheltered (66,351)
■ Unsheltered (115,583)

Total Homeless, 2025
181,934

### Estimates of Homelessness

155,792 individuals

26,142 people in families with children

8,086 unaccompanied homeless youth

8,686 veterans

64,693 chronically homeless individuals

## COLORADO



28 in every 10,000 people were homeless

-10.8% change from 2024

17.3% change from 2007

30.4%

69.6%

■ Sheltered (11,614)
■ Unsheltered (5,073)

Total Homeless, 2025
16,687

### Estimates of Homelessness

12,258 individuals

4,429 people in families with children

747 unaccompanied homeless youth

1,075 veterans

5,015 chronically homeless individuals

HUD-AR-01095

73

Appendix A

# CONNECTICUT



**10** in every **10,000** people were homeless

9.5% change from 2024

-16.7% change from 2007

22.3%

77.7%

■ Sheltered (2,902)
■ Unsheltered (833)

Total Homeless, 2025
3,735

Estimates of Homelessness

2,725  individuals

1,010  people in families with children

139  unaccompanied homeless youth

177  veterans

132  chronically homeless individuals

# DELAWARE



**15** in every **10,000** people were homeless

15.8% change from 2024

48.3% change from 2007

10.6%

89.4%

■ Sheltered (1,406)
■ Unsheltered (167)

Total Homeless, 2025
1,573

Estimates of Homelessness

899  individuals

674  people in families with children

51  unaccompanied homeless youth

94  veterans

237  chronically homeless individuals

HUD-AR-01096

74

Appendix A

# DISTRICT OF COLUMBIA



73 in every 10,000 people were homeless

-8.5%
change from 2024

-3.4%
change from 2007

15.5%

84.5%

■ Sheltered (4,340)
■ Unsheltered (798)

Total Homeless, 2025
5,138

Estimates of Homelessness

3,782 individuals

1,356 people in families with children

374 unaccompanied homeless youth

199 veterans

1,431 chronically homeless individuals

# FLORIDA



12 in every 10,000 people were homeless

-11.1%
change from 2024

-42.0%
change from 2007

47.2%     52.8%

■ Sheltered (14,726)
■ Unsheltered (13,162)

Total Homeless, 2025
27,888

Estimates of Homelessness

21,412 individuals

6,476 people in families with children

1,078 unaccompanied homeless youth

2,141 veterans

5,377 chronically homeless individuals

HUD-AR-01097

75

Appendix A

## GEORGIA



11 in every 10,000 people were homeless

<-0.1%
change from 2024

-37.5%
change from 2007

45.8%

54.2%

■ Sheltered (5,631)
■ Unsheltered (6,653)

Total Homeless, 2025
12,284

### Estimates of Homelessness

9,553 individuals

2,731 people in families with children

557 unaccompanied homeless youth

639 veterans

1,552 chronically homeless individuals

## HAWAII



47 in every 10,000 people were homeless

-41.3%
change from 2024

12.5%
change from 2007

40.8%

59.2%

■ Sheltered (2,786)
■ Unsheltered (4,042)

Total Homeless, 2025
6,828

### Estimates of Homelessness

4,943 individuals

1,885 people in families with children

187 unaccompanied homeless youth

304 veterans

1,694 chronically homeless individuals

HUD-AR-01098

76

## Appendix A

# IDAHO



-1.9%
change from 2024

54.2%
change from 2007

**13** in every **10,000**
people were homeless



50.0%    50.0%

■ Sheltered (1,349)
■ Unsheltered (1,348)

Total Homeless, 2025
2,697

### Estimates of Homelessness

**1,693** individuals

**1,004** people in families with children

**96** unaccompanied homeless youth

**202** veterans

**458** chronically homeless individuals

# ILLINOIS



-43.6%
change from 2024

-5.9%
change from 2007

**11** in every **10,000**
people were homeless



14.2%

85.8%

■ Sheltered (12,502)
■ Unsheltered (2,074)

Total Homeless, 2025
14,576

### Estimates of Homelessness

**8,406** individuals

**6,170** people in families with children

**832** unaccompanied homeless youth

**480** veterans

**1,808** chronically homeless individuals

HUD-AR-01099

Appendix A

# INDIANA



6.2%
change from 2024

-9.3%
change from 2007

Total Homeless, 2025
6,675



10 in every 10,000
people were homeless



23.0%

77.0%

■ Sheltered (5,143)
■ Unsheltered (1,532)

---

## Estimates of Homelessness

4,901 individuals

1,774 people in families with children

290 unaccompanied homeless youth

343 veterans

810 chronically homeless individuals

# IOWA

9 in every 10,000
people were homeless



7.0%
change from 2024

3.0%
change from 2007

21.7%

78.3%

■ Sheltered (2,205)
■ Unsheltered (611)

Total Homeless, 2025
2,816

---

## Estimates of Homelessness

1,935 individuals

881 people in families with children

127 unaccompanied homeless youth

119 veterans

557 chronically homeless individuals

HUD-AR-01100

Appendix A

## KANSAS



-4.8%
change from 2024

25.9%
change from 2007



9 in every 10,000
people were homeless



31.2%   68.8%

■ Sheltered (1,830)
■ Unsheltered (828)

Total Homeless, 2025
2,658

Estimates of Homelessness

2,074 individuals

584 people in families with children

113 unaccompanied homeless youth

183 veterans

516 chronically homeless individuals

## KENTUCKY



10.7%
change from 2024

-28.2%
change from 2007

13 in every 10,000
people were homeless

34.5%   65.5%

■ Sheltered (3,791)
■ Unsheltered (1,998)

Total Homeless, 2025
5,789

Estimates of Homelessness

4,529 individuals

1,260 people in families with children

249 unaccompanied homeless youth

386 veterans

1,170 chronically homeless individuals

HUD-AR-01101

79

Appendix A

## LOUISIANA



6.3%
change from 2024

-32.9%
change from 2007

8 in every 10,000
people were homeless

57.9%
42.1%

■ Sheltered (2,136)
■ Unsheltered (1,552)

Total Homeless, 2025
3,688

Estimates of Homelessness

2,948 individuals

740 people in families with children

219 unaccompanied homeless youth

234 veterans

462 chronically homeless individuals

## MAINE



-10.7%
change from 2024

-8.5%
change from 2007

17 in every 10,000
people were homeless

11.6%
88.4%

■ Sheltered (2,132)
■ Unsheltered (281)

Total Homeless, 2025
2,413

Estimates of Homelessness

1,620 individuals

793 people in families with children

167 unaccompanied homeless youth

127 veterans

520 chronically homeless individuals

HUD-AR-01102

Appendix A

## MARYLAND



**11** in every **10,000** people were homeless

**17.3%** change from 2024

**-26.0%** change from 2007

87.3%

12.7%

■ Sheltered (6,219)
■ Unsheltered (901)

Total Homeless, 2025
7,120

---

### Estimates of Homelessness

**4,482** individuals

**2,638** people in families with children

**318** unaccompanied homeless youth

**320** veterans

**796** chronically homeless individuals

## MASSACHUSETTS



**40** in every **10,000** people were homeless

**-3.6%** change from 2024

**87.2%** change from 2007

93.8%

6.2%

■ Sheltered (26,563)
■ Unsheltered (1,748)

Total Homeless, 2025
28,311

---

### Estimates of Homelessness

**7,561** individuals

**20,750** people in families with children

**567** unaccompanied homeless youth

**550** veterans

**2,058** chronically homeless individuals

HUD-AR-01103

81

Appendix A

## MICHIGAN



**4.3%**
change from 2024

**-64.1%**
change from 2007

**10** in every **10,000**
people were homeless

16.9%

83.1%

■ Sheltered (8,439)
■ Unsheltered (1,716)

Total Homeless, 2025
10,155

---

Estimates of Homelessness

**6,296** individuals

**3,859** people in families with children

**605** unaccompanied homeless youth

**428** veterans

**1,115** chronically homeless individuals

## MINNESOTA



**-8.8%**
change from 2024

**14.6%**
change from 2007

**14** in every **10,000**
people were homeless

21.7%

78.3%

■ Sheltered (6,571)
■ Unsheltered (1,821)

Total Homeless, 2025
8,392

---

Estimates of Homelessness

**4,646** individuals

**3,746** people in families with children

**718** unaccompanied homeless youth

**233** veterans

**1,443** chronically homeless individuals

HUD-AR-01104

82

Appendix A

# MISSISSIPPI



**19.6%**
change from 2024

**-9.6%**
change from 2007

**4** in every **10,000**
people were homeless

58.3% Sheltered
41.7% Unsheltered

■ Sheltered (726)
■ Unsheltered (519)

Total Homeless, 2025
**1,245**

## Estimates of Homelessness

**1,051** individuals

**194** people in families with children

**52** unaccompanied homeless youth

**75** veterans

**106** chronically homeless individuals

# MISSOURI



**14.1%**
change from 2024

**33.6%**
change from 2007

**13** in every **10,000**
people were homeless

68.5% Sheltered
31.5% Unsheltered

■ Sheltered (5,713)
■ Unsheltered (2,632)

Total Homeless, 2025
**8,345**

## Estimates of Homelessness

**6,086** individuals

**2,259** people in families with children

**545** unaccompanied homeless youth

**557** veterans

**1,800** chronically homeless individuals

HUD-AR-01105

83

Appendix A

# MONTANA



**20** in every **10,000** people were homeless

**12.7%**
change from 2024

**96.8%**
change from 2007



31.2%
68.8%

■ Sheltered (1,557)
■ Unsheltered (706)

Total Homeless, 2025
2,263

---

Estimates of Homelessness

**1,586** individuals

**677** people in families with children

**141** unaccompanied homeless youth

**160** veterans

**512** chronically homeless individuals

# NEBRASKA



**13** in every **10,000** people were homeless

**-2.4%**
change from 2024

**-24.8%**
change from 2007



10.8%
89.2%

■ Sheltered (2,369)
■ Unsheltered (287)

Total Homeless, 2025
2,656

---

Estimates of Homelessness

**1,946** individuals

**701** people in families with children

**134** unaccompanied homeless youth

**141** veterans

**691** chronically homeless individuals

HUD-AR-01106

Appendix A

## NEVADA



-2.0%
change from 2024

14.6%
change from 2007

Total Homeless, 2025
9,905


30 in every 10,000
people were homeless



50.4%
49.6%

■ Sheltered (4,991)
■ Unsheltered (4,914)

### Estimates of Homelessness

8,452 individuals

1,453 people in families with children

552 unaccompanied homeless youth

620 veterans

3,017 chronically homeless individuals

## NEW HAMPSHIRE

17 in every 10,000
people were homeless

7.2%
change from 2024

7.0%
change from 2007

Total Homeless, 2025
2,406



27.1%
72.9%

■ Sheltered (1,754)
■ Unsheltered (652)

### Estimates of Homelessness

1,673 individuals

733 people in families with children

104 unaccompanied homeless youth

140 veterans

710 chronically homeless individuals

HUD-AR-01107

85

Appendix A

# NEW JERSEY



7.5%
change from 2024

-20.8%
change from 2007

Total Homeless, 2025
13,714

14 in every 10,000
people were homeless



14.5%

85.5%

■ Sheltered (11,728)
■ Unsheltered (1,986)

---

## Estimates of Homelessness

9,159 individuals

4,555 people in families with children

602 unaccompanied homeless youth

538 veterans

1,937 chronically homeless individuals

# NEW MEXICO



1.1%
change from 2024

55.3%
change from 2007

Total Homeless, 2025
4,683

22 in every 10,000
people were homeless



45.8%    54.2%

■ Sheltered (2,537)
■ Unsheltered (2,146)

---

## Estimates of Homelessness

3,901 individuals

782 people in families with children

222 unaccompanied homeless youth

308 veterans

1,694 chronically homeless individuals

Appendix A

# NEW YORK



**-7.9%**
change from 2024

**132.5%**
change from 2007

**73** in every **10,000**
people were homeless



4.0%

96.0%

■ Sheltered (139,704)
■ Unsheltered (5,856)

Total Homeless, 2025
145,560

Estimates of Homelessness

**60,637** individuals

**84,923** people in families with children

**6,096** unaccompanied homeless youth

**1,273** veterans

**4,621** chronically homeless individuals

# NORTH CAROLINA



**33.4%**
change from 2024

**31.4%**
change from 2007

**14** in every **10,000**
people were homeless

30.9%

69.1%

■ Sheltered (10,712)
■ Unsheltered (4,800)

Total Homeless, 2025
15,512

Estimates of Homelessness

**11,500** individuals

**4,012** people in families with children

**585** unaccompanied homeless youth

**752** veterans

**2,236** chronically homeless individuals

HUD-AR-01109

Appendix A

# NORTH DAKOTA

**11** in every **10,000** people were homeless



-0.5%
change from 2024

35.4%
change from 2007

19.3%

80.7%

■ Sheltered (695)
■ Unsheltered (166)

Total Homeless, 2025
861

Estimates of Homelessness

**642** individuals

**219** people in families with children

**79** unaccompanied homeless youth

**28** veterans

**201** chronically homeless individuals

# OHIO

**10** in every **10,000** people were homeless



3.7%
change from 2024

8.3%
change from 2007

20.3%

79.7%

■ Sheltered (9,718)
■ Unsheltered (2,478)

Total Homeless, 2025
12,196

Estimates of Homelessness

**9,126** individuals

**3,070** people in families with children

**946** unaccompanied homeless youth

**668** veterans

**1,452** chronically homeless individuals

HUD-AR-01110

88

## Appendix A

## OKLAHOMA

13 in every 10,000 people were homeless



-5.4%
change from 2024

22.6%
change from 2007

37.4%  62.6%

■ Sheltered (3,239)
■ Unsheltered (1,935)

Total Homeless, 2025
5,174

### Estimates of Homelessness

4,333 individuals

841 people in families with children

399 unaccompanied homeless youth

285 veterans

1,301 chronically homeless individuals

## OREGON

64 in every 10,000 people were homeless



18.9%
change from 2024

54.6%
change from 2007

60.7%  39.3%

■ Sheltered (10,702)
■ Unsheltered (16,500)

Total Homeless, 2025
27,202

### Estimates of Homelessness

23,524 individuals

3,678 people in families with children

2,128 unaccompanied homeless youth

1,635 veterans

9,616 chronically homeless individuals

HUD-AR-01111

89

Appendix A

## PENNSYLVANIA



11 in every 10,000 people were homeless

5.3% change from 2024

-8.5% change from 2007

19.4%

80.6%

■ Sheltered (11,952)
■ Unsheltered (2,882)

Total Homeless, 2025
14,834

### Estimates of Homelessness

**10,435** individuals

**4,399** people in families with children

**658** unaccompanied homeless youth

**817** veterans

**2,778** chronically homeless individuals

## RHODE ISLAND



21 in every 10,000 people were homeless

-2.8% change from 2024

73.0% change from 2007

26.0%

74.0%

■ Sheltered (1,755)
■ Unsheltered (618)

Total Homeless, 2025
2,373

### Estimates of Homelessness

**1,507** individuals

**866** people in families with children

**69** unaccompanied homeless youth

**125** veterans

**767** chronically homeless individuals

HUD-AR-01112

90

Appendix A

# SOUTH CAROLINA



-4.2%
change from 2024

-22.3%
change from 2007

Total Homeless, 2025
4,398

**8** in every **10,000**
people were homeless



32.4%    67.6%

■ Sheltered (2,975)
■ Unsheltered (1,423)

## Estimates of Homelessness

**3,673** individuals

**725** people in families with children

**243** unaccompanied homeless youth

**380** veterans

**914** chronically homeless individuals

# SOUTH DAKOTA



8.4%
change from 2024

150.4%
change from 2007

Total Homeless, 2025
1,450

**16** in every **10,000**
people were homeless

25.0%    75.0%

■ Sheltered (1,087)
■ Unsheltered (363)

## Estimates of Homelessness

**1,038** individuals

**412** people in families with children

**132** unaccompanied homeless youth

**43** veterans

**181** chronically homeless individuals

HUD-AR-01113

91

Appendix A

# TENNESSEE



12 in every 10,000 people were homeless

6.9%
change from 2024

-21.1%
change from 2007

46.1%   53.9%

■ Sheltered (4,774)
■ Unsheltered (4,076)

Total Homeless, 2025
8,850

## Estimates of Homelessness

7,301 individuals

1,549 people in families with children

448 unaccompanied homeless youth

659 veterans

1,884 chronically homeless individuals

# TEXAS



9 in every 10,000 people were homeless

0.2%
change from 2024

-29.5%
change from 2007

43.4%   56.6%

■ Sheltered (15,870)
■ Unsheltered (12,161)

Total Homeless, 2025
28,031

## Estimates of Homelessness

22,100 individuals

5,931 people in families with children

1,402 unaccompanied homeless youth

1,907 veterans

5,066 chronically homeless individuals

HUD-AR-01114

92

## Appendix A

## UTAH



13 in every 10,000 people were homeless



**18.5%**
change from 2024

**52.2%**
change from 2007

22.8%

77.2%

■ Sheltered (3,538)
■ Unsheltered (1,046)

Total Homeless, 2025
4,584

### Estimates of Homelessness

**3,558** individuals

**1,026** people in families with children

**256** unaccompanied homeless youth

**165** veterans

**1,172** chronically homeless individuals

## VERMONT



52 in every 10,000 people were homeless



**-2.1%**
change from 2024

**227.1%**
change from 2007

8.0%

92.0%

■ Sheltered (3,116)
■ Unsheltered (270)

Total Homeless, 2025
3,386

### Estimates of Homelessness

**2,199** individuals

**1,187** people in families with children

**132** unaccompanied homeless youth

**111** veterans

**721** chronically homeless individuals

HUD-AR-01115

# Appendix A

## VIRGINIA





8 in every 10,000 people were homeless

1.4%
change from 2024

-25.7%
change from 2007



18.6%

81.4%

■ Sheltered (5,891)
■ Unsheltered (1,349)

Total Homeless, 2025
7,240

### Estimates of Homelessness

4,951 individuals

2,289 people in families with children

302 unaccompanied homeless youth

371 veterans

1,200 chronically homeless individuals

## WASHINGTON

40 in every 10,000 people were homeless

0.5%
change from 2024

35.7%
change from 2007



53.7%    46.3%

■ Sheltered (14,688)
■ Unsheltered (17,033)

Total Homeless, 2025
31,721

### Estimates of Homelessness

24,838 individuals

6,883 people in families with children

1,579 unaccompanied homeless youth

1,757 veterans

12,439 chronically homeless individuals

HUD-AR-01116

94

Appendix A

## WEST VIRGINIA



**11** in every **10,000** people were homeless

8.2%
change from 2024

-20.1%
change from 2007

45.9%    54.1%

■ Sheltered (1,042)
■ Unsheltered (883)

Total Homeless, 2025
1,925

---

### Estimates of Homelessness

**1,688** individuals

**237** people in families with children

**136** unaccompanied homeless youth

**106** veterans

**339** chronically homeless individuals

## WISCONSIN



**9** in every **10,000** people were homeless

3.8%
change from 2024

-7.2%
change from 2007

9.1%

90.9%

■ Sheltered (4,767)
■ Unsheltered (476)

Total Homeless, 2025
5,243

---

### Estimates of Homelessness

**3,354** individuals

**1,889** people in families with children

**233** unaccompanied homeless youth

**274** veterans

**604** chronically homeless individuals

HUD-AR-01117

95

Appendix A

# WYOMING



6.8%
change from 2024

-0.4%
change from 2007

Total Homeless, 2025
535

9 in every 10,000 people were homeless



18.3%

81.7%

■ Sheltered (437)
■ Unsheltered (98)

Estimates of Homelessness

448 individuals

87 people in families with children

74 unaccompanied homeless youth

48 veterans

114 chronically homeless individuals

HUD-AR-01118    96

Appendix B

# Additional Data on Homelessness in 2025

## Recent Changes to the PIT Demographic Reporting Options.

In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections. HUD combined the race and ethnicity options into a single element that allowed people to select one or more race and ethnic identities from the list below. These updates in reporting options aligned with updates made to the FY2024 HMIS Data Standards.

1. American Indian, Alaska Native, or Indigenous
2. Asian or Asian American
3. Black, African American, or African
4. Hispanic/Latina(o)
5. Middle Eastern or North African
6. Native Hawaiian or Pacific Islander
7. White

When reporting race and ethnicity for the PIT Count, CoCs were required to report race and ethnicity using the following categories. Under these categories, people were only included in a single race/ethnicity if the person reported being only one race/ethnicity identity (e.g., Black, African American, or African). Selecting the multi-racial reporting option indicates that the person identified with more than one race.

1. American Indian, Alaska Native, or Indigenous
2. American Indian, Alaska Native, or Indigenous & Hispanic/Latina(o)
3. Asian or Asian American
4. Asian or Asian American & Hispanic/Latina(o)
5. Black, African American, or African
6. Black, African American, or African & Hispanic/Latina(o)
7. Hispanic/Latina(o)
8. Middle Eastern or North African
9. Middle Eastern or North African & Hispanic/Latina(o)
10. Native Hawaiian or Pacific Islander
11. Native Hawaiian or Pacific Islander & Hispanic/Latina(o)
12. White
13. White & Hispanic/Latina(o)
14. Multi-Racial & Hispanic/Latina(o)
15. Multi-Racial (not Hispanic/Latina(o))

# B-1: ADDITIONAL DATA ON ALL HOMELESS PERSONS

EXHIBIT B1.1: Demographic Characteristics of All Homeless Persons
2025

| | All Homeless Persons | | Sheltered Homeless Persons | | Unsheltered Homeless Persons | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 745,652 | 100% | 479,332 | 100% | 266,320 | 100% |
| Age | | | | | | |
| Under 18 | 133,962 | 18.0% | 124,387 | 26.0% | 9,575 | 3.6% |
| 18 to 24 | 51,462 | 6.9% | 38,620 | 8.1% | 12,842 | 4.8% |
| 25-34 | 127,872 | 17.1% | 79,912 | 16.7% | 47,960 | 18.0% |
| 35-44 | 161,812 | 21.7% | 89,835 | 18.7% | 71,977 | 27.0% |
| 45-54 | 121,768 | 16.3% | 61,989 | 12.9% | 59,779 | 22.4% |
| 55-64 | 103,780 | 13.9% | 57,730 | 12.0% | 46,050 | 17.3% |
| 65 and over | 44,996 | 6.0% | 26,859 | 5.6% | 18,137 | 6.8% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | 540,709 | 72.5% | 340,732 | 71.1% | 199,977 | 75.1% |
| Hispanic/Latina(o) | 204,943 | 27.5% | 138,600 | 28.9% | 66,343 | 24.9% |

Note: "Sheltered" refers to people in ES, TH, and SH.

EXHIBIT B1.2: Changes in the Demographic Characteristics of All Homeless Persons
2024-2025

| | Change in All Homeless Persons | | Change in Sheltered Homeless Persons | | Change in Unsheltered Homeless Persons | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total Change | -25,828 | -3.3% | -17,924 | -3.6% | -7,904 | -2.9% |
| Age | | | | | | |
| Under 18 | -14,276 | -9.6% | -12,772 | -9.3% | -1,504 | -13.6% |
| 18 to 24 | -6,178 | -10.7% | -4,612 | -10.7% | -1,566 | -10.9% |
| 25-34 | -18,987 | -12.9% | -15,304 | -16.1% | -3,683 | -7.1% |
| 35-44 | 7,963 | 5.2% | 5,713 | 6.8% | 2,250 | 3.2% |
| 45-54 | 3,028 | 2.6% | 3,774 | 6.5% | -746 | -1.2% |
| 55-64 | -227 | -0.2% | 2,741 | 5.0% | -2,968 | -6.1% |
| 65 and over | 2,849 | 6.8% | 2,536 | 10.4% | 313 | 1.8% |
| Race/Ethnicity | | | | | | |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | -907 | -21.2% | -699 | -25.3% | -208 | -13.7% |
| American Indian, Alaska Native, or Indigenous Only | -36 | -0.2% | -37 | -0.5% | 1 | <0.1% |
| Asian or Asian American and Hispanic/Latina(o) | -160 | -20.2% | -116 | -28.4% | -44 | -11.5% |
| Asian or Asian American Only | -865 | -8.3% | -888 | -14.1% | 23 | 0.6% |
| Black, African American, or African and Hispanic/Latina(o) | -6,171 | -38.6% | -5,986 | -43.8% | -185 | -8.1% |
| Black, African American, or African Only | 6,062 | 2.7% | 9,182 | 5.5% | -3,120 | -5.2% |
| Middle Eastern or North African and Hispanic/Latina(o) | -269 | -53.9% | -288 | -71.6% | 19 | 19.6% |
| Middle Eastern or North African Only | 2,280 | 150.7% | 2,183 | 247.8% | 97 | 15.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | -197 | -18.4% | -203 | -28.9% | 6 | 1.6% |
| Native Hawaiian or Pacific Islander Only | -1,651 | -16.0% | -1,351 | -23.0% | -300 | -6.7% |
| White and Hispanic/Latina(o) | -21,524 | -41.9% | -16,771 | -41.4% | -4,753 | -43.6% |
| White Only | -840 | -0.3% | 3,317 | 2.6% | -4,157 | -3.5% |
| Multi-Racial and Hispanic/Latina(o) | -1,029 | -15.0% | -901 | -22.6% | -128 | -4.5% |
| Multi-Racial All Other | 244 | 1.0% | -74 | -0.6% | 318 | 2.8% |
| Hispanic/Latina(o) Only | -765 | -0.5% | -5,292 | -5.0% | 4,527 | 9.3% |

Note: "Sheltered" refers to people in ES, TH, and SH.

HUD-AR-01121     99

## EXHIBIT B1.3: Largest Changes in Homelessness
By State, 2007–2025

| 2024-2025 | | | 2007–2025 | | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| OREGON | 4,327 | / 18.9% | NEW YORK | 82,959 | / 132.5% |
| NORTH CAROLINA | 3,886 | / 33.4% | CALIFORNIA | 42,948 | / 30.9% |
| MARYLAND | 1,051 | / 17.3% | MASSACHUSETTS | 13,184 | / 87.2% |
| MISSOURI | 1,033 | / 14.1% | OREGON | 9,612 | / 54.6% |
| NEW JERSEY | 952 | / 7.5% | WASHINGTON | 8,342 | / 35.7% |
| **Largest Decreases** | | | | | |
| NEW YORK | -12,459 | / -7.9% | FLORIDA | -20,181 | / -42.0% |
| ILLINOIS | -11,256 | / -43.6% | TEXAS | -11,757 | / -29.5% |
| CALIFORNIA | -5,150 | / -2.8% | GEORGIA | -7,355 | / -37.5% |
| HAWAII | -4,809 | / -41.3% | NEW JERSEY | -3,600 | / -20.8% |
| FLORIDA | -3,474 | / -11.1% | MARYLAND | -2,508 | / -26.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2025.

## EXHIBIT B1.4: Percent of All Homeless Persons that are Sheltered or Unsheltered
By CoC Category, 2025



Note: "Sheltered" refers to people in ES, TH, and SH.

## B-2: ADDITIONAL DATA ON HOMELESS INDIVIDUALS

### EXHIBIT B2.1: Changes in the Number of Homeless Individuals Over Time 2007-2025

|  | Total Change 2007-2025 | | Total Change 2013–2025 | | Total Change 2024-2025 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| All Homeless Individuals | 102,586 | 24.9% | 147,112 | 40.0% | 3,279 | 0.6% |
| Sheltered Individuals | 52,004 | 24.4% | 61,950 | 30.5% | 8,737 | 3.4% |
| Unsheltered Individuals | 50,582 | 25.3% | 85,162 | 51.6% | -5,458 | -2.1% |

Note: "Sheltered" refers to people in ES, TH, and SH.

EXHIBIT B2.2: Demographic Characteristics of Homeless Individuals
*2025*

| | All Homeless Individuals | | Sheltered Homeless Individuals | | Unsheltered Homeless Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 515,286 | 100% | 265,077 | 100% | 250,209 | 100% |
| Age | | | | | | |
| Under 18 | 2,668 | 0.5% | 1,753 | 0.7% | 915 | 0.4% |
| 18 to 24 | 35,955 | 7.0% | 24,003 | 9.1% | 11,952 | 4.8% |
| 25-34 | 92,138 | 17.9% | 46,447 | 17.5% | 45,691 | 18.3% |
| 35-44 | 126,572 | 24.6% | 57,059 | 21.5% | 69,513 | 27.8% |
| 45-54 | 112,418 | 21.8% | 53,779 | 20.3% | 58,639 | 23.4% |
| 55-64 | 101,289 | 19.7% | 55,736 | 21.0% | 45,553 | 18.2% |
| 65 and over | 44,246 | 8.6% | 26,300 | 9.9% | 17,946 | 7.2% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | 402,209 | 78.1% | 213,422 | 80.5% | 188,787 | 75.5% |
| Hispanic/Latina(o) | 113,077 | 21.9% | 51,655 | 19.5% | 61,422 | 24.5% |

Note: "Sheltered" refers to people in ES, TH, and SH.

HUD-AR-01124  102

EXHIBIT B2.3: Changes in the Demographic Characteristics of Homeless Individuals 2024-2025

| | Change in All Homeless Individuals | | Change in Sheltered Homeless Individuals | | Change in Unsheltered Homeless Individuals | |
|---|---|---|---|---|---|---|
| | # | % | | % | # | % |
| Total | 3,279 | 0.6% | 8,737 | 3.4% | -5,458 | -2.1% |
| Age | | | | | | |
| Under 18 | -155 | -5.5% | 44 | 2.6% | -199 | -17.9% |
| 18 to 24 | -3,312 | -8.4% | -1,954 | -7.5% | -1,358 | -10.2% |
| 25-34 | -5,914 | -6.0% | -2,745 | -5.6% | -3,169 | -6.5% |
| 35-44 | 5,926 | 4.9% | 3,494 | 6.5% | 2,432 | 3.6% |
| 45-54 | 3,750 | 3.5% | 4,288 | 8.7% | -538 | -0.9% |
| 55-64 | 30 | <0.1% | 2,973 | 5.6% | -2,943 | -6.1% |
| 65 and over | 2,954 | 7.2% | 2,637 | 11.1% | 317 | 1.8% |
| Race/Ethnicity | | | | | | |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | -525 | -17.5% | -339 | -21.5% | -186 | -13.0% |
| American Indian, Alaska Native, or Indigenous Only | 307 | 2.2% | 303 | 5.6% | 4 | <0.1% |
| Asian or Asian American and Hispanic/Latina(o) | -107 | -17.5% | -64 | -27.5% | -43 | -11.4% |
| Asian or Asian American Only | -85 | -1.1% | -168 | -4.5% | 83 | 2.1% |
| Black, African American, or African and Hispanic/Latina(o) | -1,279 | -20.8% | -1,153 | -27.8% | -126 | -6.3% |
| Black, African American, or African Only | 7,044 | 5.0% | 8,769 | 10.2% | -1,725 | -3.2% |
| Middle Eastern or North African and Hispanic/Latina(o) | -243 | -58.1% | -262 | -81.6% | 19 | 19.6% |
| Middle Eastern or North African Only | 1,860 | 161.6% | 1,739 | 307.2% | 121 | 20.7% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | -99 | -13.4% | -65 | -16.7% | -34 | -9.7% |
| Native Hawaiian or Pacific Islander Only | -601 | -11.1% | -603 | -28.0% | 2 | 0.1% |
| White and Hispanic/Latina(o) | -9,976 | -34.5% | -5,590 | -29.6% | -4,386 | -43.7% |
| White Only | 3,616 | 1.8% | 6,917 | 7.5% | -3,301 | -2.9% |
| Multi-Racial and Hispanic/Latina(o) | -258 | -6.3% | -243 | -14.8% | -15 | -0.6% |
| Multi-Racial All Other | 748 | 4.5% | 348 | 5.4% | 400 | 3.9% |
| Hispanic/Latina(o) Only | 2,877 | 3.7% | -852 | -2.6% | 3,729 | 8.2% |

Note: "Sheltered" refers to people in ES, TH, and SH.

## EXHIBIT B2.4: Largest Changes in Homelessness Among Individuals BY STATE, 2007–2025

| 2024-2025 | | | 2007–2025 | | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| OREGON | 4,601 | / 24.3% | CALIFORNIA | 44,840 | / 40.4% |
| NORTH CAROLINA | 3,104 | / 37.0% | NEW YORK | 32,581 | / 116.1% |
| COLORADO | 2,062 | / 20.2% | OREGON | 13,653 | / 138.3% |
| NEW JERSEY | 965 | / 11.8% | WASHINGTON | 11,549 | / 86.9% |
| MISSOURI | 924 | / 17.9% | CALIFORNIA | 3,109 | / 37.1% |
| **Largest Decreases** | | | | | |
| CALIFORNIA | -5,653 | / -3.5% | FLORIDA | -11,628 | / -35.2% |
| ILLINOIS | -3,904 | / -31.7% | TEXAS | -4,206 | / -16.0% |
| FLORIDA | -2,387 | / -10.0% | GEORGIA | -2,968 | / -23.7% |
| HAWAII | -2,202 | / -30.8% | TENNESSEE | -1,161 | / -13.7% |
| NEW YORK | -1,925 | / -3.1% | ARKANSAS | -1,134 | / -38.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2025.

## EXHIBIT B2.5: Percent of Homeless Individuals that are Sheltered or Unsheltered
By CoC Category, 2025



| | Sheltered | Unsheltered |
|---|---|---|
| Major Cities | 51.1% | 48.9% |
| Other Urban CoCs | 56.0% | 44.0% |
| Suburban CoCs | 53.0% | 47.0% |
| Rural CoCs | 48.5% | 51.5% |

■ Sheltered   ■ Unsheltered

Note: "Sheltered" refers to people in ES, TH, and SH.

HUD-AR-01126   104

# B-3: ADDITIONAL DATA ON HOMELESS PEOPLE IN FAMILIES WITH CHILDREN

EXHIBIT B3.1: Changes in the Number of People in Homeless Families with Children Over Time 2007-2025

|  | Total Change 2007-2025 | | Total Change 2013–2025 | | Total Change 2024-2025 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| All Homeless People in Families with Children | -4,192 | -1.8% | 8,176 | 3.7% | -29,107 | -11.2% |
| Sheltered People in Families with Children | 35,927 | 20.1% | 22,684 | 11.8% | -26,661 | -11.1% |
| Unsheltered People in Families with Children | -40,119 | -71.3% | -14,508 | -47.4% | -2,446 | -13.2% |

Note: "Sheltered" refers to people in ES and TH.

EXHIBIT B3.2: Demographic Characteristics of People in Homeless Families with Children
2025

| | All People in Homeless Families with Children | | Sheltered People in Homeless Families with Children | | Unsheltered People in Homeless Families with Children | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 230,366 | 100% | 214,255 | 100% | 16,111 | 100% |
| Age | | | | | | |
| Under 18 | 131,294 | 57.0% | 122,634 | 57.2% | 8,660 | 53.8% |
| 18 to 24 | 15,507 | 6.7% | 14,617 | 6.8% | 890 | 5.5% |
| 25-34 | 35,734 | 15.5% | 33,465 | 15.6% | 2,269 | 14.1% |
| 35-44 | 35,240 | 15.3% | 32,776 | 15.3% | 2,464 | 15.3% |
| 45-54 | 9,350 | 4.1% | 8,210 | 3.8% | 1,140 | 7.1% |
| 55-64 | 2,491 | 1.1% | 1,994 | 0.9% | 497 | 3.1% |
| 65 and over | 750 | 0.3% | 559 | 0.3% | 191 | 1.2% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | 138,500 | 60.1% | 127,310 | 59.4% | 11,190 | 69.5% |
| Hispanic/Latina(o) | 91,866 | 39.9% | 86,945 | 40.6% | 4,921 | 30.5% |

Note: "Sheltered" refers to people in ES and TH.

EXHIBIT B3.3: Changes in the Demographic Characteristics of People in Homeless Families with Children 2024-2025

| | Change in All People in Homeless Families with Children | | Change in Sheltered People in Homeless Families with Children | | Change in Unsheltered People in Homeless Families with Children | |
|---|---|---|---|---|---|---|
| | # | % | | % | Families with Children | % |
| Total Change | -29,107 | -11.2% | -26,661 | -11.1% | -2,446 | -13.2% |
| Age | | | | | | |
| Under 18 | -14,121 | -9.7% | -12,816 | -9.5% | -1,305 | -13.1% |
| 18 to 24 | -2,866 | -15.6% | -2,658 | -15.4% | -208 | -18.9% |
| 25-34 | -13,073 | -26.8% | -12,559 | -27.3% | -514 | -18.5% |
| 35-44 | 2,037 | 6.1% | 2,219 | 7.3% | -182 | -6.9% |
| 45-54 | -722 | -7.2% | -514 | -5.9% | -208 | -15.4% |
| 55-64 | -257 | -9.4% | -232 | -10.4% | -25 | -4.8% |
| 65 and over | -105 | -12.3% | -101 | -15.3% | -4 | -2.1% |
| Race/Ethnicity | | | | | | |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | -382 | -30.2% | -360 | -30.4% | -22 | -26.8% |
| American Indian, Alaska Native, or Indigenous Only | -343 | -10.8% | -340 | -12.7% | -3 | -0.6% |
| Asian or Asian American and Hispanic/Latina(o) | -53 | -29.0% | -52 | -29.5% | -1 | -14.3% |
| Asian or Asian American Only | -780 | -28.4% | -720 | -28.2% | -60 | -30.2% |
| Black, African American, or African and Hispanic/Latina(o) | -4,892 | -49.9% | -4,833 | -50.7% | -59 | -21.5% |
| Black, African American, or African Only | -982 | -1.1% | 413 | 0.5% | -1,395 | -28.2% |
| Middle Eastern or North African and Hispanic/Latina(o) | -26 | -32.1% | -26 | -32.1% | 0 | 0.0% |
| Middle Eastern or North African Only | 420 | 116.0% | 444 | 141.0% | -24 | -51.1% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | -98 | -29.4% | -138 | -43.9% | 40 | 210.5% |
| Native Hawaiian or Pacific Islander Only | -1,050 | -21.3% | -748 | -20.2% | -302 | -25.0% |
| White and Hispanic/Latina(o) | -11,548 | -51.4% | -11,181 | -51.8% | -367 | -42.6% |
| White Only | -4,456 | -11.2% | -3,600 | -10.7% | -856 | -14.0% |
| Multi-Racial and Hispanic/Latina(o) | -771 | -28.1% | -658 | -28.0% | -113 | -29.4% |
| Multi-Racial All Other | -504 | -6.7% | -422 | -6.3% | -82 | -9.4% |
| Hispanic/Latina(o) Only | -3,642 | -4.8% | -4,440 | -6.0% | 798 | 26.5% |

Note: "Sheltered" refers to people in ES and TH.

HUD-AR-01129

## EXHIBIT B3.4: Largest Changes in People in Homeless Families with Children
By State, 2007–2025

| 2024-2025 | | | 2007–2025 | | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| NORTH CAROLINA | 782 / | 24.2% | NEW YORK | 50,378 / | 145.8% |
| MARYLAND | 695 / | 35.8% | MASSACHUSETTS | 13,915 / | 203.6% |
| CALIFORNIA | 503 / | 2.0% | VERMONT | 751 / | 172.2% |
| IOWA | 153 / | 21.0% | NORTH CAROLINA | 601 / | 17.6% |
| MONTANA | 135 / | 24.9% | IDAHO | 357 / | 55.2% |
| **Largest Decreases** | | | | | |
| NEW YORK | -10,534 / | -11.0% | FLORIDA | -8,553 / | -56.9% |
| ILLINOIS | -7,352 / | -54.4% | TEXAS | -7,551 / | -56.0% |
| COLORADO | -4,090 / | -48.0% | GEORGIA | -4,387 / | -61.6% |
| HAWAII | -2,607 / | -58.0% | OREGON | -4,041 / | -52.4% |
| MASSACHUSETTS | -1,644 / | -7.3% | NEW JERSEY | -3,787 / | -45.4% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2025.

## EXHIBIT B3.5: Percent of People in Homeless Families with Children that are Sheltered or Unsheltered
By CoC Category, 2025



| | Sheltered | Unsheltered |
|---|---|---|
| Major Cities | 95.6% | 4.4% |
| Other Urban CoCs | 93.5% | 6.5% |
| Suburban CoCs | 94.1% | 5.9% |
| Rural CoCs | 80.1% | 19.9% |

■ Sheltered ■ Unsheltered

Note: "Sheltered" refers to people in ES and TH.

# B-4: ADDITIONAL DATA ON UNACCOMPANIED HOMELESS YOUTH

EXHIBIT B4.1: Changes in Numbers of Unaccompanied
Homeless Youth Over Time
2017-2025

|  | Total Change 2017-2025 | | Total Change 2024-2025 | |
|---|---|---|---|---|
|  | # | % | # | % |
| All Unaccompanied Homeless Youth | -3,144 | -8.2% | -3,011 | -7.9% |
| Sheltered Unaccompanied Homeless Youth | 5,010 | 27.0% | -1,894 | -7.4% |
| Unsheltered Unaccompanied Homeless Youth | -8,154 | -41.3% | -1,117 | -8.8% |

EXHIBIT B4.2: Demographic Characteristics of Unaccompanied Homeless Youth
2025

| | All Unaccompanied Homeless Youth | | Sheltered Unaccompanied Homeless Youth | | Unsheltered Unaccompanied Homeless Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 35,159 | 100% | 23,552 | 100% | 11,607 | 100% |
| Age | | | | | | |
| Under 18 | 2,592 | 7.4% | 1,679 | 7.1% | 913 | 7.9% |
| 18 to 24 | 32,567 | 92.6% | 21,873 | 92.9% | 10,694 | 92.1% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | 25,879 | 73.6% | 17,387 | 73.8% | 8,492 | 73.2% |
| Hispanic/Latina(o) | 9,227 | 26.2% | 6,112 | 26.0% | 3,115 | 26.8% |

Note: "Sheltered" refers to people in ES, TH and SH.

EXHIBIT B4.3: Changes in the Demographic Characteristics of Unaccompanied Homeless Youth
2024-2025

| | Change in All Unaccompanied Homeless Youth | | Change in Sheltered Unaccompanied Homeless Youth | | Change in Unsheltered Unaccompanied Homeless Youth | |
|---|---|---|---|---|---|---|
| | | % | | % | # | % |
| Total Change | -3,011 | -7.9% | -1,894 | -7.4% | -1,117 | -8.8% |
| Age | | | | | | |
| Under 18 | -106 | -3.9% | 52 | 3.2% | -158 | -14.8% |
| 18-24 | -2,905 | -8.2% | -1,946 | -8.2% | -959 | -8.2% |
| Race/Ethnicity | | | | | | |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | -108 | -35.5% | -60 | -35.5% | -48 | -35.6% |
| American Indian, Alaska Native, or Indigenous Only | 19 | 2.0% | 69 | 14.4% | -50 | -10.2% |
| Asian or Asian American and Hispanic/Latina(o) | -5 | -10.4% | 0 | 0.0% | -5 | -19.2% |
| Asian or Asian American Only | -204 | -33.7% | -39 | -14.4% | -165 | -49.3% |
| Black, African American, or African and Hispanic/Latina(o) | 422 | 64.8% | 442 | 89.7% | -20 | -12.7% |
| Black, African American, or African Only | 31 | 0.3% | 509 | 5.8% | -478 | -15.8% |
| Middle Eastern or North African and Hispanic/Latina(o) | 7 | 63.6% | 9 | 450.0% | -2 | -22.2% |
| Middle Eastern or North African Only | 223 | 91.8% | 225 | 114.8% | -2 | -4.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | -17 | -23.9% | -8 | -22.9% | -9 | -25.0% |
| Native Hawaiian or Pacific Islander Only | -26 | -8.3% | -41 | -24.6% | 15 | 10.3% |
| White and Hispanic/Latina(o) | -1,336 | -50.0% | -1,029 | -51.4% | -307 | -45.7% |
| White Only | 21 | 0.2% | 238 | 4.1% | -217 | -4.7% |
| Multi-Racial and Hispanic/Latina(o) | -17 | -3.9% | 4 | 1.7% | -21 | -10.7% |
| Multi-Racial All Other | 166 | 11.2% | 48 | 5.7% | 118 | 18.5% |
| Hispanic/Latina(o) Only | -2,187 | -26.4% | -2,261 | -37.4% | 74 | 3.3% |

Note: "Sheltered" refers to people in ES, TH and SH.

HUD-AR-01133    111

## EXHIBIT B4.4: Largest Changes in Unaccompanied Homeless Youth
By State, 2017–2025

| | 2024-2025 | | | 2017–2025 | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| OREGON | 813 / | 61.8% | NEW YORK | 3,267 / | 115.5% |
| COLORADO | 156 / | 26.4% | OREGON | 666 / | 45.6% |
| OHIO | 131 / | 16.1% | OHIO | 251 / | 36.1% |
| NEW JERSEY | 87 / | 16.9% | ARIZONA | 185 / | 32.0% |
| MARYLAND | 64 / | 25.2% | NORTH CAROLINA | 151 / | 34.8% |
| **Largest Decreases** | | | | | |
| NEW YORK | -1,575 / | -20.5% | CALIFORNIA | -4,876 / | -37.6% |
| ILLINOIS | -1,115 / | -57.3% | NEVADA | -1,614 / | -74.5% |
| CALIFORNIA | -966 / | -10.7% | FLORIDA | -941 / | -46.6% |
| FLORIDA | -289 / | -21.1% | WASHINGTON | -556 / | -26.0% |
| HAWAII | -164 / | -46.7% | MINNESOTA | -171 / | -19.2% |

## EXHIBIT B4.5: Percent of Unaccompanied Homeless Youth that are Sheltered or Unsheltered
By CoC Category, 2025



Note: "Sheltered" refers to people in ES, TH and SH.

## B-5: ADDITIONAL DATA ON HOMELESS VETERANS

### EXHIBIT B5.1: Changes in Number of Homeless Veterans Over Time
2009-2025

|  | Total Change 2009-2025 | | Total Change 2013–2025 | | Total Change 2024-2025 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| All Homeless Veterans | -40,872 | -55.7% | -23,124 | -41.6% | -387 | -1.2% |
| Sheltered Homeless Veterans | -24,432 | -56.3% | -15,932 | -45.6% | -54 | -0.3% |
| Unsheltered Homeless Veterans | -16,440 | -54.9% | -7,192 | -34.7% | -333 | -2.4% |

Note: "Sheltered" refers to people in ES, TH and SH.

### EXHIBIT B5.2: Demographic Characteristics of Homeless Veterans
2025

|  | All Homeless Veterans | | Sheltered Homeless Veterans | | Unsheltered Homeless Veterans | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| Total | 32,495 | 100% | 18,977 | 100% | 13,518 | 100% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | 28,836 | 88.7% | 17,410 | 91.7% | 11,426 | 84.5% |
| Hispanic/Latina(o) | 3,659 | 11.3% | 1,567 | 8.3% | 2,092 | 15.5% |

Note: "Sheltered" refers to people in ES, TH and SH.

EXHIBIT B5.3: Changes in the Demographic Characteristics of Homeless Veterans 2024-2025

| | Change in All Homeless Veterans | | Change in Sheltered Homeless Veterans | | Change in Unsheltered Homeless Veterans | |
|---|---|---|---|---|---|---|
| | | % | | % | # | % |
| Total Change | -387 | -1.2% | -54 | -0.3% | -333 | -2.4% |
| Ethnicity | | | | | | |
| Non-Hispanic/Latina(o) | -14 | <-0.1% | 57 | 0.3% | -71 | -0.6% |
| Hispanic/Latina(o) | -373 | -9.3% | -111 | -6.6% | -262 | -11.1% |
| Race/Ethnicity | | | | | | |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina(o) | -40 | -28.8% | -8 | -13.6% | -32 | -40.0% |
| American Indian, Alaska Native, or Indigenous Only | 241 | 26.8% | 0 | 0.0% | 241 | 46.2% |
| Asian or Asian American and Hispanic/Latina(o) | 5 | 35.7% | 2 | 40.0% | 3 | 33.3% |
| Asian or Asian American Only | 22 | 5.9% | 6 | 3.9% | 16 | 7.1% |
| Black, African American, or African and Hispanic/Latina(o) | -101 | -33.9% | -49 | -26.2% | -52 | -46.8% |
| Black, African American, or African Only | -407 | -4.1% | -119 | -1.8% | -288 | -9.2% |
| Middle Eastern or North African and Hispanic/Latina(o) | 4 | 100.0% | 3 | n/a | 1 | 25.0% |
| Middle Eastern or North African Only | 6 | 11.3% | 7 | 77.8% | -1 | -2.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina(o) | 7 | 21.9% | -3 | -14.3% | 10 | 90.9% |
| Native Hawaiian or Pacific Islander Only | -52 | -16.9% | -18 | -15.0% | -34 | -18.1% |
| White and Hispanic/Latina(o) | -320 | -29.3% | -225 | -29.0% | -95 | -29.8% |
| White Only | 182 | 1.1% | 134 | 1.4% | 48 | 0.7% |
| Multi-Racial and Hispanic/Latina(o) | -3 | -1.2% | -17 | -18.1% | 14 | 9.1% |
| Multi-Racial All Other | -6 | -0.5% | 47 | 9.7% | -53 | -6.6% |
| Hispanic/Latina(o) Only | 75 | 3.4% | 186 | 34.6% | -111 | -6.7% |

Note: "Sheltered" refers to people in ES, TH and SH.

EXHIBIT B5.4: Largest Changes in Homeless Veterans
By State, 2009–2025

| | 2024-2025 | | | 2009–2025 | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| OREGON | 228 / | 16.2% | OREGON | 358 / | 28.1% |
| PENNSYLVANIA | 98 / | 13.6% | VERMONT | 50 / | 81.4% |
| COLORADO | 97 / | 9.9% | RHODE ISLAND | 5 / | 4.2% |
| NEW YORK | 93 / | 7.9% | MAINE | 4 / | 3.2% |
| TENNESSEE | 89 / | 15.6% | N/A | -- / | -- |
| **Largest Decreases** | | | | | |
| CALIFORNIA | -624 / | -6.7% | CALIFORNIA | -9,287 / | -51.7% |
| FLORIDA | -192 / | -8.2% | FLORIDA | -4,994 / | -70.0% |
| ILLINOIS | -79 / | -14.1% | NEW YORK | -4,606 / | -78.3% |
| INDIANA | -79 / | -18.7% | TEXAS | -3,584 / | -65.3% |
| ALABAMA | -77 / | -26.5% | GEORGIA | -2,121 / | -76.8% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2009 and 2025.

EXHIBIT B5.5: Percent of Homeless Veterans that are Sheltered or Unsheltered
By CoC Category, 2025



Note: "Sheltered" refers to people in ES, TH and SH.

## B-6: ADDITIONAL DATA ON INDIVIDUALS WITH CHRONIC PATTERNS OF HOMELESSNESS

### EXHIBIT B6.1: Changes in Numbers of Individuals with Chronic Patterns of Homelessness Over Time
2007-2025

|  | Total Change 2007-2025 | | Total Change 2013–2025 | | Total Change 2024-2025 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| All Individuals with Chronic Patterns of Homelessness | 35,937 | 30.0% | 69,461 | 80.5% | 3,165 | 2.1% |
| Sheltered Individuals with Chronic Patterns of Homelessness | 17,271 | 41.3% | 29,621 | 100.7% | 6,019 | 11.4% |
| Unsheltered Individuals with Chronic Patterns of Homelessness | 18,666 | 23.9% | 39,840 | 70.1% | -2,854 | -2.9% |

### EXHIBIT B6.2: Largest Changes in Individuals with Chronic Patterns of Homelessness
By State, 2007–2025

| 2024-2025 | | | 2007–2025 | | |
|---|---|---|---|---|---|
| **Largest Increases** | | | | | |
| OREGON | 1,909 / | 24.8% | CALIFORNIA | 24,352 / | 60.4% |
| COLORADO | 956 / | 23.6% | WASHINGTON | 9,836 / | 377.9% |
| PENNSYLVANIA | 638 / | 29.8% | OREGON | 6,787 / | 239.9% |
| WASHINGTON | 453 / | 3.8% | NEVADA | 2,146 / | 246.4% |
| NORTH CAROLINA | 412 / | 22.6% | PENNSYLVANIA | 1,189 / | 74.8% |
| **Largest Decreases** | | | | | |
| CALIFORNIA | -1,855 / | -2.8% | TEXAS | -2,865 / | -36.1% |
| FLORIDA | -723 / | -11.9% | FLORIDA | -2,086 / | -28.0% |
| NEW YORK | -456 / | -9.0% | NEW YORK | -1,855 / | -28.6% |
| ARKANSAS | -380 / | -49.1% | GEORGIA | -932 / | -37.5% |
| ALABAMA | -276 / | -35.3% | CONNECTICUT | -891 / | -87.1% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2025.

### EXHIBIT B6.3: Percent of Individuals with Chronic Patterns of Homelessness that are Sheltered or Unsheltered
By CoC Category, 2025



■ Sheltered  ■ Unsheltered

Note: "Sheltered" refers to people in ES and SH.



The U.S. Department of
Housing and Urban Development
**OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT**

HUD-AR-01139

# EVIDENCE
# MATTERS

**Transforming Knowledge Into Housing and Community Development Policy**

*Photo courtesy of DESC*

# HOUSING FIRST AND HOMELESSNESS

## IN THIS ISSUE

**03** Housing First Works

**11** Housing First: A Review of the Evidence

**20** Housing First in Action

 

HUD-AR-01141

# Message From PD&R Leadership



In this issue of *Evidence Matters,* we highlight how Housing First can address the challenges of homelessness in the United States. Housing First is a service model that prioritizes moving households quickly into housing without any preconditions. The model typically includes additional supportive services for households after they are successfully and stably housed. Housing First is a flexible, adaptive approach that guarantees that the basic housing needs of families at risk of homelessness or experiencing homelessness are met.

We focus on Housing First for a simple reason: these programs work. A growing body of evidence, much of it presented throughout this issue, shows the lasting benefits of a service model that prioritizes the delivery of housing.

Housing First is not a narrow, one-size-fits-all model. Instead, as we emphasize throughout the publication, it is an expansive approach to ending homelessness. Although Housing First programs are commonly associated with rapid rehousing strategies and permanent supportive housing, the model is intentionally broad and includes multiple types of locally tailored programs to address community needs.

In this edition of *Evidence Matters,* we highlight case studies from Boston and Chattanooga. In Boston, city leaders embraced a Housing First approach to end homelessness among veterans. Chattanooga's approach centered on rapid rehousing programs to end long-term homelessness. These examples are a few of the countless models from communities nationwide that prioritize the provision of housing in the fight to end homelessness.

Housing First is the centerpiece of the Biden-Harris administration's approach to ending homelessness. By presenting an evidence-based policy that can be adopted, tailored, and deployed in communities throughout the United States, we hope that this edition of *Evidence Matters* contributes to important policy discussions.

— Brian J. McCabe, *Deputy Assistant Secretary for Policy Development*

HUD-AR-01142

# Editor's Note

This issue of *Evidence Matters* explores the role of the Housing First model in addressing homelessness. Unlike other delivery methods for solving homelessness, Housing First relies on the principle of getting individuals and households experiencing homelessness into housing with as few barriers as possible.

The lead article, "Housing First Works," finds that the foremost researchers and policymakers addressing homelessness agree: homelessness is solvable. A resolution, however, will be possible only when evidence-based practices align with political will.

The In Practice article, "Housing First in Action," details successful case studies in two very different cities: Boston and Chattanooga. These cities focus on wraparound services offered in tandem with service providers coupled with efforts to increase housing supply, which support those experiencing homelessness and incentivize landlords to provide affordable housing.

The Research Spotlight article, "Housing First: A Review of the Evidence," examines research supporting Housing First as a successful delivery method for addressing homelessness. Studies have shown that the Housing First model has been successful in housing veterans, those with substance abuse issues, individuals with mental illness, and individuals with chronic medical conditions.

We hope that the articles in this issue of *Evidence Matters* will offer readers greater insight into the Housing First model. We welcome feedback at **www.huduser.gov/forums**.

— Parker A. Lester, *Social Science Analyst*

FEATURE

# Housing First Works

High rents, low wages, various forms of discrimination, an inadequate supply of affordable housing, evictions, and other factors contribute to the persistence of homelessness in the United States. Based on HUD Point-in-Time counts, an estimated 582,500 people in the United States were experiencing homelessness on a single night in 2022, roughly 40 percent of them in unsheltered locations unsuitable for human habitation.[1] For a significant minority, mental health and physical challenges further complicate their ability to sustain stable housing.[2] Yet when policymakers invest sufficient resources, make housing accessible, and offer services through an effective delivery model, they can significantly reduce rates of homelessness in their jurisdictions. Evidence shows that the Housing First model, which focuses on placing unhoused people into housing as quickly as

possible without preconditions and offering voluntary supportive services, is a highly effective strategy for addressing homelessness. The Biden-Harris administration has directed the federal government to prioritize the Housing First model when investing resources toward ending homelessness. Several initiatives from HUD and other federal agencies, such as the U.S. Interagency Council on Homelessness (USICH), emphasize and promote the adoption of evidence-based Housing First models. Housing First principles have been used through HUD programs and initiatives such as the Continuum of Care (CoC) program, *House America: An All-Hands-on-Deck Effort to Address the Nation's Homelessness Crisis,* and HUD-Veterans Affairs Supportive Housing (HUD-VASH) implemented with local partners across the country. "Homelessness," says USICH executive director Jeff Olivet, "is not inevitable, and it is

## HIGHLIGHTS

- Homelessness continues to be a challenge throughout the United States, especially in areas where affordable housing is scarcest.

- Housing First — an adaptable, evidence-based service model focused on getting families into housing as quickly as possible and offering voluntary supportive services — has been proven to successfully promote housing stability, improve some health outcomes, and reduce the use of high-cost services.

- Federal, state, and local governments can align investments in Housing First approaches as well as efforts to increase the supply of affordable housing to effectively solve homelessness.

not unsolvable…. The United States of America can end homelessness by fixing public services and systems…."[3]

HUD-AR-01143    3



*Photo courtesy of Allison Zapata*

Housing First is not "housing only" but is paired with the offer of voluntary supportive services.

## What Is Housing First?

Housing First is a flexible and adaptable service model that addresses homelessness by quickly placing individuals and families with children experiencing homelessness into housing without any preconditions or barriers and offering voluntary supportive services to meet individuals' needs. Jurisdictions may offer these services before placement in housing, as soon as a client interacts with a jurisdiction's homelessness services entities, but participation in services is not a precondition of placement. HUD clarifies the low-barrier approach in a recent notice of funding availability: "This means the projects allow entry to program participants regardless of their income, current or past substance use, history of victimization (e.g., domestic violence, sexual assault, childhood abuse), and a criminal record–except restrictions imposed by federal, state, or local law or ordinance (e.g., restrictions on serving people who are listed on sex offender registries)."[4]

Crucially, the Housing First approach differs from those that require individuals or families with children to meet criteria such as sobriety or participation in services *before* receiving permanent housing.[5] Called the "staircase," "linear," or "treatment first" model, these alternative approaches tie admission to or movement from one program, level of services, or housing type to the next to attainment of treatment goals.[6] The effectiveness of the staircase model, however, proves to be especially limited in meeting the needs of, and ending homelessness for, people with multiple challenges. Tainio and Fredrikson write, "[T]he insistence on service users being intoxicant-free and able to take control of their life has proven to be an insuperable barrier for many…. They face immense difficulties finding the motivation to receive care or change their lifestyles and need considerable support with everyday life."[7] A Housing First approach removes barriers to assisting people who are most difficult and costly for public systems to serve, and it helps those people

who have difficulty with congregate settings.[8]

The Housing First model originated with the Pathways to Housing program, which was established in 1992 by Sam Tsemberis. The program served clients with addiction or mental health issues by providing rental supplements to secure housing. Although the program initially required clients to agree to two staff visits per month, it provided supportive services on a voluntary basis.[9] Through voluntary participation in services as well as independent housing and community integration, the approach affirmed "consumer choice" for clients. Pathways to Housing sought harm reduction, not abstinence, from clients.[10] Beginning in 1996, the New York Housing Study included Pathways to Housing as the experimental portion of a randomized trial, comparing it with treatment first programs. The study found higher rates of housing stability and no significant group differences in most health and treatment outcomes (treatment first programs did

HUD-AR-01144

have higher rates of use of substance abuse treatment services). The success of Pathways to Housing provided a foundation and momentum for the Housing First model to be adopted more widely.[11]

The Housing First approach itself rests on the foundational premise that housing is a basic right and considers homelessness to be primarily a housing problem (and, for many people, the lack of housing is the only problem). As Colburn and Aldern, authors of *Homelessness Is a Housing Problem,* explain, "[T]he narrative about homelessness is often dominated by a focus on drugs and mental health, which may obscure other (often structural) explanations for the crisis" — namely, a scarcity of affordable housing — and "when housing is scarce, vulnerabilities and barriers to housing are magnified."[12] The primary evidence supporting the

conclusion that affordable housing scarcity is driving the homelessness crisis, says Colburn, is that "the places in the United States with the highest rates of homelessness are the places where housing is very expensive and not very accessible."[13] The individual behaviors and characteristics sometimes posited as explanations for homelessness are spread evenly across the United States, yet rates of homelessness are higher in areas with affordable housing shortages.[14] "Homelessness is driven by the lack of housing that's affordable to the lowest income families," says Margot Kushel, professor of medicine at University of California San Francisco.[15]

Finally, Housing First is premised on the assumption that everyone is "housing ready," meaning that people can be housed successfully and remain in housing without preconditions such as sobriety, a minimum income, or

the absence of a criminal record.[16] Moreover, whatever other challenges a person might face, housing instability or homelessness typically compounds those challenges, and housing stability makes addressing them more manageable.[17] Ample evidence suggests that Housing First programs that maintain high fidelity to the model increased housing stability and participants' use of supportive services compared with programs maintaining lower fidelity to the model.[18]

## What Housing First Is Not

Housing First has enjoyed bipartisan support for many years. As Urban Institute Metropolitan Housing and Communities Policy Center vice president Mary Cunningham points out, "[I]t's a strategy based on evidence of what works, not an ideology associated with one political party."[19] Some critics, however, have mischaracterized



*Photo courtesy of Allison Zapata*

According to Point-in-Time counts, HUD estimates that 582,500 people were experiencing homelessness on a single night in 2022.

HUD-AR-01145    **5**

Housing First approaches, arguing for reduced investment in them in favor of treatment first approaches. Housing First is not a program; rather, it is a service model based on flexible and adaptable principles. It also is not a one-size-fits-all approach, as some critics claim. Jurisdictions can integrate Housing First principles into numerous interventions, including permanent supportive housing, housing vouchers or affordable housing, rapid rehousing or short-term rental assistance programs, and flexible financial assistance, and they can be applied to any subgroup, including youth and veterans, among others. And, crucially, the Housing First model is centered on the client's ability to choose whether and what services to use. As Resnikoff puts it, "The specific treatment program is voluntary and customized to meet the needs of the client — precisely the opposite of 'one-size-fits-all.'"[20] Clients' needs will vary and change over time. Housing First combines permanent housing with flexible services that can be adapted as clients' needs change so that they receive an appropriate level of services.[21]

In other words, Housing First is not "housing only." As Cunningham puts it, "Housing First doesn't end with housing; it starts with it."[22] The offer of trauma-informed, wraparound supportive services as they are wanted and needed is intrinsic to the model. Some people exiting homelessness into housing in a program employing a Housing First approach will not need any additional supports, and others will have complex and significant needs. Colburn notes that homelessness can be both a cause and a consequence of some of the mental and behavioral health issues that people experiencing homelessness may face.[23] This does mean that the funding and capacity for such services are critical components of a Housing First approach, and one or both may be lacking in some cases, thereby reducing fidelity to the model.

Housing First is not a single program or program type; rather, it is a delivery



Housing First is a flexible, evidence-based service model that quickly provides people with housing without preconditions and offers wraparound services.

*Photo courtesy of Allison Zapata*

approach. Although Housing First is commonly associated with permanent supportive housing, not all permanent supportive housing programs adhere to a Housing First approach, and other programs, such as rapid rehousing, when implemented with fidelity, are using a Housing First approach. Whatever the program, if it is not adequately funded to provide both housing and services, it will fail to achieve fidelity to the Housing First model.[24] Jurisdictions can apply the Housing First approach not only to programs but also to entire communities and systems. Streamlined coordinated entry to match people experiencing homelessness to permanent housing and services, implementation of low barriers to housing and services across mainstream systems, and system-wide training of housing and services staff in evidence-based practices are among the steps that communities can take to adopt a Housing First orientation.[25]

Some critics have alleged that Housing First is an ineffective approach because homelessness has persisted and, in some contexts, increased despite widespread adoption of the model

(albeit with varying degrees of fidelity). Yet, increases in rates of homelessness caused by an insufficient supply of affordable housing are not proof that Housing First is ineffective. As HUD senior advisor Richard Cho puts it, "The increase in homelessness from 2016 to 2020 is not because the Housing First approach is ineffective; in fact, more people were exiting homelessness into permanent housing during this period than ever before. Rather, it is because housing market conditions and other factors were leading more people to become newly homeless than were being exited from homelessness into housing in the prior years."[26] As noted above, the scarcity of affordable and accessible housing is the primary cause of homelessness, and rates of homelessness are rising in the places where rental costs are increasing, and vacancy rates are decreasing. Cho notes that rates of homelessness have decreased in two-thirds of CoCs since 2010, when federal policy shifted to Housing First, and even as national rates began to rise in 2016, half of CoCs continued to see decreases in their rates of homelessness.[27] The more apt comparisons for evaluating the effectiveness or success

6

HUD-AR-01146

of Housing First, says Kushel, are alternative strategies for addressing homelessness, such as treatment first approaches. "When these approaches are compared head-to-head, on which is more likely to house more people, Housing First wins hands-down," says Kushel.[28]

## The Evidence

A number of studies, including some randomized controlled trials, indicate the effectiveness of Housing First approaches for outcomes such as housing stability, health, and reduced use of high-cost services such as emergency departments and jails.[29] (See "Housing First: A Review of the Evidence," p. 11, for a more detailed discussion of the evidence base for Housing First.)

Meta-analysis of randomized controlled trials by Baxter et al. found that Housing First approaches showed significant improvements in housing stability compared with treatment as usual.[30] The At Home/Chez Soi study, for example, found that over 2 years, participants in a program with a Housing First approach spent 73 percent of their time in stable housing compared with 32 percent for those receiving treatment as usual.[31] Similarly, a comparison of Housing First and a program requiring sobriety for chronically homeless individuals with psychiatric disabilities and substance abuse issues found that individuals randomly assigned to a program with a Housing First approach spent less time experiencing homelessness and in psychiatric hospitals compared with those in the program that required sobriety.[32]

Compared with treatment as usual, Housing First approaches reduce the use of certain high-cost municipal services. A quasi-experimental study based in Seattle examining people with severe problems with alcohol found that "[i]n this population of chronically homeless individuals with high service use and costs, a Housing First program was associated with a relative decrease in costs after 6 months," and more

cost savings were achieved the longer individuals stayed in housing. The participants had reduced number and duration of hospital visits.[33] Likewise, evaluation of the Housing First Charlotte-Mecklenburg program found that Housing First reduced high-cost service uses, including fewer nights spent in shelter, fewer arrests and incarceration events, and fewer health and emergency department visits, but increased the use of less costly supportive services and assistance.[34]

In their meta-analysis, Baxter et al. found insufficient evidence of the effect of the Housing First approach on mental health and other health outcomes.[35] Cho notes that most studies only have a 2-year follow-up, which may not be long enough to observe improvements in many chronic health conditions.[36] One area of health improvement, however, was found among individuals with HIV. Meta-analysis by Peng et al. found that, compared with treatment first programs, programs adopting the Housing First approach "decreased homelessness by 88% and improved housing stability by 41%. For clients living with HIV infection, Housing First programs reduced homelessness by 37%, viral load by 22%, depression by 13%,

emergency departments use by 41%, hospitalization by 36%, and mortality by 37%."[37] More generally, the At Home/Chez Soi randomized controlled trial found improved community functioning and quality of life for Housing First participants.[38] Another study found that Housing First was associated with reduced use of stimulants and opiates.[39]

## HUD and Other Federal Efforts

Recognizing the soundness and success of the evidence-based approach, the Biden-Harris administration has adopted various programs and initiatives to recenter the Housing First model and has set an ambitious goal to reduce homelessness by 25 percent by 2025.[40] The administration calls on state and local governments to follow federal guidance on best practices and ensure that agencies direct federal investments to proven Housing First strategies.[41]

One of the more successful demonstrations of the efficacy of the Housing First approach has been the HUD-VASH program, through which the federal government has made significant progress in curtailing experiences of homelessness among veterans. HUD-VASH pairs HUD housing choice



*Photo courtesy of John Fitzhugh, Open Doors Homeless Coalition*

The Biden-Harris administration has centered Housing First approaches in addressing homelessness and aims to reduce homelessness by 25 percent by 2025.



Photo courtesy of Allison Zapata

Housing First rests on the premise that virtually everyone is "housing ready" — able to be and remain successfully housed without preconditions.

including HUD-VASH resources. Supported by extensive regional collaboration among more than 70 partner agencies and organizations, the Houston/Harris County CoC formed The Way Home to coordinate regional efforts to prevent and end homelessness. The development of affordable housing in the region augments the supply of units available for HUD-VASH voucher recipients. For example, Travis Street Plaza provides 192 units in Houston's Midtown neighborhood, and nearby Midtown Terrace provides 286 units for veterans with access to case management and supportive services.[45] Likewise, Bergen County, a county of more than 900,000 in northeast New Jersey, met the federal criteria for ending veteran homelessness through a concerted and collaborative effort to identify and track needs, target resources, and invest in a Housing First approach. Before it met the criteria for ending veteran homelessness, the county met the criteria for ending chronic homelessness, and it is now working toward ending youth homelessness while maintaining current levels in other categories.[46]

HUD's CoC program, which funds efforts by state and local governments and nonprofits to rehouse individuals and families with children experiencing homelessness, prioritizes Housing First approaches in its selection criteria. HUD awards most of its CoC program funding competitively, and applicants receive points for incorporating a Housing First approach. In FY 2021, HUD awarded approximately $2.66 billion, including $77 million in noncompetitive Youth Homelessness Demonstration Program awards and $102 million for domestic violence projects, all of which must adopt a Housing First approach. CoC awards can fund various programs, including permanent supportive housing and rapid rehousing. HUD requires CoC-funded joint transitional housing and rapid rehousing projects to have a Housing First approach. HUD encourages CoCs to assess implementation in their jurisdiction, which will allow them to monitor projects and encourage fidelity

vouchers with support services provided by the U.S. Department of Veterans Affairs (VA). VA began implementing a Housing First approach to the HUD-VASH program in federal fiscal year (FY) 2013, although regulations do require clients to communicate with VA case managers at least once a month. Individuals can access wraparound services, often at VA medical centers and sometimes through other community-based service providers.[42] HUD-VASH's strides toward ending veteran homelessness suggests a path for ending homelessness among all populations; as the secretaries for VA and HUD and the USICH executive director write, "[W]

hen leadership is committed, resources are invested, and government and community partners take collective action, the fight against homelessness is one we can win."[43] Since 2010, the number of veterans experiencing homelessness has fallen by 55.3 percent, including an 11 percent reduction since 2020. During 2022 alone, VA housed 40,401 veterans experiencing homelessness in safe, stable homes.[44]

The Houston/Harris County CoC, for example, effectively ended veteran homelessness in 2015 (with ongoing efforts to maintain the reduction) through coordinated investment,

8

HUD-AR-01148

to the Housing First model.[47] The CoC program is a longstanding funding stream for addressing homelessness and aligning it with the Housing First approach represents a long-term commitment to the model.

Jurisdictions need to direct even nonrecurring investments to proven strategies to maximize their impact. In response to the COVID-19 pandemic, the federal government directed significant resources toward housing, including issuing 70,000 emergency housing vouchers and $5 billion in HOME grants as well as $350 billion in Coronavirus State and Local Fiscal Recovery Funds, to address housing instability and homelessness, among other challenges.[48] As of April 2, 2023, the federal government had issued emergency housing vouchers to 52,861 households.[49] *House America: An All-Hands-on-Deck Effort to Address the Nation's Homelessness Crisis* is a HUD and USICH initiative focused on channeling these and other federal resources to support Housing First programs. Seventy-nine municipalities, 16 counties, a regional leadership council of governments, 4 states, a U.S. territory, and a Tribal nation representing more than half of people experiencing homelessness in the United States have signed on to the initiative.[50] Under this initiative, communities have issued 22,500 emergency housing vouchers and directed $450 million in Emergency Solutions Grants for rapid rehousing, rehousing 62,000 households, and communities have added 15,500 units of affordable and supportive housing through September 2022. For communities participating in *House America,* HUD provided $1.25 billion through CoC awards in 2021 for services and housing for people experiencing homelessness; $1.3 billion for housing, shelter, and outreach; and, through a Special Notice of Funding Opportunity, $322 million ($54.4 million of which is set aside for rural communities) for permanent housing, supportive services, and other costs and $43 million for incremental housing vouchers. Finally, HUD and the U.S. Department of Health and Human Services jointly created the Housing and Services Resource Center to foster collaboration among community organizations providing housing and health services.[51]

The administration articulates a comprehensive, whole-of-government framework to address homelessness in the USICH report *All In: The Federal Strategic Plan to Prevent and End Homelessness,* which highlights the importance of Housing First principles. The report asserts, "To truly bring Housing First to scale for all populations, communities need access to housing and wraparound services and other supports that can be offered to implement this approach with fidelity to the model." The report outlines several strategies needed to ensure fidelity to the Housing First model. Localities will need to maximize the use of existing federal housing assistance; create more safe, affordable, and accessible housing; and increase the supply of permanent supportive housing for individuals and families with children who have complex service needs. The USICH report suggests that when directing federal funds, localities should give preference to owners who agree to use a Housing First approach.[52]

The report also calls for improving the effectiveness of rapid rehousing for individuals and families with children, strengthening capacity to address chronic health conditions, including mental health and substance use disorders, and maximizing resources that provide voluntary and trauma-informed supportive services and income supports. The report recommends increasing the use of evidence-based service delivery practices across programs; supporting fair housing enforcement and antidiscrimination efforts; and removing and reducing programmatic, regulatory, and other barriers such as eligibility and documentation requirements that systematically delay or deny access to housing for households with the highest needs.[53]

## Homelessness Is Solvable

Cunningham notes that although homelessness is a complex social problem, "it's also a simple math equation. To reduce homelessness, policymakers need to help people exit homelessness faster than people entering homelessness. Prevention — helping people stay in their housing — is just as important as helping people exit homelessness."[54] Ending homelessness requires both scaling up the Housing First approach to meet the needs of those currently experiencing homelessness as well as various strategies to prevent new entries into homelessness. In many places, especially those with a high incidence of homelessness, increasing the supply of affordable

> Ending homelessness requires both scaling up the Housing First approach to meet the needs of those currently experiencing homelessness as well as various strategies to prevent new entries into homelessness.

housing is essential to accomplish both goals. To implement Housing First approaches with fidelity, communities need available housing units for permanent supportive housing and rapid rehousing options along with needed supportive services. A sufficient supply of accessible, affordable housing is also

critical for ensuring that people can avoid housing insecurity and homelessness. Expanding the supply of affordable housing is particularly challenging and requires its own set of strategies. The Biden-Harris administration's Housing Supply Action Plan outlines steps to reduce barriers and increase investment to close housing supply gaps. In addition to dramatically expanding the supply of affordable housing, fair housing enforcement, eviction prevention initiatives, and higher wages can help stem new entries into homelessness. When evidence-based practices align with political will and the investment of resources, homelessness becomes a solvable problem. As Kushel argues, "We *have* to focus on preserving, protecting, and producing housing that's affordable for our lowest income households, and it's the federal government that can solve this problem through both investment in expanding the supply of vouchers and in supporting the development of housing."[55]   **EM**

[1] U.S. Department of Housing and Urban Development. 2022. "The 2022 Annual Homelessness Assessment Report (AHAR) to Congress: Part 1: Point-In-Time Estimates of Homelessness," 2.

[2] Jeff Olivet. 2023. "United States Interagency Council on Homelessness, All In: The Federal Strategic Plan to Prevent and End Homelessness," testimony before the Senate Housing, Transportation, and Community Development Subcommittee of the Banking, Housing, and Urban Affairs Committee, 8 March.

[3] United States Interagency Council on Homelessness. 2022. "All In: The Federal Strategic Plan to Prevent and End Homelessness," 6.

[4] U.S. Department of Housing and Urban Development. 2022. "Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2022 Continuum of Care Competition and Noncompetitive Award of Youth Homeless Demonstration Program Renewal and Replacement Grants," 68.

[5] This definition of Housing First is drawn from U.S. Department of Housing and Urban Development, n.d. "Housing First in Permanent Supportive Housing," and "Deploy Housing First Systemwide," U.S. Interagency Council on Homelessness website (www.usich.gov/solutions/housing/housing-first/). Accessed 3 April 2023.

[6] Marybeth Shinn and Jill Khadduri. 2020. "How Finland Ended Homelessness," *Cityscape: A Journal of Policy Development and Research* 22:2, 75.

[7] Hannele Tainio and Peter Fredrikson. 2009. "The Finnish Homelessness Strategy: From a 'Staircase' Model to a 'Housing First' Approach to Tackling Long-Term Homelessness," *European Journal of Homelessness* 3, 185.

[8] National Low Income Housing Coalition. 2022. "Housing First: Q&A."

[9] Stephen Gaetz, Fiona Scott, and Tanya Gulliver. 2013. "Housing First in Canada: Supporting Communities to End Homelessness," 3–4.

[10] Deborah K. Padgett, Leyla Gulcur, and Sam Tsemberis. 2006. "Housing First Services for People Who Are Homeless With Co-Occurring Serious Mental Illness and Substance Abuse," *Research on Social Work Practice* 16:1, 76.

[11] Ibid.

[12] Gregg Colburn and Clayton Page Aldern. 2022. *Homelessness Is a Housing Problem: How Structural Factors Explain U.S. Patterns,* Oakland: University of California Press.

[13] Interview with Gregg Colburn, 28 February 2023.

[14] Ibid.

[15] Interview with Margot Kushel, 14 March 2023.

[16] U.S. Department of Housing and Urban Development. n.d. "Housing First in Permanent Supportive Housing."

[17] Ibid.

[18] Todd P. Gilmer, Ana Stefancic, Benjamin F. Henwood, and Susan L. Ettner. 2015. "Fidelity to the Housing First Model and Variation in Health Service Use Within Permanent Supportive Housing," *Psychiatric Services* 1:66, 12.

[19] Interview with Mary Cunningham, 14 March 2023.

[20] Ned Resnikoff. 2021. "Housing First Is Not Housing Only," Benioff Homelessness and Housing Initiative.

[21] Richard Cho. 2023. "Testimony of Richard Cho, Ph.D., Senior Advisor for Housing and Services, U.S. Department of Housing and Urban Development before the Senate Banking, Housing, and Urban Affairs Committee," testimony before the Senate Housing, Transportation, and Community Development Subcommittee of the Banking, Housing, and Urban Affairs Committee, 8 March.

[22] Interview with Mary Cunningham.

[23] Interview with Gregg Colburn.

[24] Tim Aubry, Geoffrey Nelson, and Sam Tsemberis. 2015. "Housing First for people with severe mental illness who are homeless: a review of the research and findings from the At Home—Chez Soi demonstration project," *Canadian Journal of Psychiatry* 60:11.

[25] United States Interagency Council on Homelessness. 2016. "Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation."

[26] Richard Cho. 2023. Testimony.

[27] Richard Cho, electronic communication, 22 March 2023.

[28] Interview with Margot Kushel.

[29] National Low Income Housing Coalition. 2023. "The Case for Housing First."

[30] Andrew J. Baxter, Emily J. Tweed, Srinivasa Vittal Katikireddi, and Hilary Thomson. 2019. "Effects of Housing First approaches on health and well-being of adults who are homeless or at risk of homelessness: systematic review and meta-analysis of randomised controlled trials," *Journal of Epidemiology and Community Health* 73:5.

[31] Aubry et al. 2015.

[32] Leyla Gulcur, Ana Stefancic, Marybeth Shinn, Sam Tsemberis, and Sean N. Fischer. 2003. "Housing, hospitalization, and cost outcomes for homeless individuals with psychiatric disabilities participating in continuum of care and housing first programmes," *Journal of Community & Applied Social Psychology* 13:2.

[33] Mary E. Larimer, Daniel K. Malone, Michelle D. Garner, et al. 2009, "Health Care and Public Service Use and Costs Before and After Provision of Housing for Chronically Homeless Persons with Severe Alcohol Problems," *Journal of the American Medical Association* 301:13.

[34] M. Lori Thomas et al. 2020. "Housing First Charlotte-Mecklenburg Research & Evaluation Project Final Report."

[35] Baxter et al.

[36] Richard Cho, electronic communication, 22 March 2023.

[37] Yinan Peng, Robert A. Hahn, Ramona K.C. Finnie,

Jamaica Cobb, Samantha P. Williams, Jonathan E. Fielding, Robert L. Johnson, Ann Elizabeth Montgomery, Alex Schwartz, Carles Muntaner, Veronica Helms Garrison, Beda Jean-Francois, Benedict I. Truman, Mindy T. Fullilove, and Community Preventive Services Task Force. 2020. "Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systemic Review," *Journal of Public Health Management Practice* 26:5.

[38] Tim Aubry, Paula Goering, Scott Veldhuizen, Carol E. Adair, Jimmy Bourque, Jino Distasio, Eric Latimer, Vicky Stergiopoulos, Julien Somers, David L. Streiner, and Sam Tsemberis. 2016. "A Multiple-City RCT of Housing First with Assertive Community Treatment for Homeless Canadians with Serious Mental Illness," *Psychiatric Services* 67:3.

[39] Clare Davidson, Charles Neighbors, Gerod Hall, Aaron Hogue, Richard Cho, Bryan Kutner, and Jon Morgenstern. 2014. "Association of housing first implementation and key outcomes among homeless persons with problematic substance abuse," *Psychiatric Services* 65:11.

[40] The White House. 2022. "Fact Sheet: Biden-Harris Administration Announces Plan to Prevent and End Homelessness."

[41] Ibid.

[42] Ann Elizabeth Montgomery and Meagan Cusack. 2017. "HUD-VASH Exit Study: Final Report," Prepared for the U.S. Department of Housing and Urban Development, 2–3.

[43] Denis McDonough, Marcia L. Fudge, and Jeff Olivet. 2022. "Drop in veteran homelessness proves we can end homelessness," *Military Times,* 10 November.

[44] U.S. Department of Veterans Affairs. 2023. "VA housed more than 40,000 homeless Veterans in 2022," 26 January press release.

[45] U.S. Department of Housing and Urban Development. 2015. "Houston Ends Veteran Homelessness," *PD&R Edge.*

[46] Kristin Kellogg. 2020. "Bergen County, New Jersey: Functional Zero Case Study," Community Solutions.

[47] U.S. Department of Housing and Urban Development. "Community Planning and Development Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2021 Continuum of Care Competition and Noncompetitive Award of Youth Homeless Demonstration Program Renewal and Replacement Grants."

[48] Emergency Housing Vouchers are housing choice vouchers issued by public housing agencies to "assist individuals and families who are homeless, at-risk of homelessness, fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, or human trafficking, or were recently homeless or have a high risk of housing instability." U.S. Department of Housing and Urban Development. "Emergency Housing Vouchers" (www.hud.gov/ehv). Accessed 6 June 2023; U.S. Department of Housing and Urban Development. "House America: Frequently Asked Questions" (www.hud.gov/house_america/faq). Accessed 31 March 2023.

[49] U.S. Department of Housing and Urban Development. "Emergency Housing Voucher (EHV) Data Dashboard" (www.hud.gov/program_offices/public_indian_housing/ehv/dashboard). Accessed 3 April 2023.

[50] U.S. Department of Housing and Urban Development. 2022. "Fact Sheet: One-Year Anniversary of HUD's 'House America' Initiative to Address Homelessness," 20 September press release.

[51] Ibid.

[52] United States Interagency Council on Homelessness 2022.

[53] Ibid.

[54] Interview with Mary Cunningham.

[55] Interview with Margot Kushel.

HUD-AR-01150

RESEARCH SPOTLIGHT

# Housing First:
# A Review of the Evidence

The early 1980s marked the beginning of what could be considered the "modern era of homelessness."[1] A sequence that included two severe recessions at the start of the decade, persistent inflation, and an economic shift marked by deindustrialization hit many central cities hard. This economic shift, along with the widespread deinstitutionalization of individuals experiencing mental illness, cuts to core programs at HUD and other agencies funding social services, and an inadequate supply of affordable housing facilitated a dramatic rise in homelessness. In central areas of many major cities, zoning changes prohibited the boarding houses and single-room occupancy buildings that had traditionally accommodated individuals at risk of homelessness, and rising property values made them redevelopment targets. Most notably, since the early 1980s, rents in metropolitan areas have increased steadily while wages have stagnated.[2] These factors combined to change the frequency and nature of homelessness in America; a report from the National Academies of Sciences, Engineering, and Medicine notes, "The typical homeless person of the 1980s was younger (less than 40 years old), more impoverished, and had a higher burden of co-occurring medical, mental health, and substance use disorders than previous generations of persons experiencing homelessness."[3] For the first time, women and families appeared in significant numbers among those seeking assistance.[4] Previous typographies of those experiencing chronic homelessness as mainly poor, older alcoholic males or transient individuals unwilling to shackle themselves to the constraints of industrialized employment and modern society ("tramps" or "hobos") were fundamentally challenged by these developments.

In their study of the changing nature and demographics of homelessness in the 1990s, Kuhn and Culhane categorized homelessness into three temporal groups: transient (roughly 80% of those using a shelter), episodic (10% of all shelter users), and chronic (10% of all shelter users).[5] Individuals experiencing transient homelessness do so briefly and only once, often because of an acute disruption such as loss of employment or a costly medical event. Individuals experiencing episodic homelessness have repeated, albeit brief, shelter stays. The final group, individuals experiencing chronic homelessness, are the hardest to house, often because they have significant medical issues, disabilities, or unique service needs. Related studies from the same authors found that adults experiencing chronic homelessness disproportionately used the shelter system, accounting for 53 percent of all shelter days despite representing only 18 percent of all homeless individuals assessed in the study.[6] Stories about the disproportionate and costly use of hospital systems by individuals experiencing chronic homelessness were further reinforced by media reports, especially Malcolm Gladwell's *New Yorker* story "Million Dollar Murray."[7] A 2010 report from the U.S. Department of Health and Human Services (HHS) found similarly that "the top 5 percent of hospital users — overwhelmingly poor and housing insecure — are estimated to consume 50 percent of health care costs."[8] Such chronically homeless individuals are more likely to have documented issues concerning substance use, mental health, trauma, and chronic medical conditions, including HIV/AIDS. Although this subpopulation of individuals experiencing homelessness is a minority of all individuals experiencing homelessness, this group is the most visible and is often a target of media coverage and political rhetoric.

The response to this contemporary rise in homelessness rates and the emergent, highly visible phenomenon of individuals experiencing chronic homelessness was a "treatment first" model — also frequently referred to as a "linear" or "staircase" model. In this model, individuals experiencing homelessness must be treated for underlying issues, such as addiction or mental health issues, before becoming eligible for independent, sustained housing. This model involves progression on a continuum of different types of assistance: emergency shelter, transitional living arrangements, and permanent housing.[9] Often, this meant that individuals entered highly regulated, congregate facilities; accessed relevant treatment services while stabilizing in this transitional program; improved in treatment; and became ready for independent, permanent housing. Those who relapsed or left the program at any point forfeited their opportunity for housing assistance. This system came to prominence during the 1990s, a period when many policymakers in the federal government were deeply concerned about increasing household self-sufficiency and minimizing dependence on government programs — perhaps best captured in the epigraph of the United States Interagency Council on Homelessness' 1994 strategic

## HIGHLIGHTS

- Several studies have found that, compared with the treatment first model, Housing First approaches offer greater long-term housing stability, especially among people experiencing chronic homelessness.

- Some studies have found that Housing First programs may also reduce costs by shortening stays in hospitals, residential substance abuse programs, nursing homes, and prisons.

- Research suggests that Housing First programs successfully house people with intersecting vulnerabilities, such as veterans and people with a history of substance abuse, mental illness challenges, domestic violence, and chronic medical conditions such as HIV/AIDS.

plan, in which President Clinton wrote, "Work organizes life." In other words, housing was available only to individuals experiencing homelessness who were willing to work for it.

Testing an alternate approach, Sam Tsemberis and his colleagues founded Pathways to Housing in New York City in 1992, allowing individuals experiencing homelessness to access scattered-site housing and assertive community treatment (ACT) services without requiring commitments to sobriety or treatment. Pathways to Housing's only requirements were, first, that tenants pay 30 percent of their income (usually Supplemental Security Income) toward rent by participating in a money management program, and second, that tenants must meet with a staff member at least twice a month.[10]

This alternative to the treatment first approach was found to be more effective by several studies. As the model evolved and gained popularity, it came to be known as Housing First. The George W. Bush administration embraced Housing First principles, which contributed to a 30 percent reduction in homelessness rates in the United States between 2005 and 2007.[11] The HEARTH Act of 2009 further entrenched Housing First principles in federal policy, expanding the availability of permanent housing to families, youth, and nondisabled single adults and authorizing rapid rehousing (RRH) assistance.[12] In addition, this act mandated the creation of a national strategic plan to end homelessness, which was released in 2010.[13] Since that time, Housing First principles have been guiding federal homeless response programs. This article summarizes the evidence that underpins the Housing First approach.

## What the Evidence Says
### *The Limitations of Treatment First*
Despite the widespread adoption of the treatment first model in federal programs, many of which had no actual permanent housing component, critics doubted the potential of this paradigm to address issues of contemporary homelessness — especially those concerning individuals experiencing chronic homelessness. Long before the rise of contemporary homelessness, sociologists such as Erving Goffman had questioned the intentions and efficacy of treatment models that imposed rigid conditions on patients, which often were intended as much to institutionalize and control the patient as to effect



Sam Tsemberis and his colleagues founded Pathways to Housing in New York City in 1992, allowing individuals experiencing homelessness to access housing and services with the only requirements that tenants pay 30 percent of their income toward rent by participating in a money management program and meet with a staff member at least twice a month.

HUD-AR-01152

any sort of "cure." Moreover, emerging evidence suggested that the treatment first model lacked relative effectiveness. In a study evaluating outcomes for people experiencing chronic homelessness based on data from 11 communities receiving coordinated funding from HUD, HHS, and the U.S. Department of Veterans Affairs, Tsai et al. found that, although participants in both transitional housing and Housing First programs experienced improved psychosocial outcomes over time, participants in the Housing First program were independently housed for longer periods despite experiencing homelessness for longer periods at the study's baseline.[14] Because the study was not randomized, the authors caution that participants in the transitional housing programs group were more likely to have severe substance use issues and report greater satisfaction with transitional housing. Nevertheless, they conclude, "These results suggest that clients with substance use disorders do experience more problems living independently, but prior transitional/residential treatment may not particularly benefit them any more than Housing First approaches, especially on independent housing outcomes."[15]

Other studies have found that the imposition of external values and lack of agency on the part of the consumer (i.e., individuals experiencing homelessness) critically limit the capability of the treatment first model. Henwood et al. note, "Providers in [treatment first] programs attempted to have consumers conform to system-centered goals, which at times appeared to overlook the individuals that the system was intended to serve, resulting in higher rates of disengagement from services."[16] Put differently, the rigid nature of the treatment first model produces inferior housing stability outcomes for individuals experiencing homelessness and can result in disengagement from critical services. Furthermore, retrospective analysis from HUD's Family Options Study indicates that families experiencing homelessness may face unique,

## Housing First participants spent 73% of their time in stable housing compared with 32% of those who received treatment as usual.

relative barriers to accessing transitional housing. In addition, outcomes for families in the project-based transitional housing group were not significantly different than usual care.[17]

### Chronic Homelessness

To assess the effectiveness of Housing First and the role of consumer choice, a randomized controlled trial (RCT) was performed on the Pathways to Housing program in 2004. Participants were assigned randomly to either a Housing First experimental group or a local Continuum of Care control group to receive treatment as usual (TAU). Eligibility for this study reflected key characteristics of the chronically homeless population: participants must have spent half of the previous month living on the street or in public places, exhibited a history of homelessness over the previous 6 months, and been diagnosed with an Axis I mental health disorder. The results indicate that Housing First participants experienced significantly faster decreases in homeless status and increases in stably housed status than the TAU group did, with no significant differences in either drug or alcohol use. Overall, the Housing First experimental group demonstrated a housing retention rate of approximately 80 percent, roughly 50 percentage points above that of TAU, which, the authors noted, "presents a profound challenge to clinical assumptions held by many Continuum of Care supportive housing providers who regard the chronically homeless as 'not housing ready.'"[18]

Four major RCTs have been performed to compare the effectiveness of Housing First programs with treatment first

programs. Three of these RCTs were conducted in the United States, and the other was conducted in Canada. In a review of these RCTs, Tsai notes that two RCTs conclusively found that Housing First led to quicker exits from homelessness and greater housing stability than did TAU.[19] In the Canadian trial, an RCT in five of Canada's largest cities known as At Home/Chez Soi, analysis revealed that, in findings similar to those of the American RCTs, "Housing First participants spent 73% of their time in stable housing compared with 32% of those who received treatment as usual."[20] Baxter et al. also performed a systematic literature review and metanalysis of these four RCTs, finding that Housing First resulted in significant improvements in housing stability.[21] This study also found that no clear differences existed between Housing First and TAU for mental health, quality of life, and substance use outcomes, ultimately concluding, "The combination of a strong, positive impact on housing with little additional impact on mental health and substance use, compared with TAU, is consistent with the findings of other reviews."[22] Rog et al. performed a similarly extensive literature review to describe various permanent supportive housing (PSH) programs, assess the methodological quality of existing studies, and assess the effectiveness of PSH compared with TAU. In assessing the evidence base for PSH, which included a review of eight literature reviews, seven RCTs, and other quasi-experimental studies, Rog et al. were able to examine several major studies examining the effectiveness of Housing First, finding, "All studies found that participants in Housing

First had significantly less homelessness compared with participants receiving standard care, day treatment with no housing, or housing that was contingent on treatment and sobriety."[23] These findings were confirmed in a more recent analysis by researchers from the Centers for Disease Control and Prevention (CDC) and HUD's Office of Policy Development and Research (PD&R): in a systematic review of 26 studies comparing Housing First with treatment first or TAU programs, Peng et al. found that, compared with treatment first programs, Housing First programs decreased homelessness rates by 88 percent and improved housing stability by 41 percent.[24] This analysis also found that participants in Housing

First programs reported improved quality of life, community integration, and positive life changes compared with clients in TAU programs.

In addition to the consistent evidence that Housing First programs increase housing stability among people experiencing chronic homelessness, some evidence indicates that Housing First programs may also limit costs more effectively than do treatment first programs. In a study of adults who had been homeless for at least a month and had a chronic medical condition, Sadowski et al. found that, using an intent-to-treat analysis, participants in Housing First reported a significant reduction in costly emergency room

visits and hospitalizations compared with TAU — 24 percent and 29 percent, respectively.[25] Based on these findings, Basu et al. evaluated the relative costs of Housing First versus treatment first programs, assessing differences in hospital days, emergency room visits, outpatient visits, days in residential substance abuse programs, nursing home stays, legal services (including days in incarceration), days in shelter housing, and case management between the two programmatic models.[26] Basu et al. found that participants in Housing First programs had decreased costs because they spent fewer days in hospitals, emergency rooms, residential substance abuse programs, nursing homes, and prisons or jail. On the other hand,



Long-term evidence from HUD's Family Options Study indicates that having priority access to permanent housing offers substantial benefits for families.

HUD-AR-01154

Housing First participants incurred higher costs from higher outpatient visits per year and a greater number of days in stable housing than TAU participants. Ultimately, a comprehensive cost analysis from this RCT found that Housing First saved $6,307 annually per homeless adult with a chronic medical condition, with the highest cost savings occurring for chronically homeless individuals, at $9,809 per year.[27] The authors note that, if scaled, these savings would amount to $5.5 billion over the next 10 years. However, note that this RCT was performed in only one U.S. city, and other studies have associated Housing First models with higher costs. For example, HUD's own Family Options Study found that PSH for families was more expensive than TAU. The previously referenced report from the National Academies of Sciences, Engineering, and Medicine similarly concluded that sufficient evidence does not yet exist to conclude that PSH reduces healthcare costs. Nevertheless, although evidence about relative costs is less certain, evidence of positive outcomes is not; furthermore, evidence also exists for improved outcomes for important subpopulations that experience intersecting, challenging vulnerabilities.

### Families With Children
The Housing First model has been adopted largely by programs that serve individuals — that is, single adults in households without children rather than families — in part because chronic homelessness is much less common among households with minor children. However, many of the most effective tools for serving families experiencing homelessness broadly adhere to the core principles of the Housing First model. Beginning in 2010, HUD began enrolling families in emergency shelters in the Family Options Study, an RCT performed in 12 communities to gather evidence about which types of housing and services programs work best for homeless families. Families were assigned to one of four treatment groups: permanent housing subsidies (SUB), community-based rapid rehousing

(CBRR), project-based transitional housing (PBTH), and usual care (UC). Of these four, the first two — SUB, in which families receive priority access to a permanent housing subsidy with no dedicated supportive services, and CBRR, in which families receive priority access to temporary rental assistance — represent strategies that are broadly aligned with the principles of Housing First in that they do not require service participation or have preconditions for receiving assistance. The other two groups — PBTH, in which families receive temporary accommodation, often with intensive service requirements, and UC — represent alternatives to the Housing First approach in the form of transitional and emergency shelters. Long-term evidence from the Family Options Study indicates that

> Many of the most effective tools for serving families experiencing homelessness broadly adhere to the core principles of the Housing First model.

having priority access to deep, permanent housing offers substantial benefits for families. Specifically, "assignment to the SUB group more than halved most forms of residential instability, improved multiple measures of adult and child well-being, and reduced food insecurity."[28] Families assigned to the CBRR group had housing stability outcomes that were comparable to those of UC families but at a substantially lower cost because they avoid the use of costly transitional housing programs. Perhaps

most important, compared with UC, the treatment first group (PBTH) exhibited no impacts on eight indicators concerning family well-being and self-sufficiency, and assignment to the PBTH intervention did not facilitate improved family preservation or child well-being outcomes compared with UC. The authors conclude, "The striking impacts of assignment to the SUB group in reducing subsequent stays in shelter and places not meant for human habitation provide support for the view that, for most families, homelessness is a housing affordability problem that can be remedied with permanent housing subsidies without specialized homeless-specific psychosocial services."[29] As for the more treatment first-aligned PBTH group, the authors state that "[o]verall, 3 years after assignment, the study did not find evidence that the goals of this distinctive approach to assisting families facing unstable housing situations were achieved relative to leaving families to find their way out of shelf without priority access to the program."[30]

### Rapid Rehousing
Housing First can also include RRH programs, in which individuals experiencing homelessness are given temporary assistance that quickly moves them into private housing while providing time-limited services in some cases. This programmatic model corresponds with Housing First principles and can be an effective intervention for individuals and families who fit the typology of experiencing episodic or transient homelessness. A review of RRH program outcomes by Abt Associates for PD&R confirms this expectation; in a review of 18 studies measuring exits to permanent housing from RRH programs, the expected range for successful transition to permanent housing was 71 to 84 percent.[31] RRH programs within a Housing First framework also are successful at avoiding returns to homelessness, thus preventing many individuals and families from experiencing episodic or chronic homelessness. The largest study examining returns to homelessness from RRH programs to date is the Supportive Services

for Veteran Families program, which provided RRH assistance for homeless veterans and their families. This study found that RRH assistance prevented 84 percent of individuals and 91 percent of families from returning to homelessness after 1 year.[32] Another study found that, of the 1,500 families who exited from RRH programs, only 6 percent were found to have returned to homelessness after 1 year.

## Housing First and Relevant Subpopulations

According to the Substance Abuse and Mental Health Services Administration, in 2010, 26.2 percent of all sheltered persons who were homeless had a severe mental illness, and 34.7 percent of all sheltered adults who were homeless had chronic substance use issues. Of those who experienced chronic or long-term homelessness, approximately 30 percent had a mental health condition and 50 percent had co-occurring substance use problems.[33] In addition, previous studies have found that having HIV/AIDS-positive status and experiencing homelessness frequently co-occur, with Culhane et al. finding that individuals using homeless shelters in Philadelphia had nine times the risk of having HIV/AIDS-positive status than did the general population.[34]

### Individuals Experiencing Mental Illness

As mentioned previously, the first major RCT in the United States examining the effect of Housing First on homelessness was the Pathways to Housing evaluation, which concluded, "Our findings indicate that ACT programs that combine a consumer-driven philosophy with integrated dual diagnosis treatment based on a harm-reduction approach positively affect residential stability and do not increase substance use or psychiatric symptoms."[35]

Canada's multicity At Home/Chez Soi study was launched in 2008 to test the effectiveness of Housing First as an approach for addressing homelessness among people experiencing severe mental illness. Canada, like the United States, saw a wave of deinstitutionalization during the 1970s. Following federal policy changes during the 1990s that slashed the number of affordable housing units created, significant numbers of people with severe psychiatric disabilities living on deficient incomes found themselves no longer able to sustainably access housing, leading to a rise in homelessness rates.[36] As with the Pathways for Housing evaluation, the At Home/Chez Soi experimental group received priority access to housing and supportive services, and the control group received TAU.[37] In findings much like those of similar U.S. studies, Housing First proved to be more effective than TAU at achieving housing stability: During the 2-year course of the study, Housing First participants spent 73 percent of their time stably housed, whereas the control group was stably housed only 32 percent of the time. In the last 6 months of the study, 62 percent of Housing First participants were housed the entire time compared with 31 percent of TAU participants. Moreover, Housing First participants also displayed greater improvements in community functioning and quality of life than did TAU participants, although these effects began to fade for the "high need" experimental subgroup receiving ACT after 2 years.[38]

### Individuals With Substance Use Issues

As mentioned previously, studies have found elevated substance use among individuals experiencing homelessness; one major study found that the occurrence of drug and alcohol disorders was as high as 78 percent of all individuals experiencing chronic homelessness. In addition, for these individuals, substance use can be a barrier to accessing housing, with many expressing concern that providing housing to such individuals will result in property damage, worsening addiction, and community harm — all of which imply the need for transitional, treatment first housing programs. Davidson et al. assessed the relationship between Housing First program components and substance use across nine scattered-site projects in New York City. More specifically, the authors examined the relationship between programmatic fidelity and substance use outcomes, hypothesizing that clients in programs with higher fidelity to Housing First principles (lower barriers) would experience superior housing stability and lower rates of substance use at followup than clients in lower fidelity programs. As with all previous studies, clients in programs that maintained higher fidelity to Housing First principles were less likely to be discharged from the program, and they remained stably housed. The study also assessed alcohol, cannabis, and stimulant or opioid use during the evaluation period. The authors conclude that "[t]here was no association between fidelity in implementation of supportive housing components and client substance use. On the other hand, clients in consumer participation–consistent programs were less likely than others to report using stimulants or opiates at follow-up."[39] In other words, programs maintaining greater fidelity to Housing First principles resulted in increased therapeutic trust and alignment with supportive services, which, in turn, reduced high-risk substance use even when the programs did not mandate sobriety.

### Individuals Living With HIV/AIDS

Since the emergence of HIV/AIDS in the early 1980s, the association between HIV and homelessness has been clear. A report from the Congressional Research Service notes, "In the earlier years of the epidemic, as individuals became ill, they found themselves unable to work, while at the same time facing health care expenses that left few resources to pay for housing."[40] Without stable housing, individuals with HIV who are experiencing homelessness may not have a secure location to receive, store, and take medications, often leading to decreased adherence to treatment protocols and increased viral loads that increase the likelihood of transmission. Nearly four decades

16



*Photo courtesy of Jleitner Photography*

Roosevelt Gardens in Austin, Texas, provides 40 units of supportive affordable housing for people living with HIV. All units receive HUD's HOPWA assistance.

later, the financial and medical vulnerability associated with HIV/AIDS continues to increase the likelihood that an individual will experience homelessness. Because of intersecting areas of vulnerability involving health-care access, financial precarity, lack of shelter, and socioeconomic stigma, individuals experiencing homelessness are more likely to engage in high-risk behaviors that increase the likelihood of HIV transmission such as needle sharing, transactional sexual relationships, and unprotected sex. Accordingly, Congress enacted the Housing Opportunities for Persons with AIDS (HOPWA) housing program as part of the Cranston-Gonzalez National Affordable Housing Act of 1990. HOPWA is a grant program administered by HUD that distributes funds by formula allocation and competitive grant competitions to eligible metropolitan

statistical areas that meet minimum HIV/AIDS case requirements based on CDC data. To be eligible for HOPWA assistance, individuals must test positive for HIV/AIDS and earn incomes that do not exceed 80 percent of the area median income. HIV-positive individuals and their families receive housing assistance and supportive services as part of the program. However, jurisdictions can use HOPWA funds to develop and operate multifamily residences; fund short-term rental, mortgage, and utility assistance programs as well as rental assistance programs for PSH; construct or acquire and rehabilitate property for single-room occupancy housing; provide supportive services; and offer housing counseling and referral services.[41] HOPWA funds are used primarily for housing assistance; HUD data indicate that, for the 2014 to 2015 program year, 69 percent of

all HOPWA grant funds were used for housing assistance.

In 2003, CDC and HUD initiated the Housing and Health Study, an RCT assessing the effects of HOPWA rental assistance on the health and housing outcomes of unstably housed individuals living with HIV/AIDS. Treatment group members received HOPWA housing and services, whereas individuals in the control group received only social and health services. After 18 months, 82 percent of the treatment group members were stably housed compared with 51 percent of control group members. After the same amount of time, 15 percent of the treatment group were unstably housed compared with 44 percent of the control group. Individuals in the treatment group experienced relative mental health improvements, with

HUD-AR-01157

17



Photo courtesy of U.S. Department of Housing and Urban Development Flickr

A systematic literature review and metanalysis of four RCTs that compared the effectiveness of Housing First programs with treatment first programs found that Housing First significantly improved housing stability.

notable improvements in perceived stress and depression. Although some issues with research design generally limited the study's ability to compare the two groups, participants who were homeless during followup had 2.5 times the odds of having a detectable viral load compared with those who had been stably housed.[42] Another similar RCT, the Chicago Housing for Health Partnership study, found that after 12 months the group that received housing assistance, had higher rates of intact immunity and were more likely to have undetectable viral loads. These findings were recently confirmed in a 2020 analysis performed by CDC, HUD, and academics.[43] Providing housing also reduced the use of high-cost emergency health services. The authors note, "Compared to those in the usual care group, those in the treatment group showed 29% reduction in hospitalizations, a 29% reduction in the number of days spent in the hospital, and a 24% reduction in visits to the emergency room."[44]

### *Domestic Violence*

Another group shown to benefit from Housing First programs is survivors of domestic violence. An analysis from the National Center for Children in Poverty found that, among mothers with children who were experiencing homelessness, 80 percent were survivors of domestic violence.[45] A 2005 study of homelessness in four major Florida cities found that approximately one out of every four women experiencing homelessness lacked stable housing primarily because of experiences with violence.[46] Individuals experiencing homelessness, in turn, will also experience domestic violence because of their publicly exposed daily activities, sleeping patterns, and routines. Recently, a team from Michigan State University, with support from the Washington State Coalition Against Domestic Violence, the Office of the Assistant Secretary for Planning and Evaluation in HHS, and the Gates Foundation completed a study to assess the effects of Housing First programmatic assistance on domestic violence survivors experiencing homelessness. For this program, adherence to the Domestic Violence Housing First (DVHF) model included mobile, housing-focused advocacy; flexible financial assistance for housing and other needs; and community engagement. The study found that adherence to this survivor-centered, low-barrier service model

yielded a statistically significant difference between DVHF recipients and those receiving TAU, with DVHF recipients experiencing improved outcomes[47] in the categories of housing instability, physical abuse, emotional abuse, stalking, economic abuse, use of the children as an abuse tactic, depression, anxiety, posttraumatic stress disorder, and children's prosocial behaviors.

## Conclusion

Overwhelming evidence from several rigorous studies indicates that Housing First programs increase housing stability and decrease rates of homelessness. The best available evidence indicates that Housing First programs successfully house families and individuals with intersecting vulnerabilities, such as veterans, individuals experiencing substance use or mental health issues, survivors of domestic violence, and individuals with chronic medical conditions such as HIV/AIDS. Although findings concerning the relative costs of Housing First programs — as well as the model's ability to facilitate secondary outcomes such as sobriety or mental stability — are less certain, preliminary evidence indicates that the Housing First approach does not facilitate negative outcomes compared with treatment first programs. Rather, Housing First programs appear to reduce the use of hard drugs, improve the health status of people living with HIV/AIDS, and reduce the use of costly emergency services, all of which are indicators of improved health.

In December 2022, the Biden-Harris administration released *All In: The Federal Strategic Plan to Prevent and End Homelessness*.[48] The plan aims to decrease overall homelessness in the United States by 25 percent by January 2025. As noted in the introduction message by HUD Secretary Marcia Fudge, this new strategic plan restores the Housing First approach as the nation's guiding policy for addressing homelessness, coupling Housing First principles with homelessness prevention resources and strategies to reduce inflows into homelessness. In addition, the plan recommends

HUD-AR-01158

a person-centered, trauma-informed approach that employs evidence-based solutions. By prioritizing housing stability and restoring the dignity of those experiencing homelessness, this policy presents a more humane, proven strategy than treatment first approaches. President Biden eloquently summarizes the benefits of the strategic plan in his conclusion: "When we provide access to housing to people experiencing homelessness, they are able to take steps to improve their health and well-being, further their education, seek steady employment, and bring greater stability to their lives and to the community that surrounds them.… By ensuring more Americans have safe, stable, and affordable homes, we can build a stronger foundation for our entire Nation."[49]  EM

— Joseph R. Downes, *Office of Policy Development and Research*

[1] National Academies of Sciences, Engineering, and Medicine. 2018. *Permanent Supportive Housing; Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness,* Washington, DC: The National Academies Press.

[2] Bruce Katz. 2006. "Racial Division and Concentrated Poverty in U.S. Cities," presentation at Urban Age Conference, Johannesburg, South Africa.

[3] National Academies of Sciences, Engineering, and Medicine.

[4] Peter H. Rossi. 1990. "The old homeless and the new homelessness in historical perspective," *American Psychologist* 45:8, 954–9.

[5] Dennis P. Culhane and Randall Khun. 1998. "Patterns and Determinants of Public Shelter Utilization Among Homeless Adults in New York City and Philadelphia," *Journal of Policy Analysis and Management* 17:1, 23–43.

[6] Ibid.

[7] *See* Malcolm Gladwell. 2006. "Million-Dollar Murray: Why problems like homelessness may be easier to solve than to manage," *The New Yorker,* 5 February.

[8] National Academies of Science, Engineering, and Medicine.

[9] Stephen Eide. 2020. "Housing First and Homelessness: The Rhetoric and Reality," The Manhattan Institute.

[10] Sam Tsemberis, Leyla Gulcur, and Maria Nakae. 2004. "Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals with a Dual Diagnosis," *American Journal of Public Health* 94, 651–6.

[11] Kim Johnson. 2021. "Additional Housing Programs: Housing First," 2021 Advocates' Guide, National Low Income Housing Coalition.

[12] Josh Leopold. 2019. "Five Ways the HEARTH Act Changed Homelessness Assistance," *Urban Wire,* Urban Institute.

[13] *See* United States Interagency Council on Homelessness. 2010. "Opening Doors: Federal Strategic Plan to Prevent and End Homelessness."

[14] Jack Tsai, Alvin S. Mares, Robert A. Rosenheck. 2010. "A multi-site comparison of supported housing for chronically homeless adults: 'Housing first' versus 'residential treatment first,'" *Psychological Services* 7:4, 219–32.

[15] Ibid.

[16] Benjamin F. Henwood, Leopoldo J. Cabassa, Catherine M. Craig, and Deborah K. Padgett. 2013. "Permanent supportive housing: Addressing homelessness and health disparities?" *American Journal of Public Health* 103: Suppl 2, S188–192. *See also* Michael Allen. 2003. "Waking Rip van Winkle: Why developments in the last 20 years should teach the mental health system not to use housing as a tool of coercion," *Behavioral Sciences & the Law* 21:4, 503–21; Victoria Stanhope, Benjamin F. Henwood, and Deborah K. Padgett. 2009. "Understanding service disengagement from the perspective of case managers," *Psychiatric Services* 60, 459–64.

[17] Daniel Gubits, Marybeth Shinn, Michelle Wood, Stephen Bell, Samuel Dastrup, Claudia D. Solari, Scott R. Brown, Debi McInnis, Tom McCall, and Utsav Kattel. 2016. "Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families," U.S. Department of Housing and Urban Development, Office of Policy Development and Research.

[18] Tsemberis et al.

[19] Jack Tsai. 2020. "Is the Housing First Model Effective? Different Evidence for Different Outcomes," *American Journal of Public Health* 110:9, 1376–7.

[20] Ibid.

[21] Andrew J. Baxter, Emily J. Tweed, Srinivasa Vittal Katikireddi, and Hilary Thomson. 2019. "Effects of Housing First approaches on health and well-being of adults who are homeless or at risk of homelessness: systematic review and meta-analysis of randomised controlled trials," *Journal of Epidemiology and Community Health* 73:5, 379–87.

[22] Ibid.

[23] Debra J. Rog, Tina Marshall, Richard H. Dougherty, Preethy George, Allen S. Daniels, Sushmita Shoma Ghose, and Miriam E. Delphin-Rittmon. 2014. "Permanent Supportive Housing: Assessing the Evidence," *Psychiatric Services* 65:3, 287–94.

[24] Yinan Peng, Robert A. Hahn, Ramona K. C. Finnie, Jamaicia Cobb, Samantha P. Williams, Jonathan E. Fielding, Robert L. Johnson, Ann Elizabeth Montgomery, Alex F. Schwartz, Carles Muntaner, Veronica Helms Garrison, Beda Jean-Francois, Benedict I. Truman, Mindy T. Fullilove; Community Preventive Services Task Force. 2020. "Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systematic Review," *Journal of Public Health Management Practice* 26:5, 404—11.

[25] Laura S. Sadowski, Romina A. Kee, Tyler J. VanderWeele, and David Buchanan. 2009. "Effect of a housing and case management program on emergency department visits and hospitalizations among chronically ill homeless adults: a randomized trial," *Journal of the American Medical Association* 301:17, 1771–8.

[26] Anirban Basu, Romina Kee, David Buchanan, and Laura S. Sadowski. 2012. "Comparative Cost Analysis of Housing and Case Management Program for Chronically Ill Homeless Adults Compared to Usual Care," *Health Services Research* 47:1, 523–43.

[27] Ibid.

[28] Gubits et al., 2016

[29] Ibid.

[30] Ibid.

[31] Ibid. Note: These studies were weighted according to size.

[32] Daniel Gubits et al. 2018. "Understanding Rapid Re-housing: Systematic Review of Rapid Re-housing Outcomes Literature," U.S. Department of Housing and Urban Development, Office of Policy Development and Research.

[33] Substance Abuse and Mental Health Administration. 2011. "Current Statistics on the Prevalence and Characteristics of People Experiencing Homelessness in the United States.

[34] Dennis P. Culhane, Erica Gollub, Randall Kuhn, and Mark Shpaner. 2001. "The Co-Occurrence of AIDS and Homelessness: Results from the Integration of Administrative Databases for AIDS Surveillance and Public Shelter Utilisation in Philadelphia," *Journal of Epidemiology and Community Health* 55, 515–20.

[35] Tsemberis et al.

[36] Aubry et al. 2015.

[37] The experimental group was further divided into two groups: "High need" individuals received ACT while "moderate need" individuals received ICM. Tim Aubry, Paula Goering, Scott Veldhuizen, Carol E. Adair, Jimmy Bourque, Jino Distasio, Eric Latimer, Vicky Stergiopoulos, Julien Somers, David L. Streiner, and Sam Tsemberis. 2016. "A Multiple-City RCT of Housing First with Assertive Community Treatment for Homeless Canadians with Serious Mental Illness," *Psychiatric Services* 67:3, 275–81.

[38] Aubry et al. 2016.

[39] Clare Davidson, Charles Neighbors, Gerod Hall, Aaron Hogue, Richard Cho, Bryan Kutner, and Jon Morgenstern. 2014. "Association of housing first implementation and key outcomes among homeless persons with problematic substance use," *Psychiatric Services* 65:11, 1318–24. Note: "Consumer participation-consistent" is used to refer to programs with greater fidelity to Housing First principles.

[40] Congressional Research Service. 2016. "Housing for Persons Living with HIV/AIDS."

[41] Ibid.

[42] Richard J. Wolitski, Daniel P. Kidder, Sherri L. Pals, Scott Royal, Angela Aidala, Ron Stall, David R. Holtgrave, David Harre, and Cari Courtenay-Quirk. 2010. "Randomized trial of the effects of housing assistance on the health and risk behaviors of homeless and unstably housed people living with HIV," *AIDS Behavior* 14:3.

[43] Peng et al.

[44] Sadowski et al.

[45] Yumiko Aratani. 2009. "Homeless Children and Youth: Causes and Consequences," National Center for Children in Poverty, Mailman School of Public Health – Columbia University. More recent data from HUD's Family Options Study found that 49 percent of all homeless individuals had experienced domestic violence as an adult. For more see: Gubits et al.

[46] Jana L. Jasinski, Jennifer K. Wesely, Elizabeth Mustaine, and James D. Wright. 2005. "The Experience of Violence in the Lives of Homeless Women: A Research Report."

[47] Judy Chen and Cris M. Sullivan. 2022. "Domestic Violence Housing First Demonstration Evaluation Project: Final Report of Findings through 24 Months," Prepared for Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

[48] United States Interagency Council on Homelessness. 2022. "ALL IN: The Federal Strategic Plan to Prevent and End Homelessness."

[49] Ibid.

**IN PRACTICE**

# Housing First in Action

# HIGHLIGHTS

Many U.S. cities have adopted a Housing First approach to reduce the prevalence of homelessness, meaning that they move people experiencing homelessness into housing without preconditions for sobriety, treatment, or participation in supportive services.[1] In 2015, the city of Boston released Boston's Way Home, an action plan with the ambitious goal of ending veteran and chronic homelessness in the city through a Housing First approach. Since implementing this plan, Boston has helped more than 6,800 households experiencing homelessness access permanent housing.[2] In 2018, the city of Chattanooga, Tennessee, enacted its Homelessness Action Plan, which embraces the Housing First approach primarily through rapid rehousing (RRH) interventions. These local Housing First models have successfully reduced long-term, chronic, and veteran homelessness by developing streamlined data systems, targeted action plans, and low-barrier housing. Both cities are using federal funding and partnering with local service providers to develop additional housing units for people who require a higher level of care. Boston and Chattanooga have also signed onto *House America: An All-Hands-on-Deck Effort to Address the Nation's Homelessness Crisis,* an initiative launched in 2021 by HUD and the U.S. Interagency Council on Homelessness (USICH) to assist communities with implementing Housing First plans.

## Addressing Homelessness in Boston

The city of Boston has been following a Housing First approach for several years.[3] Some of the city's earliest Housing First efforts began in December 2014, when Mayor Martin Walsh established the Mayor's Task Force on Individual Homelessness, which worked to reduce long-term homelessness among sheltered and unsheltered adult individuals. The group also focused on improving discharge planning for people leaving institutions of care and channeling more financial resources

- **Boston's Housing First approach includes a front-door triage assessment process conducted at shelters and through street outreach to help route people to appropriate services and permanent housing.**

- **Rapid rehousing is a vital component of Chattanooga's Housing First strategy, which relies on housing navigators who match people with housing and services tailored to their specific needs.**

- **Financial incentive programs for local landlords who are willing to lease units to people exiting homelessness who may have criminal records or a poor rental history are a vital component of Housing First approaches in Boston and Chattanooga.**

into addressing homelessness. These steps laid the groundwork for Boston's Way Home: An Action Plan to End Veteran and Chronic Homelessness, which emerged in 2015 from the goals and shared vision of the task force.[4]

The Housing First approach that Boston's Way Home follows routes anyone entering the shelter system onto a path to permanent, stable housing.[5] According to Laila Bernstein, deputy director of the Supportive Housing Division at the Mayor's Office of Housing (MOH), Boston has a large influx of people entering and reentering homelessness.[6] Boston's Way Home recommended creating a front door triage system within shelters along with street outreach to connect people experiencing homelessness to services tailored to their specific needs. Front door triage provides an immediate response for people who enter an emergency shelter or are living on the street. Much like an emergency room triage system, front door triage staff assess the vulnerability and individual needs of those they encounter, engage in collaborative problem solving with them, and route them to the supports that best address their particular situations.[7]



The Mayor's Office of Housing deems front door triage a vital component of Boston's Housing First approach to assess people's needs and route them to housing and appropriate services.

*Photo courtesy of City of Boston, Mayor's Office of Housing*

HUD-AR-01160

In August 2016, Boston established a coordinated access system — a centralized data system that matches people who are experiencing long-term homelessness with permanent supportive housing (PSH) opportunities.[8] Housing providers with a vacancy notify MOH, which then matches that information with Homeless Management Information Systems (HMIS) data to identify a person in need. As a tool of coordinated entry, the coordinated access system tracks people as they transition from homelessness to permanent housing. One unique feature of Boston's coordinated access system software is that its code is open source, meaning that anyone can use the code free of charge, and communities can invest in new features and improvements that benefit everyone using the platform. Boston modeled its coordinated access system after the city of Houston's system, and it has been a major success for targeting PSH, Bernstein noted. Boston also developed an open-source data warehouse that merges different front-end systems, including HMIS, and offers systemwide reporting as well as unified records for clients who access multiple programs. According to Bernstein, "[T]he open-source component is unique, and something we want to see spread. We're really excited when we also can learn from other communities or benefit from the iterations or the tools that they've created within these platforms. The more communities that join in using these tools, the more we all benefit."[9]

## Pathways to Housing

Housing First principles are embedded in all of Boston's housing programs, and the approach's low barrier to entry is a critical component. MOH has ensured that all city-funded housing maintains low barriers to entry by applying fewer screening measures, which addresses the concerns of prospective tenants who have past criminal histories or active substance abuse disorders.[10] A critical component of Boston's Way Home is the development of additional low-barrier, subsidized rental PSH units

that include wraparound supports. MOH ensures that PSH units offer enough services to address tenants' potential safety concerns. Long-term, wraparound supports for tenants include medical care, mental health care, substance use counseling, and employment services, which help tenants improve their well-being and develop life skills to further their stability.[11]

Several new PSH projects are under development in the city. In November 2019, the Boston Planning and Development Agency approved a proposal for Pine Street Inn, a nonprofit service provider for people experiencing homelessness, and The Community Builders to create 202 units of supportive and income-restricted housing in the city's Jamaica Plain neighborhood. Once completed in early 2024, this project will be the city's largest supportive housing development. A total of 140 units will be designated as PSH and reserved for people who are transitioning out of homelessness.[12] Another project, 140 Clarendon Street, will create 210 units of affordable housing in a former Young Women's Christian Association building located in Boston's Back Bay neighborhood. Of the 210 units, 111 will be PSH for people who are transitioning out of homelessness. This project is slated for completion in 2024, and Pine Street Inn is also supporting this project by offering its services to residents in need of additional care.[13]

The city is also reducing reliance on shelters and preventing new people from experiencing chronic homelessness through RRH, which provides

assistance to quickly rehouse and stabilize households. In Boston, RRH focuses on preventing long-term homelessness by supporting the rapid transition of households from homelessness to being housed.[14] Several nonprofit service providers, including Pine Street Inn, receive city funding to house people via RRH and provide case management and other supportive services to people exiting homelessness.[15]

In addition, the Boston Housing Authority (BHA) prioritizes applicants in need of subsidized housing who are experiencing homelessness.[16] To qualify for housing through BHA, these applicants must complete a certificate of homelessness form and meet BHA's definition of homelessness. A shelter, police department, or a social services agency can also complete the form on the applicant's behalf to certify that they meet the criteria for priority service.[17] HUD awarded a limited number of Emergency Housing Vouchers to BHA for high-priority populations, including households that are experiencing or are at risk of homelessness, domestic violence, dating violence, sexual assault, or human trafficking. These households must be currently living in a shelter in or outside of Boston or already enrolled in a city-funded RRH program but are at risk of returning to an emergency shelter or unsheltered living situation.[18] Although the percentage of unsheltered people in the city is low, BHA's priority service for households experiencing homelessness has been helpful in quickly providing housing to people directly off the street, said

> Housing First principles are embedded in all of Boston's housing programs, and the approach's low barrier to entry is a critical component.

Bernstein.[19] The city also maintains a set-aside policy that requires all affordable housing projects with 10 or more units that receive city funding to reserve 10 percent of the units for people transitioning out of homelessness.[20]

Engaging with landlords is also a critical component of Boston's Housing First approach. The city launched a landlord incentive program in 2022 to encourage landlords to lease units to households exiting homelessness. The program aims to allay concerns among landlords about renting to people transitioning out of homelessness who may have a poor rental history or limited income to afford rental payments. The program supports landlords through signing bonuses of up to $4,000, broker fees, unit retention bonuses, and a dedicated customer service provider. The city also pays the tenant's security deposit. The financial support to landlords encourages their participation and, in turn, provides residents with a stable place to call home. The landlord incentive program received approximately $1 million in HUD Emergency Solutions Grants – CARES Act (ESG-CV) funds under the coronavirus pandemic stimulus relief package as well as city funding. As of February 2023, more than 160 people moved into rental units supported by the program. The program empowers landlords to be part of the housing solution for residents who can sign a 12-month lease. Residents typically qualify for housing vouchers or RRH to cover their monthly rent payments.[21] Bernstein noted that, although the landlord incentive program is gaining momentum, the ESG-CV funding for it will end in September 2023. Conversations are ongoing on how to continue the program through alternative funding streams.[22] The program offers an avenue to tap into private and existing housing stock to fulfill housing needs for people exiting homelessness.[23]

## Building on Successes

In 2016, Boston ended chronic veteran homelessness under USICH criteria, but it has not yet ended all veteran homelessness.[24] Since the 2014 launch of "Boston Homes for the Brave," an initiative to end veteran homelessness by 2015, the city has reduced veteran homelessness by 60 percent.[25] The 2022 Point-in-Time (PIT) count identified 180 veterans who were experiencing homelessness, a considerable reduction from the 450 veterans experiencing homelessness identified in the 2014 PIT count.[26] The city's Supportive Housing Division has a veterans working group that maintains a list of veterans in need of housing and coordinates supportive services. The working group also collaborates with federal, local, and nonprofit agencies to address housing barriers facing Boston's veterans.[27] The New England Center and Home for Veterans (NECHV) is a local nonprofit service provider that offers several permanent and supportive housing services for veterans who are experiencing homelessness and their families. NECHV manages a 97-unit building at 17 Court Street for veterans who previously experienced homelessness and also provides case management, housing and financial counseling, and resources for accessing benefits.[28] In addition, a partnership among BHA, Brighton Marine (a local nonprofit service provider that supports veterans and active-duty members), and other service organizations led to the development of Veterans Housing at Brighton Marine, which opened in fall 2020. Funded through the HUD-Veterans Affairs Supportive Housing program, Veterans Housing at Brighton Marine provides 25 fully furnished PSH units to veterans in need. On the same campus, Brighton Marine also operates The Residences at Brighton Marine, a 102-unit, mixed-income housing community for veterans earning between 30 percent and 120 percent of the area median income. These developments offer onsite medical and mental health care as well as substance abuse counseling, financial literacy coaching, and other wraparound supports to maintain housing stability.[29]

Boston has accessed several federal funding sources to implement its Housing First agenda. In 2020, the city received Community Development Block Grant CARES Act funding of $10.6 million and $9.8 million during the first and third rounds, respectively. A portion of this funding helped finance PSH projects.[30] The city also received American Rescue Plan Act of 2021 (ARPA) Coronavirus State and Local Fiscal Recovery Funds (SLFRF), of which approximately $19 million was allocated for PSH for people with substance use and behavioral health disorders. In addition, approximately $19 million more in SLFRF funding was directed toward low-barrier transitional housing and supportive services. This transitional housing helped address crowded living conditions at a large encampment in the city known as Mass and Cass.[31] In 2022, the Mayor's Office, public health officials, outreach staff, and mental health providers mitigated the encampment crisis through a humane, dignified response that included low-threshold, noncongregate shelter. The city created 6 low-threshold shelters, which included 131 noncongregate shelter beds plus 79 low-threshold beds in smaller congregate spaces for a total of 210 beds across the sites, to serve this unsheltered population. According to Bernstein, the "low-threshold sites, designed specifically for people with active substance use disorders who are having difficulty accessing our shelters, have transformed shelter options in Boston. There was a lot of thought about how to make shelter accessible to people who are actively using drugs, including harm reduction specialists, amnesty lockers, ability to leave at any point to use, and other best practices to meet people where they are and prevent overdose."[32]

"There are a lot of different funding sources that are coming into the city — and a lot of them are related to COVID — that are spurring more investments that we wouldn't be able to make otherwise," Bernstein stated. The Supportive Housing Division is the

22

lead agency for Boston's Continuum of Care (CoC), and in March 2023, HUD granted the city a CoC award of more than $42 million to be allocated to 14 nonprofit organizations that support residents experiencing homelessness and help fulfill the goals of Boston's Way Home. According to Bernstein, approximately 92 percent of this CoC funding supports 2,150 PSH and RRH units.[33] In April 2021, the city also received $21.6 million in HOME Investment Partnerships Program – American Rescue Plan (HOME-ARP) funds from HUD.[34] These funds are earmarked for affordable rental units, rental assistance, supportive services, and the development of noncongregate shelters. A small portion of the funding can be used for administrative and operating costs.[35] In September 2021, Boston joined the *House America* initiative. The city committed to rehousing 1,100 households that had experienced or would experience homelessness from September 2021 through December 2022. The city aimed to fund and develop 650 housing units combined with supportive services to ensure the long-term stability of tenants.[36] According to Bernstein, *House America* helped the city document its production status and track the number of households that had been rehoused. The initiative supported work that was already underway, and, as Bernstein indicated, the city exceeded its goals.[37]

As of February 2023, Boston had 3,230 PSH units and 1,964 RRH units in scattered sites. Through the work of Boston's Way Home, from July 2015 to February 2023, the city provided stable housing for 6,821 single adults, 11,295 families with children, and 1,107 veterans. Bernstein attributes these positive outcomes to the city's success in pairing affordable or subsidized housing with services. Although most households remain stably housed once they have been allocated a unit, the city monitors the rates of return to homelessness on the street, emergency shelters, transitional housing, and safe havens. In 2022, the city determined that approximately 10 percent of households



*Photo courtesy of City of Boston, Mayor's Office of Housing*

Boston Mayor Michelle Wu participated in the annual Point-in-Time count, which showed 270 fewer veterans experiencing homelessness in 2022 compared with 2014.



Boston's coordinated access system tracks people as they transition from homelessness to stable housing, and the open source feature has facilitated resource sharing of Housing First strategies among communities.

*Photo courtesy of City of Boston, Mayor's Office of Housing*

had returned to homelessness within 2 years of receiving stable housing, and approximately 4 percent of households had returned to homelessness within 6 months of receiving stable housing.[38]

The state of Massachusetts is also a right to shelter state. Although local CoCs have traditionally focused on single adult homelessness, several state regulations and funding sources focus on emergency shelter for families with children. Bernstein noted that the Supportive Housing Division is now shifting its focus to families experiencing homelessness to better align with state initiatives. In 2020, the Boston City Council passed an ordinance establishing a Special Commission to End Family Homelessness, which Mayor Michelle Wu launched in March 2022. The commission is composed of nonprofit representatives and city and state officials. Although the Boston's Way Home action plan is still Boston's guiding document for Housing First initiatives, the city is embarking on a new phase of work as the commission develops a new strategic plan to end family homelessness.[39]

## Overcoming Challenges

Boston's large shelter system often means that limited staff is available to triage everyone in need. People may enter shelters in the middle of the night, when triage teams are unavailable, and people may have other impairments that hinder them from being fully triaged. In addition, community pushback and not in my back yard (better known as NIMBY) sentiments can make developing additional PSH units difficult. Overcoming stereotypes that existing residents may hold about people experiencing homelessness will be critical to increasing PSH production. Bernstein indicated that some existing residents perceive these developments as shelters and predict that people transitioning out of homelessness and moving into the neighborhood may contribute to neighborhood crowding or alter its character. Furthermore, Boston is a dense city, and its geography also limits the amount of space available for new developments in an already tight housing market. State and city funding streams for vouchers, PSH, and services are not always coordinated, and the Boston CoC connects these three

components into a unified system to ensure that housing and services continue to be offered uninterrupted and with few barriers. Predicting the number of PSH units that will satisfy demand is also difficult because the number of people experiencing long-term homelessness constantly fluctuates.[40]

## Lessons Learned

Bernstein explained that, although Boston has several low-barrier shelters, the influx of people from outside of the city and state is higher than that of most metropolitan areas. According to Boston HMIS data from 2016 to 2018 and a 2019 community of origin custom assessment, more than 50 percent of the people in Boston's shelters come from ZIP Codes outside of the city limits. "If there were more low-barrier shelters across the country, people wouldn't need to come to Boston to be sheltered," Bernstein noted. In addition, it is critical for jurisdictions to perform higher-level "housing problem solving within every system of care and in every community and have the resources for it," she said. For example, all hospital staff should be trained in routing people to housing resources "so that shelter doesn't just become the default and we all accept that homelessness is inevitable for someone," Bernstein emphasized. "The work of training hospitals in housing problem solving and holding them accountable [for] not discharging to homelessness has started in Massachusetts thanks to leadership at MassHealth [Massachusetts' state Medicaid agency], but more needs to be done in all systems of care to prevent [these] discharges," said Bernstein.[41]

Partnering with the state to coordinate services is one strategy for using existing state-funded programs in innovative ways. Bernstein noted that pairing Medicaid services with public housing units can create a PSH package for people in need.[42] The Massachusetts Housing and Shelter Alliance and the Massachusetts Behavioral Health Partnership partnered to create the Community

HUD-AR-01164

Support Program for People Experiencing Chronic Homelessness (CSPECH), which funds services for people experiencing chronic homelessness. CSPECH allows people to use their MassHealth state Medicaid plan to access supportive services within permanent housing rather than having to rely on more expensive care accessed within emergency rooms. CSPECH was the nation's first program of its kind and represents a model for providing PSH services through Medicaid.[43] For seniors experiencing homelessness who also need nursing home care, the Supportive Housing Division has partnered with the federal Program of All-inclusive Care for the Elderly (PACE), locally administered by MassHealth. In addition to the PACE enrollment, Boston's CoC partnered with BHA to prioritize seniors experiencing chronic homelessness for public housing. Pairing the wraparound supports of PACE with public housing has created PSH for seniors exiting shelters or entering directly from the street. PACE helps seniors exiting homelessness effectively age in place with health services

brought to their homes and a van to take them to appointments. People who enroll in PACE and public housing tend to stay housed, Bernstein noted, further underscoring the potential for state and local partnerships to help communities lower barriers to housing and carry out a Housing First approach. These programs have been expanded under a 1115 MassHealth Demonstration ("Waiver") issued in 2022 by the Centers for Medicare and Medicaid Services (CMS), which created a new framework called health-related social needs (HRSN). CMS granted $8 million to Massachusetts to support HRSN work, including case management, data systems and management, trauma informed training, cultural competency training, operational support, and creation of community outreach materials.[44]

## Housing First in Chattanooga

In spring 2018, the Chattanooga Interagency Council on Homelessness conducted a needs assessment to understand the state of homelessness in the

city and identify resource gaps.[45] The needs assessment led to the development of the 2018 Homelessness Action Plan and the Office of Homelessness and Supportive Housing (OHSH), one of the city's lead agencies for implementing Housing First principles, primarily through its RRH program.[46] Sam Wolfe, former director of OHSH, explained that a strategic planning process revealed the need for more RRH. Wolfe indicated that many OHSH clients are experiencing homelessness for the first time, and RRH can help them quickly return to stable housing.[47] Housing navigators working for the city's RRH program identify housing vacancies and services that meet the specific needs of households and foster strong relationships with landlords, offer landlords financial incentives to encourage their participation, and assist households with move-in costs and other expenses.[48] OHSH prioritizes housing navigation and partners with the Chattanooga Housing Authority (CHA), which operates a Housing First program that provides preference on some waiting lists — such as CHA-managed



*Photo courtesy of WinnCompanies*

Developments such as the Residences at Brighton Marine provide affordable units and onsite wraparound services to help veterans remain stably housed.



To ensure people can transition quickly to stable housing, Chattanooga's rapid rehousing program relies on housing navigators who assess the specific needs of households and maintain strong partnerships with local landlords.

housing and the Housing Choice Voucher program — for individuals experiencing homelessness or domestic violence to be quickly housed. Although OHSH does not offer addiction management or mental health treatment itself, it offers case management services to its clients in need.[49]

## Navigating Households to Rapid Rehousing

Housing navigators are the backbone of Chattanooga's Housing First model. Housing navigators offer direct outreach to clients and assess the specific needs of households experiencing homelessness. They help streamline the administrative process to allow families to move quickly into housing. The lead housing navigator for OHSH, Johnetta Langston, indicated that navigators follow up with tenants each week to determine whether they are remaining stably housed or need additional connections to services in the community. The navigators also regularly engage with landlords to maintain good working relationships. OHSH primarily works with mom-and-pop landlords, who often are more willing to negotiate with OHSH and accept clients who may have criminal records or a history of eviction. These small landlords form the "lifeblood for our program," Wolfe stated, and have helped increase the number of people that OHSH has been able to move into stable housing. In December 2021, OHSH housed 7 people, and by December 2022, OHSH housed 98 people through RRH offered through participating landlords. Langston and her team check in with landlords weekly and work closely with the CHA to ensure that landlords and tenants complete required paperwork.[50]

## Landlord Incentives

Offering landlords incentives to participate in RRH has been critical to the program's success. In 2019, OHSH created a city-funded Landlord Risk Mitigation Fund managed by its partner organization, the Chattanooga Regional Homeless Coalition (CRHC).[51] The Landlord Risk Mitigation Fund provides additional protection to landlords who lease units to people with low incomes, past evictions, or criminal records. The fund helps landlords defray costs associated with damage to

26

HUD-AR-01166



the unit, unpaid rent, or other fees that a security deposit does not cover.[52] Landlords can receive up to $1,000 per reimbursement claim to pay for repairs. Motel units converted to studio apartments with a 1-year lease can also qualify.[53] As of February 2023, OHSH had more than 150 landlord partners, including mom-and-pop landlords, the CHA, and apartment complexes. Local property management companies also provide OHSH with vacant units for RRH.[54] As outlined in the 2018 Homelessness Action Plan, the city also created the Flexible Housing Fund (FHF), which CRHC operates, to further reduce barriers to housing for people experiencing homelessness. FHF assistance can be used to help tenants cover past-due rent, move-in costs, utility payments,

security deposits, pet surcharges, and short-term rental assistance. Applicants must access the FHF assistance through their housing navigator, who submits a request to CRHC.[55] Both the Landlord Risk Mitigation Fund and FHF require participating landlords to accept tenants with criminal records, previous evictions, substance abuse challenges, and limited employment histories. Together, these funds will help improve landlord participation in RRH.[56]

## Financing Permanent Supportive Housing

Although OHSH focuses primarily on RRH, it also recognizes the demand for PSH for those who need a higher level of care.[57] Federal funding sources have been vital for financing PSH in Chattanooga. Mayor Kelly allocated most of the city's $38.6 million in ARPA SLFRF to community development initiatives such as homelessness prevention, affordable housing development, and supportive services.[58] In response to the need for more supportive housing units in Chattanooga, the city has initiated plans to renovate the former Airport Inn (a dilapidated hotel). In October 2021, the city council unanimously voted to purchase the Airport Inn for $2.79 million using ARPA SLFRF. This project will add approximately 70 new PSH units.[59] The city plans to assign each Airport Inn resident to a dedicated case manager who can provide wraparound support. Discussions are underway to identify local service providers who can offer residents case management services to keep them housed and maintain daily operations. Onsite staff will also be available to connect residents to the Chattanooga Area Regional Transportation Authority shared ride service to allow residents to access grocery stores, offsite appointments, and other community amenities. City officials are also examining the feasibility of adding two commuter vans so that onsite staff can coordinate outings for residents.[60] In April 2021, HUD awarded Chattanooga nearly $3 million in HOME-ARP funds.[61] One third of this funding has been allocated

to tenant-based rental assistance, and it is helping to finance several housing placements. "It is a tremendous resource and has really led to our ability to get more folks housed," Wolfe stated. Although discussions are underway to explore the feasibility of using HOME-ARP funds to finance services and renovations at the Airport Inn, OHSH is also working to leverage private investment for the renovation.[62]

## Reaching Positive Outcomes

In 2019, as a result of collaboration among the city, the U.S. Department of Veterans Affairs, and CRHC, the Chattanooga/Southeast Tennessee CoC, which serves an area of Southeast Tennessee with a population of nearly 700,000, reached functional zero on all veteran homelessness. Achieving functional zero means that a community has established a coordinated system of care that connects people experiencing homelessness to housing and services. Once an individual has been identified, their experience of homelessness becomes rare and brief.[63] Since that time, however, veteran homelessness in Chattanooga has risen, largely because of the COVID-19 pandemic. As of February 2023, 56 veterans in Chattanooga were experiencing homelessness, still a dramatic improvement from the 300 veterans who experienced homelessness before the city implemented the housing action plan. CRHC will be launching a 100-day challenge to reduce the number of veterans experiencing homelessness. "We're really confident that we'll be able to get back to that functional zero benchmark with some intentional work," said Wolfe.[64]

From 2021 to 2023, Chattanooga had rehoused more than 2,000 people experiencing homelessness.[65] From January 2022 to January 2023, the total number of people experiencing homelessness in Chattanooga declined by 28 percent, and the unsheltered population declined by 40 percent. Wolfe indicated that the rate of chronic homelessness in the city is also declining, adding, "We

feel really confident that we're within striking distance on a lot of subpopulations to reach functional zero."[66] The number of agencies that refer households to OHSH for services, including local schools, domestic violence shelters, and area hospitals, has also increased.[67] These referrals have helped households in need learn how to access stable housing.

OHSH has also begun a data cleaning process in partnership with CRHC. Streamlining the paperwork and data entry processes will improve tracking of service delivery and allow more providers to participate and receive funding for housing placements. CRHC maintains a database to identify households that have received housing but returned to homelessness after 6 months to a year. In these situations, CRHC communicates with the housing navigator that was assigned to that individual to determine whether the city could have offered additional training or support to keep the individual housed. CRHC also communicates with the landlord to determine whether any

challenges existed that may have caused the person to return to homelessness. In the future, CRHC will create a landlord satisfaction survey to collect feedback on landlords' experiences and identify areas for improvement. Taking these steps can improve housing outcomes for people exiting homelessness and encourage more landlords to participate in RRH.[68]

In December 2021, Chattanooga joined *House America* with the goal of rehousing 240 households and adding 100 PSH units for people transitioning out of homelessness.[69] According to Wolfe, *House America* encouraged the city and its partners to rally behind a common goal. The city exceeded its goals by rehousing 620 households and adding 115 PSH units. In 2022, approximately 428 people received housing through OHSH's RRH program using HOME-ARP funding. In addition, roughly 250 people were housed using FHF. Once residents move into their units, 90 percent of households remain stably housed, Wolfe noted. The OHSH team closely monitors the

retention rate throughout the year to determine whether the interventions continue to be effective. As of January 2023, Chattanooga had 160 occupied PSH units and more than 70 under development through the Airport Inn redevelopment project.[70]

## Best Practices for Implementation

Communication with existing residents, partners, developers, and stakeholders is critical for successfully implementing Housing First. Wolfe explained that staff and partners must communicate frequently with residents, even on topics that may seem obvious. He learned that a lack of information can sometimes lead to "people assuming the absolute worst." Approximately 90 percent of Chattanooga's PSH is located across scattered sites, which is helpful for integrating people into the broader community. Some people exiting homelessness, however, require higher levels of care in which their supportive services are collocated with their housing. Once completed, the redevelopment of the Airport Inn will stand as a visible PSH example and lay the groundwork for future PSH developments in the city. According to Wolfe, "We've had to face a lot of hurdles in terms of resistance from local residents and their concerns about the [Airport Inn] and what supportive housing would entail. It's been a really great learning process for us for community engagement." OHSH has worked to dispel myths and ease negative perceptions that existing residents might have about people experiencing homelessness. "If we had just acted a little bit quicker" to communicate with community residents, Wolfe said, "it would've helped out tremendously."[71]

Over the past decade, the city's housing supply has not kept up with the demand among those experiencing chronic homelessness, who may need PSH units. Although some landlords are offering scattered-site units, some households "do not do well in those types of environments.… We want to try



Staff members of Chattanooga's Office of Homelessness and Supportive Housing work to reduce barriers for people transitioning out of homelessness by using resources such as the Flexible Housing Fund, which helps tenants cover move-in costs and other housing fees.

*Photo courtesy of the Chattanooga Office of Homelessness and Supportive Housing*

28

HUD-AR-01168

to have something that's owned and operated by a nonprofit that could be a little bit more lenient" and responsive to the individual service needs of people transitioning from chronic homelessness, Wolfe indicated. Key to OHSH's success has been the innovative strategies it has pursued to increase housing capacity. The Airport Inn project is a hotel conversion that also leveraged city funding. "We're also hoping to leverage private resources, and we're going to quickly scale 70 units as opposed to traditional construction, [which] could take years to build," Wolfe stated.[72]

OHSH has been successful in aligning its objectives with those of its service providers and other partners. OHSH staff recognize that everyone in the Housing First community is working toward the same goal. Information sharing is critical for partners to progress in their shared goal of ending homelessness. If another local housing provider is applying for grant funding, OHSH will not compete for it. "We try to help out as much as we can," said Wolfe, who often will first check with other executive directors to determine whether they are applying for a grant before OHSH applies for it. "We complement the work that's being done, and I think that intentionality has been able to point everyone in the same direction and allow us to go a lot further," Wolfe stated.[73]

Strengthening relationships with landlords is critical to the success of any housing program, Langston emphasized. This is especially important when working to overcome the existing stigma toward voucher holders. Many landlords refuse to accept housing vouchers, so Langston is taking measures to improve their perceptions. In addition, some funding resources limit the amounts that OHSH can allocate for landlord incentives. In the past, OHSH could use Emergency Solutions Grants to double landlords' security deposits, incentivizing their participation in RRH.[74] Although this measure is no longer an option, participating landlords have stated that the process for

receiving payments from the Landlord Risk Mitigation Fund is simple and quick. CRHC typically processes checks within a week of receiving a payment invoice.[75]

## Conclusion

The Housing First approaches in Boston and Chattanooga have reduced barriers for people who may not be able to access housing otherwise and provide vulnerable households with the stability they need to succeed. As Wolfe stated, "Housing is the only thing that solves homelessness, in our view. Every single thing we do around homelessness in terms of providing emergency shelter or food or other things, while they are critically important from a life-saving standpoint, at the end of the day, the housing unit is the thing that ultimately ends someone's homelessness and gives them the stability to build their life."[76] Both cities recognize that landlords are a fundamental component of their Housing First models and have adopted landlord incentive programs to increase the supply of housing available to people transitioning out of homelessness. Collaboration with service providers and housing navigators has streamlined the process of rapidly rehousing households and ensured that agencies tailor their resources to the specific needs of households. In addition, both cities are actively engaging and educating community residents to overcome misconceptions about supportive housing. Using financial resources in innovative ways and developing staff capacity to continue to meet housing demand will be critical to sustaining progress. **EM**

[1] United States Interagency Council on Homelessness. 2022. "All In: The Federal Strategic Plan to Prevent and End Homelessness," 92.

[2] Interview with Laila Bernstein, 27 February 2023.

[3] Ibid.

[4] City of Boston. 2015. "An Action Plan to End Veteran and Chronic Homelessness in Boston 2015-2018," 7.

[5] City of Boston. "Boston's Way Home Fund Surpasses $10 Million Two Years Ahead of Goal" (**www.boston. gov/news/bostons-way-home-fund-surpasses-10-million-two-years-ahead-goal-0**). Accessed 10 January 2023.

[6] Interview with Laila Bernstein.

[7] City of Boston 2015, 13; 16–20.

[8] City of Boston. 2016. "Boston's Way Home: One Year Report."

[9] Interview with Laila Bernstein.

[10] Ibid.

[11] City of Boston 2015, 13; Interview with Laila Bernstein; City of Boston. "More Than $38 Million Awarded to Nonprofits Providing Services to Homeless Individuals" (**www.boston.gov/news/more-38-million-awarded-nonprofits-providing-services-homeless-individuals**). Accessed 12 January 2023.

[12] Lauren Bennett. 2022. "Construction Begins on City's Largest Supportive Housing Development," *Jamaica Plain Gazette,* 28 January; Pine Street Inn. "Financials" (**www.pinestreetinn.org/about-us/financials**). Accessed 6 April 2023.

[13] City of Boston. "Groundbreaking for 140 Clarendon Street Celebrated" (**www.boston.gov/news/groundbreaking-140-clarendon-street-celebrated**). Accessed 1 March 2023.

[14] City of Boston 2015, 13;19; Email correspondence with Laila Bernstein, 3 April 2023; City of Boston 2016.

[15] Boston Housing Authority. "Emergency Housing Voucher Program" (**bostonhousing.org/en/For-Section-8-Leased-Housing/Voucher-Programs/Emergency-Housing-Voucher.aspx**). Accessed 1 March 2023.

[16] City of Boston. 2022. "Members of Special Commission to End Family Homelessness Announced."

[17] Boston Housing Authority. n.d. "Certificate of Homelessness."

[18] "Emergency Housing Voucher Program."

[19] Interview with Laila Bernstein.

[20] City of Boston. 2014. "Action Plan Program Year 2014 July 1, 2014 – June 30, 2015," 5; Interview with Laila Bernstein.

[21] City of Boston. "Landlord Incentive Program" (**www.boston.gov/departments/housing/landlord-incentive-program**). Accessed 12 January 2023; Andrew Brinker. 2023. "Boston is paying landlords to house formerly homeless people. Will it help?" *Boston Globe,* 10 February; Interview with Laila Bernstein.

[22] Interview with Laila Bernstein.

[23] Brinker.

[24] City of Boston 2016; Interview with Laila Bernstein; United States Interagency Council on Homelessness. 2016. "Criteria and Benchmark for Achieving the Goal of Ending Chronic Homelessness"; Criteria include: identifying and offering outreach to individuals experiencing or at risk of homelessness; providing immediate access to shelter or other temporary housing; administering a Housing First approach throughout the community that also accounts for the preferences of the individual; helping individuals move quickly into permanent housing with supportive services; and developing resources, plans, and capacity to recurrence.

[25] Interview with Laila Bernstein; City of Boston 2016.

[26] U.S. Department of Housing and Urban Development. 2014. "HUD 2014 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations"; U.S. Department of Housing and Urban Development. 2022. "HUD 2022 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations."

[27] Interview with Laila Bernstein; Email correspondence with Laila Bernstein, 23 March 2023.

[28] New England Center and Home for Veterans. "Tax and Financial Information" (**nechv.org/about-us/tax-and-financial-information/**). Accessed 3 April 2023; New England Center and Home for Veterans. "Mission" (**nechv. org/about-us/mission/**). Accessed 3 April 2023; City of Boston. "17 Court – The New England Center for Homeless Veterans" (**www.boston.gov/buildinghousing/17-court-new-england-center-homeless-veterans**). Accessed 3 April 2023; New England Center and Home for Veterans. "Permanent and Supportive Housing" (**nechv.org/get-help/permanent-housing/**). Accessed 3 April 2023.

29 Brighton Marine. "Housing Support for Veterans" **(www.brightonmarineinc.org/housing#veterans)**. Accessed 13 March 2023; City of Boston. "New Supportive Housing for Veterans Opens in Brighton" **(www.boston.gov/news/new-supportive-housing-veterans-opens-brighton)**. Accessed 13 March 2023; Tim Logan. 2020. "Home at last: Formerly homeless vets are moving into Brighton Marine's new 25-unit building," *Boston Globe,* 22 September.

30 U.S. Department of Housing and Urban Development. n.d. "CPD FY2020 CARES Act Formula Grants"; Interview with Laila Bernstein.

31 City of Boston. "American Rescue Plan Projects" **(www.boston.gov/news)**. Posted 1 November 2022. Accessed 27 March 2023.

32 Interview with Laila Bernstein; Email correspondence with Laila Bernstein, 3 April 2023.

33 Ibid.

34 U.S. Department of Housing and Urban Development. "HOME - American Rescue Plan Program" **(www.hud.gov/program_offices/comm_planning/home-arp)**. Accessed 1 March 2023; U.S. Department of Housing and Urban Development. "American Rescue Plan Act HOME Supplemental Allocations" **(www.hud.gov/sites/dfiles/CPD/documents/HOME-ARP.pdf)**. Accessed 1 March 2023.

35 City of Boston. 2022. "Summary of the HOME – ARP Allocation Plan."

36 City of Boston. "Boston to Participate in 'House America' Initiative to End Homelessness" **(www.boston.gov/news/boston-participate-house-america-initiative-end-homelessness)**. Accessed 26 January 2023.

37 Interview with Laila Bernstein.

38 Ibid; Email correspondence with Laila Bernstein, 23 March 2023.

39 Ibid.; City of Boston. 2020. "An Ordinance to Create the Special Commission on Ending Family Homelessness"; City of Boston. 2022. "Members of Special Commission to End Family Homelessness Announced"; Interview with Laila Bernstein.

40 Ibid.

41 Ibid; Data provided by Laila Bernstein, 3 April 2023.

42 Ibid.

43 Massachusetts Housing and Shelter Alliance. "CSPECH" **(mhsa.net/partnerships/cspech/)**. Accessed 1 March 2023; The Commonwealth of Massachusetts. "MassHealth" **(www.mass.gov/topics/masshealth)**. Accessed 1 March 2023.

44 Interview with Laila Bernstein; Centers for Medicare & Medicaid Services. "Program of All-Inclusive Care for the Elderly (PACE)" **(www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/PACE/PACE)**. Accessed 10 March 2023; The Commonwealth of Massachusetts. "Program of All-inclusive Care for the Elderly (PACE)" **(www.mass.gov/program-of-all-inclusive-care-for-the-elderly-pace)**. Accessed 10 March 2023; Department of Health and Human Services. 2022. "Approval Letter MassHealth Medicaid and CHIP Section 1115 Demonstration," 129; Manatt.

2023. "New Medicaid Opportunities to Invest in and Sustain Health Related Social Needs: A Conversation with States," 4; 11.

45 City of Chattanooga. 2018. "2018 Homelessness Action Plan for the Chattanooga Community," 4.

46 Ibid, 1; Joint interview with Sam Wolfe and Johnetta Langston, 6 March 2023.

47 Joint interview with Sam Wolfe and Johnetta Langston.

48 City of Chattanooga 2018, 7; 77; National Alliance to End Homelessness. "Core Components of Rapid Re-Housing" **(endhomelessness.org/resource/core-components-of-rrh/)**. Accessed 10 March 2023.

49 Joint interview with Sam Wolfe and Johnetta Langston; Chattanooga Housing Authority. n.d. "Housing First Program Basic Information"; Chattanooga Housing Authority. "CHA-Managed Housing" **(www.chahousing.org/low-income-public-housing)**. Accessed 6 June 2023.

50 City of Chattanooga 2018, 64–5; Joint interview with Sam Wolfe and Johnetta Langston.

51 Dave Flessner. 2022. "Chattanooga to help landlords cover damages, rehab costs to boost housing for homeless," *Chattanooga Times Free Press,* 2 March; Chattanooga Regional Homeless Coalition. 2022. "TN-500 CoC Plan for Serving Individuals and Families Experiencing Homelessness with Severe Service Needs," 3; City of Chattanooga. "Accomplishments" **(chattanooga.gov/ohsh/accomplishments)**. Accessed 17 February 2023.

52 Flessner; United States Interagency Council on Homelessness. "Engaging Landlords: Risk Mitigation Funds Community Profiles" **(www.usich.gov/tools-for-action/engaging-landlords-risk-mitigation-funds-community-profiles/)**. Accessed 15 February 2023; Email correspondence with Sam Wolfe, 28 March 2023.

53 Chattanooga Regional Homeless Coalition. 2023. "Landlord Risk Mitigation Fund Manual."

54 Joint interview with Sam Wolfe and Johnetta Langston.

55 Chattanooga Regional Homeless Coalition. "Flexible Housing Fund Guidelines" **(view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.homeless-coalition.org%2Fwp-content%2Fuploads%2F2021%2F12%2FFlexible-Housing-Fund-Guidelines-Update-12.3.21-Pg.-1-3-1.docx&wdOrigin=BROWSELINK)**. Accessed 21 February 2023.

56 Chattanooga Regional Homeless Coalition 2022, 3; Chattanooga Regional Homeless Coalition 2023; Joint interview with Sam Wolfe and Johnetta Langston.

57 City of Chattanooga. "The Need" **(chattanooga.gov/mayors-office/airport-inn/need)**. Accessed 21 February 2023; Joint interview with Sam Wolfe and Johnetta Langston.

58 City of Chattanooga. "One Chattanooga Relief and Recovery Plan" **(recovery.chattanooga.gov/#:~:text=The%20One%20Chattanooga%20Relief%20and%20Recovery%20Plan%20includes,American%20Rescue%20Plan%20invest-ment%20to%20promote%20City-wide%20prosperity)**. Accessed 7 March 2023.

59 David Floyd. 2022. "Chattanooga mayor addresses concerns about converting hotel into low-income housing," *Chattanooga Times Free Press,* 11 October.

60 Chattamatters. 2023. "How to End Chronic Homelessness," Youtube video, 18 January. Accessed 17 February 2023; Floyd; City of Chattanooga. "Frequently asked questions about the Airport Inn conversion" (**chattanooga.gov/mayors-office/airport-inn/faqs**). Accessed 21 February 2023.

61 U.S. Department of Housing and Urban Development. "Home-American Rescue Plan Program" **(www.hud.gov/program_offices/comm_planning/home-arp)**. Accessed 18 January 2023; U.S. Department of Housing and Urban Development. "American Rescue Plan Act HOME Supplemental Allocations" **(www.hud.gov/sites/dfiles/CPD/documents/HOME-ARP.pdf)**. Accessed 18 January 2023.

62 Joint interview with Sam Wolfe and Johnetta Langston.

63 Community Solutions. 2020. "Press Release: Chattanooga Reaches Functional Zero for Veteran Homelessness"; Joint interview with Sam Wolfe and Johnetta Langston.

64 Joint interview with Sam Wolfe and Johnetta Langston.

65 City of Chattanooga. "Accomplishments" **(chattanooga.gov/ohsh/accomplishments)**. Accessed 17 February 2023.

66 Joint interview with Sam Wolfe and Johnetta Langston.

67 City of Chattanooga. "Accomplishments."

68 Joint interview with Sam Wolfe and Johnetta Langston; Chattanooga Regional Homeless Coalition 2022, 3; 7; City of Chattanooga. "Accomplishments."

69 Chattanoogan. "Mayor Kelly Says New Federal Funds Will Help Provide Shelter For Homeless" (**www.chattanoogan.com/2021/12/17/440251/Mayor-Kelly-Says-New-Federal-Funds-Will.aspx**). Accessed 17 January 2023; U.S. Department of Housing and Urban Development. "House America" **(storymaps.arcgis.com/stories/c1809ec8854a4f62853d19f41ba1f89a)**. Accessed 17 January 2023.

70 Joint interview with Sam Wolfe and Johnetta Langston; Chattamatters.

71 Joint interview with Sam Wolfe and Johnetta Langston.

72 Ibid.

73 Ibid.

74 Ibid.

75 Chattanooga Regional Homeless Coalition 2022, 3.

76 Joint interview with Sam Wolfe and Johnetta Langston.

HUD-AR-01170

# Additional Resources

- The National Alliance to End Homelessness hosts "Data Visualization: The Evidence on Housing First" (2021), which links to many of the strongest studies on Housing First, including domestic and international studies and literature reviews. **endhomelessness.org/resource/data-visualization-the-evidence-on-housing-first/**.

- The Canadian Observatory on Homelessness created the "Canadian Housing First Toolkit" to help communities in Canada adopt a Housing First approach. The toolkit builds on experience and research related to the At Home/Chez Soi project as well as Pathways to Housing. The toolkit includes practical advice as well as case studies. **www.homelesshub.ca/solutions/housing-first/canadian-housing-first-toolkit**.

- The National Low Income Housing Coalition has presented a series of webinars on Housing First that are recapped and archived on their website. Past webinars have featured policymakers and practitioners who are engaged in implementing Housing First approaches at different levels of government. **nlihc.org/housing-first-webinar-recaps**.

- "Breaking the Homelessness-Jail Cycle with Housing First: Results from the Denver Supportive Housing Social Impact Bond Initiative" (2021), by Mary K. Cunningham, Devlin Hanson, Sarah Gillespie, Michael Pergamit, Alyse D. Oneto, Patrick Spauster, Tracey O'Brien, Liz Sweitzer, and Christine Velez, presents findings from a 5-year study of Denver's Supportive Housing Social Impact Bond Initiative and examines the effect of supportive housing on housing stability and shelter use, criminal justice system involvement, and substance use treatment. **www.urban.org/sites/default/files/publication/104501/breaking-the-homelessness-jail-cycle-with-housing-first_1.pdf**.

- "The Value of Ending Veteran and Chronic Homelessness in Four Communities: A Framework for Measuring Community-Wide Costs and Benefits" (2021), by Samantha Batko, Claudia D. Solari, and Nicole DuBois, examines the broader community benefits of reaching functional zero for veteran and chronic homelessness through stakeholder interviews and a review of administrative data in Bergen County, New Jersey; Lake County, Illinois; Montgomery County, Maryland; and Rockford, Illinois. **www.urban.org/sites/default/files/publication/104640/the-value-of-ending-veteran-and-chronic-homelessness-in-four-communities.pdf**.

- "Rapid Re-Housing of Families Experiencing Homelessness in Massachusetts: Maintaining Housing Stability" (2012), by Tim H. Davis and Terry S. Lane, examines the housing stability of 486 Massachusetts families previously living in shelters or motels who received rapid re-housing assistance. **scholarworks.umb.edu/cgi/viewcontent.cgi?article=1060&context=csp_pubs**.

- "How Houston's homeless strategy became a model for other US cities" (2022), by Danielle McLean, discusses the factors that led to Houston's success in using a Housing First approach to reduce homelessness. **www.smartcitiesdive.com/news/how-houstons-homeless-strategy-became-a-model-for-other-us-cities/637515/**.

For additional resources archive, go to **www.huduser.gov/portal/periodicals/em/additional_resources_2023.html**.

## Evidence Matters

**Editor:** Parker A. Lester

**Authors:** Joseph R. Downes (HUD) and Sage Computing staff

**Discuss this issue on the *Evidence Matters* Forum at www.huduser.gov/forums. You can subscribe to *Evidence Matters* at www.huduser.gov/portal/evidence.html.**

HUD-AR-01171

**U.S. Department of Housing and Urban Development**
HUD User
P.O. Box 23268
Washington, DC 20026—3268

Official Business
Penalty for Private Use $300

Return Service Requested



**Scan here for past issues**

PRESORTED
FIRST-CLASS MAIL
POSTAGE & FEES PAID
HUD
PERMIT NO. G—795

 

U.S. Department of Housing and Urban Development
Office of Policy Development and Research
www.huduser.gov ▪ 800.245.2691

HUD-AR-01172

# HHS Public Access

Author manuscript
*J Public Health Manag Pract*. Author manuscript; available in PMC 2021 October 13.

Published in final edited form as:
  *J Public Health Manag Pract*. 2020 ; 26(5): 404–411. doi:10.1097/PHH.0000000000001219.

# Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systematic Review

**Yinan Peng, MPH, PhD**,
Community Guide Office, Office of the Associate Director for Policy and Strategy

**Robert A. Hahn, PhD, MPH**,
Community Guide Office, Office of the Associate Director for Policy and Strategy

**Ramona K.C. Finnie, DrPH**,
Community Guide Office, Office of the Associate Director for Policy and Strategy

**Jamaicia Cobb, MPH**,
Community Guide Office, Office of the Associate Director for Policy and Strategy

**Samantha P. Williams, PhD**,
Division of STD Prevention, National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention (NCHHSTP)

**Jonathan E. Fielding, MD, MPH, MBA**,
UCLA Fielding School of Public Health, Los Angeles, California

**Robert L. Johnson, MD**,
Rutgers New Jersey Medical School, Newark, New Jersey

**Ann Elizabeth Montgomery, PhD**,
University of Alabama at Birmingham School of Public Health & U.S. Department of Veterans Affairs, Virginia

**Alex Schwartz**,
Milano School of Policy, Management, and Environment, Graduate Program in Public and Urban Policy, New School, San Francisco, California

**Carles Muntaner, MD, PhD**,
University of Toronto, Toronto, Canada

**Veronica Helms Garrison, MPH**,
U.S. Department of Housing and Urban Development, Washington, DC

---

**Corresponding author**: Yinan Peng, Community Guide Office, CDC, 1600 Clifton Road, Mailstop H21-10, Atlanta, GA 30329. ypeng@cdc.gov Phone: 404-498-6618.

**Financial Disclosure**: The authors of this paper do not have financial holdings related to the intervention reviewed.

**Conflicts of Interest**: The authors of this paper declare they have no conflicts of interest.

Online Supplement Figures
PRISMA style flow-chart of screening process

HUD-AR-01173

**Beda Jean-Francois, PhD**,

National Institute on Minority Health and Health Disparities, Bethesda, Maryland

**Benedict I. Truman, MD, MPH**,

Office of the Associate Director for Science, NCHHSTP CDC, Atlanta, Georgia

**Mindy T. Fullilove, MD, MS**,

Milano School of Policy, Management, and Environment, Graduate Program in Public and Urban Policy, New School, San Francisco, California

**Community Preventive Services Task Force**

## Abstract

**Context:** Poor health, including mental health and substance use disorder, can be causes and consequences of homelessness. Approximately 2.1 million persons per year in the United States experience homelessness. People experiencing homelessness have high rates of emergency department use, hospitalization, substance use treatment, social service use, arrest, and incarceration.

**Objectives:** A standard approach to treating homeless persons with a disability is called Treatment First, requiring clients be "housing ready"—that is, in psychiatric treatment and substance-free—before and while receiving permanent housing. A more recent approach, Housing First, provides permanent housing and health, mental health, and other supportive services without requiring clients to be housing ready. To determine the relative effectiveness of these approaches, this systematic review compared the effects of both approaches on housing stability, health outcomes, and health care utilization among persons with disabilities experiencing homelessness.

**Design:** A systematic search (database inception to February 2018) was conducted using eight databases with terms such as "housing first," "treatment first," and "supportive housing." Reference lists of included studies were also searched. Study design and threats to validity were assessed using Community Guide methods. Medians were calculated when appropriate.

**Eligibility Criteria:** Studies were included if they assessed Housing First programs in high income nations; had concurrent comparison populations; assessed outcomes of interest; and were written in English and published in peer-reviewed journals or government reports.

**Main Outcome Measures:** Housing stability, physical and mental health outcomes, and health care utilization.

**Results:** Twenty-six studies in U.S. and Canada met inclusion criteria. Compared with Treatment First, Housing First programs decreased homelessness by 88%, improved housing stability by 41%. For clients living with HIV, Housing First programs reduced homelessness by 37%, viral load by 22%, depression by 13%, emergency departments use by 41%, hospitalization by 36%, and mortality by 37%.

**Conclusions:** Housing First programs improved housing stability and reduced homelessness more effectively than Treatment First. In addition, Housing First programs showed health benefits and reduced health services use. Healthcare systems that serve homeless patients may promote their health and well-being by linking them with effective housing services.

HUD-AR-01174

**Keywords**

systematic review; Housing First programs; homelessness; persons living HIV experiencing homelessness

## Introduction

Poor health, including mental health and substance use disorders, are causes and consequences of homelessness.[1-3] According to the Department of Housing and Urban Development (HUD), approximately 1.4 million people in the United States slept in homeless shelters at least once during 2017.[4] Point-in-time estimates showed that approximately 1/3 of homeless persons were unsheltered in 2017.[4] Combining the two findings, it can be estimated that about 2.1 million people experienced homelessness that year. Approximately half of those experiencing homelessness have a disabling condition, defined by HUD to include limitations in daily activities, inability to work or live independently, or having HIV infection.[4,5] In poor physical and mental health and lacking resources, homeless persons may consume extensive societal resources.[6]

A standard approach to treating persons living with disabilities and experiencing homelessness, "Treatment First," requires that clients be "housing ready"—in psychiatric treatment and substance-free—prior to permanent housing.[7] An alternative approach, Housing First, provides regular, subsidized, permanent housing and supportive services to persons with disabilities experiencing homelessness without requiring prior treatment or sobriety.[7] Housed clients are encouraged, but not required, to receive treatment and maintain sobriety.[7] This approach was first assessed in New York City, followed by a collaborative HUD and Veterans Affairs Supportive Housing (HUD-VASH) program for homeless veterans, and a large-scale experiment in Canada. There has been no quantitative systematic review of program effectiveness. This review examined Housing First compared with Treatment First or treatment as usual (TAU) in achieving housing stability, improving health, and reducing health care utilization.

## Methods

Guide to Community Preventive Services ("Community Guide") methods were used for this review.[8,9] This review is PRISMA adherent, and the checklist is available at http://links.lww.com/JPHMP/A679. A systematic search used citation databases (inception to February 2018) such as PubMed, Embase, PsycINFO, and ERIC, with terms such as "housing first" and "supportive housing." Detailed search strategy can be found here. Publications also were identified from study references and review team recommendations.

Studies were included if they assessed Housing First programs implemented in high income nations, reported outcomes of interest, and were written in English and published in peer reviewed journals or government reports. Community Guide methods include a wide array of study designs to better assess effectiveness of public health interventions. Studies were included in this review if they had concurrent comparison groups. Meta-analysis was not conducted due to heterogeneity in study design and intervention characteristics. Study

*J Public Health Manag Pract*. Author manuscript; available in PMC 2021 October 13.

HUD-AR-01175

control populations were commonly categorized either as "Treatment First" or "treatment as usual" (TAU) by study authors. When authors didn't provide the designation, reviewers categorized the control groups by examining intervention descriptions.

Two reviewers screened search results and abstracted qualifying studies; disagreements were reconciled by consensus. Each study was assessed for design and threats to validity, and limitations were assigned for the following potential threats: inadequate description of the intervention and population, failure to describe sampling frame, inadequate measurement of exposure and outcomes, inappropriate analytic methods, high or differential attrition, and failure to consider or control for confounding. Study quality of execution was categorized as good (0–1 limitation), fair (2–4), or limited (>4). Studies of limited quality of execution were excluded from analysis.[8,9]

Outcomes of interest included homelessness and housing stability, physical and mental health, substance use, quality of life, and health service use. Because outcomes were measured in different ways, relative percent changes were calculated for each study, comparing intervention and control participants. Detailed outcome definitions can be found in the summary evidence table. Relative percent changes for each outcome were combined to assess the overall findings for that outcome. Medians and interquartile intervals (IQI) were calculated for outcomes with >4 data points. Outcomes were reported separately for clients living with HIV infection and veterans enrolled in HUD-VASH.

## Results

### Search Yield

A total of 2,590 citations were screened: 2,495 from the search and 95 from reference lists or team recommendation. Full-text screening was conducted for 297 publications; 28 publications met inclusion criteria, but two[10,11] were excluded for limited quality of execution, leaving 26[6,7,12-35] studies (in 65 publications) with a total of 17,182 participants for the review (Figure 1). Summary evidence table for all included studies can be found here.

### Quality of Execution Assessment [1]

Studies were either randomized controlled trials[7,14,20,22,28,30,32,35] or pre-post studies with concurrent control groups.* They were of good[14,18,23,29,34,35] or fair† quality of execution. The most common limitations in this body of evidence were unclear description of the population or intervention,‡ lack of details for sampling frame,§ high attrition,‖ and potential bias due to differential attrition for intervention and control groups.[15,16,25,27,28]

---

*References 6, 12, 13, 15-19, 21, 23-27, 29, 31, 33, 34.
†References 6, 7, 12, 13, 15-17, 19-22, 24-28, 30-33.
‡References 6, 12, 13, 15, 19-21, 23, 24, 26, 30, 31.
§References 7, 13, 15-18, 22, 24-27, 30, 32, 33.
‖References 6, 12, 15-17, 20, 24, 25, 27, 30.

HUD-AR-01176

Peng et al. Page 5

## Study, Intervention, and Participant Characteristics

Included studies evaluated Housing First programs in the United States[¶] or Canada.[15,20,27] No study from other high-income nations met study inclusion criteria. Included programs were implemented in urban,[6,7,12-29,31,33-35] suburban,[32] or a combination of these settings;[30] no study examined a program in a rural setting. Most programs recruited participants experiencing homelessness and with a mental health disorder,[13,16,19,20,31,32] substance use disorder,[6,15,22] or a dual diagnosis[7,12,17,23,26,30,33,34] that affect their ability to work. Some programs recruited participants experiencing homelessness and having a disabling condition that limits their capacity to work.[21,24,27] Three studies[18,25,28] examined the HUD-VASH program recruiting veterans with high health and housing needs. Three studies[14,29,35] recruited participants living with HIV infection. Only one study recruited homeless families,[30] with the rest recruiting individuals experiencing homelessness.

All control groups received health services with or without housing services. Some control groups were enrolled in Treatment First programs[7,25,26,30,32-34] while others received TAU with some[12-16,18,20-22,27,28,35] or no[6,17,19,23,24,29,31] description of health or housing services being provided.

Housing First clients were offered living by themselves in an apartment,[7,12,14,15,17-19,21,23,26,27,29,32-35] living with other clients in a group home,[6,13,22,31] or a choice between the two options.[16,20,24,25,28,30] Clients could choose among services and among housing options that met standards of accessibility and reasonable accommodation. Housing First programs were operational for less than 12 months,[13,14,16,18,22,25-27,31] between 12 and 24 months,[6,7,15,17,19-21,23,24,30,32,35] or more than 24 months.[12,28,29,33,34] Services were provided either through Assertive Community Treatment,[12,16,20,26] a centralized system of coordinated services, most often used for clients with more severe problems, or through Intensive Case Management,[14,17-19,21,22,28-30] a brokerage system in which clients are referred out for services, often used for clients with more moderate problems.[36,37] All offered medical, mental health, and substance use disorder treatment services. Some also offered services to assist with daily tasks[7,16,27,32-34] and social integration.[7,16,20-22,25,27,28,31-35]

The study population had a median age of 42 years,[6,7,12-16,18-26,28,30,31,34] 74% were male,[6,7,12-29,31-35] and most were black[6,7,12-14,16-19,22,23,25,26,28-30,32,34,35] (median 50%) or white[6,7,12-14,16-19,22,23,25,26,29,30,32,34] (median 32%). The median duration of participant homelessness was 6.4 years, among studies reporting.[15,24,27]

## Effects on Client Housing Status and Health Outcomes (excluding those living with HIV infection)

**Housing Stability**—Housing First programs reduced homelessness when compared with Treatment First Programs[7] (decrease of 88%) or with TAU[13,21,24,28] (median decrease of 89%, IQI: −36% to −90%) (Table 1). Homelessness was measured as number of days participants spent homeless[13, 21, 24, 28] or proportion of time participants spent homeless[7]

---

[¶]References 6, 7, 12-14, 16-19, 21-26, 28-35.

*J Public Health Manag Pract.* Author manuscript; available in PMC 2021 October 13.

HUD-AR-01177

during the evaluation period. Housing First programs improved housing stability when compared with Treatment First[7,25,30,32-34] (median increase of 41%, IQI: 18% to 166%) or with TAU[12,15,16,20,24,27,28] (median increase of 54%, IQI: 25% to 1088%) (Table 1). Housing stability was reported as number of days participants were housed[24, 27, 28] or proportion of time participants were stably housed[7, 12, 15, 16, 20, 25, 30, 32-34] during the evaluation period.

**Health, Wellness, and Emergency Department and Hospital Utilization—**
Housing First programs produced similar changes in physical health[15,24] and mental health[15, 24, 28] scores or symptoms such as suicide attempts[20] when compared to TAU (Table 1). Studies comparing Housing First with Treatment First programs[7,26] or TAU[15,22,24,28] reported mixed results on clients' alcohol and illegal substance use (Table 1).

Compared with TAU, Housing First programs improved clients' quality of life score[15,20,27,28] and increased their community integration score[20,24,27] (Table 1). In the largest randomized trial (2,148 persons with serious mental illness and experiencing homelessness in Canada), Housing First clients were more than twice as likely to report positive life changes and 25% as likely to report negative life changes when compared with clients in TAU.[20]

Participants of Housing First programs had less emergency department use[18,20,31] and hospitalization[18,31] when compared with TAU (Table 1).

**Effect on Housing and Health Outcomes for Clients Living with HIV Infection—**
Housing First clients living with HIV infection, when compared with those in TAU, had 63% greater housing stability and 38% less homelessness.[35] Client physical health, e.g., detectable viral load and opportunistic infections,[14,35] improved by a median relative change of 22% (range: −32% to −4%) (Figure 2). Clients had reduced perceived stress, depression, and other mental health problems.[35] Two studies reported decreased mortality of 32% and 42%.[14,29]

**Effect on Housing and Health Outcomes for Veterans in HUD-VASH—**Three studies[18,25,28] evaluated HUD-VASH programs, focusing on veterans who were homeless and had psychiatric or substance use disorders, or both. HUD-VASH reduced homelessness among veterans by 36% when compared with TAU.[28]These programs also improved housing stability by 14% when compared with Treatment First[25] and by 25% when compared with TAU.[28] Clients of HUD-VASH also showed a 51% reduction in alcohol use, a 4% improvement in mental health, and a 10% improvement in quality of life.[28] During the first year of the HUD-VASH program, veterans had higher rates of emergency department, mental health, and medical visits as well as hospitalizations than veterans who were still homeless.[18,28]

## Implications for Policy and Practice

- Housing First Programs are more effective in improving client housing stability compared with Treatment First Programs or treatment as usual. Housing First

HUD-AR-01178

Programs examined in this review were implemented in a few metropolitan areas and mostly recruited clients experiencing chronic homelessness who had severe mental health or substance abuse issues or both. More research and resources might be needed to increase the number of programs and evaluate program effectiveness in additional urban settings and in rural areas.

- Providing permanent housing to persons living with HIV improved their housing stability and health. Clients showed reduced viral load, which could lead to reduced HIV transmission.

- Health care systems, physicians, and allied health professionals can more effectively care for patients if they recognize and respond to the social conditions that are a source of health problems as well as potential solutions to those problems.[38] Some strategies have already been taken or are being considered, such as hospital system provision of housing for homeless patients with severe and chronic health problems,[39] healthcare providers asking patients about their housing and linking them to needed services,[40] provision of public health training to undergraduate medical students, residents, and continuing education for healthcare providers to demonstrate the powerful roles of social determinants in origins of health issues, and inform practitioners of available solutions and resources.[41,42]

## Discussion

Evidence from this systematic review indicates that Housing First programs can more effectively reduce homelessness and improve housing stability for homeless populations with a disability than Treatment First or TAU. Housing First programs offer permanent housing with accompanying health and social services, and their clients are able to maintain a home without first being substance-free or in treatment. Clients in stable housing experienced better quality of life and generally showed reduced hospitalization and emergency department use. For clients living with HIV infection, Housing First programs improved physical and mental health and reduced mortality. With stable housing, clients with HIV infection had a place to receive, store, and take their medications, leading to improved adherence, reduced viral loads, and downstream health benefits.[14]

Housing First programs produced similar changes in physical and mental health and substance use when compared with Treatment First or TAU, i.e., Housing First yielded no additional health benefit. Housing is an established social determinant of health[43] and the current review showed that Housing First programs led to improved housing stability, so it is puzzling that Housing First clients, other than those with HIV infection, did not experience additional health benefit. There are several hypothetical explanations for the absence of additional health benefit with Housing First: 1) included studies reported outcomes for clients who remained in the programs at follow-up. Included studies reported higher attrition for clients in TAU[15,16,27,28] and Treatment First Program[25] than for Housing First programs, and it is possible that clients in the control populations with more severe issues were lost to follow-up, while those in Housing First were easier to locate because of their housing; 2) the study population has severe and often chronic health issues; longer treatment might

HUD-AR-01179

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Peng et al.                                                                                                   Page 8

be needed to produce health benefit; 3) by requiring clients to be housing ready, Treatment First programs may select for clients more likely to make and maintain behavior changes. Funding available, Housing First accepts all clients, perhaps housing clients with more severe baseline health issues; 4) while Housing First clients are not penalized for substance use, Treatment First clients may lose their housing and thus may underreport this behavior; 5) Treatment First clients were required to continue treatment and may have benefited from required treatment, while for Housing First clients, treatments were optional.

Analysis of the effects of Housing First faced several challenges. Good descriptions of services available to and used by clients in both control types are rare.[44] This limits the ability to understand how and why the Housing First program had the observed outcomes, and to inform potential users on program content. Most studies assessed participants at times 2 or fewer years after their receipt of housing; longer term follow-up may be required to assess possible benefits for chronic physical and mental health conditions.

Included studies reported on a wide range of outcomes using various metrics, precluding the possibility of a meta-analysis. In addition, some effect estimates were calculated from small numbers of data points. For example, even though the effect estimates of Housing First for people living with HIV were meaningful and consistent, they were based on only three studies.[14,29,35]

The findings of this systematic review indicate that Housing First programs are more effective in reducing homelessness and improving housing stability than Treatment First programs or treatment as usual. In addition, Housing First programs provide health benefits to clients living with HIV infection and may reduce healthcare use for homeless clients overall. Attention to the state of housing, particularly for low-income populations, may improve understanding of the patient health issues and provide opportunities for improved health care.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## Acknowledgements:

The authors acknowledge Onnalee A. Gomez (formerly Library Science Branch, Division of Public Health Information Dissemination, CDC) for conducting the searches. Stacy A. Benton, from Cherokee Nation Businesses, provided input to the development of the manuscript.

The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention, the U.S. Department of Housing and Urban Development, or the National Institutes of Health.

### Funding:

This review was done with NIH as part of an InterAgency Agreement and was partially funded by NIH. The work of Jamaicia Cobb was supported with funds from the Oak Ridge Institute for Science and Education (ORISE).

HUD-AR-01180

Peng et al. Page 9

# References

1. National Academies of Sciences, Engineering, Medicine. Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness. Washington, DC: The National Academies Press; 2018. 10.17226/25133. Accessed September 2019.

2. Fischer PJ, Breakey WR. The epidemiology of alcohol, drug, and mental disorders among homeless persons. J Am Psychol. 1991;46(11):1115.

3. Susser E, Moore R, Link B. Risk factors for homelessness. Epidemiol Rev. 1993;15(2):546–556. [PubMed: 8174670]

4. The U.S. Department of Housing and Urban Development. The 2017 annual homeless assessment report (AHAR) to Congress. Part 2: Estimates of homelessness in the United States. Washington D.C. https://files.hudexchange.info/resources/documents/2017-AHAR-Part-2.pdf. Published 2018. Accessed September 2019

5. Office of the Assistant Secretary for Community Planning and Development. Homeless emergency assistance and rapid transition to housing: defining "chronically homeless." In: Department of Housing and Urban Development, ed.24 CFR Parts 91 and 578. Docket No. FR-5809-F-01. Washington D.C. Published 2015:75791-75806.

6. Larimer ME, Malone DK, Garner MD, Atkins DC, Burlingham B, et al. Health care and public service use and costs before and after provision of housing for chronically homeless persons with severe alcohol problems. JAMA. 2009;301(13):1349–1357. [PubMed: 19336710]

7. Tsemberis S, Gulcur L, Nakae M. Housing first, consumer choice, and harm reduction for homeless individuals with a dual diagnosis. AJPH. 2004;94(4):651–656.

8. Briss P, Zaza S, Pappaioanou M, Fielding J, Wright-De Agüero L, et al. Developing an evidence-based guide to Community Preventive Services-methods. Am J Prev Med. 2000;18(15):35–43. [PubMed: 10806978]

9. Zaza S, Wright-De Agüero LK, Briss PA, Truman BI, Hopkins DP, et al. Data collection instrument and procedure for systematic reviews in the Guide to Community Preventive Services. Task Force on Community Preventive Services. Am J Prev Med. 2000;18(Suppl 1):44–74. [PubMed: 10806979]

10. Kisely S, Parker J, Campbell L, Karabanow J, Hughes J, Gahagan J. Health impacts of supportive housing for homeless youth: A pilot study. AJPH. 2008;122(10):1089.

11. Lipton FR, Nutt S, Sabatini A. Housing the homeless mentally ill: A longitudinal study of a treatment approach. J Psychiatr Serv. 1988;39(1):40–45.

12. Appel PW, Tsemberis S, Joseph H, Stefancic A, Lambert-Wacey D. Housing First for severely mentally ill homeless methadone patients. J Addict Dis. 2012;31(3):270–277. [PubMed: 22873188]

13. Brown MM, Jason LA, Malone DK, Srebnik D, Sylla L. Housing First as an effective model for community stabilization among vulnerable individuals with chronic and nonchronic homelessness histories. J Community Psychol. 2016;44(3):384–390.

14. Buchanan D, Kee R, Sadowski LS, Garcia D. The health impact of supportive housing for HIV-positive homeless patients: A randomized controlled trial. AJPH. 2009;99(S3):S675–S680.

15. Cherner RA, Aubry T, Sylvestre J, Boyd R, Pettey D. Housing First for adults with problematic substance use. J Dual Diagn. 2017;13(3):219–229. [PubMed: 28414579]

16. Clark C, Rich AR. Outcomes of homeless adults with mental illness in a housing program and in case management only. J Psychiatr Serv. 2003;54(1):78–83.

17. Crisanti AS, Duran D, Greene RN, Reno J, Luna-Anderson C, Altschul DB. A longitudinal analysis of peer-delivered permanent supportive housing: Impact of housing on mental and overall health in an ethnically diverse population. J Psychiatr Serv. 2017;14(2):141.

18. Gabrielian S, Yuan AH, Andersen RM, Gelberg L. Diagnoses treated in ambulatory care among homeless-experienced veterans: Does supported housing matter? J Prim Care Community Health. 2016;7(4):281–287. [PubMed: 27343544]

19. Gilmer TP, Manning WG, Ettner SL. A cost analysis of San Diego County's REACH program for homeless persons. J Psychiatr Serv. 2009;60(4):445–450.

*J Public Health Manag Pract.* Author manuscript; available in PMC 2021 October 13.

HUD-AR-01181

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Peng et al.

20. Goering P, Veldhulzen S, Watson A, Adair C, Kopp B, et al. Mental Health Commission of Canada. National At Home/Chez Soi final report. Calgary, Alberta. https://www.mentalhealthcommission.ca/sites/default/files/mhcc_at_home_report_national_cross-site_eng_2_0.pdf. Published 2014. Accessed September 2019.

21. Hanratty M Impacts of Heading Home Hennepin's Housing First programs for long-term homeless adults. Hous Policy Debate. 2011;21(3):405–419.

22. Kennedy DP, Osilla KC, Hunter SB, Golinelli D, Maksabedian Hernandez E, Tucker JS. A pilot test of a motivational interviewing social network intervention to reduce substance use among housing first residents. J Subst Abuse Treat. 2018;86:36–44. [PubMed: 29415849]

23. Kessell ER, Bhatia R, Bamberger JD, Kushel MB. Public health care utilization in a cohort of homeless adult applicants to a supportive housing program. J Urban Health. 2006;83(5):860–873. [PubMed: 16779686]

24. Mares AS, Rosenheck RA. A comparison of treatment outcomes among chronically homelessness adults receiving comprehensive housing and health care services versus usual local care. J Adm Policy in Ment Health 2011;38(6):459–475.

25. Montgomery AE, Hill LL, Kane V, Culhane DP. Housing chronically homeless veterans: Evaluating the efficacy of a Housing First approach to HUD-VASH. J Community Psychol. 2013;41(4):505–514.

26. Padgett DK, Stanhope V, Henwood BF, Stefancic A. Substance use outcomes among homeless clients with serious mental illness: comparing housing first with treatment first programs. Community Ment Health J. 2011;47(2):227–232. [PubMed: 20063061]

27. Pankratz C, Nelson G, Morrison M. A quasi-experimental evaluation of rent assistance for individuals experiencing chronic homelessness. J Community Psychol. 2017;45(8):1065–1079.

28. Rosenheck R, Kasprow W, Frisman L, Liu-Mares W. Cost-effectiveness of supported housing for homeless persons with mental illness. Arch Gen Psychiatry. 2003;60(9):940–951. [PubMed: 12963676]

29. Schwarcz SK, Hsu LC, Vittinghoff E, Vu A, Bamberger JD, Katz MH. Impact of housing on the survival of persons with AIDS. BMC Public Health. 2009;9(1):220. [PubMed: 19583862]

30. Shinn M, Samuels J, Fischer SN, Thompkins A, Fowler PJ. Longitudinal impact of a family critical time intervention on children in high-risk families experiencing homelessness: A randomized trial. Am J Community Psychol. 2015;56(3-4):205–216. [PubMed: 26238278]

31. Srebnik D, Connor T, Sylla L. A pilot study of the impact of housing first–supported housing for intensive users of medical hospitalization and sobering services. AJPH. 2013;103(2):316–321.

32. Stefancic A, Tsemberis S. Housing First for long-term shelter dwellers with psychiatric disabilities in a suburban county: A four-year study of housing access and retention. J Prim Prev. 2007;28(3-4):265–279. [PubMed: 17592778]

33. Tsemberis S From streets to homes: An innovative approach to supported housing for homeless adults with psychiatric disabilities. J Community Psychol. 1999;27(2):225–241.

34. Tsemberis S, Eisenberg RF. Pathways to housing: Supported housing for street-dwelling homeless individuals with psychiatric disabilities. Psychiatr Serv. 2000;51(4):487–493. [PubMed: 10737824]

35. Wolitski RJ, Kidder DP, Pals SL, et al. Randomized trial of the effects of housing assistance on the health and risk behaviors of homeless and unstably housed people living with HIV. AIDS Behav. 2010;14(3):493–503. [PubMed: 19949848]

36. Bratcher K, Burchman H, Casey R, Cho R, Clark C, et al. VA National Center for Homelessness among Veterans. Permanent supportive housing resource guide. Philadelphia, PA. https://www.va.gov/HOMELESS/nchav/docs/Permanent%20Supportive%20Housing%20Resource%20Guide%20-%20FINAL.PDF. Published 2015. Accessed September 2019.

37. Substance Abuse and Mental Health Services Administration. Permanent supportive housing: building your program. Rockville, MD. https://store.samhsa.gov/system/files/buildingyourprogram-psh.pdf. Published 2010. Accessed September 2019.

38. Berwick DM. To Isaiah. JAMA. 2012;307(24):2597–2599. [PubMed: 22735428]

HUD-AR-01182

Peng et al. Page 11

39. Kuehn BM. Hospitals turn to housing to help homeless patients. JAMA. 2019;321(9):822–824. [PubMed: 30758505]

40. Hansen H, Metzl J. Structural competency in the US healthcare crisis: putting social and policy interventions into clinical practice. J Bioeth Inq. 2016;13(2):179–183. [PubMed: 27178191]

41. Geiger HJ. The political future of social medicine: Reflections on physicians as activists. Acad Med. 2017;92(3):282–284. [PubMed: 28030421]

42. Sklar DP. Reaching out beyond the health care system to achieve a healthier nation. Acad Med. 2017;92(3):271–273. [PubMed: 28221221]

43. Shaw M. Housing and public health. Annu Rev Public Health. 2004;25(1):397–418. [PubMed: 15015927]

44. Burt MR, Pollack D, Sosland A, Mikelson KS, Drapa E, et al. The Urban Institute. Evaluation of continuums of care for homeless people. Final Report. Washington D.C. http://webarchive.urban.org/UploadedPDF/continuums_of_care.pdf. Published 2002. Accessed September 2019.

HUD-AR-01183

Peng et al.                                                                                          Page 12



**Figure 1.**
Search results.

HUD-AR-01184



**Figure 2.**
Intervention effectiveness for people experiencing homelessness and living with HIV/AIDS.

HUD-AR-01185

Peng et al.                                                                                   Page 14

**Table 1.**

Intervention effectiveness for people experiencing homelessness with a disability.

| Outcome | Comparison Group | Number of Studies | Relative Difference | Favorability[a] |
|---|---|---|---|---|
| Homelessness | Treatment First | 1[7] | −88% | Favorable |
| Homelessness | Treatment as usual | 4[13,21,24,28] | −89% Range: −36% to −90% | Favorable |
| Housing stability | Treatment First | 6[7,25,30,32-34] | 41% IQI: 18% to 166% | Favorable |
| Housing stability | Treatment as usual | 7[12,15,16,20,24,27,28] | 54% IQI: 25% to 1088% | Favorable |
| Physical health | Treatment as usual | 2[15,24] | 3.3%, −0.2% | Negligible change observed |
| Mental health | Treatment as usual | 4[15,20,24,28] | −2% IQI: −5% to 4% | No change observed |
| Alcohol use | Treatment First | 1[7] | 57% | Unfavorable |
| Alcohol use | Treatment as usual | 4[15,22,24,28] | −30% Range: −82% to 36% | Favorable |
| Illegal drug use | Treatment First | 1[7] | 11% | Unfavorable |
| Illegal drug use | Treatment as usual | 2[15,24] | −1%, 62% | Unfavorable |
| Alcohol and drug use | Treatment First | 1[26] | −71% | Favorable |
| Quality of life | Treatment as usual | 4[15,20,27,28] | 5% Range: 2% to 10% | Favorable |
| Community integration[b] | Treatment as usual | 3[20,24,27] | 14% Range: 1% to 227% | Favorable |
| Emergency department use | Treatment as usual | 3[18,20,31] | −5% Range: −65% to 20% | Favorable |
| Hospitalization | Treatment as usual | 2[18,31] | −36% and −7% | Favorable |

Abbreviations: IQI = interquartile interval, calculated with five or more data points; Range = max and mean of effect estimates, reported with less than five data points

[*] Favorability refers to greater outcome improvement in the intervention population when compared with the control population.

[#] Community integration: Extent to which an individual lives, participates, and socializes in his/her community, measured, for example, in the Wisconsin Quality of Life Index.

HUD-AR-01186



U.S. Department of Housing
and Urban Development

# FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO

CPD-2600-DC-0025

Applications are due by 8:00 PM Eastern Time on 08/26/2026.

Community Planning and Development

HUD-AR-05006

# TABLE OF CONTENTS

I. BASIC INFORMATION..........................................5

A. Summary..............................................................5

B. Agency Contact(s) ..............................................7

II. ELIGIBILITY..........................................................9

A. Eligible Applicants...............................................9

B. Eligible Applications...........................................11

C. Cost Sharing or Matching .................................26

III. PROGRAM DESCRIPTION..............................28

A. Purpose.............................................................28

B. Goals and Objectives........................................28

C. Authority............................................................34

D. Unallowable Costs............................................35

E. Indirect Costs....................................................35

F. Program History ................................................35

G. Other Information...............................................38

IV. APPLICATION CONTENTS AND FORMAT.....44

A. Standard Forms, Assurances, and Certifications44

B. Budget...............................................................46

C. Narratives and Other Attachments ....................54

D. Other Application Content .................................54

V. APPLICATION REVIEW INFORMATION..........58

A. Threshold Review ..............................................58

B. Merit Review ......................................................69

C. Risk Review.......................................................86

D. Selection Process..............................................87

E. Award Notices....................................................94

VI. SUBMISSION REQUIREMENTS AND
DEADLINES..........................................................96

A. Deadlines...........................................................96

B. Submission Methods..........................................97

C. Other Submission Information ..........................102

D. False Statements.............................................102

VII. POST-AWARD REQUIREMENTS AND
ADMINISTRATION ...............................................106

A. Administrative, National and Departmental Policy
Requirements, and General Terms and Conditions
...............................................................106

B. Environmental Requirements ...........................108

C. Remedies for Noncompliance ..........................110

D. Reporting .........................................................110

VIII. CONTACT AND SUPPORT ..........................115

A. Agency Contact ...............................................115

B. esnaps.hud.gov ...............................................116

C. SAM.gov ..........................................................116

D. Debriefing and Appeals ...................................116

E. Applicant Experience Survey...........................121

F. Other Online Resources...................................121

APPENDIX.............................................................123

Appendix I. Definitions .........................................123

# BEFORE YOU BEGIN

If you are a good candidate for this funding opportunity, register in the required systems and review the application materials. If you are already registered, confirm that your information is current and active.

## SAM.gov Registration

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

## esnaps.hud.gov Registration

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

## Find the Application Package

Use the Grants Search at Grants.gov and search for opportunity number CPD-2600-DC-0025 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, contact the Support Center on Grants.gov.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page on Grants.gov.

---

**Application Deadline**
Applications are due by 8:00 PM Eastern Time on 08/26/2026.
See Section VI.A. of this NOFO.

**HUD Listserv**
To get **email alerts** about current and future funding opportunities, **subscribe** to HUD's Funding Opportunities listserv.

---

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 347 of 482
PageID #: 843

# I. BASIC INFORMATION

I.  Basic Information

  A.  Summary

  B.  Agency Contact(s)

TABLE OF CONTENTS

HUD-AR-05009

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 348 of 482 PageID #: 844

# I. BASIC INFORMATION

See Contact and Support section of this NOFO.

## A. Summary

**Federal Agency Name:**

United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2506-0044

**Due Date for Intergovernmental Review:**

See Section VI.C.1.

---

### Key Facts

**Opportunity Name:**
FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO
**Opportunity Number:**
CPD-2600-DC-0025
**Federal Assistance Listing(s):**
14.267

### Key Dates

**Application Due Date: 8:00:00 PM Eastern Time on**:
08/26/2026
**Anticipated Award Date:**
12/01/2026
**Estimated Performance Period Start Date:**
01/01/2027
**Estimated Performance Period End Date:**
12/31/2027

---

### 1. NOFO Summary

The Continuum of Care (CoC) Program is a national competition between geographic areas designed to:

- promote a community-wide commitment to the goal of ending homelessness;

- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse homeless individuals and families, persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and homeless youth while minimizing the trauma and dislocation caused by homelessness;

- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and

- optimize self-sufficiency among homeless individuals and families.

Self-sufficiency, consistent with the purposes of the McKinney-Vento Act, 42 U.S.C. § 11381(4), means the ability to meet basic needs, including a place to live, without public or private assistance. This is consistent with dictionary definitions of the term. The Oxford English Dictionary defines *self-sufficiency* as the "state or condition of not needing or relying on external assistance, support, or aid." Similarly, Merriam-Webster defines *self-sufficient* as "able to maintain oneself or itself without outside aid: capable of providing for one's own needs."

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is homeless youth ages 24 and younger, including unaccompanied and pregnant or parenting youth.

## 2. Funding Details

**Type of Funding Instrument**

G (Grant)

## Available Funds

Funding of approximately **$4,040,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On February 3, 2026, the President signed H.R. 7148 authorizing the Consolidated Appropriations Act, 2026 (Public Law 119-75) which makes approximately $4,010,000,000 in CoC Program funding available.

Of the $4,010,000,000, HUD is making available at least $52,000,000 for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects.

Additionally, HUD is making available approximately $52,000,000 in funding from the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in section II.B.3.eof this NOFO. HUD reserves the right to use the earliest available

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 350 of 482    PageID #: 846

fiscal year funds for projects that are able to meet the FY 2025 CoC DV Bonus obligation deadline (September 30, 2027), so long as the total amount awarded for each DV Bonus project is consistent with the funding process outlined in V.D3.d.

HUD may add to the total amount with available funds that have been carried over or recaptured from previous fiscal years. All requirements in the FY 2026 application process, including requirements for the entire CoC Consolidated Application and the total amount of funds available, are included in this NOFO.

## Estimated Number of Awards

7000 awards from available funding

## Length of Performance Period:

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:


## B. Agency Contact(s)

See Contact and Support section of this NOFO.

Case 1:26-cv-00436-MSM-AEM     Document 30-3     Filed 07/17/26     Page 351 of 482
PageID #: 847

# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Eligible Applications

C. Cost Sharing or Matching

TABLE OF CONTENTS

HUD-AR-05013

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 352 of 482   PageID #: 848

# II. ELIGIBILITY

## A. Eligible Applicants

If your organization is not an eligible applicant, your application won't be reviewed or scored, and you won't receive funding from HUD.

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

06 (Public and State controlled institutions of higher education)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

Additional Information on Eligibility

You cannot apply as an individual.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

To be eligible for funding under the FY 2026 Continuum of Care and Youth Homelessness Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule).

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

A faith-based organization may apply on the same basis as any other organization, subject to the requirements in 24 CFR 5.109, and receive the full protections for religion in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, the Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1), Title VII of the Civil Rights Act (42 U.S.C. §§ 2000e-1(a), 2000e-2(e), and the Americans with Disabilities Act (42 U.S.C. § 12113(d)). HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

An organization may seek a religious accommodation from any requirements of this program or other HUD requirement that substantially burden its religious exercise under the Religious

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 353 of 482
PageID #: 849

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Freedom Restoration Act or other applicable law, consistent with 24 CFR 5.109(c). If such an accommodation is requested, HUD will not deny the organization unless it determines that doing so is necessary to further a compelling governmental interest and is the least restrictive means of achieving that interest, consistent with applicable law.

Faith-based organizations may also hire, fire, and make other employment decisions on the basis of their sincerely held religious beliefs, including requiring employees to adhere to religious tenets, practices, and standards of conduct, without jeopardizing their eligibility to receive HUD funds, consistent with applicable law.

A faith-based organization may not use direct financial assistance from HUD to support or engage in any explicitly religious activities except where consistent with the Free Exercise Clause and Establishment Clause of the First Amendment, the Religious Freedom Restoration Act, and any other legal protections for religious exercise. Such an organization also may not, in providing services funded by HUD, or in their outreach activities related to such services, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

## 2. Restrictions

### a. Statutory and Regulatory Requirements

You must meet the current General Statutory and Regulatory Eligibility Requirements. If you do not meet these requirements, your application won't be scored, and you won't receive funding from HUD. This is a threshold requirement for all HUD funding.

### b. Resolution of Civil Rights Matters

If you have any outstanding or unresolved judgments for violating civil rights laws, you must settle them before you apply. If you don't, settle the civil rights law violations before you apply, your application won't be scored, and you won't receive funding from HUD. This is a threshold requirement for all HUD funding.

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

**(1)** An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

**(a)** the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

**(b)** Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

**(2)** HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 354 of 482 PageID #: 850

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

resolve the matter include, but are not limited to:

**(a)** Current compliance with a voluntary compliance agreement signed by all the parties;

**(b)** Current compliance with a HUD-approved conciliation agreement signed by all the parties;

**(c)** Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

**(d)** Current compliance with a consent order or consent decree; or

**(e)** Current compliance with a final judicial ruling or administrative ruling or decision.

## B. Eligible Applications

1. An application from an eligible entity is considered for funding if it meets basic threshold requirements and passes merit review.

2. Your application must support the goals of this NOFO.

**3.** The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 15 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications with the following limitations:

**(1)** The CoC Bonus amount for a Split CoC that is not a New Tribal CoC will be no less than $250,000 and no more than $3,000,000;

**(2)** The CoC Bonus for a Merged CoC will be no less than $750,000 and no more than $10,000,000;

**(3)** The CoC Bonus for a CoC that is neither a Split CoC nor a Merged CoC will be no

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 355 of 482
PageID #: 851

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

less than $500,000 and no more than $5,000,000.

**(4)** The CoC Bonus for a New Tribal CoC will be no less than $500,000 and no more than $5,000,000.

**<u>Definitions:</u>**

**Split CoC** is a CoC that has newly registered during the prior three registration periods (FY 2023 CoC Registration period or later) and includes geographic area that was previously associated with another CoC that continues to operate.

**Merged CoC** is a CoC that includes geographic area that was associated with one or more other CoCs in any of the prior three registration periods (the FY 2023 CoC Registration period or later) and that CoC no longer operates.

**New Tribal CoC** is a CoC that has newly registered in one of the prior three registration periods (FY 2023 CoC Registration period or later) that includes a Formula Area [see section 2.b.(3)of Appendix I].

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).* Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding and serve the population described in **III.G.11.c**.

**e.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).* A new DV project created through (1) the DV Bonus or (2) through reallocation of renewal DV projects.

**(1)** CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 20 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 20 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 20 percent of the CoC's PPRN is more than $5 million.

**(2)** CoCs may reallocate eligible DV Renewal projects to create new DV Reallocation projects.

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated.

**(4)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

   **(a)** For PH-RRH and TH projects, the application must demonstrate:

   The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

   **(b)** For Supportive Services Only Coordinated Entry (SSO-CE) projects, the

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 356 of 482
PageID #: 852

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

application must demonstrate:

The project is designed to implement policies, procedures, and practices that equip the CoC's coordinated entry to better meet the needs of homeless individuals who are experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking.

**(5)** The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2026 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f.** *New Projects Created with CoC Bonus or Through the CoC Reallocation process.* CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS projects for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE projects to develop or operate a Coordinated Entry system.

In addition to the fact that HUD may reject a CoC Bonus or CoC Reallocation project as described elsewhere in this NOFO, HUD may reclassify, reduce, or reject a CoC Bonus or

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 357 of 482
PageID #: 853

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

CoC Reallocation project as described below.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

For new projects created through the CoC Bonus process, HUD must determine whether the CoC has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**g. *Youth Homeless Demonstration Program (YHDP).*** Consistent with the requirements of the Consolidated Appropriations Act, 2026, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section II.B.3.h. of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section II.B.3.h these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects through the YHDP Replacement process.

To ensure YHDP activities are implemented in an effective, consistent, and proven way, all YHDP projects funded under this NOFO may only be used to serve homeless youth, age 24 and younger and all YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with NOFO requirements, or with the Special YHDP Activities identified in section IV.B.2 of this NOFO: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.29, 578.31, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93(a)-(b), 578.93(d)-(e), 578.95, 578.97, 578.99, 578.103(a)(3)-(14),578.103(a)(16)-(18), 578.103 (b),–578.103 (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 358 of 482
PageID #: 854

time to time, with the exception of 200.306(b)(5) apply. Federal fair housing and nondiscrimination requirements cannot be waived.

**h. *New YHDP Projects Created through YHDP Replacement processes.*** CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation.

**(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities listed in section IV.B.2 of this NOFO; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at Appendix I of this NOFO, it must submit a YHDP Replacement project application.

**(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section II.B.3.i for more information.

**(3)** A YHDP Replacement project application must include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing for each eligible YHDP project. If the Collaborative Applicant submits both a renewal project application and YHDP replacement project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in section IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing, which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services, and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(f)** Permanent Housing, including PH-PSH and PH-RRH projects. Current YHDP recipients may apply for Permanent Housing projects through the YHDP Replacement process only when the recipient is consolidating multiple (up to 10) existing YHDP Permanent Housing renewal grants. In these instances, the YHDP Replacement project must have the same recipient as the existing renewal grants being consolidated and the BLIs for the YHDP Replacement project application must match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications for not meeting threshold requirements; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement. HUD will not select YHDP project applications that fail to score high enough according to the Tier 2 scoring process described in V.D.

**(6)** YHDP Replacement projects may establish an operating start date that will be the day after the end of the previous grant term for the expiring YHDP renewal.

**(7)** A YHDP renewal project applicant may submit a YHDP Replacement application to change from one program component to another eligible component. Replacement grant applications to change program components must fully transition to the new component by the end of the 1-year YHDP Replacement grant term and may only apply for renewal in the next CoC Program Competition under new the component.

YHDP grants changing component types that include housing costs (e.g. PHH, PH-RRH, or TH) to an SSO grant may not pay for rental assistance or leasing costs with SSO grant funding during the transition period. While the project is transitioning to SSO during the 1-year period after award, the project must use other funding to cover housing costs while it transitions to the new component.

**(8)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**i. *Expansion Project.*** The process used by eligible renewal project applicants to add funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.c of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 360 of 482 PageID #: 856

an expiration date in CY 2027.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

(1) The following limitations apply to expansion grant applications:

(a) If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

(b) HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

(c) Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

(d) CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

(e) If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections II.B.3.d and II.B.3.e of this NOFO.

(f) New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

(2) Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

(a) submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE project applications, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections II.B.3.h and II.B.4 of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 362 of 482 PageID #: 858

expanded, must serve 100 percent individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a and V.D.3.b of this NOFO.

**j. *Consolidation Project.*** HUD encourages the consolidation of eligible renewal grants. Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted.

To be eligible for consolidation, the projects must have the same recipient and be for the same component. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2027. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

**i.** outstanding audit or monitoring findings,
**ii.** outstanding obligation to HUD that is in arrears,
**iii**. unresolved construction delays,
**iv.** a history of poor financial management/drawdown issues,
**v.** history of low occupancy levels, or lack experience in administering the project type, or
**vi.** other capacity issues.

**(d)** the projects have the same recipient and are for the same component.

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.11 of this NOFO, including a project originally funded under the Special

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 363 of 482
PageID #: 859

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded under the Special CoC NOFO Competition) or a DV Renewal project**;**

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2027. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two different components (e.g., PH and TH).

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant

with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**k.** *Transition Grant.* A Transition grant is an application to fund a new CoC project through the reallocation process to transition eligible CoC renewal project(s) (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. Transition grant applications awarded FY 2026 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2027 may submit a FY 2026 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and project quality thresholds established by HUD in sections V.A.4.a and V.A.4.c of this NOFO. If the project application identifies the project as a transition grant and the CoC accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. FY 2025 grants expiring in CY 2027 that were not required to submit a FY 2025 renewal application for the FY 2025 funding opportunity, the applicant will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions:

YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 365 of 482
PageID #: 861

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

types. If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

## 4. Renewal Project Requirements.

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2025 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2026 CoC Program funds if they are currently operating and have an expiration date in CY 2027 (the period from January 1, 2027, through December 31, 2027).

**a.** Compliance and re-evaluation. To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year. Further, HUD may condition renewal on compliance with audits for large grant recipients (over $1,000,000) as required by 2 CFR 200.501 and other post-award requirements from prior years, as required by 2 CFR Part 200, 24 CFR Part 91, 24 CFR Part 578, and other applicable law.

**b.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**c.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**d.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the same type of housing as identified in their most recent grant agreement, or amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**e.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. In cases where two or more eligible

projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to the sum of the original ARA of the renewal projects before consolidation.

**f.** Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**g.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**h.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD, except as provided in Section IV.B.3 of this NOFO. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**i.** *Actual Per Unit Cost – Renewal Grants.* Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2026 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**j.** *Renewal Project Grant Terms.* Renewal project applications are limited to a 1-year grant term with 1 year of funding. Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

## 5. New Project Requirements.

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation, or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2026.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Per the Consolidated Appropriations Act, 2026, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on the System Performance rating factor in section V.B.1.b of this NOFO).

**c. *New Project Grant Terms.*** The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (8) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 368 of 482 PageID #: 864

grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

    **(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

    **(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11383(a)(11) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

    **(c)** CoC Planning and UFA Costs grants are not renewable.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 369 of 482 PageID #: 865

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

## C. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for homeless youth or if the recipient has already had a match exemption approved for this renewal as provided in Section I.C.1.b.4 of Appendix A of the FY 2022 Youth Homelessness Demonstration Program NOFO (FR-6700-N-35).

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 370 of 482 PageID #: 866

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

TABLE OF CONTENTS

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 370 of 482 PageID #: 866

HUD-AR-05032

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is a national competition between geographic areas designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among homeless individuals and families.

As described in detail below, a "Housing First" approach to homelessness has failed to deliver on the CoC Program's primary goal: to end homelessness.

The FY 2026 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2027. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2026, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

"Housing First" has been a profound failure by any measure. Far from ending homelessness as promised, since the policy was first mandated by HUD in 2013:

- Literal homelessness (on the street, in emergency shelters, or in transitional housing) has increased 27%,

- Chronic homelessness has increased 80.5%, and

- Unsheltered homelessness has increased 36.1%.[1]

This is despite the fact that, since 2013:

- Taxpayer funded "permanent housing" beds have increased 150.9%[2],

- "Rapid rehousing" was created, artificially lowering numbers by recategorizing people in short-term assistance as "permanently housed," and

- CoC spending has increased 111%.[3]

HUD is restoring the CoC program to its original goals of reducing homelessness and optimizing self-sufficiency by focusing on meaningful outcomes, expanding competition, prioritizing treatment, economic independence, and emphasizing law and order.

More than a decade ago, advocates of "Housing First" argued that the approach would end

all types of homelessness in 10 years.[4] By focusing on permanently subsidized housing with no conditions, the Obama Administration said it would end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[5]

In 2026, it is evident that those promises have profoundly failed. After focusing on permanently subsidized housing with no conditions for more than a decade, homelessness reached the highest population ever recorded at the highest rate of increase ever recorded last year. [6] There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness – Permanent Housing. The nation's supply of Permanent Supportive Housing has increased by 111% (more than double) since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5%.

The present-day homelessness assistance framework has incentivized the speed at which individuals receive subsidized housing rather than the quality of services individuals receive in order to reach self-sufficiency and independent living.[7] This NOFO takes steps to restore competition, balance, and true outcomes to the CoC program.

## 1. Improving Outcomes.

This NOFO incentivizes outcomes consistent with the purposes of the CoC program including optimizing self-sufficiency, reducing homelessness, and minimizing the trauma caused to communities as a whole by homelessness. HUD is committed to supporting meaningful, sustained reductions in homelessness and increases in self-sufficiency rather than measuring outputs such as the number of beds created or filled.

Because unsheltered homelessness causes unique trauma to individuals, families, and communities, this NOFO focuses on reductions in unsheltered homelessness and encampments.

One of the main objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381, is to optimize self-sufficiency among homeless individuals and families. CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of successful providers, including faith-based providers, and improve the overall performance of the CoC. This NOFO also makes a significant investment in Transitional Housing and Supportive Service Only projects to ensure that those who can recover and achieve self-sufficiency have the support to do so.

## 2. Creating Competition to Improve Innovation and Accountability.

The Continuum of Care Program was intended to be a "national competition between geographic areas" (42 U.S.C § 11386a), which is also consistent with Office of Management and Budget requirements that federal grants be awarded on a competitive, objective basis, even for renewals. 2 CFR 200.204 and 200.205. In 2024, 90% of every CoC's Annual

Case 1:26-cv-00436-MSM-AEM Document 30-3 Filed 07/17/26 Page 373 of 482 PageID #: 869

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[8] This means that only about 10% of FY24 CoC awards were competed on the basis of merit between geographic areas. In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Competition drives outcomes, effectiveness, innovation, and accountability. Consistent with the FY26 appropriation bill, HUD is setting Tier 1 at 60% and competing 40% of CoC ARD on the basis of merit between geographic areas. Increased competition brings the CoC Program back to its original intent as a competitive program, not an entitlement program or block grant. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency.

### 3. Restoring Balance to the Continuum of Care.

The CoC program has four project components for all CoCs: Permanent Housing, Transitional Housing, Supportive Service Only, and HMIS. This NOFO provides opportunities to restore a healthy balance of CoC-funded projects to further community-wide efforts to reduce homelessness.

From 2007 to 2009 there was a nearly equal distribution of Emergency Shelter beds, Transitional Housing beds, and Permanent Supportive Housing beds.[9] During this time, the number of homeless individuals was decreasing consistently. Beginning in 2010, and reinforced by HUD's 2013 policy changes, Permanent Supportive Housing beds increased dramatically as Transitional Housing beds decreased dramatically. The distribution of types of assistance is far from the balance seen in 2007.

The numbers cited above reference nationwide bed counts. The trend and disparities between Permanent Housing and Transitional Housing is even more apparent when narrowed to CoC-funded housing in particular. In 2024, 88% of the CoC national award went to Permanent Housing, and only 1% supported transitional housing projects.[10]

Instead of a balanced continuum of assistance, the CoC Program has become a "one size fits all" response to homelessness that restricted the spectrum of eligible program components, excluding a wide array of community providers in the process. By investing in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care Program to help able-bodied people move to self-sufficiency. Individuals who are likely to never be able to return to the workforce–over 62 years old, physically disabled, developmentally disabled–should be prioritized for Permanent Supportive Housing. Instead, many Permanent Supportive Housing units prioritize certain disabilities thereby failing to serve the most vulnerable. Many individuals with disabilities, including impairment due to substance abuse, are able to recover and regain self-sufficiency and deserve every opportunity to receive treatment and services to help them do so.

To the extent permitted by law, HUD is shifting its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 374 of 482 PageID #: 870

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

### 4. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency.

According to a nationwide study, 75% of a survey sample of 64,000 unsheltered homeless individuals reported a substance use disorder and 78% reported a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.[11] Another study found that two-thirds of homeless individuals self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. Of those, 29% reported wanting treatment and being unable to receive it.[12] Based on HUD's 2024 Point-In-Time Count data, which asks individuals if they wish to self-report substance abuse, 24.7% of unsheltered homeless individuals select to self-report substance abuse. The results of ignoring the prevalence of substance use disorder among homeless people is deadly.

According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths."[13] The risk of fatal overdose inside Permanent Supportive Housing is noteworthy, and tragic. The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[14] According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[15]

Despite the tragic realities of substance abuse and fatal overdose among those who are homeless or living in Permanent Supportive Housing, there are recipients of CoC funding who reportedly, under the misnomer of "harm reduction," permit, and even encourage, the use and distribution of illicit drugs on their property including by distributing drug paraphernalia like needles, pipes, and foil. This NOFO provides communities opportunities to invest in treatment services and recovery housing, and ensures that recipients do not distribute drug paraphernalia or knowingly permit the use and distribution of fatal, illicit drugs on their properties. This is not a requirement that projects condition assistance on sobriety or treatment, although both are allowable under 24 CFR 578. CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for homeless individuals and families. The NOFO encourages investment in treatment-focused beds, recovery housing, and partnership with community behavioral healthcare providers, drug courts, and other addiction and severe mental illness treatment providers. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

### 5. Promoting Economic Self-Sufficiency.

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. In fact, self-sufficiency is one of only four purposes Congress provided for the CoC Program. CoCs should partner with workforce development centers,

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 375 of 482 PageID #: 871

employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness to unsubsidized housing and prevent future returns to homelessness.

Although a chief goal of the program is self-sufficiency, HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[16] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65.[17] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of the total participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[18]

One way to advance both recovery and self-sufficiency is through supportive service participation requirements. Service participation requirements have been successfully employed in most federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996. For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment insurance benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF) requires beneficiaries to work or advance their education.

According to a national poll in 2025, there is strong bipartisan support for supportive service participation requirements, with 64% of respondents in favor of "requiring participation in addiction and mental health treatment and job training programs as a condition of receiving taxpayer-funded housing."[19] Well-designed supportive service participation requirements provide structure and accountability for program participants to meet their unique goals and needs. Rather than hinder participant choice, participation requirements empower goals and participant progress.

In accordance with 24 CFR 578.75(h), HUD encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F).

### 6. Advancing Public Safety for All.

Safety and security for all members of the public, especially those living on the streets and in encampments, is essential to promoting a community-wide commitment to the goal of ending homelessness and minimizing trauma to individuals, families, and communities. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 376 of 482 PageID #: 872

Respecting the rule of law is critical to community-wide efforts to address homelessness and protect all residents. According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of homeless individuals despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among homeless individuals in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[20] One recent study indicates that in some states, as many as half of unsheltered homeless individuals are registered sex offenders, in violation of requirements that they have a registered address.[21]

None of the realities above suggest that the entire homeless population is engaged in criminal or illicit activity despite significant disproportionality. Data also indicates that homeless individuals are the victims of crime at higher rates than the general public.[22] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to homeless individuals and to the community. It is common sense to acknowledge the close relationship between unchecked homelessness and illicit activity with its many victims. Enforcing the rule of law is critical to protecting the safety of everyone regardless of their housing status, which in turn promotes one of the core purposes of McKinney-Vento, "community-wide commitment to the goal of ending homelessness." 42 U.S.C. § 11381(1).

In 2024, The City of Seattle reported that 76% of residents surveyed in a downtown neighborhood disagreed or strongly disagreed with the statement "I feel safe in my neighborhood."[23] The respondents included residents of three Permanent Supportive Housing buildings in the neighborhood. The city described a downtown environment that creates "opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form."[24]

The public supports policies that advance public safety related to homelessness. According to national polling in 2024, there is strong bipartisan support for public camping bans and stricter enforcement of drug laws, with 72% of voters in favor of "moving individuals into shelters over allowing camping" and 60% of voters in favor of "stricter drug enforcement near service providers, including penalties for facilities permitting drug activity."[25]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness decreased by one-third.[26] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 14%.[27]

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable homeless individuals. In *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

First responders and law enforcement are often the first to encounter our most vulnerable members of society and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the Continuum of Care. CoCs should work with law enforcement, first responders, and their state

Case 1:26-cv-00436-MSM-AEM  Document 30-3  Filed 07/17/26  Page 377 of 482 PageID #: 873

and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

### 7. Minimizing Trauma for Vulnerable Populations.

One of the purposes of the CoC program is to minimize the trauma associated with homelessness 42 U.S.C. § 11381(2). CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking.

### 8. Expanding Access Based on Merit, and Not Ideology.

HUD is committed to providing an equal opportunity to every applicant, recipient, and program participant free from discrimination. Part of this commitment is recognizing that faith-based providers deserve a level playing field to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[28]

To the fullest extent permitted by law, HUD will ensure that faith-based organizations can participate in the CoC program and operate consistent with their sincerely held religious beliefs, recognizing all relevant protections provided by subsection c of HUD's Equal Participation Rule, 24 CFR § 5.109, the Religious Freedom Restoration Act, and the First Amendment. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

Likewise, HUD is committed to promoting equal access to CoC programs for homeless individuals and program participants regardless of their race or other protected status. The prior administration wrongly and illegally pressured or required providers to discriminate against participants based on their race, sex, or other protected status.[29] The purpose of the Fourteenth Amendment of the U.S. Constitution is to "do away with all governmentally imposed discrimination based on race . . . . Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). To that end, this NOFO prohibits the use of federal funds being used for any type of racial preferences, even under the guise of "diversity, equity, and inclusion." HUD wants to increase access to homelessness relief for *all* individuals and families.

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C. 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2026 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Consolidated Appropriations Act, 2026 (Public Law 119-75) which makes approximately $4,010,000,000 in CoC Program funding. Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 378 of 482
PageID #: 874

Additionally, HUD is making available approximately $52,000,000 in funding from the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in section II.B.3.e of this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Information for Award Applicant/Recipient form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

## F. Program History

FY 2026 CoC awards will be made through this NOFO. The following are new or different compared to previous years:

### 1. Investment in New Transitional Housing and Supportive Service Only Projects.

Unlike in prior years, CoCs may apply for Transitional Housing and Supportive Service Only projects including street outreach. In order to increase competition, broaden the applicant pool, and restore balance to the Continuum of Care Program, this NOFO provides a set-aside

of $1,300,000,000 for new projects with a priority for Transitional Housing and Supportive Service Only projects. CoCs may use the Transition Grant process described in Sec. II.B.3.k to create new projects. HUD reminds CoCs that individuals living in Permanent Housing may be eligible for Transitional Housing (see HUD guidance) and encourages CoCs to assess the unique needs of individuals and families to provide appropriate assistance to meet their needs.

## 2. Increase in Competition.

The Continuum of Care program is a national competition between geographic areas (42 U.S.C. 11386a). Consistent with the FY26 HUD appropriation, Tier 1 is set at 60 percent of the CoC's Annual Renewal Demand (ARD). HUD reminds CoCs and applicants of the Solo Applicant appeal process described in Sec. VIII.D.3.a. for project applicants that believe they were denied the right to participate in a reasonable manner.

HUD will competitively renew or replace YHDP projects. Additionally, the CoC may use the YHDP Replacement process (which includes YHDP Reallocation) to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.B.2 of this NOFO.

## 3. Increase in Equitable Bonus Funding.

Due to the increase in competition, CoCs may apply for bonus projects in an amount of up to 15% of the CoC's Final Pro-Rata Need (FPRN). Unless otherwise described in Sec. II.B.3.c, the CoC Bonus will be no less than $500,000 and no more than $5,000,000. The CoC Bonus funding structure described in Sec. II.B.3.c affords all CoCs a more equitable opportunity to compete for bonus funds and better ensures that awards are made on the basis of merit, not merely existing resources.

## 4. Expanding Eligible DV Bonus Projects to Include Transitional Housing.

Unlike prior years, Transitional Housing is an eligible DV Bonus project in this NOFO. Consolidated Appropriations Act, 2026, Pub. L. 119-75, div. D, tit. II, 140 Stat. 173, 399 (Dec. 3, 2026). The Secretary has determined that Transitional Housing is an eligible activity that is critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking.

## 5. Program Components that are eligible under this NOFO.

The four components that will be funded through this CoC Program Competition are fully described at 24 CFR 578.37 and include: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS.

Additionally, HUD will allow renewal project applications for Joint TH/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.5 of this NOFO for more information). HUD will not accept new Joint TH/PH-RRH component project applications.

## 6. Housing with shared kitchen and bathroom facilities.

Under the CoC Interim Rule at 24 CFR 578.75, housing leased with Continuum of Care

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 380 of 482
PageID #: 876

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

program funds, or for which rental assistance payments are made with Continuum of Care program funds, must meet the applicable standards at 24 CFR 982.401 (HQS), and starting on October 1, 2026, 24 CFR 5.703 (NSPIRE). Both HQS and NSPIRE require a bathroom and a kitchen in the unit. HUD will consider requests to waive this regulatory requirement for good cause to facilitate projects proposing a housing model that does not meet this standard, such as Single Rooms Occupancy units (SROs).

**7. Special CoC NOFO grants and Rural Costs.**

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2027 are eligible to renew under this NOFO.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition that are applying for renewal may only request costs that are eligible under the CoC Program.

**8. Reallocation.**

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2027. For more information on Reallocation requirements see Sec. II.B.3.f of this NOFO.

**9. Competitive Repurposing of YHDP Renewal Funds**

Pursuant to the Consolidated Appropriations Act, 2026, any CoC, in consultation with their youth action board, that determines it no longer has an identified need for funds to renew an eligible YHDP renewal grant under this NOFO shall notify HUD, and HUD shall recapture the YHDP renewal funding and make the recaptured amounts competitively available for a subsequent YHDP and Youth Homelessness System Improvement (YHSI) grants NOFO Competition. See section VI.B.1.c.(3)

**10. Preferences for Elderly Individuals and Families and Disabled Individuals and Families**

Pursuant to the Consolidated Appropriations Act, 2026 recipients of CoC Program funds, including funds awarded under this NOFO and prior CoC Program Competition NOFOs may establish preferences for:

- Elderly individuals and families. For purposes of establishing preferences under this allowance, HUD is defining elderly as 55 and older.
- Disabled individuals or families as defined by section 401(10) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(10)).

When implementing these preferences, all other federal fair housing and nondiscrimination requirements apply.

**11. Award Announcement Timeline.**

Pursuant to the Consolidated Appropriations Act, 2026, HUD will announce FY26 CoC awards no later than December 1, 2026, barring any judicial or congressional intervention.

## G. Other Information

### 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2026 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objectives established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section VI.A.

**c.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**d.** HUD will score the FY 2026 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**e.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

### 2. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2026 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listings in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD, which projects are prioritized for funding.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2026:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as assessed in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

### 3. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2025 or earlier, including projects originally

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 382 of 482
PageID #: 878

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2027 (between January 1, 2027, and December 31, 2027). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section II.B.4 for more information on renewal project requirements.

### 4. Reallocation.

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2027. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.c of this NOFO. For more information on the requirements for projects created through reallocation, see sections II.B.3.e (DV Reallocation), II.B.3.f (CoC Reallocation), and II.B.3.h (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must reduce or eliminate one or more projects and use those funds to create the single, new transition grant [see section II.B.3.k of this NOFO].

### 5. Joint TH/PH-RRH Component Project.

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

**a.** leasing of a structure or units, and operating costs to provide transitional housing;

**b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

**c.** supportive services;

**d.** costs of contributing data to the HMIS; and

**e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services

provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

### 6. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services, and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.c.(4)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.c.(4)(b) of this NOFO.

### 7. Centralized or Coordinated Assessment System (Coordinated Entry).

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

### 8. Non-Dedicated Permanent Supportive Housing Beds.

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

### 9. Beds Dedicated to Chronically Homeless Individuals and Families.

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

### 10. DedicatedPLUS Project.

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were

unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing requirements at 24 CFR 578.93.

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2026 CoC Program Competition.

### 11. Participant Eligibility.

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process.

As provided by the Consolidated Appropriations Act, 2026, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 385 of 482 PageID #: 881

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act where the head of household also has a qualifying disability as defined section 401(9) of the McKinney-Vento Homeless Assistance Act; or

**(2)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

# IV. APPLICATION CONTENTS AND FORMAT

IV.    Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Other Attachments

D. Other Application Content

TABLE OF CONTENTS

HUD-AR-05048

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 387 of 482
PageID #: 883

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and

- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections II.B and VI of this NOFO for information on eligible project applications and submission requirements.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| Application for Federal Assistance (SF-424) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant and Recipient Assurances and Certifications (HUD-424B) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant/Recipient | Required with the application and completed |

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 388 of 482
PageID #: 884

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| **Disclosure/Update Report (HUD-2880)** | in e-snaps via the information from the Project Applicant Profile. |
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps. Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

**The following forms are not built into e-snaps but are required to be submitted by Collaborative applicants with the CoC Priority listing:**

**1. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 389 of 482 PageID #: 885

all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2026 Form HUD-2991 must be completed and dated between December 10, 2025 and August 26, 2026 and attached to the FY 2026 CoC Priority Listing.

**2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.**

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal resolution or a letter from an official or principal of the Indian Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

**3. Code of Conduct.**

Both you, as the award recipient, and all subrecipients must have a code of conduct (or written standards of conduct). The code of conduct must comply with the requirements included in the "Conducting Business in Accordance with Ethical Standards", as well as any program-specific requirements. These requirements include ethical standards related to conflicts of interest for procurements in 2 CFR 200.318(c) and 2 CFR 200.317, as well as HUD-specific conflict of interest standards. HUD maintains a list of organizations that have previously submitted written standards of conduct on its Code of Conduct for HUD Grant Programs webpage. But it is your responsibility to ensure that the standards are compliant with the noted requirements and that HUD has the latest version of the written standards. Updated written standards should be submitted with the application. Any updates to your written standards, after the application period, should be submitted as directed by the HUD program contact for this NOFO.

**4. Certification for Opportunity Zone Preference Points (HUD 2996), if applicable.**

The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities

and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

**Eligible Costs.**

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

**1. YHDP Costs.**

Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO (see section II.B.3.g of this NOFO). Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections II.B.3.gof this NOFO, as well as VAWA Costs, and Rural Costs, described in sections 4 and 5, below. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs; the YHDP activities described in section II.B.3.g; VAWA Costs and Rural Costs described in sections IV.B.4 and 5 below; and the YHDP Special Activities in section IV.B.2 below . HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

**2. Special YHDP Activities.**

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Recipients of YHDP may utilize the following housing standards for transitional

housing and Rapid Rehousing units. Recipients implementing this special YHDP activity may also establish standards that exceed or add to these minimum standards and must keep documentation of what standards are applied to the units and proof that the units complied with the standards before assistance is provided.

**(a)** *Structure and materials.* The structures must be structurally sound to protect residents from the elements and not pose any threat to the health and safety of the residents.

**(b)** *Space and security.* Each resident must be provided adequate space and security for themselves and their belongings. Each resident must be provided an acceptable place to sleep.

**(c)** *Interior air quality.* Each room or space must have a natural or mechanical means of ventilation. The interior air must be free of pollutants at a level that might threaten or harm the health of residents.

**(d)** *Water supply.* The water supply must be free from contamination.

**(e)** *Sanitary facilities.* Residents must have access to sufficient sanitary facilities that are in proper operating condition, are private, and are adequate for personal cleanliness and the disposal of human waste.

**(f)** *Thermal environment.* The housing must have any necessary heating/cooling facilities in proper operating condition.

**(g)** *Illumination and electricity.* The structure must have adequate natural or artificial illumination to permit normal indoor activities and support health and safety. There must be sufficient electrical sources to permit the safe use of electrical appliances in the structure.

**(h)** *Food preparation.* All food preparation areas must contain suitable space and equipment to store, prepare, and serve food in a safe and sanitary manner.

**(i)** *Sanitary conditions.* The housing must be maintained in a sanitary condition.

**(j)** *Fire safety.*

**i.** There must be a second means of exiting the building in the event of fire or other emergency.

**ii.** Each unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each occupied level of the unit. Smoke detectors must be located, to the extent practicable, in a hallway adjacent to a bedroom. If the unit is occupied by hearing impaired persons, smoke detectors must have an alarm system designed for hearing-impaired persons in each bedroom occupied by a hearing-impaired person.

**iii.** The public areas of all housing must be equipped with a sufficient number, but not less than one for each area, of battery-operated or hard-wired smoke detectors. Public areas include, but are not limited to, laundry rooms, community rooms, day care centers, hallways, stairwells, and other common areas.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $500 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 393 of 482
PageID #: 889

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

**(I)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness. Owner incentive and retention payments may not be paid for units owned by the project recipient, subrecipient, their parent organization(s), any other related organization(s), or organizations that are members of a partnership, where the partnership owns the structure.

**(13)** Recipients of Transitional Housing projects may use Single Room Occupancy (SRO) units to house youth. SRO units are subject to regulations at 24 CFR 982.602 and 24 CFR 982.605. Fair Market Rent (FMR) and utility costs for SROs are calculated as 75% of the zero-bedroom FMR and utility costs, respectively.

**(14)** Rental Assistance may be administered by nonprofit providers, Tribes, and TDHEs, in addition to the organizations listed in 24 CFR 578.51(b).

**b. *YHDP Exceptions.*** Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of leasing or rental assistance in TH or RRH projects to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 394 of 482
PageID #: 890

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

connection with housing assistance, such as the <u>Foster Youth to Independence initiative</u>, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** For YHDP Renewal projects only, YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**c.** *Innovative Activities.* In addition to the specific activities authorized above or in 24 CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC lead. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

**3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.**

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition that are applying for renewal may only request costs that are eligible under

the CoC Program. This means the following costs are no longer eligible in projects originally awarded under the Rural Set Aside:

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service are no longer eligible. Funds may no longer be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** *Emergency food and clothing assistance.* Costs for providing clothing to program participants are not eligible. Costs for providing meals or groceries are an eligible supportive service (24 CFR 578.53(e)(7) and must now be classified on the supportive services budget line item.

**c.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness are no longer eligible. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized by title V of the Act, and implemented by 24 CFR part 581, and the Single-Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291.

Applicants may move funds currently allocated to these costs in their current grant agreement to other eligible CoC Program costs through the project application.

Costs for funding repairs, repairs necessary to make housing habitable to be used for transitional or permanent housing, emergency short-term lodging costs, and capacity building activities remain eligible; however, these costs must now be classified as Rural Costs (as identified in paragraph 5 below). Applicants may move funds currently allocated to these costs in their current grant agreement to the Rural Costs BLI through the project application.

## 4. VAWA Costs Information.

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families

to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

## 5. Rural Costs Information.

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(11) of Appendix I] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 397 of 482
PageID #: 893

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications, including YHDP Replacement projects or added to eligible renewal projects, including YHDP Renewal projects, through expansion.

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in e-snaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, describes its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

### 1. Technical Application Errors

HUD will contact you to fix a technical error with your timely application after the due date. Technical errors, if corrected, do not affect (positive or negative) your merit rating under this NOFO. Examples of technical errors include, but are not limited to: inconsistencies in funding requests; a missing or incomplete form or certification; failure to submit an otherwise sufficient application under the correct Assistance Listings number or Funding Opportunity Number in Grants.gov; improper signature on a form or certification; and missing or inappropriate eligibility documentation.

HUD will send notice to the authorized organization representative to fix a technical error. You must respond timely and appropriately to HUD's notice (see submission requirements).

Your application is not eligible for funding if you fail to fix the error to HUD's satisfaction by the due date in HUD's notice. HUD will not review information submitted after the due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2026 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 398 of 482 PageID #: 894

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.8 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

## 2. Corrections to Deficient Applications

Deficiency is information missing or omitted within a submitted application. Deficiencies typically involve missing documents, information on a form, or some other type of unsatisfied information requirement (e.g., an unsigned form, unchecked box, expansion grant application errors, etc.). Deficiencies may be either curable or non-curable. Correction of technical deficiencies must be received by HUD within 7 calendar days after notification is received by the applicant from HUD via email. The start of the cure period will be the date stamp on the email HUD sends to the authorized representative as noted in the Project Applicant Profile in e-snaps; therefore, it is critical the project applicant's authorized representative's information is accurate. Additionally, HUD reserves the right to respond to unanticipated system defects, ambiguities, and technical difficulties in application submissions in e-snaps through a flexible implementation of its authority to cure application deficiencies through written inquires seeking clarification and additional information (also known as callbacks). Upon proper publication in the Federal Register, HUD reserves the right to extend the Competition deadline for good cause.

## F. Other Federal Statutes

CoCs may request, in the FY 2026 CoC Application, up to 10 percent of funding for the fiscal year awarded under this NOFO be approved to serve homeless households with children and youth defined as homeless under other federal statutes who are unstably housed (paragraph 3 of the definition of homeless found at 24 CFR 578.3). Approved CoCs are limited to using only up to 10 percent of the total amount awarded for each fiscal year appropriation to the CoC to serve this population and must determine which project(s) HUD will allow to use some or all their funding for this purpose. The only project types that will be funded in this Competition to serve this population are Transitional Housing, Supportive Services Only, and the Joint TH/PH-RRH component projects.

To be approved to serve this population, CoCs making this request must demonstrate serving this population is of equal or greater priority, which means that it is equally or more cost-effective in meeting the overall goals and objectives of the plan submitted under Section 427(b)(1)(B) of the Act, especially with respect to children and unaccompanied youth, than serving the homeless as defined under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3. CoCs must thoroughly describe how the requirements described in Section 427(b)(1)(F) of the Act will be met. Some examples of how a CoC can demonstrate that serving this population is of equal or greater priority than serving those defined as homeless under paragraphs (1), (2), and (4) of the definition of homeless in 24 CFR 578.3 include:

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 399 of 482
PageID #: 895

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**1.** Evidence that the CoC has adequate resources to house all individuals and families defined as homeless under paragraphs (1) and (4) at 578.3 in their geographic area.

**2.** An analysis that demonstrates that the net public cost (including mainstream resources, resources dedicated to preventing and ending homelessness, such as CoC Program funds, and other municipal funds, such as public works) is reduced if the CoC is able to use CoC Program funds to provide housing and supportive services to those individuals defined as homeless under paragraph (3) at 578.3.

**3.** Evidence that the length of time individuals and families in the CoC's geographic area is low (e.g., less than 30 days) and the CoC has adequate resources to house all people who become homeless under paragraphs (1) and (4) at 578.3 within 30 days.

CoCs must identify the specific project(s) that will use funding for this purpose (up to 10 percent of the CoC's total award) by submitting an attachment to the CoC Application in *e-snaps* that must include the following:

   **a.** project name(s) as listed on the CoC Priority Listing; and

   **b.** amount of funding in the project or per project that will be used for this purpose.

See 24 CFR 578.89 for more information about this limitation.

# V. APPLICATION REVIEW INFORMATION

V. Application Review Information

A.  Threshold Review

B. Merit Review

C. Risk Review

D. Selection Process

E. Award Notices

TABLE OF CONTENTS

HUD-AR-05062

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

**When you apply**: Your application is reviewed to make sure it meets the threshold requirements of this NOFO. If your application has a technical error, HUD will allow you to correct it. If you fail to meet **any** of the threshold requirements, your application is **not** eligible for HUD funding. If you do meet the threshold requirements, your application moves to Merit Review (the next step).

### 1. Timely Application Submission

Late applications are not evaluated and not eligible for funding. See deadlines in Section VI.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: https://www.hud.gov/program_offices/comm_planning/coc.

### 2. Complete Application

If your application is timely, HUD will confirm completeness. Your application is considered for funding if it is complete and responsive to the requirements in this NOFO. If your application is incomplete, HUD will ask you to fix any technical errors. Otherwise, incomplete and nonresponsive applications are not considered for funding.

### 3. Eligible Applicant

Upon receipt, HUD will confirm whether you are an eligible applicant. Applications from ineligible applicants do not proceed to merit review and are not eligible for HUD funding.

> **a. *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).*** Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

> **b. *Collaborative Applicants.*** Only CoCs with a valid FY 2026 e-snaps registration will have access to the FY 2026 CoC Consolidated Application in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2026 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

> > • the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
> > • the CoC-designated Collaborative Applicant is no longer in business;

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

• the CoC designates a new Collaborative Applicant; or

• HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c. *Indian Tribes and Tribally Designated Housing Entities (TDHE).*** The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms "Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-26-03).

Indian Tribes and TDHEs may:

**(1)** create a CoC;

**(2)** be a Collaborative Applicant;

**(3)** be an eligible project applicant; or

**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. *Solo Applicants.*** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate, that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2026 funding must submit their solo project application in e-snaps to HUD by 8:00 PM ET, on August 26, 2026. See section VIII.D.3.a of this NOFO for additional information regarding the Solo Applicant appeal process.

## 4. Threshold Criteria.

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met requirements (1)-(4) through its previously approved grant application unless HUD finds information to the

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 403 of 482 PageID #: 899

contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.11 of this NOFO.

**(4)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must use a comparable database that meets the needs of the local HMIS.

**(5)** Project applicants must submit the required certifications specified in this NOFO.

**(6)** Project applicants must certify affirmatively to the following:

> The project applicant will not engage in illegal racial discrimination. This is consistent with the requirements of 2 CFR 200.300(a).

> The project applicant will not operate drug injection sites or "safe consumption sites" in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a).

> This certification is not a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement.

**(7)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition to ensure that it can

Case 1:26-cv-00436-MSM-AEM Document 30-3 Filed 07/17/26 Page 404 of 482 PageID #: 900

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

adequately manage federal awards and comply with all applicable federal laws. HUD will not penalize applicants for complying with the terms and conditions of prior HUD grants.

**b. *Renewal Project Threshold.*** To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year.

CoCs must consider the need to continue funding for projects expiring in CY 2027 (January 1, 2027 to December 31, 2027) when applying for FY 2026 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office, including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition based on HUD's evaluation for reasons including, but not limited to, the following:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 405 of 482 PageID #: 901

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** Compliance with audits for large grant recipients (over $1,000,000 or more) as required by 2 CFR 200.501.

**c. *New Project Threshold.*** HUD will review all new project applications to determine if they meet the following project quality threshold requirements. Projects created through reallocation are new projects.

**(1)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(2)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(3)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who have never received a CoC Program funded project;

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant. Hud also reserves the right to reject a project if the recipient is not compliant with audits for large grant recipients (over $1,000,000 or more) as required by 2 CFR 200.501.

**(4)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component prior to executing a grant agreement.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 406 of 482
PageID #: 902

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| (a) Transitional Housing (TH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Transitional Housing projects must receive at least 6 out of 8 points available for this project type. New TH projects that do not receive at least 6 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing (i.e., case management, behavioral healthcare, employment training, etc.) |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 months or has a plan in place to ensure homeless individuals and families will exit homelessness within 24 months. |
| | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure that at least 50 percent of participants exit to a positive destination within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | Describe how the proposed project will:<br><br>• assess the service needs of program participants,<br><br>• and provide individualized services for program participants during their time in Transitional Housing that will result in at least 20 hours per week of engagement in services, activities or employment for all program participants, except for a program participant over age 62 or who is an individual with handicaps as defined in 24 |

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 407 of 482
PageID #: 903

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

## V. Application Review Information

| | | CFR 8.3 or a with a developmental disability as defined under 24 CFR 578.3 (examples of services or activities include case management, counseling, treatment, volunteering, work therapy, education, job training, community-building activities, etc.) Employment may contribute to the 20 hours per week of engagement. The project description provided here does not constitute a reporting or documentation requirement.<br><br>Indicate that the proposed project will create service plans for each program participant that include:<br><br>• the services to be provided, when and how often services will be provided, by whom all services will be provided;<br><br>• program participant goals, strategies for achieving those goals, and target dates for achievement to focus on improved health and wellness, housing stability, and increased employment income leading to financial stability and self-sufficiency. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

**(b) Supportive Services Only (SSO) Standalone (24 C.F.R. 578.37(a)(3) and 578.53)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for | 1 | The Supportive Services project is necessary to assist people in exiting homelessness, addressing barriers to stable housing (e.g., substance use disorder, unemployment, childcare, etc.) and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 408 of 482 PageID #: 904

| this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | | including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
|---|---|---|
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

### (c) Supportive Services Only (SSO) Street Outreach

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of, or a plan for, partnering with first responders and law enforcement to engage people living in places not meant for human habitation to access emergency shelter, treatment programs, reunification with family, transitional housing or independent living. The applicant must cooperate and not interfere or impede with the enforcement of local laws such as public camping and public drug use laws and assist/be willing to assist first responders in their efforts to engage homeless individuals. |

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 409 of 482 PageID #: 905

## V. Application Review Information

| | | |
|---|---|---|
| | 1 | The applicant has experience providing outreach services, or a plan for providing outreach services, consistent with the activity description at 24 CFR 578.53(e)(13) and has a plan for or has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |

**(d) SSO-Coordinated Entry (SSO-CE)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points will be rejected. | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
| | 1 | There is a standardized assessment process. |
| | 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application | Points Availa | Criteria |
|---|---|---|

V. Application Review Information

| Rating Factors | ble | |
|---|---|---|
| New Permanent Housing projects must receive at least 3 out of the 5 points available for this project type. New Permanent Housing projects that do not receive at least 3 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, including where appropriate, on-site supportive services. |
| | 1 | The project will serve homeless individuals or families with a disability in accordance with 24 CFR 578.37(a)(1)(i). |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(e) Permanent Housing: Rapid Rehousing (PH-RRH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 24 months. |
| | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, |

| Permanent Housing projects that do not receive at least 4 points will be rejected. | | mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
|---|---|---|
| | 1 | The applicant has previously operated or currently operates a homelessness project where, or has a plan in place to have, at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant, or has a plan in place to ensure this. |
| | 1 | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(f) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not receive at least 3 points will be rejected. | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation. |
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG |

V. Application Review Information

| | | reporting) and other reports required by other federal partners. |
|---|---|---|

**(g) CoC Planning – Collaborative Applicants Only**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project that will be carried out by the CoC with Planning grant funds is compliant with the provisions of 24 CFR 578.7. |
| | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

## B. Merit Review

If your application meets the threshold requirements, a panel will review and score its merits. The panel may include HUD employees and non-employees. They will evaluate your application based on the following criteria. The results of the evaluation are shared with senior HUD officials who make the final decisions about funding consistent with this NOFO.

**Merit Review Summary**

| Merit Review Summary | |
|---|---|
| **Criterion** | **Maximum number of points = 200** |
| **a. Project Capacity, Review, and Ranking.** | 14 |
| **b. System Performance.** | 64 |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 413 of 482 PageID #: 909

| c. CoC Coordination and Engagement. <br> I. Accountable Structure and Planning <br> II. Community Coordination <br> III. Coordination to Serve Subpopulations | 122 |
|---|---|
| **Bonus Points** | |
| **CoC Merger and UFA Bonus (V.B.1.d)** | 6 |
| **Policy Initiative Preference Points (V.B.2)** | 14 |

## 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2026 CoC Program Competition.

### Rating Factors Details

a. *Project Capacity, Review, and Ranking.* HUD will award up to 14 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this NOFO. In making selections, CoCs should consider factors such as financial stability, performance history, capacity, audit findings, and public complaints. This written process or tool must: <br><br> Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 point). <br><br> Demonstrate that it used system performance measures in |

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 414 of 482
PageID #: 910

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

| | | |
|---|---|---|
| | | their local review, selection, and rating process and that these factors account for at least 25% of the total points available (up to 2 points). |
| | | For housing projects (TH, PH-PSH, PH-RRH) that the following measures were considered (up to 3 points): |
| | | • Returns to homelessness; |
| | | • Employment income; and |
| | | • Supportive service participation requirements. |
| **(2) *Ranking and Selection Process.*** | 3 | The CoC must:<br><br>• Invite new proposals from entities that have not previously received funding if such eligible entities exist;<br><br>• Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have a website must post this information to a partner website within the CoC (e.g., a city or county website);<br><br>• Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and<br><br>• Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction. |
| **(3) *Reallocation.*** | 5 | CoCs are encouraged to review the renewal project eligibility criteria at V.A.4.a and V.A.4.b, the risk review at V.C, data from Annual Performance Reports, system performance measures, and other outcome and performance data to reallocate funding from lower performing projects to higher performing projects.<br><br>• Describe how the CoC actively reviews the performance of existing CoC Program funded projects and have a |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 415 of 482 PageID #: 911

| | | standard process for reallocating funding from lower performing projects to create new high performing projects; OR |
| | | • Demonstrate that the CoC has cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2026 CoC Program Competitions. |

**b. System Performance.** HUD will award up to 64 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) Reducing the Number of Homeless Individuals and Families.**<br><br>CoCs should work to achieve sustained long-term, meaningful reductions in unsheltered homelessness in their communities. | 20 | The CoC will receive:<br><br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2026 PIT compared to the prior year's data.<br><br>• Up to 5 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2024 and 2025 PIT Counts AND the 2025 and 2026 PIT Counts.<br><br>• 2 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2024 and 2026 PIT Counts.<br><br>• 2 points for demonstrating a decrease in unsheltered homelessness between 2018 or 2019 and 2026 PIT Counts.<br><br>• 3 points for demonstrating at least a 5 percent decrease in the number of individuals and families experiencing chronic homelessness between the 2025 and 2026 PIT Counts.<br><br>• 3 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2026 PIT compared to the prior year's data. |
| **(2) Reduce Encampments.** | 8 | • Describe, using quantitative evidence, a reduction in the number of encampments or the number of people residing in encampments in the geographic area of the CoC, and if there is no reduction, explain any plans the CoC has to participate in efforts to |

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 416 of 482 PageID #: 912

| | | |
|---|---|---|
| | | reduce these numbers. |
| **(3) Reduce First Time Homelessness.** | 2 | • Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HUD's Homelessness Data Exchange (HDX); <br><br> • Describe the CoC's plan to decrease the number of individuals and families becoming homeless for the first time. |
| **(4) Length of Time Homeless.** | 2 | • Demonstrate a reduction in the length-of-time homeless compared to the prior year's data as reported in HDX; <br><br> • Describe the CoC's plan to reduce the length of time individuals and families remain homeless. |
| **(5) Successful Exits from Assistance.** | 6 | • Demonstrate that the rate of successful exit from ES, SH, TH, and RRH is at least 50% (up to 2 points); <br><br> • Demonstrate that at least 20% of program participant exits from TH/RRH/PSH collectively are to unsubsidized housing using HMIS data (up to 4 points). |
| **(6) Returns to Homelessness.** | 6 | • Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX: <br><br> Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months). <br><br> Is less than 7% over 12 months (3 points, or 1 point if less than 11% over 12 months). |
| **(7) Jobs and Income Growth.** | 12 | • Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in HDX (up to 6 points); <br><br> • Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 6 points); |
| **(8) Timely** | 2 | Demonstrate that the CoC: |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 417 of 482 PageID #: 913

| | | |
|---|---|---|
| ***Submission of Data.*** The CoC collected and submitted data in a timely manner. | | • Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2026, or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD;<br><br>• Submitted both the 2026 HIC and PIT count data in HDX 2.0 by April 30, 2026, 8:00 PM EDT, or an alternate date approved by HUD;<br><br>• Submitted their Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 16, 2026, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and<br><br>• Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on March 4, 2026, or an alternate date approved by HUD. |
| ***(9) HMIS and Comparable Database Participation*** | 2 | • Demonstrate at least 85 percent of the beds in the CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons experiencing homelessness in the geographic area covered by the CoC. |
| **(10)** ***Tracking Participant Outcomes in HMIS and Comparable Databases.*** The CoC has low rates of unknown exit destinations. | 2 | • Demonstrate the rate of unknown exit destinations in HMIS for housing projects (TH, PSH, RRH, SH) is less than 10 percent. |
| ***(11) Unit Utilization Rates.*** The CoC utilizes funded units. | 2 | • Demonstrate the average unit utilization rate in the CoC across housing projects is at least 85 percent. |

c. ***CoC Coordination and Engagement.*** HUD will award up to 122 points to CoCs that

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 418 of 482 PageID #: 914

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

V. Application Review Information

demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Accountable Structure and Planning (up to 16 points)** | | |
| **(1) *Stakeholder Participation*** | 2 | The CoC must indicate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area: Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including Certified Community Behavioral Health Clinics (CCBHCs) and CMHCs, local court systems, hospitals, universities, affordable housing developers, law enforcement, employment programs including the Local Workforce Development Board (WDB) and American Job Centers, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(2) *Representative Governance Board*** | 8 | Indicate a CoC decision-making governance board representative of the community that includes: • at least 1 person with current or former experience of homelessness (up to 1 point); • at least 3 elected public officials (or 1 elected official if the CoC is in a rural area) (up to 3 points); (4 points for including all of the below, 2 points for a majority of the below.) • a representative of the business community such as a member of a Business Improvement District; • a representative of law enforcement; • a representative of a recovery housing/sober living provider; • a representative from a behavioral or primary health provider such as from a Federally Qualified Health Center, CCBHC, Healthcare for the Homeless, or other accessible primary care |

| | | |
|---|---|---|
| | | provider;<br><br>• a representative of a local workforce development organization or system such as a member of the Local Workforce Development Board, State Workforce Agencies, or American Job Centers;<br><br>• a representative from a local court system managing Assisted Outpatient Treatment (AOT) and/or other civil commitment processes; or from specialty courts (e.g., Mental Health Court, Drug Court, Care Court.) |
| **(3) *Transparent Processes.*** | 2 | Describe how the CoC has a transparent process (e.g., communicated in a public manner such as on the CoC's website) in place to:<br><br>• Invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually.<br><br>• Solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from a broad array of individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area.<br><br>• Accept and consider proposals from organizations that have not previously received CoC Program funding including faith-based organizations. |
| **(4) *Comprehensive Strategies.*** | 4 | Describe how the CoC will incorporate comprehensive strategies for reducing homelessness, including interventions in 42 U.S.C. 11386b(d) and other targeted projects for specific subpopulations, by providing a plan to address a gap in the CoC's current homelessness system. The plan should include:<br><br>• Identifying the gap, using data or stakeholder feedback;<br><br>• The strategy to address the needs of all relevant subpopulations;<br><br>• Quantifiable performance measures;<br><br>• Timelines for the completion of specific tasks; |

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 420 of 482
PageID #: 916

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

## V. Application Review Information

|  |  | • Identifying specific funding sources for planned activities; and<br><br>• An individual or body responsible for overseeing implementation of specific strategies. |
|---|---|---|
|  | **Community Coordination. (up to 72 points)**<br><br>The CoC is coordinating with specific housing and service providers and other community partners to address homelessness. | |
| **(5) Treatment and Recovery Services.** | 20 | • Demonstrate, by listing the projects and treatment providers, that substance use treatment is available on-site for at least 30% of TH/RRH/PSH projects by listing the projects and treatment providers. Rural CoCs (as listed at https://www.hud.gov/hud-partners/community-coc) will receive full points for identifying access to treatment;<br><br>• Describe how the CoC partners with, or has projects that provide, outpatient treatment for mental health and substance use disorders with a range of appropriate levels of care, psychosocial interventions, medication management, suicide prevention, and recovery supports;<br><br>• Describe how the CoC partners with, or has projects that provide access to, peer recovery specialists or other forms of peer support and recovery navigation;<br><br>• Describe how the CoC identifies individuals experiencing Serious Mental Illness and connects them with the services necessary to promote stability, such as Assertive Community Treatment teams and other models that combine intensive care coordination and assertive outreach with comprehensive treatment.<br><br>• Identify partnerships the CoC has with providers and entities providing services in connection with Drug Courts and other specialty courts serving individuals with mental and substance use disorders, Assisted Outpatient Treatment (AOT) programs, and inpatient civil commitment.<br>   o Describe how the CoC coordinates with |

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 421 of 482 PageID #: 917

|  |  | these providers to support housing stability and movement towards independence, including by leveraging court orders. |
|  |  | • Identify partnerships the CoC has with the local crisis system of care including 988 and crisis contact centers, mobile crisis and outreach services, and crisis stabilization services. |
|  |  | • Demonstrate that for every 2 persons reporting chronic substance use in the CoC's most recent PIT count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation in the program in accordance with 24 CFR 578.75. List the projects the units are part of. The units may be existing renewals or newly proposed under this NOFO.<br><br>    o At least 1 unit per 2 per persons = 6 points<br>    o At least 1 unit per 4 persons = 3 points |
|  |  | • Indicate the availability of 24/7 access to detox, residential, and inpatient behavioral health treatment within the geographic area of the CoC; |
|  |  | • Identify at least one formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC), SAMHSA Projects for Assistance in Transition from Homelessness (PATH) provider, Grants for the Benefit of Homeless Individuals (GHBI) provider, or a similar facility if none of the above are located in the geographic area; |
|  |  | • Identify at least one new or existing CoC project that operates sober housing in accordance with 24 CFR 578.93(b)(5). |
|  |  | • Describe how the CoC coordinates with the programs named in this section to facilitate warm hand-offs to stable housing providers and prevent entry into homelessness. |
| **(6) *Investment in Supportive*** | 8 | Demonstrate that the CoC is investing adequately in |

| | | |
|---|---|---|
| *Services.* | | supportive services by showing either:<br><br>• through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or<br><br>• 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(7) *Participation Requirements for Supportive Services.*** | 8 | Demonstrate that housing projects (TH, PH-PSH, PH-RRH, and Joint projects) require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by providing direct language from supportive service agreements (contract, occupancy agreement, lease, or equivalent).<br><br>• 100% of CoC housing projects have participation requirements (8 points).<br><br>• 50% of CoC housing projects have participation requirements (4 of the 8 points).<br><br>Except that consistent with 24 CFR 5.2005(b)(1) assistance may not be denied on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for admission, assistance, participation, or occupancy. |
| **(8) *ESG Recipients and Emergency Shelter.*** | 2 | • Describe how the CoC has and will continue to consult with ESG recipients in the planning and allocation of ESG funds;<br><br>• Describe how the CoC coordinates with shelter providers to connect individuals and families with CoC assistance. |
| **(9) *Data Sharing for Improved Outcomes and Transparency.*** | 2 | • Describe how the CoC has or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law in order to inform the homelessness response system.<br><br>• Describe how the CoC utilizes other data sources alongside HMIS to improve care (e.g., health care utilization and claims data, electronic health care record data; admission, discharge, and transfer |

| | | |
|---|---|---|
| | | data; and law enforcement and corrections system data). |
| **(10) *Employment and Workforce Development.*** | 5 | Identify at least one partnership that the CoC has with employment and workforce development programs and organizations such as the Local Workforce Development Board, State Workforce Agency, American Job Center (also known as One-Stop Career Centers), registered apprenticeship program, community and technical college, union training program, adult education provider, or State Vocational Rehabilitation agency. |
| **(11) *Street Outreach, Law Enforcement and First Responders.*** | 5 | <ul><li>Demonstrate an increasing number of people exit street outreach to a positive destination;</li><li>Describe how Street Outreach projects (including co-response) cooperate with first responders and law enforcement to increase positive interactions in order to increase housing and service engagement and promote use of CoC services.</li></ul> |
| **(12) *Family or Support Network Reunification.*** | 4 | Describe how the CoC or its recipients assist with family or support-network reunification efforts for individuals experiencing homelessness or living in CoC-funded housing (e.g., case management, travel costs, arrangement of assistance in another geographic area.) |
| **(13) *Public Housing Agencies.*** | 2 | <ul><li>Indicate that the CoC has an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive Housing to HUD assisted housing.</li></ul> |
| **(14) Protecting Public Safety.** HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). | 14 | HUD has a vested interest in ensuring that all grantees are maximizing their potential Federal award to accomplish the program's purposes. To that end, to receive full points, CoCs should:<ul><li>Demonstrate, by providing evidence, that the CoC cooperates and does not interfere with or impede local efforts to advance the objectives below, and assists first responders in providing services to homeless individuals.</li><li>Identify local laws, policies, or other practices that help or hinder the CoC's ability to advance</li></ul> |

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 424 of 482
PageID #: 920

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| Law enforcement and public safety protections play a critical role in accomplishing these purposes. | | the objectives below and provide a plan explaining how the CoC will leverage beneficial policies while overcoming the harmful effects of restrictive ones. If you cannot provide any mitigating steps, please explain why. Include qualitative and quantitative details in your response. |
|---|---|---|
| | | ○ Quickly clear tents and encampments on public property and connect individuals who are camping in public with appropriate services. In your response, describe the current status of tents and encampments in the CoC's geographic area. |
| | | ○ Decrease the public use of illicit drugs and quickly connect individuals who are using illicit drug in public with appropriate services and/or law enforcement. In your response, describe the current status of overdoses and illicit drug use in public spaces in the CoC's geographic area. |
| | | ○ Utilize standards that address homeless individuals who are a danger to themselves or others (e.g., involuntary commitment.) |
| | | ○ Comprehensively share information, including location information, in accordance with the Sex Offender Registry and Notification Act (SORNA). |
| | | The CoC should maintain records reflecting the analysis performed in response to this rating criteria. |
| (*15) Outreach* | 2 | Describe the CoC's strategy to outreach to all individuals and families experiencing homelessness across their geographic area. |
| **Coordination to Serve Subpopulations. (up to 34 points)** The CoC is coordinating outreach, assistance and services for specific subpopulations experiencing homelessness. | | |
| (16) *Children and Youth.* | 6 | • Indicate written agreements are in place between the CoC or its HUD-funded projects and educational supports and services for |

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 425 of 482 PageID #: 921

| | | |
|---|---|---|
| | | children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV); <br><br> • Identify formal partnerships the CoC has with youth education providers including Local Educational Agencies (LEAs), McKinney-Vento liaisons, school districts, GED programs, community and technical colleges, and other post-secondary education providers; <br><br> • Describe policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services; <br><br> • Describe how the CoC coordinates with foster care or child welfare services to assist youth transitioning from public systems of care; <br><br> • Describe how the CoC coordinates with RHY-funded providers including Street Outreach Programs, Basic Center Programs, Transitional Living Programs, and Maternity Group Homes where such providers exist. |
| **(17) Families.** | 4 | Identify at least one RRH or TH project in the CoC that primarily or exclusively serves families with children experiencing homelessness in accordance with 24 CFR 578.93(b). Describe how the project: <br><br> • Provides supportive services focused on improving incomes to pay rent such as workforce development, job training, or registered apprenticeship programs; and <br><br> • Leverages funding from mainstream family service systems such as Temporary Assistance for Needy Families (TANF). <br><br> • Combines housing assistance with childcare, parenting support, pregnancy-related and child healthcare, and education. |
| **(18) Veterans.** | 4 | Identify at least one partnership the CoC has with the Department of Veterans Affairs or other Veteran Serving Organizations to do the following: |

| | | |
|---|---|---|
| | | • Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance; <br><br> • Coordinate the provision of emergency shelter, outreach, supportive services, and housing; <br><br> • Ensure access to a full spectrum of employment and career pathway opportunities; <br><br> • Share data with the Department of Veterans Affairs as appropriate; and <br><br> • Identify and fill service gaps for veterans. |
| **(19) *Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking.*** | 4 | Identify at least one partnership the CoC has with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to, or fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| **(20) *Justice System Re-entry.*** | 4 | Identify at least one partnership the CoC has to prevent homelessness among people transitioning from prisons, jails, or court-ordered programs. |
| **(21) *High Utilizers of Healthcare Systems.*** | 4 | Identify at least one partnership or project the CoC has to provide specialized supportive services for homeless individuals with a high level of medical needs. |
| **(22) *Aging and Elderly.*** | 4 | Identify at least one partnership or project the CoC has to serve aging and elderly individuals experiencing homelessness such as with a provider of residential care, assisted living, or medical respite services. CoC-funded projects may establish preferences for elderly individuals or families. |
| **(23) *Permanent Supportive Housing for Chronically Homeless Individuals and Families.*** | 4 | Identify at least one RRH or PSH project that prioritizes individuals experiencing chronic homelessness. Describe how that project: <br><br> • Provides on-site behavioral healthcare; <br><br> • Has a policy for assessing program participant need for higher level of care (i.e., assisted living, residential treatment); and |

| | | • Has a policy for assessing program participant readiness for moving on to unsubsidized or other permanent housing. |
|---|---|---|

**d. *CoC Merger or Unified Funding Agency Bonus Points.*** HUD will award up to a possible 6 bonus points to Unified Funding Agencies or to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Unified Funding Agency or CoCs Merged after the FY 2024 CoC Program Registration CoC Program Registration deadline.** | 6 | Unified Funding Agency – all UFAs will receive maximum points.<br><br>Merged CoCs - all CoCs that merged will receive maximum points. |

*For the Section 3 requirements above, you can opt to have the default Section 3 rating factor below, or incorporate the rating elements below into another rating factor that includes other elements.*

*If 24 CFR Part 75 (Section 3) applies to the grant, retain the rating factor titled **"Section 3"** below and adjust the points accordingly, up to a maximum of four (4) points. These points are part of the total 100 points available.*

*NOFOs for grants that are required to comply with Section 3 must award points (maximum of 4) for the inclusion of a quality Section 3 plan.*

*If the NOFO is **not** required to comply with Section 3 and does not award Section 3 points, you may either keep the final row of text for informational purposes or simply remove this row from your NOFO.*

## 2. Policy Initiative Preference Points

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 428 of 482 PageID #: 924

### a. Opportunity Zones

You may receive up to four (4) points, if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

### b. Advancing Recovery by Prohibiting Illicit Drug Enablement

Apart from the required selection criteria, you may receive up to ten (10) points if you can describe the policy or statement the CoC has in place to ensure that all housing projects submitted by the CoC will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off property under their control, knowingly permit the use or distribution of illicit drugs on property under their control, or conduct, permit, encourage, or allow any of these activities under the pretext of "harm reduction."

None of the above constitute a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement, although those practices may be allowable under 24 CFR 578. Full points will be awarded for a description of a clear CoC policy or statement in addition to affirmative certifications in section V.A.4.a.(6) for all projects submitted by the CoC.

To receive full points, the policy or statement must:

**(1)** Prohibit CoC-funded housing projects from operating drug injection sites or "safe consumption sites," knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of "harm reduction;"

**(2)** Describe what remedies will be taken for CoC-funded housing projects determined by the CoC to be in violation of the above;

**(3)** Encourage the provision of substance use disorder treatment and recovery housing within or outside of the CoC; and

**(4)** Not restrict or prohibit CoC-funded housing projects that require program participants to be sober or to participate in treatment as a condition of assistance in accordance with 24 CFR 578.

### 3. Other Factors

Your application must respond to the following additional criteria.

### a. Budget

HUD may evaluate the budget. HUD may assess whether the budget aligns with planned program activities and objectives. HUD may consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The project budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.

- The total amount of funding is within the amount of funding available to the CoC.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 429 of 482 PageID #: 925

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

## b. Certification of Consistency with the Consolidated Plan

You must ensure that the activities in your application are consistent with your local Consolidated Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making any awards, including renewal awards, HUD will evaluate each applicant's likelihood of successfully carrying out the project. This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1). Here's what HUD looks at:

**Past Performance:**

- Government-wide performance data, as noted in 2 CFR 200.206(a)

- Public sources like news reports, Inspector General findings, Government Accountability Office reports, and complaints with a reasonable basis

- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards. HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions in prior NOFOs that are in direct conflict with those contained herein.

- Reports from past audits, including those performed under 2 CFR part 200, subpart F– Audit Requirements

- History of finishing activities on time and using any promised matching or leveraged funds

- Debarments or suspensions

- Misuse of federal funds for purposes outside of the program

**Organizational Health:**

- Financial stability and capacity, including compliance with cost principles in 2 CFR Part 200 Subpart E (200.400 et seq.), and where applicable, 200 Part 170

- Quality of management systems and ability to meet the management standards in 2 CFR part 200

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 430 of 482 PageID #: 926

- Ability to follow all required laws and rules
- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities
- Capacity, including staffing structures and capabilities

**Results:**

- Ability to promote self-sufficiency and economic independence
- Number of people served or targeted for assistance
- History of illegal discrimination, including illegal racial discrimination
- History of subsidizing or facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO

HUD in its discretion may use the results of the risk review as a sufficient and independent basis to make adverse funding decisions, including rejecting an award, applying special conditions on the award, or reducing the amount of an award.

## D. Selection Process

When making award funding decisions, HUD will consider:

- Threshold review results, including eligibility requirements.
- Merit review results.
- Risk review results.

To the extent allowed by law, HUD may also consider:

- The scope of the overall projected impact on the program and administrative goals and priorities in this NOFO.
- Reasonableness of the estimated costs to the government.
- The applicant's readiness to conduct the proposed work.
- Likelihood that the proposed project will result in the benefits expected.
- Broad range of recipients beyond recurrent recipients.
- Geographic dispersion.
- All else being equal, preference for applicants with lower indirect cost rates.
- Applicants with demonstrated success in implementing Gold Standard Science (applicable to research awards).
- Applicants with potential to produce immediate results and potential for longer-term, breakthrough results, based on the goals of this NOFO (applicable to research awards).

To the extent allowed by law, HUD may exercise its discretion in deciding whether and how to issue an award based on the above criteria, including decisions to:

- Fund applications in whole or in part.

- Impose special conditions on an award

- Fund applications at a lower amount than requested.

- Choose to fund no applications under this NOFO.

- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met timely.

- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.

- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.

- Release another NOFO, if funding is available and if HUD does not receive applications of merit to obligate the funds.

## 1. Threshold Review.

HUD will conduct a project eligibility review on all projects, and a new project threshold review and renewal project threshold review on new and renewal projects respectively.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the new project threshold review in section V.A.4.c of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

## 2. Conditional Selection and Adjustments to Funding.

HUD Headquarters will conditionally select project applications for funding using the following process:

a. *HUD Funding Process.* All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications.

**(1)** HUD will select all CoC Planning and UFA Costs applications that meet project eligibility threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.

**(2)** HUD will then select all projects in Tier 1 that pass project eligibility thresholds as described in section V.A.4 of this NOFO.

**(3)** HUD will then review DV Bonus projects (this does not include DV Reallocation or the renewal of projects originally funded under the DV Bonus) already selected for funding through the above process and determine whether $104,000,000 has been awarded to DV Bonus projects:

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 432 of 482
PageID #: 928

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(a)** If at least $104,000,000 has been selected for conditional award no further action is needed.

**(b)** If $104,000,000 has not been selected for conditional award – HUD will continue down the list and fund additional DV Bonus projects by project-level score until at least $104 million has been selected.

**(4)** HUD will then review Permanent Housing projects for families with children already selected for funding through the above process and determine whether $430,000,000 has been awarded to Permanent Housing projects that serve families with children:

**(a)** If at least $430,000,000 has been selected for conditional award no further action is needed.

**(b)** If $430,000,000 has not been selected for conditional award – HUD will continue down the list and fund additional Permanent Housing for families with children projects by project-level score until at least $430 million has been selected.

**(5)** HUD will then select new Transitional Housing (TH) or Supportive Service Only (SSO) projects ranked in Tier 2 that meet project eligibility thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.

**(6)** HUD will then continue selecting new projects ranked in Tier 2 that meet project eligibility thresholds in the order of project score as described in section V.D.3.b below until $1,300,000,000 of new projects have been selected.

**(7)** If at any point, HUD selects new projects in an amount more than $1,300,000,000 HUD will remove all remaining unselected new projects, recalculate Tier 2 scores, and continue selecting projects.

**b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2026 CoC and YHDP Competition, a project must have an expiration date in Calendar Year (CY) 2027 (between January 1, 2027, and December 31, 2027).

## 3. Additional HUD Funding Process Information.

CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2026 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 433 of 482
PageID #: 929

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2026, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

a. **Tier 1.** Tier 1 is equal to 60 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass project eligibility thresholds.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

b. **Tier 2.** Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this point value from the highest scoring project application to the lowest:

(1) *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

(2) *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

(3) *Service Participation.* Up to 10 points for projects that indicate that they have or will incorporate supportive service participation requirements in their program design, based on individual need in accordance with 24 CFR 578.75(h). Supportive Service Only (SSO) and HMIS will automatically receive 10 points in this category.

Consistent with 24 CFR 5.2005(b)(1) assistance may not be denied on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 434 of 482 PageID #: 930

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

admission, assistance, participation, or occupancy.

**c. *Projects Straddling Tiers.*** If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**d. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).*** This NOFO provides approximately $104 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section II.B.3.iof this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and, when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

### 4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR Part 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 435 of 482
PageID #: 931

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

### 5. Adjustments to Projects.

HUD may adjust the selection of competitive projects as follows:

**a. *CoC Maximum Award and FMR Adjustments.*** The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR in place at the application submission deadline.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance in all new and renewal projects requesting the FMR will be adjusted by applying the FMR in effect at the time of application submission to HUD, including instances where the FMR for a specific area has decreased from the previous year.

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (II.B.4i.) will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area decreased from the previous year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 436 of 482
PageID #: 932

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**b.** *Cost of Living Adjustment Factor.* HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

## 6. Geographic Diversity.

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

## 7. Funding Diversity.

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

## 8. Grant Award Transfers and Recipient Changes.

Except as identified in (a)-(e) below, HUD will only execute grant agreements with the organization that submitted the FY 2026 project application in e-snaps. In instances where HUD and the conditionally selected applicant do not finalize the terms and conditions of the award, HUD may select another eligible applicant [Sec. II.A]

HUD will continue to consider requests to change a project recipient after a grant agreement has been executed in accordance with 24 CFR 578.105.

Under this NOFO, HUD may treat the change of a project applicant as a curable deficiency in instances where a FY 2026 CoC renewal application does not reflect the new recipient as the applicant. These instances include:

**a.** In cases where a recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and after applying for FY 2026 funds, HUD approves and both HUD and the recipient execute a grant agreement amendment to transfer the expiring grant;

**b.** In cases where a nonprofit organization is awarded a FY 2026 grant and subsequently merges with another or reorganizes, and the grant will be operated by substantially the same entity;

**c.** For HMIS grants, in cases where the CoC designates a new HMIS lead, but the prior HMIS lead is awarded a FY 2026 HMIS grant

**d.** For CoC Planning grants, in cases where the CoC designates a new Collaborative

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 437 of 482 PageID #: 933

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Applicant, but the prior Collaborative Applicant is awarded the FY 2026 CoC Planning grant

**e.** At its sole discretion, HUD may consider the transfer of an Award under other circumstances not described in (a)-(d) above.

### 9. Use of unawarded funds.

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VIII.D below, HUD reserves the right to issue a supplemental NOFO.

## E. Award Notices

If your application is successful, HUD will email an award notice to the authorized official representative from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. The notice may also include HUD-imposed award conditions as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

A.   Deadlines

B.   Submission Methods

C.   Other Submissions

D.   False Statements

TABLE OF CONTENTS

HUD-AR-05100

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 439 of 482 PageID #: 945

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically, unless you qualify to submit a paper application. See Find the Application Package to make sure you have everything you need to apply online.

Make sure you are current with SAM.gov and UEI requirements before applying for the award. See the Before You Begin section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 11:59:59 PM Eastern time on:

08/26/2026

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. An improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2026 funding is 8:00 PM ET on August 26, 2026.

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. The implementation of deadlines that meet the standards outlined below for FY 2026 CoC Program project applications are part of the scoring criteria as detailed in section V.B of this NOFO.

### 2. CoC Notification to Project Applicants.

The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2026 CoC Program application submission deadline.

Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

### 3. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 440 of 482
PageID #: 936

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the CoC Priority Listing and FY 2026 project applications, the CoC's Collaborative Applicant must send written notification to Karen DeBlasio, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

**a. *CoC Registration.*** HUD required Collaborative Applicants to complete the FY 2026 CoC Program Registration in accordance with Notice CPD-26-03: Continuum of Care Program Registration. If a Collaborative Applicant did not complete the FY 2026 CoC Program Registration, HUD moved the previous year's registration forward with no changes.

**b. *CoC Review of Project Applications Prior to Submission to HUD.*** HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2026 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to HUD rejecting projects, and delays accessing project funds to house and assist homeless individuals and families. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 441 of 482   PageID #: 957

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections II.B.3.d, II.B.3.e, and V.D.3.d of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections II.B.3g and II.B.3.h of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between December 10, 2025 and August 26, 2026.

**c. *Collaborative Applicant Submission Requirements*.** Collaborative Applicants must submit the FY 2026 Consolidated application by the FY 2026 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2026CoC Application, the FY 2026 CoC Priority Listing, and all FY 2026 project applications on behalf of the CoC.

The "Submit" button will not be available on the Submission Summary of the FY 2026 CoC Application and FY 2026 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from the FY 2026 CoC Application and the FY 2026 CoC Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2026 application deadline.

The CoC Consolidated Application includes the following:

**(1) FY 2026 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's website, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project

Case 1:26-cv-00436-MSM-AEM Document 30-3 Filed 07/17/26 Page 442 of 482 PageID #: 938

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(g) The FY 2026 HDX Competition Report.** The FY 2026 HDX Competition Report contains data submitted to HUD via HDX, including HIC, PIT count, and system performance data.

**(2) FY 2026 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The HUD-required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.A of this NOFO).

**(3) FY 2026 CoC Priority Listing.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications, and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 443 of 482
PageID #: 989

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects;
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

If a CoC, in collaboration with the Youth Action Board (YAB), determines that it no longer has an identified need to renew an eligible YHDP project under this NOFO, the Collaborative Applicant must indicate in the Priority Listing the project information and amounts that will be removed from the CoC's ARD and made available under a subsequent YHDP NOFO Competition.

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

**i.** CoC Planning Project Listing; and
**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.A.2 of this NOFO).

## d. Project Application Submissions.

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section II.B of this NOFO.

## e. Timely Submissions.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 444 of 482 PageID #: 940

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

### f. Resolving Technical Difficulties.

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2026 CoC and YHDP funding should print the Submission Summary form for the FY 2026 CoC Priority Listing for proof of compliance with the FY 2026 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2026 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13 that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

## 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 445 of 482
PageID #: 941

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to the Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the established deadline.

## C. Other Submission Information

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD will contact you to fix a technical error with your timely application after the due date. Use the following submission requirements to respond to HUD's notice.

### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

### b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting your application, you acknowledge that you have read and understood federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care (CoC) program as described in this NOFO. As part of your application for CoC funding, you must provide the certifications and assurances described below to ensure that you understand your obligation to protect the funds from fraud. Furthermore, grant recipients must require each subrecipient to provide the same anti-fraud certifications and assurances.

On behalf of the applicant, and in support of your application for the CoC grant, you certify under the penalty of perjury, that:

(1) You have the authority to make the following representations on behalf of yourself and the applicant, and you understand that these representations will be relied upon as material in any HUD decision to make an award to the applicant based on its application.

(2) You have the legal authority to apply for the federal assistance sought by the application, and that the applicant has the institutional, managerial, and financial capability to ensure proper planning, management, and completion of the project described in the application.

(3) The information provided in the application is true, accurate, and complete.

(4) Throughout the period of performance for the award, if any,

> a. The applicant will comply with and follow all federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care program;

> b. The applicant will require all subrecipients to comply with and follow all federal laws and regulations, grant terms and conditions, and rules and requirements applicable to HUD's Continuum of Care program;

> c. The applicant will notify HUD within fifteen (15) calendar days if the applicant becomes aware of any violation of HUD requirements pertinent to the award by any person or entity–including, but not limited to the applicant, any subrecipient, or contractor;

> d. The applicant will maintain safeguards to address and prevent any conflicts of interest, and to prohibit employees from using their positions in any manner that poses, or appears to pose, a personal or financial conflict of interest; and

> d. The applicant will comply with HUD's conflict-of-interest requirements stated at 24 CFR 578.95.

(5) The applicant will give HUD, the Office of Inspector General, and the Comptroller General of the United States, through any authorized representative, access to and opportunity to examine all records, books, papers, documents, or electronic records related to the award, if any, made by HUD.

(6) The applicant will establish an accounting system in accordance with generally accepted accounting standards or HUD directives, consistent with 2 C.F.R. § 200.302, "Financial Management," and 2 C.F.R. § 200.303, "Internal Controls."

(7) The applicant will submit the performance, financial, and program reports as outlined in the NOFO and required by federal laws and regulations.

(8) The applicant will require that the language of these Anti-Fraud Certifications and Assurances be included in the award documents or agreements for all subawards as defined at 2 CFR 200.1and that the applicant will seek from all subrecipients the same certifications and assurances.

(9) You understand that complying with the terms, conditions, and requirements of your award, if any, is a material condition of remaining eligible for HUD funding.

Finally, by submitting your application, you acknowledge that you understand that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil, or administrative sanctions, including but not limited to: charges and remedies provided for by applicable state laws and regulations; fines,

Case 1:26-cv-00436-MSM-AEM  Document 30-3   Filed 07/17/26   Page 447 of 482 PageID #: 943

restitution, and/or imprisonment under 18 U.S.C. §§ 287, 1001, 1010, 1012, 1014; treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 U.S.C. §§ 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, Federal Acquisition Regulations Part 9.4 or 2 C.F.R. Part 180; and other remedies including termination of active HUD award.

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 448 of 482 PageID #: 944

# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION

VII. Post-Award Requirements and Administration

A.   Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B.   Environmental Requirements

C.   Remedies for Noncompliance

D.   Reporting

TABLE OF CONTENTS

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 449 of 482 PageID #: 945

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2026:

**Administrative**

1. Build America, Buy America (BABA) (Sections 70901-52 of Public Law 117-58; 41 U.S.C. 8301 et seq; and 2 CFR Part 184)

2. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 U.S.C. § 4601 et seq.; 49 CFR part 24; and applicable program regulations)

3. Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

4. HUD requirements related to safeguarding resident/client files consistent with 2 CFR 200.303(e)

5. The Federal Funding Accountability and Transparency Act (FFATA) (2 CFR part 170)

6. Eminent Domain

7. Participation in HUD-Sponsored Program Evaluation (12 U.S.C. 1701z-1; 12 U.S.C. 1702z-2; 24 CFR part 60; and FR-6278-N-01)

8. The Freedom of Information Act (FOIA) (5 U.S.C. § 552(b) and 24 CFR 15.107(b))

9. Presidential Executive Actions affecting federal financial assistance programs

- Executive Order (EO) 14332 (*Improving Oversight of Federal Grantmaking*)

- EO 14303 (*Restoring Gold Standard Science*)

- EO 14219 (*Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative*);

- EO 14218 (*Ending Taxpayer Subsidization of Open Borders*);

- EO 14202 (*Eradicating Anti-Christian Bias*);

- EO 14205 (*Establishment of the White House Faith Office*)

- EO 14182 (*Enforcing the Hyde Amendment*);

- EO 14173 (*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*);

- EO 14168 (*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*)

- EO 14151 (*Ending Radical and Wasteful Government DEI Programs and Preferencing*); and

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 450 of 482 PageID #: 946

- [EO 14148](#) (*Initial Rescissions of Harmful Executive Orders and Actions*)

## Civil Rights and Other Protections

10. The Fair Housing Act ([42 U.S.C. 3601-3619](#)) and Civil Rights laws (24 CFR 5.105(a))

11. Affirmatively Furthering Fair Housing (AFFH) requirements ([42 U.S.C. § 3608(e)(5)](#) and [24 CFR 5.150 et seq](#))

12. Economic Opportunities for Low-and Very Low-income Persons ([12 U.S.C. § 1701u](#) and [24 CFR part 75](#))

13. Compliance with Immigration Requirements ([8 U.S.C. § 1601-1646](#); and [Executive Order 14218](#), *Ending Taxpayer Subsidization of Open Borders*)

14. Accessible Technology requirements ([29 U.S.C. § 794d](#); [29 U.S.C. 794](#); and [42 U.S.C. 12131-12165](#) and implementing regulations at 36 CFR part 1194 (Section 508 regulations), [24 CFR § 8.6](#) (Section 504 effective communication regulations), [28 CFR part 35, subpart H](#) (DOJ Web Access Rule), and [28 CFR part 35, subpart E](#) (DOJ's Title II communications regulations))

15. Ensuring, when possible, the consideration of small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms consistent with [2 CFR 200.321](#)

16. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with [42 U.S.C. 2000bb et seq.](#); [24 CFR 5.109](#); [Executive Order (EO) 14202](#), *Eradicating Anti-Christian Bias;* and [EO 14205](#), *Establishment of the White House Faith Office*

17. Accessibility for Persons with Disabilities requirements ([29 U.S.C. § 794](#) and implementing regulations at [24 CFR parts 8](#) and [100](#); [28 CFR part 35](#))

18. Applicable Violence Against Women Act (VAWA) requirements in the Housing Chapter of VAWA ([34 U.S.C. § 12491-12496](#)); [24 CFR part 5, subpart L](#); and program-specific regulations

19. Trafficking in persons ([Section 106(g) of the Trafficking Victims Protections Act of 2000 (TVPA), as amended 22 U.S.C. § 7104(g)](#) and implementing regulations at [2 CFR part 175](#))

## Environmental

20. Environmental requirements that apply in accordance with [24 CFR part 50](#) or [part 58](#); [42 U.S.C. 4321 et seq.](#)

## Business Integrity

21. Conducting Business in Accordance with Ethical Standards (Code of Conduct), including [2 CFR 200.317](#), [2 CFR 200.318(c)](#), and other applicable conflicts of interest requirements

22. Prohibition on Certain Telecommunication and Video Surveillance Services or Equipment ([41 U.S.C. § 3901](#) and [2 CFR 200.216](#))

23. Waste, Fraud, Abuse, and Whistleblower Protections ([41 U.S.C. § 4712](#))

24. Drug-Free Workplace ([2 CFR part 2429](#))

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 451 of 482
PageID #: 947

In addition, if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved, or reversed, the full terms of the award agreement and NOFO, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon issuance of this NOFO.

Additionally,

**1.** Awards made under this NOFO will not be used to engage in illegal racial discrimination including racial preferences.

**2.** Awards made under this NOFO will not be distributed in a way that violates or otherwise is used to interfere with constitutional protections guaranteed for speech and religious beliefs and the free exercise of religion.

**3.** Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856, knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 USC 863. This is not a requirement that program participants must be sober in order to receive assistance, participate in treatment in order to receive assistance, or be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement.

**4.** Pursuant to 2 CFR 200.332(b)(2), all agreements or contracts made with subrecipients under this NOFO must contain the same terms and conditions as those in the grant agreement issued by HUD. Any conflicting terms and conditions must be approved by HUD.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

   **a.** All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in

24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

**b.** For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

**c.** Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all relevant and available information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

## 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).
- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or

renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law:

- if an award no longer effectuates the program goals or agency priorities; or

- in the case of a partial termination, if HUD determines that the remaining portion of the award will not accomplish the purposes for which the HUD award was made.

HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with the U.S. Constitution, Federal statutes, regulations, or your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## D. Reporting

HUD requires recipients to submit performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.

Further, the Recipient hereby acknowledges that HUD is in the process of implementing new grants management and reporting tools for all records pertinent to the Federal award. Recipient agrees to report on grant performance and financial activities (including vendor and cash disbursement supporting details for the Recipient and its Subrecipients) using these new tools when they are released and to satisfy occasional requests for records pertinent to the federal award, consistent with the requirements for recordkeeping, access to records, and reporting laid out in 2 CFR part 200, which may be amended from time to time. HUD will work with the Recipient to support its transition to the new reporting tools. HUD reserves the right to exercise all of its available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include, without limitation, requiring additional or more detailed financial reports, suspension of disbursements, and all other legally available remedies, to the furthest extent permitted by law.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | <ul><li>Awards equal to or greater than $30,000</li><li>Data on executive compensation and first-tier subawards</li><li>See Public Law 109-282</li></ul> | See 2 CFR Appendix A to Part 170(a)(2)(ii) |

VII. Post-Award Requirements and Administration

| Report | Description | When |
|---|---|---|
| | and 2 CFR part 170<br>• HUD reports initial prime recipient data to usaspending.gov<br>• Submit via SAM.gov | |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceeds $10,000,000 for any period of time during the period of performance of this Federal award<br>• See Appendix XII to 2 CFR 200<br>• Submit via SAM.gov | See 2 CFR Appendix-XII to Part 200 I.(d) |
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 455 of 482 PageID #: 951

| Report | Description | When |
|---|---|---|
| Audit Requirements | In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD.<br><br>• Single or program-specific audit is required if annual expenditures equal to or greater than $1,000,000 in Federal awards<br><br>• Required for the fiscal year in which the expenditure occurs<br><br>Financial statement audit and programmatic compliance evaluation | See 2 CFR part 200 subpart F and Appendix XI to 2 CFR part 200 |
| Section 3 Reporting Regulations | Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. | See HUD's Section 3 website for additional information including annual reporting requirements. |

**1. Program Specific Reporting Requirements.**

   **a.** In accordance with program regulations at 24 CFR 578.103, project recipients must maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $1,000,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

   **b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 456 of 482 PageID #: 952

information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## 2. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 457 of 482    PageID #: 953

# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A. Agency Contact

B. Grants.gov

C. Sam.gov

D. Debriefing

E. Applicant Experience Survey

F. Other Online Resources

TABLE OF CONTENTS

HUD-AR-05119

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 458 of 482 PageID #: 954

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM ET on August 26, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: Office of Special Needs Assistance Programs

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 2415 Eisenhower Ave

City: Alexandria

VA VIRGINIA

Case 1:26-cv-00436-MSM-AEM    Document 30-3    Filed 07/17/26    Page 459 of 482 PageID #: 955

22314

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.3.a of this NOFO for additional information about

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 460 of 482
PageID #: 956

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

- *Solo Applicants.* A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

- *Denied or Decreased Funding.* A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

- *Consolidated Plan Certification.* A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

- *Competing CoCs*. A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

### a. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 11386a of this title, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary." 42 U.S.C. 11382(*i*)

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of August 26, 2026 at 8:00 PM ET. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

(1) *Written Notice of Intent to Appeal.* The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

(2) No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

snapsappeals@hud.gov.

**(3)** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**(4)** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**(5)** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s) and may order the Continuum of Care to take remedial steps to ensure that the solo applicant can reasonably participate in future funding opportunities.

**b. Denied or Decreased Funding.**

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**(1)** *Denied Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.2 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(a)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**i.** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**ii.** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award

amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**iii.** HUD did not have sufficient funding to fund all eligible projects ranked within the CoC's maximum award amount.

**(b)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**i.** documentation that the project was ranked within the maximum award amount available to the CoC;

**ii.** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**iii.** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(c)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**i.** documentation that the project was ranked within the maximum award amount available to the CoC;

**ii.** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**iii.** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**iv.** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.3.b.(2) of this NOFO.

**(d)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**(2) *Decreased Funding.*** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant.
Documentation submitted by the applicant must include evidence of the HUD error the

applicant believes was made.

**(3)** *HUD Decision and Notification of Decision.* Where HUD determines that HUD error occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused the denial or decrease.

## c. Consolidated Plan Certification

### 1. *Written Appeal.*

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D.2 of this NOFO. The written appeal must include the following information:

**(a)** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**(b)** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**(c)** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

> **i.** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

> **ii.** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**(2)** *Jurisdiction Response.* The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(a)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 464 of 482   PageID #: 960

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(b)** written rebuttal to any claims made by the applicant in the written appeal.

**(3)** *HUD Decision and Notification of Decision.*

**(a)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(b)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(c)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(d)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources to learn background on some of the NOFO requirements.

# APPENDIX

Appendix

Appendix I Definitions

TABLE OF CONTENTS

HUD-AR-05127

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 466 of 482 PageID #: 962

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as in 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD rates your application for funding.

**Unique Entity Identifier (UEI)** has the same meaning as in 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to complete all parts of the FY 2026 CoC Consolidated Application in e-snaps on behalf of the CoC.

    a. *The following terms are defined in 24 CFR 578.* Applicants must refer to the Rule for the definitions contained in this section.

**(1)** Annual Renewal Amount (ARA)
**(2)** Applicant
**(3)** Centralized or Coordinated Assessment System
**(4)** Chronically Homeless
**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 467 of 482 PageID #: 963

**(9)** Final Pro Rata Need (FPRN)

**(10)** High Performing Community (HPC)

**(11)** Homeless Management Information System (HMIS)

**(12)** HMIS Lead

**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced, applicants may apply to serve the population as defined in Section 103(b) of the Act.

**(14)** Permanent Housing

**(15)** Permanent Supportive Housing

**(16)** Preliminary Pro Rata Need (PPRN)

**(17)** Private Nonprofit Organization

**(18)** Program Participant

**(19)** Project

**(20)** Rapid Rehousing (RRH).

**(21)** Recipient

**(22)** Subrecipient

**(23)** Transitional Housing

**(24)** Unified Funding Agency

**(25)** Victim Service Provider

**b.** *CoC Program NOFO Terms*. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

**(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

**(a)** renewal projects approved and ranked on the Renewal Project Listing;

**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;

**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and

**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process.

Case 1:26-cv-00436-MSM-AEM   Document 30-3   Filed 07/17/26   Page 468 of 482 PageID #: 964

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 6 bonus points to the FY 2026 CoC Application Score for CoCs that registered as a merged CoC during the FY 2026 CoC Program Registration process.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraph (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

**(8) Merged CoC.** A Merged COC is a CoC that includes geographic area that was associated with one or more other CoCs in any of the prior three registration periods (the FY 2023 CoC Registration period or later) and that CoC no longer operates.

**(9) New Tribal CoC. A** New Tribal CoC is a CoC that has newly registered in one of the prior three registration periods (FY 2023 CoC Registration period or later) that includes a

Formula Area (see definition in paragraph (3) above).

**(10) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(11) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which CoC program funds are made available.

**(12) Self-sufficiency.** Consistent with the purposes of the McKinney-Vento Act, 42 U.S.C. § 11381(4), means the ability to meet basic needs, including a place to live, without public or private assistance. This is consistent with dictionary definitions of the term. The Oxford English Dictionary defines *self-sufficiency* as the "state or condition of not needing or relying on external assistance, support, or aid." Similarly, Merriam-Webster defines *self-sufficient* as "able to maintain oneself or itself without outside aid : capable of providing for one's own needs."

**(13) Shared Housing.** YHDP Renewal and YHDP Replacement projects, including YHDP Reallocations, may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in

sharing a housing unit with a roommate unrelated to the program participant.

**(14) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

**(15) Split CoC.** A split CoC is a CoC that has newly registered during the prior three registration periods (FY 2023 CoC Registration period or later) and includes geographic area that was previously associated with another CoC that continues to operate.

**(16) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections II.B.3.h of this NOFO.

Appendix II. Endnotes

[1] 2025 AHAR

[2] 2025 AHAR

[3] Based on national award reports at HUD Exchange

[4] Are Cities' Pledges to End Homelessness Working?

[5] USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness - HUD Exchange

[6] The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[7] How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

[8] Tier 1 of FY24-25 CoC NOFO

[9] The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[10] CoC_AwardComp_NatlTerrDC_2024.pdf

[11] Health Conditions Among Unsheltered Adults in the US

[12] CASPEH_Report_62023.pdf

[13] Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic | Public Health | JAMA Network Open | JAMA Network

[14] Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[15](#) [2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States](#)

[16](#) [System-Performance-Measures-Data.xlsx](#)

[17](#) [2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States](#)

[18](#) [2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States](#)

[19](#) [National Crime Poll | Cicero Institute](#)

[20](#) [How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf](#)

[21](#) [Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless | Cicero Institute](#)

[22](#) [Homeless Data and Plan News Release FINAL 3-21-22.pdf](#)

[23](#) [hes_resultsupdated.pdf](#)

[24](#) [Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach](#)

[25](#) [2024 National Public Safety and Homelessness Poll | Cicero Institute](#)

[26](#) [Austin's homeless population dispersing after 2 years of camping ban enforcement | Community Impact](#)

[27](#) [20240304161555229_23-175 Amicus BOM Cicero PDFA.pdf](#)

[28](#) [History of The Salvation Army](#)

[29](#) [EXCLUSIVE: In Cities Across America, Homeless Services Are Doled Out Based on Race and Sexual Identity](#)

HUD-AR-05133

# OMB'S

# ADMINISTRATIVE

# RECORD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS *et al.*,

       *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT
*et al.*,

       *Defendants*.

Case No. 26-cv-436-MSM-AEM

### OFFICE OF MANAGEMENT AND BUDGET'S CERTIFICATION OF THE
### ADMINISTRATIVE RECORD

I, Clark P. Abourisk, Associate Director for Justice and Transportation Programs, on

personal knowledge and information provided to me in my official capacity, hereby certify to the

best of my knowledge and belief that the attached Administrative Record at OMB_AR_00001

through OMB_AR_00009 is a true, correct, and complete copy of the non-privileged documents

that were directly or indirectly considered in connection with the agency's decisions that are at

issue in the above-captioned matter.

I hereby certify under the penalty of perjury that the foregoing is true and correct to the

best of my knowledge and belief.

Executed this 15th day of July in Washington, D.C.

_____

1

**35817**

**Federal Register**

Vol. 90, No. 143

Tuesday, July 29, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14321 of July 24, 2025

## Ending Crime and Disorder on America's Streets

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* Endemic vagrancy, disorderly behavior, sudden confrontations, and violent attacks have made our cities unsafe. The number of individuals living on the streets in the United States on a single night during the last year of the previous administration—274,224—was the highest ever recorded. The overwhelming majority of these individuals are addicted to drugs, have a mental health condition, or both. Nearly two-thirds of homeless individuals report having regularly used hard drugs like methamphetamines, cocaine, or opioids in their lifetimes. An equally large share of homeless individuals reported suffering from mental health conditions. The Federal Government and the States have spent tens of billions of dollars on failed programs that address homelessness but not its root causes, leaving other citizens vulnerable to public safety threats.

Shifting homeless individuals into long-term institutional settings for humane treatment through the appropriate use of civil commitment will restore public order. Surrendering our cities and citizens to disorder and fear is neither compassionate to the homeless nor other citizens. My Administration will take a new approach focused on protecting public safety.

**Sec. 2**. *Restoring Civil Commitment.* (a) The Attorney General, in consultation with the Secretary of Health and Human Services, shall take appropriate action to:

(i) seek, in appropriate cases, the reversal of Federal or State judicial precedents and the termination of consent decrees that impede the United States' policy of encouraging civil commitment of individuals with mental illness who pose risks to themselves or the public or are living on the streets and cannot care for themselves in appropriate facilities for appropriate periods of time; and

(ii) provide assistance to State and local governments, through technical guidance, grants, or other legally available means, for the identification, adoption, and implementation of maximally flexible civil commitment, institutional treatment, and ''step-down'' treatment standards that allow for the appropriate commitment and treatment of individuals with mental illness who pose a danger to others or are living on the streets and cannot care for themselves.

**Sec. 3**. *Fighting Vagrancy on America's Streets.* (a) The Attorney General, the Secretary of Health and Human Services, the Secretary of Housing and Urban Development, and the Secretary of Transportation shall take immediate steps to assess their discretionary grant programs and determine whether priority for those grants may be given to grantees in States and municipalities that actively meet the below criteria, to the maximum extent permitted by law:

(i) enforce prohibitions on open illicit drug use;

(ii) enforce prohibitions on urban camping and loitering;

(iii) enforce prohibitions on urban squatting;

(iv) enforce, and where necessary, adopt, standards that address individuals who are a danger to themselves or others and suffer from serious mental illness or substance use disorder, or who are living on the streets and

cannot care for themselves, through assisted outpatient treatment or by moving them into treatment centers or other appropriate facilities via civil commitment or other available means, to the maximum extent permitted by law; or

(v) substantially implement and comply with, to the extent required, the registration and notification obligations of the Sex Offender Registry and Notification Act, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders.

(b) The Attorney General shall:

(i) ensure that homeless individuals arrested for Federal crimes are evaluated, consistent with 18 U.S.C. 4248, to determine whether they are sexually dangerous persons and certified accordingly for civil commitment;

(ii) take all necessary steps to ensure the availability of funds under the Emergency Federal Law Enforcement Assistance program to support, as consistent with 34 U.S.C. 50101 *et seq.,* encampment removal efforts in areas for which public safety is at risk and State and local resources are inadequate;

(iii) assess Federal resources to determine whether they may be directed toward ensuring, to the extent permitted by law, that detainees with serious mental illness are not released into the public because of a lack of forensic bed capacity at appropriate local, State, and Federal jails or hospitals; and

(iv) enhance requirements that prisons and residential reentry centers that are under the authority of the Attorney General or receive funding from the Attorney General require in-custody housing release plans and, to the maximum extent practicable, require individuals to comply.

**Sec. 4**. *Redirecting Federal Resources Toward Effective Methods of Addressing Homelessness.* (a) The Secretary of Health and Human Services shall take appropriate action to:

(i) ensure that discretionary grants issued by the Substance Abuse and Mental Health Services Administration for substance use disorder prevention, treatment, and recovery fund evidence-based programs and do not fund programs that fail to achieve adequate outcomes, including so-called "harm reduction" or "safe consumption" efforts that only facilitate illegal drug use and its attendant harm;

(ii) provide technical assistance to assisted outpatient treatment programs for individuals with serious mental illness or addiction during and after the civil commitment process focused on shifting such individuals off of the streets and public programs and into private housing and support networks; and

(iii) ensure that Federal funds for Federally Qualified Health Centers and Certified Community Behavioral Health Clinics reduce rather than promote homelessness by supporting, to the maximum extent permitted by law, comprehensive services for individuals with serious mental illness and substance use disorder, including crisis intervention services.

(b) The Attorney General shall prioritize available funding to support the expansion of drug courts and mental health courts for individuals for which such diversion serves public safety.

**Sec. 5**. *Increasing Accountability and Safety in America's Homelessness Programs.* (a) The Secretary of Health and Human Services and the Secretary of Housing and Urban Development shall take appropriate actions to increase accountability in their provision of, and grants awarded for, homelessness assistance and transitional living programs. These actions shall include, to the extent permitted by law, ending support for "housing first" policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency; increasing competition among grantees through broadening the applicant pool; and holding grantees to higher standards of effectiveness in reducing homelessness and increasing public safety.

OMB_AR_00002

(b) The Secretary of Housing and Urban Development shall, as appropriate, take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation.

(c) With respect to recipients of Federal housing and homelessness assistance that operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia, or permit the use or distribution of illicit drugs on property under their control:

(i) the Attorney General shall review whether such recipients are in violation of Federal law, including 21 U.S.C. 856, and bring civil or criminal actions in appropriate cases; and

(ii) the Secretary of Housing and Urban Development, in coordination with the Attorney General, shall review whether such recipients are in violation of the terms of the programs pursuant to which they receive Federal housing and homelessness assistance and freeze their assistance as appropriate.

(d) The Secretary of Housing and Urban Development shall take appropriate measures and revise regulations as necessary to allow, where permissible under applicable law, federally funded programs to exclusively house women and children and to stop sex offenders who receive homelessness assistance through such programs from being housed with unrelated children.

(e) The Secretary of Housing and Urban Development, in consultation with the Attorney General and the Secretary of Health and Human Services, shall, as appropriate and to the extent permitted by law:

(i) allow or require the recipients of Federal funding for homelessness assistance to collect health-related information that the Secretary of Housing and Urban Development identifies as necessary to the effective and efficient operation of the funding program from all persons to whom such assistance is provided; and

(ii) require those funding recipients to share such data with law enforcement authorities in circumstances permitted by law and to use the collected health data to provide appropriate medical care to individuals with mental health diagnoses or to connect individuals to public health resources.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

OMB_AR_00003

(d) The costs for publication of this order shall be borne by the Department of Housing and Urban Development.

THE WHITE HOUSE,
*July 24, 2025.*

[FR Doc. 2025–14391

Filed 7–28–25; 11:15 am]

Billing code 4210–67–P

OMB_AR_00004

# Presidential Documents

Executive Order 14332 of August 7, 2025

## Improving Oversight of Federal Grantmaking

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to improve the process of Federal grantmaking while ending offensive waste of tax dollars, it is hereby ordered:

**Section 1**. *Purpose.* Every tax dollar the Government spends should improve American lives or advance American interests. This often does not happen. Federal grants have funded drag shows in Ecuador, trained doctoral candidates in critical race theory, and developed transgender-sexual-education programs. In 2024, one study claimed that more than one-quarter of new National Science Foundation (NSF) grants went to diversity, equity, and inclusion and other far-left initiatives. These NSF grants included those to educators that promoted Marxism, class warfare propaganda, and other anti-American ideologies in the classroom, masked as rigorous and thoughtful investigation.

The harm imposed by problematic Federal grants does not stop at propagating absurd ideologies. An unsafe lab in Wuhan, China—likely the source of the COVID–19 pandemic—engaged in gain-of-function research funded by the National Institutes of Health. The NSF gave millions to develop AI-powered social media censorship tools—a direct assault on free speech. Taxpayer-funded grants have also gone to non-governmental organizations that provided free services to illegal immigrants, worsening the border crisis and compromising our safety, and to organizations that actively worked against American interests abroad.

Even for projects receiving Federal funds that serve an ostensibly beneficial purpose, the Government has paid insufficient attention to their efficacy. For example, a significant proportion of the results of federally funded scientific research projects cannot be reproduced by external researchers. Even at Harvard and Stanford, once considered among America's most prestigious universities, senior researchers have resigned following accusations of data falsification. A substantial portion of many Federal grants for university-led research goes not to scientific project applicants or groundbreaking research, but to university facilities and administrative costs.

The grant review process itself also undermines the interests of American taxpayers. Writing effective grant applications is notoriously complex, and grant applicants that can afford legal and technical experts are more likely to receive funds—which can then further support these non-mission functions. In addition, there is insufficient interagency coordination and review by relevant subject matter experts to reduce duplication. As a result, the best proposals do not always receive funding, and there is too much unfocused research of marginal social utility.

In short, there is a strong need to strengthen oversight and coordination of, and to streamline, agency grantmaking to address these problems, prevent them from recurring, and ensure greater accountability for use of public funds more broadly. The Government holds tax revenue in trust for the American people, and agencies should treat it accordingly.

**Sec. 2**. *Definitions.* For purposes of this order:

(a) The term "agency" has the meaning given to it in section 551 of title 5, United States Code, except that such term includes only agencies that have the statutory authority to award, offer, or manage Federal grants

and does not include the Executive Office of the President or any components thereof.

(b) The term "agency head" means the highest-ranking official or officials of an agency, such as the Secretary, Administrator, Chairman, Director, Commissioners, or Board of Directors, unless otherwise specified in this order.

(c) The term "Director" means the Director of the Office of Management and Budget (OMB).

(d) The term "discretionary award" or "discretionary grant" means a grant that is a "discretionary award" as that term is defined in 2 CFR 200.1. It does not include programs where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants; those awarded based on a statutory formula; or disaster recovery grants.

(e) The term "funding opportunity announcement" means a "notice of funding opportunity" as defined in 2 CFR 200.1, as it pertains to a discretionary award.

(f) The term "grant" means any "grant agreement or grant" as defined in 2 CFR 200.1, "cooperative agreement" as defined in 2 CFR 200.1, or similar award of financial assistance, including foreign assistance awards.

(g) The term "regulation" means an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the procedure or practice requirements of an agency, including, without limitation, regulations, interpretative rules, and statements of policy.

(h) The term "senior appointee" means an individual appointed by the President, a non-career member of the Senior Executive Service, or an employee encumbering a Senior Level, Scientific and Professional, or Grade 15 position in Schedule C of the excepted service.

**Sec. 3**. *Strengthening Accountability for Agency Grantmaking.* (a) Each agency head shall promptly designate a senior appointee who shall be responsible for creating a process to review new funding opportunity announcements and to review discretionary grants to ensure that they are consistent with agency priorities and the national interest. For the avoidance of doubt, this process shall not guarantee any particular level of review or consideration to funding applicants except as consistent with applicable law. As consistent with applicable law, this review process shall incorporate, at a minimum:

(i) review and approval of agency funding opportunity announcements by one or more senior appointees or their designees;

(ii) continuation of existing coordination with OMB;

(iii) to the extent appropriate to the subject matter of the announcements, review by designated subject-matter experts as identified by the agency head or the agency head's designee;

(iv) review of funding opportunity announcements and related forms to ensure that they include only such requirements as are necessary for an adequate evaluation of the application and are written in plain language with a goal of minimizing the need for legal or technical expertise in drafting an application;

(v) interagency coordination to determine whether the subject matter of a particular funding opportunity announcement has already been addressed by another agency announcement and, if so, whether one of the announcements should be modified or withdrawn to promote consistency and eliminate redundancy;

(vi) for scientific research discretionary grants, review by at least one subject matter expert in the field of the application, who may be a member of the grant review panel, the program officer, or an outside expert; and

(vii) pre-issuance review of discretionary awards to ensure that the awards are consistent with applicable law, agency priorities, and the national

interest, which shall involve in-person or virtual discussion of applications by grant review panels or program offices with a senior appointee or that appointee's designee.

(b) Agency heads shall designate one or more senior appointees to review discretionary awards on an annual basis for consistency with agency priorities and substantial progress. Such review shall include an accountability mechanism for officials responsible for selection and granting of the awards.

(c) Until such time as the process specified in subsection (a) of this section is in place, agencies shall not issue any new funding opportunity announcements without prior approval from the senior appointee designated under subsection (a) of this section, except as required by law.

**Sec. 4**. *Considerations for Discretionary Awards.* (a) Senior appointees and their designees shall not ministerially ratify or routinely defer to the recommendations of others in reviewing funding opportunity announcements or discretionary awards, but shall instead use their independent judgment.

(b) In reviewing and approving funding opportunity announcements and discretionary awards, as well as in designing the review process described in section 3(a) of this order, senior appointees and their designees shall, as relevant and to the extent consistent with applicable law, apply the following principles, including in any scoring rubrics used to assess grant proposals:

(i) Discretionary awards must, where applicable, demonstrably advance the President's policy priorities.

(ii) Discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate:

(A) racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation;

(B) denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic;

(C) illegal immigration; or

(D) any other initiatives that compromise public safety or promote anti-American values.

(iii) All else being equal, preference for discretionary awards should be given to institutions with lower indirect cost rates.

(iv) Discretionary grants should be given to a broad range of recipients rather than to a select group of repeat players. Research grants should be awarded to a mix of recipients likely to produce immediately demonstrable results and recipients with the potential for potentially longer-term, breakthrough results, in a manner consistent with the funding opportunity announcement.

(v) Applicants should commit to complying with administration policies, procedures, and guidance respecting Gold Standard Science.

(vi) Discretionary awards should include clear benchmarks for measuring success and progress towards relevant goals and, as relevant for awards pertaining to scientific research, a commitment to achieving Gold Standard Science.

(vii) To the extent institutional affiliation is considered in making discretionary awards, agencies should prioritize an institution's commitment to rigorous, reproducible scholarship over its historical reputation or perceived prestige. As to science grants, agencies should prioritize institutions that have demonstrated success in implementing Gold Standard Science.

(c) Nothing in this order shall be construed to discourage or prevent the use of peer review methods to evaluate proposals for discretionary awards or otherwise inform agency decision making, provided that peer review recommendations remain advisory and are not ministerially ratified,

routinely deferred to, or otherwise treated as de facto binding by senior appointees or their designees. Further, nothing in this order shall be construed to create any rights to any particular level of review or consideration for any funding applicant except as consistent with applicable law.

**Sec. 5**. *Revisions to the Uniform Guidance.* (a) The Director shall revise the Uniform Guidance and other relevant guidance to streamline application requirements and to further clarify and require all discretionary grants to permit termination for convenience, including when the award no longer advances agency priorities or the national interest, but subject to appropriate exceptions, including agreements entered into in furtherance of international trade agreements or those awarded by the Department of Commerce under title XCIX of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283), the CHIPS Act of 2022 (Public Law 117–167), or division F of the Infrastructure Investment and Jobs Act (Public Law 117–58).

(b) The Director shall further revise the Uniform Guidance and other relevant guidance to appropriately limit the use of discretionary grant funds for costs related to facilities and administration.

**Sec. 6**. *Implementation and Termination Clauses.* (a) Within 30 days of the date of this order, each agency head shall review the agency's standard grant terms and conditions and submit a report to the Director detailing:

(i) whether the agency's standard terms and conditions for discretionary awards permit termination for convenience and include the termination provisions described in 2 CFR 200.340(a), including the provisions that an award may be terminated by the agency "if an award no longer effectuates the program goals or agency priorities" or, in the case of a partial termination by the recipient, if the agency "determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made";

(ii) whether the agency's standard terms and conditions for discretionary foreign assistance awards permit termination based on the national interest; and

(iii) the approximate number of active discretionary awards at the agency, as well as the approximate percentage of funding obligated under those awards that contains termination provisions allowing for termination under the circumstances described in subsection (i) of this section.

(b) Each agency head shall, to the maximum extent permitted by law and consistent with relevant Executive Orders or other Presidential directives, take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest. Each agency head shall ensure that such terms are included in all future discretionary grants and likewise shall take steps to revise all applicable regulations binding on or incorporated in discretionary grant terms and conditions to require such terms. Agency heads shall take action to incorporate these new terms and conditions into all future amendments to grant awards.

(c) To the extent practicable and consistent with applicable law, agency heads shall insert in future discretionary grant agreements terms and conditions that:

(i) prohibit recipients from directly drawing down general grant funds for specific projects without the affirmative authorization of the agency; and

(ii) require grantees to provide written explanations or support, with specificity, for requests for each drawdown.

**Sec. 7**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

OMB_AR_00008

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

(e) The costs for publication of this order shall be borne by the Office of Management and Budget.

THE WHITE HOUSE,
*August 7, 2025.*

[FR Doc. 2025–15344

Filed 8–11–25; 11:15 am]

Billing code 3110–01–P

OMB_AR_00009