**DECLARATION OF ANN MARIE OLIVA**
**NATIONAL ALLIANCE TO END HOMELESSNESS**

I, Ann Marie Oliva, declare the following under penalty of perjury:

1.       My name is Ann Marie Oliva. I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

2.       I am the Chief Executive Officer of the National Alliance to End Homelessness ("the Alliance"). I have dedicated my career to educating the public on the nature of homelessness and its solutions, and to advancing best practices within the homeless services sector.

3.       I have worked in homelessness assistance for more than 30 years. Early in my career I helped to implement the first U.S. Department of Housing and Urban Development (HUD) funded Continuum of Care (CoC) in the nation (Washington, DC–called the D.C. Initiative), and was for more than nine years a lead member of the District's team that responded to HUD's Notices of Funding Opportunity (NOFOs) for the legacy programs that Congress consolidated in 2009 to form the Continuum of Care Program.

4.       I worked as a HUD technical assistance provider to help CoCs comply with HUD policy and regulations, respond to natural disasters (including Hurricane Katrina), and use data to better inform local decision-making. From 2007 to 2017 (spanning three Administrations), I served as HUD's Director of the Office of Special Needs Assistance Programs, then the Deputy Assistant Secretary for Special Needs and a member of the Senior Executive Service. During my 10-year tenure at HUD, I administered the CoC Program competition, and many of the operational structures that I understand are currently in place were implemented under my leadership. I also oversaw the implementation of the Homeless Emergency Assistance and Rapid

1

Transition to Housing (HEARTH) Act, which modernized and amended the McKinney-Vento Homeless Assistance Act and formally authorized the CoC Program. This included leading the drafting and clearance of applicable regulations, including the current CoC Program Interim Rule. I also partnered with the U.S. Department of Veterans Affairs (VA) to design and implement evidence-based programs for Veterans experiencing homelessness that led to an overall decrease of more than 50 percent in Veteran homelessness nationwide.

5. I have worked directly in communities from coast to coast over the last 10 years, which gives me a sense of operational and political challenges our members experience locally.

6. This experience and corresponding expertise provide me with knowledge and perspective on the CoC Program application and awards process, as well as the harms our members face as a result of HUD's actions.

**A. Overview**

7. On June 1, 2026, HUD issued the FY 2026 Notice of Funding Opportunity (NOFO).

8. The FY 2026 NOFO again imposes sweeping changes to HUD's funding commitments, including a $1.3 billion set-aside that will cap permanent housing investments for people experiencing homelessness. HUD's cut to permanent housing alone will likely force more than 97,000 people back onto the streets and in shelters. Program participants are some of the most vulnerable members of our society and include families with children, unaccompanied youth, people with disabilities (including physical, mental, behavioral, and substance use related), people who are experiencing homelessness for the first time as well as people considered chronically homelessness, people who are fleeing or attempting to flee domestic violence or human trafficking, and people who are older or veterans.

2

9. A return to unsheltered homelessness carries catastrophic consequences for the people whose assistance and support will be de-funded because of this NOFO: exposure to extreme weather events; life-threatening infections; unmanaged chronic illnesses; lack of sobriety supports and relapse; predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations and for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in communities across the country, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life. Responding to years of HUD guidance, CoCs have specifically placed people who are most vulnerable to the harms of homelessness in the PSH units this NOFO will defund.

10. The FY 2026 NOFO is also already beginning to cause harm, and that will get worse come August 11, when CoCs must announce what projects they will include, exclude, or reduce in their applications for funding: CoCs will be forced to eliminate or drastically reduce permanent supportive housing and rapid re-housing programs; CoC-funded permanent housing sites that are cut through the local competitive process will begin to close their doors; impacted providers (especially those whose grant renewal dates are early in the year) will start to wind down operations and lay off staff; and thousands of stably housed individuals and families will face an increased risk of eviction or program displacement. This is a brief and incomplete snapshot of the cascading consequences.

11. At the same time, CoCs and providers also have an urgent need for clarity on what their FY 2026 funding will be.

**B.    About the Alliance and Our Members**

12.    The Alliance has substantial expertise in the factors driving homelessness as well as evidence-based and emerging best practices that end people's homelessness.

13.    The Alliance is a nonprofit, nonpartisan membership organization that seeks to ensure that no American is homeless and does so by mobilizing all sectors of American society in an alliance to end homelessness.

14.    We have more than 10,000 members that span all 50 states. Our members include nonprofit organizations, people with lived experience of homelessness, service providers, practitioners, researchers, funders, businesses, and local and state government entities dedicated to ending homelessness. Our members, many of whom previously or currently receive CoC grants from HUD, focus on making homelessness in the United States a rare, brief, and a one-time occurrence through the provision of coordinated, compassionate, and high-quality homelessness response services.

15.    The Alliance's members play a significant role in the organization in at least three ways.

16.    First, Alliance members guide the Alliance's agenda and activities. Members sit on a series of formal councils and advisory bodies that advise the Alliance on its various workstreams, including its Leadership Council, Research Council, Community Strategic Team (Lived Experience Advisors Council), and Capacity Building Network. Members also guide the Alliance's activities by shaping the content and agenda of the Alliance's biannual conferences, which act as a central forum for members and other community leaders to share best practices and lessons learned from their communities, drive innovations, and build lasting solutions for ending homelessness. Alliance members help shape those conversations by responding to calls

4

for presentations with proposed talks and panels and by filling out robust surveys at the end of conferences that inform future conferences.

17.    Second, Alliance members provide crucial financial support that facilitates Alliance activities. Members pay registration fees that provide up to 85 percent of the funds necessary to run the annual conferences, and some members provide direct donations that fund the Alliance's broader activities.

18.    Finally, Alliance members comprise roughly a quarter of the Alliance's Board of Directors. In that capacity, Alliance members play a direct role in leading the organization, setting priorities, and in selecting Alliance leadership, including future board members and the Alliance officers.

19.    Because we have an agenda that reflects the needs of our members, we are able to effectively serve them by: (1) conducting and disseminating research that provides data and support for effective, evidence-based solutions to end homelessness; (2) educating opinion leaders and policymakers about proven strategies and advocating for policies that support sustainable solutions to ending homelessness; (3) collaborating with public and private sectors to build the capacity of local communities and CoCs to implement solutions; (4) offering intensive, on-the-ground technical assistance tailored to its members' local needs, including how to manage the CoC or track data; and (5) fostering a collaborative approach to ending homelessness by convening members across the country—through annual conferences and other fora—to share best practices and learn from one another.

20.    The Alliance also offers its members specific services regarding the CoC grant program, including analysis and training on HUD's policy and funding priorities. Such services facilitate the ability of Alliance members to compete for and comply with grants issued under the

CoC program. In addition, we analyze grant requirements issued in NOFOs and advise our members on how to create the most effective, efficient, and equitable homeless response system under a competition's process and requirements. Our reach in this area is broad—for example, over 3,500 people registered for our most recent webinar on the FY 2026 NOFO.

**C.    The Continuum of Care Program**

21.    The CoC Program funds critical housing and services to support individuals and families experiencing homelessness, mainly by accessing and maintaining permanent housing. The CoC Program currently funds nearly 7,000 individual projects. The primary goal of a CoC is to end homelessness in a specific geographic area through the development and implementation of unified, community-wide strategy to prevent and end homelessness. Key responsibilities of CoCs include, but are not limited to: coordinating all aspects of services for individuals and families experiencing homelessness, from street outreach to emergency shelter, transitional housing, and permanent housing; managing funding to operate the Continuum of Care Program, which involves planning how to use HUD funding to support the community's homeless population; collecting data such as annual or biannual counts of the homeless population (point-in-time counts), as well as an annual enumeration of emergency shelters, transitional housing units, permanent housing beds and other beds/services that make up a community's homeless assistance system; and fostering collaboration among a wide range of partners to ensure that services are delivered efficiently and effectively.

22.    Permanent housing and funding stability have been cornerstones of the Continuum of Care (CoC) Program since its creation.

23.    The HEARTH Act requires HUD to provide incentives for CoCs to use funding for "activities that have been proven to be effective at reducing homelessness." 42 U.S.C. § 11386b(d)(1). Congress identified two (and only two) activities that meet that bar, and both are

permanent housing strategies: (1) permanent supportive housing for chronically homeless individuals and families and (2) rapid re-housing for homeless families. *Id.* § 11386b(d)(2). Congress also authorized HUD to identify other proven-effective strategies based on research and after notice and comment, but HUD has never done so.

24.     Congress also required that minimum amounts of funding be directed to permanent housing projects for certain populations. In particular, at least 10 percent of appropriated funds must go toward permanent housing for homeless families with children. 42 U.S.C. § 11386b(b). In addition, so long as it would leave enough funds available to renew all existing projects, 30 percent of appropriated funds must go to new permanent housing projects for individuals and families with disabilities. *See id.* § 11386b(a)(1), (2), (4).

25.     Today, nearly 88 percent of the CoC Program's funding goes to permanent housing approaches.

26.     But permanent housing cannot operate effectively without confidence in the stability of the funding. Therefore, in the CoC Program Congress also appropriately prioritized stability for communities, projects, and formerly homeless people by protecting the opportunity of existing grants to be renewed.

27.     Congress protected CoCs' ability to obtain renewals of existing projects by ensuring that they could apply for enough funding to cover those renewals. In general, the statute requires HUD to consider "the need within [each CoC's] geographic area" when making awards, and it treats that need as the geographic area's "estimated grant amount." 42 U.S.C. § 11386a(b)(2). That need amount is determined by a regulatory formula that looks to factors related to population size and poverty. *Id.*; *see also* 24 C.F.R. § 578.17(a)(3). But if that is not

enough to renew all existing grants for the area, the higher amount—the amount needed to renew all expiring grants—will govern. 42 U.S.C. § 11386a(b)(2)(B)(iii).

28.    Congress also provided further protections for renewals of existing permanent housing projects in order to maximize business continuity and stability, and therefore the ability for projects to operate effectively over time. To do this, Congress mandated that funding appropriated for the CoC Program be available to renew permanent housing awards. *See* 42 U.S.C. § 11386c(b). It also limited HUD's discretion to deny renewals. In particular, the statute requires HUD to determine whether to renew existing permanent housing awards based on the CoC's certification as to two things only—that a demonstrated need for the project remains and that the project complies with program requirements and appropriate quality and habitability standards. *Id.* § 11386c(b). The statute makes clear that this is not meant to limit HUD's ability *to renew* existing projects in accordance with other statutory sections. *See id.* § 11386c(c). But it does not authorize HUD to reject renewals based on any other factors. *See id.*

**D.    The CoC Program Competition Application Process**

29.    Congress codified the CoC Program into law to modernize the federal government's approach. It supports a community-based approach to addressing homelessness that enables local and regional entities to coordinate strategies best suited to the particular needs of their geographic areas. The statute accordingly recognizes local "continuums of care" (CoCs)—coalitions composed of representatives of various entities involved in addressing homelessness as well as people with lived experience of homelessness—that are responsible for addressing homelessness within their localities or regions.

30.    Consistent with that community-wide approach, the application for CoC funding happens at the community level. Each CoC must designate a "collaborative applicant" that will apply for funding on behalf of the whole community.

31.     The statute and binding regulations establish the maximum amount that each geographic area is eligible to receive. *See* 42 U.S.C. § 11386a(b)(2); 24 C.F.R. § 578.17(b). This amount is meant to reflect the community's relative need. The need amount is determined by a regulatory formula that looks to factors related to population size and poverty, or by the amount needed to renew all expiring CoC grants for one year (called the Annual Renewal Demand, or ARD), whichever is higher. 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(a)(3). Currently, for most CoCs, ARD is higher than the formula-based amount. This framework ensures that communities can apply for enough funding to continue serving people in existing programs— either by seeking renewal of successful projects or reallocating that funding to another project that can better serve those people.

32.     This statutorily defined need amount is the maximum amount for which each CoC can apply (not including bonus funding). HUD must inform CoCs of this amount when it issues a NOFO so that CoCs know the total amount they are permitted to apply for on behalf of their communities.

33.     After HUD issues a NOFO for CoC funding, the CoC must run a local competition to select the projects it will include in the CoC's application to HUD. In other words, individual service providers submit applications for particular projects to the CoC's collaborative applicant, and the collaborative applicant then submits a CoC-wide application to HUD. That CoC-wide application puts forth the projects that the collaborative applicant selected in the local competition, in ranked order (called the "priority listing").

34.     In general, projects must apply through this locally run competition and cannot apply to HUD on their own. The only exception to this rule is referred to as the "Solo Application" process, which is reserved for rare instances when an applicant attempted to

participate in the local competition but was unreasonably excluded from participating by the CoC.

35.    Although the NOFO sets forth the general criteria and process by which HUD will select projects for funding, it does not provide CoCs or project applicants with all of the information they need to apply. Rather, HUD must also make the actual application available on its online grant portal, "e-snaps." This application provides the questions that CoCs and project applicants must answer to get points as described in the NOFO. This is normally accompanied by a "detailed instructions" document that provides guidance on how to respond to these questions. For example, the NOFO may indicate that there are 3 points available related to whether the CoC has implemented street outreach procedures to ensure all persons experiencing homelessness are aware of the housing and services providers within the CoC's geographic area. The question(s) in the application, accordingly, may require CoCs to describe how often street outreach encounters lead to permanent housing, or require submission of data to support permanent housing placements by outreach providers. The detailed instructions may include information about how to fill out the budget chart for each application type or how to document match funding.

36.    A collaborative applicant and its project applicants need all three of these documents (the NOFO, the CoC and project applications, and the detailed instructions) *and* the CoC's ARD in order to confidently both complete the local competition and submit an application to HUD.

37.    Once applications are submitted to HUD, HUD then evaluates CoCs' applications and awards funds through a competitive process that considers criteria that are largely based on the CoC's application overall. For instance, HUD must look to factors like "the methodology"

the CoC used to "to determine the priority for funding local projects," the CoC's plan for reducing homelessness and achieving related goals, and the CoC's "previous performance" in achieving certain outcomes in the community. *See* 42 U.S.C. § 11386a(b)(1).

38.    Because CoCs apply at the community-wide level, and because HUD must consider a CoC's overall application in making funding decisions, project applications are interdependent. If a CoC includes a disfavored project on its application, that can drag the entire CoC's application down and reduce other projects' likelihood of selection as well. And if the CoC includes projects that are not ultimately selected, that represents a loss to the entire community. That loss, moreover, has effects that will last long past the current funding year. In most instances, the base amount that CoCs can apply for is limited to the amount needed to renew their existing grants. So, if the CoC receives less grant money this year, that will reduce the amount it is even eligible to apply for in subsequent years.

**E.    The FY 2026 NOFO**

39.    On June 1, 2026, HUD issued a NOFO announcing the competition for $4.04 billion in CoC funding for FY 2026. HUD estimates it will make approximately 7,000 awards under this NOFO.

40.    Despite releasing the FY 2026 NOFO on June 1, HUD still has not informed CoCs of the amounts they are eligible to apply for, despite the statutory requirement that it do so concurrently with issuing the NOFO. *See* 42 U.S.C. § 11386a(b)(2)(A). This means that CoCs do not know the bottom-line amount they can apply for overall, and it also means they do not know the amounts for which they can apply for CoC Bonus funding, DV Bonus funding, and CoC Planning and Unified Funding Agency grants, which are tied to either the CoC's preliminary pro rata need (the need amount as determined by a regulatory formula) or final pro rata need (which is the higher of the preliminary pro rata need or the amount needed to renew all expiring grants).

11

*See* FY 2026 NOFO at 11, 12, 25, 90. It also means that CoCs do not know how much funding they can receive in Tier 1 (which, as explained further below, corresponds to the amount of funding that HUD must award according to CoCs' selections, without nationwide competition). That is particularly problematic under this year's NOFO because, given the Set-Aside discussed below, permanent housing projects listed in Tier 2 are exceedingly unlikely to get funding. So, if a CoC misestimates its Tier 1, it could accidentally place a permanent housing project partially or completely in Tier 2 (thinking that was still Tier 1). That would result in all new projects in Tier 2 receiving lower scores—and lower likelihood of selection—while the permanent housing project would also have a vanishingly small chance of receiving funding.

41.    HUD has also failed to post the actual applications in e-snaps and corresponding detailed instructions, leaving CoCs and project applicants to guess what various criteria mean or what information they will need to provide with only 25 days remaining before CoCs must inform applicants of whether their applications will be accepted, rejected or reduced.

42.    Communities are unclear on many aspects of the NOFO, and to date HUD has failed to provide timely or complete answers to questions, even where such answers are needed to submit an application. On June 4, 2026, HUD held a meager 16-minute webinar about the NOFO with no substantive guidance provided, and no opportunity for applicants to ask questions. Further, neither the question and answer (Q&A) nor chat functionality was enabled on the webinar platform. Many members report that they have emailed HUD at the address HUD provided for questions about the NOFO, but that their questions have gone unanswered for weeks.

43.    Even so, communities have done their best to understand the incredibly complex and convoluted selection process that the FY 2026 NOFO puts forth. As communities have

analyzed this NOFO and prepared to apply, its impacts have become more and more clear. The NOFO is already causing massive instability in communities and, if implemented, would devastate communities' homelessness response systems by stripping funding from existing permanent housing projects regardless of merit and by directing funding to strategies not proven effective at reducing homelessness.

44.      Further contributing to the chaos, late afternoon on July 16 (the day before this filing), HUD announced its "intent to modify" the FY 2026 NOFO. HUD, *Continuum of Care Competition*, https://perma.cc/D7WJ-PTTR. It posted a "preview" version of the modified NOFO that is "not yet effective," but that HUD will "make effective" at some time in the next week, "pending further agency deliberation." The "previewed" modification introduces an entirely new process for certain CoCs (including one it has already identified) that will deepen the chaos in those regions.

### 1.      A massive set-aside for new transitional housing and supportive-services-only projects will defund permanent housing and renewals

45.      The FY 2026 NOFO adopts a massive and unprecedented set-aside for new projects, with a heavy priority for transitional housing and supportive-services-only projects (Set-Aside). In particular, it sets aside $1.3 billion for new projects only, despite Congress's command that appropriated funds be available to renew existing projects, and despite the fact that this set-aside guarantees that significant numbers of existing projects will be ineligible for renewal, no matter how effective. Worse, the set-aside is principally available only for new transitional housing and supportive-services-only projects. New permanent housing projects can receive a share only if that money remains after HUD makes awards to *all* transitional housing and supportive-services-only projects that applied. Given the total amount of funding available, this set-aside acts as a de facto cap on existing permanent housing projects.

46.     The FY 2026 NOFO implements this set-aside through a waterfall that designates the order in which projects will be funded. FY 2026 NOFO at 88–89. First, HUD will award certain administrative grants to each CoC. Then, it will make awards that CoCs included in their Tier 1—i.e., the top portion of each CoC's priority listing—so long as they pass "eligibility thresholds." (As required by a recently enacted statute, the NOFO allows CoCs to list projects totaling 60 percent of the amount needed to renew all the CoC's existing grants in Tier 1.) Then, it will ensure that funds are allocated to satisfy congressionally mandated earmarks—$104 million for certain types of projects to assist victims of domestic violence and $430 million for permanent housing for families with children. If those statutory minimums were not already satisfied through the awards to Tier 1 projects, then HUD will select additional projects by score until it meets the minimum allocation requirements. Next, it will select new transitional housing or supportive-services-only projects ranked in Tier 2 in order of project score until $1.3 billion in new projects have been selected. Then, if and only if there are not enough transitional housing and supportive-services-only projects to reach $1.3 billion, HUD will allocate funding to other new projects, in order of project score, until it reaches $1.3 billion. Finally, once it reaches $1.3 billion in new projects, it will award the remaining funds—if there are any—to existing projects in order of score.

**2.     Selection criteria effectively force communities to abandon proven strategies**

47.     The FY 2026 NOFO sets out four levels of review that HUD will conduct: threshold review, "merit" review, "risk" review, and additional factors that HUD will consider. "Merit" review applies only to Tier 2 projects, but the other levels of review apply to both Tiers. At each level, HUD pushes unproven and ineffective strategies at the expense of proven ones.

14

### a. *Amorphous "risk review" and additional criteria threaten to reject projects on virtually any grounds*

48.    The NOFO provides that HUD retains discretion to reject applications based on a host of amorphous factors ("Risk Review" and "Additional Factor" Criteria) that effectively give HUD free reign to deny awards on virtually any grounds.

49.    The NOFO states that all projects must pass "risk review," which looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project." FY 2026 NOFO at 86. The NOFO provides various undefined criteria for assessing that, such as the applicant's "[a]bility to promote self-sufficiency and economic independence." *Id.* at 87. It also looks to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal" and with no explanation of what HUD deems "illegal." *See id.* at 87. The NOFO also states that HUD will rely on potentially biased or unverified information, such as "news reports," to assess applicant's past performance. *Id* at 86*.*

50.    The NOFO reserves to HUD the option to consider—and reject projects based on—amorphous additional factors after completing all other review steps. *Id.* at 87. These other factors include things like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a "[b]road range of recipients beyond recurrent recipients." *Id.* Although the NOFO says that HUD will consider these additional factors "to the extent allowed by law," it does not provide any additional explanation of when it views itself as permitted to consider these factors or provide any explanation as to what these factors mean.

51.    This "risk review" and consideration of additional factors give HUD substantially more unfettered discretion than ever before to reject applications.

52.    The inclusion of these amorphous factors—and the accompanying threat that HUD might reject any project it does not like—distorts CoCs' decision-making in selecting the projects to include on their applications. In particular, these factors pressure CoCs to screen out projects that HUD might reject for ideological reasons (such as a history of promoting diversity, equity, and inclusion) and to otherwise conform to HUD's wishes, to reduce the risk of being rejected on some subjective ground.

### b.    Threshold and merit criteria effectively force communities to abandon proven strategies

53.    The FY 2026 NOFO contains a host of threshold and merit criteria that, individually and in combination, effectively force communities to defund proven strategies in favor of unproven and ineffective ones.

54.    Threshold review criteria apply to all projects—both at Tier 1 and Tier 2. Threshold review determines if an individual project is eligible for funding on a pass/fail basis. If a project fails to meet any threshold requirement, it is disqualified from eligibility and any further consideration for funding. FY 2026 NOFO at 58. For some threshold requirements for new projects, the NOFO lists multiple criteria, each with separate point values, and requires projects to attain a minimum point value to be eligible, but not necessarily to satisfy all listed criteria. FY 2026 NOFO at 63–69. However, the NOFO further provides that, if the project is selected, it must meet *all* listed threshold criteria before its grant will be executed. FY 2026 NOFO at 62.

55.    Merit review applies only to projects in Tier 2. At the merit review stage, HUD evaluates the CoC's application overall and assigns the CoC a score. To calculate that score,

HUD assigns points for various "merit criteria" that look to the CoC's activities and the overall composition of projects in the CoC's application. That CoC score then factors into a separate score that HUD assigns individual projects. The individual project score is based on the CoC's score (worth 50 percent), how highly the project was ranked in the CoC's application (worth 40 percent), and whether the project mandates participation in supportive services (worth 10 percent). *Id.* at 90. At each level of the waterfall described above (after Tier 1), projects are generally selected in order of their project score, unless they are disqualified based on HUD's review of "risk" or additional factors. *See id.* at 89. It is important to note, however, that score only matters within each level of the waterfall. In other words, a low scoring new transitional housing project will be funded well before a higher scoring permanent housing project—if any permanent housing projects can be funded at all in Tier 2 given the total amount available and the selection process outlined in the NOFO.

56.    Through both threshold and merit criteria, the NOFO pushes CoCs to abandon the practices that research and experience have proven are most effective at minimizing homelessness, including a "Housing First" approach —which prioritizes providing housing to people without any preconditions like sobriety, employment, or participating in treatment or other services—and to impose service requirements instead (Service Requirements Criteria); to stop all harm reduction activities in their communities (Anti-Harm Reduction Criteria); and to promote unproductively punitive law enforcement responses to homelessness (Law Enforcement Criteria). *See* FY 2026 NOFO at 28–34. That Law Enforcement Criteria include points for CoCs that do not take actions that "interfere with" local efforts to advance the objectives of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender

Registry and Notification Act (SORNA)" (Local Policies Criterion). FY 2026 NOFO at 80–81. This deters CoCs from advocating against those types of local efforts.

57.    ***Non-statutory threshold criteria for Tier 1 projects.*** An overarching problem is that the NOFO requires Tier 1 projects to meet threshold criteria that have no grounding in the statute or regulations, but rather implement HUD policy objectives. This is improper as applied to Tier 1 projects because Congress provided that, for FY 2026, HUD *must* award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of funding, CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. Nonetheless, HUD has imposed threshold requirements that are not limited to requirements imposed by statute and regulation.

58.    For example, to obtain certain points toward meeting the minimum required to pass threshold review, projects must have a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark; and must provide services in a way "that will result in" *all* program participants participating in services at least 20 hours per week; must "partner[] with first responders and law enforcement" and "cooperate … with the enforcement" of public camping and public drug use laws; and must show that the support offered will help participants achieve "self-sufficiency" (which the NOFO incorrectly defines to mean no reliance on any public or private assistance, even from mainstream programs) within 24 months. FY 2026 NOFO at 6, 63–65, 67–68.

59.    ***Service Requirements Criteria.*** The FY 2026 NOFO includes multiple criteria that pressure CoCs to put forth applications for projects that mandate services. For projects

18

subject to merit review, the NOFO makes mandating services the single largest individual scoring factor affecting projects' likelihood of selection within each level of the waterfall. In particular, out of the 100 possible points available to a project, projects will receive up to 10 points if "they have or will incorporate supportive service participation requirements." FY 2026 NOFO at 90. By comparison, projects can receive a total of 50 points for their CoC's score on the dozens of other merit criteria combined. *See id.* In addition, in the "merit" review of the CoCs' overall application, the NOFO assigns points for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, *id.* at 79; demonstrating certain numbers of CoC-funded units mandating substance abuse treatment as a condition of participation in the program, *id.* at 78; and for not restricting CoC-funded housing projects from requiring treatment or sobriety as a condition of assistance, *id.* at 85. Threshold criteria also pressure CoCs to put forth projects that impose service requirements by assigning points based on the results the project will receive. That prediction of the future necessarily requires a subjective assessment—and applicants know that HUD will evaluate that through its anti-Housing-First lens.

60.    ***Anti-Harm Reduction Criteria.*** At the threshold review stage, the FY 2026 NOFO disqualifies applicants that do not certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863" (Safe Drug Use Certification). FY 2026 NOFO at 60; *see also id.* at 108. This requirement applies not just to the grantees' use of grant funds, but also to any activity the grantee engages in, even with non-federal funds. While the condition states only that grantees may not engage in activity that other

19

laws already prohibit, Defendants appear to have an expansive view of what those laws prohibit, and have included this condition to deter lawful harm reduction activities. In addition, at the merit review stage, the NOFO assigns 10 points to CoCs that "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" FY 2026 NOFO at 85. To obtain these points, a CoC would have to bar projects from operating harm reduction services even with the project's own, non-CoC funding.

61.     ***Law Enforcement Criteria.*** At the threshold and merit review stages, applicants must cooperate with first responders and law enforcement to receive certain points, including by helping enforce local laws on public camping and public drug use. *Id.* at 65, 80. In addition, to receive certain merit points, a CoC must show that it does not take actions that (in HUD's judgment) "interfere with" local efforts to advance the objectives of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)." *Id.* at 80–81. This appears to broadly penalize CoCs that advocate against or otherwise express opposition to the policies that the NOFO favors.

### c. *Self-sufficiency criteria conflict with Congress's intent and ignore challenges some populations face*

62.     The FY 2026 NOFO also adopts multiple criteria (Self-Sufficiency Criteria) that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"—which the NOFO (improperly) defines as "the ability to meet basic needs,

including a place to live, *without public or private assistance.*" FY 2026 NOFO at 6 (emphasis added).

63.     In particular, for renewal projects to pass threshold review, the NOFO states that HUD will assess the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." *Id.* at 61. Projects that fail HUD's assessment will be disqualified from consideration. Similarly, at the "Risk Review" stage, HUD identifies a project's "[a]bility to promote self-sufficiency and economic independence" as a "sufficient and independent basis" to reject an application. *Id.* at 87. This also fails to account for the statutory selection criteria requirement that performance measures account for the challenges faced by the program participant. 42 U.S.C. § 11386a(b)(1)(A) (providing that criteria for awarding funds shall take into account "the previous performance of the recipient regarding homelessness" as measured by criteria "that shall take into account barriers faced by individual homeless people").

64.     The McKinney-Vento Act makes clear that Congress did not intend to advance that particular notion of "self-sufficiency"—and did not establish a goal of moving unhoused people, particularly those with disabilities, off of public benefits. Indeed, far from aiming to end homeless individuals' reliance on any assistance, Congress specifically directed CoCs to *promote* access to, and use of, other mainstream programs that could assist those populations, such as Medicaid or the Supplemental Nutrition Assistance Program. *See* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B). And, consistent with the statute, HUD has long considered increasing participants' benefits-based income to be a sign of strong performance. *See id.* § 11386a(b)(1)(A)(v). Indeed, the NOFO's conception of "self-sufficiency" fails to account for the realities of serving certain communities. For example, many program participants

have disabilities, trauma histories, or safety needs that require ongoing support and create barriers to achieving the type of "self-sufficiency" the NOFO envisions.

### d. A preference for people with certain disabilities discriminates against people with other disabilities

65. The FY 2026 NOFO also announces a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority). In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." FY 2026 NOFO at 30. Based on that discriminatory premise for which the Administration provides no evidence to support, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities and creates a second-class tier of disabilities that excludes and harms individuals with mental health disabilities and substance use disorders.

66. The NOFO does not award points based on this priority, but the statement that this population "should be prioritized" pressures applicants to do just that, given that HUD requires applications to "support the goals of this NOFO" and retains discretion to reject or select projects based on their "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected." *Id.* at 11, 87.

### e. Eligibility limits for CoC Bonus funding unfairly disadvantage communities with relatively higher need

67. The FY 2026 NOFO also establishes arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits), and those limits systematically disadvantage communities with higher relative need in favor of communities with lower relative need.

22

68.     Bonus funding is an amount that CoCs can apply for on top of their statutorily defined need. *See* 24 C.F.R. § 578.17(b)(4). No community in the entire country has enough resources to meet their overall need.

69.     The NOFO provides for a "CoC Bonus," which is an additional amount that CoCs can apply for, for "new project[s]," beyond their statutorily defined need. *See* FY 2026 NOFO at 11–12. The NOFO provides that each CoC can apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need—but further establishes minimum and maximum award amounts that actually make CoCs eligible for widely diverging amounts. *Id.* The specific floors and caps vary based on whether the CoC split or merged in the last three years or not. As an example, the bonus for a CoC that neither split nor merged is a minimum of $500,000 (even if 15 percent of its need is lower) and a maximum of $5 million (even if 15 percent of its need amount is far higher).

70.     This means that the amounts CoCs can apply for bear little relation to their actual demonstrated need.

71.     The Bonus Limits systematically disadvantage larger CoCs with more people experiencing homelessness and more need in favor of smaller CoCs with relatively lower numbers of people experiencing homelessness. It does this in two ways.

72.     First, CoCs with higher relative need cannot compete for as much funding (in relation to their need) as CoCs with lower relative need.

73.     Second, the bonus limits disadvantage larger CoCs with greater relative need in competing for their statutorily defined need amounts that are ranked in Tier 2. That is because in Tier 2 scoring, HUD assigns projects up to 40 points each based on how CoCs prioritize projects within the funding available to that CoC—funding that includes statutorily defined need *and*

Bonus funding. See NOFO at 90. So, projects ranked towards the top of the list receive significantly more points than those at the bottom.

74.     This means that for smaller CoCs, even projects that are for funding beyond their statutorily defined need (that is, funding needed to maintain services in their communities) may score higher than a project for a larger CoC that is within their statutorily defined need. That's because smaller CoCs have a much larger Tier 2 amount relative to the size of their statutorily defined need, so a project in the middle of their Tier 2 list may be outside of their statutory need amount, but still receiving a relatively high Tier 2 score under the NOFO's formula. Meanwhile a larger CoC could have a project that is within its statutorily defined need, and because it's towards the bottom of its list (as a result of the Bonus Limit's ceiling), it would receive a much lower score under the NOFO.

75.     An example helps illustrate this. Take two CoCs: a large one with $100 million in statutorily defined need and a small one with $1.5 million in statutorily defined need. Because of the Bonus Limits, the larger CoC would be eligible for $5 million in CoC bonus funding, while the smaller CoC would be eligible for $500,000 in CoC bonus funding. Imagine each puts forward an identical $500,000 project and ranks it towards the bottom of the portion of their list that goes towards meeting their statutorily defined need. The larger CoC's project would score approximately 8 out of 40 available points based on their ranking placement—because it's close to the bottom of its list. But the smaller CoC's project would score approximately 30 points— because with the Bonus Limit floor, their list can continue for many more projects—even though that is beyond their statutorily defined need. And if they both received perfect scores of 60 on the other, "merit"-based criteria, the large CoC's project would score 68, while the smaller CoC's identical project would score 90—and be much more likely to receive funding. Thus, the Bonus

Limits—through an incredibly byzantine selection process—systematically disadvantage CoCs with higher relative need in favor of CoCs with lower relative need.

### 3. Post-award conditions impose ideological and other restrictions not authorized by Congress

76.    The FY 2026 NOFO requires successful grantees to agree to award conditions (Post-Award Conditions), many of which are the same as or similar to conditions that courts have repeatedly held likely unlawful.

77.    ***E.O. Conditions.*** The NOFO states that grantees "must follow … Presidential Executive Actions affecting federal financial assistance programs" (E.O. Conditions). FY 2026 NOFO at 106–07. The NOFO lists 11 executive orders that grantees must follow, including:

a.    Executive orders that broadly seek to eradicate all diversity, equity, and inclusion activities. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order 14173; *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14151; *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332;

a.    Executive orders that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized. *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168 ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 (Grantmaking Executive Order);

b.    An executive order that purports to bar grant funds from being used to fund or promote elective abortion. *Enforcing the Hyde Amendment*, Executive Order 14182;

25

c.  An executive order directing the end of "support for 'housing first' policies."

*Ending Crime and Disorder on America's Streets*, Executive Order 14321

(Homelessness Executive Order); and

d.  An executive order that mandates verifying immigration status and seeks to

ensure "that Federal payments to States and localities do not, by design or

effect, facilitate the subsidization or promotion of illegal immigration, or abet

so-called 'sanctuary' policies that seek to shield illegal aliens from

deportation." *Ending Taxpayer Subsidization of Open Borders*, Executive

Order 14218.

78.  The NOFO also separately requires grantees to comply with "Immigration

Requirements" set forth in the *Ending Taxpayer Subsidization of Open Borders* Executive Order.

FY 2026 NOFO at 107.

79.  These executive orders instruct federal agencies on what to do but do not purport

to impose obligations on the public. Nonetheless, the NOFO's requirement that grantees

"follow" or "[c]ompl[y] with" these executive orders appears to require grantees to act in

accordance with those orders' policies. And these requirements cause grantees to fear that they

will face potentially ruinous False Claims Act litigation and liability if they are found to promote

diversity, equity, and inclusion; to respect transgender and nonbinary individuals' gender

identities; or to engage in other lawful activities.

80.  ***Safe Drug Use Condition.*** The NOFO also includes a post-award condition (Safe

Drug Use Condition) requiring grantees to commit to not violating various drug-related laws. FY

2026 NOFO at 108. This mirrors the threshold Safe Drug Use Certification requirement

described above and appears meant to deter lawful harm reduction activities.

26

81.     *Judicial Restriction.* The FY 2026 NOFO includes a provision (Judicial Restriction) that purports to restrict courts' ability to grant relief that would extend beyond the boundaries of that court's district. In particular, the NOFO provides that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction." FY 2026 NOFO at 108.

## F.   In adopting the FY 2026 NOFO, HUD has disregarded many important considerations, misconstrued and ignored evidence, and failed to consider alternatives

82.     The FY 2026 NOFO does not consider the significant evidence that demonstrates the most effective approaches to addressing homelessness.

### 1.     HUD's justifications for this NOFO fall flat

83.     On July 13, 2026, HUD produced the administrative record for the FY26 CoC NOFO. This collective justification for the NOFO included two memos—the first was from Caitlyn McKenney, Deputy Assistant Secretary for Community Planning and Development's Office of Special Needs, regarding "Review FY26 CoC NOFO," (hereinafter the "NOFO Memo"). It is a recommendation memo outlining the "policy goals and objectives" proposed in the FY2026 NOFO. The second is a memo from Dr. Robert Marbut, Senior Policy Advisor, regarding "Homeless Policy Forms – CoC Program," which provided a purported summary of approximately 40 forums on the topic of "homelessness and the CoC program" (hereinafter the "Marbut Memo").

84.     **CoC Program Context and History is Lacking.** The AR displays a stunning lack of understanding of the CoC program requirements and the history of the program. For example: (1) the NOFO Memo repeatedly discusses an abrupt shift towards Housing First in 2013, when in fact HUD and other federal agencies had repeatedly adopted and promoted Housing First for years prior; (2) the slide deck that accompanies the Marbut Memo significantly

27

misunderstands key aspects of the CoC program, including stating that HUD "Cut[s] CoC NOFA Funding for Emergency Shelters" in 2013, when in fact the CoC program has never included emergency shelter as an eligible activity; (3) the NOFO Memo repeatedly confuses and conflates Housing First and permanent housing, two related but different interventions to address homelessness; (4) the NOFO memo consistently states that HUD has not allowed providers to require case management services when, in fact, HUD's own regulations *require* case management in Rapid Re-Housing Programs, and providers are allowed to require some non-disability related services like case management to ensure smooth program operation; 5) the NOFO Memo incorrectly states that no new Transitional Housing (TH) or Supportive Service Only (SSO) programs have been allowed, even though HUD has historically allowed these interventions when they have been needed and supported by the evidence—for example, TH is an eligible component for CoC-Youth Homelessness Demonstration Program (YHDP) grants and SSOs were specifically allowed in HUD's Special CoC NOFO for Unsheltered and Rural projects (SNOFO); and 6) the NOFO Memo asserts that YHDP renewals have only been awarded "non-competitively," which fails to acknowledge the critical context that the one time HUD *did* award YHDP renewals competitively (in 2023), Congress immediately expressed its displeasure at the change, including appropriations report language about it the following year.

85.     **Misleading or Incorrect Data.** HUD consistently mischaracterizes or misuses data in the AR. The NOFO Memo relies heavily on non-academic citations, including press clippings from dubious sources, to support HUD's position. Where legitimate academic citations are included, HUD's descriptions generally fall into three categories: omission of pertinent literature, misrepresentation/mischaracterization of the literature, or selective representation

regarding findings of the research. Further, the slide deck misleadingly mixes data sources and lacks clear/accurate labels for the information it presents.

86.     **Lack of Evidence for Transitional Housing or Supportive Service Only Programs**. Although HUD spends a lot of time in the NOFO Memo incorrectly refuting the efficacy of permanent housing and/or Housing First, it provides zero evidence as to the efficacy of TH or SSO programs as contemplated in the NOFO. It does include a report about transitional housing for youth and young adults, but transitional housing for that population is already allowed through the YHDP projects.

87.     **McKinney-Vento Act Requirements**. Throughout the NOFO Memo, HUD does not consider key aspects and requirements of the authorizing legislation in recommendations regarding the FY2026 NOFO, as described throughout this declaration.

88.     **Alternative Approaches**. Maybe most importantly, HUD does not even fleetingly consider other ways to reach their policy goals that would not result in de-funding a major portion of the nation's permanent housing programs for people experiencing homelessness. For example, they could submit a proposal to Congress to fund a demonstration program on a modernized type of transitional housing – which would serve the dual purpose of funding new projects that align with their approach and developing evidence for the model. Or, they could take a similar approach to the one used by HUD for the *Special NOFO to Address Unsheltered and Rural Homelessness*, by asking Congress for permission to use Section 231 (recaptured) funds to award new transitional housing and service projects. They could also work closely with the U.S. Department of Health and Human Services to align resources to ensure behavioral health and health services are available to CoC program participants. Yet, according

to the NOFO Memo, they don't even consider these more humane and effective options that would not result in the displacement of thousands of people from their homes.

### 2.    HUD failed to accurately characterize the feedback it received

89.    The Marbut Memo purports to summarize the "listening sessions" he has held across the country. The memo is undated, but it is clear it does not reflect contemporaneous notes from each meeting; it is a high-level summary after the fact that lacks nuance and fails to include information shared by attendees not aligned with his ideologies and approaches to homelessness. The threadbare summary also states that there was "general consensus" among attendees on certain points, including that Housing First is not working and there is a need to reduce renewals. Our members attended many of these listening sessions (both those that were and were not invite-only) and shared very different takeaways; there was not a consensus on these topics, suggesting that the Marbut Memo does not accurately reflect these sessions. For example, our members reported that the meetings did not allow for differing perspectives and ideas—when they tried to share their experiences and concerns, they were shut down. Our members did not find that the large majority of attendees were in agreement with the principles set forth in the Marbut Memo. Many questions went unanswered by HUD. Further, the slide deck that Dr. Marbut used in these meetings was similarly flawed, including incorrect, confusing, and misleading data.

### 3.    Causes of homelessness

90.    Much of the FY 2026 NOFO is based on the premise that because homelessness has increased in past years, our country's approach to addressing homelessness must be a failure. HUD points to Housing First and the prioritization of permanent housing as the reasons why homelessness has risen.

30

91.     The evidence tells a very different story. First, the recently released 2025 Annual Homelessness Assessment Report (AHAR) found that the country experienced a 3.3 percent decrease in homelessness from 2024 to 2025. This decrease cuts against HUD's sweeping claims in the NOFO. The 2025 AHAR also made clear that there are permanent housing units available for less than ten percent of people who need them. This supports a finding made in the 2024 AHAR, which concludes that the nation is suffering an affordable housing crisis, rising inflation, and stagnating wages, all significant contributors to homelessness in the United States.

92.     The NOFO and the NOFO memo rely on the 2024 AHAR, but the report does not support the conclusions HUD makes. Notably, nowhere in the report analyzing the national and local causes (as reported by CoCs across the country), does HUD identify "Housing First" or prior HUD policies as a reason for the previously rising homelessness rates. The same holds true for the 2025 AHAR, which was released earlier this year.

93.      A growing body of research suggests a strong connection between homelessness and housing affordability – or the lack thereof. A 2023 report by Pew Charitable Trust notes "a large body of academic research has consistently found that homelessness in an area is driven by housing costs, whether expressed in terms of rents, rent-to-income ratios, price-to-income ratios, or home prices."[1] A more recent report from the Joint Center for Housing Studies of Harvard University found "much of the increase in housing instability comes from growing housing costs and a lack of affordable housing." The study goes on to state that "proposed and implemented cuts to federal housing resources will weaken assistance programs that are already underfunded

---

[1] Alex Horowitz et al., *How Housing Costs Drive Levels of Homelessness,* Pew (Aug. 22, 2023), https://www.pew.org/en/research-and-analysis/articles/2023/08/22/how-housing-costs-drive-levels-of-homelessness.

relative to the demonstrated need."[2] HUD's attempt to connect high rates of homelessness to the approaches most employed by the communities working to address the issue strives to find a causal link where none exists. There is significant evidence showing that the rates of homelessness in the country are a result of significant gaps in affordable housing. The NOFO then goes on to make drastic, sweeping changes to our country's approach to addressing homelessness based on the erroneous conclusion it sets forth in the NOFO.

    **4.**       **Set-Aside**

94.      The FY 2026 NOFO creates a $1.3 billion Set-Aside. The Set-Aside 1) reserves this funding for new projects only, and 2) prioritizes Transitional Housing and Supportive Service Only projects. The Set-Aside essentially imposes a cap on permanent housing funding in the NOFO at approximately 60%, and on renewals at 60%. Because HUD is prioritizing funding to go to Transitional Housing and Supportive Service Only projects first, regardless of local community needs, and regardless of whether permanent housing projects have earned higher scores, Set-Aside funding will likely not be used for permanent housing. And because the set-aside is for new projects only, the funding will not be used for renewals.

95.      This Set-Aside alone will dramatically increase homelessness.

96.      Since creation of the CoC Program, HUD has never made appropriated funding categorically unavailable for existing projects (aside from the unimplemented attempts for FY 2025, which we previously challenged in litigation).

---

[2] *The State of the Nation's Housing 2025,* Joint Center for Housing Studies of Harvard University at 8–9 (2025), https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_The_State_of_the_Nations_Housing_2025.pdf.

97.     A critical problem with this approach is that in our country today, roughly 88 percent of all CoC Program funds are slated to support permanent housing in some capacity. And while this is a national average, many Alliance members actually spend more than 90 percent of the CoC's funding on permanent housing programs that provide a lifeline for seniors, veterans, families, and people with physical and mental disabilities. In one year, the Set-Aside will drop the amount of funding for permanent housing projects to 60 percent. By withholding $1.3 billion in funds from these projects, the Set-Aside threatens to force tens of thousands of individuals and families back into homelessness. This remarkable Set-Aside not only departs from local planning and investments during the last decade, but also prevents communities from setting local priorities to end homelessness.

98.     The Set-Aside marks a shift toward time-limited, less stable interventions and will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long term rental subsidies and intensive supportive services to maintain stability. If the Set-Aside is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits.

99.     According to HUD's own data, nearly 18,000 people on average became homeless for the first time each week in 2024. CoCs, even the highest performing ones, cannot keep up with the current demand for rehousing assistance. Withholding funding for renewals for proven strategies that reduce homelessness and displacing permanently housed residents in those programs who have overcome homelessness and trauma will set even the highest performing localities like Dallas and Miami back. Most CoCs will be set back years.

100.    In addition to the number of individuals and families that will be thrust back into homelessness as a result of the Set-Aside, the Set-Aside raises numerous additional issues for CoCs and providers.

101.    First, although nonprofit providers are permitted to administer tenant-based rental assistance for permanent housing projects, they are not for transitional housing. Rental assistance is an effective approach in many CoCs because it allows projects to utilize existing rental stock within the community, rather than building from the ground up or purchasing/master leasing entire structures they then must manage (often without the specific expertise needed to successfully do so). Congress recognized this and amended the CoC's authorizing statute to allow nonprofit organizations to administer rental assistance for permanent housing. However, the statute does not explicitly allow nonprofit organizations to administer rental assistance for transitional housing, and the regulation does not allow for it.

102.    Thus, when up to a third of projects under this NOFO are abruptly switched from permanent housing to transitional housing, the providers who have been administering rental assistance will no longer be able to do so.

103.    For providers that can even switch from permanent housing to transitional housing (many cannot for a variety of reasons), they will need to determine whether they can provide support through lease or ownership of property instead, which carries a significant increase in risk and requires time, planning, and resources to invest. Many providers will be unable to provide this support and thus will be unable to participate in the CoC program as they have in the past.

104.    The "transition grants" that the NOFO provides for do not resolve the problems with shifting to transitional housing. For one, providers have to convert their *entire* project to

transitional housing—and could not protect permanent support for residents with serious disabilities or others for whom transitional housing would not work, while moving partially to a transitional housing model. This creates an impossible choice for providers. In addition, as explained further below, many existing providers—namely, nonprofits—cannot effectively switch to transitional housing because, by regulation, they are not permitted to offer tenant-based rental assistance in transitional housing (though they can for permanent housing).

105.    Second, HUD states that individuals living in permanent housing may be eligible for transitional housing, attempting to downplay the consequences of the massive shift away from permanent housing. But this ignores that it is not practicable to simply move individuals and families from permanent housing into transitional housing programs, and efforts to do so will place enormous burdens on CoCs and tenants alike that would risk many of those individuals and families becoming homeless again.

106.    But that aside, it's also not permissible under the law. The NOFO allows transitional housing projects to serve only "persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act" (with some exceptions and slight variations for specified programs serving survivors of domestic violence and/or youth). FY 2026 NOFO at 42. Generally, persons residing in permanent housing do not meet the definition of "homeless" under the statute and regulation unless they become literally homeless, i.e., "lack[] a fixed, regular, and adequate nighttime residence" for a period of time. 24 C.F.R. § 578.3(1); 42 U.S.C. § 11302(a)(1)–(4).

107.    HUD attempts to circumvent this by relying on two very narrow circumstances where a person may qualify because they "will imminently lose their primary nighttime residence": (A) someone who will "lose their primary nighttime residence within 14 days, have

35

no subsequent residence identified, and have no other resources or support networks to obtain other permanent housing" ("Category 2"); or, (B) someone who is "fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and who lack resources and support networks to obtain other permanent housing" ("Category 4").[3]

108.    There are several issues with HUD's guidance, publicly issued just prior to publication of the FY 2026 NOFO. For Category 2, it ignores the practical impossibilities of aligning an individual's lease and right to abode, eviction procedures, and termination of funding, with an available transitional housing bed within the 14-day period. Local policies detail how available resources like transitional housing, rapid rehousing, or permanent supportive housing are matched with people experiencing homelessness. As it stands, no community in the country has enough resources to meet the demand for any single intervention. Even if it were possible from a timing standpoint—which it is likely not—an individual being exited from a permanent housing program would then have to be placed on a priority list with other individuals and families experiencing homelessness for consideration of placement into new transitional housing. As such, an individual or family may not meet the criteria to receive placement to be prioritized for this new transitional housing, Additionally, providers must collect proof of eligibility for every person served, and the documentation requirements for eligibility for Category 2 require proof that the individual or household has to physically leave the unit within 14 days (usually proven by an eviction notice or similar documentation), not just that project funding is ending in 14 days, as HUD's new self-serving guidance suggests. Furthermore,

---

[3] *See* Program Participants' Eligibility to Move from Permanent Supporting Housing [*sic*] (PSH) / Rapid Re-Housing (RRH) to Transitional Housing (TH), U.S. Dep't of Housing and Urban Development at 1 (May 2026), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.

HUD has entirely failed to account for the fact that residents in permanent housing have leases and rights of abode, the varying state laws governing tenant eviction, and difficulties that impacted individuals will face in trying to document their eligibility for transitional housing, or the trauma of dislocation for those individuals. And for Category 4, for a survivor to move from their permanent housing unit into a transitional housing bed, in addition to the issues of getting out of the person's lease for their housing, the survivor will have to provide documentation—again—to demonstrate eligibility for the transitional housing bed.

109. Third, the Set-Aside forces CoCs to make choices that will harm their clients—as they must choose which projects to preserve (or try to preserve) and which to sacrifice. In some instances, the Set-Aside also irrationally forces choices that are not even consistent with the FY 2026 NOFO's (misguided) purposes. For example, the Santa Clara County CoC has a Transitional Housing project for homeless youth and young adults that is highly successful in achieving permanent housing outcomes, but because HUD's set aside for Transitional Housing is only for new, not renewal, projects, the CoC is now forced to decide whether to list this highly effective project in Tier 1 to preserve it for renewal, which would likely mean that a similarly successful permanent supportive housing project that houses individuals with disabilities would not be able to be preserved for renewal and therefore likely lose funding.

110. CoCs themselves operate permanent supportive housing (PSH) projects in partnership with agencies and other partners, and they cannot simply convert those into new transitional housing projects to take advantage of the New Project Set-Aside. Among other reasons, it is not uncommon for permanent housing projects to be deed-restricted, such that providers are forbidden from shifting to a different type of housing.

111.    Further, many clients of permanent supportive housing have severe disabilities; they cannot simply be moved to transitional housing. For example, a permanent housing project serving people with chronic health issues cannot just shift to transitional housing. The individuals they serve depend on services like support in accessing regular healthcare appointments and adhering to a daily medication regimen to keep their conditions in check, and the nature of the services offered in transitional housing are meaningfully different. Further, evidence shows that transitional housing can exclude those who need the most support. Individuals participating in transitional housing are less likely to remain housed than those in permanent housing, and people relying on transitional housing are likely to continue to need assistance once the support ends.[4]

112.    In addition, transitional housing is often more expensive for clients and providers alike.[5] That means CoCs and providers will be able to serve fewer people with the same amount of money. It is also less effective in reducing homelessness compared to other approaches, like

---

[4] Samantha Batko & Pear Moraras, *Evidence Shows Permanent Supportive Housing Helps People Exit Homelessness. A Proposed Funding Change Would Cut Those Programs*, Urban Institute (Nov. 18, 2025), https://www.urban.org/urban-wire/evidence-shows-permanent-supportive-housing-helps-people-exit-homelessness-proposed.

[5] See Brooke Spellman et. al., *Costs Associated with First-Time Homelessness for Families and Individauls,* U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research at ES-3 (March 2010), https://www.huduser.gov/publications/pdf/costs_homeless.pdf (finding that transitional housing was the "most expensive model for individuals"); s*ee also* HUD, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition, FR-5700-N-31B, at 10 (2013), https://perma.cc/SK7R-YAL8 (noting research showing that transitional housing is generally "more expensive""); Daniel Gubits et. al., *Family Options Study*, U.S. Dep't of Housing and Urban Development, Office of Policy Development and Research (Oct. 2016), https://www.huduser.gov/portal/family_options_study.html (finding high monthly costs of transitional housing programs).

rental assistance.[6] Research has also shown that transitional housing did not improve residential stability compared to permanent supportive housing.[7]

113.    The Set-Aside also marks a departure from services and programs that are working. There is a large and growing evidence base demonstrating that permanent housing with services is an effective solution to homelessness. People experiencing homelessness who access housing faster with the appropriate services are more likely to remain stably housed. This is true for both PSH and RRH. PSH has a one-year housing retention rate of up to 98 percent and some communities see as high as 100 percent (based on CoC-level data[8]). Studies have also demonstrated that rapid re-housing helps people exit homelessness quickly—in one study, an average of two months—and remain housed. A variety of studies show that between 75 percent and 91 percent of households remain housed a year after being rapidly re-housed.[9]

114.    PSH has been found to be a particularly effective approach to ending homelessness for high-need populations, such as individuals and families with a disability who

---

[6] Samantha Batko & Pear Moraras, *Evidence Shows Permanent Supportive Housing Helps People Exit Homelessness. A Proposed Funding Change Would Cut Those Programs*, Urban Institute (Nov. 18, 2025), https://www.urban.org/urban-wire/evidence-shows-permanent-supportive-housing-helps-people-exit-homelessness-proposed (comparing transitional housing to Housing First, finding that often, transitional housing excludes those who need the most support, that participants are less likely to remain housed when using transitional housing, and that people relying on transitional housing still need assistance once the program end).

[7] Maureen A. Hayes et al., *The SHIFT Study: Final Report. Serving and Housing Interventions for Families in Transition*, American Institutes for Research (2021), https://www.air.org/sites/default/files/2021-06/SHIFT_Service_and_Housing_Interventions_for_Families_in_Transition_final_report_0.pdf.

[8] Nat'l Summary of Homeless Sys. Performance 2020-2024, U.S. Dep't of Housing & Urban Dev. (June 12, 2025), https://files.hudexchange.info/resources/documents/National-Summary-of-Homeless-System-Performance.pdf.

[9] *See also* Daniel Gubits et al., *Understanding Rapid Re-Housing*, U.S. Dep't of Housing & Urban Dev. (July 7, 2018), https://www.huduser.gov/portal/sites/default/files/pdf/Systematic-Review-of-Rapid-Re-housing.pdf.

experience chronic patterns of homelessness, for communities that implement it with fidelity to the model. Positive outcomes include: a significant decrease in use of shelter stays, positive shifts in health use from crisis to preventive care, reduction in justice system interactions, improved child welfare outcomes, and cost-effectiveness. In accordance with the HEARTH Act's goal of bringing vulnerable individuals and families to safe and stable housing, since at least 2016, HUD has strongly encouraged CoCs to prioritize individuals and families who experience chronic patterns of homelessness and who may have the most "severe service needs" for available PSH units. This directive is backed by strong evidence showing that prioritization of these populations for PSH is effective in reducing chronic homelessness, which has been confirmed by the experience of CoCs.

### 5. Service Requirements and Housing First

115. "Treatment first" or mandatory-service models are less effective and more costly at ending homelessness and may exclude the most vulnerable individuals who cannot meet these requirements.[10] This approach undermines our members' ability to tailor interventions to promote stability and self-sufficiency, leaving vulnerable individuals and families (including homeless youth and survivors of domestic violence)—particularly those with disabilities or histories of chronic homelessness—at heightened risk of program failure, housing loss, and a return to homelessness.

116. Compounding this harm, the alternative models prioritized by the FY 2026 NOFO often require participants to comply with rigid, coerced treatment plans including mandatory substance use treatment, mental health programming, and intrusive case management directives

---

[10] Sam Tsemberis et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals with a Dual Diagnosis*, NAT'L LIBR. OF MED. (Apr. 2004), https://pmc.ncbi.nlm.nih.gov/articles/PMC1448313/.

to remain eligible for housing. For people with disabilities, trauma histories, or complex behavioral health conditions, these requirements strip away personal autonomy and dignity, forcing individuals to engage in services that may not be clinically appropriate, wanted, or effective. Mandating sobriety does not produce sobriety. These unsound mandates will lead directly to further housing loss, re-traumatization, and disengagement from care, pushing individuals into crisis, hospitalization, incarceration, or back onto the streets.

117.    Further, HUD's approach in the NOFO does not include quality standards or safeguards to ensure that the treatment they want to require is of high quality. There is, for example, no discussion of Medication Assisted Treatment or standards for mental health treatment. Typically, at a minimum, CoCs would be required to show documentation that they are working with a state or local behavioral health department to ensure a level of quality for the health and/or behavioral health services being required, and/or that they (and their staff) are properly accredited to provide the services contemplated in the NOFO. This NOFO pushes CoCs to fund treatment, on incredibly rapid timelines, without giving them the time or tools to ensure that the treatment is safe and beneficial.

118.    In addition, about 1 in 25 U.S. adults live with a serious mental illness, while 157 million people live in a Mental Health Professional Shortage Area (where the number of health professionals in an area cannot meet the current need).[11] In 2023, more than three-fourths of direct services provider respondents reported that they were forced to turn away new referrals due to ongoing staffing shortages.[12] According to the University of California, San Francisco

---

[11] Health Workforce Shortage Areas, https://data.hrsa.gov/topics/health-workforce/shortage-areas.

[12] *The State of America's Direct Support Workforce Crisis 2023,* American Network of Community Options and Resources at 2 (2023), https://www.ancor.org/wp-content/uploads/2023/12/2023-State-of-Americas-Direct-Support-Workforce-Crisis_Final.pdf.

(UCSF) Benioff Homelessness and Housing Initiative's California Statewide Study of People Experiencing Homelessness "participants discussed numerous barriers to receiving treatment or other help to reduce use or enter recovery. They reported times where they were ready to engage with treatment services but [services] were unavailable, either because there weren't openings at local treatment facilities and wait times were long, or the staff were unresponsive to their needs, or the treatment was far away."[13]

119.    HUD also gets the evidence wrong on Housing First and service requirements. Research endorsed by HUD in 2023 found the Housing First model to be more effective than mandated treatment models, particularly in its ability to create "greater long-term housing stability," to reduce costs (by shortening stays in hospitals, prisons, and elsewhere), and to "successfully house people with intersecting vulnerabilities, such as veterans and people with a history of substance abuse" and "mental illness challenges."[14]

120.    This research, discussed in HUD's *Evidence Matters* newsletter, which overwhelmingly supports Housing First, is now purportedly a basis for HUD's departure from the approach. HUD explains in the NOFO Memo that it believes Housing First includes two aspects: "no participation requirements or preconditions, and indefinite assistance without time limits." AR 43-44. It goes on to state that the studies largely focused on the lack of "preconditions," not the lack of service requirements, and thus was reflective of Housing First.

---

[13]Margot Kushel & Tiana Moore, *Toward a New Understanding, The California Statewide Study of People Experiencing Homelessness,* Benioff Homelessness and Housing Initiative, University of California San Francisco at 64 (June 2023), https://homelessness.ucsf.edu/our-impact/studies/california-statewide-study-people-experiencing-homelessness.

[14] *See* U.S. Dept. of Housing and Urban Development, *Housing First: A Review of the Evidence*, EVIDENCE MATTERS at 11 (Spring/Summer 2023), https://web.archive.org/web/20250112024308/https://www.huduser.gov/portal/sites/default/files/pdf/EM-Newsletter-Spring-Summer-2023.pdf.

HUD also asserted that because initial programs to implement Housing First required participants to agree to occasional staff visits, any successes described in the Evidence Matters newsletter support HUD's proposed service requirements approach, rather than Housing First.

121.    These explanations are beyond the pale, for several reasons. First, HUD's attempt to distinguish prior Housing First programs from those offered now fail; the programs HUD described *were* Housing First programs. Second, permanent housing projects, like rapid-rehousing, can and often do require the exact type of meetings HUD describes—case management meetings. *See, e.g.*, 24 C.F.R. 578.37(a)(1)(ii)(F). What cannot be required is disability-related services, like substance abuse treatment. As described in this declaration, those requirements often lead to lower retention rates.

122.    Once this is accounted for, HUD's argument—the basis of its entire departure from Housing First in favor of service requirements—quickly falls apart.

123.    HUD emphasizes that "too few entities create the accountability and structure needed to help an addict recover or a young person finish school and find meaningful employment," AR 44, but this ignores other research, previously endorsed by HUD, that indicates that requiring treatment "produces inferior housing stability outcomes" and can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services."[15] Another study that compared Housing First approaches to service requirement approaches found that the Housing First approaches led to higher program retention rates and

---

[15] *Id.* at 13; *see also, e.g.*, Sam Tsemberis, et al., *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals With a Dual Diagnosis*, AM. J. PUB. HEALTH (Apr. 2004), https://pmc.ncbi.nlm.nih.gov/articles/PMC1448313/#sec13.

lower substance use among participants.[16] Similarly, a study found PSH using a Housing First approach "with client-centered practices foster housing retention of a traditionally difficult-to-house population and is in line with other research linking Housing First with superior housing retention rates compared with abstinence-based programs."[17] Further, many of our members have built successful programs using Housing First approaches.[18]

124.    In addition, HUD repeatedly cites research showing *positive* housing outcomes in support of its efforts to impose service requirements. For example, HUD relies on a 2021 "systematic review of 26 studies," which found that Housing First had an "88% decrease in days spent homeless," and a "41% increase in days spent housed" compared to treatment first assistance. AR 44. For a federal program focused on housing stability, these are undoubtably numbers that support the Housing First approach. But because it purports that the outcomes related to "physical health, mental health, alcohol use, and illegal drug use" all had either negligible or unfavorable outcomes, HUD argues this study supports a different approach in the CoC program. First, this is wrong. A housing program should first and foremost be focused on housing and stability. But second, it also misstates the study results. The study concludes that not only did Housing First "decrease[] homelessness by 88%," it also "showed health benefits and

---

[16] Deborah K. Padgett et al., *Substance Use Outcomes Among Homeless Clients with Serious Mental Illness: Comparing Housing First with Treatment First* Programs, Community Mental Health Journal (January 2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC2916946/.

[17] Clare Davidson et al*., Association of housing first implementation and key outcomes among homeless persons with problematic substance use*, NAT'L LIBR. OF MED. at 11 (Nov. 2014), https://pubmed.ncbi.nlm.nih.gov/25022344/.

[18] Brown et al., *Housing First as an effective model for community stabilization among vulnerable individuals with chronic and non-chronic homelessness histories*, J. OF COMM'TY PSYCH. (Vol. 44, Issue 3, April 2016) (studying King County PSH program and finding 44% reduction in days hospitalized when comparing PSH tenants to a comparison group), https://onlinelibrary.wiley.com/doi/abs/10.1002/jcop.21763.

reduced health services use."[19] The study concludes by finding that "Housing First programs can more effectively reduce homelessness and improve housing stability for homeless populations with a disability than Treatment First."[20]

125.    HUD also argues that this systematic review included many limitations that resulted in "mixed" and "lacking" evidence. *See* AR 44. But that is merely an attempt to mask the conclusions of the systematic review of twenty-six peer reviewed studies published in journals or government reports: "Housing First programs improved housing stability and reduced homelessness more effectively than Treatment First. In addition, Housing First programs showed health benefits and reduced health services use."[21] HUD's dismissal of this significant body of evidence in favor of Housing First based on standard study limitations does not pass muster.

126.    HUD cites to other studies that also show the benefits of Housing First. See AR 44-45. But HUD argues that these approaches often include levels of "robust, intensive treatment services" that it asserts are "exceedingly rare" among CoC providers. It provides no support for that assertion, and none exists. Housing First approaches can and do include varying levels of services, including robust ones. HUD cannot baselessly argue that because Housing First providers offer services, service requirements are therefore beneficial. The opposite is true, and HUD's analysis is flawed.

127.    Similarly, HUD argues that the HUD-VASH program—a program that serves homeless veterans—is not evidence of the efficacy of Housing First, because it requires participants to receive case management services as needed. But that requirement is consistent

---

[19] Yinan Peng et al., Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health Among Homeless Populations with Disability: A Community Guide Systematic Review, 26 J. Pub. Health Mgmt. & Prac. 404 (2020).

[20] *Id*.

[21] *Id.*

with Housing First and is something *all* rapid rehousing requires. Services are required on a *voluntary* basis. *See* 89 Fed. Reg. 65769, 65775 (2024); 24 C.F.R. § 578.37(a)(1)(ii)(F). In addition, even that minimal requirement was only added in 2024—and most of the reduction in veteran homelessness happened in the years before that change was made.[22]

128.    The HUD provisions mandating service requirements are not only unsupported by research; they cause numerous issues that significantly impact individuals experiencing domestic violence.

129.    Projects that receive funding under the Violence Against Women Act (VAWA) cannot, by law, comply with the mandatory service requirement criteria in the FY 2026 NOFO. These projects are at significant risk of losing funding, and the CoC as a whole will lose points if these projects are included in the collaborative application. This will lead to CoCs either losing funding, discouraging CoCs from including those projects in their application, or discouraging organizations receiving VAWA funding from participating in the local competition. Undoubtedly, this will negatively affect clients experiencing homelessness and domestic violence.

130.    Other CoCs and providers are put in an impossible position because HUD did not consider state and local laws when it issued this NOFO. Housing First is supported by swaths of evidence, and some states and localities require or incentivize providers to use a Housing First approach. But doing so will now jeopardize CoC funding for entities in those jurisdictions.

131.    For example, one member provider is currently in the midst of executing new contracts for supportive housing with their governmental partner. That governmental entity

---

[22] Shawn Liu, *Veteran homelessness continues downward trend: 56% since 2010*, Veterans Affairs (June 25, 2026), https://news.va.gov/147673/veteran-homelessness-continues-downward-trend/.

requires them to employ Housing First strategies. That provider is determining whether they want to risk noncompliance with local law, or risk losing federal funding. They are caught in an impossible predicament.

### 6.    Anti-Harm Reduction Criteria

132.    HUD seeks to eliminate harm reduction activities by CoCs and providers, even when conducted with non-federal funding. HUD's approach is not supported by the significant evidence that finds that harm reduction is effective. Further, the evidence HUD does cite does not stand for the propositions HUD asserts. For example, the FY 2026 NOFO states that two-thirds of homeless individuals self-reported *regular use* of hard drugs. But the study actually says that almost one third reported regular current use; the two-thirds figure is when study participants were asked about *lifetime* use.[23] And regardless, this study ultimately recommends permanent supportive housing as a critical intervention—which the NOFO disincentivizes (and thus fails to mention). HUD also relies on another study to support that "homeless individuals self-report high rates of substance use disorder (SUD) and mental illness." It does so despite an explicit warning at the beginning of the study explaining that the study should not be used to make these representative conclusions.[24] HUD also mischaracterizes data in an article it cites about overdoses in King County, which included data not from just PSH but also subsidized housing and recovery housing more generally[25]; it also focuses on data from 2020–2023 while

---

[23] Margot Kushel & Tiana Moore, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness*, Benioff Homelessness and Housing Initiative (June 2023), https://homelessness.ucsf.edu/sites/default/files/2026-04/CASPEH_Report_62023_v4.pdf.

[24] Janey Rountree et al., Health Conditions Among Unsheltered Adults in the U.S., Calif. Pol'y Lab (2025), https://capolicylab.org/wpcontent/uploads/2025/11/Health-Conditions-Among-Unsheltered-Adultsin-the-US.pdf.

[25] FY 2026 NOFO at 31 (*citing* Claudia Gross Shader, *Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach*, Seattle Office of City Auditor (July 2024),

ignoring that (1) *all* overdoses rose during COVID-19 and have fallen steadily *since* 2023 and (2) the majority of overdose deaths occur in private or rented residences, not housing service sites.[26]

133.    The FY 2026 NOFO also includes no discussion of the evidence that shows that harm reduction approaches can reduce overdoses,[27] and that the presence of overdose prevention sites do not make communities less safe.[28]

### 7.    Law Enforcement Criteria

134.    There is significant evidence that criminalization of homelessness does not reduce homelessness or increase public safety. Policies that target actions related to homelessness do not "yield a long-term reduction in the number of people experiencing homelessness on a given

---

https://seattle.gov/documents/Departments/CityAuditor/auditreports/OverdoseAndCrimeConcentrationsAudit.pdf).

[26] *Overdose deaths in King County,* King County, https://kingcounty.gov/en/dept/dph/health-safety/safety-injury-prevention/overdose-prevention-response/data-dashboards#toc-Overdose-deaths.

[27] *See, e.g.,* Kirk B. Fetters, *Projected Outcomes of Reducing Federal Funding for Syringe Service Programs via Executive Order*, JAMA Network Open (June 2026), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2850494?guestAccessKey=438021e4-bc12-4d8d-8bfc-1a67ee258e94&__cf_chl_f_tk=vjPqyXSsUgyg9q0mkFUbRlLXAHUsdLMtf_IfcaEo8L4-1782967636-1.0.1.1-ZGD8CHwWIC7xxgjw9Itf6ScULbR5TqyzPHCKdnKtTic#251081603; *see also* Jennifer Ng et al*., Does evidence support supervised injection sites*? Can Fam Physician (Nov. 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5685449/; Jerome M. Adams, *Making the Case for Syringe Service Programs*, PUBLIC HEALTH REPORTS (Jul 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7407057/.

[28] Aaron Chalfin et al., *Overdose Prevention Centers, Crime, and Disorder in New York City,* Jama Network Open Public Health (Nov. 2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2811766?__cf_chl_f_tk=alv9E2AIkF61kpJPt9iMfn_u1e5M7MaufKpXZsNoIac-1783012142-1.0.1.1-x1xxwuNJ_vzpAHENyES_U8PyKMt5HRe_jWQQYesBZKw.

night."[29] Further, law enforcement officials themselves have acknowledged that criminalization policies are ineffective. A nationwide survey of almost 100 police departments found that a "crime control approach" is "unlikely to produce desired results for the police, the public or the individuals living on the streets."[30] The NOFO and administrative record's reliance on anecdotal evidence and selective news articles – including more than one-third (47) total of which are posts on X/Twitter, a self-publishing platform with no editorial oversight, does not change that there is no empirical evidence that criminalization reduces homelessness or that displacing encampments helps people get housed.[31] Instead, criminalization forces people to move from one public area to another, or lands them in jail, where individuals may suffer interruptions in access to public benefits, shelter, and even their own possessions.

135.    Unsurprisingly, then, criminalization, exacerbates the conditions of poverty. Studies have found that the destruction of property, which often occurs during encampment clearing, can pose additional obstacles to work, education, and access to services.[32] It also harms individuals'' health, as it often involves the "seizure of medical items," and "disrupts access to

---

[29] Hannah Lebovits & Andrew Sullivan, *Do Criminalization Policies Impact Local Homelessness?,* POLICY STUDIES JOURNAL at 11 (Jul 2025), https://onlinelibrary.wiley.com/doi/10.1111/psj.70056.

[30] Robert Hartmann McNamara et al., *Policing the Homeless: Policy, Practice and Perceptions,* 36 POLICING: INT'L J. at 357, 369 (2013), https://www.researchgate.net/publication/255979657_Policing_the_Homeless_Policy_Practice_and_Perceptions.

[31] Nicole DuBois et al., *Criminalizing Homelessness Worsens the Crisis, Research Shows*, National Alliance to End Homelessness (Feb. 4, 2025), https://endhomelessness.org/wp-content/uploads/2025/02/CriminalizingWorsensTheCrisis_NAEH_2-4-25.pdf.

[32] *Id*.

healthcare."[33] These approaches are often also more expensive than other approaches a local community may deem more effective.[34]

136.    The FY 2026 NOFO's one-size-fits-all approach to mandatory involvement of law enforcement strips CoCs of local autonomy. Many CoCs do work with law enforcement on numerous issues, tailoring their approach to the needs of their communities. But emphasizing law enforcement in the way the NOFO requires for certain points would counterproductively cause unhoused people to lose trust in providers. The Law Enforcement Criteria also threaten to disadvantage or disqualify CoCs and projects based on the state and local laws of the jurisdictions in which they operate. Various criteria require projects and CoCs to "cooperate with" enforcement of local laws on public camping (among other things), but it is unclear how applicants can meet those criteria if the local jurisdiction does not have or does not enforce camping bans against unhoused individuals, like in Providence, RI. The Law Enforcement Criteria also require CoC applicants to identify local laws and policies that help or hinder the CoC's ability to quickly clear encampments, decrease the public use of illicit drugs, engage in involuntary commitment, and comprehensively share information in accordance with SORNA.

---

[33] *Id.*

[34] Sarah Gillespie et al., *Costs and Offsets of Providing Supportive Housing to Break the Homelessness-Jail Cycle,* Urban Institute (July 2021), https://www.urban.org/sites/default/files/publication/104499/costs-and-offsets-of-providing-supportive-housing-to-break-the-homelessness-jail-cycle_0.pdf; *see also New King County Data Shows Stable Housing Associated with Sustained Reductions in Jail Bookings*, News Release (June 2026), https://content.govdelivery.com/accounts/WAKING/bulletins/41c4b1c ( "[J]ail bookings declined nearly 27% in the first year after people moved into housing and continued to fall over time, reaching a 37.6% reduction within three years."); *The Cost of Long-Term Homelessness in Central Florida*, Supportive Housing Network of New York (2014), https://shnny.org/uploads/Florida-Homelessness-Report-2014.pdf; *Crisis Assistance: Helping Out On The Streets*, White Bird Clinic (2020), https://whitebirdclinic.org/wp-content/uploads/2020/06/CAHOOTS-Media-Guide-20200626.pdf (In Oregon, Crisis Assistance team handled 24000 calls, which is about 20% of the 911 total calls and only required police backup 250 times.).

Although HUD wrote this criterion to focus on the CoC's activities and not the laws and policies of the jurisdiction, it appears to be designed to prioritize grantees in states and localities with favored policies, as the Homelessness E.O. and OMB's related apportionment footnote direct HUD to do.

137. The Law Enforcement Criteria also include points to CoCs that demonstrate that they do "not interfere with or impede local efforts" on clearing encampments, decreasing public illicit drug use, pursuing involuntary commitment, and comprehensively sharing information under SORNA (Local Policies Criterion). CoCs are concerned that they will be deemed to "interfere with or impede" those types of local efforts if they advocate against them, for example, by opposing policies that vigorously enforce public camping bans or that pursue involuntary commitment of unhoused individuals, or by supporting measures like Rhode Island's Homeless Bill of Rights, which gives unhoused individuals a right to privacy in their personal property, even if in an encampment.

### 8. Self-Sufficiency Criteria

138. HUD's definition of self-sufficiency will disincentive CoCs serving clients most in need. Under the FY 2026 NOFO, clients with severe disabilities, or those clients facing obstacles to self-sufficiency as HUD newly defines it, would hurt the CoC's chances at receiving points under these criteria. Thus, a CoC may be inclined to serve individuals most likely to reach "self-sufficiency" fastest—which could leave behind those most in need. Or, a CoC may decide to prioritize those most in need. Those CoCs would then jeopardize their funding, as they would likely achieve lower scores under this NOFO.

### 9. Discriminatory Disability Priority

139. The Discriminatory Disability Priority threatens to displace people with great need from their housing. People who do not have the physical or developmental disabilities that

51

the FY 2026 NOFO prioritizes still require the support that permanent supportive housing provides. For example, some people in permanent supportive housing have a serious and persistent mental illness, sometimes with a comorbid substance use disorder. In MLK County, for example, more than 75 percent of individuals served by CoC-funded PSH have mental health disabilities. Many individuals and families with these conditions do not have, and may never have, the chance to be financially independent, especially in this economy and housing market. The Discriminatory Disability Priority threatens to create a mass exodus of people leaving permanent supportive housing because they do not meet the narrow category of disabilities the NOFO prioritizes.

**10.      Amorphous Risk Review Criteria and Consideration of Additional Factors**

140.     The amorphous risk review criteria would allow HUD to turn away an otherwise high-performing program for politicized, arbitrary, or other improper reasons, without any recourse for review. In a landscape where federal agencies have terminated even existing grants based on illegal criteria such as how residents of a particular state voted in an election, these provisions create immense uncertainty that politically-disfavored projects or applicants will be punitively refused funding. *See, e.g.*, *City of Saint Paul v. Wright*, 816 F. Supp. 3d 65, 74 (D.D.C. 2026) ("Defendants freely admit that they made grant-termination decisions primarily— if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump in 2024"); *Illinois v. Vought*, 820 F. Supp. 3d 727, 731-32 (N.D. Ill. 2026) (OMB made decision to "target plaintiffs and direct (or guide) the agencies to terminate public-health grants"); *Harvard v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025) (terminations in retaliation for protected speech); *AAUP v. Trump*, 815 F. Supp. 3d 907 (N.D. Cal. 2025) ("[T]he unrebutted record in this case shows that Defendants have used the threat of investigations and economic

sanctions to impermissibly coerce the [university] to stamp out faculty, staff, and student "woke," "left," "anti-American," "anti-Western," and "Marxist" speech.").

141. The amorphous criteria also distort CoCs' decisionmaking. A CoC may be wary of including a project in Tier 1 (or at all) if there is concern the provider has engaged in activities that HUD disfavors, like promoting DEI or acknowledging people's gender identities. These criteria create a looming threat of rejection that pushes CoCs to exclude projects for ideological and political reasons, rather than based on their ability to address homelessness effectively.

### 11.  Bonus Limits

142. The Bonus Limits will redistribute funding from communities with higher relative need to communities with lower relative need. These limits make CoCs with lower homelessness per capita eligible for extra funding equal to as much as 61.2 percent of their need, while leaving CoCs with more homelessness per capita eligible for an amount equal to only as little as 3.5 percent of their need. These Bonus Limits will cause communities with higher rates of homelessness—communities that represent more than 40 percent of the total homeless population—to lose access to nearly $93 million in funding. And they will systematically disadvantage CoCs with higher relative need in the competition for *all* funding, not just bonus funding.

### G.  The FY 2026 NOFO Is Harming Alliance Members and Our Nation's Most Vulnerable Populations

143. With the FY 2026 NOFO, HUD has again destabilized the CoC program. The chaotic rollout is leaving communities scrambling to apply while many critical questions remain unanswered, and forcing them to divert resources otherwise spent planning their homelessness response. In addition, the NOFO—with its harmful approaches and ideological conditions—is causing some providers to withdraw from the CoC program. The NOFO is also forcing CoCs to

make devastating choices about which existing projects to prioritize for funding. When CoCs make those choices—which they must inform their local applicants of by no later than August 11, 2026—that will in some instances cause irreversible consequences: The projects that are not selected or ranked highly will begin winding down their programs. And, of course, if HUD is permitted to make awards under the FY 2026 NOFO, CoCs and service providers will lose critical funding in their communities and be forced to eliminate or drastically reduce many permanent housing programs on which individuals and families rely. At the same time, CoCs and service providers also face harm from prolonged uncertainty about what projects will receive funding for FY 2026, and will suffer harm to their programs and community-wide responses to homelessness if FY 2026 funding is delayed, especially given the delays with FY 2024 and FY 2025 funding.

**1.    The chaotic application process and destabilizing FY 2026 NOFO selection criteria are forcing CoCs and providers to divert limited resources away from their primary missions**

144.    The FY 2026 NOFO's destabilizing selection criteria, as well as the chaotic manner in which HUD has rolled out the NOFO, are draining the resources of CoCs and providers and diverting time and attention away from their primary missions.

145.    The NOFO guarantees that many existing projects will not receive funding in FY 2026. This forces CoCs and providers to engage in contingency planning now, particularly to determine how they can soften the blow to clients whose housing will no longer be funded. This is incredibly time-intensive and diverts CoCs' resources away from fulfilling their primary missions, including by working on system planning, improving processes for connecting people with needed support, analyzing homelessness data to identify needs, engaging partners and people with lived experience, and continually improving strategies to reduce homelessness.

54

146.    The chaotic manner in which HUD has rolled out the NOFO has exacerbated the drain on CoCs' resources. Over a month and a half after the NOFO was issued, HUD still has not notified CoCs of the amounts they are eligible to apply for.

147.    Nor has HUD posted the actual application with the questions that grantees must address. Though HUD released the NOFO on June 1, 2026, the deadline imposed by Congress, as of July 17, HUD has not opened e-snaps, the online application portal, and has not released the actual application or detailed instructions that accompany the NOFO. It is extremely challenging for CoCs to make selections, or to prepare their applications, when the application forms are not available and CoCs do not know precisely what HUD will require.

148.    This information is critical, because it provides details as to how the NOFO criteria will be assessed, and it allows CoCs and providers to know what information they need to collect and organize. Particularly where HUD has released a NOFO that represents a radical shift in the CoC program, CoCs and providers need time to understand how to put their application together.

149.    In addition, applicants have many questions about vague, ambiguous, and inconsistent aspects of the NOFO, but their questions to HUD have gone unanswered, in some cases for weeks. CoCs and projects are left to guess about what some aspects of the NOFO mean, are unable to begin preparing applications, and are unable to make fully informed decisions about what projects to put forward. The uncertainty, and need to attempt to decipher the NOFO, forces communities to spend even more resources to respond to the NOFO than normal.

150.    Further straining their resources, HUD has also published two other NOFOs for homelessness funding with concurrent application timelines: for Youth Homelessness programs

(posted on June 10 with an August 10 due date) and the CoC Builds program (posted on June 23 with a deadline of July 24). And the Department of Health and Human Services has opened a NOFO for a program to support homeless individuals with substance use disorders or serious mental illness at the same time as well (posted on June 17 with a deadline of July 17). Thus, CoCs and providers must apply to as many as four federal NOFOs at the same time.

151.    Applying to a NOFO is time- and resource-intensive in any circumstances. But applying to multiple NOFOs at once, when the agency has not yet provided information necessary to actually move forward, is a tremendous drain. In addition, given the significant changes the NOFO seeks to implement, Alliance member CoCs must spend even more resources to analyze project and client data and hold meetings to make hard decisions about the fate of CoC projects. CoCs also must begin the intensive work it will take to make the types of transitions the NOFO effectively requires, like pivoting from permanent housing to transitional housing and from rental assistance to a leasing model. To take just one example, a member CoC had hoped to dedicate time this summer and fall to a project seeking to reduce costs for vital records and documents for homeless individuals. As a result of the FY 2026 NOFO, that work has been put on hold, because assessing the impact of this NOFO on the CoC is time-intensive and must take priority.

152.    The time needed to respond to this particularly chaotic application process is preventing CoCs from fully performing their primary roles of coordinating their communities' homelessness response and improving overall system performance. For example, one CoC member is fielding numerous questions from service providers regarding the NOFO changes. The criteria are vague, and the CoCs don't have the application or instructions, so it is a time-intensive process that often results in answers that are insufficient for the providers.

**2.      The FY 2026 NOFO is already causing some providers to withdraw from the program, and will cause more withdrawals the longer the process goes on**

153.    The FY 2026 NOFO is already causing some providers to withdraw from the CoC program. This makes CoCs' homelessness response systems less effective and forces CoCs to spend already scarce resources on crisis management rather than on direct system improvements and homelessness response efforts.

154.    Various aspects of the NOFO are causing providers to withdraw from the CoC program in some instances. For example, some cannot quickly pivot to providing transitional housing or services-only projects. That is for a variety of reasons, including that nonprofits are not permitted to provide transitional housing by means of rental assistance, the model many currently use for their permanent housing projects. In addition, many longstanding permanent supportive housing projects also receive funding from other sources that restrict their ability to pivot, or also have long-term restrictions on property use. For at least one member CoC, a key provider in their region cannot pivot because insurance carriers are unwilling to provide insurance for the project if it is converted to transitional housing. For some, mandating services or supporting aggressive law enforcement responses is antithetical to their values. Some domestic violence projects have decided not to apply because they cannot mandate services while remaining compliant with other federal laws—and so know both that they will not be competitive and also that being included in a CoC's application would bring down the entire CoC's score and thus hurt the entire community's chances. Some providers cannot give up providing harm reduction services (with non-federal funds) that save lives in their communities. And some cannot risk being targeted for supposed non-compliance with ideological conditions that appear to bar DEI activities, or to prohibit conduct that recognizes and respects the identifies of transgender and nonbinary individuals. Nor can they simply abandon those activities while

57

remaining true to their missions and values, as multiple providers including a faith-based member have reported.

155.    Whether it be because they do not expect they could receive funding, because they cannot sacrifice their values and missions, or because they fear False Claims Act or other sanctions for their lawful activities if they continue with the program, some providers are choosing to drop out of the program and not seek funding again.

156.    This results in a loss of institutional knowledge and expertise in the community.

157.    It also fractures relationships with critical partners. For example, member CoCs have worked hard to build relationships with landlords so that the landlords will accept referrals from homelessness service agencies. The loss of funding will leave those landlords with vacant units or with having to undertake expensive eviction processes—and make them less willing to engage with the program going forward. This, in turn, will decrease future housing opportunities for people experiencing homelessness.

158.    Providers' withdrawing also forces CoCs to spend resources finding, and in some instances training, suitable replacements. For instance, an Alliance member that is a small rural CoC has heard that at least two providers will pull out of the program. This has forced the CoC to divert resources to identify organizations that could provide the services the community needs. In some instances, this can be a particular drain where the replacement provider has no experience with federal grants and requires substantial training and technical assistance on grant applications and management.

159.    One CoC member has been informed by a state domestic violence coalition that if the conditions are unchanged by the time the CoC must submit their application, they will not participate given the service requirements that conflict with their obligations under other federal

laws. This will be an incredible loss for this CoC, which has made significant strides in addressing homelessness for individuals experiencing domestic violence in the past several years in part through CoC funding. At the same time, if the high-performing DV service provider does participate, the CoC will be disadvantaged under the criteria in the NOFO, because their collective score would decrease.

160. The farther along the FY 2026 NOFO process progresses, more providers will likely drop out. Members report that providers are getting "burned out." And once CoCs notify applicants that they will not be included in the CoC's application (or will be listed low enough that they are unlikely to obtain funding), those applicants will plan accordingly. Once they internalize, and begin planning for, not having CoC funding, it will be harder to reverse course if the FY 2026 NOFO is blocked and HUD issues a new one. Every time an organization has to pivot, it is a drain on its resources, and some providers will not pivot back to the program once they have turned away.

**3.    The FY 2026 NOFO is forcing CoCs and providers to make impossible decisions now and threatens to erode trust and damage important relationships**

161. Given how the NOFO structures the selection process, it is highly unlikely that HUD will award funding to existing projects that CoCs place in Tier 2 of their priority listing. This is because little or no funding will remain after HUD allocates funds at higher levels of the waterfall—to Tier 1 projects, congressionally mandated earmarks, and the $1.3 billion for new projects. Some communities can also see now that, given the scoring criteria, they will likely rate lower than other CoCs and therefore be particularly unlikely to receive any renewal funding for projects placed in Tier 2.

162. As a result, CoCs are forced, now, to make the extremely difficult decision whether to (1) sacrifice a significant portion of their renewal projects to apply for new

transitional housing and supportive-services only project that, given the Set-Aside, stand a much higher chance of receiving funding, or (2) to put forward as many of its renewal projects as it can, to at least try to retain funding for those projects even if the likelihood is very small for projects in Tier 2.

163.    Further complicating the decision, CoCs must apply for grants to run their Homeless Management Information Systems process (which collects data on homelessness in the community) and Coordinated Entry (which coordinates intake, assessment, and referrals for the whole community). Those provide necessary infrastructure for the community's entire homelessness response system, so CoCs face a lot of pressure to include them in their Tier 1—even though that in most instances means an existing permanent housing project will be displaced and defunded.

164.    The choice of which projects to select and how to rank them is particularly difficult because, if the CoC loses funding overall, that affects not only the funding the community will receive for FY 2026, but also reduces the amount it can even apply for in subsequent years. In other words, losing funding now has lasting effects—and would affect a CoC's ability to provide critical housing and services for many years into the future.

165.    Many CoCs have more high-performing projects than they can include in Tier 1. They now face the impossible position of having to choose which of its high-performing projects to protect by placing them in Tier 1, and which to list in Tier 2 or exclude from the CoC's application altogether.

166.    Further complicating matters, CoCs are fearful that even projects that they place in Tier 1 will be rejected based on the amorphous "risk" review criteria and additional factors—given that those factors seem to reserve to HUD the discretion to reject projects on virtually any

ground. This makes the decision even harder, as CoCs must worry that, if they include in Tier 1 a project that recognizes people's gender identities, engages in DEI activities, or uses a Housing First approach, HUD will reject the project and the CoC will not receive even the limited Tier 1 funding that Congress intended to essentially guarantee them. Some CoCs are very concerned that even their Tier 1 projects will be jeopardized as a result of the unclear risk review criteria, and are trying to guess at what HUD might hope to see in order to best protect their funding.

167.    The NOFO is pushing CoCs to make terrible choices about which projects to put forward for funding. For example, CoCs are not seeking funding for permanent housing that they cannot fit in Tier 1, and are instead replacing it with transitional housing projects that are eligible for the Set-Aside. Those projects will not be able to serve as many people. The NOFO is also incentivizing CoCs and providers to serve people with lower service needs (at the expense of those with higher-needs) to meet the Self-Sufficiency Criteria and performance metrics. It is also pressuring CoCs to direct resources to people with physical and developmental disabilities to the exclusion of people with mental health and substance use disabilities. And it is using this funding to pressure CoCs to pressure their whole communities to abandon life-saving harm reduction services. Under the NOFO, CoCs and providers also must choose between putting forward a competitive application and exercising their First Amendment right to recognize people's gender identities or to express their own views on local policies on encampments, involuntary commitment, and more.

168.    CoCs must make these decisions by August 11, 2026, at the absolute latest, because the FY 2026 NOFO requires CoCs to notify project applicants by then whether they were selected for inclusion on the CoC's priority listing, rejected, or reduced. FY 2026 NOFO at

96 (requiring CoCs to provide this notice 15 days before the August 26 deadline for CoCs to submit their community-wide applications to HUD).

169.   Providers, too, face terrible choices. Providers' staff, many of whom have dedicated their careers to serving unhoused youth and young adults, families with children, survivors of domestic violence, people with disabling conditions, and other unhoused populations, are considering reallocating grants that are currently successfully housing vulnerable people in order to be competitive under the FY 2026 NOFO, putting the very people they have assisted at risk of homelessness yet again. As explained above, permanent housing projects cannot just quickly convert to transitional housing for many different reasons.

170.   These decisions will have devastating human consequences. CoCs often cannot serve as many people in transitional housing as they could in permanent supportive housing—so CoCs must now grapple with the heartbreaking decision who will be able to keep their unit and who will become homeless.

171.   These shifts in funding will erode the effectiveness of communities' response to homelessness, defund proven strategies, and leave vulnerable individuals and families without needed homes and support.

172.   In addition, once CoCs make these decisions and notify project applicants, that will likely damage relationships between the CoCs and the providers in their areas. If an existing project is included only at Tier 2, that will be seen as a "death sentence" given the grim prospects for existing projects at that tier. And, of course, projects that are not included on the CoC's application at all are guaranteed not to receive funding. This will damage CoCs' relationships with those providers and threatens to erode the trust that CoCs have built among providers and formerly unhoused people in their communities.

173.    In some instances, Alliance members that are local governments will face significant pressure to "backfill" funding for projects that are not selected or that are listed in Tier 2. But local governments will not be able to meet that need for all projects likely to be cut by the FY 2026 NOFO, due to steep federal cuts to social safety net programs across the board. This inability to promise to provide alternative funding to rescue CoC projects will also likely damage relationships, both between the CoC and service providers and between the CoC and the clients served by those programs.

**4.    When CoCs make their local selections in August, unselected and lower-ranked projects will in some instances immediately begin winding down**

174.    In some instances, providers who are not selected for their CoC's application, or who are ranked lower down, will immediately begin preparing to shut down their programs, given the certainty or near certainty that those projects will not receive funding.

175.    This will include stopping enrolling new clients and maintaining wait lists, moving clients out to other locations or preparing them for the upcoming loss of housing, reducing case manager hours, and laying off staff.

176.    Providers are already operating in a state of uncertainty given the dramatic changes the FY 2026 NOFO seeks to implement. For example, in the Cambridge CoC, some projects have already paused referrals (i.e., are not accepting new individuals for assistance) for fear of creating more tenancies that would be at risk from the likely loss of renewals of existing permanent housing projects.

177.    And once projects receive the more official signal that they will not or likely will not receive funding—as a ranking in Tier 2 or exclusion from the priority listing altogether would portend—some will begin taking irreversible steps to wind down their projects.

178.    Once providers begin taking these steps—laying off staff, ending partnerships, exiting clients—they cannot easily be unwound. Once they start this process, they may not be able to return to the CoC later, even if circumstances change.

**5.    If HUD makes awards under the FY 2026 NOFO, CoCs, providers, and the individuals and families they serve will face a devastating loss of support**

179.    If HUD is permitted to make awards under the FY 2026 NOFO, communities will face a cascading crisis: CoCs will be forced to eliminate or drastically reduce many permanent supportive housing and rapid rehousing programs; CoC-funded permanent housing sites will face operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement. CoCs in turn will be forced to redirect limited funds away from reducing unsheltered homelessness and into emergency stabilization efforts simply to prevent widespread returns to homelessness.

180.    The NOFO's defunding of existing permanent housing projects will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life. Individuals will be forced into shelters, hospitals, jails, encampments, or the streets—where they will not be able to obtain the stability and intensive services they need, increasing strain on social and emergency services networks.

181.    The NOFO's defunding of renewals will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long term rental subsidies and intensive supportive services to maintain stability. If the set-aside is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits.

182. Additionally, clients currently assisted by permanent housing will not be eligible to access transitional housing projects that the NOFO aims to create given HUD's definition of homelessness and eligibility criteria, and given that it costs more to provide transitional housing, the same funding will not serve as many people. Thousands of households will also lose access to supportive services. For these households, the disinvestment in permanent housing is not merely a service reduction, it is a life-threatening disruption that reverses years of progress to stability and self-sufficiency. Project applicants and housing/service providers will face immediate operational and financial crises. Projects that were designed, funded, and staffed around evidence-based permanent housing models will be forced either to downsize, convert to entirely different interventions, such as costly or infeasible transitional housing, or close altogether. Providers will be required to rapidly rework budgets, reassign staff, and make difficult decisions about which households to evict due to reduced capacity. Many communities have built their homeless response systems around permanent supportive housing and rapid re-housing as the backbone of stability. This sudden shift guts that foundation.

183. This will have particularly harmful impacts on chronically homeless individuals with severe and persistent disabilities. For example, in MLK County, more than 75 percent of individuals served by CoC-funded PSH have mental health disabilities. Those individuals require the intensive supportive services that permanent supportive housing provides and cannot be effectively served through transitional housing, which is not designed to support people with those types of long-term needs. People in this permanent housing cannot just be moved to transitional housing—and instead will in many instances find themselves without critically needed assistance and at risk of hospitalization or housing loss.

65

184.    The FY 2026 NOFO's changes, and its defunding of permanent housing, will also have impacts on people waiting for housing—making them less likely to get the support they need. For example, in Santa Clara County, nearly 6,000 homeless households are currently on the community waitlist for permanent housing. Seventy percent of those households are highly vulnerable (due to the degree of their disabling conditions, episodes of homelessness, or other adverse life experiences) and are in need of permanent supportive housing. That includes substantial numbers of households that have experienced domestic violence or that qualify as chronically homeless.

185.    The NOFO's defunding of permanent housing also undermines the impact of communities' investments in permanent housing from other sources. For example, the Santa Clara County CoC's projects, many of which have been in operation for years, have been heavily leveraged by matching funds from the County and the Santa Clara County Housing Authority, and by the County's funding of permanent housing developments. These are substantial local investments into permanent housing made in partnership with HUD and can never be regained if these programs are forced to shutter due to loss of funding.

186.    The Alliance completed an analysis of the impact of the FY 2026 NOFO's major changes.[35] The analysis uses publicly available data compiled from several sources including the FY 2025 Award Announcements with supplemental information other sources like the 2025 Housing Inventory Count. The analysis, which likely understates the devastation that CoCs face given data limitations, shows that the FY 2026 NOFO's changes threaten to cause as many as 97,000 people to lose housing.

---

[35] See *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing,* National Alliance to End Homelessness (June 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/.

187.    As an example, a member CoC in Maryland stands to lose $1.1 million in permanent housing funding, which will impact upwards of 70 individuals losing their permanent supportive housing, many of whom are single women and families. Another member CoC in California reports they anticipate losing more than $26 million annually despite showing a recent reduction of almost 20% in unsheltered homelessness in the last year. In Texas, 39 percent of permanent housing beds are funded through the CoC program and altering this funding may result in 5,616 people losing their housing due to the loss of just over $67 million in funding. A CoC in the South anticipates losing funding that supports housing for 1,050 people—most of whom will be forced back into homelessness because there is nowhere else to place those people.

188.    Given the magnitude of these losses, CoCs will need to make requests for emergency funding from State and local government or philanthropic partners, reduce the number of housing units, reduce or discontinue services, or lose their share of permanent supportive housing units to standard low-income units. Without funding, permanent supportive housing properties struggling to maintain even the most basic of operations will likely default on loans and lose federal Low-Income Housing Tax Credits. Projects that previously received capital funding to create new permanent housing are often subject to lengthy deed restrictions that require the project to continue to operate as permanent housing and will no longer be able to meet that commitment. For example, a member who operates permanent supportive housing in multiple CoCs that span five different states reports that they will not be able to fulfill their Land Use Restriction Agreements without service dollars and partners, which jeopardizes more than 400 of their units.

67

189. In short, the set-aside for new projects directly undermines the Homelessness Assistance Act, destabilizes its long-term investments in permanent housing, and reverses more than a decade of coordinated homelessness strategy.

190. In sum, existing permanent housing programs will face abrupt shortfalls, forcing them to either reduce or eliminate essential housing subsidies and supportive services. This directly destabilizes programs that currently house individuals with disabilities, chronic homelessness histories, and other high-needs populations including homeless youth, older adults and survivors of domestic violence, undermining years of system-level planning and investment in housing stability. Indeed, HUD has historically directed CoCs to prioritize the *most* vulnerable individuals and families for permanent supportive housing, in particular, and communities have followed this direction. Hence, those are the people who stand to lose their housing as a result of HUD's actions. For clients of the CoCs, the consequences are dire: the loss of permanent housing subsidies will result in involuntary exits to unsheltered homelessness, heightened exposure to health risks, and, for the most vulnerable populations, increased risk of mortality. The policy deprioritizes evidence-based permanent housing programs, erodes the hard-won stability of CoC systems, and threatens the safety and lives of the individuals these programs were designed to protect.

**6.       These harms are exacerbated by the context of the past 18 months**

191. These harms must be viewed in the context of 18 months' worth of patterned federal actions and chaos that have wrought so much havoc on funding recipients that their faith

in HUD – a once trustworthy partner – is now misplaced.[36] This latest action reinforces the same pattern of confusion, chaos, and unpredictable harm.

192.    In the past 18 months, Alliance members have faced funding freezes and ongoing funding delays that have or are currently impacting three rounds of funding (FY24, FY25 and now FY26) for these critical programs; received altered grant agreements with unlawful terms; suffered the loss of HUD field offices and the staff who once helped them with routine technical matters; experienced the cancellation and reinstatement of technical assistance; and have had to work with clients, staff, and landlords/vendors through continuous cash flow gaps and funding uncertainty. The compounding effect of the pattern of actions by this administration has already caused irreversible harm to our members, some of whom had providers be forced to close their programs, lay off staff, and exit formerly homeless individuals and families back into homelessness. Worse, many of our members are unable to apply to the NOFO through no fault of their own.

### 7.    Delays in awarding FY 2026 funding also cause CoCs and providers harm

193.    At the same time, CoCs and providers also need certainty. Delays in HUD making FY 2026 awards will leave them in the dark about what funding they will receive next year. While the fate of this NOFO remains uncertain, it is difficult for CoCs and providers to even make educated guesses about what projects will be funded going forward.

194.    Providers' existing grants begin expiring in January 2027. Based on available data, roughly 10 percent of FY 2025 grants will expire in the first three months of 2027. For those providers in particular, delays are especially problematic.

---

[36] These compounding harms are further detailed in a prior Oliva declaration in a related case. *See* Third Supplemental Declaration of Ann Marie Oliva ¶¶ 9-24, *Nat'l Alliance to End Homelessness v. HUD*, No. 25-cv-636 (D.R.I.) (Dkt. No. 75-1).

195.    With funding uncertain, some members will have to begin winding down. They will not be able to accept new clients, given the risk that they would have to withdraw that support in the near future. That risk is particularly salient because withdrawing support would retraumatize those individuals, erode the trust they had built, and potentially cause long-term harm to those individuals' openness to accepting help.

196.    Even those members who are more likely to receive funding under this NOFO would face harm from delays, as they would be left with gaps in funding. Some providers, particularly smaller ones, do not have the resources to bridge gaps—particularly because they have already had to tap those resources in the last two funding years. They will therefore face serious challenges in finding alternative funding to maintain their housing projects and retain their staff. And while some providers may be able to temporarily fill gaps, whether through assistance from local governments or otherwise, that funding must be diverted from other critical services and programs. Money spent to temporarily keep a project afloat is money that cannot be spent on public health, public safety, or social services, harming local communities. After HUD's efforts to cut CoC renewal funding last year, Congress intervened in February 2026 and gave CoCs and their providers much needed certainty that FY 24-25 funding would be renewed. Providers have no such assurances this time, and cannot indefinitely shift funding and resources without the certainty that they will get an award.

197.    Time is of the essence. The NOFO puts the Alliance's members in a terrible position. If HUD proceeds with the FY 2026 NOFO, Alliance members will face devastating harm to their programs, their missions, and their ability to effectively serve their communities. At the same time, ongoing uncertainty about FY 2026 funding also means that CoCs and

providers cannot plan and communities will again have to cut back programs or divert resources as they, yet again, face gaps in funding resulting from delayed awards.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of July, 2026

Ann Marie Oliva
Chief Executive Officer
National Alliance to End Homelessness