## DECLARATION OF RENEE M. WILLIS
## (NATIONAL LOW INCOME HOUSING COALITION)

I, Renee M. Willis, declare the following under penalty of perjury:

1. My name is Renee M. Willis. I am over 18 years old. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

2. I am the President and Chief Executive Officer at the National Low Income Housing Coalition (NLIHC), a nonprofit organization headquartered in Washington, D.C. I have been in that role since May 2025. In that capacity, my roles and responsibilities include leading a team of over 40 policy advocates, researchers, organizers, and more toward the goal of achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice. Immediately prior to this permanent appointment, I served as Interim President and Chief Executive Officer from January 2025 to May 2025. In that interim role, I assumed full executive leadership of the organization, guiding its strategic direction, overseeing cross-departmental governance, managing organizational operations, and working closely with board leadership and legal counsel to inform critical decision-making, including matters related to national policy advocacy and funding priorities.

3. Prior to that, I served as Senior Vice President for Racial Equity, Diversity, and Inclusion at NLIHC from 2021 to January 2025. In that role, I worked to ensure that NLIHC's commitment to racial equity, diversity, and inclusion was woven through its culture, policies, programs, and practices. From 2015 to 2021, I served as NLIHC's Vice President for Field and Communications, during which time I worked closely with our

1

membership, including homeless services providers, to educate them on federal policy and to support them in achieving their missions.

4. Prior to my work at NLIHC, I served as housing services chief with Arlington County, Virginia, as administrator of the Office of Landlord-Tenant Affairs for Montgomery County, Maryland, and as advocate and manager for the Public Justice Center's Tenant Advocacy Project.

5. I have over 30 years of experience in housing policy and related work at the community, regional, and national level.

6. The facts contained in this declaration come from my personal knowledge and communications I have had with my staff and the staff of the member organizations that NLIHC serves.

## I.    The National Low Income Housing Coalition

7. NLIHC is a nonprofit organization headquartered in Washington D.C. It is dedicated to achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice.

8. NLIHC's over 1,000 dues-paying members include state and local housing coalitions, tenants of public and assisted housing and other impacted people, nonprofit housing providers, homeless service providers, fair housing organizations, public housing agencies, private developers and property owners, local and state government agencies, faith-based organizations, researchers, and concerned citizens.

9. While its members are drawn from the entire spectrum of housing interests, NLIHC does not represent any one segment of the housing industry. Rather, NLIHC focuses on advocating for policy and funding improvements for extremely low-income people who receive or need

2

federal housing assistance, including people experiencing and at risk of homelessness.

10. NLIHC provides a variety of support to its members to assist in their missions and assist them in serving their communities. This includes educating members about new or proposed legislation, executive orders, or grant opportunities; convening members to share best practices and problem solve; undertaking factual and policy research to support members' missions; providing support to members undertaking policy advocacy, and more.

## II.    NLIHC has long advanced its mission and those of its members through the Continuum of Care Program

11. Since the program's creation, the CoC Program has worked to provide coordinated distribution of funding and services to people experiencing or at risk of homelessness in particular geographies, with the goal of creating "a system-wide response to ensure that homelessness is rare, brief, and nonrecurring."[1]

12. The CoC Program is the single largest source of federal funding to combat homelessness. The program's long-time focus on providing *permanent* housing (PH) programs, such as rapid re-housing and permanent supportive housing, has been critical to advancing what NLIHC sees as the primary purpose of federal low-income housing policy: housing stability.

13. NLIHC members across at least twenty states directly receive CoC funding, or are housing providers who utilize funding from the CoC

---

[1] NLIHC, *The Advocates' Guide* (2026 ed.) (Advocates' Guide) at 8-517, https://nlihc.org/sites/default/files/AG-2026/NLIHC_Advocates_Guide_26_1.pdf

3

program.[2] These members collectively were allocated over $160 million through the FY24 CoC Notice of Funding Opportunity process.

14. Since 1997, NLIHC has published an annual "Advocates' Guide" that provides research, program summaries, and advocacy tools for those involved in low-income housing work, comprising hundreds of pages of resources written by a variety of leading experts about the ways to improve housing opportunities for low-income people in America.[3]

15. For over a decade, one of the sections of the Advocates Guide has been an overview of the Continuum of Care program, summarizing the history of the program, the mechanisms by which grants may be applied for and awarded, current regulatory and legislative activity related to the program, and resources for local advocates involved in the CoC program.[4]

16. NLIHC's work also includes undertaking research for and providing policy advice to members on topics implicated by the 2026 NOFO.

17. For example, NLIHC has long emphasized the critical importance of Housing First policies in ending homelessness, providing members and the public resources to understand the benefits of the Housing First model and organizing research on its effectiveness.[5] As NLIHC has noted, the Housing First approach has also long been the priority for CoC programs because it is "proven to be effective for most individuals and families," and the best use of "scarce federal resources" when the goal is to prioritize

---

[2] These states include Alabama, Alaska, Arizona, California, Colorado, Delaware, Georgia, Kentucky, Massachusetts, Minnesota, Nevada, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, Texas, Vermont, and Washington.

[3] Advocates' Guide, *supra* n. 1.

[4] *See* Advocates' Guide, *supra* n. 1 at 8-517–8-518.

[5] *See, e.g.,* NLIHC, *Housing First: A Critical Strategy to End Homelessness*, https://nlihc.org/sites/default/files/Housing-First-A-Critical-Strategy.pdf

4

"high-performing shelter and service providers that are most effective in addressing homelessness."[6]

18. Conversely, non-Housing First programs, those that "requir[e] participants to first participate in various service programs, abstain from drugs and alcohol, and adhere to a set of behavioral requirements," are far less effective at ending homelessness and have left participants to "languish in shelters for long periods of time with no clear path to exit homelessness."[7]

19. NLIHC has also shared extensive resources highlighting the ways the criminalization of homelessness is both inhumane and ineffective. The criminalization of homelessness

> violate[s] constitutional, civil, and human rights, traumatize homeless individuals, and negatively impact their physical and mental health (including creating police encounters than can lead to unnecessary use of force or death), create arrest records, fines, and fees that stand in the way of homeless people securing jobs or housing, and perpetuate racial inequity.[8]

20. NLIHC also provides resources and research on the unique housing challenges faced by LGBTQIA people, who disproportionately live in poverty and often face discrimination in access to housing— discrimination that is legal in many jurisdictions that do not include LGBTQIA status as a protected characteristic.[9] Huge portions of LGBTQIA people, and particularly those who are transgender or

---

[6] *Id* at 2.

[7] Advocates' Guide, *supra* n. 1 at 8-520

[8] Advocates' Guide, *supra* n. 1 at 6-378.

[9] *See, e.g.*, NLIHC Opportunity Starts at Home, *LGBTQIA+ Equity and Housing Fact Sheet*, https://www.opportunityhome.org/resources/lgbtq-rights-and-housing-fact-sheet/ [https://perma.cc/S3QE-DCUS] (archived Nov. 30, 2025).

nonbinary, experience homelessness at some point in their life, and have substantially fewer alternative housing or shelter options if their living situation becomes unsafe.[10]

21. And for more than thirty (30) years, NLIHC has tracked and documented the growing divide between income and rental housing costs in its seminal research report, *Out of Reach.*[11]

22. *Out of Reach* identifies a "signature statistic" known as the "Housing Wage," which refers to the full-time hourly wage needed to afford modest rental housing.[12]

23. The 2025 *Out of Reach* report identified the national Housing Wage as $28.17 for a modest one-bedroom rental and $33.63 per hour for a modest two-bedroom home.[13]  As the report states "these required wages far exceed not just the federal minimum wage but also the median wages of workers in many of the most common occupations, such as home health aides, food service workers, and administrative assistants."[14]

24. Federal housing assistance, such as the permanent supportive housing offered through the Continuum of Care program, fills this income-to-rent gap for program participants, but only one in four eligible households receives federal housing assistance due to limited funding.[15]

---

[10] *Id.*

[11] NLIHC, *Out of Reach 2025: The High Cost of Housing* at 11, available at https://nlihc.org/sites/default/files/2025_OOR_FullReport.pdf

[12] *Out of Reach 2025* at 11.

[13] *Out of Reach 2025* at 11.

[14] *Out of Reach 2025* at 11.

[15] *Out of Reach 2025* at 11 (citing P. Bailey, Addressing the affordable housing crisis requires expanding rental assistance and adding housing units. Washington, D.C: Center on Budget and Policy Priorities (2022))

25. The solution to this gap is to expand government subsidies that make modest rental housing affordable and increase the supply of affordable housing, not reduce access to it.[16]

## III.    The 2026 NOFO and its impact on NLIHC members

26. The 2026 NOFO was issued on June 1, 2026.

27. A number of NLIHC's members receive CoC funding and are trying to understand the impact of the recently issued FY26 NOFO on their operations.

28. All of NLIHC's members who receive CoC funding are impacted by the dramatic shifts in HUD's administration of the CoC program, and many of them (and the tenants they serve) are set to face extraordinary harms as a result of HUD's sudden attempt to restructure the program.

29. Many of NLIHC's members:

   a. Are likely to lose catastrophic amounts of program funding under HUD's new proposed FY 2026 NOFO, which sets Tier 1 renewals at 60 percent of Annual Renewal Demand (ARD) and contains a $1.3 Billion set-aside for new transitional housing and supportive services, which excludes funding for existing projects including permanent supportive housing projects.  As a result, many programs have no practicable way to continue significant portions of their services or keep many of the tenants they serve housed next year;

---

[16] *Out of Reach 2025* at 11.

b. Are likely to face significant funding gaps caused by delays in the disbursement of any FY26 funds that they do ultimately secure through FY26 grant applications; and

c. Are at risk of becoming ineligible for CoC funding under HUD's new threshold criteria and scoring requirements.

30. The FY26 NOFO abandons proven strategies for addressing homelessness, such as Housing First and voluntary services, and instead implements service requirements and engagement with law enforcement despite concerns regarding the harmful effects of mandating services and criminalization of homelessness.

31. The experiences of NLIHC members North Carolina Coalition to End Homelessness and Colorado Coalition for the Homeless are representative of the impacts that NLIHC members in the CoC program will experience.

### A.    North Carolina Coalition to End Homelessness

32. The North Carolina Coalition to End Homelessness is an NLIHC member heavily involved in the CoC program in the state of North Carolina.

33. NCCEH is the collaborative applicant for the "Balance of State" CoC in North Carolina. A BoS CoC is the CoC that covers the remainder of a state that isn't already covered by more local or regional CoCs. In practice, a BoS CoC serves as the CoC for most of a state's rural areas and smaller cities, which don't otherwise have dedicated CoCs.

34. As the collaborative applicant, NCCEH provides joint support to every program that receives funding through the BoS CoC, fulfilling a number of managerial and administrative tasks on behalf of those programs that would be inefficient and impractical to duplicate across each smaller program in the BoS CoC. The collaborative applicant organizes and

submits the CoC application, coordinates directly with HUD, undertakes performance monitoring, and more.

35. As the collaborative applicant for the North Carolina BoS CoC, NCCEH serves as the CoC for 79 different counties in the state. This program currently provides permanent housing to nearly 1,500 households in North Carolina.

36. NCCEH is also the Homeless Management Information System (HMIS) lead agency for the NC Balance of State CoC, serving all 79 of the BoS counties plus two additional counties (Durham and Orange). Every community being served by a CoC is required by law to have an HMIS that collects standardized tenant level data and data on the provision of housing and services to program participants, facilitating standardized data across administrative tasks like CoC grant applications and annual reports. Because the communities served by the BoS CoC are each small and have fewer resources, it is impracticable for them to each operate a discrete HIMS. The HIMS functionality is instead aggregated into one provider covering all of them (plus Orange and Durham) – NCCEH.

### 1. The FY26 NOFO is catastrophic for NCCEH's programs

37. Since 2025, HUD has created a state of fear and anxiety for NCCEH staff and the programs it supports. Through the chaotic issuance of NOFOs that impose requirements that have little basis in evidence, HUD's actions will cause increased homelessness for the vulnerable people NCCEH serves. These actions threaten the integrity of the entire CoC system.

38. The FY26 CoC NOFO is no different and presents the same criteria that have the potential to increase homelessness and cause harm to entire communities as the FY25 CoC NOFO.

39. Compounding these concerns, HUD has refused to answer questions or issue guidance regarding the FY26 NOFO, leaving applicants without the clarity necessary to comply with its requirements.

40. NCCEH is the collaborative partner for NC BoS CoC projects that, based on the FY2026 Grant Information Worksheet, have been awarded $23.9 million under the FY25 CoC Program grant renewal. Of these funds, 88.6 percent (roughly $21.2 million) go towards permanent housing projects.

2. **NCCEH projects will be significantly harmed if awards are substantially delayed**

41. In previous CoC funding cycles, there have been instances in which NCCEH projects funded in a prior fiscal year expend the entirety of their grant allocation before the subsequent year's application is finally awarded and contracted by HUD. However, in prior years, the vast majority of projects were at least able to face this uncertainty knowing that they were Tier 1 projects that were very likely to secure funding once the CoC grant process was completed.

42. This year, because Tier 1 is set at 60 percent of the annual renewal demand, there is not enough money to completely fund traditional Tier 1 projects that provide permanent housing. Permanent housing programs that are scored in Tier 2 through the local competition face a significant danger of not being awarded any funding.

10

43. Most NCCEH supported providers are operating within a 30-45 day window of cash to float their programs. While private philanthropic foundations previously provided grants to support programmatic and operational costs to assist providers during funding gap periods, many of those foundations are now changing their approaches, reducing funding to programs, resulting in a shrinking pool of non-federal funds. Any substantial delay in issuing CoC awards will therefore place those programs under threat of collapse and destabilize entire communities.

### 3. The impact of the Set-Aside will drastically reduce permanent housing

44. The FY26 NOFO creates a $1.3 Billion set-aside with heavy priority for new transitional housing and supportive service only projects. The set-aside has had an extremely destabilizing effect on NCCEH and the programs and people it serves.

45. The only programs with a strong likelihood of renewal are those placed in Tier 1. Programs placed in Tier 2 are unlikely to be renewed because the Set-Aside earmarks almost all Tier 2 funding for new projects only.

46. NCCEH has calculated that after funding HMIS and Coordinated Entry in Tier 1, it will leave only 61% of its current PH budget of $21,234,873 available to be placed in Tier 1 in this competition, at the most.

47. As a result, 39% of project funding for existing permanent housing projects will be placed in Tier 2 and will be at significant risk of funding loss, unless they are able to convert to Transitional Housing.

48. Losing 39% of funding would put 39% of NCCEH's current PH units at risk, which is about 392 units. These units are a mix between 1, 2, 3, 4,

11

and 5 bedroom units. So far the FY26 NOFO is putting far more than 392 people at risk of homelessness.

49. Currently, a great deal of NCCEH staff time is being spent working with providers to try to understand what it will take to transition a program from permanent housing to transitional housing, as well as what it will take for clients of permanent housing to qualify for transitional housing.

50. In particular, the client qualifications to move from PH to TH are unclear to NCCEH's very experienced staff. NCCEH staff have questions regarding whether clients will be required to go through coordinated entry again, whether they will need to get on a shelter waiting list for the limited supply of emergency shelter. NCCEH staff have submitted these questions to HUD asking for clarification, but HUD has not provided answers.

51. It is also not practicable to simply move tenants from PH into transitional housing programs. To qualify for transitional housing programs, PH tenants would likely need to prove that they are at imminent risk of losing housing within 14 days, supported by a variety of paperwork and evidence. *See, e.g.,* 24 C.F.R. § 576.500 (recordkeeping requirements for homelessness status). To transition these individuals from PH to transitional housing as HUD seems to contemplate would place extraordinary administrative burdens on NCCEH and other CoCs to prepare this documentation for tenants (something NCCEH has never done before), and to do so on a rapid timeline for the majority of their tenants, before CoC funding expired. The likely result of this transition is not that NCCEH's PH tenants would simply shift to a new administrative system; it is that many of those individuals and families would become homeless. This transition would be cruel, unnecessary, and would risk

12

losing contact with many families and individuals who currently have stable housing provided by the CoC system.

52. Lastly, NCCEH had contemplated saving its PH portfolio by dropping HMIS from Tier 1, but doing so would likely lose funding for a third of its staff, and destroy CoC administrative capacity for the least-well-resourced municipalities in the state, who do not have the resources or experience to build new in-house HMIS's to make up for the disappearance of NCCEH. That decline in administrative capacity would make it impossible for the counties served by the BoS CoC to effectively compete for and manage CoC funds in the future. And rebuilding that administrative capacity at a later date would take years.

4. **Other components of the FY26 NOFO will deeply harm NCCEH programs and the persons they serve**

53. The FY26 NOFO's prioritization of persons with physical and developmental disabilities, but not mental health disabilities, has caused deep concern amongst NCCEH supported programs. The population of individuals that NCCEH serves via PH is extremely vulnerable. There are tenants in PH that only have mental health disabilities and this prioritization would cause vulnerable people with severe mental health disabilities, currently served in PH, to be dropped from programs and even evicted in order to comply with the prioritization.

54. In addition, the majority of PH tenants are genuinely unable to work or function in the way that would be necessary to afford stable housing. NCCEH does not expect any meaningful portion of these individuals to simply be able to reallocate resources and pay market rent for their homes

13

if PH funding disappears; nor will NCCEH be able to meet the threshold and risk review criteria of self-sufficiency as defined in the NOFO as "the ability to meet basic needs, including a place to live, *without public or private assistance*." For example, many disabled tenants cannot work, and receive Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI) for a disability. Disability income will not increase to cover rental assistance that evaporates under HUD's new NOFO and moving disabled tenants off of public assistance in order to meet the self-sufficiency criteria would be deeply harming.

55. The self-sufficiency criteria would penalize NCCEH projects that help individuals whose disabilities affect their ability to work.

56. NCCEH and the programs it supports are deeply concerned that there will be such a narrow segment of people who qualify for service prioritization that there will be an increase in vulnerable people who are pushed into homelessness and toward living on the street.

### 5. **The policy changes envisioned in the FY26 NOFO are unworkable and will harm NCCEH and its partners.**

57. The FY26 NOFO requires grantees to follow eleven Presidential Executive Orders, including Executive orders that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized.[17] This requirement would significantly curtail NCCEH's services and speech to unhoused persons

---

[17] *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168 ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 (Grantmaking Executive Order);

for reasons that have no evidenced basis in ending homelessness. Indeed, in previous years, for example, HUD *required* CoCs to conduct a "Point in Time" count to survey homeless populations that included gender responses such as "Non-Binary," "Questioning," "Transgender," "Different Identity," "Culturally Specific Identity (e.g., Two-Spirit)," or "More Than One Gender."[18]

58. The FY26 NOFO also lists Executive Orders that broadly seek to eradicate all diversity, equity, and inclusion activities. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order 14173; *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14151; *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332; but HUD previously required CoC applicants to affirmatively describe their "experience in effectively addressing the needs of underserved communities, particularly Black and Brown communities, who are substantially overrepresented in the homeless population."[19]

59. It is also unclear what is meant by the FY26 NOFO threshold review criteria to "partner[] with first responders and law enforcement." NOFO at 63-65. The NOFO does not define what it means to "partner" and the criteria has raised questions about whether programs must have law

---

[18] HUD, *HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations, NC-503 North Carolina Balance of State CoC*, Jan. 31, 2024, https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_NC-503-2024_NC_2024.pdf.

[19] HUD, *FY 2024 and 2025 Continuum of Care (CoC) Application: Detailed Instructions for Collaborative Applicants* at 6 (July 31, 2024), https://partnersforhome.org/wp-content/uploads/2020/07/FY-2024-CoC-Application-Detailed-Instructions-07-31-24.pdf

enforcement on their governing boards or simply have a contact in law enforcement that they call when needed. Currently funded CoC programs are concerned that this requirement will cause trauma for current service recipients who have had prior traumatic experiences with law enforcement. As a result, NCCEH and the programs it supports sees this requirement as a deterrent for people who want to receive services and one that will harm its ability to provide housing and services with compassion and care.

### 6. NCCEH fears great harm should local competition results be announced

60. The local competition for FY26 has been one of the most stressful competitions NCCEH has ever run. If NCCEH is required to announce results of the local competition, it will destabilize their CoC. Programs that are not listed in Tier 1 will learn that they are unlikely to get funding to sustain their work. Staff members of those programs will lose jobs and clients will lose housing. Critical service relationships will be harmed as clients face the traumatic reality of homelessness. Announcing local competition awards has the potential to destabilize working relationships amongst organizations within the CoC and NCCEH believes the fall out could be disastrous.

61. NCCEH has been a longtime partner of HUD's and has sought to comply with HUD's directives, but the FY26 NOFO requires a sudden pivot in services and approaches, even restricting who NCCEH serves.

16

62. Similarly, these policy reversals could result in NCCEH losing an additional seven of its nineteen staff who are funded entirely through HMIS to support the NC BoS CoC.

## B.    Colorado Coalition for the Homeless

63. Another of NLIHC's members, the Colorado Coalition for the Homeless (CCH), has been arguably the state's leading force in establishing Colorado's CoC ecosystem. CCH facilitated efforts that established Colorado's BoS CoC (and was the collaborative applicant for the CoC for 25 years) and helped establish the Metropolitan Denver Homelessness Initiative (Metro Denver's CoC).

64. CCH has received CoC awards continuously since 1999.

65. Today, CCH is the largest funded partner of the Metropolitan Denver Homelessness Initiative (MDHI)—the CoC covering the Denver area. CCH shares responsibility with the state of Colorado as the BoS CoC for Colorado.

66. CCH is the single largest provider of PH in the state of Colorado.

67. CCH has been awarded over $17 million in funding through MDHI's COC (either directly or as a subrecipient) through FY25, more than 99 percent of which goes towards PH. In total, CCH accounts for half of MDHI's CoC funding, and all of these funds are currently renewals rather than new projects.

68. CCH has also been awarded over $1.3 million in funding through the Colorado BoS CoC, 96 percent of which goes towards PH.

69. In total, CCH serves more than 1,100 people in more than 770 households through the CoC program.

17

1. **Delays or Unresolved legal/funding questions create immediate operational harm to CCH's programs**

70. Even a delay or unresolved legal/funding question creates immediate operational harm. CCH cannot wait until funding is formally lost to begin planning for possible staffing reductions, service disruption, caseload changes, or client risk. Those planning demands affect department operations immediately and create uncertainty for services relied upon by approximately 1100 clients. Clients may feel this uncertainty through slower response times, changing staff availability, fewer flexible supports, and reduced confidence that the program will be able to intervene when housing problems arise.

71. Furthermore, some of CCH's programs depend on landlord partnerships to keep clients housed and resolve tenancy concerns before they become evictions. If program continuity, payment stability, or service capacity becomes uncertain, landlords may become less willing to accept referrals, renew leases, pause eviction actions, negotiate payment or damage concerns, or work through behavioral and payment concerns with its clients. For clients, this may result in fewer second chances, less informal problem-solving, quicker escalation to formal notices, and fewer available housing options if they need to move.

72. Additionally, funding uncertainty may affect hiring, backfilling vacancies, staff retention, caseload capacity, and continuity of care. Even before a final funding decision is made, the department would need to plan for multiple staffing and service scenarios. For clients, staffing instability means fewer visits, fewer reminders, slower responses, less support with paperwork, less landlord mediation, and weaker continuity with staff they trust.

18

73. If a client loses housing, a landlord relationship breaks down, a staff member leaves, or service capacity is reduced due to uncertainty, those harms cannot simply be undone by a later award. Rehousing someone after eviction or a return to homelessness is significantly more difficult than preventing the housing loss in the first place. This is especially true for clients with eviction history, damages claims, behavioral health acuity, substance use concerns, limited income, or strained landlord relationships. Once a client has an eviction filing, unpaid balance, damaged landlord relationship, or period of homelessness, the barriers to stabilization become much more difficult to overcome.

### 2. The Set Aside and Forced Conversion of Families from Permanent Supportive Housing to Transition Housing Will Cause Significant Harm

74. The dramatic shifts in the CoC program away from stable, continuous, and permanent housing envisioned by the FY26 NOFO would be catastrophic for CCH and the tenants it serves.

75. The combination of the reduction in funding available in Tier 1 to 60 percent of annual renewal demand and the $1.3 Billion set aside for new projects in Tier 2, place the 497 individuals in the 177 families in CCH's Families Permanent Supportive Housing project at significant risk of returning to homelessness. This cataclysmic result would impact 272 children under age 18 or 54% of all planned project participants for the upcoming grant year.

76. Across all the CoC funded PH projects at CCH, there are over 1,168 people, including 284 children under 18, whose housing stability and ongoing supportive services are at risk under the FY26 NOFO and who

19

are now living with uncertainty about whether they will still have stable housing next year. The $1.3 Billion set-aside is unlikely to support any permanent housing projects puts almost 1200 people at risk at CCH alone for the sake of ideological changes that have already been ruled unlawful in previous litigation.

### 3. Transitioning existing Rapid Rehousing or Permanent Housing Projects to Transitional Housing is not Possible

77. Further, CCH cannot simply flip a switch and transition its tenants from PH towards other programs like transitional housing. Redesigning its CoC program to prioritize other types of housing would require re-evaluating hundreds of existing tenants to identify whether they meet the criteria for transitional housing. Many of CCH's disabled tenants likely would not meet the requirements for transitional housing, which typically require people to be literally homeless at the time they enter transitional housing, and have a viable exit plan from transitional housing.

78. Tenants also have lease rights under PH, and converting their units into a transitional housing scheme raises fair housing concerns, disability discrimination concerns, and might require the issuance of mass notices of evictions. Other significant challenges would involve staff retraining, and a substantial expenditure of relocation expenses for each tenant. Changing the type of housing and lease structure also may not be permissible for some projects, given conditions attached to the funding that capitalized the housing and/or that supports operation of the housing development itself. HUD does not appear to have considered any of the plethora of legal, logistical, or procedural challenges that would flow from

20

trying to transition tenants *en masse* from permanent to transitional housing.

79. Furthermore, CCH and the subgrantee agencies have discussed at length the possibility of moving Rapid Rehousing Programs to Transitional Housing Programs. Unfortunately, HUD rules/regulations for scattered site programs, physical requirements required for a site-based program, and excessive financial liability prevent the ability to transition this grant to a TH Program. This results in the only avenue for continued funding being a renewal of the Rapid Rehousing grant. Without this renewal funding the program would wind down and cease operations. The following explains why conversion to each of the three (3) Transitional Housing models is unworkable:

   a. Conversion to Scattered Site Transitional Housing: Transitional Housing Rental Assistance Funds require a government entity or a Public Housing Authority to administer the funding, *see* 24 C.F.R. § 578.51(b), so programs like CCH, a nonprofit, cannot automatically convert to scattered site Transitional Housing without partnering with an eligible entity. CCH has explored entering into an agreement with an eligible governmental entity (the Colorado Division of Housing) to administer the rental assistance. That partnership alone would cost CCH approximately an additional $200K per year, simply to have the state administer transitional housing rental assistance that CCH previously administered as rapid rehousing assistance. This additional unnecessary bureaucratic layer makes little practical sense and is costly to CCH.

21

b. Transitional Housing Operating Funds for Site-Based Transitional Housing: Site-based transitional housing requires a physical structure that operates as a Transitional Housing Program. *See* 24 CFR § 578.55(a). The best available local option would be to convert an existing building - an emergency shelter - into transitional housing at considerable cost of renovation, changes to agency mission and alterations to long-standing programming for the local community.

c. Transitional Housing Leasing Funds: TH Leasing funds require Master Leases where the HUD recipient (CCH) or sub grantee executes a lease with a private landlord. *See* 24 CFR § 578.49. In a Master Leasing scenario, the HUD recipient assumes liability for tenant caused damages to rental units. CCH's 39 years of experience implementing HUD housing programs has taught it that Master Leasing requires allocation of resources for replacement/repair of household appliances, flooring, walls, plumbing, electrical systems, windows, doors, landscaping, and other items described in the lease, for which CCH is not currently funded.

80. CCH believes CoCs need a genuine continuum that includes homelessness prevention, affordable housing, shelter, rapid resolution funding, Transitional Housing, recovery TH, RRH, and PH. TH has an important role within that continuum. The concern with the FY26 NOFO is that shifting substantial resources back toward TH, without updating the regulations to allow nonprofits to administer rental assistance or clearly demonstrating why this scale of change will improve outcomes, creates avoidable costs, administrative burdens, and most importantly risks for

22

people who are currently housed and their potential housing loss.

### 4. Other Components of the FY26 NOFO Will Cause Significant Harm for CCH Program Operations

81. HUD suggests the FY26 NOFO changes will encourage "accountability" and push tenants towards "self-sufficiency," and has called the long-standing prioritization of stable, permanent housing a "self-sustaining slush fund."[20] But HUD appears to deeply misunderstand, or is mischaracterizing, the tenants that CCH and other CoCs serve. Many of CCH's tenants are going to need subsidized housing every day for the rest of their lives, with homelessness as the only realistic alternative. Many of them live with disabilities that prevent them from ever attaining adequate employment that would allow them to afford and sustain housing. Using this NOFO to push these tenants out of permanent housing will result in them returning to homelessness, not getting new jobs.

82. The law enforcement criteria is vague and unclear. CCH, which operates scattered site programs, does not understand what partnering "with first responders and law enforcement" means for scattered site programs that operate in properties operated by private landlords. Simply placing a family in an apartment owned by a private landlord does not give CCH authority to send in law enforcement absent exigent circumstances. CCH fears being penalized in its application due to the vague nature of this criteria.

---

[20] HUD, *HUD Secretary Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund*, https://www.hud.gov/news/hud-no-25-132 [https://perma.cc/Y9CN-5QUD] (archived Nov. 30, 2025).

23

83. Other provisions in the FY26 NOFO are equally impractical or unfair. The FY26 NOFO requires compliance with various Executive Orders, including those that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized, yet CCH has never taken steps to investigate or confirm the self-reported sex of its tenants. Nevertheless, this requirement could either disqualify CCH from funding or impose liability on CCH should it respect one of its participants' gender identity.

84. The FY26 NOFO also imposes service requirements. These unfunded requirements would necessitate drastic changes to CCH's model and staff deployment—like more compliance enforcement staff, higher staffing ratios to track treatment, more crisis response for tenants who refuse services, more licensed behavioral health staff and supervisors (of which there already exists a significant national shortage). And CCH expects that it would lose existing staff who do not want to work under a mandatory treatment model.

85. CCH has historically (in collaboration with HUD) prioritized nationally recognized, evidence-based models for addressing homelessness that prioritize housing stability and actively *avoid* interventions like forced treatment. Evidence from forced treatment programs shows that they lead to far more frequent escalations and conflict between staff and tenants, increased need for law enforcement and emergency room services, and ultimately endanger (rather than help) tenants whose main need is stable housing.

24

## IV.    Conclusion

86. The experiences of NCCEH and CCH are representative of the impacts that NLIHC members (and the clients they serve) are likely to experience under HUD's dramatic policy changes but are not an exhaustive accounting of the effects on all NLIHC's members.

87. These impacts are likely to result in catastrophic changes to the CoC ecosystem, including the outright disappearance of long-time housing providers and, most importantly, the loss of housing for huge numbers of people in our country who can least afford it.

I declare under penalty of perjury as described in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 17th day of July, 2026

_____
Renee M. Willis
President and Chief Executive Officer
National Low Income Housing Coalition

25