**<u>DECLARATION OF MICHELLE M. WILCOX,</u>**
**<u>PRESIDENT & CEO, CROSSROADS RHODE ISLAND</u>**

I, Michelle M. Wilcox, declare as follows:

1.     I am over the age of 18 and competent to testify to the facts contained in this Declaration. I am the President and CEO of Crossroads Rhode Island (Crossroads), a nonprofit organization headquartered in Providence, Rhode Island.

2.     I have served as President and CEO of Crossroads since 2024. In this capacity, I have direct responsibility for overseeing Crossroads' operations, programs, and services, and I am familiar with the needs of the individuals and families we serve. Prior to serving as President and CEO, I have worked with Crossroads (previously known as Traveler's Aid Society of Rhode Island) since 1993. The facts set forth in this declaration are based on my personal knowledge, information provided to me by Crossroads staff in the course of their duties, by Crossroads clients, and review of Crossroads' records. If called as a witness, I could and would testify competently to the matters stated herein.

**I.     <u>CROSSROADS' MISSION AND SERVICES</u>**

3.     Crossroads Rhode Island is a non-profit housing and homeless services organization. Established in 1894 as Traveler's Aid Society of Rhode Island, Crossroads Rhode Island has since grown and evolved to become the largest provider of homeless services in the state of Rhode Island, and the only developer of affordable housing exclusively for this population. With headquarters in Providence, Rhode Island, Crossroads provides programs and services statewide.  Our Mission is to help those experiencing homelessness secure stable homes.

4. Crossroads offers a range of services to people experiencing homelessness, including housing, basic needs, emergency shelter, case management, referrals, and education and employment services. Using a Housing First model that prioritizes stable housing as the primary intervention to end homelessness, we provide in-home, client-centered case management and clinical support.

## II.   CROSSROADS' HUD GRANTS

5. My organization has applied for and received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), since approximately 2012 and prior to that, Supportive Housing Program (SHP) grants since the early 1990's.

6. Crossroads is the direct recipient of four grants, all included in one contract. Upon funding approval, HUD sends contracts directly to Crossroads for signature. Crossroads is the subrecipient of an additional contract and the subrecipient Program Agreement is sent from the pass through entity, Rhode Island Housing, to Crossroads for signature.

7. Currently, Crossroads is operating under and relying on four CoC grants totaling $2,163,299 for CoC FY 2024. Crossroads applied for these grants pursuant to the two-year FY 24-25 NOFO and executed the award notices on June 4, 2025. On May 28, 2026, Crossroads received an award letter from HUD, stating that these grants will be renewed for FY 2025 for a total of $2,301,985. To date, Crossroads has not yet received the federal award agreement for FY 2025.

2

8.      Crossroads receives three CoC grants for permanent housing. One of the permanent supportive housing grants provides funding for supportive services, operating, leasing and rental assistance for 101 households, including individuals, youth, families and older adults, living in a variety of Crossroads' owned and managed buildings. The current contract runs through October 31, 2026, and we have received notice that this contract will be renewed for FY 25, but we have not yet received a new contract.

9.      Another permanent housing grant provides supportive services to 25 residents within Crossroads' owned Traveler's Aid Housing, who have now all moved into Summer Street Apartments. This grant was expanded in the FY 2023 NOFO to provide supportive services to up to 125 individuals. The current contract runs out December 31, 2026, and we have received notice that this contract will be renewed, but we have not yet received a new contract.

10.     The third permanent housing grant, referred to as Rapid Rehousing Program, provides supportive services and rental assistance for 21 families experiencing homelessness now living in private market apartments. The current contract runs out December 31, 2026, and we have received notice that this contract will be renewed, but we have not yet received a new contract.

11.     Crossroads also receives a CoC grant for supportive services. This grant provides services to support the implementation of RI CoC's Coordinated Entry System, with specific focus on the diversion/housing problem solving and rapid resolution

3

supports to stabilize individuals and families experiencing homelessness, with an additional focus on domestic violence survivors. We have served 679 people in the current grant. The current contract runs out December 31, 2026, and we have received notice that this contract will be renewed, but we have not yet received a new contract.

12.    Crossroads also receives a sub-agreement with CoC federal funds, awarded by Rhode Island Housing. This grant provides rental assistance for up to 26 households residing in private market apartments as well as Crossroads' owned property. The current subaward runs out December 31, 2026, and our understanding is that RI Housing has received notice that this contract will be renewed, but we have not yet received a new sub-award from RI Housing for FY 2025 for the January 1, 2027 through December 31, 2027 period.

13.    Crossroads relies heavily on the CoC Grants to fund critical services to support individuals and families experiencing homelessness, many of whom experience chronic homelessness. Funds support leasing and rental assistance and/or operating costs for properties that we own, properties that we manage and rental units in the private market.  Funds also pay for case management supportive services for the individuals and families enrolled, which is critical in maintaining housing stability. There are hundreds of families and individuals who participate in these programs.

14.    If Crossroads cannot apply for HUD funding, or is disqualified from or disadvantaged in competing for funding, because of new conditions in the FY26 NOFO, for the reasons explained below, it would be extremely detrimental to Crossroads and its mission. Without this funding, the most vulnerable people who have

experienced homelessness will lose their housing and associated supportive services. This will lead to an increase in homelessness.

15.     Without the renewal funds for any of the above grants, residents who are now stably housed will be responsible for paying 100% of the rental cost, which is not feasible for the very low-income population we serve. This will result in returns to homelessness. Private market landlords will lose this guaranteed rent and be forced to charge residents higher rents. For the vast majority of households, this will not be possible, which will lead to landlords faced with the legal cost of evictions and lost rent as families are unable to pay and the time it takes to lease up to new families.

16.     Also, Crossroads will face a similar burden, as there are very few other options for this type of rental support. Crossroads-owned apartments supported by rental assistance or operating funds will lose those funds. Because many of these properties are deed restricted, Crossroads is limited to who we can rent to, and how much we can charge.  This will lead to increased vacancy and not enough rent to support operations. And last, staff associated with these programs will lose employment, contributing to an increased number of unemployed people.

## III.    CROSSROADS HAS INVESTED SIGNFICANTLY IN ALIGNING ITS HOUSING PROGRAMS WITH LONGSTANDING HUD POLICIES

17.     **Using a Housing First approach**. For the past decade, all permanent housing, which includes both Rapid Rehousing and Permanent Supportive Housing programs, were required to follow "a housing-first approach" and funded projects that

5

helped individuals and families move quickly into permanent housing without pre-conditions so that participants could choose the services they need to improve their health and well-being while remaining in their housing.

18.     Since 2014, Crossroads has operated and delivered our programs and services using the Housing First approach. Our model provides a wide array of sup-portive services and supports delivered in vivo – in our clients' homes. The Housing First model is founded on the belief that stable housing is the necessary first step to address other challenges, so services are offered to support residents, but they are not mandatory.

19.     While services aren't required, we proactively engage with residents and use every engagement as an opportunity to offer services. This builds relationships, trust, and often can contribute towards willingness to engage. Research suggests, and we have found, that this low-barrier approach can be more effective, as people are more likely to engage with services when they choose to.

20.     Additionally, when it comes to individuals with substance use disorder, our many years of housing clients based on Housing First has provided us with ex-tensive examples that demonstrate that when we place people in housing and then provide services and voluntary access to treatment, individuals with substance use disorder are in a better position to engage in these supports.

21.     **Decriminalizing homelessness**. Consistent with the required focus on Housing First principles described above, in the preceding several years, HUD has

6

urged CoC applicants to avoid practices that criminalize homelessness, and to "promote participant choice," while also working with law enforcement and state and local governments to enlist their support for housing people who reside in encampments.

22.    Following this approach, Crossroads cooperates with law enforcement to ensure the safety of our clients and to ensure they have a safe, stable environment. We are supportive of the police and work closely with them to support the transition of people in encampments to safe shelter and housing. As living outside is far less safe than being in a shelter or housing, our staff works with local law enforcement in a way that facilitates the quickest and safest transition from unsafe activities to safer ones. However, Crossroads staff do not and must not engage in activities which are enforcement of local laws, as we are not a law enforcement entity. Our work with law enforcement is voluntary and aimed to support the safety of the people we serve, not to enable us to serve as proxy for law enforcement.

23.    As the clients we serve had often had poor experiences with law enforcement, it is important that as we work in gaining trust with clients to engage in services and transition to a safer environment, we cannot be seen as part of law enforcement, but instead supportive of them in helping the people we serve.

24.    **Addressing racial inequities**. Our mission to help those experiencing homelessness secure stable homes is deeply connected to diversity, equity and inclusion. We recognize that homelessness affects people from all backgrounds, but systemic barriers mean some communities, including people of color, are impacted more than others. By centering equity in our work, we aim to remove those barriers of

racial inequities and ensure everyone has fair access to housing and support. In the past, HUD has supported this work, including through the most recent FY24-25 NOFO, which stated that proposed CoC projects "should address racial inequities to ensure successful outcomes for all persons experiencing homelessness" by "using proven approaches," including by doing things like "partnering with a racially diverse set of community partners and people experiencing homelessness and partnering with organizations serving underserved populations," and taking steps to identify and eliminate the barriers that result in racial inequities.

25.    **Improving assistance to LGBTQ+ individuals**. HUD's regulation requires HUD grant recipients, to ensure that "[e]qual access to CPD programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity." 24 C.F.R. § 5.106. Crossroads' mission and core values work to create broader opportunities for the people we serve to be able to present as their authentic selves. We are committed to creating inclusive, welcoming spaces where all people feel valued and supported on their journey to stable housing. In providing direct client services, we use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of our transgender and nonbinary clients that we serve, especially in congregate shelters where placement is based on gender identity.

## IV. HUD'S FY2026 COC PROGRAM NOFO DISADVANTAGES OR MAY EVEN DISQUALIFY CROSSROADS

26.    HUD's FY26 Continuum of Care Program Notice of Funding Opportunity (NOFO), issued on June 1, 2026, make it impossible for Crossroads to fairly compete for or receive HUD funding, and HUD's awarding funding under this NOFO will cause tremendous harm.

### A. New Requirements that Conflict with Crossroads' Mission and Service Delivery Model

27.    **Housing First**. The NOFO for FY 2026 abandons the Housing First model mandated by prior NOFOs, adopted by Crossroads since 2014 and, heavily advantages projects that mandate participation in services. The FY26 NOFO fundamentally changes the scoring criteria for housing projects. Unlike prior years, which scored projects based on voluntary service participation consistent with Housing First principles, the new NOFO assigns a substantial number of points to projects that have or will incorporate supportive service participation requirements. The FY26 NOFO also pressures CoCs to put forth projects that impose service requirements, and this pressure is passed on to Crossroads, as an applicant in the local competition. The NOFO assigns points for demonstrating that a certain percentage of housing projects within the (Rhode Island) CoC mandate participation in supportive services; for showing that CoC-funded units mandate substance abuse treatment as a condition of participation in the program; and for not restricting housing projects from requiring treatment or sobriety as a condition of assistance. These scoring criteria undercut person-centered, voluntary engagement, which is proven to reduce harm, improve medical adherence, and support vulnerable groups.

9

28.     A shift to mandatory service participation in order to be a competitive applicant will negatively impact Crossroads' ability to deliver our mission, as we know that clients will feel threatened and disempowered when asked to sign participation agreements. This will result in some people refusing housing and services. The Housing First model has worked because it gives clients choice. Mandatory service participation takes away that choice. This requirement is, in effect, coercion, because it is not the client's choice.

29.     Mandatory service participation will also lead to increased program terminations, as Crossroads will be forced to exit individuals who choose not to engage in these required services. The very nature of requiring participation will also lead to higher incidences of service refusal.

30.     We know, from research and more than 10 years of offering services with a Housing First model, that services are more successful when individuals choose to engage with them, and are not forced to engage with them. Our data has shown that 93% of those placed in our housing, following a Housing First approach, never return to homelessness. Personal autonomy is a basic tenet of Crossroads' service delivery model, and the NOFO's service-requirements-related criteria would mean that we either risk being denied funds if we do not implement the requirement, or conflict with our mission if we do.

31.     Additionally, Crossroads receives multiple Family Violence Prevention Services (FVPSA) grants, passed through from the Rhode Island Coalition Against

10

Domestic Violence, and we use this grant money to provide housing services and supports to victims and survivors of domestic violence. Under FVPSA, it is illegal for a provider to require beneficiaries to participate in support services as a condition of receiving housing assistance, and those services must be voluntary. 42 U.S.C. § 10408(d)(2). Thus, as a subrecipient of FVPSA awards, Crossroads will be unable to mandate participation in supportive services, and we would face a great disadvantage because we cannot receive the large number of points that are granted to programs that mandate participation in supportive services. The RI CoC, moreover, would be disadvantaged on its overall application if it includes Crossroads because that would harm its ability to earn points assigned to CoCs that have certain numbers of projects within the CoC that mandate services.

32.     Under the new NOFO scoring criteria that favor mandatory service participation, Crossroads' approach—which has proven effective for years and is consistent with research-based best practices and FVPSA requirements—would be disadvantaged in competition for funding.

33.     **Harm Reduction**. The FY26 NOFO assigns points to CoCs that prohibit CoC-funded housing projects from, among other things, conducting "activities under the pretext of 'harm reduction.'" To obtain these points, a CoC would have to bar projects from operating harm reduction services, even with the project's own, non-CoC funding.

11

34.    Harm reduction is a proven evidence-based approach that is central to Crossroads' mission and service delivery model wherein we meet people where they are without judgment and without requiring abstinence as an immediate goal.

35.    We employ a range of harm reduction practices and offer our staff and the people we serve with the opportunity to be trained in the delivery of Narcan (Naloxone) and ensure they have easy access to this life-saving medicine. Staff, clients and residents who have completed the Narcan training receive a supply of Narcan. In addition, Nalox Boxes are located in many of Crossroads facilities and housing programs. These have been used countless times to reverse the effects of opioid overdose among the people we serve. Abstinence does not work for everyone and without the option of having Narcan available, we will be putting our clients' lives in jeopardy.

36.    Other harm reduction practices that are central to our mission include provision of fentanyl test strips to avoid life-threatening drugs. We also provide sharps containers in multiple locations as part of harm reduction. These offer safety to clients and staff as they reduce the potential for needle sticks resulting from inappropriate disposal of used needles.

37.    Finally, as abstinence does not work for all people, we work to provide an array of options for clients in how they wish to seek treatment. This may include Medically Assisted Treatment (MAT), which is evidence based and provides clients with choices and options for living a full life.

38.    In addition, the NOFO suggests that a program must be disqualified, or violates award conditions, if it fails to evict or exit participants from assistance for a

12

non-first-time violation of a drug-related program policy or lease requirement. Evicting a participant for a non-first-time drug-related program violation is not a viable option for Crossroads for many reasons. Crossroads recognizes that the individuals it serves struggle with substance use disorders and it is important that they are offered opportunities to seek treatment. If Crossroads is forced to evict for non-first-time violations, in order to be a competitive applicant, Crossroads will face reputational damage with the Rhode Island courts, which have strong tenant protections – particularly in supportive housing. The courts expect housing and service providers to work with tenants and attempt to help them seek recovery and improved quality of life. While Crossroads has and will evict individuals for substance-related activities, it is not for the substance use itself, but instead when the impact of that behavior affects the quality of life and peaceful enjoyment of other tenants.

39.    The scoring that incentivizes CoCs to prohibit service providers from engaging in harm reduction activities in the FY26 NOFO would have a significant impact on Crossroads' ability to deliver on our mission, and this requirement would mean that we either risk being ineligible for these funds if we do not implement the requirement, or conflict with our mission if we do.

40.    **Serving people with mental health and substance use disabilities.** The FY26 NOFO directs projects to "prioritize[]" individuals with physical and developmental disabilities—but not mental health disabilities—for permanent supportive housing.  Limiting or prioritizing permanent supportive housing only to indi-

viduals with physical disability impairment or a developmental disability, and excluding all other individuals with disabilities, will have a terrible negative impact on Crossroads' ability to carry out our mission and the CoC programs we operate.

41.    While people with physical and developmental disabilities are present in the population of those experiencing homelessness, the prevalence of mental illness and substance use among this population is also extraordinarily high. All people who experience homelessness have trauma and as a result, this trauma can lead to substance use as a coping mechanism. Substance use and homelessness are interconnected in a cycle which is often addressed through the provision of permanent housing and supportive services. This new deprioritization of people with substance use disorder and mental illness will prohibit some of the people most in need of these services from receiving them.

42.    Furthermore, this preference which is on the basis of disability (prioritizing individuals with physical and developmental disabilities over individuals with mental health disabilities) would expose us to liability under the Americans with Disabilities Act, Rhode Island Civil Rights of People with Disabilities Act, R.I.G.L. § 42-87-1, et seq., and other federal, state, and local laws and regulations that prohibit discrimination on the basis of disability.

**B.    New Criteria and Preferences that Place Crossroads at a Competitive Disadvantage Because of Its Location in Providence, Rhode Island**

43.    The FY26 NOFO also includes scoring factors tied to the existence of state or local laws where the project is located, entirely outside the control of the

applicant organization. For example, at the threshold and merit review stages, applicants must cooperate with first responders and law enforcement to receive certain points, including by helping enforce local laws on public camping and public drug use. Additionally, to receive certain merit points, a CoC must show that it does not take actions that (in HUD's judgment) "interfere with" local efforts to advance the objectives of clearing tents and encampments, decreasing the public use of illicit drugs, pursuing involuntary commitment, and sharing information in accordance with the Sex Offender Registry and Notification Act (SORNA).

44.    **Public Camping.** Under this criteria, Crossroads will likely be penalized and be at a competitive disadvantage because its services are located in Providence, Rhode Island. The City of Providence has a law that prohibits fining anyone for camping on public property, Providence, R.I., Ordinance 2025-11 (Apr. 3, 2025), and the State of Rhode Island has a Homeless Bill of Rights, enacted at R.I. Gen. Law § 34-37.1-3, which provides that "a person experiencing homelessness . . . has the right to a reasonable expectation of privacy in his or her personal property to the same extent as personal property in a permanent residence." Both the municipal ordinance and the state law appear to conflict with the preference for prohibitions on public camping. Yet, the NOFO awards points to providers that cooperate with local efforts to quickly clear encampments. It is unclear how Crossroads could receive those points given that there are, by virtue of state and local law, no such local efforts. Thus Crossroads will be at a competitive disadvantage for reasons entirely outside of its control.

15

45.    Furthermore, this scoring preference would be detrimental to Crossroads as we have no way of understanding what level of and type of cooperation is necessary to result in the awarding of points. Crossroads has worked and continues to work closely with the City of Providence and State of Rhode Island to support proven, evidence-informed practices to humanely address encampments. This requirement will have a chilling effect on both our advocacy efforts and our ability to engage with the unhoused clients we serve, many of whom have had poor experiences with law enforcement, and our independence as a service provider would be threatened by a requirement that we engage with law enforcement and take up a law enforcement role.

46.    **Harm Reduction**. Crossroads may also be at a competitive disadvantage because R.I. Gen. Law § 23-12.10, effective March 1, 2022, authorizes a four-year pilot program to prevent drug overdoses through the establishment of "harm reduction centers" where persons may safely consume pre-obtained substances. Because Crossroads' services are located in Rhode Island, and due to this state law, Crossroads' application may be rejected or at a competitive disadvantage, as HUD may view this law as not enforcing prohibitions against public illicit drug use. Thus, it is unclear how Crossroads could receive the points awarded to providers that cooperate with efforts to decrease the public use of illicit drugs.

47.    This scoring preference would also be detrimental to Crossroads as we have no way of understanding what level of and type of cooperation is necessary for enforcement of local public drug use laws. As discussed above, our clients have often

16

had poor experiences with law enforcement and many are in recovery, and this requirement will have a chilling effect on our ability to engage with the unhoused clients we serve. Crossroads has and will continue to cooperate with law enforcement, but that cooperation is voluntary and aimed to support the safety of the people we serve, not to enable us to serve as proxy for law enforcement.

48.    **SORNA**. The FY26 NOFO adds a scoring preference for cooperating with local efforts to share information in accordance with SORNA. Rhode Island is included on a Department of Justice-generated list of jurisdictions that have not substantially implemented SORNA. Thus, it is unclear how Crossroads could receive those points given that the Administration does not consider there to be adequate efforts to share information under SORNA. As a result, Crossroads will be at a competitive disadvantage for reasons entirely outside of its control.

## C.    Retroactive Application of New Standards

49.    Crossroads is particularly concerned that, under the FY26 NOFO, HUD reserves the right to penalize organizations for activities they were previously required or encouraged to undertake.

50.    For instance, the NOFO states that applicants may be rejected if they have a "history of illegal discrimination."

51.    Crossroads has never engaged in illegal discrimination, but are concerned that the Administration has a new and radical view that DEI activities constitute "illegal discrimination." Crossroads has promoted diversity, equity, and inclusion, consistent with prior HUD priorities. Prior HUD NOFOs and policies required or strongly encouraged organizations to promote racial equity, address disparities,

17

and support LGBTQ+ populations. Crossroads has operated in good faith compliance with these requirements for years.

52. The FY26 NOFO also states that applicants may be rejected if they have a "[h]istory of subsidizing or facilitating activities that conflict with the purposes of this NOFO." This criterion is impermissibly vague and would allow HUD to target any organization deemed not aligned with the current administration's views, regardless of the organization's performance or outcomes in serving homeless populations. For instance, we have long implemented voluntary services consistent with Housing First principles. We have also engaged in harm reduction.

53. This provision creates enormous uncertainty and risk for Crossroads. We have no way of knowing what past activities might be deemed to "conflict with the purposes of this NOFO." Our longstanding work, which we had invested in to be aligned with federal laws and longstanding HUD priorities, could all potentially be characterized as conflicting with the NOFO's new requirements.

### D.    Defunding Permanent Housing and Existing Projects

54. The FY26 NOFO dramatically withdraws funding from existing projects and permanent housing by setting aside $1.3 billion for new projects only, with a heavy priority for transitional housing and supportive-services-only projects.

55. This acts as a de facto cap on existing permanent housing projects, and this will have a significant and dramatic negative effect on Crossroads. It is highly possible that some our existing grants will not receive renewal funding given this new set-aside.

18

56.     This change puts Crossroads' renewal funding at risk based on factors outside our control, including how the Rhode Island CoC is scored on HUD's new merit review criteria. The RI CoC has 37 annual grants with 25 of them providing permanent housing. The new structure will limit RI to applying for fewer renewal grants in Tier 1. Based on the new scoring criteria in the FY26 NOFO, and for the reasons discussed above, at least one of our supportive permanent housing projects will not be renewed, and we do not know if the other permanent housing grants will be renewed.

57.     If Crossroads' permanent housing grants are not renewed, that would mean that approximately 173 households living in apartments either owned by Crossroads or owned by private individuals will lose their housing and supportive services. And more than 600 households would lose housing services. The availability of the CoC renewal funds is critical to our ability to deliver on our mission. These funds total $2,505,085 and Crossroads does not have replacement funds available. Nearly all of our funding comes through grants and contracts, and we would not be able to use funds awarded to us for other programs and services to make up for the loss of the CoC funds.

58.     The properties that Crossroads owns in which we provide permanent housing have affordability and other deed restrictions which limit our options for operating the housing. For example, we cannot charge market rents for these apartments. If CoC funding is eliminated, our obligation to continue to operate these per-

19

manent housing programs does not due to the deed restrictions. Other deed restrictions include limiting who we can serve in terms of income levels and history of homelessness, for example. Without CoC renewal funding, Crossroads will be faced with significant financial jeopardy and forced to make decisions of how to reallocate limited resources in order to comply with these programmatic obligations.

59.    Additionally, the FY26 NOFO changes the project scoring to account for "commitment to service participation requirements" rather than "commitment to housing first," further disadvantaging Crossroads' voluntary services approach for the reasons described above.

**E.    Post-Award Conditions and Compliance with Executive Orders**

60.    The FY26 NOFO includes post-award requirements, such as compliance with Executive Order 14218, Ending Taxpayer Subsidization of Open Borders; Executive Order 14202, Eradicating Anti-Christian Bias; Executive Order 14205, Establishment of the White House Faith Office; Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferences; Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; Executive Order 14182, Enforcing the Hyde Amendment; and Executive Order 14321, Ending Crime and Disorder on America's Streets.

61.    **Assistance to LGBTQ+ individuals.** The FY26 NOFO states that grantees must follow Executive Orders, including executive orders that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized. This is not only contrary to past HUD

20

NOFOs, HUD regulations and RI state law, but Crossroads cannot and will not meet this requirement.

62.    As discussed above, Crossroads treats people in accordance with their gender identity. People who identify as transgender or non-binary make up a disproportionate percentage of those experiencing homelessness. This new restriction will result in our no longer being able to serve some of the most vulnerable individuals in our communities. These are the people who are most often bullied, harassed and victims of violence. With this restriction, we are placed in a position of knowingly disrespecting and misidentifying people we serve. The result will be that Crossroads loses the trust and confidence of those whom it is our mission to serve, and more individuals will be homeless and isolated from services and supports.

63.    Under the new NOFO, Crossroads' practice of treating people in accordance with their gender identity—which is consistent with state and federal law and aligned with its mission of reducing homelessness to marginalized populations—would be disadvantaged in competition for funding.

64.    **Addressing Racial Inequities**. The FY26 NOFO also requires adherence to executive orders that broadly seek to eradicate all diversity, equity and inclusion activities.  How this will be assessed is unclear, but Crossroads is concerned that its DEI activities will be viewed as a basis for taking away funding.

65.    **Immigration Verification**. The FY26 NOFO also requires grantees to comply with an executive order that mandates verifying immigration status, Ending Taxpayer Subsidization of Open Borders, EO 14218, and requires grantees to comply

with "immigration requirements" set forth in the Ending Taxpayer Subsidization of Open Borders, EO 14218. Crossroads does not, nor is it legally required, to verify immigration status for its services. 8 U.S.C. § 1642(d). It has long been Crossroads' policy to provide low-barrier services to people experiencing homelessness without preconditions or requiring personal information unrelated to the delivery of shelter and services. While some of our housing programs do require that we verify immigration status, those who do not have legal status are not automatically disqualified from housing.

66.    For all the reasons discussed above, Crossroads genuinely fears that in performing its lawful activities and program delivery, we will be accused of violating the above post-award conditions to which HUD insists we must agree. This fear is amplified by many statements by the federal government that it will use the False Claims Act as a "weapon" against nonprofits.

## V.    THE IMPOSSIBLE CHOICE AND IRREPARABLE HARM

67.    The new FY26 NOFO presents Crossroads with a lose-lose choice. Crossroads could forgo applying for or accepting HUD grant awards and face devastating consequences to our organization's financial health, our ability to provide housing assistance to vulnerable people who are homeless and at risk of homelessness, and our ongoing operations. Or, Crossroads could attempt to comply with the new conditions and change its programs to meet the new criteria and betray our mission, abandon the clients we serve, jeopardize compliance with professional ethical standards, and face enormous risks of litigation and government investigation under the False Claims Act for activities we have undertaken in good faith for years.

22

68.     If Crossroads cannot receive HUD funding under these conditions, we will be forced to terminate or drastically reduce housing assistance services to Rhode Island residents experiencing homelessness. Hundreds of formerly homeless Rhode Islanders would be at immediate risk for losing their housing if Crossroads lost the HUD CoC funding. Currently there are 173 households in permanent housing receiving services, and more than 600 households annually who receive housing problem solving and rapid resolution supports. Individuals and families would be forced back into homelessness, which would result in the loss of gains made in health and mental health treatment and substance use stability, placing them at risk of exploitation, survival crime, and severe trauma.

69.     The harm extends beyond individuals and families served by Crossroads to the broader Rhode Island community. Research has shown that individuals and families experiencing homelessness utilize emergency services such as hospitals at much higher rates than those that are housed, costing the state of Rhode Island potentially millions of dollars. As the largest provider of housing and supportive services for families and individuals who have experienced homelessness in Rhode Island, the loss of CoC funding would be catastrophic. People with disabling conditions living unsheltered on the street or staying in emergency shelters would remain homeless for months or years if supportive housing is no longer available. HUD CoC funding provides Crossroads with the resources to house those households with the highest acuity whether they live in Providence, Warwick, Middletown, or anywhere else in the state.

70. Should Crossroads face a drastic reduction in the CoC program funds, the impact on our staff would be profound. Staff members working in the CoC-funded properties and programs may face lay-offs, which would lead to the loss of income and potential loss of the staff members' housing. Some of our staff are currently working two jobs just to make ends meet, and additionally about 7-8% of our workforce are individuals with lived experience of homelessness.

71. Program reductions impact morale, which would also lead to other employees feeling insecure about their employment and could result in voluntary terminations as staff look to other opportunities with greater stability, which would lead to staff shortages throughout Crossroads.

72. If, alternatively, Crossroads were to change its programs to competitively apply for funding under the new NOFO, we would face profound harm to our mission and operations. We would be forced to abandon evidence-based approaches and embrace a punitive, nonsensical model that will have far reaching impacts for both the people we serve and those who work in this field.

73. These changes would fundamentally destroy Crossroads' mission and effectiveness. These changes would lead to unbelievable fear and uncertainty for our clients. Those that have already experienced so much trauma and difficulty, who are now housed and stable, will be faced with the prospect of returning to homelessness through no fault of their own – when the system that was supposed to help them, turned its back on them.

74.    Moreover, the vagueness of the new requirements creates impossible uncertainty. Crossroads has no clear guidance on what activities would be deemed to "cooperate" with or "impeded" law enforcement, promote gender ideology, or constitute "illegal DEI" under the administration's new interpretations. Even if Crossroads attempted to comply, we face the constant threat of investigation, funding termination, and False Claims Act liability based on vague standards to activities we have undertaken for years in good faith.

75.    Crossroads fears that if it agrees to the new funding conditions, it could face not only loss of grant funds mid-program, but federal government investigation, private party litigation under the False Claims Act, and potential liability for activities that were previously encouraged or required. These potential consequences make Crossroads deeply concerned about applying for or accepting awards under the new NOFO. To attempt to mitigate these risks, Crossroads would have to fundamentally change its identity, abandon its mission, and betray the vulnerable individuals and families it exists to serve.

## VI.    <u>CONCLUSION</u>

76.    The FY26 NOFO places Crossroads in an impossible position where we cannot compete for or accept HUD funding without abandoning our mission, betraying the vulnerable populations we serve, and violating professional ethical standards. At the same time, we cannot forgo HUD funding without ending critical housing assistance services that dozens of vulnerable people depend on.

25

77.     In addition, under the NOFO, Crossroads is in serious jeopardy of losing funding it relies on to house individuals and families otherwise at risk of homelessness.

78.     Without relief from the Court, Crossroads will suffer irreparable harm, and individuals and families experiencing homelessness throughout Rhode Island will be denied access to the specialized, affirming services they desperately need.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2026.

Michelle M. Wilcox
President & CEO, Crossroads Rhode Island.

26