IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS *et al.*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT *et al.*,

*Defendants*.

Case No. 26-cv-436-MSM-AEM

**DECLARATION OF SHEILA A. DILLON**

I, SHEILA A. DILLON, hereby declare under penalty of perjury as prescribed in 28

U.S.C. § 1746 that the following is true and correct:

1.      My name is Sheila A. Dillon. This declaration is based on my knowledge,

professional education and experience, and review of relevant records. I am over the age of

eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of

Boston.

2.      I have been employed as the Chief and Director of the Mayor's Office of Housing

("MOH") of the City of Boston since 2013. Prior to my current role I was the Director of the

Massachusetts Bureau of Rental Assistance. I have spent more than 30 years of my career in

affordable housing and community development programs, including the oversight of programs

to address homelessness.

3.      MOH is responsible for addressing homelessness, creating and preserving

1

DECLARATION OF SHEILA A. DILLON

affordable housing, and ensuring that renters and homeowners can secure and maintain safe, stable housing. MOH also develops and implements the City of Boston's housing creation and homelessness prevention plans and collaborates with local and national partners to find new solutions for homelessness and to build more accessible housing, particularly for those with lower incomes.

4.  As the Chief and Director of MOH, I oversee all functions of MOH, including our homelessness prevention and family stabilization programs.

5.  In furtherance of this work, MOH routinely applies for and receives various grants from HUD, including Continuum of Care ("CoC") grant funding. MOH has received CoC funding every year for more than twenty-five years due to the strong performance of the City of Boston in implementing permanent supportive housing programs that stabilize households exiting homelessness. The City of Boston CoC (the "Boston CoC") has consistently received increases in its CoC award in the form of new funding for CoC Bonus projects, Domestic Violence ("DV") Bonus projects, and other competitive funding opportunities. This is a result of Boston's strong performance on the CoC application and its overall system performance, as demonstrated by decreases in unsheltered homelessness, homelessness among veterans, and chronic homelessness in Boston.

6.  Since 2011, Boston has reduced homelessness among veterans by 60%. Since 2007, Boston has reduced chronic homelessness by 26% and unsheltered homelessness by 57%. For decades, Boston has consistently had one of the lowest rates of unsheltered homelessness of all major cities in the United States. Boston was also cited by the U.S. Department of Veterans Affairs for being among three cities in the nation that ended chronic homelessness among

2

DECLARATION OF SHEILA A. DILLON

veterans.[1]

7.      HUD awards points to CoC applicants based on a variety of metrics, including past performance and success in grant management. In 2024, HUD awarded the Boston CoC 158.75 out of 200 total points, 7.25 points above the national median.

8.      In Boston, approximately 1,927 formerly homeless individuals and families are housed using CoC grant funding. These households include some of the most vulnerable members of the community: 1,447 people with disabilities, 213 children, and 457 seniors over 65. This group includes 197 veterans, 166 of whom have a disability.

9.      The process for obtaining CoC funding begins when HUD issues a Notice of Funding Opportunity ("NOFO"), which outlines award eligibility and scoring criteria. Based on this notice, Boston hosts a local competition to submit a collective application to HUD consisting of individual project applications. This process includes developing and publishing Boston CoC's policies for acceptance and scoring of projects in accordance with HUD's new priorities, holding a public application process for new projects, conducting review and scoring of new applications and renewal applications, and preparing applications for HUD's ultimate review and funding determination.

10.     HUD issued a Notice of Funding Opportunity on June 1, 2026, for the CoC program covering fiscal year 2026 ("FY26 NOFO").

11.     The Boston CoC is currently scoring local applications. Local applications were due to the Boston CoC on July 6, 2026, and the Boston CoC plans to notify applicants whether they have been accepted by August 11, 2026. As of this writing, HUD has not released its project

---

[1] *See* VA Homeless Programs: VA 25 Cities Initiative, available at:  https://www.va.gov/homeless/25cities.asp

3

DECLARATION OF SHEILA A. DILLON

applications, a necessary step in the selection process.

12.     In putting together its application, the Boston CoC evaluates local applicants and ranks them by priority and score, with the highest priority projects in "Tier 1" and the remainder in "Tier 2." Tier 1 projects are funded so long as they pass HUD's threshold review, while Tier 2 projects are subject to additional merit review and are only considered if there is funding remaining after the Tier 1 projects have been allocated. The FY26 NOFO caps a CoC's Tier 1 projects at 60% of the overall funding needed to renew existing projects ("Annual Renewal Demand"). By contrast, Tier 1 funding has historically been allocated at anywhere between 90% and 100% since tier-based scoring was implemented in 2013.

13.     Contrary to longstanding "Housing First" practices, the FY26 NOFO shifts focus away from Permanent Supportive Housing ("PSH") and Rapid Rehousing ("RRH") (together, Permanent Housing or "PH") and instead prioritizes new, Transitional Housing ("TH") and Supportive Services Only ("SSO") projects. The NOFO sets aside $1.3 billion for new projects only, limiting the number of existing projects that can be renewed. In allocating these set aside funds, the NOFO indicates that HUD will first fund TH and SSO projects, only turning to PH projects if any funding remains. Thus, any PH projects relegated to Tier 2 will almost certainly not be funded.

14.     Permanent Housing projects in Boston that will be lost to these cuts include Pine Street Inn's Housing Works Partnership Consolidated, which has been operating for 10 years and currently provides rapid rehousing to 134 homeless individuals, and Bridge Over Troubled Waters' Rapid Rehousing Plus project, which has been operating for 5 years and currently provides rapid rehousing to 86 homeless young adults.

15.     Accounting for the FY26 NOFO's abandonment of Housing First principles and

4

DECLARATION OF SHEILA A. DILLON

numerous other drastic policy shifts will be a costly, labor intensive process. Some current subrecipients who have developed and refined successful, evidence-based programs will be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive because of the rapid shifts in HUD's priorities; some have already chosen not to reapply; and some will be unable to overhaul their programs quickly enough to bring them into compliance within the required timeline. Specifically, providers in Boston have raised concerns with MOH that the FY26 NOFO's intolerant position on harm reduction programs may cause their agency to drop out of the competition.

16.    These concerns and others like it are likely to cause the Boston CoC to lose the benefit of its experienced partners and thus compromise its ability to provide stable services for vulnerable community members.

17.    When providers have had to step away from the program in the past, Boston has faced significant challenges in finding qualified and adequately resourced replacements to fill the gap. Even where such replacements do exist, the administrative costs to train and onboard new providers will create significant strain on the City.

18.    Providing homeless individuals and families with Permanent Housing reduces their reliance on other publicly funded systems — such as jails, hospital inpatient programs, emergency shelters, psychiatric institutions, and emergency rooms — creating net savings for taxpayers. A 2015 analysis found that in Massachusetts, Permanent Supportive Housing programs save taxpayers $13,401.00 per person per year. [2]

19.    93% of Boston's CoC grant funds are dedicated to Permanent Housing programs,

---

[2] *See* "Home & Healthy for Good: Progress Report 2015", Massachusetts Housing and Shelter Alliance, December 2015. Available at: https://archives.lib.state.ma.us/entities/journalfile/781879ae-1c95-4b22-95ad-c0d820e85037

DECLARATION OF SHEILA A. DILLON

which exclusively fund housing for formerly homeless households, including people with disabilities. This prioritization of PH aligns with HUD's longstanding "Housing First" model, as reflected in many years of CoC NOFOs.

20.     For example, the 2024-2025 NOFO, issued on July 31, 2024, identified Permanent Housing as HUD's top priority, and explained that "CoC Program funded projects should help individuals and families move quickly into **Permanent Housing without preconditions** and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing." *See* 2024-2025 NOFO at p. 8 (emphasis added).

21.     For the FY26 NOFO, the maximum amount that the Boston CoC can expect to receive for Permanent Housing projects is less than $32,986,103. Because of the NOFO's $1.3 billion new project set aside, and the cap on Tier 1, the Boston CoC cannot reasonably expect to receive funding for Permanent Housing projects beyond this amount. The Tier 1 renewal request will also include funding for HMIS and Coordinated Entry projects, which support administrative and compliance functions that are required by HUD. Because of these restrictions on funding for existing and successful projects, Boston will need to attempt to transfer tens of thousands of dollars supporting hundreds of clients in PH projects to locations, projects, and services that will qualify for TH.

22.     The obstacles the Boston CoC will face in attempting this conversion of project types are numerous.

23.     First, most clients housed in PH projects will not be eligible for TH housing by nature of being presently sheltered. Thus, in order to satisfy the TH requirements, Boston understands HUD's guidance on this issue to require each client to jump through numerous

6

DECLARATION OF SHEILA A. DILLON

administrative hoops to demonstrate an imminent risk of loss of housing in the next 14 days, which may include the initiation of a court proceeding.

24.     Second, because of the strict service requirements that accompany new TH programs in the FY26 NOFO, as well as the well-documented higher cost of TH relative to PSH and RRH[3], the same amount of money previously allocated to PH programs will be able to serve significantly fewer individuals if successfully transitioned to TH programs. This will lead to the loss of housing for individuals and families even if the total funding amount were maintained. The Boston CoC does not have the resources necessary to move everyone currently housed by the Continuum into TH or alternative non-CoC-funded permanent housing, and no matter what mitigating steps are taken, there will undoubtedly be individuals who are displaced in this process.

25.     Third, even for those who are successfully able to transition from a PH to a TH project, a sudden shift from a permanent housing arrangement to a temporary, transitional accommodation only guaranteed for 2 years at a time is devastating and destabilizing. Research indicates that forced moves, such as evictions, are linked to long lasting consequences such as PTSD, and higher emergency department usage[4] as well as poorer health outcomes for mothers and their children, including adverse birth outcomes and childhood health outcomes.[5]

---

[3] *See* HUD, Office of Policy Development and Research, *Costs Associated with First-Time Homelessness for Individuals and Families*, (March 2010) Available at: https://www.huduser.gov/publications/pdf/costs_homeless.pdf

[4] *See* Smith, et. al. *Eviction, post-traumatic stress, and emergency department use among low-income individuals in New Haven*, CT (Preventive Medicine Reports, 2022) Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9502672/#fn-group1

[5] *See* Desmond and Kimbro. *Eviction's Fallout: Housing, Hardship, and Health* (Social Forces, 2015) Available at: https://academic.oup.com/sf/article-abstract/94/1/295/1754025?redirectedFrom=fulltext

7

DECLARATION OF SHEILA A. DILLON

26.     Nonetheless, the FY 2025 NOFO prioritizes mandatory treatment and required supportive service participation and penalizes applicants that follow the longstanding Housing First model. At Tier 2 project selection, HUD will allocate points to projects that abandon Housing First principles, by rewarding projects that mandate participation in supportive services.

27.     The reduction in available funding for Permanent Housing would require Boston to eliminate approximately $18 million in Permanent Housing projects in favor of new services-only and temporary housing projects with strict mandatory service, treatment, and employment requirements.

28.     Boston has no alternative funding to renew these grants. Eliminating the required $18M would mean approximately 636 households would lose their Permanent Housing. The resulting increase in homelessness would strain Boston's shelters, streets, jails, emergency rooms, and mental health treatment providers. A 2020 study found that in Massachusetts, people experiencing homelessness who were placed in Permanent Supportive Housing incurred $5,267.00 less in health care costs than those who were not.[6]

29.     Beyond the risks of losing access to housing or shelter, the Boston CoC's clients are likely to lose trust in the CoC's ability to provide reliable services if the current model is upended. Clients who are asked to leave their stable housing programs may not accept further assistance from the Boston CoC.

30.     This risk of lost trust extends to providers and the community as well. The programs funded by the Boston CoC rely on numerous community partners to operate. Boston

---

[6] *See* Brennan et. al, *The Preventive Effect of Housing First on Health Care Utilization and Costs Among Chronically Homeless Individuals,* published December 12, 2020. Available at: https://www.bluecrossmafoundation.org/publication/preventive-effect-housing-first-health-care-utilization-and-costs-among-chronically

DECLARATION OF SHEILA A. DILLON

CoC funds go towards project-based, sponsor-based, and tenant-based rental assistance, *see* 24 C.F.R.§ 578.51(c)-(e), as well as supportive services including community health centers and substance use treatment providers. Property owners, service providers, and other businesses in Boston rely on these payments, and may be less willing to work with the Boston CoC if their contracts are disrupted by these rapid policy changes.

31.    To align with HUD's new policy priorities, the drastic changes Boston has made to its local competition process have been time and labor intensive, and the changes Boston will need to make to its housing programs portfolio will be even more time-consuming. Critically, once these changes are publicly announced on or before August 11, 2026, FY25 projects that will not receive FY26 renewal funding may choose to begin reducing staff, reducing or closing new client referrals, or closing early entirely. The resulting program closures, staff reductions, and lease modifications will be exceedingly difficult if not impossible to reverse should the FY26 NOFO be enjoined later on in this proceeding. If Boston's longstanding, proven effective PH projects are wound down now, they may be gone for good.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 16th day of July, 2026.

Signed by:

*Sheila Dillon*

ECCEF321B23F4C3...

Sheila A. Dillon
Chief and Director
Mayor's Office of Housing
City of Boston

9

DECLARATION OF SHEILA A. DILLON