**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*, <br><br> *Defendants*. | Case No. 26-cv-436-MSM-AEM |

## <u>DECLARATION OF ELIZABETH MENGERS MAGARGEE</u>

I, ELIZABETH MENGERS MAGARGEE, declare under penalty of perjury as set forth in 28 U.S.C. § 1746 that the following is true and correct:

1.      I am over the age of 18 years, am competent to testify as to matters in this declaration, and make it based on personal knowledge and my review of relevant records.

2.      I am the Director of Homeless Program Planning for the City of Cambridge's ("City") Housing Department. I have served in this role since July 1, 2026, which is the effective date of a departmental reorganization whereby my position was moved from the Department of Human Services Programs ("DHSP") into the City's expanded Housing Department. From 2018 through June 30, 2026, I served as the Planning and Development Manager for DHSP and prior to that, I served as the Continuum of Care Homeless Services Planner for DHSP from 2011 through 2018.

3.      Among my duties as Director of Homeless Program Planning, I am responsible for the administration of the City's Continuum of Care Program known as the Cambridge CoC, MA-509 ("CoC"). The City of Cambridge serves as the Collaborative Applicant for the CoC.

4.      Since the mid-1990s, the City has convened and coordinated a group of organizations and individuals that constitute a CoC that works to address homelessness in the City. The CoC uses a coordinated community-based process of identifying needs and building a system of housing and services to address the needs of homeless persons.

5.      The City routinely applies for and receives various grants from the U.S. Department of Housing and Urban Development ("HUD"), including CoC Program grant funding, to fund and support these homelessness support programs. The City has received grant

DECLARATION OF ELIZABETH MENGERS MAGARGEE

funding through the CoC process since 1997.[1] The CoC has been a steady source of funding to help the City respond to homelessness.  Consistent renewal of the CoC's grant funds allows for stability for the critical programs that enable the City to house our most vulnerable residents. The City manages the local competition process and communicates the requirements and procedures to the nonprofit subrecipients of CoC program funds.

6.      The City relies on the CoC grant funds as one of its primary funding sources to address homelessness in the community through provision of Permanent Housing.

7.      There were 476 people experiencing homelessness in the City on January 28, 2026, the most recent point-in-time count reported to HUD. In Federal Fiscal Year 2025 (October 1, 2024 – September 30, 2025), 1,910 people were served by the Cambridge CoC in Emergency Shelter, Transitional Housing, Rapid Rehousing, and Permanent Supportive Housing projects. 9% of those served by the CoC were under the age of 18; 12% were young adults aged 18-24; 49% were adults between 25-54; and 30% were adults aged 55 and older. 75% had a disabling condition; 12% were veterans; and 18% were domestic violence survivors.

8.      The Cambridge CoC has consistently achieved a 95% to 98% retention rate in Permanent Supportive Housing programs since reporting began for System Performance Measures ("SPM").

9.      In the 2025 CoC awards, which were announced on 4/27/2026 and 5/21/2026, HUD awarded $6,823,498 to the CoC.

---

[1] The HEARTH Act of 2009 consolidated the Supportive Housing Program ("SHP") and Shelter plus Care ("S+C") grant programs into the Continuum of Care grant program. The initial grants received through the CoC process were SHP and S+C grants; in 2012, these grant programs melded into the CoC Grant Program when the HEARTH Act Continuum of Care Interim rule went into effect.

2

DECLARATION OF ELIZABETH MENGERS MAGARGEE

10. On June 1, 2026, HUD published the FY 2026 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants Notice of Funding Opportunity ("FY26 NOFO").

11. The FY26 NOFO emphasizes policy goals that are the antithesis of the longstanding goals of prior NOFOs, such as following a Housing First approach, addressing racial inequities, improving assistance to LGBTQ+ individuals, decriminalizing homelessness, and expanding permanent housing. Each CoC competition since 2015 has included opportunities to apply for Permanent Housing Bonus funds and scoring incentives for adopting a Housing First approach and has required CoCs to identify strategies they take to prevent criminalization of homelessness; each competition since 2017 has required CoCs to describe how they address the needs of LGBTQ+ individuals and their families; and each competition since 2018 has included questions about how CoCs are evaluating and addressing racial disparities.

12. In order to compete for funding under a NOFO that abandons these longstanding objectives, the CoC and its subrecipients must now divert time and resources from current programs towards rewriting its local competition, locating, training, and onboarding new providers willing to operate programs under HUD's new priorities, and working with renewal Permanent Housing ("PH") projects and staff to plan for budget reductions or reallocations of funds and the subsequent displacement of clients told they had a permanent supportive housing arrangement.

13. The FY26 NOFO shifts focus away from Permanent Supportive Housing ("PSH") and instead prioritizes new, Transitional Housing ("TH") and Supportive Services Only ("SSO") projects. The NOFO sets aside $1.3 billion for new projects only, limiting the number of existing

DECLARATION OF ELIZABETH MENGERS MAGARGEE

projects that can be renewed. In allocating these set aside funds, the NOFO indicates that HUD will first fund TH and SSO projects, only turning to PSH projects if any funding remains.

14.     Since 2015, the Tier 1 threshold - the amount of funds most likely to be renewed - for CoC competitions has ranged between 85% and 95% of Annual Renewal Demand ("ARD"), and the Tier 1 threshold for the 2024-2025 NOFO was set at 90% of ARD. The FY26 NOFO sets the Tier 1 threshold at 60% of ARD. This means that 40% of renewal funds are at risk of nonrenewal, and any PSH projects pushed to Tier 2 are highly unlikely to receive funding.

15.     Consistent with longstanding HUD priorities and practice, throughout multiple presidential administrations, the City has applied a consistent approach to the awarding of CoC funding over the previous several years. Since 2013, the City has used between 80% and 88% of CoC grant funds to support Permanent Housing Projects. The remaining funds are directed to HUD-mandated data and infrastructure projects including Coordinated Entry and HMIS. The Cambridge CoC currently does not host any TH projects.

16.     For the Cambridge CoC, HUD's Tier 1 threshold in the 2026 NOFO means the program will experience a predicted gap of $2.6 million in renewal funding that must be converted from PSH projects to TH or SSO. Any funds not successfully reallocated will be lost not only for this year but in future competitions as well, as the amount of utilized ARD carries over from year to year.

17.      According to HUD's issued guidance on eligibility to transition from PSH to TH, each client's loss of housing as a result of the end of a PSH project will need to line up precisely within a 14 day window that will allow them to claim imminent risk of loss of housing. The administrative complexity of this process will require almost the entirety of the CoC's support

4

DECLARATION OF ELIZABETH MENGERS MAGARGEE

staff, who will no longer have the time to actually work to connect people to the services that they need.

18.    Even if the CoC is able to convert PSH projects to TH and SSO projects, the increased costs associated with transitional housing and supportive services will inevitably result in fewer clients served, and the displacement of families and individuals who believed they had obtained permanent housing.

19.    In any conceivable outcome, the conversion process will significantly disrupt the lives of a vulnerable subset of the population in a way that is entirely incongruous with the purpose of the CoC program. It took many years for the CoC's service providers to build a relationship with these individuals to get them housed and equipped with the services they need. The administrative acrobatics required to make these individuals technically unhoused in order to qualify for TH threatens to destroy these critical relationships.

20.    In addition to the complicated and traumatic process itself of again being labeled unhoused, the FY26 NOFO's Tier 1 threshold and selection priorities indicate that a limited few existing PSH projects, or portions of PSH projects, can in fact be salvaged. This places the Cambridge CoC in the position of designing a funding process and local competition that will determine which projects, are "safe" in Tier 1 and which must convert, either in whole or part, to a TH project, leaving the CoC and project subrecipients with the horrific task of needing to ultimately choose who among the stable PSH participants gets to keep their units and communities, and who must uproot their lives.

21.    As a result of the FY26 NOFO's abandonment of Housing First principles and drastic shift in policy priorities related to harm reduction, support for LGBTQ+ individuals, and mental health services, some current subrecipients who have developed and refined successful,

DECLARATION OF ELIZABETH MENGERS MAGARGEE

evidence-based programs may be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive; some may choose not to apply; and some will be unable to overhaul their programs. The CoC will lose the benefit of experienced partners, and its ability to provide stable services with continuity for its vulnerable community members will be compromised.

22. Cambridge similarly loses the benefit of a broader range of *potential* new applicants as a result of these conditions. Prior to the FY26 NOFO, Cambridge was approached by a provider interested in applying for a Supportive Services Only grant project. However, because this provider's driving mission is to serve queer youth and uplift harm reduction, they will likely be reluctant to participate in the local competition out of fear of being disqualified due to the language in the NOFO, limiting the already small pool of equipped and resourced agencies able to serve the community.

23. The changes in the 2026 NOFO place program participants, nonprofit subrecipients, the City, and the CoC in an untenable position with tragic consequences for the City's homelessness reduction efforts. For example, the City now must communicate to subrecipients that projects that have been successful in stabilizing formerly chronically homeless people will no longer be prioritized for funding, which harms the goodwill and relationship between the City and its subrecipient partners and puts tenancies at risk for over 200 stably housed CoC participants.

24. Requiring the CoC to reduce the amount of funding for Permanent Housing projects will increase homelessness in the community in two ways. First, the current participants of projects that are not included in the 60% Tier 1 cap will likely lose safe stable housing. Even if these projects are converted to the TH components, as HUD has suggested, tenants will face

DECLARATION OF ELIZABETH MENGERS MAGARGEE

eligibility complications because their existing PSH tenancies prevent them from meeting HUD's definition of homelessness required to be eligible for Transitional Housing.

25.     Second, the significant reduction of Permanent Housing inventory available to the CoC will exacerbate the existing bottleneck of eligible people who are prioritized for Permanent Housing by the Coordinated Entry system and awaiting referrals for placement. The CoC currently has over 335 people who are homeless awaiting placement in supportive housing projects. Furthermore, records show that over the past five years, tens of thousands of households have been on the Cambridge Housing Authority's waitlist, demonstrating the immense unmet need for affordable housing in the community. The Cambridge CoC needs more, not less, supportive housing, and the requirement to limit the amount of Permanent Housing funding will reverse progress our community has made to provide appropriate supportive housing for people with histories of long durations of homelessness and complex service needs.

26.     If the CoC loses up to $2.6 million in CoC program funds for Permanent Housing it will face significant challenges at a time when the local economy is forcing difficult budget decisions. A loss of CoC funds for Permanent Housing resulting in the return to the streets of the City and the greater region of previously housed residents will overwhelm the City's social, medical, and emergency services. The loss of CoC supported housing will fall directly on the City with severe financial and social consequences. To the extent the City can redirect resources to fill the federal funding gap, it would mean making difficult trade-offs and reducing funding for other vital City programs.

27.     Additionally, the CoC's service provider agencies work hard to develop trusting relationships with participants and may be forced to sever those relationships, disrupting years of

7

DECLARATION OF ELIZABETH MENGERS MAGARGEE

trust and support, which could contribute to further marginalization of households who in many cases mistrust systems of care.

28.     CoCs are required to run a local competition to evaluate, select, and rank project applications to prioritize for CoC funding. The CoC's local competition closes on July 23 and project rankings must be finalized by August 11. The local competition typically spans a 4-week period: already a very tight timeline to satisfy even in the absence of a complete overhaul of scoring and ranking procedures. Furthermore, at the time of writing we are in week 7 of a 12.5-week competition, and HUD has not yet made available critical documents such as the ARD report, detailed instructions, or the actual application forms in the e-snaps system. These delays are making an extraordinarily challenging competition even harder.

29.     The scoring criteria and overly prescriptive requirements of this NOFO require the CoC and applicants to rework years of planned programming or lose the stable source of federal funds the community has relied on since the 1990s.

30.     For example, the FY26 NOFO imposes threshold eligibility criteria that could result in HUD refusing funding due to the CoC's prior compliance with HUD requirements relating to addressing racial inequities or improving services to LGBTQ+ populations.

31.     When HUD has previously implemented policy changes, it has done so gradually, recognizing that significant policy changes cannot responsibly happen overnight. This has given CoCs an opportunity to work within the local context to thoughtfully plan and adopt new policies and programs that work at the local level. The scale and scope of the changes contained in the 2026 NOFO will disrupt and harm the residents of Permanent Housing projects, project operation by nonprofit subrecipients, the emergency shelter system that is already at capacity, and the entire system of care designed to address the crisis of homelessness in the community.

DECLARATION OF ELIZABETH MENGERS MAGARGEE

With the close of the local competition looming, these drastic changes will need to be made imminently in order to move forward with a funding application, and it is unlikely that once these changes are made they will be able to be quickly undone – or undone at all – down the road.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 15th day of July, 2026

_____
Elizabeth Mengers Magargee
Director of Homeless Program Planning
Housing Department
City of Cambridge

9
DECLARATION OF ELIZABETH MENGERS MAGARGEE