### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>*Defendants*. | Case No. 26-cv-436-MSM-AEM |

### DECLARATION OF JELANI JACKSON

I, Jelani Jackson, hereby declare the following:

1.      I am a resident of the State of Washington. This declaration is based on my knowledge, professional education and experience, and review of relevant records. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Martin Luther King, Jr. County, Washington ("MLK County").

2.      I am the Interim Director of the Housing and Community Development Division (HCD) within the MLK County Department of Community & Human Services (DCHS). As Interim Director, my duties include managing HCD's work to advance affordable housing development, housing stability, and housing policy and planning. I have held this position since March 2026.

3.      Prior to accepting the role of Interim Director of HCD, I served as the Health Through Housing (HTH) Initiative Manager. In this role I served as the overall leader of the HTH Initiative for King County. My responsibilities included administering a locally collected

1

Docusign Envelope ID: 5C1B3A83-FC1D-859C-8393-746D8B36615B

sales tax to build and fund the operation of approximately 1,400 units of Permanent Supportive Housing.

4.     Prior to joining King County, I worked at the Department of Veterans Affairs as a Social Worker. One half of my career was spent serving chronically homeless Veterans assigned to the Veterans Affairs Supportive Housing Program. In this role, I housed and/or provided long term intensive case management services to well over 150 Veterans and their families. The other half of my career was spent in a leadership role overseeing social work services in the Emergency Department and Primary Care.

5.     MLK County is experiencing a severe housing and homelessness crisis. Thousands of people across the County are homeless on any given night. For example, according to a January 2026 Point-in-Time (PIT) Count, which takes a snapshot of the number of people without housing on a specific date, over 18,000 individuals experienced homelessness, with over 64% of those individuals experiencing unsheltered homelessness. Data from DCHS's Performance Measurement and Evaluation team shows that in 2020, the number of persons experiencing homelessness over the course of a year was 40,800.

6.     To house people experiencing homelessness, MLK County receives funding from the U.S. Department of Housing and Urban Development's (HUD) Continuum of Care (CoC) program for permanent supportive housing (PSH), which provides long-term, affordable housing combined with supportive services for individuals and families experiencing homelessness. Through other organizations affiliated with MLK County, primarily the King County Regional Homelessness Authority (KCRHA), CoC funds also go towards rapid rehousing (RRH) and Joint Component programs, which help individuals and families exit homelessness and return quickly to permanent housing by providing temporary financial assistance and other supportive services

such as housing search and stability case management. In addition, CoC funds support transitional housing, Homeless Management Information System (HMIS) and Coordinated Entry.

7.      As of April 2026, the CoC PSH funding directed to MLK County serves 2,244 people. This includes 148 units and 473 beds for households with minor children, 182 veteran households, and around 1,900 people who have mental health disabilities and/or substance use disorder. Across all King County funded PSH projects, 4,730 people are served, including more than 3,700 individuals who have mental health disabilities and/or substance use disorder (as of April 1, 2026).

8.      MLK County has applied annually for CoC funding as part of a Continuum since 1995. The Seattle-King County Continuum represents a coalition of stakeholders that includes MLK County, other local governments, nonprofit organizations, people experiencing homelessness and other parties. Currently, KCRHA submits the CoC application to HUD on behalf of the Seattle-King County Continuum.

9.      On January 17, 2025, the Seattle-King County Continuum was awarded $67 million in CoC funding for Fiscal Year 2024. Of this amount, MLK County was the direct recipient of $38.85 million for 22 PSH projects. The Fiscal Year 2025 funding, continuing what was expected to expire in the first and second quarters of 2026, is under contract, and the Seattle-King County Continuum believes that the funding that is set to expire in the third and fourth quarters of 2026 will also be renewed.

10.     The application process begins when HUD posts a Notice of Funding Opportunity ("NOFO"). The NOFO includes information on eligibility, application scoring criteria, and award administration. Pursuant to the NOFO, the Continuum submits a system-wide application

3

that describes the local homelessness landscape and the Continuum's response along with individual project applications. HUD scores the system-wide application, giving points for responses that show progress and align with HUD's priorities. The NOFO indicates how much funding a Continuum is eligible to apply for. The application score determines whether and how much money is awarded to the projects included in the Continuum application; a separate grant agreement is ultimately awarded for each funded project. The sum of the grants awarded to the individual projects equals the amount awarded to the Continuum as a whole.

11.    The amount that MLK County is awarded for FY 2026 determines the amount MLK County is eligible to apply for not only next year but also for future years. If the Continuum includes a project in its application that HUD ultimately does not fund, that will have long-lasting consequences, reducing total funding eligibility for FY 2026 and thereafter.

12.    To create the system-wide application, the Continuum evaluates project applications and ranks them in a "priority listing." The highest-scoring projects, taking into account geography, population and system needs, are ranked in Tier 1. For example, the positioning of a well performing project that is the only one serving youth in South King County; or the sole DV project in East County. Tier 1 projects will be funded if they pass HUD's threshold review process and if HUD does not disqualify them based on the expanded risk review or other additional review factors. The FY 2026 NOFO only allows CoCs to include 60% of their projects in Tier 1. By contrast, Tier 1 funding has been allocated between 90% and 100% since the implementation of tier-based scoring in the FY 2013 NOFO, which increased housing stability in communities. Under the FY 2026 NOFO, the remaining projects will be ranked as Tier 2; those projects are subject to HUD's merit review and must compete nationally for funding under HUD's priorities and set-asides.

Docusign Envelope ID: 5C1B3A83-FC1D-859C-8393-746D8B36615B

13.     For the 2026 NOFO, the Seattle-King County Continuum must announce its ranking priority listing, including Tier 1 and Tier 2 designations, on or before August 11, 2026. The Continuum must then submit its final application to HUD on or before August 26, 2026.

14.     The FY 2026 NOFO sets aside $1.3 billion for new projects only (the "Set-Aside") and is prioritizing transitional housing and supportive services only projects for the Set-Aside. Even proven and effective existing projects are not eligible for this funding, which represents around a third of available funding, meaning that PSH renewals not ranked in Tier 1 will almost certainly not receive CoC funding for FY 2026.

15.     The Seattle-King County Continuum received a total 2025 award, excluding the planning grant amount, of $66.28M, the base for the Continuum's 2026 application. Of that amount, $60.73M, or 92% of funds, supports current permanent housing (PH) contracts. Assuming the Continuum is awarded the same base amount, if the FY 2026 NOFO's Tiering goes into effect, the effect will be that funding for renewals will be limited to 60% (or $39.77), a loss of $20.96M in PH capacity. MLK County's share of that loss is $13M. MLK County will be unable to make up for this dramatic loss in PSH funding, especially over the long term.

16.     Such a substantial reduction of PH funding will jeopardize the stable housing of many local residents, including children, older adults, veterans and disabled persons who currently rely on permanent housing assistance.

17.     Individuals in PSH have long been prioritized because they are the most vulnerable people, they have disabilities and chronic health conditions and need a high level of intervention. While the goal is for PSH participants to be as independent as possible, most served by MLK County's PSH have severe and persistent disabilities and will never be eligible to or able to work. The FY 2026 NOFO's assumption that individuals without physical or

developmental disabilities are presumptively able to enter the workforce is deeply misguided and lacks any evidentiary support. More than 75% of the individuals in MLK County's PSH, have a mental health disability, and need intensive staffing to help with stability. Transitional housing is not designed to support people with these types of needs, and these individuals cannot simply be transitioned to transitional housing. Nor would they be eligible for transitional housing unless they suffered the trauma of eviction and becoming homeless again. As a result, if their PSH projects lose funding, they will find themselves without critically needed supports and at risk of hospitalization or worse.

18.    The loss of housing for these individuals will also cause ripple effects in the community: the CoC will have to redirect resources to trying to find new housing, and when individuals inevitably end up in shelters or on the street, that will increase the strain on social and emergency services networks. MLK County does not have sufficient existing shelters, let alone other temporary housing options or affordable housing, to serve everyone who will become homeless as a result of the funding cuts to PSH.

19.    The magnitude of the impending PSH funding losses is multiplied by the Continuum's leveraging of HUD dollars to secure city, state, and private investment. Of MLK County's 22 PSH projects, 19 are facility-based (meaning that they are located in specific buildings), and either MLK County and/or the City of Seattle has a capital investment in each of those facilities. MLK County alone has invested $48M in capital funds and nearly $10M in annual operating funds across all Continuum projects. Additional funds leveraged from the City of Seattle and Washington State push total capital investments in Continuum projects above $435M and annual operating funds above $35M. If operators lose access to HUD CoC funds, the result will be a significant and potentially irreparable damage to their ability to make loan

6

payments and keep buildings running. If they default on the loans, MLK County could lose thousands of units of housing and tens of millions of dollars of public investment, damaging the County's reputation and goodwill, and making it harder to recruit private investment and operators in the future.

20. The nature of these capital investments also means that MLK County cannot simply or quickly repurpose the projects or convert to transitional housing. The County has 50-year commitments of capital resource in PSH projects that have multiple regulatory agreements binding these properties to PSH projects. Loss of funding and the resulting financial instability could cause the projects to face penalties from multiple public and private investors if they cannot serve the PSH population, and would of course jeopardize the residents of this housing. Changing population requirements on the properties would involve multiple agencies and restricted sources of funding. Such changes cannot be accomplished quickly; it may not be possible at all in many instances because public funders are often subject to narrow or inflexible expenditure restrictions. Most importantly, tenants of MLK County PSH have rights to tenancy that would prevent a property owner from changing the property operating model quickly. Such changes would require years of transition and legal proceedings and would cause serious disruption to the community.

21. The Seattle-King County Continuum has prioritized permanent housing projects that adhere to "Housing First" principles for CoC funding because the HUD CoC NOFO previously prioritized those projects. Federal agencies have provided significant advice in support of Housing First projects, such as the U.S. Department of Health and Human Service, Substance Use and Mental Health Services Administration, Permanent Supportive Housing Evidence-Based Practices "KIT." *See* https://library.samhsa.gov/product/permanent-supportive-

housing-evidence-based-practices-ebp-kit/sma10-4509. The "Housing First" approach has been shown in studies too numerous to list here to be effective in addressing homelessness, including for chronically homeless individuals impacted by substance use disorder, mental illness disorders, and those with dual diagnoses. Contrary to the FY 2026 NOFO's characterization of Housing First, this approach actively and assertively promotes recovery and treatment along with engagement in services. What it does not do is coerce compliance with such services, consistent with longstanding evidence. Requiring project applicants to abandon this approach is contrary to established research and would deeply impact housing providers and residents. As a recent example, with the "Housing First" approach MLK County CoC-funded PSH demonstrated 97.2% occupancy, and 94.4% percent of participants exit to or maintain permanent housing between July 1, 2024, and June 30, 2025.  From my own observations, starting as a social worker, then as a supportive housing case manager, later in primary care as both a provider and leader, and now in a leadership position for King County, I have consistently seen what becomes possible when people experience the safety, stability, and dignity of housing. When people have their basic needs met, recovery from homelessness can begin.

22.    Adopting Housing First models also supports funding consistency for providers, because state funding programs use and require them. For instance, the Washington State Health Care Authority's (HCA) "Foundational Community Supports" Medicaid benefit pays for a subset of housing services and uses SAMHSA's PSH fidelity model, and the Washington Department of Commerce's PSH Toolkit references Housing First approach and the SAMHSA PSH fidelity model. The AHAH guidelines note that the HCA and DSHS were legislatively directed to implement evidence-based and research-based practices through SB5732/HB1519 (2013). The legislature also directed the Washington State Institute for Public Policy (WSIPP) to

8

create an inventory of practices as a guide for HCA to use, which includes the SAMHSA PSH model. The guidelines also speak to Housing First as a key principle.

23.    A 2025 MLK County analysis of similar PSH programs found that residents of those buildings had fewer and shorter hospital stays and fewer emergency room visits after moving into PSH. After two years, residents experienced 30% fewer hospital days, 41% fewer inpatient stays, and 39% fewer emergency room visits after moving into housing. DCHS would expect if residents were moved out of PSH due to a funding shortfall, these trends would reverse, increasing burdens to the County's first responders and public health resources.

24.    Similarly, a June 2026 MLK County analysis found that residents in Housing First-based PSH showed a 26.9% decrease in jail bookings in the first year after they became housed; the decrease continued and improved over the three years that the analysis tracked, with a 37.6% decrease in jail bookings by year 3.

25.    The NOFO makes clear that applications "must support" the NOFO's goals. HUD will rank and review MLK County on service requirement-related criteria, including how many of the projects within the CoC mandate participating in supportive services and for showing that certain numbers of units mandate substance abuse treatment as a condition of participation. That score will impact how competitive any projects ranked in Tier 2 will be nationally. The FY 2026 NOFO will thus force MLK County and projects within its continuum to decide between abandoning successful practices or else losing funding.

26.    The amorphous Risk Review and "Additional Factor" criteria that HUD has set out would also allow HUD to refuse funding on virtually any grounds. Historically, HUD has looked at the actual performance of projects, not potentially unverified information like "news reports." MLK County is deeply concerned that it, and by extension its affiliated project

9

applicants, will be targeted because they hold values around immigration, diversity, and gender identity that are aligned with applicable law but at odds with the current administration's views. The vague and undefined criteria in the FY 2026 NOFO will give HUD an opportunity to arbitrarily punish CoC applicants for political disagreements entirely unrelated to homelessness funding. This uncertainty and concern is neither unfounded nor speculative in light of federal agencies' actions in the past year and a half. *E.g.*, *American Inst. of Chemical Engineers v. Wright*, 1:26-cv-1063 (D.D.C. June 10, 2026), Stipulation (Department of Energy stipulated to judgment in favor of plaintiffs based on a concession that "[a] primary reason for the selection of … DOE grant termination decisions … was whether the grantee was located in a 'Blue State'").

27. Under the FY 2026 NOFO, HUD is slated to make awards by December 1, 2026. The FY 2025 funds begin to expire in the first quarter of 2027. The more time it takes HUD to promulgate and make announcements under a lawful NOFO, the longer projects will have to go without funding and the greater the chance that people will be turned away from housing because of funding uncertainty. Four MLK County projects with annual start dates between February and April collectively receive $2.1 million annually under their current awards and provide permanent housing to more than 170 households. If FY 2026 funding is delayed, they will be left in limbo with a funding gap and will need to decide whether to risk moving forward without reliable funding, which in turn imperils the households they serve.

28. In sum, changes to the local homelessness response system, and by its nature the funding for vulnerable people's homes, cannot be implemented overnight. The Seattle-King County Continuum would have to begin making decisions and taking steps now—and not in December—in response to the changes contemplated by the FY 2026 NOFO, to try to stabilize people who will lose their homes and to consider how to manage the large-scale and unsupported

10

Docusign Envelope ID: 5C1B3A83-FC1B-850C-8393-746D8B36615B

changes that HUD seeks to impose. The Continuum also expects that if it has to announce rankings on August 11, some providers who are not selected in Tier 1 will see the writing on the wall and begin preparing to shut down their programs, including stopping enrollments and laying off staff.

29.      MLK County and the Seattle-King County Continuum are already having to expend resources in responding to the FY 2026 NOFO and are facing impossible choices about which projects to prioritize and how to structure Continuum priorities and practices in case the NOFO is allowed to proceed. The Continuum will be unable to include all its high-performing projects in Tier 1. In addition, the Continuum uses a ranking tool that is updated annually and reflects both HUD and local priorities. Because many of HUD's new priorities are a complete reversal of prior practices, the Continuum must make difficult decisions about whether to realign local priorities, values, and evidence-based practices with HUD's stated goals to maximize the chances of obtaining any funding, or to try to preserve an established system which has proven successful over time and been aligned with long-established HUD rules. If it has to move forward with the local competition priority list and ranking process, the Continuum will have great difficulty adjusting its scoring to reflect HUD's new priorities—many of which are a complete reversal of prior practice—while still aligning with local priorities and values. Similarly, if the Continuum has to submit an application on August 26, it must describe the CoC's policies and practices and must make decisions about whether to align those practices with HUD's new stated goals, despite the high risk of losing housing units in order to maximize the chances of obtaining funding.

11

Docusign Envelope ID: 5C1B3A83-FC1B-850C-8393-746D8B36615B

I declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on July __16__, 2026.

Signed by:

*Jelani Jackson*

FA2331EDC4DD47A...

Jelani Jackson
Interim Director
Housing and Community Development Division
Department of Community & Human Services
Martin Luther King, Jr. County