**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>*Defendants*. | Case No. 26-cv-436-MSM-AEM |

**<u>DECLARATION OF APRIL CALVIN</u>**

I, April Calvin, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of the State of Tennessee. This declaration is based on my knowledge, professional education and experience, and review of relevant records. I am over the age of eighteen and suffer from no legal incapacity.

2.      I am the director of the Office of Homeless Services ("OHS") for Nashville. As the Collaborative Applicant for the Nashville-Davidson County Continuum of Care ("Nashville CoC"), OHS plans, coordinates, monitors, trains, and educates the Nashville CoC regarding best practices as identified by HUD. In my role, I provide leadership in collaboration with the Mayor, Metro Council, Metropolitan Development and Housing Agency, and the Homelessness Planning Council. My responsibilities also include overseeing OHS's role as Homeless Management Information System ("HMIS") Lead.

{N0779741.1}

3.    The Nashville CoC is made up of over 125 community partners that work together to end homelessness in Nashville and Davidson County by addressing the recovery and supportive service needs for people experiencing homelessness.

4.    I am responsible for all OHS grant applications, including the Continuum of Care Grant ("CoC Grant"). OHS manages the local competition process and communicates the requirements and procedures to the nonprofit recipients of CoC Grant funds. OHS completes and submits the Collaborative Application for the CoC Grant.

5.    Metro Nashville relies on CoC Grant funds as one of its primary sources to address homelessness in the community. In 2025, CoC Grant funds went to ten funded agencies of the Nashville CoC. Throughout 2025, 11,769 people experienced homelessness in Nashville Davidson County, according to the HMIS shared database. Of those 11,769 people experiencing homelessness, 1,977 people across 1,087 households, including 468 people experiencing chronic homelessness, 880 people with disabilities, 862 children, and 507 survivors of domestic violence were served by CoC funding. Additionally, in 2024, 1,367 people across 666 households in Nashville Davidson County were housed by CoC funding. In February 2024 alone, CoC funding helped provide $360,868.65 in rental assistance. Still, at any given point in time, 2,000 to 3,000 people are experiencing homelessness in Metro Nashville. The need is always greater than the housing supply.

6.    The Nashville CoC was awarded $11,846,313 from the 2024–25 CoC Grant for FY 2024. The funding that was expected to expire in the first and second quarters of 2026 has been renewed for Fiscal Year 2025 in approximately the same amount as funding for Fiscal Year 2024, and the Nashville CoC believes that the funding that is set to expire in the third and fourth quarters

{N0779741.1}

will be renewed for Fiscal Year 2025.  Approximately eighty-seven percent of those funds were directed towards Permanent Housing.

7.    The amount that Nashville is awarded for FY 2026 determines the amount that Nashville is eligible to apply for next year and also in future years. If the Continuum includes a project in its application that HUD ultimately rejects, it loses out on that funding, which will have long-lasting consequences for total funding eligibility for FY 2026 and thereafter.

8.    Permanent Housing means community-based housing without a designated length of stay and includes both Permanent Supportive Housing and Rapid Rehousing. In Permanent Housing, the program participant must be the tenant on a lease for a term of at least one year, that is renewable for a term that is a minimum of one month, and that is terminable only for cause. Permanent Supportive Housing means permanent housing in which wraparound supportive services are provided to assist recently homeless persons with a disability to live independently. This includes housing subsidies paired with stabilization case management. The wraparound supportive services currently offered to residents in Permanent Supportive Housing include onsite mental health and addiction recovery options as well as employment services. Rapid Rehousing means short-term and medium-term rental assistance and supportive services for those experiencing homelessness with or without a disabling condition. In Davidson County, there are currently approximately 989 clients in Permanent Housing, including 373 children, 553 disabled persons, and 25 veterans.

9.    Our focus on Permanent Housing has yielded overwhelmingly positive results. For example, seven encampments across Davidson County have closed over the course of the last four years. Those encampments had a total population of approximately five hundred residents, with the average resident having been homeless for five years or more. The majority of those residents

{N0779741.1}

are currently in Permanent Housing. Only fifteen percent have returned to unsheltered homelessness.

10.     Metro Nashville's investment in Permanent Supportive Housing also reduces costs of other public services, such as emergency medical care. Data analysis of local housing intervention compared with national data provided by NAEH estimates that every $1 spent on Permanent Supportive Housing saves Metro Nashville $2.70.

11.     HUD has long prioritized a "Housing First" approach. As exemplified by the 2022, 2023, and 2024–25 CoC NOFOs, the Housing First approach "prioritizes rapid placement and stabilization in permanent housing." And adopting a Housing First approach historically has been a way to earn points toward funding opportunities. As stated above, Nashville CoC includes ongoing wraparound supportive services as part of its Permanent Housing plan.

12.     A Notice of Funding Opportunity ("NOFO") was issued on June 1, 2026, for the CoC Grant covering the 2026 fiscal year (the "FY26 NOFO."). The FY 2026 NOFO sets aside $1.3 billion for new projects only (the "Set-Aside") and prioritizes transitional housing and supportive services. Even proven and effective existing projects are not eligible for the Set-Aside funding, which represents around a third of available funding, meaning that PSH renewals not ranked in Tier 1 will almost certainly not receive CoC funding for FY 2026. The Set-Aside in the 2026 NOFO therefore effectively means that for Permanent Housing, renewal projects will be limited to no more than 60 percent of the CoC's Annual Renewal Demand ("ARD"). A substantial percentage of existing, successful PSH projects will not be ranked in Tier 1 and are virtually guaranteed to lose funding, imperiling stable housing for approximately 100 individuals.

13.     The Nashville CoC, however, may be unable to allocate all of Tier 1's 60% to PSH renewals, meaning that even more households are at risk. This is because the Nashville CoC is

{N0779741.1}

facing an impossible choice about where to rank its HMIS grant and its Coordinated Entry (CE) grant. OHS is both the HMIS Lead and the CE Lead for the Nashville CoC. The HMIS system is required by the HEARTH Act of 2009 and serves as the critical database that holds unduplicated client data for forty-nine agencies serving Nashville's homeless population. The data is used for strategic planning, coordinating services, and analyzing highest and best use of funds, as well as generating certain reports required by HUD. OHS has not sought alternative funding to support the HMIS database software or CE activities. Losing out on this funding would hinder the ability of Nashville to collect the necessary data to ensure that individuals and families experiencing homelessness are properly accounted for, to inform policy and decision making, and to perform needs analyses and establish funding priorities. Partner organizations would also be significantly impacted: Nashville CoC members who rely on HMIS would have to purchase their own license to access the HMIS database at significant cost. Furthermore, without funding for the HMIS shared database and CE, the ability of Nashville CoC members to serve the homeless population would be significantly hampered. Federal law requires the CE Lead to make referrals for supportive services. Funding for the HMIS shared database and CE are essential for CoC infrastructure and to ensure that individuals and families experiencing homelessness or at risk of homelessness receive referrals for the supportive services they need. In short, retaining this funding is essential, but if Nashville ranks it in Tier 1, that takes limited funding away from PSH renewals.

14.     Every CoC, including the Nashville CoC, is also responsible for maintaining a CE system to coordinate service delivery for specific vulnerable populations as identified by HUD. The Mary Parrish Center, a local agency that serves victims and survivors of interpersonal violence, also has a CE grant specifically for populations affected by interpersonal violence. To ensure that victims and survivors receive needed services and do not fall through the cracks, the

{N0779741.1}

Nashville CoC must also list the Mary Parrish Center's CE grant in Tier 1. Together, the OHS HMIS, OHS CE, and Mary Parrish Center's CE grants would take up over $400,000 in Tier 1, leaving even less funding available for Permanent Housing renewals.

15.     Should the Nashville CoC be limited to a less than 60 percent renewal for Permanent Housing funds, it is inevitable that a large number of clients currently in Permanent Housing will lose potentially years-long safe, stable housing. Given that many of these clients experience a disability of some kind—particularly because disability is required for program participation in Permanent Supportive Housing—they would be at a high risk of returning to unsheltered homelessness. Indeed, clients who are currently in subsidized Permanent Housing likely would not qualify for Transitional Housing programs unless they first return to homelessness.

16.     There are significant barriers, however, that prevent Permanent Supportive Housing projects from being converted into Transitional Housing projects. Many permanent Supportive Housing providers in Nashville are nonprofits that use their funding to provide tenant-based rental assistance. But HUD regulations prevent nonprofits from providing rental assistance for Transitional Housing. Nonprofits that utilize rental assistance payments therefore cannot convert Permanent Housing units to Transitional Housing units. Voucher programs run by Metro Nashville's housing authority cannot be converted into Transitional Housing either. These restrictions make it even more challenging to provide sufficient Transitional Housing to accommodate all residents forced out of Permanent Supportive Housing. The FY26 NOFO will force the Nashville CoC to make difficult decisions about who can stay in Permanent Housing and who will return to homelessness.

{N0779741.1}

17.    Nashville CoC members have invested significant time and effort to develop relationships with clients. Having to sever those relationships—either by declining to fund a particular project with CoC funds or by forcing clients out of Permanent Housing—would not only have the immediate effect of taking away safe, stable housing, but would also poison future efforts to help a marginalized population who often distrusts systems of care.

18.    Nashville CoC members have also invested significant time and effort to develop relationships with partners in the community. CoC members work with approximately 160 landlords to use CoC Grant funds to pay approximately 450 leases. Since November 2025, when HUD released a NOFO that included a cap on CoC Grant funds that could go toward Permanent Housing, landlords have faced significant funding uncertainty. OHS was able to keep landlords in the CoC program in large part because litigation secured the necessary funding. But OHS expects that landlords would begin to pull out of the CoC program if two or three expected payments did not come through.

19.    Further, the Set-Aside will significantly affect the organizations who are members of the Nashville CoC. If funding is cut, members may face significant financial obligations with no ability to request reimbursement. To illustrate this impending funding problem: CoC Grant awards fund forty-three staff positions across the Nashville CoC. Most of these staff provide direct supportive services to Permanent Housing program participants. These include the same services that, under the FY26 NOFO, must be provided 20 hours per week to Transitional Housing participants in order for Transitional Housing projects to obtain CoC Grant funding. CoC projects have informed OHS that if they were to lose funding, projects only have approximately 30 days after current funding expires before they would be forced to start laying off these staff members.

{N0779741.1}

20.     The FY26 NOFO also has significant other drastic changes from pre-2025 NOFOs. The FY26 NOFO states that HUD will conduct a threshold "Risk Review" that includes criteria that looks to the applicant's "[h]istory of illegal discrimination," but it provides no detail or guidance on what HUD might consider illegal. Additionally, HUD can reject a project based on amorphous factors such as "the overall projected impact on the . . . priorities in this NOFO." This injects tremendous uncertainty into the competition process and Nashville CoC is concerned that project applicants might be rejected for unlawful ideological reasons completely unconnected to housing. This would result not just in the loss of funding for that project but also a reduction in the funding that Nashville is eligible for next year.

21.     To my knowledge, there has never been this dramatic a policy shift in the CoC program from one year to the next. The Nashville CoC complied with past HUD requirements regarding Housing First, as well as past HUD requirements regarding racial equity and respect for an individual's gender identity. These factors were incorporated into the evaluation criteria for the local competition and, accordingly, shaped applicants' project designs. The FY26 NOFO forces the Nashville CoC to remake its entire local competition process around a new set of policy priorities. HUD has provided no guidance on how to implement policy priorities, leaving applicants and the Performance Evaluation Committee to guess at how to most effectively compete for funding.

22.     The Nashville CoC is particularly concerned about the FY26 NOFO criteria that incentivize projects to prioritize Permanent Supportive Housing for people with physical and developmental disabilities over people with mental illness (including substance use disorders). It is a program requirement that every head of household in Permanent Supportive Housing has some disabling condition. This population requires a high level of intervention regardless of the type of

{N0779741.1}

disability. Indeed, as CE Lead, we have identified this population as highly vulnerable based on the standardized Vulnerability Index-Service Prioritization Decision Assistance Tool. Based on our most recent self-reports, approximately one-third of people served by the Nashville CoC struggle with mental health concerns and approximately one-quarter struggle with substance use. It is likely that this population would have great difficulty finding new permanent housing, meaning people will be forced into shelters or out on the street. That, in turn, would increase the strain on the whole system. Shelters would likely have more demand than they could accommodate.

23.    HUD has also required applications for the CoC Grant to be due close in time to applications for the Youth Homelessness grant (due August 10, 2026) and the Continuum of Care Builds grant (due July 23, 2026). Further, HUD's chaotic process with NOFOs over the past several months, in conjunction with the multiple NOFOs with concurrent application deadlines, have placed a great strain on the Nashville CoC's system, and agencies are completely overloaded with the high administrative burden of applying for multiple grants. In addition, given the significant changes the NOFO seeks to implement, CoCs must spend even more resources to analyze project and client data and hold meetings to make hard decisions about the fate of CoC projects. For example, Nashville's CoC Performance Evaluation Committee has had to shift meetings from monthly to weekly to accommodate all the necessary planning.

24.    The Nashville CoC and its community are facing heartbreaking decisions about which projects to place in Tier 1 and which will effectively be cut. The decisions of what projects will not be placed in Tier 1 will have devastating consequences for the people displaced from their housing, because these renewal projects are so unlikely to be selected for funding due to the new project Set Aside. The decision is also causing great emotional and psychological distress to

{N0779741.1}

members of the Board and to local agency partners, both of which include individuals who have lived experience of homelessness.

25.     Nashville will also face significant pressure to "backfill" funding for projects that are not selected or that are listed in Tier 2 (and therefore are unlikely to be funded). But they cannot plausibly meet that need for all projects likely to be cut by the FY 2026 NOFO, due to steep federal cuts to social safety net programs across the board. This inability to promise to provide alternative funding to rescue CoC projects will also likely damage relationships, both between the CoC and service providers and between the CoC and the clients served by those programs.

26.     Longstanding partners cannot be easily replaced by new projects. In the Nashville CoC, for example, the new agencies interested in applying for funding have little or no knowledge of HUD procedures, and will require significant staff time to onboard and train them to fulfill the administrative obligations of CoC grantees.

27.     Under the FY 2026 NOFO, HUD is slated to make awards by December 1, 2026. The FY 2025 funds begin to expire in the first quarter of 2027. The more time it takes HUD to promulgate and make announcements under a lawful NOFO, the longer projects will have to go without funding and the greater the chance that people will be turned away from housing because of funding uncertainty. If FY 2026 funding is delayed, they will be left in limbo with a funding gap and will need to decide whether to risk moving forward without reliable funding, which in turn imperils the households they serve. For example, last year, Nashville CoC member Safe Haven Family Shelter, which provides rapid rehousing for families, had a period of performance that ended January 31, 2026. That award was ultimately renewed May 7, 2026, thanks to Congress's intervention, but they will again face funding gaps if HUD does not promptly release and issue awards under a lawful 2026 NOFO.

{N0779741.1}

28.    The Nashville Continuum has to begin making decisions and taking steps to respond to the unprecedented and large-scale changes imposed by HUD now—and not later this year, to try to stabilize people who will lose their homes and to consider how to manage the broad changes to program operations in the FY 2026 NOFO. The Nashville Continuum also expects that if it has to announce rankings on August 11, providers who are not selected in Tier 1 will recognize that they are going to lose funding and will begin preparing to shut down their programs, including stopping enrollments and laying off staff. None of that can be readily reversed once the process begins.

29.    Similarly, if the Continuum has to submit an application on August 26, it must describe the CoC's policies and practices as part of that application and must therefore make decisions at that time about whether to align those practices with HUD's stated goals in order to maximize the chances of obtaining funding.

EXECUTED July 16, 2026.

_____
April Calvin

{N0779741.1}