**DECLARATION OF COUNTY OF SANTA CLARA DIRECTOR FOR OFFICE OF SUPPORTIVE HOUSING KATHRYN J. KAMINSKI**

I, KATHRYN J. KAMINSKI, declare as follows:

1.      I am a resident of the State of California. I have personal knowledge of all facts stated in this declaration, and if called to do so, I could and would testify to them competently under oath.

2.      I am the Director for the County of Santa Clara Office of Supportive Housing (OSH or the "Department"), a position I have held from August 18, 2025 to present. Prior to this position, I served as Acting Director from July 2024 until August 2025 and as Deputy Director of OSH for four years, overseeing OSH's contracts and grants team, fiscal team, Continuum of Care (CoC) team, and the supportive housing system, which encompasses services including emergency shelter, short-term financial assistance to quickly prevent or lift households out of homelessness, interim and transitional housing, rapid rehousing, and permanent supportive housing. Prior to serving as Deputy Director, I served as the CoC Quality Improvement Manager for approximately three years, overseeing the county-wide CoC efforts including policy development and implementation, system performance measurement, the CoC collaborative application, and federal grant compliance. Prior to becoming employed with the County of Santa Clara, I worked for the City of San José Housing Department from January 2015 to September 2017 as a Development Officer, where I managed HUD grants such as the Community Development Block Grant (CDBG), Emergency Solutions Grant (ESG), and Housing Opportunities for People with AIDS (HOPWA) programs, including compliance with federal regulations, budgeting, reporting, contract development, subrecipient management and monitoring, and program evaluation. Prior to employment with the City of San José, I was employed as a Senior Associate at TDA, Inc., a national consulting firm, from September 2011

DECL. OF KATHRYN J. KAMINSKI                    - 1 -

to December 2014, where I provided training and technical assistance to grantees receiving federal funding from HUD. Overall, I have more than fourteen years of experience with a broad variety of activities relating to grant management and program oversight for HUD-funded programs.

3.      In my role as Director of OSH, I oversee the department budget, the administration of all grants and contracts, delivery of services, and management of the County's affordable housing loan portfolio.

4.      I am familiar with the terms and conditions of HUD's federal fiscal year 2026 Notice of Funding Opportunity for the Continuum of Care grant program, released in June of 2026 ("FY 2026 NOFO").

**Background on OSH and the CoC Grant Program**

5.      OSH's mission is to increase the supply of housing and supportive housing that is affordable and available to extremely low-income and/or special needs households. OSH supports the County of Santa Clara's mission of promoting a healthy, safe, and prosperous community by working to end and prevent homelessness.

6.      Since the late 1980s, government agencies and community-based organizations in Santa Clara County have partnered to address the needs of homeless individuals and families. In 1992, these organizations formed the Santa Clara County Collaborative on Affordable Housing and Homeless Issues (the "Collaborative"), an unincorporated association. In addition to improving coordination and services, the Collaborative was formed to meet the 1995 HUD requirement that all communities submit a collective application for HUD CoC funds.

7.      From 1992 to 2013, the Steering Committee of the Collaborative served as the governing board for administration of CoC program funds and as the primary entity for planning

DECL. OF KATHRYN J. KAMINSKI                    - 2 -

and coordinating homeless services.

8.      In 2013, regional local governments, non-profit housing leaders, and other stakeholders came together to reorganize the structure of the Santa Clara County Continuum of Care ("Santa Clara County Continuum" or the "Continuum") to improve regional coordination of federal, state, and local resources towards reducing homelessness in the county. Through this process, OSH was designated as the Collaborative Applicant on behalf of the Santa Clara County Continuum. The role of the Collaborative Applicant is to submit the annual application to HUD for CoC Program funds on behalf of all grantees in the Continuum's geographic area, and to administer the CoC to ensure that the operation of the Continuum and use of grant funds meet HUD's requirements. The Continuum's collaborative application includes project applications from the County of Santa Clara and on behalf of non-profit organizations that receive their CoC grant funds directly from HUD.

9.      A large portion of CoC funding for which the County of Santa Clara is the recipient supports rental assistance and/or case management for residents of Permanent Supportive Housing (PSH) programs, which provide services such as case management and clinical, educational, vocational, and housing services to help chronically homeless households obtain and keep their housing.[1] The rental assistance and case management services supported through HUD CoC project grants are provided to residents of PSH developments and residents utilizing tenant-based housing vouchers throughout the county. Case management matches clients to the services and resources they need to remain stably housed.

---

[1] Under HUD regulations and the McKinney-Vento Act, a "chronically homeless" person is someone who has experienced homelessness for a year or longer—or who has experienced at least four episodes of homelessness totaling 12 months in the last three years—and also has a disabling condition that prevents them from maintaining work or housing. HUD, *Homeless emergency Assistance and Rapid Transition to Housing: Defining "Chronically Homeless,"* 80 Fed. Reg. 75791 (Dec. 4, 2015).

DECL. OF KATHRYN J. KAMINSKI                - 3 -

10.     In addition to PSH programs, a significant portion of CoC funding in Santa Clara County supports Rapid Rehousing (RRH) programs, which provide time-limited rental assistance for up to two or three years, paired with supportive services such as case management and clinical, educational, vocational, and housing services to help individuals and families in Santa Clara County exit homelessness and return quickly to permanent housing. RRH is a key component of the Santa Clara County Continuum's response to homelessness because it connects people to housing as quickly as possible by providing rental assistance and other supportive services like housing search and case management for up to two or three years.

11.     As of the last "Point-in-Time Count" in 2025,[2] over 10,000 individuals in Santa Clara County were experiencing homelessness, but the true number is most likely higher. These individuals and families are some of the most vulnerable residents of the county and many will require the types of permanent housing supports currently provided by CoC grants to exit homelessness and obtain housing. Many struggle with psychiatric conditions, chronic health problems, mental health and substance use disorders, family trauma, and other challenges, and require additional and ongoing case management and supportive services in order to help ensure that they maintain housing stability. The households served by CoC grants are as diverse as the population of Santa Clara County as a whole and include veterans, seniors, survivors of domestic violence, families with children, former foster youth, and people with disabilities.

12.     Despite the success of the County's permanent housing programs at keeping households stably housed, particularly households who were once chronically homeless, the

---

[2] The Point-in-Time (PIT) Count is a bi-annual census of sheltered and unsheltered people experiencing homelessness on a single night in January. As a condition of funding, HUD requires Continuums to conduct this count every other year, as well as an inventory of beds and housing units that serve people experiencing homelessness. Continuums must submit this data to HUD. *See* https://www.hudexchange.info/programs/hdx/pit-hic/#2025-pit-count-and-hic-guidance.

DECL. OF KATHRYN J. KAMINSKI                    - 4 -

number of people newly entering homelessness outpaces the County's capacity to house them, due to systemic factors such as lack of affordable housing supply in the region and stagnating wages—particularly for low-income households—not keeping up with rental costs.[3] As noted in the 2025 Point-in-Time Count Report for Santa Clara County, the increase in the number of homeless individuals counted during the 2025 Point-in-Time Count compared to the 2023 Count was due to an increase in sheltered homeless individuals and households. This increase reflects shelter capacity growth and higher utilization rates of shelter beds due to improvements in the County's system for connecting those in need with shelter.[4] The County also implemented new methodology to obtain a more accurate and comprehensive representation of the homeless population for the 2025 Point-in-Time Count, so increases in numbers may be reflective of improvements in survey practices as well.

13.    CoC funding for PSH and RRH programs supports rental subsidies and services that have been critical to assisting thousands of residents in not only resolving their homelessness, but achieving housing stability. The housing case management provided with CoC funding includes building life skills such as assistance with applying for housing and jobs, paying rent and utilities, and connection to food resources and other basic needs. Housing vouchers and rental subsidies do not cover the entire amount of rent, thus, these services are essential for supporting residents to create a plan to cover their portion of the rent and to stay housed. Case managers also support residents with the annual voucher renewal process and assist tenants in interactions with their landlords. CoC funds are also used to provide or connect residents to mental health and substance use treatment services, financial literacy, health

---

[3] 2025 Point-in-Time Count Report for Santa Clara County at 5, *available at* *https://files.santaclaracounty.gov/exjcpb1571/2025-09/santa-clara-county-point-in-time-count-2025-final-report.pdf?VersionId=Rl1.G6aaDKy9frtsmdKUrEepVwgOmZQ3*.
[4] *Id.* at 4.

DECL. OF KATHRYN J. KAMINSKI              - 5 -

insurance and healthcare, and job training. While housing vouchers make housing affordable for individuals and families in CoC-funded programs, the supportive services are critical in assisting households in stabilizing their housing, meeting their basic needs, and improving their income and quality of life. Without these wrap-around services, households may be at risk of losing their housing voucher/subsidy and their home.

### The County Has Invested Significantly in Aligning its Housing Programs With Longstanding HUD Policies

14.     From the time it began participating in the CoC Program, the County has invested significantly in housing models and other practices that aligned with HUD's longstanding policies, including implementing Housing First principles, establishing coordinated entry policies that prioritized placement of the most vulnerable households in permanent supportive housing, and training providers on compliance with HUD's Equal Access Rule prohibiting discrimination on the basis of sexual orientation and gender identity, in addition to other protected characteristics. This investment includes contracting with an expert consulting agency to provide the training and technical assistance necessary to implement all of these longstanding policies and requirements, as well as to support the County CoC's application and compliance with HUD's notoriously complex requirements for CoC grantees.

15.     These policies have been successful in reducing chronic homelessness in Santa Clara County. Santa Clara County's local data demonstrates the effectiveness of this model. For example, a May 2026 report showed that slightly more than 96 percent of households in permanent supportive housing programs in Santa Clara County, the vast majority of whom met the definition of "chronically homeless" at the time of program entry, remained stably housed for 12 consecutive months after enrollment. For the County's Rapid Rehousing Programs, 78 percent of program participants exited to a permanent housing destination within 24 months of

DECL. OF KATHRYN J. KAMINSKI                - 6 -

enrollment.  Both of these metrics far exceed the stable housing benchmark required by HUD for the types of new transitional housing projects that the FY 2026 NOFO prioritizes, which is that 50 percent of households move into some type of permanent housing within 24 months after program enrollment.

16.    HUD's historic prioritization of permanent housing programs that are implementing the Housing First model enabled the Santa Clara County Continuum to increase its annual CoC award from less than $11 million in 2010 to nearly $50 million in 2024, largely for renewal projects that the Continuum has been able to stably fund year after year. During that same period, the Santa Clara County CoC awards specifically for permanent housing programs—which comprise the bulk of the total award—increased from approximately $7.8 million in 2010 to over $44 million in 2025.

17.    Along with the growth in CoC funding, the County has significantly invested local funds into CoC projects by providing matching funds, as required by the CoC Program, from the County and from the Santa Clara County Housing Authority. Additionally, the County has invested in the funding of permanent housing developments. One significant source of investments in permanent housing developments has come from voters in the county passing a general obligation bond measure in 2016, known as the 2016 Measure A Affordable Housing Bond, reflecting the local community's support of permanent housing as a solution to ending homelessness. The County's investment also includes 856 additional permanent supportive housing and rapid rehousing units *currently* under construction or approved by the County Board of Supervisors (as of July 2026). The County has historically relied on CoC grants as a primary source of funds to provide rental assistance and supportive services to individuals and families placed into rapid rehousing units in these developments and to provide supportive services to

DECL. OF KATHRYN J. KAMINSKI                - 7 -

residents in permanent supportive housing units.  Under the FY 2026 NOFO, there will likely not be CoC funding to provide the necessary rental assistance and supportive services to support people in new permanent housing units funded by the County and currently under construction. CoC funds supporting families and individuals at existing permanent housing units in operation are likely to be reduced or eliminated, putting the tenants at risk of losing housing and the creating financial risk for the projects.

18.    As a result of its relative success in prior HUD CoC competitions, OSH depends heavily on the CoC grant program to fund critical housing subsidies and services to support individuals and families experiencing homelessness. The County's partnerships with HUD, the State of California, local jurisdictions, and non-profits, and the coordination of these efforts through the Santa Clara County Continuum, have resulted in huge strides in meeting community needs to reduce homelessness, even amid unprecedented challenges. For example, from 2015 to 2019, the County's supportive housing system helped nearly 9,000 households move from homelessness to permanent housing and doubled both the number of supportive housing units and temporary shelter capacity. From 2020 to 2025, the County's supportive housing system helped over 20,800 people move from homelessness to permanent housing.

**Harms from HUD's FY 2026 NOFO**

19.    There are many terms and conditions in the FY 2026 NOFO that are concerning because they significantly depart from longstanding prior HUD policies and requirements and because they do not reflect evidence-based best practices for resolving homelessness.

20.    In particular, because of the large set aside ($1.3 billion) for only new transitional housing and/or supportive-services-only projects (the "set aside"), and the funding process laid out at pages 88 to 91 of the FY 2026 NOFO, it is very unlikely that funding will be left over for

DECL. OF KATHRYN J. KAMINSKI              - 8 -

any renewal projects in Tier 2 of the competition after HUD has finished selecting new projects. Therefore, any renewal projects that cannot be placed in Tier 1 are very likely to lose CoC funding under this NOFO. The renewal projects that will very likely go unfunded under the FY 2026 NOFO are precisely those that, as I explained above, have shown incredible success year after year at meeting HUD's own success metrics.

21.     Therefore, in preparing for the local competition, the Santa Clara County Continuum is forced to make extremely difficult decisions regarding which renewal projects, among the more than 30 projects that each serve individuals with high needs, to preserve in Tier 1. These decisions mean that the remaining renewal projects must either find alternative funding, transition to a completely new project, or shut down. Due to the short time frame required for conducting the local competition, announcing the results, and submitting the final NOFO application to HUD, these decisions—with the weight of life or death consequences for the individuals and families being served—have to be made in a matter of weeks.

22.     At the outset, because of the NOFO's conditions, including HUD's reduction in funding for permanent housing renewal projects through the set aside, members of the Santa Clara County Continuum and the County have had to divert significant additional resources above and beyond what is typically required to prepare the local competition. The County diverted staff time to analyze project and client data to assist the Continuum's Board of Directors in making careful decisions about the fate of CoC projects, because the wellbeing and lives of so many people served by these projects are at stake. Because the County is the Continuum's lead entity, County staff time was also diverted to organize multiple meetings of the Continuum's Board of Directors and a grantee working group, to understand the drastic policy changes included the FY 2026 NOFO as compared to previous NOFOs, discuss the difficult decisions

DECL. OF KATHRYN J. KAMINSKI                     - 9 -

about what projects to preserve for renewal funding, and attempt to mitigate against the inevitable harms to households losing their stable permanent housing as a result of the FY 2026 NOFO. I participated in several of these meetings, which included incredibly difficult discussions, such as whether to prioritize funding for projects serving seniors with disabling conditions who have experienced chronic homelessness or projects serving youth and young adults at high risk of trauma and human trafficking if they remain unhoused. Forcing communities to make these decisions in a very short time period puts incredible strain on the relationships the partners have built over decades of working collaboratively to serve all populations in need.

23.    These decisions are made more difficult by the fact that the Santa Clara County Continuum must include its Homeless Management Information System (HMIS) infrastructure in its Tier 1 listings, so that it may be renewed. HUD requires all Continuums to maintain a HMIS, which is a software system for coordinating services and client information across homelessness assistance and service providers within the region. The County of Santa Clara manages the HMIS for the Continuum, including through more than $3 million annually in contracts with a software vendor (with over $20 million invested overall since the County adopted HMIS), as well as OSH staff members providing administrative support and data analysis services. The CoC HMIS grant covers approximately half of the cost of HMIS administration and the remaining costs are covered by local funds.  Following HUD's example, the State of California now also requires recipients of state grants relating to homelessness to maintain and provide reports from a HMIS database. Thus, HMIS is critical to maintaining eligibility for both federal and state funding, as well as an irreplaceable tool for managing client services, reporting outcomes, and evaluating programs and projects. Because of the set aside in

DECL. OF KATHRYN J. KAMINSKI                    - 10 -

the FY 2026 NOFO, the HMIS project would likely lose CoC funding if not included in Tier 1, and therefore, to maintain compliance federal and state requirements, the Santa Clara Continuum must assign dollars within its Tier 1 allocation to HMIS instead of to other renewal projects for permanent housing and transitional housing.

24.     The FY 2026 NOFO also forces other choices that seem to contradict some of HUD's stated goals, like prioritizing transitional housing. For example, the Santa Clara County CoC has a transitional housing project for homeless youth and young adults that is highly successful at achieving permanent housing outcomes, but because HUD's set aside is only for new, not renewal, projects, the CoC is forced to decide whether to list this highly effective project in Tier 1, versus a permanent supportive housing project that houses individuals with disabilities or permanent housing project serving people fleeing domestic violence.

25.     It is almost inevitable that a permanent housing or other project not selected for funding in the local competition will need to begin winding down once that determination has been made, because the high likelihood of funding discontinuation would make it irresponsible to continue to enroll households in the program knowing they would be at risk of an abrupt loss of subsidy and supportive services. This wind-down includes stopping accepting new applications or referrals for clients, which in turn leads to an even greater backlog of people waiting in the queue for housing support. CoC Grantees must also plan for the transition or layoff of staff working on CoC-funded permanent housing projects that are very likely to lose funding.

26.     In response to the FY 2026 NOFO, the Santa Clara County Continuum is attempting to transition some projects, including rapid rehousing projects, into new transitional housing projects. However, there are significant difficulties and costs resulting from these

DECL. OF KATHRYN J. KAMINSKI                  - 11 -

changes, and the new transitional housing projects, even if they are selected for funding by HUD in the Tier 2 process, are unlikely to perform as successfully as the Continuum's existing rapid rehousing projects. This will lead to increased exits back into homelessness for clients. The Santa Clara County Continuum has historically prioritized permanent housing projects through its local competition not just in response to prior, longstanding HUD policy but also because local experience—backed by data—showed that transitional housing projects much more often had worse outcomes for ending homelessness than permanent housing solutions. The Continuum has retained the few transitional housing projects that have proven to be successful because they either serve a specific population (young adults) whose needs can be met by temporary housing programs, or because they achieve better outcomes by combining transitional housing with rapid rehousing services and supports.

27.    The first problem with transitioning existing rapid rehousing projects into transitional housing projects is that the clients must qualify under the definition of "homeless" in the relevant statute and HUD regulations (this is stated in the FY 2026 NOFO at page 42), and current residents of permanent housing projects that are being forced to close or transition will therefore not be eligible to move into the transitional housing program because they are not "homeless" as defined in those sources. I am aware that HUD has issued guidance purporting to highlight two circumstances where someone living in a permanent housing project might qualify as homeless—if they are fleeing domestic violence or will imminently lose their residence within 14 days—but in practical reality many people will not meet these conditions. If a permanent housing resident is forced to wait until they are within 14 days of losing their housing to become eligible for transitional housing, it is extremely unlikely that a transitional housing unit will be available within that timeframe. Therefore, current residents of closed or transitioned permanent

DECL. OF KATHRYN J. KAMINSKI                    - 12 -

housing programs will likely be forced to become homeless again (and likely on the street or other place not meant for human habitation because emergency shelters and similar programs are already at capacity), in order to be eligible for transitional housing or a different permanent housing program. I anticipate that the transition process will be very traumatizing for individuals and families recovering from homelessness or chronic homelessness.

28.    An additional aspect that makes transitioning permanent housing projects into transitional housing projects difficult is that, for transitional housing projects, non-profit organizations are not allowed to administer rental assistance payments directly to landlords. Rather, those payments must be administered through public agencies like the County or the public housing authority. This will likely discourage landlords from continuing in the project if it is switched from permanent housing to transitional housing, as there are efficiencies for the landlords in receiving rental payments from non-profits that public agencies cannot provide. Therefore, transitioning permanent housing projects to transitional housing projects places the Santa Clara County Continuum at risk of losing longstanding partnerships with landlords that have been willing to offer their units to clients needing subsidies. It is already difficult to recruit new landlords to participate in these types of programs, and transitional housing projects are even less enticing to landlords because of the higher rates of tenant turnover. Transitional Housing rental subsidies are also much less common than permanent housing program subsidies. I expect transitioning projects from permanent housing program subsidies to transitional housing subsidies would require the Continuum to conduct significant outreach and education to landlords to establish understanding and interest from landlords.

29.    There are other programmatic issues arising from the FY 2026 NOFO—in particular, the requirement that for a new transitional housing project to be selected and to

DECL. OF KATHRYN J. KAMINSKI                - 13 -

receive an executed grant agreement, it must require clients to participate in at least 20 hours per week of services, activities or employment, with limited exceptions for individuals over age 62 or with certain disabilities (excluding alcohol or substance use disorders). *See* FY 2026 NOFO at page 62-64 (new project threshold criteria for transitional housing), and page 90 (Tier 2 project selection process).

30.    This is a significant shift that will likely result in more clients disengaging from programs, or service providers being required to terminate clients who do not or cannot comply with the hours requirement. This requirement will also likely generate significant additional costs for compliance which the CoC grants will not adequately compensate (including staffing to provide additional activities, monitoring for compliance, and documenting that a client's disabilities make them exempt from the requirement), and therefore create additional financial strains that jeopardize the security of these projects. Additionally, California requires that recipients of certain State-funded homelessness assistance grants *not* require assisted individuals to receive treatment or perform any other activities as a condition of receiving shelter, therefore, CoC applicants in the Continuum that modify their programs to meet the mandatory services requirement, may risk non-compliance and not be eligible for state homelessness assistance grants at all, which also threatens the viability of these projects and make it more difficult for the Continuum to recruit new project applicants.

31.    Relatedly, the mandatory services requirement, in addition to other conditions in the FY 2026 NOFO (such as compliance with the Administration's Executive Orders pertaining to DEI programs, gender identity, and immigration) has discouraged some project applicants in the county—particularly those that serve survivors of domestic violence—from applying for funding under this NOFO. Other service providers for survivors of domestic violence that

DECL. OF KATHRYN J. KAMINSKI            - 14 -

currently operate within the county are discouraged from submitting projects as new applicants because the conditions in the FY 2026 NOFO will require them to make programmatic changes and certifications that are not aligned with their values and missions. For example, the requirement that transitional housing clients participate in at least 20 hours per week of services, activities or employment is not aligned with effectively serving survivors fleeing domestic violence or human trafficking. When people are fleeing domestic violence or human trafficking situations, service providers are focused first and foremost on ensuring the client's safety and security, not requiring them to participate in services or gain employment immediately. Additionally, the prohibition on nonprofit organizations providing rental assistance would significantly limit the options victim services agencies have to support their clients. Agencies serving survivors must protect the confidentiality of their clients and do not share client level information with other partners. The requirement for a public agency to administer rental assistance means these agencies cannot offer rental assistance directly, greatly limiting programmatic options for agencies serving survivors. Therefore, the Santa Clara County Continuum is currently in a position to lose a significant portion of its DV bonus funding because of the FY 2026 NOFO.  Not to mention, the loss of the programs specializing in serving survivors of domestic violence is a devastating blow to the community's continuum of care.

32.     The human cost of this potential loss of funding would be enormous. Thousands of Santa Clara County residents who are experiencing or at risk of homelessness rely on these CoC-funded programs. As of June 30, 2026, the Santa Clara County CoC grants providing permanent housing were serving 2,610 people (1,820 households), including over 2,059 adults and 551 minor children. People housed in these programs include 876 seniors (55+), 1,330 households (73%) with a mental health disorder, 844 households (46%) with a chronic health

DECL. OF KATHRYN J. KAMINSKI                - 15 -

condition, 416 households (23%) with developmental disabilities, and 784 households (43%) with physical disabilities. All households in PSH programs have a disabling condition, as the eligibility for PSH programs has long included a requirement that people served have a disabling condition that "is expected to be long-continuing or of indefinite duration and substantially impedes the individual's ability to live independently."[5] In fact, HUD requires that CoC programs "must, to the maximum extent feasible, ensure that people with more severe service needs and levels of vulnerability are prioritized for housing and homeless assistance."[6]

33.     The loss of CoC funding would likely result in participants of these programs losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence. Loss of housing interventions such as RRH would also increase the burden on the County's emergency shelter/temporary housing programs and other safety net programs because, without access to rental assistance, the households are more likely to become homeless or chronically homeless.

34.     The expected increase in persons returning to homelessness due to the loss of CoC funding for permanent housing projects will also have significant downstream impacts because of the great need for housing in Santa Clara County. There are currently nearly 6,000 homeless households on the County's Community Queue waiting for permanent housing. Based on the vulnerability assessment performed for every household in need of housing in order to prioritize them for housing interventions in the Community Queue, 70 percent of these households score within the permanent supportive housing range, meaning they have the highest vulnerability scores (due to the household's degree of disabling conditions, incidents of chronic

---

[5] 24 CFR § 578.103.
[6] HUD Office of Community Planning and Development, Notice CPD-17-01 at 5 (Jan. 23, 2017), https://www.hud.gov/sites/documents/17-01cpdn.pdf.

DECL. OF KATHRYN J. KAMINSKI                - 16 -

homelessness, and other adverse life experiences and risk factors). Of these households, 44 percent are survivors of domestic violence and 43 percent meet the statutory definition of chronically homeless. New households—including families with children—are being added to the Community Queue list each day due to the structural factors causing homelessness discussed above. In March 2026, 362 households completed a housing assessment for the first time, and 54 percent of those households scored within the permanent supportive housing level of housing intervention needed (meaning they experience multiple risks and vulnerabilities, such as chronic health issues and physical disabilities, they have been a victim of crime or domestic violence, or they have experienced homelessness for a long duration, among other factors). The likely increase in the number of chronically homeless individuals and households as a result of the FY 2026 NOFO will also result in greater public and community costs due to more emergency room visits, interactions with law enforcement, and incarceration.[7]

35.    We know from a comprehensive study conducted in 2015, that the public costs of providing services to residents who are experiencing chronic homelessness in Santa Clara County are far higher than the public cost when these same individuals are permanently housed. The difference is especially stark for the most high-needs, chronically homeless individuals, for

_____

[7] From at least 2005 to 2014, HUD encouraged Continuums to create new permanent supportive housing projects dedicated for chronically homeless individuals and households.  From 2014 onwards, HUD required Continuums to prioritize chronically homeless individuals and households for permanent supportive housing units, "[t]o ensure that all PSH beds funded through the CoC Program are used as strategically and effectively as possible."  HUD Office of Community Planning and Development, Notice CPD-14-012 at 2 (July 28, 2014), https://www.hud.gov/sites/documents/14-12cpdn.pdf; *superseded by* Notice CPD-16-11 (July 25, 2016), https://www.hud.gov/sites/documents/16-11cpdn.pdf.  In November 2025, HUD withdrew both CPD-14-012 and CPD-16-11. The Santa Clara County Continuum continues to prioritize the most vulnerable individuals and households because that is, as HUD stated, the most effective use of permanent supportive housing units and reduces public costs compared to leaving these households to cycle through shelters, temporary housing, hospitals, jails, and/or unsheltered homelessness.

DECL. OF KATHRYN J. KAMINSKI                    - 17 -

whom the study found an average annual cost reduction of $42,706 when comparing the pre-housing public costs associated with these households compared to the post-housing public costs. While costs overall are higher now than in 2015, the causal relationship between providing stable housing for high-needs households and significant reduction in associated public costs for serving those households remains true.[8]

36.     While my most pressing concern is the harm that the FY 2026 NOFO will cause to clients who are in permanent housing programs that are forced to close, or to transition to transitional housing projects, the County will also be directly harmed by the FY 2026 NOFO. Because of the set aside and loss of funding for renewal projects, the County must now choose whether to absorb the costs of some projects, including two permanent supportive housing renewal projects that will likely be shuttered if the County does not do so. The FY 2026 NOFO puts the County's rapid rehousing programs at significant risk. These projects will be placed into Tier 2 because the Continuum needs to preserve Tier 1 funds for the projects that serve the most vulnerable households, which primarily is permanent supportive housing. As discussed above, renewal projects in Tier 2 are very unlikely to be awarded because of the new project set-aside. Based on our understanding of the NOFO, the opportunity to retain these critical funds that are supporting successful rapid rehousing programs is to apply for transition grants to convert these programs from rapid rehousing to transitional housing. We are forced to choose between three negative outcomes – absorb the costs to keep the successful program in operation, place it into Tier 2 where it is unlikely to be funded and wind down the program, or transition to a program type that has less positive outcomes for clients.  The County will likely also need to absorb the

---

[8] Daniel Flaming, et al, *Home Not Found: The Cost of Homelessness in Silicon Valley* (2015), *available at* er_homenotfound_report_6.pdf.

DECL. OF KATHRYN J. KAMINSKI                - 18 -

costs of an infrastructure grant for coordinated entry (also a condition of eligibility for HUD CoC funding), to allow more room within the Santa Clara County Continuum's Tier 1 allocation to preserve the permanent supportive housing projects that house the most vulnerable members of the community.

37.     The Santa Clara County CoC's local competition has historically been uncontroversial because projects were ranked based on demonstrated outcomes and community needs. The FY 2026 NOFO upends the process because so many renewal projects have little to no chance of being awarded funding in Tier 2, despite high performance. Informing recipients and subrecipients that their projects were not selected for Tier 1 may damage relationships between the Continuum and project applicants, and between the County of Santa Clara and its subrecipients for CoC project funding, because it will be seen as a "death sentence" for the project, given the grim prospects for projects ranked in Tier 2. The County of Santa Clara will likely face significant pressure to absorb the costs for additional projects, which it will not be able to do for all CoC projects whose funding will likely be cut by the FY 2026 NOFO, due to steep federal cuts to social safety net programs across the board. The fact that the County cannot promise to provide alternative funding to rescue CoC projects will also likely damage relationships between the County and service providers, and between the County and the clients served by these programs.

38.     The FY 2026 NOFO wrests away local control over the competition and prevents communities from continuing to invest in programs and interventions that have been most successful in meeting local needs. Normally, when a project is shut down or not selected for renewal funding, that is a local community decision, based on the fact that the project is not performing well at reducing homelessness. When this decision has been made in the past our

DECL. OF KATHRYN J. KAMINSKI                - 19 -

local community has made a plan to ensure the clients enrolled in the program receive the support they need to remain housed, typically by transferring to another program. Now, because of the FY 2026 NOFO's major reallocation of funds and constellation of other challenging conditions, the NOFO will lead to a large number of projects being forced to shut down or drastically change, all at once, regardless of the needs of the local community and without adequate time or resources to meet the needs of the program participants currently enrolled in the programs.

39.    Overall, even for projects ranked in Tier 1, I fear that there is significant risk that the Santa Clara County Continuum will lose a substantial amount, or possibly even all, of its CoC funding. This is due to changes to the scoring criteria that disadvantage communities that excelled under HUD's previous priorities and policies, and the broad discretion that HUD has reserved for itself to reject projects and applicants using vague and subjective criteria under "Risk Review."  The possible loss of funding will have negative consequences for our community well into the future, because it will reduce or possibly eviscerate the Santa Clara County Continuum's annual renewal demand, and therefore the amount of funding that the Continuum is eligible to receive, for subsequent years.

40.    This funding uncertainty—for a program that is fundamentally about stability—comes at a time of great budgetary strain for the County of Santa Clara (due primarily to federal funding cuts for safety net services the County is required to provide). The County, like entities across California and the nation, is facing budget deficits that seriously strain the County General Fund resources the County has available to fund programs if longstanding federal grant funds are cut off. To meet the County's obligation to deliver a balanced budget, County departments, agencies, and executive leadership made very difficult choices—including cutting programs,

DECL. OF KATHRYN J. KAMINSKI                - 20 -

services, and staff positions—in the most recent fiscal year's Adopted Budget to close a $787 million budget deficit while maintaining critical services for the community. If the County were deprived of its CoC funding, it would struggle to sustain its CoC-funded services that serve homeless families with children; unhoused transition-age youth (age 18-24); chronically homeless adults; and survivors of domestic violence, sexual assault, human trafficking and/or stalking.

41.	The County's fiscal year runs from July 1 to June 30, and the County has already entered into all of its service agreements for projects funded by the County's CoC grants for the County's 2026-2027 fiscal year—although the current CoC grant agreements for some of these projects will end before June 30, 2027 and may not be renewed due to the FY 2026 NOFO. In prior years, the County could contract for services each fiscal year with reasonable reliance on the stability of CoC renewal funds, even if the federal fiscal year and HUD CoC annual award timeline were not directly aligned with the County's fiscal year. In other words, the County could budget and plan for the costs of its permanent housing, transitional housing, and other CoC-projects each year with the expectation that, absent a significant reduction in appropriation of funding by Congress, the funding would come, even if there was a short gap to fill.

42.	In my own experience, aside from the FY 2025 CoC NOFO that was enjoined, I am not aware of HUD ever having made changes to the CoC program this abruptly and without the opportunity for Continuums to prepare for and respond to the changes. In past years, when HUD has considered significant changes to the CoC program, it has either tested those changes through a demonstration program, such as the Youth Homelessness Demonstration Program, which allowed grantees to apply for waivers to test new strategies or models or implemented changes incrementally over time. It does not seem that HUD considered these alternatives to

DECL. OF KATHRYN J. KAMINSKI	- 21 -

implementing the changes it seeks to require Continuums to adopt through the FY 2026 NOFO.

43.     Lastly, HUD's delay in providing project application guidance further adds to the challenges for CoCs to prepare for the competition. As of the date of this declaration, HUD has not yet made project application forms available in e-snaps. *E-snaps* is the electronic CoC Program Application and Grants Management System that HUD's Office of Special Needs Assistance Programs (SNAPS) uses to support the CoC Program funding application and grant awards process. Based on my experience with the e-snaps application process, the forms will need to be redesigned to reflect the substantial changes in the FY 2026 NOFO. Although the deadline for submission is quickly approaching, potential applicants are currently unable to view the new forms to prepare project applications. It takes an immense amount of work to prepare individual project application forms and Continuum application narratives to submit to HUD, even when there are not huge changes like in the FY 2026 NOFO, and I am concerned that HUD's chaotic and disorganized roll-out of the FY 2026 NOFO will harm the Santa Clara County Continuum's ability to prepare a quality application in time before the deadline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at San José, California this 16th day of July, 2026.

Kathryn J. Kaminski

DECL. OF KATHRYN J. KAMINSKI                    - 22 -