**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>     *Defendants*. | Case No. 26-cv-436-MSM-AEM |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND/OR PRELIMINARY RELIEF AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Introduction................................................................................................................. 1

Argument ................................................................................................................... 2

I.    The FY 2026 NOFO and Its Challenged Provisions Are Invalid under the APA ................... 2

    A.  The Set-Aside exceeds Defendants' statutory authority, is contrary to law, and violates notice-and-comment requirements ................................................................. 3

        1.  Section 11386a(b) does not authorize HUD to impose the Set-Aside ......................... 3

        2.  The Set-Aside conflicts with § 11386b(d)'s limits on providing incentives ............... 5

        3.  The Set-Aside conflicts with § 11386c(b)'s provisions governing permanent housing renewals in two separate ways ........................................................................ 6

        4.  The Set-Aside violates notice-and-comment requirements ........................................ 9

    B.  Multiple other Challenged Provisions exceed Defendants' authority or are contrary to law ............................................................................................................... 10

        1.  The Safe Drug Use Condition and Certification exceed Defendants' authority ......... 10

        2.  The Discriminatory Disability Priority exceeds Defendants' authority and conflicts with nondiscrimination requirements ............................................................. 12

        3.  The Self-Sufficiency Criteria exceed Defendants' authority .................................... 14

        4.  The Subjective "Risk Review" and "Additional Factor" Criteria exceed Defendants' authority ............................................................................................. 15

        5.  Applying the Non-Statutory Threshold Criteria to Tier 1 projects exceeds Defendants' authority and conflicts with the 2026 Appropriations Act's mandate to fund Tier 1 projects based on local CoCs' selections ............................... 16

        6.  The E.O. Conditions exceed Defendants' authority and conflict with nondiscrimination requirements........................................................................... 18

        7.  The Judicial Restriction exceeds Defendants' authority ........................................... 20

    C.  The FY 2026 NOFO is arbitrary and capricious ............................................................. 21

        1.  Set-Aside .............................................................................................................. 21

        2.  Service Requirements Criteria ................................................................................ 24

        3.  Anti-Harm Reduction Criteria ............................................................................... 26

        4.  Law Enforcement Criteria...................................................................................... 27

        5.  Self-Sufficiency Criteria ........................................................................................ 28

6.   Discriminatory Disability Priority ................................................................. 29

7.   Subjective "Risk Review" Criteria and Additional Factors....................................... 30

8.   Bonus Limits.................................................................................................... 30

9.   E.O. Conditions.............................................................................................. 32

II.  The FY 2026 NOFO and Its Challenged Provisions Violate the Constitution ....................... 32

   A.  The Local Policies Criterion and "Gender Ideology" E.O. Conditions violate the First Amendment ...................................................................................... 32

   B.  Multiple Challenged Provisions violate the Spending Clause......................................... 33

   C.  The Court need not address Plaintiffs' other separation-of-powers challenges .............. 35

III. OMB Has Unlawfully Restricted CoC Funding ......................................................... 35

   A.  The Apportionment Footnotes exceed OMB's statutory authority................................. 35

   B.  The Apportionment Footnotes are arbitrary and capricious ........................................... 38

IV. The Court Need Not Address HUD's Prior Unlawful Failure to Provide CoCs Statutorily Mandated Information............................................................................. 38

V.  The Court Should Grant Plaintiffs' Requested Relief ............................................................. 38

   A.  Defendants do not oppose Plaintiffs' request for preliminary relief by August 10 should the Court require more time to consider summary judgment................................ 39

   B.  On summary judgment, vacatur, declaratory relief, and a permanent injunction are warranted......................................................................................................... 39

     1.   Vacating the FY 2026 NOFO is necessary to allow providers to submit new applications untainted by the unlawful provisions....................................................... 40

     2.   Defendants do not oppose declaratory relief ................................................................ 41

     3.   A permanent injunction is permissible and warranted.................................................. 41

Conclusion ....................................................................................................................... 43

## TABLE OF AUTHORITIES

**CASES**

*Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375 (D.C. Cir. 2006)............................................. 22

*Berge v. United States*, 949 F. Supp. 2d 36 (D.D.C. 2013) ...................................................... 42

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,* 295 F.3d 28 (D.C. Cir. 2002) ................. 20

*Bloate v. United States*, 559 U.S. 196 (2010) .......................................................................... 14

*Caribbean Produce Exch., Inc. v. Sec'y of Health and Human Servs.*,
    893 F.2d 3 (1st Cir. 1989)..................................................................................................... 10

*Chamber of Com. v. U.S. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999)..................................... 9

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) .............................................................. 3, 4

*City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. 2025) .................. 18, 19

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)............................................................ 34

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ........................................... 36

*Clarian Health W., LLC v. Hargan*, 878 F.3d 346 (D.C. Cir. 2017)............................................... 9

*Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) ..................................................... 20

*Dalton v. Specter*, 511 U.S. 462 (1994)...................................................................................... 35

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)........................................................................ 21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................................... 25

*Furtado v. Oberg*, 949 F.3d 56 (1st Cir. 2020)............................................................................ 39

*Guckenberger v. Bos. Univ.*, 974 F. Supp. 106 (D. Mass. 1997)................................................. 13

*League of United Latin Am. Citizens v. Exec. Off. Of President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) ..................................................................................... 20

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025) .............. 15, 18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................ 21, 26, 38

*N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018)................................................................... 9

*Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63 (D.D.C. 2025).............. 36

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) .................................................. 9

*R.R. Ave. Props., LLC v. Acadia Ins.*, 37 F.4th 682 (1st Cir. 2022) ............................................. 31

*Ramirez v. ICE*, 568 F. Supp. 3d 10 (D.D.C. 2021) ....................................................................... 42

*Reisman v. Associated Faculties of Univ. of Me.*, 939 F.3d 409 (1st Cir. 2019) .......................... 37

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ....................................................... 6

*Russello v. United States*, 464 U.S. 16, 23 (1983) .......................................................................... 8

*South Dakota v. Dole*, 483 U.S. 203 (1987) .................................................................................. 34

*Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) ....................................................... 20

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ...................................................................................... 6

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ...................................................... 14

*Webster v. Doe*, 486 U.S. 592 (1988) ............................................................................................ 31

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*,
    784 F. Supp. 3d 127 (D.D.C. 2025) .......................................................................................... 34

**FEDERAL STATUTES**

21 U.S.C. § 856 .............................................................................................................................. 11

21 U.S.C. § 863 .............................................................................................................................. 11

31 U.S.C. § 1512 ...................................................................................................................... 36, 37

42 U.S.C. § 11313 .................................................................................................................... 14, 27

42 U.S.C. § 11360 .......................................................................................................................... 13

42 U.S.C. § 11381 ................................................................................................... 14, 16, 17, 22, 28

42 U.S.C. § 11381–11389 .............................................................................................................. 31

42 U.S.C. § 11386a .......................................................................... 3, 4, 10, 12, 14, 15, 17, 38

42 U.S.C. § 11386b .............................................................................................................. 5, 9, 14

42 U.S.C. § 11386c ................................................................................................................. 6, 7, 8

2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173 .......................................... 15, 16, 26

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 ............................... 26

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4,
139 Stat. 9 ...................................................................................................................... 26

**FEDERAL REGULATIONS**

24 C.F.R. § 10.1 ................................................................................................................ 9

24 C.F.R. § 578.37 .......................................................................................................... 25

24 C.F.R. § 578.53 .......................................................................................................... 13

24 C.F.R. § 578.93 .......................................................................................................... 13

89 Fed. Reg. 65769 (2024) .............................................................................................. 25

**OTHER AUTHORITIES**

Comptroller General of the United States, B-163628 (Jan. 4, 1974),
https://perma.cc/KJP5-RKRR ...................................................................................... 36

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to
the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025).... 18, 19

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*,
Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025)...................................... 18

*Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218,
90 Fed. Reg. 10581 (Feb. 25, 2025) ......................................................................... 18

*Enforcing the Hyde Amendment*, Exec. Order No. 14182, 90 Fed. Reg. 8751
(Jan. 31, 2025)........................................................................................................... 18

*Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332,
90 Fed. Reg. 38929 (Aug. 12, 2025)......................................................................... 19

*Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025).................. 36

OMB. Exec. Order No. 6166, § 16 (June 10, 1933), reprinted in 5 U.S.C. § 901 ........................ 36

OpenOMB, *Homeless Assistance Grants*, https://perma.cc/JWZ6-WBGN ................................ 35

S. Rep. No. 93-688 (1974)............................................................................................... 36

U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations
Law* (3d ed. 2006), https://perma.cc/3CWL-WX35.................................................... 37

## INTRODUCTION

Defendants fail to show that the Department of Housing and Urban Development's (HUD's) FY 2026 Notice of Funding Opportunity (NOFO) for the Continuum of Care (CoC) program comports with Congress's (or the Constitution's) commands or the Administrative Procedure Act's (APA's) requirements for reasoned decisionmaking. In radically upending the federal government's primary response to homelessness, Defendants double down on criticizing HUD's own longstanding approach that has prioritized permanent housing. But, try as Defendants might to turn this into a policy debate, Congress set the parameters for the CoC program, and Defendants must abide by them. As Plaintiffs have shown, many aspects of the FY 2026 NOFO exceed Defendants' statutory authority or even outright conflict with governing laws. Defendants' basic response is that the statute actually gives HUD extraordinarily broad discretion to do as it pleases. But Defendants' interpretations cannot be squared with the statute's text.

In addition to straying beyond the bounds Congress set, the FY 2026 NOFO is also arbitrary and capricious. HUD distorts the facts and evidence and pays nothing more than lip service to—or completely ignores—many important impacts of its decisions. In some instances, Defendants even offer facially illogical justifications for their choices, including by claiming that making huge numbers of projects categorically ineligible for the $1.3 billion Set-Aside—and limiting the applicant pool—somehow *increases* competition. At bottom, Defendants claim they need to transform the program to better address homelessness, but they pursue their predetermined strategy without considering important factors or offering rational explanations.

Defendants likewise fail to persuasively defend the Apportionment Footnotes that the Office of Management and Budget (OMB) imposed to compel HUD to award funds according to the mandates of two executive orders.

1

For the reasons Plaintiffs previously explained, expedited resolution is warranted here—and Defendants do not disagree. Plaintiffs respectfully request that the Court enter summary judgment in favor of Plaintiffs by August 10 invalidating the NOFO and all its Challenged Provisions. But if the Court needs more time to consider summary judgment as to all the Challenged Provisions, it should grant Plaintiffs preliminary relief by that date. Defendants have not disputed the appropriateness of preliminary relief if the Court concludes Plaintiffs are likely to succeed on the merits, so the Court can readily grant such relief on the basis of any one of Plaintiffs' multiple claims if it requires more time to issue a final decision addressing all of the Challenged Provisions.

## ARGUMENT

### I.    The FY 2026 NOFO and Its Challenged Provisions Are Invalid under the APA

The FY 2026 NOFO and its Challenged Provisions violate the APA several times over—and Defendants fail to show otherwise. Resolving Plaintiffs' claims that certain Challenged Provisions exceed Defendants' authority and are contrary to law—and granting Plaintiffs relief on those claims—is sufficient to address Plaintiffs' challenges to those particular provisions, and would confirm that Defendants cannot lawfully just try to adopt those unlawful provisions again.[1] As to any provisions that the Court concludes exceed statutory authority or are contrary to law, the Court would not need to then separately address the claim that those particular provisions are arbitrary and capricious.

---

[1] Plaintiffs claim that the Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, and (as applied to Tier 1 projects) Non-Statutory Threshold Criteria all either exceed Defendants' authority, conflict with governing law, or both.

### A. The Set-Aside exceeds Defendants' statutory authority, is contrary to law, and violates notice-and-comment requirements

The Set-Aside is unlawful for multiple independent reasons: it exceeds HUD's authority, conflicts with multiple statutory provisions, and was adopted without following mandatory notice-and-comment procedures. Defendants fail to offer a persuasive response to any of these points.

### 1. Section 11386a(b) does not authorize HUD to impose the Set-Aside

To begin, no statute grants Defendants the authority to adopt the Set-Aside, which earmarks $1.3 billion in funds for new projects only and prioritizes transitional housing and supportive-services-only projects for those funds. Defendants seek to rely on 42 U.S.C. § 11386a, but that provision does not supply the authority that Defendants need. Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mots. for Summ. J. or, in the Alternative, Preliminary Inj. (Defs.' Mem.) at 29–30 (Dkt. No. 32). That provision authorizes HUD to establish "criteria" for making awards that must include many statutorily enumerated factors and can include "such other factors as the Secretary determines to be appropriate to carry out [the CoC statute] in an effective and efficient manner." 42 U.S.C. § 11386a(a)–(b).

The Set-Aside is not a "criteri[on]" within the meaning of this provision, let alone one that helps carry out the statute "in an effective and efficient manner." *Id.* First, it is not a "criteri[on]" because it is utterly unlike the many other criteria that the statute specifies. It is a well-established canon of construction that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (quotations omitted). Here, the statute provides a long list of "criteria" that HUD must establish—and not a single one categorically excludes certain types of

3

projects from consideration. Rather, the enumerated criteria include things like "the previous performance of the recipient," "how the number of individuals and families who become homeless will be reduced in the community," "the extent to which the recipient will … address the needs of all relevant subpopulations" and "set quantifiable performance measures," "the extent to which [CoC program funding] will be supplemented with [other] resources," and the recipient's "coordination" with "other entities serving" homeless populations. 42 U.S.C. § 11386a(b)(1). These criteria that the statute lists are different in kind from the Set-Aside's categorical disqualification of existing projects. Because the Set-Aside is thus not "similar in nature" to the listed criteria, it is not a "criteri[on]" within the meaning of the provision. *See Circuit City*, 532 U.S. at 115.

Second, even if the Set-Aside could be considered a "criterion," it is certainly not one that helps carry out the statute "in an effective and efficient manner." Categorically making existing projects ineligible for funding, no matter how successful they are, does nothing to serve effectiveness or efficiency. Defendants claim (at 30) that the Set-Aside "is effective" because it "increase[s] competition" by "expand[ing] the scope of applicants and projects," but that is demonstrably false. The Set-Aside outright disqualifies existing projects from consideration (and comes close to outright disqualifying new permanent housing projects as well)—thereby limiting the scope of eligible applications and decreasing competition. For similar reasons, Defendants badly err in contending (at 31) that the Set-Aside is "efficient" because it "remove[s] uncompetitive projects and ensure[s] that only the best performers will receive funds." The Set-Aside disqualifies existing (and permanent housing) projects no matter how competitive they would be or how well they perform.

4

### 2.    The Set-Aside conflicts with § 11386b(d)'s limits on providing incentives

The Set-Aside also conflicts with 42 U.S.C. § 11386b(d), which limits the circumstances in which HUD can provide incentives for types of projects. In particular, that provision requires HUD to provide "bonuses or other incentives" for specified activities that "have been proven to be effective" in combatting homelessness, and it identifies two (and only two) strategies that Congress deemed to have proven effective—two types of permanent housing. 42 U.S.C. § 11386b(d)(1), (2)(A)–(B). The provision also allows HUD to identify additional proven strategies "based on research and after notice and comment to the public." *Id.* § 11386b(d)(2)(C). But HUD has never done so. Yet the Set-Aside provides a massive incentive for new transitional housing and supportive-services-only projects, contrary to these statutory limitations.

Defendants' responses are unavailing. First, Defendants assert in passing (at 51) that the Set-Aside is not a "bonus or incentive" at all. That assertion defies reality—the provision heavily incentivizes providers and CoCs to put forward transitional housing and supportive-services-only projects. *See* Decl. of Ann Marie Oliva (Oliva Decl.) ¶¶ 162, 167, 169 (Dkt. No. 30-4). Indeed, that was the point. *See* Administrative Record (AR) 50–58.[2]

Second, Defendants contend (at 71–72) that the provision merely establishes the incentives that HUD "shall" create and does not provide that HUD "shall *only*" incentivize the listed activities. But that interpretation would fail to give any meaningful effect to the provision authorizing HUD to determine that other strategies have proven effective "based on research and after notice and comment to the public," 42 U.S.C. § 11386b(d)(2)(C). After all, Defendants'

---

[2] The relevant excerpts of the Administrative Record are included in the Consolidated Excerpts of Administrative Record filed with this brief. The Consolidated Excerpts of Administrative Record include materials included in the Excerpts of Record Plaintiffs filed with their motion (Dkt. No. 30-3) as well as additional materials cited in this brief.

interpretation would mean HUD was free to provide incentives for whatever other activities it wished—even if they have not been proven effective, and even if HUD did not undertake the required process to determine that they had been. That would violate the "cardinal principle" that no part of a statute should be construed to "be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up).

Finally, HUD claims (at 72–73) that, actually, it did make the required determination "based on research and after notice and comment to the public" because it "reviewed articles and peer-reviewed research," issued "numerous public statements," and talked to people at "forums" and in "separate discussions." But that cannot possibly satisfy the statute's requirement, particularly given the background understanding that an "opportunity for comment must be … meaningful." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). HUD did not provide clear notice that it was determining new transitional housing and supportive-services-only projects to "have been proven effective." It did not make clear that it was soliciting comment on that determination. And it did not offer a clear way for the public to submit comments—invitation-only forums and private meetings cannot credibly be considered an opportunity for "the public" to comment. *See* Supplemental Declaration of Ann Marie Oliva (Suppl. Oliva Decl.) ¶¶ 15–19.

### 3. The Set-Aside conflicts with § 11386c(b)'s provisions governing permanent housing renewals in two separate ways

As Plaintiffs' opening brief explains, the Set-Aside also outright conflicts with 42 U.S.C. § 11386c(b) in two separate ways. Pls. Mem. in Supp. of Mot. for Partial Summ. J. and/or Prelim. Relief (Pls.' Mem.) at 28 (Dkt. No 30-1). Defendants fail to show otherwise.

First, the Set-Aside conflicts with the provision's mandate that funds appropriated for the CoC program "shall be available for the renewal of [permanent housing] contracts," because the

Set-Aside makes $1.3 billion in appropriated funds categorically *un*available for such renewals. 42 U.S.C. § 11386c(b). In response, Defendants emphasize (at 32) that § 11386c(b) requires only that "[t]he sums made available under subsection (a)" be available for permanent housing renewal—and, according to Defendants, subsection (a) authorizes HUD to decide what funds to make available. Not so. Subsection (a) provides that permanent housing renewals "may be funded" under two different appropriations accounts—the CoC program appropriation or another account. 42 U.S.C. § 11386c(a). This authorizes HUD to "fund[]" permanent housing renewals from either source, but "fund[ing]" awards is distinct from "ma[king funds] available" for them. *Id.* § 11386c(a)–(b). It is Congress that makes funds "available" by appropriating funding for the specified accounts from which the renewals "may be funded." *See id.* § 11386c(a). Thus, under subsection (b), those funds that Congress appropriates—and thereby makes available in the two specified accounts—must "be available" for permanent housing renewals. That does not mean that HUD must actually *fund* all the renewals—but the specified funding must "be available" for them such that renewals have an opportunity to compete. The Set-Aside violates that mandate by making $1.3 billion in funding categorically *unavailable* for covered renewals.

Second, the Set-Aside conflicts with § 11386c(b)'s mandate that HUD "determine whether to renew" permanent housing projects "on the basis of" the CoC's certification that two (and only two) specified criteria are satisfied. Defendant's chief response to this is that HUD has broad discretion about what to fund because subsection (a) provides that such renewals "may" be funded. Defs.' Mem. at 33. But subsection (a) governs the possible sources of funding: It provides that renewals "may be funded" under the two specified accounts. It does not govern HUD's discretion to grant or deny renewals. Subsection (b) is what speaks to that. And subsection (b) provides in no uncertain terms that HUD "shall determine whether to renew" a permanent housing award "on the basis of certification by the [CoC]" that two specified criteria

7

are met. 42 U.S.C. § 11386c(b). That subsection grants HUD no discretion to decide whether to renew such awards based on any other factors.

Nor does subsection (c) grant HUD such discretion, as Defendants claim (at 32, 34). That subsection states that "[n]othing in this section shall be construed as prohibiting the Secretary *from renewing* contracts under this part in accordance with criteria set forth in a provision of this part other than this section." 42 U.S.C. § 11386c(c) (emphasis added). This provision clarifies only that HUD is authorized to "renew[]" awards if warranted by other statutory provisions; it does not permit HUD to *decline* to renew awards on such other grounds. If Congress had wanted to grant HUD that broader authority, it would have used the same language it used in subsection (b)—and provided that nothing prohibited HUD from "determin[ing] whether to renew" awards in accordance with other criteria. But it did not, and in circumstances like that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted). And, of course, Congress's choice to give HUD broader discretion to renew than to decline to renew makes good sense given the statute's general prioritization of stability and renewals.

Defendants' miscellaneous other arguments also fall flat. For instance, Defendants assert that HUD previously "chose to shift the vast majority of its CoC funds to Permanent Housing and Tier 1 projects" and that, if that was legal, the Set-Aside for new transitional housing and supportive-services-only projects must be, too. Defs.' Mem. at 33–34 (emphasis omitted). That makes no sense because § 11386c provides protections for permanent housing renewals—not for other types of projects. Defendants also contend (at 35) that Plaintiffs' interpretation of

8

subsection (b) "is inconsistent with" the "*competitive*" nature of the CoC program. But renewals still compete—they are just evaluated based on the statutorily designated factors.

### 4.    The Set-Aside violates notice-and-comment requirements

For two separate reasons, Defendants also failed to follow required notice-and-comment procedures in imposing the Set-Aside. First, as explained in Section I.A.2 above, they improperly designated new transitional housing and supportive-services-only projects as "proven" activities eligible for incentives without providing the public notice and opportunity to comment that 42 U.S.C. § 11386b(d)(2)(C) requires.

Second, Defendants separately failed to follow HUD's own regulations requiring notice and comment for substantive rules, including rules that relate to grants. *See* 24 C.F.R. § 10.1. Defendants contend (at 73) that "[t]he NOFO falls within th[e] exception" to those regulatory requirements for "a statement of policy or an interpretive rule." But Defendants' argument speaks only in broad terms about the NOFO as a whole and does not specifically address the effect of the Set-Aside—the particular provision that Plaintiffs argue is procedurally unlawful in this way. As Plaintiffs explained, there can be little doubt that the Set-Aside is a substantive (*i.e.*, legislative) rule, and not an interpretive one or a statement of policy. Pls.' Mem. at 41–42.

A legislative rule is one that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quotations omitted). In other words, a legislative rule has "binding effect," *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 358 (D.C. Cir. 2017), unlike an interpretive rule or statement of policy, which "does not impose any requirements," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014), and "leaves agency decisionmakers free to exercise their informed discretion in individual cases," *Chamber of Com. v. U.S. Dep't of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999). Defendants assert (at 73) without support that the fact that

the NOFO is "binding" on agency officials does not make it a legislative rule. But the case they cite in fact says that an agency action is a legislative rule if it imposes "binding norms intended to have the force of law" that "restrain[] the discretion of officials." *Caribbean Produce Exch., Inc. v. Sec'y of Health and Human Servs.*, 893 F.2d 3, 7 (1st Cir. 1989). The Set-Aside has such a "binding" effect by excluding existing projects from nearly a third of the available funding and requiring the agency to fund all new transitional housing and supportive-service-only applications before using the Set-Aside funds for permanent housing. *Id.* The Set-Aside "restrain[s] the discretion of officials and [is] therefore subject to the notice-and-comment procedures" required by HUD's regulations. *Id.*

### B. Multiple other Challenged Provisions exceed Defendants' authority or are contrary to law

Multiple other provisions of the FY 2026 NOFO also exceed Defendants' authority or outright conflict with governing statutes or regulations.

### 1. The Safe Drug Use Condition and Certification exceed Defendants' authority

Defendants lack authority to impose the Safe Drug Use Condition and Certification— which bar grantees from operating "safe consumption sites" or engaging in other harm reduction activities (purportedly) in violation of federal law, even with their own, non-CoC funding. Contrary to Defendants' contention (at 35–36), these provisions cannot be justified as exercises of 42 U.S.C. § 11386a(b)(1)(G)'s authorization for HUD to adopt criteria "appropriate to carry out [the CoC program] in an effective and efficient manner." These provisions constrain grantees' conduct outside the scope of the CoC program and thus have nothing to do with the program's effectiveness or efficiency. Defendants baldly assert (at 36) that "the NOFO limits this criterion to those activities and projects funded with CoC funds," but that is decidedly not what the NOFO says. The NOFO requires applicants to certify that "[t]he project applicant" will not

10

engage in the covered activities—not just that the applicant will not engage in the activities *with CoC funds*. *See* AR 5065. And it specifies that awards will not fund any "project, service provider, or organization" that engages in the covered activities—not just that awards will not fund the activities themselves. *See* AR 5113.

Nor can Defendants justify these provisions as mere "remind[ers] … to comply with Federal criminal laws," for at least three reasons. *Contra* Defs.' Mem. at 35. First, the provisions in fact sweep more broadly than that. As Plaintiffs previously explained, the NOFO states that these provisions are "not a requirement that program participants … be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement"—a clarification that strongly implies that these provisions *are* a requirement that providers evict participants for any *second*-time drug violation. Pls.' Mem. at 15–16 (citing AR 5065, 5113). There is no support for Defendants' apparent view that federal criminal laws impose such a requirement, and Defendants offer no response to that point.

Second, HUD does not have authority to blackball applicants based on HUD's own view of whether their harm reduction activities violate federal law. The drug statutes that the NOFO cites prescribe penalties for noncompliance—penalties that can be imposed by a court following the ordinary legal process. *See* 21 U.S.C. §§ 856(b), (d), 863(b). But nothing authorizes HUD to decide for itself whether an organization has violated those statutes and then to deny grant funding to them as a penalty.

Finally, the actual certification that HUD is requiring applicants to sign is not even on its face cabined to violations of federal criminal laws. Instead, the application (which HUD posted only after Plaintiffs filed their initial brief) requires applicants to certify that "[t]he project applicant will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of

11

illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" Suppl. Oliva Decl. ¶ 7 & Ex. A. That certification would disqualify applicants that engage in harm reduction activities, regardless of whether they are legal.

### 2. The Discriminatory Disability Priority exceeds Defendants' authority and conflicts with nondiscrimination requirements

Defendants concede that the NOFO tells applicants that HUD's goals and objectives "should be prioritized." Defs.' Mem. at 39 (citing AR 5035). Yet they claim that HUD's express statement *in its goals and objectives* that individuals with physical and developmental disabilities—but not mental health disabilities—should be "prioritized" for housing "does not require" any action by applicants and therefore cannot be challenged. *Id*. This ignores that HUD (1) requires applications to "support the goals of this NOFO" and (2) reserves discretion to consider "the overall projected impact" of the project "on the … priorities in this NOFO" when making selection decisions. AR 5016, 5092. Applicants—including Plaintiffs and Plaintiff Associations' members—must therefore either adopt a discriminatory policy or risk losing out on funding from HUD. Suppl. Oliva Decl. ¶¶ 13–14.

On the merits, Defendants fail to respond at all to Plaintiffs' arguments that the NOFO's priority violates the Rehabilitation Act and the Americans with Disabilities Act (ADA). *See* Pls.' Mem. at 28–29. Defendants instead claim (at 39–40) that provisions of the CoC statute and regulations justify the Discriminatory Disability Priority, but none does.

First, Defendants invoke (at 39–40) a statutory provision stating that, in making awards, HUD should consider "the extent to which the recipient will address the needs of all relevant subpopulations." 42 U.S.C. § 11386a(b)(1)(B)(iv)(I). This does not authorize the Discriminatory Disability Priority because a CoC can address all relevant subpopulations' needs without discriminatorily advantaging people with certain disabilities. And individuals with severe mental

illnesses do not "need … a permanent supportive home" (Defs.' Mem. at 40) any less simply because their disability is mental health-related instead of physical. The Priority makes an illegal stereotype-based classification about which types of disabilities may achieve "self-sufficiency" rather than simply directing applicants to prioritize individuals with the most intensive needs, regardless of what type of disability they may have. *See Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 134 (D. Mass. 1997) ("The ADA and Section 504 specifically prohibit discrimination … based on thoughtlessness, apathy and stereotypes about disabled persons.").

Second, Defendants invoke (at 40) a regulation authorizing grantees to "provide a preference for the housing to subpopulations … who need the specialized supportive services that are provided in the housing." 24 C.F.R. § 578.93(b)(7). Contrary to Defendants' contention (at 40), this provision does not authorize HUD to "provide[] preferences to subpopulations who need … a permanent supportive home." For one, permanent supportive housing is not itself a "specialized supportive service" within the meaning of the regulation; it is a type of program in which different specialized services are offered. 24 C.F.R. § 578.53(b)(2); *see also* 42 U.S.C. § 11360(29) (defining "supportive services"); 24 C.F.R. § 578.53(e). So, the regulation grants no license to provide preferences in accessing permanent supportive housing generally. Instead, the regulation authorizes preferences based on who needs particular supportive services—for example, a project specializing in "substance abuse addiction treatment" could prioritize individuals with substance use disorder, or a project specializing in "domestic violence services" could prioritize survivors of domestic violence. *See* 24 C.F.R. § 578.93(b)(7). The Discriminatory Disability Priority has no such tailoring and excludes individuals without regard to the type of supportive services they may need.

### 3.    The Self-Sufficiency Criteria exceed Defendants' authority

Defendants likewise lack authority to adopt the Self-Sufficiency Criteria, which threaten to disqualify projects based on whether they will achieve Defendants' particular conception of "self-sufficiency"—which the NOFO defines as "the ability to meet basic needs, including a place to live, *without public or private assistance*." AR 5011 (emphasis added). Plaintiffs do not dispute that HUD can properly promote self-sufficiency—that is one of several goals Congress established for the CoC program. *See* 42 U.S.C. § 11381(4). But HUD cannot evaluate applicants based on the cramped view of self-sufficiency that the NOFO adopts, as that view runs contrary to the statute. Throughout, the statute makes clear that the CoC program should help people get assistance from mainstream programs, like Medicaid, SNAP, Supplemental Security Income, and the like. *See, e.g.*, 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B). Indeed, the very section that says the program should "optimize self-sufficiency" also says that the program should "promote access to, and effective utilization of, mainstream programs … and programs funded with State or local resources." *Id.* § 11381(3); *see also id.* § 11313(a)(7) (defining "mainstream programs"). Nowhere does the statute suggest that the CoC program's goal is to eliminate participants' need for any type of "public or private assistance." AR 5011.

In defending the NOFO's no-assistance-at-all version of "self-sufficiency," Defendants offer nothing more than a cherry-picked dictionary definition. *See* Defs.' Mem. at 37. But Defendants' reliance on "a dictionary definition" improperly fails to "account for the governing statutory context." *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010); *see also, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 574 (S.D.N.Y. 2014) ("[A] statutory term should be defined by the context of the statute rather than by the dictionary." (cleaned up)). And the statutory context shows that Congress intended to promote usage of other, mainstream assistance, not to

14

discourage it. Given that context, Defendants could not properly penalize applicants based on their clients' reliance on other, non-CoC assistance.

### 4. The Subjective "Risk Review" and "Additional Factor" Criteria exceed Defendants' authority

Defendants also lack authority to impose the subjective "Risk Review" and "Additional Factor" criteria. Although Defendants claim that these factors promote effectiveness and efficiency and are therefore authorized by 42 U.S.C. § 11386a(b)(1)(G), the factors are not so cabined. For instance, some factors look to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal." Those factors threaten to disqualify providers solely based on DEI or harm reduction activities that HUD disfavors and that have no bearing on the provider's ability to effectively and efficiently carry out a CoC grant. *See* AR 5092. In addition, highly subjective factors—like ones looking to the applicant's "[a]bility to promote self-sufficiency and economic independence," the project's "overall projected impact on the … priorities in this NOFO," and the "[l]ikelihood that the proposed project will result in the benefits expected," AR 5092—are so open-ended that they leave it open for HUD to disqualify projects on any ground at all. The statutory authority to establish "criteria" cannot be read to authorize such unbounded discretion, particularly when the criteria the statute otherwise establishes are all concrete and specific. *See* 42 U.S.C. § 11386a(b)(1); *see also Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash. 2025) (noting that HUD's "catchall" authority must be interpreted to authorize conditions "of the same kind" as those enumerated), *appeal pending*, No. 25-3664.

Defendants also err in suggesting (at 39) that these criteria are authorized by the statutory requirement for HUD to "prioritize funding" for CoCs that "have demonstrated a capacity to

15

reallocate funding from lower performing projects to higher performing projects." 2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173, 399. The problem with the overly subjective factors is that they do not meaningfully address how projects "perform[]" at all—and instead just grant unbridled discretion to HUD.

Nor can HUD defend the "Additional Factor" Criteria on the ground that the NOFO states that HUD will consider them only "[t]o the extent allowed by law," AR 5092. *Contra* Defs.' Mem. at 38. HUD cannot permissibly consider the overly subjective factors in any circumstances, so Plaintiffs would at a minimum be entitled to a declaration saying so.

> **5.    Applying the Non-Statutory Threshold Criteria to Tier 1 projects exceeds Defendants' authority and conflicts with the 2026 Appropriations Act's mandate to fund Tier 1 projects based on local CoCs' selections**

Defendants also lack authority to impose the Non-Statutory Threshold Criteria to Tier 1 projects. *See* Pls.' Mem. at 29. That is because the 2026 Appropriations Act requires HUD to make awards to projects that CoCs place in Tier 1 of their community-wide applications, so long as those projects meet statutory requirements. *See* Pub. L. No. 119-75, 140 Stat. at 399. In particular, the Act requires HUD to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"—the amount corresponding to the NOFO's Tier 1—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" *Id.* The requirement to "select projects … based on rankings determined by the local continuum of care" means that HUD must honor local CoCs' rankings for that portion of funding—and award funds to the projects that CoCs rank in Tier 1. The only caveat is that this must be "consistent with 42 U.S.C. 11381 *et seq.*," the provisions governing the CoC program—meaning that HUD need not honor the CoC's rankings if the CoC ranked in Tier 1 a project that is inconsistent with statutory requirements. The Non-Statutory Threshold Criteria violate this mandate by requiring Tier 1 projects to meet additional, non-statutory

16

requirements to be selected. Applying those non-statutory requirements means that HUD will not award the specified statutory amount "based on rankings determined by the local continuum of care," but based on projects' compliance with the NOFO's additional criteria. *See id.*

Defendants claim (at 43) that the 2026 Appropriations Act does not actually require HUD to select all projects that CoCs rank in Tier 1 so long as they meet statutory requirements. In Defendants' view, the Act's requirement that selections be "consistent with 42 U.S.C. 11381 *et seq.*" incorporates HUD's authority under 42 U.S.C. § 11386a to establish selection criteria— and, so, the mandate to award funds "based on" local CoCs' rankings does not "override[]" whatever other selection criteria HUD might impose. Defs.' Mem. at 43–44. That badly misreads the statute. To begin, HUD cannot impose additional criteria on these projects because then it would not be awarding funds "based on" local CoCs' rankings—what the 2026 Appropriations Act requires. In addition, HUD's authority under § 11386a is the authority to establish criteria governing "a national competition between geographic areas." 42 U.S.C. § 11386a(a); *see also id.* § 11386a(b)(1). But, as Defendants themselves repeatedly acknowledge, the 60 percent amount specified in the Appropriations Act is not subject to any such national competition. *See, e.g.*, Defs.' Mem. at 32 (noting that the 2026 Appropriations Act directs HUD "to use at least 60% of the funds for non-competitive awards"); *see also id.* at 2, 13, 14. Thus, any criteria that HUD establishes under § 11386a would not be relevant.

Defendants also point out (at 43) that the Non-Statutory Threshold Criteria "only apply to new project applications," and not renewals. But that is irrelevant. The Appropriations Act requires HUD to "select projects" of the specified amount "based on" the local CoCs' rankings, not just to select renewal projects based on those rankings.

17

### 6.    The E.O. Conditions exceed Defendants' authority and conflict with nondiscrimination requirements

The E.O. Conditions also exceed Defendants' authority, and several of them conflict with nondiscrimination requirements to boot. Starting with HUD's (lack of) statutory authority, Defendants do not point to any statutory provision authorizing them to require grantees to follow executive orders. Instead, Defendants baldly assert (at 40) that HUD has authority to "require grants to comply with Executive Orders relevant to the contracted activity." But the executive orders by and large have nothing to do with the CoC program or ending homelessness—and instead advance wholly unrelated ideological and policy goals on topics relating to DEI, gender identity, abortion, and immigration. *See, e.g.*, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); *Enforcing the Hyde Amendment*, Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025); *Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 25, 2025). As multiple courts have held, HUD lacks authority to impose these sorts of "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute." *King Cnty.*, 785 F. Supp. 3d at 886–87; *accord, e.g.*, *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10–11 (N.D. Cal. 2025), *appeal pending*, No. 25-7378.

In addition, although Defendants do not make the argument in addressing Plaintiffs' statutory-authority and contrary-to-law claims, they elsewhere contend that the E.O. Conditions do not "impose[] anything on Plaintiffs themselves." Defs.' Mem. at 84; *see also id.* at 67. But that cannot be squared with the actual language of the NOFO, which (1) states that "You"—*i.e.*, the grantee—"must follow the applicable provisions" in a HUD policy document and then

18

(2) goes on to list what the "applicable provisions" are, including requirements to comply with nearly a dozen executive orders. AR 5111–12. No statute authorizes Defendants to require grantees to comply with these executive orders.

And to the extent Defendants mean to say that these conditions just require *HUD* to follow those orders in awarding grants, that exceeds Defendants' authority as well. No statute authorizes HUD to award or deny funds based on the grantees' adherence to the executive orders' directives on gender, DEI, and other topics unrelated to the CoC programs' goals.

In addition to exceeding Defendants' authority, the E.O. Conditions that require adherence to the Administration's view that gender is binary and immutable—the "Gender Ideology" E.O. and Grantmaking E.O.[3]—are also contrary to law. In particular, they conflict with the Fair Housing Act, Title VII, and HUD's Equal Access Rule, all of which prohibit discrimination on the basis of gender identity. *See* Pls.' Mem. at 30. Defendants do not dispute that requiring grantees to deny people's gender identities would conflict with those nondiscrimination requirements.

Instead, Defendants assert (at 40–41) that the E.O. Conditions necessarily cannot violate these (or, apparently, any) laws because a HUD document states that executive orders "may only apply to the extent they are consistent with" statutory and regulatory requirements. HUD, *Gen. Admin., Nat'l, and Departmental Pol'y Requirements and Terms for HUD's Fin. Assistance Programs* at 1 (2026), https://perma.cc/25EU-TBVW. But that sort of savings clause does not "magically ensure" that the condition is lawful. *City of Fresno*, 2025 WL 2721390, at *10.

---

[3] *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" E.O.); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025) (Grantmaking E.O.).

19

Defendants point to cases suggesting that plaintiffs in some instances cannot challenge mandates to take action only as "permitted by law." Defs.' Mem. at 41–42. But those cases addressed situations where—unlike here—it was possible to comply with the mandate without violating governing laws. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (addressing a "policy that … is above suspicion in the ordinary course of administration"); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 (D.D.C. 2020) (noting it was too early to tell "whether the implementation" of a challenged mandate "might cross th[e] line" into unlawfulness); *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Sotomayor, J., concurring) (noting possibility that challenged order "can and will be carried out consistent with the constraints of law"). Here, by contrast, it is hard to see how a grantee could possibly comply with the gender-related Executive Orders' anti-transgender mandates without violating nondiscrimination laws. And in circumstances like that—where a mandate "cannot possibly be implemented consistent with applicable law"—then "a saving clause is meaningless." *League of United Latin Am. Citizens v. Exec. Off. Of President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025).

### 7.    The Judicial Restriction exceeds Defendants' authority

Defendants decline to defend the Judicial Restriction as written and instead claim (at 42–43) that the provision does not purport to limit the scope of any relief a court might order. That is difficult to square with Judicial Restriction's text, which states that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable *in any jurisdiction*, they shall be ineffective *as to such jurisdiction*." AR 5113 (emphasis added). At any rate, Defendants' concession (at 42) that the Restriction does not actually limit judicial relief to the "geographic location of a court" is reason enough alone to vacate the provision, given that its actual language purports to do so.

20

### C. The FY 2026 NOFO is arbitrary and capricious

Defendants also acted arbitrarily and capriciously in adopting the Challenged Provisions. Across the board, they distort and disregard evidence, ignore important consequences of the provisions, and even offer reasoning that is facially illogical—all in reckless pursuit of their predetermined policy preferences. Defendants try to check the boxes by offering superficial reasoning to support their choices, but reasoned decisionmaking is not a box-checking exercise; an agency's consideration must be genuine. *See Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019) (holding that an agency may not offer "contrived" reasoning but must "offer genuine justifications for important decisions"). Defendants' consideration of the issues falls far short of the APA's requirements.

### 1. Set-Aside

The Set-Aside is arbitrary and capricious, and Defendants fail to show otherwise. Defendants failed to consider multiple "important aspect[s] of the problem," and the reasoning they offer fails to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

To start, Defendants did not meaningfully consider the impact the Set-Aside would have on providers (whose existing projects would be defunded) or participants (who would lose their housing assistance as a result), and likewise did not consider the reliance interests of those stakeholders. Defendants insist (at 48–49, 52–53, 57–58) that they did consider those factors—but their consideration was entirely superficial and failed to address key issues. As for the participants, Defendants claim (at 52–53, 58) that they can just move to transitional housing. But, as Plaintiffs' opening brief explains (at 32–33), that will generally not be a realistic option, including because transitional housing will often not be available at the right time, in the right geographic area, or at all. Defendants claim (at 53) that this "disagree[ment]" about "the

21

viability" of participants' moving to transitional housing is irrelevant because Defendants "consider[ed] the issue." But they did not. Defendants did not consider the multiple impediments to existing participants' remaining stably housed—undeniably an important aspect of the problem.

Defendants' consideration of the impact on providers also falls short. On that, Defendants tout that the NOFO offers "transition grants" that would allow providers to transition permanent housing projects to transitional housing over the course of a year. *See* Defs.' Br. at 48–49, 58. But, as Plaintiffs explained before, this ignores that such transitions are often not workable for a host of reasons—because regulations bar nonprofits from administering rental assistance for transitional housing; because insurers may refuse to insure transitional housing properties; and because properties often have deed restrictions that prevent providers from switching them to transitional housing. Pls.' Mem. at 33–34. Defendants offer no response to these critical points.

Defendants also offer explanations that fail to meet APA standards of rationality. For one, they double down on claiming (at 52) that the Set-Aside "furthers competition." But Defendants do not—and cannot—explain how that is so. The Set-Aside makes existing projects categorically ineligible to compete and conclusively tips the competition in favor of transitional housing and supportive-services-only projects, no matter their merit. That restricts competition; it does not advance it. Defendants' illogical reasoning alone renders the Set-Aside arbitrary and capricious. *See Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is illogical on its own terms, the agency's order is arbitrary and capricious." (cleaned up)).

Defendants also confuse correlation with causation in emphasizing that homelessness increased while CoC funding focused principally on permanent housing. *See* Defs.' Mem. at 45–

22

47. There are many other explanations for the rise in homelessness during that period. Pls.'
Mem. at 36.

Further, Defendants emphasize the importance of services while disregarding that services are a critical part of permanent housing projects as well. *See, e.g.*, Defs.' Mem. at 46. Defendants disparage (at 9–11) HUD's prior approach as "Housing Only," but that is grossly misleading. Defendants conveniently ignore that, even while the CoC program has prioritized permanent housing, a significant portion of funding has gone to services; that Congress created *other* programs to fund services; and that projects often layer funding from those and other sources to provide services in their CoC-funded housing projects. *See* Suppl. Oliva Decl. ¶¶ 10–12. As a report that Defendants (mis-)cite explained, residents in permanent supportive housing "are offered services equivalent in intensity to or even greater than services offered in transitional housing." Office of Policy Development and Research, HUD, *Costs Associated with First-Time Homelessness for Families and Individuals* at 3-2 (2010), https://perma.cc/P38H-M5WS; *contra* Defs.' Mem. at 15 (citing AR 52–53) (claiming that the report showed that transitional housing offered a "comprehensive range of on-site services" as "compared to Permanent Supportive Housing"). Defendants offer no reasonable explanation why they need to defund permanent housing to get individuals and families the supportive services they need.

Finally, Defendants suggest that they should be able to implement the Set-Aside's shift away from permanent housing because they "forewarned" stakeholders it was coming. Defs.' Mem. at 57; *see also id.* at 48. But that forewarning does not change the fact that Defendants failed to consider key issues and based their decision on irrational reasoning. Nor does it matter that Defendants did not make these changes quite so abruptly this year as they did last year. *Contra* Defs.' Mem. at 57–58. That may obviate (some of) the timing problem, but it leaves the many other problems unaddressed. And while Defendants claim (at 44) that Plaintiffs

23

"conceded" that HUD could implement these changes if it just waited until this year, Plaintiffs did no such thing. Last year, the extremely last-minute timing alone made it illegal and arbitrary and capricious for HUD to make its desired changes. *See, e.g.*, Pls.' Mem. in Supp. of Mot. for Summ. J. at 33–38, *NAEH v. HUD*, No. 25-cv-636 (D.R.I. filed Jan. 14, 2026) (Dkt. No. 67-1). Plaintiffs pointed out that HUD could avoid that particular timing problem by instead waiting until the next year—but in no way suggested that HUD's changes would not present *other* problems. *See, e.g., id.* at 36 ("Nowhere does the record explain … why the agency could not wait until a new funding cycle to make any *lawful* changes on a timely basis" (emphasis added)).

### 2.    Service Requirements Criteria

Defendants do not specifically respond to Plaintiffs' claim that the Service Requirements Criteria are arbitrary and capricious. *Compare* Pls.' Mem. at 34–38, *with* Defs.' Mem. at 44–71. But even extrapolating arguments from their defenses of some of the other Challenged Provisions, Defendants fail to counter Plaintiffs' arguments that the Service Requirements Criteria are neither reasonable nor reasonably explained.

For example, Defendants submit that it is "reasonable to encourage treatment and support" because treatment "remove[s] one obstacle for homeless individuals to achieve self-sufficiency." Defs.' Mem. at 61. But "encouraging" treatment is different from mandating it, which is what the NOFO's Service Requirements push providers to do. And, as Plaintiffs explained (at 35, 36–37), the evidence shows that making treatment voluntary produces better outcomes, including because it meets people where they are and does not cause them to lose trust or disengage. In response, Defendants repeatedly tout a study that they claim "show[s] that service requirements have better outcomes." Defs.' Mem. at 50, 62 (citing AR 61). But their cited study—the linchpin for their factual finding—did not address homeless populations or service requirements for housing at all, much less purport to disagree with studies showing the

24

effectiveness of Housing First. Rather, that study found that a particular state involuntary outpatient commitment program for individuals experiencing severe mental illness led to better hospitalization and engagement outcomes than voluntary treatment. AR 3311. Pointing to that single off-point study does not constitute a "reasoned explanation … for disregarding facts and circumstances that underlay" HUD's prior policy favoring voluntary treatment. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). That failure alone renders the Service Requirements Criteria arbitrary and capricious. *See id.*

Defendants otherwise do not respond to Plaintiffs' contention that the agency "distorts or outright ignores the evidence to justify its departure from Housing First." Pls.' Mem. at 36. They simply assert (at 63) that "the evidence on Housing First is mixed and complicated" and urge the Court to defer to the agency on "how to interpret the data." Missing is any citation to the record or any relevant data. And although Defendants double down on their reliance on the HUD-VASH program as support for their new approach, they remain incorrect that the program imposes mandatory service requirements. The requirement that participants "receive the case management services … as needed," 89 Fed. Reg. 65769, 65775 (2024); *see* 24 C.F.R. § 578.37(a)(1)(ii)(F), is distinct from requiring other types of services, such as "outpatient health services," which remain voluntary under the HUD-VASH program, 89 Fed. Reg. at 65775. Case management services are both required in rapid rehousing programs and consistent with a Housing First approach. Pls.' Mem. at 37–38. HUD thus has not reasonably explained its decision to abandon that approach and implement the Service Requirements Criteria instead.

Defendants also fail to show that HUD adequately accounted for the enormous disadvantage these criteria inflict on entities that aid survivors of domestic violence and sexual assault—who generally cannot lawfully mandate services. *See* Pls.' Mem. at 35–36. Instead, Defendants respond with non sequiturs. They point out (at 62) that they provided "a bonus for

domestic violence service providers," but the bonus they provided is the opportunity to compete for $104 million in funding that Congress specifically earmarked for domestic violence services. AR 5011; 2026 Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399–400; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, tit. I, § 1101, 139 Stat. 9, 12; Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F., tit. II, 138 Stat. 25, 363. Defendants do not explain how following that congressional mandate justifies systematically disadvantaging domestic violence providers in the competition for all *other* CoC funding—let alone for disadvantaging any CoC that seeks Domestic Violence Bonus funding or otherwise includes a domestic violence project in their application. Defendants also claim (at 62) that they provided a "Violence Against Women Act carveout" from the merit criteria favoring service requirements, but—as Plaintiffs pointed out (at 36)—the carveout does not address the actual problem. The NOFO's "carveout" addresses an unrelated issue and still leaves domestic violence providers unable to earn the many service-mandate points that they cannot lawfully obtain. AR 5084, 5095. Defendants do not respond to this point—apparently because they have not considered it. Defendants also point out (at 63) that another statute only requires services under *that* statute to be voluntary, but they do not consider or address the practical difficulties providers face in complying with the conflicting mandates when a project receives funding from both of these sources. This failure to consider the impact on domestic violence services is yet another independent reason why the Service Requirements Criteria are arbitrary and capricious.

### 3.    Anti-Harm Reduction Criteria

Defendants are similarly unresponsive to Plaintiffs' arguments showing that the Anti-Harm Reduction Criteria are arbitrary and capricious because HUD "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Defendants assert (at 60) that "there were higher rates of overdose and persisting substance use

disorder in Permanent Supportive Housing," but that conclusion says nothing about the effectiveness of harm reduction. Moreover, none of the studies HUD cites analyzed overdose rates based on the availability or unavailability of harm reduction services. *See* AR 58–60 (citing studies at AR 3089–269). Indeed, the studies HUD cited that do mention harm reduction "[r]ecommend[]" "ensuring that housing options support harm reduction" to "decrease PEH [people experiencing homelessness] mortality," AR 3099, and point to harm reduction as a "well established" strategy for "reducing overdoses," AR 3203–04.

Defendants also assert (at 60) that "there was sufficient evidence" to conclude that harm reduction caused harm, but the analysis they cite points only to a narrative news report, a policy paper, and an executive order—not any actual data—to support that conclusion, *see* AR 60 (citing sources at AR 3270–75, 3289–303). And Defendants fail to consider how the Anti-Harm Reduction Criteria will deter legal harm reduction efforts—because one criteria in the NOFO is by its terms not limited to illegal efforts, AR 5090; because the certification that applicants must sign in the actual application is also not so limited, Suppl. Oliva Decl. ¶ 7 & Ex. A; and because even the provisions purportedly limited to "illegal" harm reduction strongly suggest that providers will face liability even for lawful conduct like failing to evict a participant for a second-time drug-related violation, AR 5065, 5113.

### 4.    Law Enforcement Criteria

The Law Enforcement Criteria promote overly prescriptive law enforcement responses to homelessness, and Defendants have provided no reasonable explanation for including those criteria. Defendants acknowledge (at 69–70) that a statutory goal of the McKinney-Vento Act is to minimize trauma among homeless individuals and communities, but they ignore that the statute specifically encourages "constructive alternatives to criminalizing homelessness" in service of that goal. 42 U.S.C. § 11313(a)(12). And Defendants fail to respond to Plaintiffs' point

27

that Defendants disregarded the significant evidence showing that criminalization and encampment clearing may *cause* significant trauma and do not reduce homelessness. *See* Pls.' Mem. at 38–39; Oliva Decl. ¶¶ 134–35.

### 5. Self-Sufficiency Criteria

The Self-Sufficiency Criteria are likewise arbitrary and capricious. As explained above, *supra* Section I.B.3, Defendants wrongly equate the statute's goal of "optimiz[ing] self-sufficiency" with eliminating participants' need for public or private assistance of any kind, 42 U.S.C. § 11381(4). As Plaintiffs explained in their opening brief (at 29), HUD's incorrect interpretation fails to account for the preceding statutory goal of "promot[ing] access to, and effective utilization of, mainstream [benefits] programs," such as SNAP and Medicaid. *Id.* § 11381(3). Nowhere in Defendants' response do they even acknowledge that conflicting provision (or others), and that failure of consideration alone supports vacating these criteria. *See* Defs.' Mem. at 60–64.

Instead, Defendants spend pages explaining why they made self-sufficiency a primary goal. *See* Defs.' Mem. at 60–63. That ignores Plaintiffs' point. Plaintiffs do not object to the promotion of self-sufficiency in itself, but instead challenge the particular conception of self-sufficiency that the NOFO adopts: meeting basic needs without *any* other "public or private assistance." AR 5011. On that point, Defendants state only that "[n]othing in the NOFO assumes or requires all homeless individuals to become self-sufficient." Defs.' Mem. at 64. But the NOFO threatens to disqualify CoCs and projects whose participants fail to achieve this level of self-sufficiency. *See* AR 5066, 5092. Defendants did not consider that this disincentivizes CoCs from serving clients who are most in need due to severe disabilities or other circumstances that make it unlikely those clients will support themselves without the help of mainstream benefits programs. *See* Oliva Decl. ¶ 138.

### 6.   Discriminatory Disability Priority

The Discriminatory Disability Priority is also arbitrary and capricious. Defendants first argue (at 65) that the Priority is merely a "policy statement" that Plaintiffs cannot challenge. But as explained above, the Discriminatory Disability Priority impacts what providers and communities will apply for and thereby causes them harm. *See supra* Section I.B.2.

Defendants' arguments on the merits of the Discriminatory Disability Priority fail as well. Defendants rely only on *ipse dixit* in claiming that HUD provided a "reasonable basis" for the Discriminatory Disability Priority. Defs.' Mem. at 65. HUD asserts that it "found that certain homeless subpopulations … are likely unable to achieve self-sufficiency." *Id*. (citing AR 53, 5035). Neither of the citations to the record provides any explanation or evidence for this so-called "finding," nor for HUD's conclusion that individuals with severe mental health disabilities *could* "achieve self-sufficiency" while individuals with physical and developmental disabilities could not. AR 53, 5035. Defendants failed to consider that some individuals have such severe mental health disabilities that they cannot return to the workforce, or that many individuals with physical or developmental disabilities *can* participate in the workforce and/or live independently. Defendants also suggest (at 65–66) that it is fine to deprioritize individuals with mental health disabilities because they "can move to Transitional Housing … to enable them to recover and achieve self-sufficiency," but this similarly fails to account for the fact that individuals currently in permanent supportive housing often have disabilities that require that level of support. Declaration of Renee M. Willis (Willis Decl.) ¶ 53 (Dkt. No. 30-5); Declaration of Jelani Jackson (Jackson Decl.) ¶ 17 (Dkt. No. 30-10). The extent and severity of a person's disability or disabilities, and whether or not that person will need supportive services, does not depend on whether that disability is physical or mental. HUD's claims to the contrary are neither reasoned nor plausible.

29

### 7.   Subjective "Risk Review" Criteria and Additional Factors

Defendants attempt to dismiss Plaintiffs' arguments that the Subjective "Risk Review" Criteria and Additional Factors allow HUD to reject projects for any reason, including ideological reasons, by asserting merely that the Risk Review contains "concrete factors for evaluating projects." Defs.' Mem. at 64. But the factors Plaintiffs challenge are not "concrete" or "objective," *contra id.*, and instead purport to allow HUD to reject applicants based on things like their "history of [what HUD deems to be] illegal discrimination" or based on highly subjective factors like the anticipated "impact on the … priorities of this NOFO." AR 5092; *see also supra* Section I.B.4.

Defendants completely ignore Plaintiffs' key point—that these vague and subjective conditions pressure CoCs to select and prioritize projects based on predictions about what HUD might reject on ideological or other grounds, and in turn chill providers from engaging in entirely lawful (and in some cases constitutionally protected) activity. For example, the factor looking to the provider's "[h]istory of illegal discrimination," AR 5092—given this Administration's orchestrated campaign to end activities promoting diversity, equity, and inclusion that have long been considered lawful—will chill providers from engaging in lawful activity honoring diversity. *See also* Oliva Decl. ¶¶ 140–41.

Defendants also suggest (at 64) that Plaintiffs raise an as-applied challenge, but Plaintiffs' claim that the inclusion of specific criteria and factors in the NOFO was unreasonable and not reasonably explained is inherently a facial challenge to the NOFO.

### 8.   Bonus Limits

Defendants' attempts to defend the Bonus Limits do not withstand scrutiny. First, Defendants assert in passing (at 70) that the Bonus Limits are committed to HUD's unreviewable discretion. That perfunctory argument, "unaccompanied by some effort at developed

argumentation," is waived. *R.R. Ave. Props., LLC v. Acadia Ins.*, 37 F.4th 682, 689 n.6 (1st Cir. 2022). It is also meritless because agency action is committed to unreviewable agency discretion only in those "rare instances" in which there is "no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988). Here, the CoC statute provides plenty of law to apply. *See* 42 U.S.C. §§ 11381–11389.

Second, Defendants claim (at 70–71) that HUD needed to change things because "previous Bonuses were determined simply by the size of the CoC" and not tied "to CoC performance, merit, or outcome." But Bonus awards *were* tied to merit—CoCs had to compete for that funding. *See, e.g.*, HUD, *FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* at 24, https://perma.cc/DQ4P-U6QH. And if Defendants instead mean to say that the previous bonus limits—the amounts CoCs were *eligible* to apply for—were determined based on the CoC's size and not (directly) their merit, they fail to explain why the FY 2026 NOFO's new limits are any different. Those limits, too, are based on the CoC's size and not tied to merit—small CoCs can apply for at least $500,000 even if they perform poorly, and large CoCs can seek no more than $5 million even if they perform superlatively. AR 5016–17.

Finally, Defendants offer no response to Plaintiffs' point that HUD entirely failed to consider that the Bonus Limits would systematically disadvantage CoCs with higher relative need in competing for *all* Tier 2 funding, not just in competing for bonus funding. *See* Pls.' Mem. at 40–41. Defendants state (at 71) that HUD recognized the Bonus Limits would cause some CoCs to lose "Bonus resources," but those were "above and beyond the CoCs' existing renewal demands." That is wrong. Given how the Bonus Limits interact with the complex system for scoring Tier 2 projects, the Bonus Limits will cause some CoCs to lose *existing* resources, not just the "bonus" resources that are "above and beyond" what is needed to renew their existing

31

projects. Oliva Decl. ¶¶ 73–75. Defendants' argument only confirms that HUD failed to consider this important aspect of the problem.

### 9.    E.O. Conditions

Defendants do not attempt to argue that the E.O. Conditions are reasonable or reasonably explained; they merely contend, based on a document other than the NOFO, that the conditions only "*may* apply" and do "not 'act' on Plaintiffs." Defs.' Mem. at 66–67 (emphasis added) (cleaned up). But, as explained in Section I.B.6 above, the contention that the E.O. Conditions do not apply to grantees is belied by the plain text of the NOFO, which states that grantees "*must* follow*" the listed executive orders. AR 5111–12 (emphasis added). And any ambiguity about whether the conditions apply only increases the confusion that these conditions cause—and does nothing to eliminate the chilling effect they have. *See* Pls.' Mem. at 41.

The E.O. Conditions are arbitrary and capricious for the reasons explained in Plaintiffs' opening brief. *Id.* Defendants have waived any argument that they have provided a reasoned explanation for those conditions' inclusion. And if HUD's position is that these conditions "do not apply to the CoC grantees" (Defs.' Mem. at 67), then the agency should have no concern with striking those purportedly meaningless conditions from the NOFO.

## II.    The FY 2026 NOFO and Its Challenged Provisions Violate the Constitution

Several Challenged Provisions also violate the Constitution—providing grounds to invalidate them under the APA and to enjoin them directly under the Constitution.

### A. The Local Policies Criterion and "Gender Ideology" E.O. Conditions violate the First Amendment

Defendants do not dispute Plaintiffs' contention that it violates the First Amendment to disadvantage applicants who advocate against certain local policies (as the Local Policies Criterion does) or to bar grantees from recognizing people's gender identities (as the E.O.

Conditions do). *See* Pls.' Mem. at 43–44. Instead, Defendants dispute whether those provisions actually impose those restrictions. *See* Defs.' Mem. at 83–84. By their terms, they do.

The Local Policies Criterion awards points to CoCs that "do[] not interfere with or impede *local efforts to advance the objectives*" of quickly clearing encampments, pursuing involuntary commitment, and the like. AR 5085–86 (emphasis added). This does not appear limited to "interfering with law enforcement in the performance of their duties," as Defendants contend. Defs.' Mem. at 83. Rather, CoCs understand it to bar them from interfering with any "local efforts to advance [those] objectives," AR 5085, which would include speaking out against those objectives or otherwise advocating against the local policies that the NOFO favors. That violates the First Amendment, and Defendants do not suggest otherwise.

Similarly, the E.O. Conditions provide that grantees "must follow" the listed Executive Orders. AR 5111. While Defendants contend (at 84) that the Executive Order Conditions are not meant to impose any obligations on grantees, that strains credulity. After all, it makes no sense for HUD to tell grantees they "must follow" the Executive Orders if HUD did not intend for grantees to at least *think* there was some obligation with which they needed to comply. HUD clearly included this condition to constrain grantees' behavior—even if it does so by misleading them to think they are required to implement the Executive Order's views on gender to keep their grants. That chills their speech in violation of the First Amendment.

## B. Multiple Challenged Provisions violate the Spending Clause

Defendants' arguments against Plaintiffs' Spending Clause claim are equally unavailing. Plaintiffs argue that the Challenged Provisions violate the Spending Clause for three separate reasons—and Defendants all but completely ignore two of them. In particular, Defendants fail to address Plaintiffs' claims that several of the Challenged Provisions—including the E.O. Conditions and Safe Drug Use Condition and Certification—fail to comply with the Spending

Clause's requirements (1) that funding conditions be "'unambiguous[]'" and (2) that they be "'reasonably calculated' to advance 'a purpose for which the funds are expended.'" Pls.' Mem. at 45–46 (quoting *South Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987)).[4]

The most Defendants offer is a contention that only "Congressional action," and not executive action, can violate the Spending Clause. Defs.' Mem. at 79. That is not the law. As one court of appeals unequivocally put it, the Spending Clause "appl[ies] to agency-drawn conditions on grants." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019). That is because, when Congress "delegates the task of specifying [spending] conditions" to an agency—as Defendants claim Congress has done here—there is "no reason why the addition of an agency middleman either expands or contracts Congress's power" under the Spending Clause. *Id.* While Defendants point to a case holding that the Spending Clause does not apply to executive action, that case holds only that the Spending Clause does not apply where "Congress has not even purported to authorize" the relevant executive action, and the executive instead takes it based on its own (purported) inherent power. *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025) (cleaned up); *see also* Defs.' Mem. at 79. That limitation on the Spending Clause's applicability has no relevance here, where HUD claims that Congress authorized its actions. *See* Defs.' Mem. at 79–82. These conditions that HUD has imposed violate the Spending Clause just as if Congress had imposed them directly itself.

---

[4] As for the third reason, Plaintiffs also argued that Defendants impinged on Congress's Spending Clause power by adopting provisions that Congress did not authorize it to adopt. Defendants focus almost exclusively on this aspect of the claim, but for the reasons explained below, the Court not need not address this. *See infra* Section II.C.

**C. The Court need not address Plaintiffs' other separation-of-powers challenges**

Plaintiffs also asserted that Defendants violated the Spending Clause and other separation-of-powers requirements by adopting NOFO provisions they had no authority to adopt. The Court need not address this claim given Defendants' concession that they cannot impose the Challenged Provisions absent statutory authority. If Defendants claimed "inherent constitutional power as the Executive" to impose the Challenged Provisions, that would indeed violate the separation of powers. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994). But Defendants apparently disclaim any such authority. *See* Defs.' Mem. at 79–82 (not claiming any inherent constitutional authority and instead arguing that various statutes authorize the Challenged Provisions). The Court therefore need not address this separation-of-powers claim.

## III.   OMB Has Unlawfully Restricted CoC Funding

The Apportionment Footnotes—which require CoC grants to adhere to two executive orders imposing ideological and policy restrictions—are also unlawful. *See* Pls.' Mem. at 8–9, 47–49. They exceed OMB Defendants' statutory authority and are arbitrary and capricious. As with the challenges to the FY 2026 NOFO, granting Plaintiffs relief on their statutory-authority claim would make it clear that OMB cannot lawfully just try to impose these restrictions again.

**A. The Apportionment Footnotes exceed OMB's statutory authority**

As Plaintiffs' opening brief explains, OMB lacks statutory authority to impose the Apportionment Footnotes. Pls.' Mem. at 47–48. Defendants seek to dodge the issue by claiming (at 75) that the Footnotes "have no effect on this litigation" because they "do not impose any obligations on the public." But Defendants cannot seriously claim that the Footnotes have no impact on Plaintiffs. The Footnotes require HUD (1) to include the Grantmaking E.O.'s ideological terms and conditions in CoC grant agreements and (2) to make CoC awards in accordance with the Homelessness E.O.'s policy directives. OpenOMB, *Homeless Assistance*

35

*Grants*, https://perma.cc/JWZ6-WBGN (captured June 16, 2026). Those directives will without question significantly affect Plaintiffs' interests.

Defendants' arguments on the merits also fail. Defendants yank a few statutory words from context to claim that the Apportionment Footnotes are authorized because Congress gave the executive "extremely broad power" to apportion funds "'as the official considers appropriate.'"[5] Defs.' Mem. at 74 (quoting 31 U.S.C. § 1512(b)(2)). But the statute cannot reasonably be read to grant Defendants the power they claim—the power to impose policy and ideological restrictions on appropriated funds. Indeed, it has long been accepted that the apportionment process is not to be used "for the making of policy or the setting of priorities." S. Rep. No. 93-688, at 166 (1974); *see also, e.g.*, Comptroller General of the United States, B-163628, at 2 (Jan. 4, 1974), https://perma.cc/KJP5-RKRR ("[T]he apportionment power may not lawfully be used as a form of executive control or influence over agency functions."); *Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 71 (D.D.C. 2025) (holding that the executive could not use the apportionment power to withhold funds based on a lack of "align[ment] with the Executive's priorities"); *City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987) (noting that Congress amended apportionment provisions to preclude the executive branch from using them "as authority for implementing 'policy' impoundments").[6]

Instead, the relevant statutory provision makes clear that the executive must apportion funds to serve a particular, statutorily specified purpose: "to prevent obligation or expenditure at

---

[5] The statute grants the President authority to make apportionments, but the President has delegated this power to OMB. Exec. Order No. 6166, § 16 (June 10, 1933), reprinted in 5 U.S.C. § 901 note; *see also Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025).

[6] Defendants claim (at 75) that *City of New Haven* did not concern "the power to make apportionments," but it did. The relevant passage specifically addresses 31 U.S.C. § 1512 and Congress's amendments "to limit apportionments." *City of New Haven*, 809 F.2d at 906 n.18.

a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). In other words, apportionment is meant "to prevent an agency from spending its entire appropriation before the end of the fiscal year and then putting Congress in a position in which it must either enact an additional appropriation or allow the entire activity to come to a halt." U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations Law* at 6-119 (3d ed. 2006), https://perma.cc/3CWL-WX35.

The following subsection—(b)(2), the one Defendants focus on—must be read in that context. *See Reisman v. Associated Faculties of Univ. of Me.*, 939 F.3d 409, 412 (1st Cir. 2019) (explaining that courts "must read the individual provisions of the statute … in the context of the statute as a whole and not in isolation"). It provides that the executive "shall apportion an appropriation under paragraph (1) of this subsection as the official considers appropriate." 31 U.S.C. § 1512(b)(2). Far from giving the executive broad power to attach to an apportionment whatever conditions the executive wishes, this provision authorizes the executive to determine how to "appropriate[ly]" dole out funding to ensure agencies do not overspend. That is confirmed by the provision's designation of the purpose of apportionment. *See id.* § 1512(a). And it is confirmed by the text of subsection (b)(2) itself, which provides that the official must apportion funds "*under paragraph (1) of this subsection* as the official considers appropriate." *Id.* § 1512(b)(2) (emphasis added). Paragraph (1) addresses the administrative mechanisms by which an official can apportion funds—by "months, calendar quarters, operating seasons, or other time periods," by "activities, functions, projects, or objects," or by "a combination" of any of those ways. *Id.* § 1512(b)(1). In referring to paragraph (1), subsection (b)(2) gives the executive discretion to make apportionments according to whichever of those administrative mechanisms the official "considers appropriate." *Id.* § 1512(b)(2).

37

### B. The Apportionment Footnotes are arbitrary and capricious

The Apportionment Footnotes requiring adherence to executive orders are also arbitrary and capricious because Defendants failed to consider any aspects of the problem. Pls.' Mem. at 48. Indeed, the administrative record literally includes nothing more than the two executive orders themselves. OMB Administrative Record 1–9.[7] Defendants contend (at 75–76) that "it was reasonable for OMB to include" the Footnotes because they "directly implicate[] grantmaking" or "the CoC program," but that is nonresponsive. The OMB Defendants "entirely failed to consider" the impact these Footnotes' restrictions would have—and, indeed, all other "important aspect[s] of the problem"—so including them was arbitrary and capricious for that reason alone. *State Farm*, 463 U.S. at 43.

## IV. The Court Need Not Address HUD's Prior Unlawful Failure to Provide CoCs Statutorily Mandated Information

Plaintiffs agree that HUD now has, finally, provided CoCs with their pro rata estimated grant amounts as required by 42 U.S.C. § 11386a(b)(2)(A). The Court therefore need not address Count 5, which challenged HUD's (prior) unlawful failure to provide that statutorily mandated information.

## V. The Court Should Grant Plaintiffs' Requested Relief

Defendants concur in Plaintiffs' request for an expeditious decision to minimize funding delays and the resulting harm. *See* Defs.' Mem. at 86. Plaintiffs respectfully request relief by August 10 for all the reasons they previously explained. *See* Pls.' Mem. at 49–59. If the Court cannot rule on summary judgment by then, preliminary relief is warranted. And on summary

---

[7] The OMB Administrative Record is included in the Consolidated Excerpts of Administrative Record filed with this brief.

judgment, the Court should impose vacatur, declaratory, and injunctive remedies to redress Plaintiffs' and Plaintiff Associations' members' harm.

### A. Defendants do not oppose Plaintiffs' request for preliminary relief by August 10 should the Court require more time to consider summary judgment

Defendants do not address Plaintiffs' request for preliminary relief by August 10 if the Court is unable to rule on summary judgment by then. Thus, if the Court concludes that Plaintiffs are likely to succeed on the merits of any of their claims, it can appropriately conclude that Defendants have otherwise waived any opposition to Plaintiffs' alternative request for preliminary relief—and enter an order staying the NOFO and all its deadlines and preliminarily enjoining HUD from implementing them. *See Furtado v. Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) (treating "a party's failure … to respond to a properly raised argument … as waiver"); *see also* Pls.' Mem. at 55–59.

### B. On summary judgment, vacatur, declaratory relief, and a permanent injunction are warranted

Defendants fail to effectively rebut Plaintiffs' showing that, on summary judgment, the Court should vacate the FY 2026 NOFO and Apportionment Footnotes; declare the NOFO, its Challenged Provisions, and the Apportionment Footnotes unlawful; and permanently enjoin Defendants from reimposing the Apportionment Footnotes or the Challenged Provisions whose unlawfulness HUD cannot cure.

### 1. Vacating the FY 2026 NOFO is necessary to allow providers to submit new applications untainted by the unlawful provisions

Defendants do not dispute that vacatur is an appropriate remedy, but instead contend that the Court should vacate only the unlawful conditions[8] while "permit[ting] the remainder of the 2026 NOFO to go into effect." *See* Defs.' Mem. at 86–87. In other words, Defendants apparently ask the Court to vacate the unlawful provisions in the NOFO but allow HUD to otherwise proceed in making awards—without giving CoCs and providers a new opportunity to apply to a lawful NOFO. Such limited relief would be almost no relief at all.

The NOFO and its unlawful provisions have dramatically shaped how CoCs ran their local competitions and what projects providers put forward. *See* Suppl. Oliva Decl. ¶¶ 21–25. King County, Washington, for example, did not accept applications for new permanent housing projects given the Set-Aside. *Id.* ¶ 23. CoCs also adjusted the scoring rubrics for their local competitions to match the NOFO's criteria. *Id.* Providers followed suit. *Id.* ¶ 24. When they could, they shifted to apply for transitional housing instead of permanent housing to have a shot at receiving funding. *Id.*; Declaration of Kathryn J. Kaminski (Kaminski Decl.) ¶ 26 (Dkt. No. 30-12). Providers have proposed projects with service mandates that they would not otherwise impose given the NOFO's heavy priority for such mandates. Suppl. Oliva Decl. ¶ 24. Some domestic violence providers just did not apply at all given how severely the Service Requirements Criteria disadvantage them. Suppl. Oliva Decl. ¶ 24; Oliva Decl. ¶ 159; Kaminski Decl. ¶ 31. Other providers did not apply either, because they could not pivot to providing

---

[8] Defendants attempt to list the Challenged Provisions that the Court would vacate, but the list is incomplete (as it includes the Safe Drug Use Condition and Criteria but omits the other Anti-Harm Reduction Criteria). *See* Defs.' Mem. at 87. For the full list of unlawful provisions, Plaintiffs respectfully refer the Court to the Appendix of Challenged Provisions included with Plaintiffs' motion. Dkt. No. 30-2.

transitional housing or services-only projects, could not abandon their (lawful and non-federally funded) harm reduction activities, or could not agree to E.O. Conditions that appeared to require them to abandon DEI activities and adhere to the Administration's views on gender. Oliva Decl. ¶ 154; Suppl. Oliva Decl. ¶ 24.

The FY 2026 NOFO already dramatically shaped the application pool, and simply striking the NOFO's unlawful provisions cannot unwind that. Instead, the entire NOFO must be vacated so that HUD can issue a new one; CoCs can run local competitions in conformance with a new, lawful NOFO; and providers can decide what to apply for based on the new NOFO's lawful criteria. Without a new application process, the FY 2026 NOFO's unlawful provisions would still have an impact—a dramatic one—on this year's CoC awards. To ensure that there is such a new process, the Court should vacate the FY 2026 NOFO in full.

### 2.    Defendants do not oppose declaratory relief

Defendants do not contest that, if Plaintiffs prevail on their claims, declaratory relief is an appropriate remedy. The Court should therefore declare the FY 2026 NOFO and its Challenged Provisions, as well as OMB's Apportionment Footnotes, unlawful.

### 3.    A permanent injunction is permissible and warranted

A permanent injunction is also warranted to bar HUD from reimposing the Challenged Provisions whose unlawfulness HUD cannot cure (and to bar the OMB Defendants from reimposing the Apportionment Footnotes). Defendants' arguments against that relief fail.

Defendants first contend (at 88–89) that the APA does not provide authority for a court to order "specific relief." That is mistaken, but Plaintiffs do not seek "specific relief" here in any event. Defendants then concede that a court may issue an injunction under the APA, but argue that "such relief is available where 'there is only one rational course for the Agency to follow upon remand.'" Defs.' Mem. at 90 (cleaned up) (quoting *Berge v. United States*, 949 F. Supp. 2d

41

36, 43 (D.D.C. 2013)). That, however, is the test for compelling an agency to take a particular action. *See Berge*, 949 F. Supp. 2d at 42–43; *Ramirez v. ICE*, 568 F. Supp. 3d 10, 24–26 (D.D.C. 2021). Plaintiffs do not seek such an injunction *compelling* particular action, but rather an injunction *prohibiting* Defendants from violating the law by imposing the same unlawful provisions again.

In any event, even if the "only one rational course" test applied to the prohibitory injunction that Plaintiffs seek here, Plaintiffs meet it. Plaintiffs seek an injunction barring only those Challenged Provisions whose unlawfulness HUD cannot cure with better reasoning. Pls.' Mem. at 51 & n.7 (listing those provisions); *contra* Defs.' Mem. at 90. With regard to those Challenged Provisions, there is therefore "only one rational course" for HUD to follow going forward, *Berge*, 949 F. Supp. 2d at 43: HUD must *not* persist in including them in future NOFOs.

Defendants also miss the mark in disputing (at 90–91) that Plaintiffs satisfy the traditional equitable factors for injunctive relief. In contesting irreparable harm, Defendants do not engage with the specific harms Plaintiffs enumerated and for which they provided significant evidentiary support. Pls.' Mem. at 52–53. Instead, Defendants respond only that HUD could generate "innumerable permutations" of the Challenged Provisions in the future and that it is "speculative" whether these reimposed provisions would irreparably harm Plaintiffs. Defs.' Mem. at 90. But Defendants offer no reason to doubt that Plaintiffs and Plaintiff Associations' members would face the same harms if Defendants imposed these same Challenged Provisions again. Nor could Defendants claim it is overly speculative whether they would attempt to reimpose the Challenged Provisions. Defendants have now twice sought to impose many of the Challenged Provisions and would have every incentive to attempt to do so again absent an injunction.

42

On the balance of the equities, Defendants assert (at 91) that an injunction would "effectively bar HUD from implementing its congressional mandate to set housing policies and priorities"—but that assertion is irreconcilable with the fact that the requested injunction would necessarily bar HUD only from taking action that is contrary to or not authorized by law. The equitable factors thus further support issuance of the limited prohibitory injunction that Plaintiffs seek.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs on counts 1–4, 6–8, and 10–11 of their complaint and enter Plaintiffs' requested relief.

July 31, 2026

Respectfully submitted,

Amy R. Romero
 (RI Bar No. 8262)
Kevin Love Hubbard *
 (MA Bar No. 704772)
DeLuca, Weizenbaum,
 Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
 Lawyers' Committee for RI

*Counsel for All Plaintiffs*

Toby Merrill *^
 (MA Bar No. 601071)
Cassandra Crawford *^
 (NC Bar No. 45396)
Graham Provost *^
 (DC Bar No. 1780222)

/s/ Kristin Bateman
Kristin Bateman *
 (DC Bar No. 90037068)
Madeline H. Gitomer *
 (DC Bar No. 1023447)
Christine L. Coogle *
 (DC Bar No. 1738913)
Carrie Y. Flaxman *
 (DC Bar No. 458681)
Robin Thurston *
 (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

43

Kayla Svihovec *^
 (DC Bar No. 1735588)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

Tony LoPresti *
 (CA Bar No. 289269)
County Counsel
Kavita Narayan *
 (CA Bar No. 264191)
Chief Assistant County Counsel
Meredith A. Johnson *
 (CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson *
 (CA Bar No. 314899)
Deputy County Counsel
Leily Arzy *
  (CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Lynette Labinger
 (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation
 of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Antonia K. Fasanelli *
 (DC Bar No. 481856)
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Christopher M. Sanders *
 (WA Bar No. 47518)
General Counsel to the King County
 Executive
Cristy J. Craig *
 (WA Bar No. 27451)
Senior Deputy Prosecuting Attorney
Mika Rothman *
 (WA Bar No. 55870)
Deputy General Counsel
Office of the King County Prosecuting

44

John K. Whitaker *
 (TN BPR No. 039207)
Senior Counsel
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

 Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov
mrothman@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

\* Admitted *pro hac vice*
^ Admitted in listed states but not licensed to practice law in California.

45

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2026, I electronically filed the within document, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ Kristin Bateman
Kristin Bateman