**SUPPLEMENTAL DECLARATION OF ANN MARIE OLIVA**
**NATIONAL ALLIANCE TO END HOMELESSNESS**

I, Ann Marie Oliva, declare the following under penalty of perjury:

1.    My name is Ann Marie Oliva, and I am the CEO of the National Alliance to End Homelessness ("Alliance").

2.    I have personal knowledge of the facts contained in this declaration or learned of them in the course of performing my official duties. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

3.    I previously submitted a declaration in this case in support of Plaintiffs' Motion for Partial Summary Judgment and/or Preliminary Relief (Dkt. No. 30-4).

4.    I submit this Supplemental Declaration in further support of Plaintiffs' motion to address a few discrete points Defendants raised in their opposition brief.

**A.    The Application's Safe Drug Use Certification**

5.    On July 20, 2026, after much delay, HUD made the actual project applications (for new projects, renewal projects, and CoC planning grants) for the CoC program available in e-snaps, the online application portal. (It still has not posted the application that *CoCs* must submit, however.) The actual applications—which projects must submit to be considered for funding—contains a certification relating to safe drug use that is more restrictive than the Safe Drug Use Certification in the FY 2026 NOFO.

6.    The FY 2026 NOFO states that, to be eligible, project applicants must certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863." FY 2026 NOFO at 60.

7.      The actual application, by contrast, requires project applicants to certify to different language. In particular, the application requires providers to certify that "[t]he project applicant will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" This certification, unlike the one in the NOFO, does not purport to be limited to violations of federal laws. A true and correct copy of the online application certification, with identifying information redacted, is attached to this declaration as Exhibit A.

8.      Both versions of the certification force providers to make an impossible choice—either forgo lawful and life-saving harm-reduction activities (for fear that HUD might incorrectly deem them unlawful) or forgo applying for CoC funds. While providers do not believe their harm reduction activities violate federal drug laws, HUD has signaled that it takes an expansive view and that providers could potentially face liability, for example, even for just failing to evict a participant after a second-time violation of a drug-related requirement.

9.      The certification required by the actual application eliminates any protection that the NOFO's reference to federal law might provide.

**B.    The CoC Program's Provision of Supportive Services To Date**

10.      HUD claims that HUD's permanent-housing-focused approach to homelessness under the CoC program has become "Housing Only"—that is, housing with no accompanying supportive services. That is not true. While the CoC program has prioritized permanent housing in recent years (because that is the strategy that has proven effective), it has also funded services, both as a part of permanent housing projects and separately.

11.      For example, between 2022 and 2026, nearly a quarter of CoC funding has gone to services—$577.4 million in calendar year (CY) 2022, $664.9 million in CY 2023, $729.3

million in CY 2024, and $954.4 million in CY 2026, based on the Alliance's analysis of the grant inventory worksheets for those years. (HUD did not make the data for 2025 publicly available.)

12.    In addition, it is very common for housing projects to also provide services using *other* funding. Projects are generally required to secure match funds to participate in the CoC program, and they often use the match funds to pay for services. And even beyond match requirements, projects layer funding from other sources, including other federal programs that Congress created to fund services more specifically (such as the Community Services Block Grant (CSBG), Medicaid 1115 Waiver, Grants for the Benefit of Homeless Individuals, Treatment for Individuals Experiencing Homelessness (TIEH), Supportive Services for Veterans Families, Health Care for the Homeless Program, and Health Care for Homeless Veterans Program, to name just a few) as well as state and private sources.

**C.    Impact of the Discriminatory Disability Priority**

13.    HUD claims that the NOFO's Discriminatory Disability Priority does not actually require applicants or CoCs to take any action, but HUD ignores the actual impact of that provision. The Discriminatory Disability Priority states that "[i]ndividuals who are likely never to be able to return to the workforce—over 62 years old, physically disabled, developmentally disabled—should be prioritized for Permanent Supportive Housing." FY 2026 NOFO at 30. HUD emphasizes that the NOFO does not go on to award points based on this prioritization.

14.    Even so, the Discriminatory Disability Priority has a significant impact. That is because (1) HUD tells applicants that its goals and objectives "should be prioritized," *id.* at 30, (2) HUD requires applications to support the "goals of this NOFO," *id.* at 11, and (3) HUD retains discretion to review applications and accept or reject them based on the project's "impact on the … priorities in this NOFO," *id.* at 87. These directives and open-ended criteria push applicants to follow the Discriminatory Disability Priority's instruction. Applicants are between

3

a rock and a hard place and must choose to either adopt the discriminatory disability policy or risk rejection from HUD.

**D.    Notice and Comment on the FY 2026 NOFO**

15.    HUD claims that it provided notice to the public that it was making a determination under 42 U.S.C. § 11386b(b)(2)(C) that new transitional housing and supportive-services-only projects "have been proven effective at" achieving one or more of three enumerated statutory goals—"reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title." HUD also claims that it provided the public an opportunity to comment by hosting "dozens of forums informing stakeholders of the upcoming changes." But HUD did not provide meaningful notice or a meaningful opportunity to comment.

16.    First, HUD did not provide meaningful notice. It did not state that it intended to make a determination under § 11386b(b)(2)(C) that transitional housing and supportive-services-only activities had been proven effective. Nor did it state which of the three enumerated statutory goals those activities had purportedly "been proven effective" at achieving. Nor did HUD explain why only new transitional housing and supportive-services-only projects (as opposed to existing ones) could be "proven effective." (Indeed, that makes no sense.)

17.    The Alliance closely monitors HUD's activities in the CoC program and was not on notice that HUD intended to make such a determination.

18.    Second, HUD did not provide a meaningful opportunity for *public* comment. It did not publicly post an announcement, invite comments, or direct the public how to submit them. The Alliance accordingly did not have an opportunity to comment on HUD's determination.

19.    HUD claims that it "solicited and received public comments" through these "dozens of forums" that they hosted to "inform[] stakeholders of the upcoming changes" and "through separate discussions with CoC recipients and other homelessness-service providers." That is not a meaningful opportunity for public comment either. Alliance members report that the forums were invitation-only, and the Alliance, for example, never received an invitation. Alliance members also report that the forums were generally available only for in-person attendance. In any event, allowing input from select invitees who are available and able to attend an in-person meeting does not provide a meaningful opportunity for public comment.

**E.    Impact of the NOFO and the Feasibility of Moving Forward without a New Competition**

20.    As my prior declaration details, the FY 2026 NOFO is causing and threatening to cause Alliance members tremendous harm. Merely striking the unlawful provisions of the NOFO and allowing HUD to otherwise move forward with awards, based on the current application pool, would fail to redress that harm.

21.    The FY 2026 NOFO has had a very significant impact on the FY 2026 application pool.

22.    CoCs apply for HUD CoC funding on behalf of their entire communities, and they must first run a local competition to determine which projects to include in their community-wide application. Those local competitions have for the most part already concluded or will soon conclude because, under the NOFO, CoCs must announce their selections by August 11.

23.    The FY 2026 NOFO had a huge influence on how CoCs ran their local competitions—by shaping what types of projects they solicited applications for and how they scored them. As one example, because of the Set-Aside, member Martin Luther King, Jr. County in Washington only accepted transitional housing or supportive-services-only projects for

reallocations or new awards. To meet other NOFO criteria, the King County CoC also adopted new scoring criteria to advantage providers that collaborate with law enforcement and providers that impose service requirements. It also only accepted applications from providers who would attest to all of HUD's required threshold certifications, including the one relating to safe drug use. Other CoCs have taken similar steps. As another example, Boston required all applicants to certify that they would mandate service participation for clients as part of the program design, to the extent allowed by law. That became a threshold requirement in Boston's local competition— a requirement that Boston imposed as a direct result of the FY 2026 NOFO's Service Requirements Criteria. Likewise, Nashville completely retooled its local competition application to base it on the FY 2026 NOFO. And it encouraged providers (both existing and new) to apply for transitional housing and supportive-services-only grants, even though that community most needs permanent supportive housing or rapid rehousing.

24.     The FY 2026 NOFO has also had a significant influence on which providers applied and what projects they applied for. In response to the Set-Aside, providers submitted fewer applications for permanent housing. King County, for example, did not receive any applications for new permanent housing projects, in contrast with previous years. As another example, in Boston, virtually any provider that previously administered rapid rehousing (or joint transitional housing-rapid rehousing) either did not apply at all or proposed another project type as a result of the NOFO's Set-Aside. Providers proposed projects with service mandates so they could earn the significant points awarded to projects with such mandates—even though the providers would not otherwise have proposed such mandates. Some domestic violence providers opted out of applying altogether due to the impracticability of imposing service mandates given conflicting federal requirements—and given that the Service Requirements Criteria would

6

heavily disadvantage them, and their CoCs, as a result. Other providers did not apply because they could not pivot to providing transitional housing or services-only projects, could not abandon their (lawful and non-federally funded) harm reduction activities that keep their clients safe, or could not agree to E.O. Conditions that appeared to require them to abandon DEI activities and adhere to the Administration's views on gender.

25.    For all these reasons and more, the FY 2026 NOFO has heavily influenced what projects are in the application pool.

26.    To undo the effects of the FY 2026 NOFO's unlawful provisions, HUD would have to reissue a new NOFO without the unlawful provisions. In some instances (as with the Safe Drug Use Certification and E.O. Conditions, for example), HUD could just strike the unlawful provisions. In other instances, it would also have to do some rewriting—to change the scoring to account for criteria that are no longer in there, to change the selection process to account for the elimination of the Set-Aside, and to set new parameters for bonus funding. The community would then need time to undertake a new application process. CoCs would have to design and announce a new local competition; providers would have to apply; and CoCs would have to make and announce selections before applying to HUD. This new application process is necessary to eliminate, to the extent possible, the ongoing impacts of the FY 2026 NOFO's unlawful provisions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of July, 2026

_____
Ann Marie Oliva
Chief Executive Officer
National Alliance to End Homelessness

7

# Exhibit A

Applicant: ▮▮▮▮▮▮▮                                          ▮▮▮▮▮▮▮▮▮▮
Project: ▮▮▮▮▮▮▮▮ FY26                                      ▮▮▮▮▮

# 1M. Project Eligibility Certification

**1. The project applicant will not engage in racial preferences or other forms of illegal discrimination**

**2. The project applicant will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of "harm reduction."**