**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,

*Defendants*.

Case No. 26-cv-436-MSM-AEM

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND/OR PRELIMINARY RELIEF**

## TABLE OF CONTENTS


Introduction ........ 1

Background ........ 4

A. Statutory background ........ 4

1. Congress establishes the CoC program to end homelessness ........ 4

2. Congress appropriates FY 2026 funding for the CoC program ........ 5

B. HUD issues the FY 2026 notice of funding opportunity for the CoC program ........ 6

1. Overview of the selection process ........ 6

2. A massive set-aside for new transitional housing and supportive-services-only projects would defund permanent housing and renewals (Set-Aside) ........ 7

3. Other provisions disqualify or disadvantage applicants on improper grounds ........ 8

C. OMB imposes Apportionment Footnotes that create additional restrictions on CoC Funding ........ 10

D. This litigation ........ 11

E. The FY 2026 NOFO threatens devastating harm to Plaintiffs and the communities they serve ........ 13

Legal Standards ........ 13

Argument ........ 14

I. The Set-Aside Is Unlawful, and This Court Should Vacate It and Enjoin HUD from Awarding Tier 2 Funding until CoCs Have a Chance to Resubmit Tier 2 Applications ........ 14

A. The Set-Aside exceeds HUD's statutory authority ........ 15

B. The Set-Aside violates § 11386c(b) by improperly disqualifying renewals ........ 17

C. The Set-Aside is arbitrary and capricious ........ 18

D. The Court should sever and vacate the Set-Aside and permanently enjoin HUD from making Tier 2 awards until CoCs have an opportunity to resubmit Tier 2 applications ........ 23

II. Multiple Other NOFO Provisions Are Unlawful, and This Court Should Vacate Those Provisions and Enjoin HUD from Applying Them ........ 25

A. Service Requirements Criteria ........ 25

B. Anti-Harm Reduction Provisions ........ 29

1. The Safe Drug Use Certification and Condition exceed HUD's statutory authority ........ 30

2. All of the NOFO's Anti-Harm Reduction Provisions are arbitrary and capricious ........ 31

C. Law Enforcement Criteria ........ 32

1. The Local Policies Criterion violates the First Amendment ........ 33

2. All of the Law Enforcement Criteria are arbitrary and capricious ............................ 33

D. Subjective “Risk Review” and Additional Factor Criteria ............................................ 34

E. Self-Sufficiency Criteria ........................................................................................... 36

F. Discriminatory Disability Priority ............................................................................ 37

G. Non-Statutory Threshold Criteria ............................................................................ 39

H. Bonus Limits ............................................................................................................ 40

I. E.O. Conditions ........................................................................................................ 42

1. All E.O. Conditions exceed HUD’s authority and are arbitrary and capricious ......... 42

2. The “Gender Ideology” E.O. conditions are contrary to law and the Constitution ........................................................................................................ 43

J. The Court should vacate these provisions and enjoin HUD from applying them ........... 45

III. The OMB Apportionment Footnotes Are Unlawful, and This Court Should Declare Them Unlawful and Permanently Enjoin OMB from Imposing Them ................................ 46

A. The Apportionment Footnotes exceed OMB’s statutory authority and are arbitrary and capricious ........................................................................................................ 47

B. The Court should declare the Apportionment Footnotes unlawful and enjoin OMB from reimposing them ........................................................................................... 48

IV. If the Court Requires More Time to Consider Summary Judgment, It Should Stay the NOFO and Preliminarily Enjoin HUD from Obligating Funds ............................................ 49

Conclusion ........................................................................................................................ 49

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 33, 45

*Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*,
721 F.3d 871 (7th Cir. 2013) ........ 38

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) ........ 13

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........ 44

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........ 14

*City of Fresno v. Turner*,
No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. 2025), *appeal pending*, No. 25-7378 ........ 42

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) ........ 47

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ........ 14

*Cnty. of King v. Turner*,
No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) ........ 15, 35, 42

*DHS v. Regents of the Univ. of Calif.*,
591 U.S. 1 (2020) ........ 18, 21

*Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Imm. Servs.*,
No. 26-cv-132, 2026 WL 2042424 (D.R.I. July 15, 2026) ........ 46, 48, 49

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ........ 24, 46, 49

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 26

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) ........ 18

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025), *appeal pending*, No. 26-1182 ........ 48

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) ........ 48

*Martin Luther King, Jr. Cnty. v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025), *aff'd in part and remanded*, No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) ............................ 35, 42, 43, 48

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)........................................................................................ 23, 46

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................... 18, 19, 32

*Nat'l Council of Nonprofits v. OMB*,
763 F. Supp. 3d 36 (D.D.C. 2025) ....................................................................... 48

*NEA v. Finley*,
524 U.S. 569 (1998)........................................................................................ 33, 44

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................ 14, 24

*R.I. Coal. Against Domestic Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025)........................................................................ 14

*R.I. Coal. Against Domestic Violence v. Kennedy*,
812 F. Supp. 3d 180 (D.R.I. 2025)....................................................................... 45

*R.I. Coal. Against Domestic Violence v. Kennedy*,
No. 25-cv-342, 2026 WL 2364298 (D.R.I. Aug. 14, 2026)....................................... 43

*Russello v. United States*,
464 U.S. 16 (1983)............................................................................................. 18

*Rust v. Sullivan*,
500 U.S. 173 (1991)........................................................................................ 33, 45

*S.F. AIDS Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025) ............................................................ 44, 45

*Smith v. Aroostook Cnty.*,
376 F. Supp. 3d 146 (D. Me. 2019) ..................................................................... 39

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021) .......................................................................... 19

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015)............................................................................................ 44

*Viscito v. Nat'l Plan. Corp.*,
34 F.4th 78 (1st Cir. 2022)................................................................................... 13

*Washington v. HUD*,
171 F.4th 473 (1st Cir. 2026)............................................................................... 28

*Washington v. HUD*,
No. 25-cv-626, 2026 WL 1863886 (D.R.I. June 29, 2026) ....................................... 26

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 47

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 14, 49

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F. Supp. 3d 440 (D.R.I. 2025), *aff'd in part and vacated in part on other grounds*, 186 F.4th 25 (1st Cir. 2026) .......... 48

**Statutes**

5 U.S.C. § 705 .......... 13, 49

5 U.S.C. § 706 .......... 18, 23, 45, 47

21 U.S.C. § 856 .......... 31

21 U.S.C. § 863 .......... 31

29 U.S.C. § 794 .......... 38

31 U.S.C. § 1512 .......... 10, 47

31 U.S.C. § 1513 .......... 10, 47

31 U.S.C. § 1517 .......... 10, 47

31 U.S.C. §§ 1517–1519 .......... 11

34 U.S.C. § 12351 .......... 27

42 U.S.C. § 2000e-2 .......... 44

42 U.S.C. § 3604 .......... 44

42 U.S.C. § 10408 .......... 27

42 U.S.C. § 11301 note .......... 16

42 U.S.C. § 11302 .......... 19

42 U.S.C. § 11313 .......... 9, 34, 36

42 U.S.C. § 11360 .......... 4

42 U.S.C. § 11360a .......... 4, 5

42 U.S.C. § 11381 .......... 4, 9, 36

42 U.S.C. §§ 11381–11388 .......... 4

42 U.S.C. § 11383 .......... 4, 5, 20

42 U.S.C. § 11386 .......... 5, 43

42 U.S.C. § 11386a .......... 5, 7, 9, 14, 15, 16, 17, 30, 35, 36

42 U.S.C. § 11386b ........ 9, 11, 16, 17, 36

42 U.S.C. § 11386c ........ 16, 17

42 U.S.C. §§ 12131–12134 ........ 38

42 U.S.C. §§ 12181–12189 ........ 38

Judiciary Act of 1789, ch. 20, 1 Stat. 73 (1789) ........ 14

Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, Pub. L. No. 111-22, 123 Stat. 1632 (2009) ........ 4, 16, 28

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 (2024) ........ 16

Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173 (2026) ........ 5, 6, 7, 16, 40, 49

**Regulations**

24 C.F.R. § 5.106 ........ 44

24 C.F.R. § 8.3 ........ 38

24 C.F.R. § 8.4 ........ 38

24 C.F.R. § 9.103 ........ 38

24 C.F.R. § 9.130 ........ 38

24 C.F.R. § 578.3 ........ 4, 19

24 C.F.R. § 578.5 ........ 4

24 C.F.R. § 578.7 ........ 5

24 C.F.R. § 578.9 ........ 5

24 C.F.R. § 578.17 ........ 7

24 C.F.R. § 578.37 ........ 22, 29

24 C.F.R. § 578.51 ........ 20

24 C.F.R. § 578.93 ........ 38

28 C.F.R. § 35.130 ........ 38

28 C.F.R. § 36.301 ........ 38

Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-Veterans Affairs Supportive Housing Program, 89 Fed. Reg. 65769 (2024) ........ 29

Notice; Delegation of Apportionment Authority, 90 Fed. Reg. 9737 (Feb. 18, 2025) ........ 10, 47

Notice of Research Justifying Additional Incentives for Certain Activities To Reduce Homelessness, 91 Fed. Reg. 57901 (Sept. 11, 2026) ........ 11

Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 30, 2025).......... 42, 43

Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 31, 2025).......... 42

Exec. Order No. 14182, *Enforcing the Hyde Amendment*, 90 Fed. Reg. 8751 (Jan. 31, 2025) .......... 42

Exec. Order No. 14218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10581 (Feb. 25, 2025) .......... 42

Exec. Order No. 14321, *Ending Crime and Disorder on America's Streets*, 90 Fed. Reg. 35817 (July 24, 2025).......... 10

Exec. Order No. 14332, *Improving Oversight of Federal Grantmaking*, 90 Fed. Reg. 38929 (Aug. 12, 2025).......... 10, 43

**Other Authorities**

Availability of Waiver to Allow Private Nonprofit Recipients of the *FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO* to Administer Rental Assistance, HUD (Sept. 18, 2026), https://perma.cc/668U-4MQK.......... 21

Continuum of Care Program Competition, HUD, https://perma.cc/A5QX-4YUL.......... 6, 12

Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN (last accessed July 17, 2026).......... 10, 11

OMB Circular No. A-11 (Aug. 2025), https://perma.cc/897F-UUQK.......... 11, 47

Office of Policy Development and Research, HUD, *Costs Associated with First-Time Homelessness for Families and Individuals* (2010), https://perma.cc/P38H-M5WS.......... 22

Russ Vought, Executive Office of the President of the United States, in *Mandate for Leadership: The Conservative Promise* (2023) (Project 2025), https://perma.cc/7GM8-AGXE.......... 10

## INTRODUCTION

Plaintiffs respectfully renew and amend their motion for summary judgment and/or preliminary relief on their claims relating to FY 2026 Continuum of Care (CoC) program awards.[1] In June, the Department of Housing and Urban Development (HUD) issued an FY 2026 notice of funding opportunity (NOFO) for the CoC program, the federal government's flagship program to address homelessness. That NOFO destabilizes the program.

Most concerningly, that NOFO sets aside a whopping $1.3 billion—nearly one-third of available funds—for new transitional housing and supportive-services-only projects, without authorization and without regard for the statutory protections Congress gave permanent housing renewals. This Set-Aside categorically withholds a massive amount of funding from existing permanent housing projects, no matter how successful—guaranteeing that those projects will face devastating cuts. This Set-Aside flies in the face of overwhelming evidence that permanent housing is far more effective than the approaches the Set-Aside funds—not to mention Congress's own judgment that permanent housing should be prioritized. If implemented, the Set-Aside threatens to force nearly 100,000 people back into homelessness.

On top of that, multiple other NOFO provisions, set forth in detail in the accompanying Appendix, push other unproven and even harmful approaches—or otherwise threaten to disqualify or disadvantage applicants on improper grounds. Like the Set-Aside, these other provisions are also contrary to Congress's design, the Administrative Procedure Act's prohibition on arbitrary and capricious decisionmaking, or both.

---

[1] Plaintiffs move for partial summary judgment. As set forth in more detail in the accompanying motion, their motion covers all remaining claims relating to the FY 2026 NOFO, but does not cover Count 12, which relates to HUD's ongoing delays in making FY 2025 renewal awards. Pls.' Mot. at 2 n.3. If those delays continue, Plaintiffs will separately seek relief on that claim at an appropriate time.

Plaintiffs brought this suit to challenge this NOFO, and this Court quickly ruled on summary judgment. The Court held that HUD had unlawfully adopted the Set-Aside without undertaking statutorily required notice and comment and vacated the NOFO in full. The Court accordingly declined to reach Plaintiffs' other challenges to the Set-Aside or to any other provisions of the NOFO.

Now, through a series of twists and turns, this case is back before this Court. Defendants appealed, and the First Circuit stayed the Court's order, concluding that Defendants were likely to prevail in challenging this Court's notice-and-comment holding. But, at Plaintiffs' request, the First Circuit quickly vacated the judgment on that point and remanded the case so that Plaintiffs could expeditiously pursue their remaining claims before HUD makes awards—which HUD is required to do by December 1, 2026.

Plaintiffs are back between a rock and a hard place. If HUD makes awards under this NOFO, programs across the country will lose funding they rely on to house vulnerable members of their communities—forcing them to end stable housing for the people they serve. At the same time, communities can ill afford substantial delays in CoC awards going out—a problem that gets worse with the passage of time.

Given these realities, Plaintiffs no longer seek vacatur of the NOFO in full (even though that remedy remains legally warranted) and instead seek more surgical relief that would allow a substantial amount of funding to go out while still protecting against the worst effects of the NOFO's unlawful provisions. In particular, the Court should vacate the Set-Aside and other unlawful provisions set forth in the accompanying Appendix, while leaving the remainder of the NOFO intact.

The NOFO's two-tier application process, under which the projects that communities rank on their applications fall into two tiers, offers a path to this narrower relief. "Tier 1" awards

are selected first, from funds not covered by the Set-Aside, and represent the majority (roughly 60 percent) of FY 2026 funding. For Tier 1 awards, Plaintiffs' requested relief would allow HUD to proceed with making awards using the existing applications, just without applying the unlawful selection criteria and other provisions that Plaintiffs challenge here. Striking the NOFO's unlawful provisions will ensure that those provisions do not improperly disqualify applicants or bind them to unlawful requirements, while still allowing Tier 1 funding to go out without substantial delay.

For "Tier 2" awards, additional relief is necessary. The Tier 2 award process must be severed and vacated, and HUD must be enjoined from making Tier 2 awards until HUD has allowed communities to resubmit applications to a NOFO without a Set-Aside. That new opportunity to apply is imperative because the Set-Aside thoroughly distorted what communities included in Tier 2 of their applications. With $1.3 billion reserved for new transitional housing and supportive-services-only projects, CoCs could not rationally apply for renewals or permanent housing projects in their Tier 2—even if that was what their communities most needed. Thus, for relief on the Set-Aside to be meaningful at all, communities must have a chance to reapply for that portion of funding.

Plaintiffs respectfully request summary judgment as soon as possible so that HUD can proceed with making awards on lawful terms. In all events, Plaintiffs respectfully request relief before HUD makes awards—which HUD is required to do by December 1. And to the extent that the Court requires more time to consider summary judgment, it should grant preliminary relief blocking HUD from announcing or obligating awards under the NOFO—steps that, once taken, could make effective relief more complicated.

HUD's FY 2026 NOFO violates the Administrative Procedure Act several times over and threatens devastating harm if implemented. The Court should order Plaintiffs' narrowed requested relief to forestall the NOFO's worst consequences.[2]

## BACKGROUND

### A. Statutory background

#### 1. Congress establishes the CoC program to end homelessness

Formally created by the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act in 2009, the CoC program funds a variety of projects that support homeless individuals and families, including by providing housing, rental assistance, and supportive services that help participants maintain housing long-term. 42 U.S.C. §§ 11360(29), 11383; *see also* Pub. L. No. 111-22, §§ 1301–1306, 123 Stat. 1632, 1680–96 (2009), *codified at* 42 U.S.C. §§ 11381–11388. Today, the CoC program is the largest federal grant program dedicated to addressing homelessness.

The statute supports a local, community-based approach to addressing homelessness. To that end, the statute recognizes local or regional "continuums of care" (CoCs)—coalitions composed of representatives of various entities involved in addressing homelessness, as well as people with lived experience of homelessness—that are responsible for coordinating local strategies to address homelessness within their geographic areas. *See* 42 U.S.C. § 11360a(a); *see also* 24 C.F.R. §§ 578.3, 578.5(a). Those CoCs determine local needs, run a local competition,

[2] For the Court's convenience, to prevent the need to refer to several different filings to understand Plaintiffs' arguments, Plaintiffs submit this complete memorandum in support of their renewed and amended motion, rather than incorporating their previous briefing. Nonetheless, the merits arguments in support of Plaintiffs' claims are substantially similar to the arguments in Plaintiffs' memorandum in support of their previous motion for partial summary judgment (Dkt. No. 30-1). This memorandum refers back to declarations filed at docket numbers 30-4 through 30-13 and 33-2.

and then submit a CoC-wide application to HUD on behalf of their geographic area. 42 U.S.C. § 11360a; *see also* 24 C.F.R. §§ 578.7, 578.9. HUD then awards funds through a national competition between the CoCs. 42 U.S.C. § 11386a(a).

The statute sets forth various requirements for HUD's administration of the CoC program—including eligibility and selection criteria, conditions on awards, and other mandates. *See, e.g.*, 42 U.S.C. §§ 11383, 11386, 11386a. Throughout, the statute reflects two congressional priorities of particular relevance here: protecting renewals and promoting permanent housing. *See infra* Argument Sections I.A–I.B.

**2. Congress appropriates FY 2026 funding for the CoC program**

For FY 2026, Congress has appropriated over $4 billion for the CoC program. 2026 Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026). For the first time, the appropriations act expressly requires HUD to make a significant portion of FY 2026 awards based on the projects that the local continuums of care select in their local competitions, without the continuums needing to compete against one another for that funding. In particular, HUD must "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"—that is, at least 60 percent of the amount needed to provide one-year renewals of each CoC's expiring grants—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" *Id.* at 399. This codifies HUD's historic practice of awarding funding through two different "tiers": projects that CoCs rank in "Tier 1" on their applications receive funding without having to compete against other CoCs (provided that they meet baseline requirements), while projects that CoCs rank in "Tier 2" must compete nationally.

The appropriations act also sets some deadlines. HUD was required to issue a NOFO for these FY 2026 funds by June 1, 2026. *Id.* at 400. And HUD must make awards "not later than

December 1, 2026," though the Act does not withdraw HUD's authority to make awards after that date. *See id.*

**B. HUD issues the FY 2026 notice of funding opportunity for the CoC program**

On June 1, 2026, HUD issued the NOFO for FY 2026 CoC funding.[3] Administrative Record (AR) 5006–5133.[4] Through a web of unlawful and unreasoned provisions, HUD has created a selection process that categorically cuts off renewal funding for a significant number of projects, forces communities to abandon proven strategies, and otherwise disqualifies or disadvantages projects on improper grounds.

**1. Overview of the selection process**

The NOFO sets forth an extraordinarily complex selection process. It establishes a two-tier system for project applications, as contemplated by the 2026 Appropriations Act and consistent with HUD's historical practice. Under that system, each CoC's application provides a priority listing of projects, which are grouped into Tier 1 and Tier 2, with Tier 1 being the higher priority for the local CoC.

When making awards, HUD allocates funds to Tier 1 projects first (after certain administrative awards). AR 5093. Projects that CoCs rank in their Tier 1 do not compete against other CoCs' projects. Instead, Tier 1 projects will be funded so long as they pass three stages of review: threshold review, risk review, and review for additional factors. AR 5091–92, 5093. The NOFO sets the Tier 1 amount at the minimum required by the 2026 Appropriations Act—

---

[3] HUD has since amended the FY 2026 NOFO twice. *Continuum of Care Program Competition*, HUD, https://perma.cc/A5QX-4YUL. The amendments have not altered the provisions that Plaintiffs challenge, and this brief continues to cite to the original NOFO, which is contained in the administrative record. The accompanying Appendix contains page references to both the original NOFO and the current version of the amended NOFO.

[4] The certification and index of HUD's administrative record are at Dkt. No. 29. Relevant excerpts of the administrative record are available in Plaintiffs' Consolidated Excerpts of Administrative Record at Dkt. No. 33-1.

meaning that each CoC's Tier 1 can include projects totaling 60 percent of the amount needed to renew their expiring grants. AR 5095; *see also* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399; 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(b)(2). Although the Tier 1 amount is pegged to the amount needed to renew expiring grants, CoCs can include expiring or new grants in their Tier 1, whatever they determine best fits local needs.

Everything else on a CoC's application is included in Tier 2, which HUD turns to after selecting Tier 1 awards. Tier 2 projects compete nationally. As with Tier 1 projects, the NOFO requires Tier 2 projects to undergo threshold, risk, and additional factor review, but Tier 2 projects also undergo so-called "merit review." AR 5074–91, 5093–95. That merit review step assigns a score to the CoC overall based on a long list of criteria, and that CoC score is then the most heavily weighted of several factors that determine each individual project's score. AR 5074–91, 5095. The NOFO establishes a priority ordering that designates different categories of projects to which funds can be allocated. AR 5093–94. Within each level of the priority ordering at Tier 2, projects are generally selected in order of score, unless they are disqualified based on HUD's review of "risk" or additional factors. *See* AR 5094.

**2. A massive set-aside for new transitional housing and supportive-services-only projects would defund permanent housing and renewals (Set-Aside)**

At Tier 2, the FY 2026 NOFO sets aside $1.3 billion—nearly all of the funding available at Tier 2—for new projects only, with a conclusive priority for transitional housing and supportive-services-only projects (Set-Aside). AR 5040–41; *see also* Declaration of Ann Marie Oliva (Oliva Decl.) ¶¶ 45, 161 (Dkt. No. 30-4). By setting aside these funds for new projects only, the NOFO categorically makes existing projects ineligible for that funding. Given the size of the Set-Aside, the inevitable result is that many effective existing projects will not be renewed, threatening to force tens of thousands of people back into homelessness.

Moreover, HUD designed the $1.3 billion set-aside to go principally or exclusively to new transitional housing and supportive-services-only projects, and not permanent housing. Under the priority ordering that the NOFO establishes, HUD will first fund *all* new transitional housing and supportive-services-only projects that apply. AR 5094. Then, if and only if any of the $1.3 billion remains, HUD will allocate funds to other types of new projects (such as permanent housing). *See id.* In other words, transitional housing and supportive-services-only projects receive funding first, even if permanent housing or other projects score higher on merit-based criteria. This set-up creates a significant incentive for CoCs to apply for transitional housing and supportive-services-only projects in their Tier 2—even if those projects are less effective or less suited to local needs—as CoCs are otherwise unlikely to receive any portion of the $1.3 billion set-aside. Oliva Decl. ¶¶ 161–62.

#### 3. Other provisions disqualify or disadvantage applicants on improper grounds

The NOFO also includes a host of other unlawful provisions, all listed in the accompanying Appendix of Challenged Provisions of the FY 2026 NOFO (App.). Those include criteria that effectively force communities to defund proven strategies in favor of unproven and ineffective ones. For instance, multiple Service Requirements Criteria abandon the proven "Housing First" approach—which prioritizes providing housing to people without any conditions like sobriety, employment, or participating in treatment or other services—and instead heavily favor projects that require participants to engage in services to obtain and keep their housing. App. Sec. II. Anti-Harm Reduction Provisions seek to eliminate programs like needle exchanges—even independently funded ones—that aim to reduce the negative consequences of drug use. App. Sec. III. Law Enforcement Criteria pressure CoCs, and their states and localities, to adopt unproductively punitive law enforcement responses to homelessness—including by

penalizing CoCs for advocating against HUD's preferred law-enforcement-centered local policies. App. Sec. IV.

Still other provisions threaten to disqualify or disadvantage applicants on other improper grounds. Amorphous "Risk Review" and Additional Factor Criteria open the door for HUD to deny awards for virtually any reason. App. Sec. VI. "Self-Sufficiency" Criteria disfavor reliance on mainstream benefits like SNAP or Medicaid, even though the statute *encourages* use of those benefits. App. Sec. V; *see also* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(A)(v), 11386a(b)(1)(D), 11386b(d)(2)(B). And a Discriminatory Disability Priority discriminatorily favors projects that serve people with physical and developmental disabilities over projects serving people with other disabilities, such as mental health or substance use disorders. App. Sec. VIII. The NOFO imposes arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits) that systematically disadvantage communities with higher relative need in favor of communities with lower relative need. App. Sec. IX. And, contrary to the 2026 Appropriations Act's mandate that CoCs' Tier 1 projects be funded if consistent with the statute, the NOFO imposes—and applies to Tier 1 projects—threshold review criteria that threaten to disqualify applicants on grounds that have no basis in statutory requirements. App. Sec. VII.

On top of it all, the NOFO imposes Executive Order (E.O.) Conditions that require successful applicants to comply with a long list of executive orders, including orders targeting diversity, equity, and inclusion; the rights and identities of transgender and gender-nonconforming people; undocumented immigrants; abortion; and Housing First policies. App. Sec. X.

### C. OMB imposes Apportionment Footnotes that create additional restrictions on CoC Funding

By law, before an agency can award or otherwise spend funding that Congress has appropriated, the Office of Management and Budget (OMB) must apportion it—*i.e.*, make them available to the agency. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025) (noting that the President has delegated responsibility for apportioning funds to the Director of OMB). This is an administrative function meant to ensure that agencies do not overspend. *See* 31 U.S.C. § 1512(a). Yet the Director of OMB has taken the position that OMB should be "aggressive in wielding" apportionments "on behalf of the President's agenda." Russ Vought, *Executive Office of the President of the United States*, *in Mandate for Leadership: The Conservative Promise* 45 (2023) (Project 2025), https://perma.cc/7GM8-AGXE.

OMB has done just that with its apportionment of FY 2026 funds for the CoC program. In making that apportionment, OMB imposed two footnotes (Apportionment Footnotes) that restrict HUD from obligating the funds unless HUD complies with two executive orders. Homeless Assistance Grants, OpenOMB, https://perma.cc/JWZ6-WBGN (last accessed July 17, 2026). One of those executive orders, in turn, requires HUD to ensure that grants do not "promote" disfavored activities, like recognizing transgender people's existence, assisting immigrants, or engaging in diversity, equity, and inclusion activities.[5] And the other calls for HUD to end "housing first," freeze funding for organizations that operate safe drug use sites, and

---

[5] *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, § 4(b)(ii)(A)–(C), 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025); *see also* Pls.' Mem. i.s.o. Mot. for Partial Summ. J. and/or Prelim. Relief (Pls.' Mem.) at 8 (Dkt. No. 30-1).

give "priority" to grantees in states and municipalities that enforce laws criminalizing homelessness.[6]

OMB designated these footnotes as legally binding, meaning that HUD would violate the Antideficiency Act—and the relevant officials could face administrative and criminal penalties—if they do not follow the footnotes. *See Homeless Assistance Grants*, OpenOMB, https://perma.cc/JWZ6-WBGN; OMB Circular No. A-11 § 120.34 (Aug. 2025), https://perma.cc/897F-UUQK; 31 U.S.C. §§ 1517–1519.

**D. This litigation**

Plaintiffs—nonprofits, local governments, and national membership organizations whose members rely on CoC funding to serve people experiencing homelessness in their communities—filed this suit on July 2, 2026, to challenge the FY 2026 NOFO, as well as OMB's efforts to restrict the funding to advance ideological goals. Compl. (Dkt. No. 1). Plaintiffs challenged multiple provisions of the NOFO on multiple independent grounds. Pls.' Mem. (Dkt. No. 30-1).

The Court quickly ruled on the parties' cross-motions for summary judgment. Mem. and Order at 10 (Dkt. No. 34). In particular, the Court "set aside the 2026 NOFO in its entirety" on the ground that HUD had adopted the NOFO's Set-Aside without undertaking notice and comment required by 42 U.S.C. § 11386b(d). Given that this defect alone warranted setting aside the NOFO in full, there was no "need for the Court to rule on" Plaintiffs' other claims. *Id.* at 10.

Defendants appealed and sought a stay pending appeal. Defs.-Appellants' Emergency Mot. for Stay Pending Appeal, *National Alliance to End Homelessness v. HUD*, No. 26-1923 (1st Cir. Aug. 14, 2026). While that stay motion was pending, on September 11, HUD issued a

---

[6] *Ending Crime and Disorder on America's Streets*, Exec. Order No. 14321, §§ 3, 5(a)–(c), 90 Fed. Reg. 35817, 35817–19 (July 24, 2025).

notice seeking public comment on the relevant issues—a step HUD stated it was taking to address the district court's ruling and to "reinforce its ability to establish the set-aside" in the NOFO. 91 Fed. Reg. 57901, 57902 (Sept. 11, 2026). A few days later, the First Circuit granted a stay pending appeal, holding in a one-page order that HUD was likely to succeed in challenging this Court's "holding that the set-aside in the NOFO was subject to notice and comment requirements pursuant to 42 U.S.C. § 11386b(d)." Order at 2, *National Alliance to End Homelessness v. HUD*, No. 26-1923 (1st Cir. Sept. 16, 2026). The court of appeals further concluded that HUD faced irreparable injury because, without a stay, it "would be unable to implement the NOFO" by the December 1 deadline, "thereby creating funding gaps." *Id.*

In light of those developments, and to preserve their opportunity to seek effective relief on their other claims, Plaintiffs filed an emergency motion asking the court of appeals to summarily dispose of the appeal by vacating this Court's decision and remanding for further proceedings on Plaintiffs' remaining claims. Pls.-Appellees' Emergency Mot. for Summ. Vacatur and Remand, *National Alliance to End Homelessness v. HUD*, No. 26-1923 (1st Cir. Sept. 21, 2026). Plaintiffs explained that while they continued to believe the district court correctly decided the notice-and-comment claim, they were willing to forgo that claim in light of HUD's actions to undertake notice and comment now and in the interest of obtaining resolution of their other claims promptly, before HUD makes awards under the NOFO. *Id.* at 5.

The court of appeals granted that motion, over Defendants' opposition, three days later. Judgment, *National Alliance to End Homelessness v. HUD*, No. 26-1923 (1st Cir. Sept. 24, 2026). The court vacated the judgment on the notice-and-comment claim and remanded for further proceedings on any other claims. *Id.* The court of appeals issued the mandate that day. Mandate, *National Alliance to End Homelessness v. HUD*, No. 26-1923 (1st Cir. Sept. 24, 2026).

In the meantime, HUD reopened the FY 2026 NOFO on September 18, with applications due on September 30, 2026. *Continuum of Care Program Competition*, HUD, https://perma.cc/A5QX-4YUL. HUD has said it would endeavor to make awards by the December 1, 2026, statutory deadline.[7]

### E. The FY 2026 NOFO threatens devastating harm to Plaintiffs and the communities they serve

If HUD is permitted to make awards under this NOFO, that will strip funding from many existing permanent housing and other projects—forcing those projects to withdraw support for the formerly homeless individuals and families that rely on them. The NOFO threatens to cause nearly 100,000 people to lose their housing. Oliva Decl. ¶ 186. The loss of housing threatens catastrophic follow-on consequences for people's health and safety. *See* Pls.' Mem. at 22–23 (Dkt. No. 30-1). The NOFO will also result in other devastating shifts if implemented—away from people with mental health and substance use disorders, away from transgender individuals, away from domestic violence service providers, and away from the highest-need populations, to take just a few examples. *See id.* at 23. These shifts will erode the effectiveness of communities' responses to homelessness, defund proven strategies, and leave vulnerable individuals and families without needed support. Oliva Decl. ¶ 171.

## LEGAL STANDARDS

***Summary judgment.*** Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotations omitted). For Administrative

[7] *See, e.g.*, Declaration of Caitlyn J. McKenney ¶¶ 60–62, *Los Angeles Homeless Servs. Auth. v. Trump*, No. 2:26-cv-7056 (C.D. Cal. Aug. 24, 2026) (Dkt. No. 71-2) (HUD representing in a parallel case that, if it were permitted to proceed with the NOFO by September 14, HUD could make awards by December 1).

Procedure Act (APA) claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

***Preliminary relief.*** The APA authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant a preliminary injunction. *See* Judiciary Act, ch. 20, § 11, 1 Stat. 73, 78 (1789). The same standards apply to both types of preliminary relief. *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025). To obtain preliminary relief of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely "irreparable harm … absen[t] preliminary relief," (3) "that the balance of equities tips in [the movant's] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the [g]overnment is the opposing party," the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. The Set-Aside Is Unlawful, and This Court Should Vacate It and Enjoin HUD from Awarding Tier 2 Funding until CoCs Have a Chance to Resubmit Tier 2 Applications

The Set-Aside violates the APA several times over—it exceeds HUD's statutory authority, conflicts with a provision protecting permanent housing renewals, and is arbitrary and capricious. The Court should sever and vacate the Set-Aside and enjoin HUD from awarding Tier 2 funding—the pot of funds most affected by the Set-Aside—until HUD has allowed CoCs to resubmit Tier 2 applications to seek funding for the projects their communities actually need.

**A. The Set-Aside exceeds HUD's statutory authority**

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority … violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (cleaned up). No statute grants Defendants the authority to adopt the Set-Aside, which earmarks $1.3 billion in funds for new projects only and prioritizes transitional housing and supportive-services-only projects for those funds. Defendants seek to rely on 42 U.S.C. § 11386a, which enumerates various selection criteria and authorizes HUD to establish additional ones as it "determines to be appropriate to carry out [the CoC statute] in an effective and efficient manner," 42 U.S.C. § 11386a(b)(1)(G). *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mots. for Summ. J. or, in the Alternative, Prelim. Inj. (Defs.' Mem.) at 29–30 (Dkt. No. 32). But that provision does not authorize HUD to override Congress's own judgment about what makes the program effective and efficient—and the Set-Aside does just that in at least three ways.

First, the Set-Aside effectively overrides the remainder of § 11386a(b), in which Congress itself imposed a lengthy list of criteria—things like the applicant's previous performance, overall plan, ability to leverage other resources, and coordination with other homelessness-response entities. *See* 42 U.S.C. § 11386a(b)(1)(A)–(F). The Set-Aside makes those congressionally established criteria all but completely dead letter. Under the Set-Aside, HUD will fund all new transitional housing and supportive-services-only projects that apply, no matter how they fare on other criteria, before HUD will even consider any permanent housing project—and existing projects will not be considered at all. This cannot be squared with the statute's direction that HUD "shall" make awards based on criteria that "shall include" the congressionally enumerated factors. *Id.* § 11386a(a), (b)(1). The Set-Aside's favoring of new

transitional housing and supportive-services-only projects makes all those congressionally mandated criteria irrelevant. HUD's authority to adopt additional criteria to "carry out [the CoC program] in an effective and efficient manner" does not give it license to effectively nullify the criteria Congress itself imposed. *Cf. Cnty. of King v. Turner*, — F.4th —, No. 25-3664, 2026 WL 2489361, at *11 (9th Cir. 2026) (explaining that, when "interpret[ing] a residual clause," court "give[s] effect, if possible to every clause and word of the statute" (cleaned up)).

Second, the Set-Aside undermines Congress's efforts to protect stability for the program and the people it serves by prioritizing renewals of existing projects. Congress made sure CoCs would have a chance to compete for enough funding to renew their existing grants, at least so long as enough appropriated funding was available: Congress directed HUD to "increase the estimated need amount" for CoCs as necessary "to provide 1 year of renewal funding for all expiring contracts." 42 U.S.C. § 11386a(b)(2)(B)(i), (iii). As discussed below, Congress also required HUD to consider two and only two factors when deciding whether to renew existing permanent housing awards. *See infra* Section I.B (citing 42 U.S.C. § 11386c(b)). And Congress in recent appropriations acts has restricted HUD's ability to use funding for "new projects," without similarly restricting funding renewals. *See* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 401 (providing that CoC funds can be used for "new projects" in only two circumstances); *see also, e.g.*, Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 364 (same). HUD cannot credibly contend that it serves "effective[ness] and efficien[cy]" to categorically withhold $1.3 billion from existing projects whose funding Congress sought to protect.

Third, the Set-Aside likewise flouts Congress's judgment, reflected over and over in the statute, that permanent housing is effective and should be prioritized. Congress expressly stated that a key purpose of the HEARTH Act was "to establish a Federal goal of ensuring that

individuals and families who become homeless return to permanent housing within 30 days." Pub. L. No. 111-22, § 1002, 123 Stat. at 1664, *codified at* 42 U.S.C. § 11301 note. It required specified portions of funding to be set aside for permanent housing for particular populations. 42 U.S.C. § 11386b(a) (requiring HUD to allocate significant portion of funds to create new permanent supportive housing unless doing so would leave insufficient funds for renewals); *id.* § 11386b(b) (setting minimum funding levels for permanent housing for families with children). It determined that specified permanent housing strategies had "been proven effective" at addressing homelessness and mandated that HUD provide incentives for those activities. *Id.* § 11386b(d). And it provided special protections for renewals of permanent housing awards. *Id.* § 11386c(a)–(b). It is not "effective and efficient" to defund the very strategies that Congress itself sought to promote.

Whatever discretion § 11386a(b)(1)(G) might grant HUD to adopt new selection criteria for CoC awards, it does not allow HUD to override Congress's own priorities in adopting them.

**B. The Set-Aside violates § 11386c(b) by improperly disqualifying renewals**

The Set-Aside also violates 42 U.S.C. § 11386c(b) by improperly disqualifying renewals. That provision directs HUD to "determine whether to renew" permanent housing projects "on the basis" of the CoC's certification as to two—and only two—things: that "there is a demonstrated need" and that "the project complies with program requirements and appropriate standards of housing quality and habitability." 42 U.S.C. § 11386c(b). But the Set-Aside means that HUD will necessarily deny many permanent housing renewals based on another factor—HUD's decision to make $1.3 billion unavailable for renewals. Because the Set-Aside makes renewals ineligible for $1.3 billion, HUD necessarily is not "determin[ing] whether to renew" permanent housing projects "on the basis" of the two statutory factors Congress established, but rather based on its own, unauthorized decision to limit the funds available for them.

Contrary to Defendants' previous contentions, § 11386c(c) does not grant HUD discretion to reject renewals even if they meet the statutory factors. *Contra* Defs.' Mem. at 32, 34 (Dkt. No. 32). That subsection states that "[n]othing in this section shall be construed as prohibiting the Secretary *from renewing* contracts under this part in accordance with criteria set forth in a provision of this part other than this section." 42 U.S.C. § 11386c(c) (emphasis added). This provision clarifies only that HUD is authorized to "renew[]" awards if warranted by other statutory provisions; it does not permit HUD to *decline* to renew awards on such other grounds. If Congress had wanted to grant HUD that broader authority, it would have used the same language it used in subsection (b)—and provided that nothing prohibited HUD from "determin[ing] whether to renew" awards in accordance with other criteria. But it did not, and in circumstances like that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotations omitted). And, of course, Congress's choice to give HUD broader discretion in renewing than in declining to renew makes good sense given the statute's general prioritization of stability and renewals.

**C. The Set-Aside is arbitrary and capricious**

The Set-Aside is also arbitrary and capricious and therefore must be invalidated under 5 U.S.C. § 706(2). To withstand arbitrary-and-capricious review, the agency must have offered "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* An agency must genuinely consider relevant evidence and factors; merely "stating that a factor was considered—or found—is not a substitute for considering or finding it." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (cleaned up). And an agency "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (cleaned up). The Set-Aside flunks these basic standards.

To begin, HUD fails to articulate "a rational connection between the facts found and the choice made" in adopting the Set-Aside. *See State Farm*, 463 U.S. at 43 (cleaned up). HUD claims that the Set-Aside is needed to "expand opportunities" for transitional housing and supportive-services-only projects to receive funding. AR 51. But HUD did not need to give those projects a conclusive preference in the competition to expand their "opportunities"—and, in fact, doing so flatly conflicts with HUD's stated goal of promoting "competition." *See* AR 48–50. Making nearly all of the program's competitive funding available only to limited types of projects restricts, not promotes, competition. HUD did not explain or justify these anti-competitive impacts. Nor did it consider instead allowing all projects to compete on equal footing, let alone "give a reasoned explanation for its rejection of [that] alternative[]." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

In addition, HUD "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by disregarding the reality that categorically cutting off funding for existing permanent housing projects will cause those projects to shutter and force people out of their homes. HUD claims it has "provide[d] a path" for "current participants to maintain … assistance," but by and large it has not. AR 54. HUD's chief (purported) solution is that residents of defunded permanent housing can just move to transitional housing. *See* AR 54–55, 5041. But

that is generally not practicable. Because transitional housing programs can only serve individuals who meet the definition of "homeless" in statute and regulation, permanent housing residents do not qualify unless they become homeless again or are at "imminent risk" of homelessness—meaning they will lose their residence within the next 14 days. *See* 24 C.F.R. § 578.3; 42 U.S.C. § 11302(a)(1)–(4); Oliva Decl. ¶¶ 106–08. It is far from guaranteed that this timing will line up with a transitional housing spot becoming available. AR 55; Oliva Decl. ¶ 108; Declaration of Renee M. Willis (Willis Decl.) ¶ 51 (Dkt. No. 30-5). After all, communities do not have sufficient available resources to serve everyone who will be thrust out of permanent housing and into homelessness once again. *See* Oliva Decl. ¶¶ 99, 108; Willis Decl. ¶ 24; Declaration of Kathryn J. Kaminski (Kaminski Decl.) ¶¶ 32–34 (Dkt. No. 30-12); Declaration of Ann Chanecka (Chanecka Decl.) ¶ 29 (Dkt. No. 30-13).

While the NOFO aims to fund new transitional housing, that does not solve the problem. For one, that new housing may not be in the same geographic area as the permanent housing projects that are defunded—meaning those projects' displaced residents will still have nowhere to go. And, in any event, the new transitional housing will not be able to house all the people who are displaced from permanent housing because transitional housing is more expensive and the same level of funding therefore houses fewer people. Oliva Decl. ¶ 112.

The NOFO's "transition grants" do not solve the problem either. *Contra* AR 55. While those grants in theory enable existing providers to transition a permanent housing project to transitional housing over the course of the year, that is not a practicable option in many circumstances, given multiple significant barriers. *See* Willis Decl. ¶ 79; Declaration of April Calvin (Calvin Decl.) ¶ 16 (Dkt. No. 30-11). For instance, many providers have properties that cannot easily be converted away from permanent supportive housing because of deed restrictions on the property's use and population served. Declaration of Jelani Jackson (Jackson Decl.) ¶ 20

(Dkt. No. 30-10). In still other instances, insurers have refused to insure projects operating as transitional (as opposed to permanent) housing. Oliva Decl. ¶ 154. And, at the time projects had to submit their applications to the local competitions, HUD regulations effectively barred many nonprofit providers from converting their existing programs to transitional housing—so they could not apply for those transition grants. *Compare* 24 C.F.R. § 578.51(b), *with* 42 U.S.C. § 11383(g); *see also* Oliva Decl. ¶¶ 101–03; Willis Decl. ¶ 79a. HUD has since waived the relevant regulatory restriction,[8] but that came too late to be any help, because the time to apply to local competitions had already passed by the time HUD issued the waiver—so the nonprofits that provide a substantial amount of permanent housing were precluded from applying for the transition grants that HUD touts.

In its haste to defund proven permanent housing projects, HUD also failed to sufficiently account for the "serious reliance interests" of providers and the individuals and families they serve. *See Regents*, 591 U.S. at 30. Plaintiffs and their members and constituents, along with countless providers around the country, developed supportive housing systems, invested significantly in building permanent housing—including with their own funds—all in reliance on the longstanding and consistent directives from HUD. *See, e.g.*, Oliva Decl. ¶¶ 26, 110, 188; *see also* Kaminski Decl. ¶¶ 14–18; Jackson Decl. ¶¶ 19–20; Declaration of Sheila A. Dillon (Dillon Decl.) ¶¶ 19–20 (Dkt. No. 30-8). And the individuals and families in permanent housing rely on the stable living environment that meets their unique needs. HUD did not adequately consider the harm that will befall them when they lose housing, or the resulting consequences for the communities in which they live. *See, e.g.*, Oliva Decl. ¶¶ 111–14; Chanecka Decl. ¶ 21.

---

[8] Availability of Waiver to Allow Private Nonprofit Recipients of the *FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO* to Administer Rental Assistance, HUD (Sept. 18, 2026), https://perma.cc/668U-4MQK.

HUD mostly emphasizes that the Set-Aside will funnel funding to transitional housing and supportive-services-only projects that, it claims, will more effectively address homelessness than permanent housing has. That flies in the face of the evidence—which, among other things, shows that people given transitional housing are less likely to remain stably housed. *See* Oliva Decl. ¶¶ 111–14. What's more, while transitional housing can adequately serve specific subpopulations like youth and survivors of domestic violence, it does not effectively meet the needs of too many, like those with severe disabilities, individuals with chronic health issues, or people experiencing chronic homelessness. *Id.*

Moreover, while Defendants protest that supportive services are critical, they ignore that supportive services are a key part of the very permanent housing projects that the Set-Aside defunds. *See* 24 C.F.R. § 578.37(a)(1) (requiring permanent supportive housing to offer supportive services). Even while the CoC program has prioritized permanent housing, a significant portion of funding has gone to services; projects often layer funding from other sources to provide services in their CoC-funded housing projects; and Congress has created other programs to fund services. *See* Supplemental Declaration of Ann Marie Oliva (Suppl. Oliva Decl.) ¶¶ 10–12 (Dkt. No. 33-2). As a report that Defendants (mis-)cite explained, residents in permanent supportive housing "are offered services equivalent in intensity to or even greater than services offered in transitional housing." Office of Policy Development and Research, HUD, *Costs Associated with First-Time Homelessness for Families and Individuals* at 3-2 (2010), https://perma.cc/P38H-M5WS; *see also* AR 2261–62 (relying on that report). Defendants do not need to defund permanent housing to get individuals and families the supportive services they need—and they offer no reasonable explanation for why they would.

### D. The Court should sever and vacate the Set-Aside and permanently enjoin HUD from making Tier 2 awards until CoCs have an opportunity to resubmit Tier 2 applications

To remedy the Set-Aside's unlawfulness, the Court should declare it unlawful, vacate the NOFO provisions implementing it, and permanently enjoin HUD from awarding the funds most affected by the Set-Aside—Tier 2 funds—until HUD has provided CoCs a new opportunity to submit Tier 2 applications. The Set-Aside dramatically altered what CoCs included in Tier 2 of their applications. Because the $1.3 billion Set-Aside makes up nearly all Tier 2 funding, CoCs had no real choice but to apply for new transitional housing or supportive-services-only projects in Tier 2 of their applications—even if that is not what they actually need or want. Oliva Decl. ¶¶ 167–71, 179–86. Thus, for relief from the Set-Aside to be meaningful at all, CoCs must have a new opportunity to submit Tier 2 applications without the distorting influence of the Set-Aside.[9]

Vacating the Set-Aside and declaring it unlawful are straightforward remedies for the Set-Aside's unlawfulness under the APA. *See* 5 U.S.C. § 706(2) (providing that the "reviewing court shall … hold unlawful and set aside agency action" that violates the APA). It is also appropriate here to vacate only the provisions implementing the Set-Aside, while leaving the remainder of the NOFO intact (minus any other provisions that are separately vacated as unlawful), because the NOFO contains an express severability clause. *See* AR 5113 (providing that "if any part or provision of the … terms of this NOFO are … held to be … unenforceable,

[9] Even this will not fully remedy the Set-Aside's impacts—the Set-Aside affected the entirety of CoC applications, including Tier 1. But the opportunity to resubmit Tier 2 applications would mitigate some of the worst effects. For instance, instead of fully rejecting projects or relegating them to Tier 2, some CoCs included all existing permanent housing projects in their Tier 1, but with each at a reduced amount so they would all fit within the Tier 1 limits. If CoCs have the opportunity to resubmit Tier 2 applications without the Set-Aside, they could seek additional funding for those projects to bring them back up to existing funding levels.

they … shall not invalidate or affect the legality or enforceability of the remaining provisions and applications" of the NOFO). In particular, the Court can vacate section V.D.2.a(3)–(7), the provisions setting forth the process by which HUD will make Tier 2 awards. AR 5093–94.

To ensure that HUD does not make Tier 2 awards anyway, this Court should also permanently enjoin HUD from making Tier 2 awards until it has granted CoCs an opportunity to resubmit applications without the Set-Aside in place. An injunction is warranted when it would have "meaningful practical effect independent of" vacatur of the challenged agency action. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The injunction here would have such meaningful effect: with vacatur alone, HUD might argue that it can still make Tier 2 awards, and that the vacated provisions just no longer constrain how it does so. A permanent injunction would make it crystal clear that HUD cannot make Tier 2 awards until CoCs have a chance to resubmit their Tier 2 applications.

In addition, the traditional factors pertinent to injunctive relief support entry of a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs prevail on the merits for the reasons discussed above. And, without an injunction, Plaintiffs face "irreparable injury" that could not be adequately redressed through "remedies available at law." *Id.* If HUD makes awards pursuant to the existing Tier 2 applications, no remedy at law (as opposed to at equity) could unwind those awards and restore CoCs' chance to obtain funding for the projects they would have sought under a lawful NOFO.

The "balance of equities" and "public interest," which "merge" when the government is a party, also favor such a permanent injunction. *See Nken*, 556 U.S. at 435. Without a new application process for Tier 2 awards, funds will inevitably go to new, unproven programs at the expense of existing programs that tens of thousands of people rely on for support. The impact would hit individuals currently in permanent supportive housing the hardest. Oliva Decl. ¶ 181.

These individuals, who have disabilities and chronic health conditions, need a high level of intervention and have long been prioritized because they are the most vulnerable. *E.g.*, Oliva Decl. ¶ 190. The loss of funding means that these individuals will be forced onto the street or into shelters that are unable to provide the stability and intensive services they need, increasing strain on social and emergency services networks. *E.g.*, Oliva Decl. ¶ 180. And people who currently have stable housing will face increased risk of mortality and heightened exposure once they lose their homes, threatening the safety and lives of individuals these programs were designed to protect. *E.g.*, Oliva Decl. ¶ 190.

On the other side of the balance, HUD has complained that a new application process will prevent it from meeting the December 1 statutory deadline. But a deadline for making awards is not license to break the law when doing so. Nor can HUD complain that a new application process will cause delay and resulting funding gaps. This relief still allows Tier 1 awards—approximately 60 percent of funding—to go out immediately. And, for Tier 2, the adverse impacts of funding delays pale in comparison to the alternative. If HUD makes awards pursuant to existing Tier 2 applications, a large number of existing projects will lose funding not just for now, but for good—causing devastating harm to the individuals and families they serve.

## II. Multiple Other NOFO Provisions Are Unlawful, and This Court Should Vacate Those Provisions and Enjoin HUD from Applying Them

Multiple other NOFO provisions also violate the APA, and the Court should sever and vacate those as well, in addition to enjoining HUD from applying those provisions when making awards.

### A. Service Requirements Criteria

Without grappling with the considerable evidence that Housing First models are effective, *see* Oliva Decl. ¶ 119, the Service Requirements Criteria push CoCs to put forth

projects that mandate services—and exclude projects that do not. App. Sec. II. For instance, the NOFO makes whether a project "ha[s] or will incorporate supportive service participation requirements" the single largest factor affecting the project's score. AR 5095. Other Service Requirements Criteria assign points to a CoC's score for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, AR 5084, and for demonstrating certain numbers of CoC-funded units mandate substance abuse treatment as a condition of participation in the program, AR 5083.[10]

These Service Requirements Criteria are arbitrary and capricious for multiple reasons. To begin, as with last year's NOFO that this Court previously set aside, HUD "gives little to no thought or analysis to the negative externalities created by its transition from a Housing First approach to one that mandates" services. *Washington v. HUD*, No. 25-cv-626, 2026 WL 1863886, at *4 (D.R.I. June 29, 2026). As HUD previously determined, requiring treatment can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services." AR 1153; *see also* Oliva Decl. ¶¶ 115–16, 123. HUD fails to consider that detrimental impact now, and fails to explain its departure from these "facts and circumstances that underlay" HUD's prior longstanding support of Housing First—a failure that in itself renders the Service

[10] Multiple factors at the threshold review stage also threaten to disqualify projects that do not mandate services. In particular, the NOFO includes threshold criteria that look to the results that the project will achieve—criteria that necessarily involve subjective assessments and that HUD will evaluate through its pro-service-mandates lens. *See, e.g.*, AR 5068–69 (assessing whether the project "will result in at least 20 hours per week of engagement in services, activities or employment for all program participants"); *see also* AR 5072–73 (looking to whether the services offered "will ensure" certain outcomes). Given the NOFO's strong signals that HUD does not believe Housing First can achieve favorable outcomes, these subjective, predictive criteria leave room for HUD to reject projects that do not mandate services—and those criteria have already pressured CoCs to put forward projects mandating services to reduce the risk of being disqualified.

Requirements Criteria arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

HUD also fails to consider that service requirements erode client trust and choice, which can lead to client disengagement and make it harder to give them help. Oliva Decl. ¶¶ 115–16, 123; Willis Decl. ¶ 85. HUD likewise does not consider that many people will refuse services, and, with service mandates, providers will be forced to stop serving those individuals, resulting in more unhoused people—not fewer. *See* Oliva Decl. ¶¶ 115–16; Declaration of Michelle M. Wilcox (Wilcox Decl.) ¶¶ 28–29 (Dkt. No. 30-6). HUD emphasizes troubling statistics about drug use and overdoses among certain homeless populations, but it offers no evidence that service requirements will do better than Housing First in addressing those problems. *See, e.g.*, AR 59; *see also* Oliva Decl. ¶ 86.

HUD also failed to adequately account for the enormous disadvantage these criteria inflict on entities that aid survivors of domestic violence and sexual assault—who generally cannot lawfully mandate services. These organizations often rely on CoC funding and funding under the Violence Against Women Act and other federal laws that outright prohibit grantees from mandating services. 34 U.S.C. § 12351(b)(3); 42 U.S.C. § 10408(d)(2); Oliva Decl. ¶¶ 128–29. Those providers cannot lawfully change their policies to earn the (significant) points the NOFO assigns for service requirements. This systematically disadvantages domestic violence services. While the NOFO contains a domestic violence-related caveat, it is not relevant to this issue. AR 63, 5084, 5095. That caveat states that providers should not deny assistance to an otherwise-eligible participant "on the basis or as a direct result of the fact that the participant is or has been a victim of domestic violence" or a related crime. AR 63, 5084, 5095. But the NOFO still penalizes domestic violence service providers for not mandating services—a serious impact that HUD apparently did not even consider. *See* AR 63.

HUD also distorts or outright ignores the evidence to justify its departure from Housing First. HUD decries the Housing First approach as a "failure" and recites statistics showing that various homelessness metrics had gotten worse since HUD implemented a Housing First policy. AR 42, 5033. But as HUD itself previously concluded, the rise in homelessness is attributable to factors like the "national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism"—*not* the availability of housing without service mandates. AR 902; *see also* AR 921, 933, 945, 956, 975; Oliva Decl. ¶¶ 90–93; Willis Decl. ¶¶ 21–25. Congress likewise found that "a lack of affordable housing and limited scale of housing assistance programs are the primary causes of homelessness." Pub. L. No. 111-22, div. B, § 1002, 123 Stat. at 1664. HUD now pays lip service to the "multitude of factors" likely driving increases in homelessness, AR 48, but ultimately just asserts without evidence that Housing First policies are to blame, *see* AR 41–48. HUD also failed to consider that just days before the NOFO's release, HUD quietly published a report showing that, between 2024 and 2025, while Housing First remained HUD's approach, homelessness *decreased* by 3.3 percent. AR 1025; *see also* Oliva Decl. ¶ 91.

HUD also dismisses the large body of evidence showing that Housing First is effective, while at the same time pointing to no valid evidence that service requirements are effective. As the First Circuit recently noted, the "Housing First model is evidence-based, with studies consistently showing that people are more likely to maintain their housing and avoid a return to homelessness when they live in a Housing First facility." *Washington v. HUD*, 171 F.4th 473, 480 n.1 (1st Cir. 2026). HUD acknowledges a 2021 systematic review of 26 studies that concluded that "Housing First programs are more effective in reducing homelessness and improving housing stability than Treatment First programs," AR 1180—but disregards its conclusion because of various nitpicked limitations. *See* AR 44–45; *see also* Oliva Decl. ¶¶ 124–

25. HUD also brushes aside its own publication highlighting numerous studies that found Housing First programs to be more effective than Treatment First at boosting housing stability, quickly helping people out of homelessness, reducing costs, and more. *See* AR 44, 1151; Oliva Decl. ¶¶ 123–27; *see also* Jackson Decl. ¶¶ 23–24; Dillon Decl. ¶ 18. This approach—dismissing or mischaracterizing evidence that does not support HUD's policy preferences (contrast the characterization at AR 44 with the actual study at AR 1143–44)—pervades HUD's attempt to justify its departure from Housing First. *See* AR 44–48; *see also* Oliva Decl. ¶¶ 115–27.

At the same time, HUD fails to point to any evidence that service requirements are effective in addressing homelessness, and instead points to studies that show that robust *voluntary* services contribute to housing retention. AR 45; Oliva Decl. ¶¶ 126–27. HUD also claims that the HUD-VASH program—a very successful program serving homeless veterans—demonstrates the effectiveness of service requirements. AR 46–47. But although that program requires participants to "receive the case management services … as needed," that requirement is consistent with Housing First and, in fact, is something that all rapid rehousing requires—and the HUD-VASH program offers other services on a *voluntary* basis. *See* 89 Fed. Reg. 65769, 65775 (2024); 24 C.F.R. § 578.37(a)(1)(ii)(F); *see also* Oliva Decl. ¶ 127. HUD has not reasonably explained its decision to abandon that approach and implement the Service Requirements Criteria instead.

**B. Anti-Harm Reduction Provisions**

Multiple NOFO provisions (Anti-Harm Reduction Provisions) seek to eliminate certain types of harm reduction programs, even independently funded ones. App. Sec. III. "Harm reduction" programs aim to reduce the negative consequences of drug use and, as relevant to the NOFO, include things like methadone treatment and needle exchanges to prevent infectious disease. Evidence shows that harm reduction reduces the risk of overdose and improves housing

stability and health outcomes, particularly as compared to abstinence-contingent services. Oliva Decl. ¶¶ 132–33. Nonetheless, the NOFO pressures communities to end such programs. Several of these provisions exceed HUD's statutory authority, and they all are arbitrary and capricious.

### 1. The Safe Drug Use Certification and Condition exceed HUD's statutory authority

To start, two Anti-Harm Reduction Provisions exceed HUD's statutory authority by targeting harm-reduction activities that applicants engage in on their own dime, outside the scope of the HUD-funded program. One, the Safe Drug Use Certification, disqualifies applicants that do not certify that they will not "operate drug injection sites or 'safe consumption sites,'" "knowingly permit the use or distribution of illicit drugs on property under their control," or "knowingly distribute drug paraphernalia," all "in violation of" specified federal laws. AR 5065.[11] The other, the Safe Drug Use Condition, imposes a mirror-image condition on applicants who receive awards—barring them from engaging in the specified activities. AR 5113. These requirements apparently apply to the organization generally, not just the HUD-funded project. *See* AR 5065 (applying to "[t]he project applicant"), AR 5113 (applying to "the service provider[] or organization").

HUD lacks authority to impose these restrictions on activities that are separate and apart from the HUD-funded project. While 42 U.S.C. § 11386a(b)(1)(G) authorizes HUD to adopt criteria "appropriate to carry out [the CoC program] in an effective and efficient manner," these

---

[11] In the application that applicants must actually submit, HUD has imposed a certification that uses different language that is not even on its face limited to activities "in violation of" federal laws. Instead, the application requires applicants to certify that "[t]he project applicant will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" Suppl. Oliva Decl. ¶ 7 & Ex. A.

provisions constrain grantees' conduct outside the scope of the CoC program and thus have nothing to do with the CoC program's effectiveness or efficiency.

Nor can these provisions be defended on the ground that they purport to bar only activity that violates federal law, for at least three reasons. First, in implementing these NOFO provisions, HUD has used *different* language that is not even on its face cabined to conduct that violates federal law. *See supra* p.30 at n.11. Second, even considering the NOFO's facially cabined language, the provisions in fact sweep beyond conduct that violates federal law. The NOFO's Safe Drug Use Certification and Condition go on to state that they are "not a requirement that program participants … be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement"—a clarification that strongly implies that these provisions *are* a requirement that providers evict participants for any *second*-time drug violation. AR 5065, 5113. There is no support for the NOFO's strong suggestion that federal criminal laws impose such a requirement. Finally, HUD does not have authority to blackball applicants based on HUD's own view of whether their harm reduction activities violate federal law. The drug statutes that the NOFO cites prescribe penalties for noncompliance—penalties that can be imposed by a court following the ordinary legal process. *See* 21 U.S.C. §§ 856(b), (d), 863(b). But Congress has not authorized HUD to decide for itself whether an organization has violated those statutes and then to deny grant funding to it as a penalty.

### 2. All of the NOFO's Anti-Harm Reduction Provisions are arbitrary and capricious

In addition to the Safe Drug Use Certification and Condition described above, a third Anti-Harm Reduction Provision awards points to CoCs that "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or

distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" AR 5090. All three of the NOFO's Anti-Harm Reduction Provisions are arbitrary and capricious.

For one, HUD "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. In addition to mischaracterizing studies that it claims support its new approach, HUD fails to address the significant research that demonstrates that harm reduction is effective in both preventing overdoses and addressing homelessness. AR 59–62; *see also* Oliva Decl. ¶¶ 132–33. HUD also fails to consider that requiring that applicants not operate "illegal" safe consumption sites and the like—with no explanation of what that means—will deter legal harm reduction efforts. And it similarly fails to consider that the strong implication that grantees must exit people who violate drug-related rules more than once will undermine organizations' ability to effectively serve people with substance use disorders.

**C. Law Enforcement Criteria**

The NOFO's Law Enforcement Criteria pressure CoCs—and states and localities—to adopt and express support for law enforcement responses to homelessness that are unproductively punitive. App. Sec. IV. Going even further, one Law Enforcement Criterion (the Local Policies Criterion) assigns points to CoCs that commit not to take actions that (in HUD's judgment) "interfere with … local efforts to advance the objectives" of "[q]uickly clear[ing] tents and encampments," "[d]ecreas[ing] the public use of illicit drugs," pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)." AR 5085–86. The Local Policies Criterion violates the First Amendment, and all of the Law Enforcement Criteria are arbitrary and capricious.

### 1. The Local Policies Criterion violates the First Amendment

The Local Policies Criterion threatens to disadvantage CoCs that advocate against the enforcement-centered local policies that the NOFO favors—and that violates the First Amendment.[12]

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," it can only do so within constitutional limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). The government may not leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). Nor may it restrict "protected [speech] outside the scope of the federally funded program." *All. for Open Soc'y*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). The Local Policies Criterion transgresses both of these limits—by aiming to suppress speech opposing the local policies that HUD favors and by penalizing such speech even when CoCs engage in it outside the scope of the HUD-funded program.

### 2. All of the Law Enforcement Criteria are arbitrary and capricious

In addition, all the Law Enforcement Criteria are arbitrary and capricious. Those criteria require cooperation with law enforcement in enforcing local laws prohibiting public camping and public drug use and in connecting unhoused people with services—even though in some communities a law enforcement-based approach can erode trust and make providers less effective. *See* AR 5070, 5085–86; Oliva Decl. ¶¶ 134, 136. In adopting these criteria, HUD has ignored Congress's goals and failed to consider multiple important aspects of the problem. HUD

[12] The First Amendment claim is brought by Plaintiffs the National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads Rhode Island, and Youth Pride, Inc.

ignores that the McKinney-Vento Act specifically urges HUD to develop "constructive alternatives to criminalizing homelessness" in order to minimize trauma among homeless individuals and communities. 42 U.S.C. § 11313(a)(13). HUD states that the NOFO's focus is not "to jail, fine, or endlessly move unsheltered individuals," AR 67, but it fails to consider that the evidence shows these are exactly the effects that requiring punitive law enforcement responses to homelessness have. HUD also disregarded the significant evidence showing that criminalization and encampment clearing are not only ineffective, but also may cause significant trauma and do not reduce homelessness. Oliva Decl. ¶¶ 134–35. It also entirely fails to consider the impacts of exposing more people to criminal legal system interactions for nonviolent offenses. *Id*.

**D. Subjective "Risk Review" and Additional Factor Criteria**

The NOFO also establishes amorphous and subjective "Risk Review" Criteria and Additional Factors that effectively give HUD free rein to deny awards on virtually any grounds. App. Sec. VI. Specifically, the NOFO requires all projects to pass "risk review," a step that has historically looked to factors like audit reports and financial stability, but that HUD has now expanded to include subjective, policy-based criteria—such as the applicant's "[a]bility to promote self-sufficiency and economic independence," its "[h]istory of illegal discrimination," and its "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO," with HUD, not a court, apparently being the sole arbiter of what is "illegal." *See* AR 5092. The NOFO also states that HUD will rely on potentially unverified information, such as "news reports," to assess applicants' past performance. AR 5091. On top of that, the NOFO reserves to HUD the option to consider—and reject projects based on— amorphous additional factors like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a

"[b]road range of recipients beyond recurrent recipients." AR 5092. Although the NOFO says that HUD will consider these additional factors "to the extent allowed by law," it does not explain what HUD believes that means. *Id.* These "risk review" and additional factors open a backdoor for HUD to make selections based on improper grounds, even if NOFO provisions more specifically implementing Defendants' ideological and policy agenda are invalidated. These criteria exceed HUD's authority and are arbitrary and capricious.

To begin, no statute grants HUD authority to leave itself such unbridled discretion. While 42 U.S.C. § 11386a(b)(1)(G) authorizes HUD to adopt criteria that help carry out the program "in an effective and efficient manner," that authority must be interpreted to authorize criteria "of the same kind" as the ones enumerated in the immediately preceding subparagraphs. *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash. 2025) (noting that HUD's "catchall" authority under § 11386a(b)(1)(G) must be interpreted to authorize conditions "of the same kind" as those enumerated), *aff'd in part and remanded*, No. 25-3664, 2026 WL 2489361, at *8 n.4 (9th Cir. Aug. 25, 2026). Those other criteria are all much more concrete—looking to things like the CoC's past performance on specifically identified metrics, how its plan addresses specifically identified goals, and how the CoC leverages other resources and coordinates with other stakeholders. 42 U.S.C. § 11386a(b)(1)(A)–(F). Against that backdrop, § 11386a(b)(1)(G) cannot be read to authorize these criteria that are so open-ended that they leave it open for HUD to disqualify projects on virtually any ground.

The Subjective "Risk Review" and Additional Factor Criteria are also arbitrary and capricious. For one, HUD did not offer any explanation for them at all—there is no mention of them whatsoever in the relevant memo explaining the NOFO. *See* AR 39–74. Provisions that "have not been explained at all" do not withstand arbitrary-and-capricious review. *See King Cnty.*, 785 F. Supp. 3d at 888. In addition, HUD does not appear to have considered that this

would distort the CoC competition by signaling that HUD might reject awards for virtually any reason at all, including based on ideological or other grounds—thereby pushing CoCs to make different selections than they otherwise would. *See* Oliva Decl. ¶¶ 140–41. Nor did HUD explain how the competition would be fair with HUD retaining such unbridled discretion—or how it is appropriate for HUD to reject projects based on alignment with HUD's preferences, even if a court invalidates NOFO provisions more specifically implementing those arbitrary and in some cases outright unlawful preferences.

**E. Self-Sufficiency Criteria**

The NOFO also unlawfully adopts Self-Sufficiency Criteria that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"—which the NOFO (improperly) defines as "the ability to meet basic needs, including a place to live, *without public or private assistance*." AR 5011 (emphasis added). App. Sec. V. In particular, the NOFO provides that projects can be disqualified based on HUD's assessment of the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency," or their "[a]bility to promote self-sufficiency and economic independence." AR 5066, 5092. These Self-Sufficiency Criteria exceed HUD's authority and are arbitrary and capricious.

HUD lacks authority to impose these criteria because the conception of "self-sufficiency" they incorporate runs contrary to the statute. Throughout, the statute makes clear that the CoC program should help people get assistance from mainstream programs, like Medicaid, SNAP, Supplemental Security Income, and the like. *See, e.g.*, 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B). Indeed, the very section that says the program should "optimize self-sufficiency" also says that the program should "promote access to, and effective utilization of, mainstream programs … and programs funded with State or local resources." *Id.* § 11381(3), (4); *see also id.* § 11313(a)(7) (defining "mainstream programs"). Given that the

statute encourages use of other, non-CoC assistance, HUD cannot claim authority to disqualify applicants based on their clients' use of such assistance.

The Self-Sufficiency Criteria are also arbitrary and capricious. In addition to failing to account for Congress's promotion of mainstream benefits programs, HUD also ignored the realities of serving communities with disabilities or other needs that make it difficult or impossible to achieve the type of self-sufficiency the NOFO envisions. Willis Decl. ¶¶ 54, 81. These Criteria disincentivize CoCs from serving those people who are in greatest need of support—an important factor that HUD failed to consider. *See* Oliva Decl. ¶ 138.

**F. Discriminatory Disability Priority**

Relying on stereotypes, the NOFO also imposes a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority). App. Sec. VIII. In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." AR 5035. Based on that discriminatory premise, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* The Additional Factor Criteria implement this priority by allowing HUD to reject projects based on their "overall projected impact on the … priorities in this NOFO." AR 5092. This is contrary to law and in excess of HUD's statutory authority, as well as arbitrary and capricious. Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities to create a second-class tier of disabilities that excludes and harms individuals with mental health disabilities, including substance use disorders. Although the NOFO does not award points based on this priority, the Additional Factors provide a path for HUD to implement it, as they purport to reserve to HUD

the discretion to choose projects based on their "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected." AR 5092.

To begin, the Discriminatory Disability Priority—which favors individuals with physical and developmental disabilities over those with mental health and substance use disabilities—conflicts with multiple nondiscrimination laws. The express preference for some types of disabilities over others violates the Rehabilitation Act of 1973, which bars federal agencies from discriminating against people "solely by reason of her or his disability." 29 U.S.C. § 794(a). And projects that follow this directive would engage in discrimination in violation of the Americans with Disabilities Act. 42 U.S.C. §§ 12131–12134, 12181–12189; 28 C.F.R. §§ 35.130(b)(8), 36.301; *see Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (concluding that treating individuals with one type of disability "worse than persons with other disabilities" is unlawful). The Discriminatory Disability Priority is also contrary to HUD's own regulations, which prohibit excluding otherwise eligible individuals "on the grounds that they do not have a *particular* disability," 24 C.F.R. § 578.93(b)(7) (emphasis added), and which bar grantees from discriminating on the basis of disability, *id.* § 8.4(b)(1)(ii) (barring grantees from "afford[ing] a qualified individual with handicaps an opportunity to participate in" the grant-funded service "that is not equal to that afforded to others"); *id.* § 9.130(b)(1)(ii) (similar). The regulations broadly cover not only physical and developmental disabilities but also mental health disabilities and substance use disorders. *See id.* §§ 8.3(a)(2), 9.103. HUD lacks authority to prioritize people with certain disabilities over others in violation of these multiple nondiscrimination mandates.

The Discriminatory Disability Priority is also arbitrary and capricious. HUD relies on baseless stereotypes, not evidence, in prioritizing individuals with physical and developmental disabilities over those with mental, emotional, or substance use disorders. HUD suggests

that "able-bodied people" can "move to self-sufficiency" while individuals with other types of disabilities cannot. *See* AR 5035. But it cites no evidence supporting this conclusion. Instead, HUD failed to consider that some individuals have such severe mental health disabilities that they cannot return to the workforce, or that many individuals with physical or developmental disabilities *can* participate in the workforce and/or live independently. The extent and severity of a person's disability or disabilities, and whether or not that person will need supportive services, do not depend on whether that disability is physical or mental. HUD's reliance on baseless stereotypes with respect to substance use disorders (and apparently mental health disabilities as well) cannot satisfy the requirement for reasoned decisionmaking. *Cf., e.g.*, *Smith v. Aroostook Cnty*., 376 F. Supp. 3d 146, 160 (D. Me. 2019) (holding that defendant could not base policy decisions on stereotypes).

Defendants also failed to consider the reliance interests of individuals who are currently in permanent supportive housing but who do not have a "prioritized" physical or developmental disability. This provision risks jeopardizing their stable housing simply based on stigma-based judgment. *See* Oliva Decl. ¶ 139; Calvin Decl. ¶ 22; Willis Decl. ¶ 53. And Defendants also failed to consider that, as explained above, grantees cannot prioritize one class of disabilities over another while also complying with federal law, HUD's own regulations, and local and state laws that prohibit unequal treatment on the basis of disability.

**G. Non-Statutory Threshold Criteria**

The NOFO includes threshold review criteria—criteria that all projects must satisfy to be eligible for an award—that have no grounding in statutory or regulatory requirements (Non-Statutory Threshold Criteria). *See* App. Sec. VII. As applied to Tier 1 projects, these Non-Statutory Threshold Criteria exceed HUD's authority and are contrary to the 2026 Appropriations Act.

In particular, in the 2026 Appropriations Act, Congress required that HUD award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq*." Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of funding—which corresponds to the projects that CoCs list on "Tier 1" of their applications—CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. Despite the 2026 Appropriations Act's mandate, the NOFO requires *all* new projects, including those that CoCs list in their Tier 1, to pass a threshold review that is not limited to requirements imposed by statute and regulation, but rather also includes multiple policy-based criteria imposed by the NOFO alone—such as meeting, or having a plan to meet, specified benchmarks; ensuring that "all" program participants will participate in services; cooperating with law enforcement, including in addressing public camping and public drug use; and helping participants end reliance on any assistance, even from mainstream programs. AR 5068–70, 5072–73.

These criteria violate the 2026 Appropriations Act, and accordingly exceed HUD's statutory authority, by requiring Tier 1 projects to meet additional, non-statutory requirements to be selected. Applying those non-statutory requirements means that HUD will not award the specified statutory amount "based on rankings determined by the local continuum of care," but based on projects' compliance with the NOFO's additional criteria. HUD lacks authority to impose—and potentially disqualify projects based on—those additional criteria on projects that CoCs rank in their "Tier 1."

**H. Bonus Limits**

The NOFO imposes Bonus Limits that arbitrarily and capriciously disadvantage communities with higher relative need in favor of communities with lower relative need. App.

Sec. IX. Generally, CoCs can only apply for funding equal to their total need, as determined according to statutory specifications. But they can also apply for additional amounts—Bonus funding—on top. The NOFO sets arbitrary limits on the amount of CoC Bonus funding CoCs can apply for: While the NOFO generally allows CoCs to apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need, it sets a floor of $500,000 (which may be far more than 15 percent of a small CoC's need) and a cap of $5 million in bonus money (which may be far less than 15 percent of a large CoC's need). AR 5016–17. As a result, the amounts CoCs can apply for bear little relation to their actual need.

This hits larger CoCs with a double whammy. First, the Limits make larger CoCs eligible for only a small amount of bonus funding relative to their need. Oliva Decl. ¶¶ 70–71, 142. HUD claimed that, without those limits, bonus awards would "be made not on merit" but based on the CoC's statutorily defined need. AR 73. That explanation is irrational. Bonus funding is awarded based on how projects score in the merit-based competition. *See* AR 5095. And, besides, the FY 2026 NOFO's Bonus Limits themselves advantage smaller CoCs over larger ones wholly apart from their relative merit: They boost the amount that small CoCs can apply for even if they perform poorly, while also limiting the amounts that even top-performing larger CoCs can seek.

Second, given how the Bonus Limits interact with the NOFO's incredibly complex mechanism for scoring Tier 2 applications, the Limits also systematically disadvantage CoCs with higher relative need in competing for *all* Tier 2 funding needed to maintain services in their communities. Oliva Decl. ¶¶ 73–75, 142. Given that complex interaction, if a small CoC and large CoC scored the same on the NOFO's merit criteria and put forward identical projects that they comparably ranked, the small CoC's project would get a higher final score—and be much more likely to receive funding—despite the projects' equivalence. HUD did not consider that effect of that interaction at all—a hallmark of arbitrary and capricious decisionmaking.

### I. E.O. Conditions

The NOFO also imposes post-award conditions (E.O. Conditions) requiring successful applicants to follow a long list of executive orders, including orders targeting diversity, equity, and inclusion; the rights and identities of transgender and gender-nonconforming people; undocumented immigrants; abortion; and Housing First policies. App. Sec. X. As multiple courts have already held, these conditions exceed HUD's statutory authority and are arbitrary and capricious. Moreover, several of those conditions require adherence to the Administration's view that people's gender identities should not be recognized—and those conditions must be set aside for the additional reasons that they are contrary to nondiscrimination laws and the Constitution.

#### 1. All E.O. Conditions exceed HUD's authority and are arbitrary and capricious

No statute authorizes HUD to require grantees to follow executive orders that by and large have nothing to do with the CoC program or ending homelessness—and instead advance wholly unrelated ideological and policy goals on topics relating to DEI, gender identity, abortion, and immigration.[13] As multiple courts have held, HUD lacks authority to impose these sorts of "[s]ubstantive conditions implicating controversial policy matters that are unrelated to the authorizing statute." *King Cnty.*, 785 F. Supp. 3d at 886–87, *affirmed*, --- F.4th ----, 2026 WL 2489361, at *8 n.4;[14] *accord, e.g.*, *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10–11 (N.D. Cal. 2025), *appeal pending*, No. 25-7378. While the statute authorizes HUD to impose conditions "to carry out [the CoC program] in an effective and efficient manner,"

---

[13] *See, e.g.*, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); *Enforcing the Hyde Amendment*, Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025); *Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 25, 2025).

[14] The local government plaintiffs here are also plaintiffs in *King County v. Turner*.

limiting what grantees do on unrelated matters on their own time and dime has nothing to do with the CoC program's effectiveness and efficiency. *See* 42 U.S.C. § 11386(b)(8).

The E.O. Conditions are also arbitrary and capricious, as multiple courts, including this one, have held in considering materially identical conditions. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2026 WL 2364298, at *1, 3–5 (D.R.I. Aug. 14, 2026); *King Cnty.*, 785 F. Supp. 3d at 888–89. Here, as in those cases, HUD has provided no reasoned explanation—indeed, the memo explaining the basis for the NOFO does not mention those conditions at all. AR 39–74. HUD, moreover, has failed to consider important aspects of the problem, including that it will be difficult for grantees to understand what these conditions require of them given that executive orders typically provide instructions to federal agencies, not the public. These conditions, moreover, will improperly chill grantees from engaging in lawful activities—like recognizing people's gender identities or promoting DEI—that are inconsistent with the executive orders' announced policies. *See* Declaration of Rush Frazier (Frazier Decl.) ¶¶ 12–19 (Dkt. No. 30-7); Willis Decl. ¶¶ 57–58, 83. HUD did not address these consequences.

**2. The "Gender Ideology" E.O. conditions are contrary to law and the Constitution**

Two E.O. Conditions require grantees to comply with executive orders imposing the view that sex is binary and immutable and that people's gender identities should not be recognized.[15] These conditions violate nondiscrimination laws and the First Amendment.

Start with the nondiscrimination laws. The Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, which includes

[15] AR 5111 (requiring compliance with *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025), and *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 12, 2025)).

gender identity. 42 U.S.C. §§ 3604(a)–(b), 2000e-2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106. Yet the gender-related E.O. Conditions would require grantees to commit to treating sex as binary—which would apparently preclude them from acknowledging transgender individuals' gender identity or treating them in accordance with that identity. These E.O. Conditions thus would improperly compel organizations to violate the Fair Housing Act, Title VII, and/or HUD's nondiscrimination regulations.

The gender-related E.O. Conditions also violate the First Amendment by restricting grantees' speech.[16] Under those Conditions, a grantee apparently could not "refer to the clients they serve … by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1219 (N.D. Cal. 2025). This violates the First Amendment, for multiple different reasons.

For one, these conditions unconstitutionally leverage government funding to "aim at the suppression of" what the government considers to be "dangerous ideas"—namely, the idea that a person can have a gender identity distinct from their sex assigned at birth. *See Finley*, 524 U.S. at 587 (cleaned up). Second, and relatedly, these restrictions are "not relevant to the objectives of the program," *All. for Open Soc'y*, 570 U.S. at 214, and instead are "directed … towards disfavored speech." *S.F. AIDS Found.*, 786 F. Supp. 3d at 1219. Third, these conditions

[16] The First Amendment claim is brought by Plaintiffs the National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads Rhode Island, and Youth Pride, Inc.

unconstitutionally "demand[] that funding recipients adopt—as their own—the Government's view on an issue of public concern." *All. for Open Soc'y*, 570 U.S. at 218 (quoting *Rust*, 500 U.S. at 197). Under those conditions, a grantee apparently must use language that acknowledges only sex assigned at birth, and not gender, and thus effectively must express the government's views on gender as if they were the grantee's own. For just these sorts of reasons, multiple courts have held that gender-related conditions like these likely violate the First Amendment. *See, e.g.*, *S.F. AIDS Found.*, 786 F. Supp. 3d at 1219 (holding that it likely violated the First Amendment to bar grantees from "promot[ing] gender ideology"); *R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 194–95 (D.R.I. 2025) (same).

**J. The Court should vacate these provisions and enjoin HUD from applying them**

The Court should declare the provisions unlawful, vacate them (while leaving the remainder of the NOFO intact), and permanently enjoin HUD from applying them. Plaintiffs do not seek a new opportunity to resubmit applications on the basis of these provisions' unlawfulness. Unlike with the Set-Aside, severing and vacating the provisions, and enjoining HUD from applying them, would provide meaningful—albeit imperfect—relief. Of course, if the Court requires a new Tier 2 application process to remedy the effects of the Set-Aside, CoCs would have a chance to resubmit Tier 2 applications without the influence of the Set-Aside *or* any other unlawful provision that the Court vacates.

Vacating the offending provisions and declaring them unlawful is straightforward relief under the APA. *See* 5 U.S.C. § 706(2). Severing them and leaving the remainder of the NOFO intact is also appropriate here, where the NOFO includes a severability provision expressly providing that invalidation of any provision of the NOFO "shall not invalidate or affect … the remaining provisions." AR 5113.

A permanent injunction blocking HUD from applying the invalidated provisions is also warranted. This would have the "meaningful practical effect," *Monsanto*, 561 U.S. at 165, of preventing HUD from reimposing the vacated provisions behind the scenes and making clear that it cannot apply those provisions when making selections and cannot require awardees to adhere to them.

The traditional factors also support injunctive relief. *See eBay*, 547 U.S. at 391. Plaintiffs prevail on the merits, and they would face irreparable injury that could not be remedied at law. *See id.* If HUD makes awards using these criteria, no remedy at law (as opposed to equity) could unwind those awards and give CoCs a chance to receive awards based on lawful criteria. The equities also support relief. Providers and the communities they serve will be harmed if HUD implements the unlawful provisions—by, for example, imposing service requirements, disadvantaging people with mental disabilities, or penalizing lawful harm reduction. And, on the other side of the balance, "an agency is not harmed by an order prohibiting it from violating the law." *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Imm. Servs.*, No. 26-cv-132, 2026 WL 2042424, at *10 (D.R.I. July 15, 2026) (cleaned up).

## III. The OMB Apportionment Footnotes Are Unlawful, and This Court Should Declare Them Unlawful and Permanently Enjoin OMB from Imposing Them

OMB has also improperly restricted CoC funding in violation of the APA by imposing the Apportionment Footnotes.[17] If these Footnotes remain in place, they will continue to control how HUD can award CoC program funding—so these Footnotes should separately be vacated.

[17] The existing apportionments will expire today, on September 30, 2026. *See* OMB Circular No. A-11 § 120.56 (Aug. 2025), https://perma.cc/897F-UUQK. But OMB will need to reapportion the funds before HUD can make awards, and OMB has in no way suggested it will not include the Footnotes again. In these circumstances—where "the Government nowhere suggests that if this litigation is resolved in its favor[,] it will not reimpose" the challenged provisions—the challenge to these Footnotes "remains justiciable." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (cleaned up).

### A. The Apportionment Footnotes exceed OMB's statutory authority and are arbitrary and capricious

To begin, the Apportionment Footnotes must be set aside because they exceed OMB's statutory authority. *See* 5 U.S.C. § 706(2)(C). No statute confers on OMB the authority to impose extra-statutory ideological and policy restrictions on how agencies can use appropriated funds. OMB has authority to apportion appropriated funds—that is, make them available—before an agency can obligate them. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025). But that is an administrative power that is meant to ensure that agencies do not spend funds in excess of what Congress appropriated. *See* 31 U.S.C. § 1512(a). Nothing in the statute authorizes OMB to use this power to implement policy objectives. *See City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987) (noting that Congress amended apportionment provisions to preclude the executive branch from using them "as authority for implementing 'policy' impoundments").

The Apportionment Footnotes must also be set aside for the independent reason that they are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). The administrative record shows that OMB considered nothing more than the two executive orders in compelling HUD to abide by them. OMB Administrative Record 1–9.[18] It therefore necessarily failed to consider any aspects of the problem, including the restrictions' impacts on providers, CoCs, and program participants. And, as court after court has made clear, "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *aff'd in part and vacated in part on other grounds*, 186 F.4th 25 (1st Cir. 2026); *see also, e.g.*, *Nat'l Council of Nonprofits v. OMB*,

[18] The OMB administrative record is included in the Consolidated Excerpts of Administrative Record at Dkt. No. 33-1.

763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("[F]urthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888–89 ("[R]ote incorporation of executive orders … does not constitute 'reasoned decisionmaking.'"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294–95 (W.D. La. 2022) ("A command in an Executive Order does not exempt an agency from the APA's reasoned decision-making requirement.").

### B. The Court should declare the Apportionment Footnotes unlawful and enjoin OMB from reimposing them

The Court should declare the Apportionment Footnotes unlawful and permanently enjoin OMB from reimposing them. Where, as here, plaintiffs establish that agency action is "unlawful, declaratory relief is clearly warranted." *Illinois v. Noem*, 813 F. Supp. 3d 282, 309 (D.R.I. 2025), *appeal pending*, No. 26-1182. A permanent injunction is also warranted. The existing apportionments, and their associated Footnotes, will expire today (September 30, 2026), so there will imminently be no agency action to vacate—at least until OMB makes a new apportionment with the same footnotes—even though the controversy remains live. *See supra* at p.46 n.17. Thus, a permanent injunction is necessary to ensure that OMB does not reimpose the Footnotes' unlawful restrictions.

The traditional factors support such an injunction. *See eBay*, 547 U.S. at 391. Plaintiffs succeed on the merits for the reasons discussed above. And they would face irreparable harm if funds are denied to them because they do not comply with the policies of the "Gender Ideology" and Grantmaking Executive Orders. Frazier Decl. ¶¶ 10, 51–64; Wilcox Decl. ¶¶ 62–63; 67–75. The equities likewise support relief. The footnotes would harm transgender people and people who rely on Housing First projects, while, conversely, the "agency is not harmed by an order prohibiting it from violating the law." *Dorcas*, 2026 WL 2042424, at *10 (cleaned up).

## IV. If the Court Requires More Time to Consider Summary Judgment, It Should Stay the NOFO and Preliminarily Enjoin HUD from Obligating Funds

If the Court requires more time to enter a summary judgment on Plaintiffs' challenges to the many unlawful provisions in the FY 2026 NOFO, Plaintiffs respectfully request that the Court enter preliminary relief in the meantime. In particular, HUD has been ordered by Congress to make awards under a lawful NOFO by December 1, 2026, and has indicated that it is working to meet that deadline. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 400. HUD could, however, make awards before that date, or before the Court is able to rule on the present motion. Thus, Plaintiffs request that if more time is needed to consider these claims, the Court enter a stay under 5 U.S.C. § 705 or a preliminary injunction blocking HUD from obligating or announcing awards under the NOFO.

The traditional factors support this relief. *See Winter*, 555 U.S. at 20. Plaintiffs are likely to succeed on the merits for all the reasons described above—any one of which alone would justify barring HUD from making awards while this motion is pending. Plaintiffs and Plaintiff Associations' members would also suffer irreparable harm absent preliminary relief because, once HUD makes awards, it will be significantly more complicated to award effective final relief—and Plaintiffs and Plaintiff Associations' members stand to lose significant funding if HUD proceeds with the NOFO's unlawful provisions. The equities also favor preliminary relief because HUD faces no harm from "an order prohibiting it from violating the law." *Dorcas*, 2026 WL 2042424, at *10 (cleaned up).

## CONCLUSION

The Court should grant partial summary judgment to Plaintiffs and order the requested relief.

September 30, 2026

Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman *
(DC Bar No. 90037068)
Madeline H. Gitomer *
(DC Bar No. 1023447)
Christine L. Coogle *
(DC Bar No. 1738913)
Carrie Y. Flaxman *
(DC Bar No. 458681)
Robin Thurston *
(DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Amy R. Romero
(RI Bar No. 8262)
Kevin Love Hubbard *
(MA Bar No. 704772)
Lawyers' Committee for Rhode Island
56 Pine Street, Suite 200
Providence, RI 02903
(401) 238-3953
amy@lawyerscommitteeri.org
kevin@lawyerscommitteeri.org

*Counsel for All Plaintiffs*

Toby Merrill *^
(MA Bar No. 601071)
Cassandra Crawford *^
(NC Bar No. 45396)
Graham Provost *^
(DC Bar No. 1780222)
Kayla Svihovec *^
(DC Bar No. 1735588)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, and City of Tucson*

Tony LoPresti *
(CA Bar No. 289269)
County Counsel
Kavita Narayan *
(CA Bar No. 264191)

Lynette Labinger
(RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Chief Assistant County Counsel
Meredith A. Johnson *
(CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson *
(CA Bar No. 314899)
Deputy County Counsel
Leily Arzy *
(CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

John K. Whitaker *
(TN BPR No. 039207)
Senior Counsel
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

* Admitted *pro hac vice*
^ Admitted in listed states but not licensed to practice law in California.

Antonia K. Fasanelli *
(DC Bar No. 481856)
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Christopher M. Sanders *
(WA Bar No. 47518)
General Counsel to the King County Executive
Cristy J. Craig *
(WA Bar No. 27451)
Senior Deputy Prosecuting Attorney
Mika Rothman *
(WA Bar No. 55870)
Deputy General Counsel
Office of the King County Prosecuting Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov
mrothman@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*