**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-436-MSM-AEM |
| STATE OF WASHINGTON, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants.* | Case No. 1:26-cv-439-MSM-AEM |

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **3**

I. Statutory Background .......... 3

II. Executive Order 14321 .......... 7

III. HUD's Strategy to Decrease Homelessness .......... 8

A. Housing First has Failed to Address Homelessness .......... 9

B. Restoring Transitional Housing and SSO projects .......... 11

C. To Address the Issues of Housing First and to Restore the Benefits of Transitional Housing and SSO, HUD Issues the 2026 NOFO .......... 12

1. Increased Competition .......... 13

2. Restoring balance to the Continuum of Care .......... 14

3. Optimizing Self-Sufficiency through Supportive Services and Treatment .......... 17

4. Safety and the Impact of Homelessness .......... 21

IV. The Terms of the 2026 NOFO .......... 23

V. Instant Lawsuit .......... 25

**LEGAL STANDARDS** .......... **27**

**ARGUMENT** .......... **29**

I. The Court Should Grant Summary Judgment to Defendants .......... 29

A. The Secretary Acted Within His Statutory Authority in Issuing the FY 2026 NOFO (NAEH Plaintiffs Counts 1 and 2, State Plaintiffs Count 1) .......... 29

1. The "Set-Aside"/"De Facto Cap" is not contrary to law or in excess of statutory authority. (NAEH and States) .......... 30

2. The Safe Drug Use Condition and Certification is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs) .......... 40

3. The Self-Sufficiency Criteria are not contrary to law or in excess of statutory authority. (NAEH and States) .................................................. 42

4. The "Risk Review" and "Additional Factor" Criteria are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)............................................................................... 44

5. The Discriminatory Disability Policy is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs) .................................... 45

6. The Executive Order Conditions are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs) .................................... 46

7. The "Judicial Restriction" is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs) .................................................... 48

8. The Non-Statutory Threshold Criteria are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs) .................................... 49

B. The Challenged Provisions of the 2026 NOFO Are Not Arbitrary and Capricious (NAEH Plaintiffs Count 3, State Plaintiffs Count 3).......................... 50

1. The Set-Aside/De Facto Cap is not arbitrary or capricious (NAEH and State Plaintiffs)..................................................................... 51

a. HUD considered the impacts from the set-aside.......................... 53

b. HUD relied on statutory factors in making the set-aside............. 58

c. HUD provided a reasonable explanation for the set-aside............ 59

d. HUD considered reliance interests when making the set-aside ........................................................................... 64

2. The Safe Drug Use Condition and Certification is not arbitrary or capricious (NAEH Plaintiffs).............................................................. 67

3. The Self-Sufficiency Criteria are not arbitrary or capricious (NAEH and State Plaintiffs) ............................................................ 68

4. The Risk Review and Additional Factor Criteria are not arbitrary or capricious (NAEH Plaintiffs).............................................................. 72

5. The alleged "Discriminatory Disability Policy" is not arbitrary or capricious (NAEH Plaintiffs).............................................................. 73

6. The Executive Order Condition are not arbitrary or capricious (NAEH Plaintiffs) .......... 74

7. The Judicial Restriction is not arbitrary or capricious (NAEH Plaintiffs) .......... 75

8. The Non-Statutory Threshold Criteria are not arbitrary or capricious (NAEH Plaintiffs) .......... 75

9. The Law Enforcement Criteria are not arbitrary or capricious (NAEH Plaintiffs) .......... 77

10. The Bonus Limits are not arbitrary or capricious (NAEH Plaintiffs) .......... 78

C. The Apportionment Footnotes Are Lawful and Reasonable .......... 79

1. Plaintiffs' Claims Regarding the Apportionment Footnotes are Precluded .......... 79

2. The Apportionment Footnotes are not contrary to law (NAEH Plaintiffs Count 6) .......... 81

3. The Apportionment Footnotes are not arbitrary and capricious (NAEH Plaintiffs Count 7) .......... 83

D. The 2026 NOFO Does Not Violate the First Amendment (NAEH Plaintiffs Claims 8, 11) .......... 85

1. Because NAEH Plaintiffs cannot establish a constitutional violation, their contrary-to-constitutional-right claim under the APA fails (NAEH Plaintiffs Count 8) .......... 87

II. If the Court Is Inclined to Grant Relief, the Court Should Craft a Narrow Remedy .......... 88

A. Defendants Do Not Oppose an Expeditious Ruling .......... 88

B. The Court Should Limit Relief to the Provisions, If Any, On Which Plaintiffs Prevail .......... 88

C. Injunctive Relief Is Not Appropriate .......... 90

III. The Court Should Not Enter a Preliminary Injunction .......... 92

**CONCLUSION .......... 92**

## TABLE OF AUTHORITIES

### Cases

*Action on Smoking & Health v. CAB*,
713 F.2d 795 (D.C. Cir. 1983) .......... 91

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .......... 85, 87

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 80, 81

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
786 F. Supp. 3d 237 (D. Mass. 2025) .......... 87

*Ass'n of Am. Univs. v. Dep't of Def.*,
792 F. Supp. 3d 143 (D. Mass. 2025) .......... 28

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) .......... 89

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984) .......... 80

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) .......... 51

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 47

*Burns v. Johnson*,
829 F.3d 1 (1st Cir. 2016) .......... 27

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......... 39

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .......... 88, 90

*CISPES v. FBI,*
770 F.2d 468 (5th Cir.1985) .......... 86

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 28

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) .......... 82

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) .......... 29

*Cnty. of L.A. v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) .......... 90

*Coe v. McHugh*,
968 F. Supp. 2d 237 (D.D.C. 2013) .......... 27

*Common Cause v. Trump*,
506 F. Supp. 3d 39 (D.D.C. 2020) .......... 47

*Ctr. for Auto Safety v. Peck*,
751 F.2d 1336 (D.C. Cir. 1985) .......... 60

*Culbertson v. Berryhill*,
586 U.S. 53 (2019) .......... 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 28, 55

*Dep't of State v. Aids Vaccine Advoc. Coal.*,
146 S. Ct. 19 (2025) .......... 79

*Doe v. Trs. of Bos. Coll.*,
942 F.3d 527 (1st Cir. 2019) .......... 29

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 40, 61

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 85

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 79

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
802 F.3d 99 (1st Cir. 2015) .......... 27

*King Cnty. v. Turner*,
785 F. Supp. 3d 863 (W.D. Wash. 2025) .......... 84

*Lawson v. FMR LLC*,
571 U.S. 429–37 (2014) .......... 40

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 38, 39

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) .......... 71

*McCuin v. Sec'y of Health & Hum. Servs.*,
817 F.2d 161 (1st Cir. 1987) .......... 43

*Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
291 F. Supp. 3d 174 (D. Mass. 2018) .......... 27

*Monsanto v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 90

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 67

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) .......... 84

*National Council of Nonprofits v. OMB*,
763 F. Supp. 3d 36 (D.D.C. 2025) .......... 84

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025) .......... 29

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 92

*POM Wonderful LLC v. Coca-Cola Co.*,
573 U.S. 102 (2014) .......... 38

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .......... 90

*Regan v. Taxation with Representation of Wash.*,
461 U.S. 540 (1983) .......... 87

*Reno v. Flores*,
507 U.S. 292 (1993) .......... 47

*River St. Donuts, LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) .......... 28, 55

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 85

*Salazar ex rel. Salazar v. District of Columbia*,
896 F.3d 489 (D.C. Cir. 2018) .......... 89

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) .......... 84

*Trump v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) (Mem.) .......... 48

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339 (1st Cir. 2024) .......... 28

*United States v. District of Columbia*,
897 F.2d 1152 (D.C. Cir. 1990) ............ 88

*United States v. Hicks,*
980 F.2d 963 (5th Cir.1992) ............ 86

*United States v. O'Brien,*
391 U.S. 367–77 (1968) ............ 86

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ............ 29

*Vidot v. R.I. Dep't of Corr.*,
No. CV 22-305JJM, 2024 WL 4262767 (D.R.I. Sep. 23, 2024) ............ 91

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ............ 85, 86

*Washington v. Dep't of Hous. & Urb. Dev.*,
No. 25-CV-626-MSM-AEM, 2026 WL 1863886 (D.R.I. June 29, 2026) ............ *passim*

*Washington, et al. v. HUD, et al.*,
26-1922 (1st Cir. 2026), September 14, 2026 Slip Op. ............ 26, 35

*Webster v. Doe*,
486 U.S. 592 (1988) ............ 30

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ............ 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............ 29

*Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*,
778 F. Supp. 3d 440 (D.R.I. 2025) ............ 84

**Statutes**

5 U.S.C. § 701 ............ 79

5 U.S.C. § 705 ............ 28

5 U.S.C. § 706 ............ 28, 87

21 U.S.C. § 856 ............ 23, 40, 41

21 U.S.C. § 863 ............ 24, 40, 41

31 U.S.C. § 1351 ............ 80

31 U.S.C. § 1512 ............ 79, 80, 81

31 U.S.C. § 1513 ............ 79, 80, 81

31 U.S.C. § 1517 ............ 80

42 U.S.C. § 10408 .......... 70
42 U.S.C. § 11032 .......... 57
42 U.S.C. § 11301 .......... 12, 35
42 U.S.C. § 11360 .......... 4, 6
42 U.S.C. § 11360a .......... 25
42 U.S.C. § 11361 .......... 34
42 U.S.C. § 11381 .......... *passim*
42 U.S.C. § 11381 *et seq.* .......... 6, 30, 49
42 U.S.C. § 11382 .......... 4, 39, 40
42 U.S.C. § 11383 .......... 1, 4
42 U.S.C. § 11386a .......... *passim*
42 U.S.C. § 11386b .......... *passim*
42 U.S.C. § 11386c .......... *passim*
42 U.S.C. § 11386d .......... 14
42 U.S.C. §§ 11381–11389 .......... 29
Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026 Appropriations Act) .......... *passim*

**Rules**

Fed. R. Civ. P. 56 .......... 27

**Executive Materials**

2 C.F.R. § 200.204 .......... 13, 14
2 C.F.R. § 200.205 .......... 13, 14
2 C.F.R. § 200.206 .......... 44, 72
2 C.F.R. § 200.300 .......... 41
2 C.F.R. § 200.319 .......... 4
2 CFR § 200.404 .......... 76
24 C.F.R. § 8.4 .......... 46, 74
24 C.F.R. § 578.3 .......... 6, 57
24 C.F.R. § 578.7 .......... 45
24 C.F.R. § 578.13 .......... 25
24 C.F.R. § 578.21 .......... 4
24 C.F.R. § 578.33 .......... 4
24 C.F.R. § 578.37 .......... 4, 19, 73
24 C.F.R. § 578.93 .......... 46, 74

89 Fed. Reg. 65769 (Aug. 13, 2024) .......... 71

Executive Order No. 6166, 5 U.S.C. §§ 124–132 note .......... 81

Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......... 87

Executive Order No. 14321, 90 Fed. Reg. 35,817 (July 29, 2025) .......... 7, 8, 82, 83

Executive Order No. 14322, 90 Fed. Reg. 38,929 (Aug. 7, 2025) .......... 81, 82, 83, 84

**Other Authorities**

91 C.J.S. *Vacate* (1955) .......... 91

Caroline Cawley, et al., *Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic*, JAMA Network Vol. 5, No. 3 (Mar. 10, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789907 .......... 62

*Continuum of Care Program Competition*, HUD, https://perma.cc/A5QX-4YUL .......... 66

Dep't of Housing & Urban Dev., *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (2026), https://www.hud.gov/sites/default/files/CFO/documents/General-Administrative-National-Departmetal-Policy-Requirements-Terms-Financial-Assistance-Programs.pdf ("Gen. Admin. Requirements") .......... 46, 47, 74, 87

Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* (2026), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf .......... 65, 66

*Drug Overdose Death Counts*, U.S. Centers for Disease Control and Prevention, National Center for Health Statistics, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm .......... 63

HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* (2022) at 27, https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf .......... 61

Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)*, https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf .......... 56

OMB, Circular A-11 .......... 81

Protect Democracy, Homeless Assistance Grants (May 22, 2026), https://perma.cc/JWZ6-WBGN .......... 82

## INTRODUCTION

By challenging the Notice of Funding Opportunity ("NOFO") for the Continuum of Care program ("CoC") for the second year in a row, Plaintiffs[1] confirm that they are asking the Court to freeze in place for all time the failed homelessness policies of the last decade. The CoC program is the largest federal assistance program for homeless individuals and families. Over the past decade, the CoC program has mandated, to the exclusion of all else, a Housing First policy—place homeless individuals in permanent housing as fast as possible, for as long as possible, no strings attached. Over this same period, homelessness has increased 36.1%. The tragic crisis of homelessness in America persists despite an increase of CoC spending of 111%.

After careful research and consideration, including over 40 forums across the nation with interested stakeholders, HUD determined that the CoC program would be more effective in achieving its statutory goals of reducing homelessness and improving self-sufficiency if it restored a measure of balance to the program by increasing focus on Supportive Services and Transitional Housing. These statutorily recognized pillars of the CoC program were abandoned the past ten years—Transitional Housing supply has decreased 59% nationwide as Permanent Supportive Housing supply increased 44%. AR51. Before Transitional Housing and Supportive Services were abandoned in favor of a single-minded focus on Housing First, homelessness had been decreasing year-over-year. Accordingly, HUD has now decided to set aside funds in the 2026 NOFO for Transitional Housing and Supportive Services, two of the already-recognized activities under 42 U.S.C. § 11383(a).

---

[1] Pursuant to the parties stipulations in both cases, *Washington, et al., v. HUD, et al.*, 1:26-cv-00439 (D.R.I.) ("States Litigation"), ECF No. 16, and *Nat'l All. to End Homelessness, et al., v. HUD, et al.,* 1:26-cv-00436 (D.R.I), ECF No. 27, Defendants file this consolidated motion and opposition in both cases against both sets of Plaintiffs.

This goes hand in hand with other changes in the 2026 NOFO.[2] Taking a clear cue from Congress, who set the mandatory non-competitive rate at 60% in the most recent appropriations bill, HUD opened 40% of the funds for the CoC program for competition. HUD, using its statutorily provided discretion, set new criteria to advance the policies of the 2026 NOFO: more Supportive Services, more Transitional Housing, and a true "continuum of care" that can meet the unique needs of homeless individuals and families, rather than mandate the "one-size-fits-all" approach of simply providing a home to an individual with little to no support to help them regain dignity and self-sufficiency.

Plaintiffs, some of whose members include entrenched grantees of the CoC program, bring this lawsuit to handcuff HUD and grantees across the country to a Housing First policy and guarantee their own funds in the future. They bring an array of policy disputes dressed up as legal claims, challenging up to eight separate provisions as being unlawful, ten provisions as being arbitrary and capricious, the apportionment to HUD from the Office of Management and Budget ("OMB") as being unlawful and arbitrary and capricious, and then all of these as unconstitutional to boot. But consistently across all of these challenges, Plaintiffs ignore the broad statutory grant of discretion to HUD to determine criteria for making grants under the CoC program, and ignore the broad discretion to OMB to apportion appropriations. Both agencies fully and completely explain each and every challenged action. And because Plaintiffs' constitutional claims merely parrot their statutory challenges, all of Plaintiffs' claims fail.

This Court is tasked with determining whether HUD followed the law, not whether Plaintiffs' preferred approach would make better policy. Accordingly, the Court should enter

[2] "FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO"

summary judgment for Defendants and deny Plaintiffs' motions for summary judgment and preliminary injunction.

## BACKGROUND

### I. Statutory Background

The primary purposes of the CoC program are to reduce the number of homeless persons and increase their self-sufficiency. The statutory mechanism to achieve these goals is designed to provide funding to nonprofit providers and state and local governments to promote access to and utilization of homelessness-reduction programs nationwide. HUD administers the CoC program under the McKinney-Vento Homeless Assistance Act and other related provisions, including the Department of Housing and Urban Development Reform Act of 1989 and the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, which amended and reauthorized the McKinney-Vento Act and formalized the CoC program.

Per the McKinney-Vento Act, as amended by the HEARTH Act, the congressional purposes underlying the CoC program are to "promote community-wide commitment to the goal of ending homelessness"; "provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness"; "promote access to, and effective utilization of, mainstream programs" aimed at reducing homelessness; and "optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

The McKinney-Vento Act provides that grants awarded under the CoC program "shall be used to carry out projects" consisting of one or more of several eligible activities, including "[c]onstruction of new housing units," "[a]cquisition or rehabilitation of a structure," or

"[l]easing of property," all "to provide transitional or permanent housing," *id.* § 11383(a)(1)–(3); the provision of "rental assistance," *id.* § 11383(a)(4); and the provision of "[s]upportive" and "rehousing services," *id.* § 11383(a)(6)–(7).[3]

Congress requires the HUD Secretary to "award grants, on a competitive basis, and using the selection criteria" established under the McKinney-Vento Act, "to carry out eligible activities" for "projects that meet the program requirements" under the Act by awarding funds to project sponsors or to "unified funding agencies." *Id.* § 11382(a). The Act requires that such awards be made "through a national competition between geographic areas based on criteria established by the Secretary[,]" *id.* § 11386a(a), and defines a "geographic area" to be, among other things, a "State, metropolitan city, urban county, town, village," or "a combination or consortia of such, in the United States," *id.* § 11360(9). Both the McKinney-Vento Act and HUD regulations make clear that robust competition of CoC applications across geographic areas is a key feature of the CoC program. *See, e.g.*, *id.* § 11382(a) ("The Secretary shall award grants[] on a competitive basis[.]"); 24 C.F.R. § 578.21(a) ("HUD . . . will award funds to recipients through a national competition."); *id.* § 578.33(d)(2) ("Review criteria for competitively awarded renewals made after August 30, 2012 will be described in the [Notice of Funding Availability]."); *see also* 2 C.F.R. § 200.319(a) ("All procurement transactions under the Federal award must be conducted in a manner that provides full and open competition[.]").

The McKinney-Vento Act also requires HUD to assess "the previous performance of the recipient regarding homelessness" across a variety of metrics, 42 U.S.C. § 11386a(b)(1)(A); "the

[3] More specifically, the eligible activities are (1) Permanent Housing, which includes Permanent Supportive Housing and Rapid Rehousing; (2) Transitional Housing; (3) Supportive Services Only; (4) Homeless Management Information System; and (5) Homelessness Prevention. 24 C.F.R. § 578.37(a).

plan of the recipient, which shall describe" the steps the recipient will take to address the goals of the CoC program, *id.* § 11386a(b)(1)(B); the recipient's methodology for determining funding priority, *id.* § 11386a(b)(1)(C); and the "extent to which the amount of assistance" will be "supplemented with resources from other public and private sources," *id.* § 11386a(b)(1)(D). Congress then permits the Secretary to rely on "such other factors as the Secretary determines to be appropriate to carry out" the CoC program "in an effective and efficient manner." *Id.* § 11386a(b)(1)(G).

The McKinney-Vento Act also explains that the "[r]enewal of expiring contracts for leasing, rental assistance, or operating costs for permanent housing" projects "may" be funded under "the appropriations account" for housing assistance or under the "section 8 project-based rental assistance account." *Id.* § 11386c(a). The Act then provides that any funds so available—*i.e.*, any funds made available under section 11386c(a) for renewal—"shall be available for the renewal of contracts" in "successive 1-year terms" for tenant-based assistance and "successive terms of up to 15 years at the discretion of the applicant or project sponsor" for "rental assistance and housing operation costs associated with permanent housing projects." *Id.* § 11386c(b). Per the Act, the Secretary "shall determine whether," in his discretion, "to renew a contract for such a permanent housing project on the basis of certification" by an applicant that "(1) there is a demonstrated need for the project" and "(2) the project complies with program requirements and appropriate standards of housing quality and habitability, *as determined by the Secretary*." *Id.* (emphasis added).

As relevant to this litigation, the McKinney-Vento Act defines "permanent housing" to be "community-based housing without a designated length of stay," which "includes both permanent supportive housing and permanent housing without supportive services." *Id.* §

11360(17). "Supportive services" means "services that address the special needs of people served by a project," including "child care services," "employment assistance" programs, the "provision of outpatient health services, food, and case management[,]" certain housing and employment counseling services, mental health services, and "other supportive services necessary to obtain and maintain housing." *Id.* § 11360(29). "Transitional housing" is defined as "housing the purpose of which is to facilitate the movement of individuals and families experiencing homelessness to permanent housing within 24 months or such longer period as the Secretary determines necessary." *Id.* § 11360(31). A HUD regulation defines a "Continuum of Care" to be "the group organized to carry out the responsibilities required" under the CoC program, which is "composed of representatives of organizations" like "nonprofit homeless providers," "faith-based organizations," "governments," "public housing agencies," and others, "to the extent these groups are represented within the geographic area and are available to participate." 24 C.F.R. § 578.3.

For FY 2026, Congress appropriated $4,010,000,000 for the CoC program. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026 Appropriations Act). As relevant to this litigation, Congress instructed the Secretary to "prioritize funding" for CoCs that "have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects[.]" *Id.* The Secretary was also instructed to select projects "totaling not less than 60 percent of the annual renewal demand[4] for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." *Id.*

[4] The Annual Renewal Demand (ARD) is the total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition. NOFO 124. This number is not set as a specific number by either statute or regulation.

## II. Executive Order 14321

On July 24, 2025, President Trump signed the "Ending Crime and Disorder on America's Streets" Executive Order. Exec. Order No. 14321, 90 Fed. Reg. 35,817 (July 29, 2025). This order found that the number of individuals living on the streets in 2024 was the highest ever recorded. *Id.* § 1. It found that the current programs failed to address homelessness, and that Federal governments and the States should focus on the root causes of homelessness: addiction and mental health conditions. *Id.* Accordingly, the HUD Secretary was directed to assess HUD's discretionary grant programs and determine whether priority could be given to those grants that enforce prohibitions on open illicit drug use, urban camping and loitering, and urban squatting. *Id.* § 3. The HUD Secretary was also directed, to the extent permitted by law, to take the following actions:

1) "end[ing] support for 'housing first' policies" to the extent they "deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency;"
2) "increas[ing] competition among grantees through broadening the applicant pool;"
3) "hold[ing] grantees to higher standards of effectiveness in reducing homelessness and increasing public safety[;]"
4) "take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation[;]" and
5) not allow "recipients of Federal housing and homelessness assistance that operate drug injection sites or 'safe consumption sites,' [or to] knowingly distribute drug paraphernalia, or permit the use or distribution of illicit drugs on property under their control[.]"

*Id.* § 5, 90 Fed. Reg. at 35818-19.

## III. HUD's Strategy to Decrease Homelessness

One of HUD's primary policy initiatives is to reform its homelessness program, with special emphasis on the CoC program as the single largest Federal homelessness program. AR39. From 2013 to 2025, HUD automatically renewed 85%-95% of CoC grants without considering competitive scores. AR40. The ironic effect of this unregulated renewal rate was to leave very little funding to further the goal of creating new Permanent Housing as encouraged by statute. *See* 42 U.S.C. § 11386b(a)(5). The increased renewals crowded out the number of new units that could be built. The program incentivized the speed at which individuals can receive permanent, subsidized housing and did not focus on self-sufficiency. *Id*. This culminated in the highest level of homelessness recorded in a single night in 2024, reflecting that this approach failed. *Id.* And this occurred despite the program receiving year-over-year funding increases. *Id.* HUD's challenged decision to abolish the Housing First focus recognizes that there are many homeless individuals that cannot gain self-sufficiency, but the one-size-fits-all approach did not serve, and may have in fact harmed, those individuals and families that could reach self-sufficiency. *Id.*

HUD officials have met with numerous stakeholders on the issue of homelessness since 2025. *Id.* HUD has also organized and attended 40 local forums across 19 states and the District of Columbia to convene homelessness stakeholders including CoC recipients. *Id.* HUD found that no fewer than six major cities are transitioning from a Housing First approach to invest more in short-term shelters, housing conditioned on treatment and sobriety, removal of homeless camps, treatment centers, and public safety partnerships. AR40-41. HUD also noted that the American public has recognized that homelessness, addiction, and mental illness are intertwined and that existing homelessness policy has come into question. And since at least January 2025, HUD has consistently informed the public, and CoC stakeholders in particular, that HUD is

making a "paradigm shift" away from Housing First policy and toward recovery and self-sufficiency. AR39.

Because of the observed failure of Housing First, policy changes happening across the country at the local level, and most importantly, the statutory goals of the CoC program, HUD made changes reflected in the 2026 NOFO. HUD is restoring the CoC program to its original statutory goals of reducing homelessness and optimizing self-sufficiency by focusing on meaningful outcomes, expanding competition, prioritizing treatment, economic independence, and emphasizing law and order. AR5033.

**A. Housing First Has Failed to Address Homelessness**

In 2013, HUD made a drastic policy shift to mandate Housing First across the CoC program. AR41. A Housing First Policy, according to HUD, is one that emphasizes "rapid placement and stability in permanent housing in which admission does not have preconditions . . . and in which housing assistance is not conditioned upon participation in services." AR41-42.

HUD's implementation of Housing First has funded Permanent Housing to the exclusion of Transitional Housing and Supportive Services Only (SSO) projects. AR43. The 2013 NOFO de-prioritized Transitional Housing and SSO projects, and in recent NOFOs HUD has not allowed any new Transitional Housing or SSO projects. AR42. When implementing Housing First, HUD focused on two key aspects: no participation requirements or preconditions, and indefinite assistance without time limits. AR43. Housing First became Housing Only.

This policy had negative consequences. AR5033. Case managers were eliminated, and fewer services were provided to homeless individuals. AR42. Homelessness reached the highest number ever recorded at the highest rate of increase ever recorded in 2024. *Id.*; AR5034. Since 2013, chronic homelessness has increased 80.5%, unsheltered homelessness has increased 36.1%, and literal homelessness (on the street, in emergency shelters, or in transitional housing)

has increased 27%, despite a 44% increase nationwide in Permanent Supportive Housing beds and an increase in CoC spending of 111%. AR42; NOFO 28. And while the supply of Permanent Housing (which includes Permanent Supportive Housing and Rapid Rehousing) has increased by 188% since 2007, the supply of Transitional Housing beds has decreased by 59.5%. AR42-43.

In evaluating the failure of the Housing First/Housing Only approach, HUD identified critical weaknesses, including flawed methodology and contradictory evidence, in studies supporting Housing First. AR44-47. In particular, these studies: 1) tended to show that physical health, mental health, alcohol use, and illegal drug use all had unfavorable or negligible outcomes in Housing First assistance; 2) compared Permanent Housing only to Treatment First" assistance that preconditioned housing on treatment; 3) showed positive outcomes when housing is tied to services; 4) showed no difference between Transitional Housing and Permanent Housing; and 5) demonstrated that treatment services are heavily utilized when offered. *Id*. As a result, HUD determined that such studies were unreliable. *Id.*

In sum, the findings from Housing First interventions vary, and the body of literature is not robust. AR46. None of the studies examined the impact of varying types of assistance on the total homelessness population in a community over time. *Id*. Rather, they examined the amount of time an individual uses subsidized housing. *Id*. Because the congressional purpose is to reduce homelessness for the community and not just at the individual level, there is no robust evidence that Housing First (especially when applied as Housing Only) achieves that objective, as homelessness has increased. *Id*. Further, HUD's prior approach here openly de-emphasized an array of other critical services contemplated under McKinney-Vento, such Transitional Housing and Supportive Services, which are tied to positive outcomes.

HUD also found that a weakness of the Housing First system is that too few entities create accountability and structure for a homeless individual to reach self-sufficiency. AR44. Indeed, the country's first "Housing First" program had required participants to agree to two staff visits per month, a requirement that would have excluded it from CoC funding under HUD's Housing First mandate. *Id*. In addition, HUD considered an analogous but distinct program, the homeless veterans program HUD-VASH,[5] which requires case management services as a condition for housing assistance, and this program has reduced homelessness for veterans. AR46-47. The success of HUD-VASH suggests that assistance conditioned on participation in services works, and at a national scale. *Id*.

At bottom, HUD concluded that homelessness has risen since the mandate of Housing First, and that Housing First, in practice Housing Only, has not advanced the statutory goals of addressing homelessness or optimizing self-sufficiency. AR47.

**B. Restoring Transitional Housing and SSO projects**

By increasing investment in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care program to help homeless individuals move to self-sufficiency. *Id.* Instead of a balanced continuum of assistance, the CoC program has imposed a one-size-fits-all response to homelessness that restricts the spectrum of eligible program components, excluding a wide array of community providers in the process. AR5035. HUD is duly restoring previously neglected but statutorily recognized solutions.

[5] The Housing and Urban Development-VA Supportive Housing (HUD-VASH) program is a joint federal initiative that pairs Housing Choice Voucher (HCV) rental assistance from the U.S. Department of Housing and Urban Development (HUD) with VA case management and supportive services. These services are designed to help homeless Veterans and their families find and sustain permanent housing and access the health care, mental health treatment, and other supports necessary to help them improve their quality of life and maintain housing.

Congress identified only four objectives for the CoC program, and one is to optimize self-sufficiency among homeless individuals and families. 42 U.S.C. § 11381(4). Self-sufficiency is aided most directly by Transitional Housing and SSO projects. These projects are two of the five types of projects allowed under the CoC program. By reinvesting in these project types, HUD will allow CoCs to address the "many and complex" causes of homelessness and to serve the "diverse needs" of homeless individuals. AR43; *see also* 42 U.S.C. § 11301(a)(3).

The 2026 NOFO provides CoCs with new flexibility to prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery. AR43. In drafting the 2026 NOFO, HUD did not require sobriety to obtain assistance, nor does it impose preconditions for assistance. *Id*. Rather, the 2026 NOFO creates space for sober living for individuals in recovery who want a sober living environment, and encourages a select number of beds for which treatment is the purpose. *Id*. The 2026 NOFO is meant to return to a healthy diversity of assistance programs, and specifically is not directed toward eliminating Permanent Supportive Housing, cutting funding, forcing sobriety and treatment, or criminalizing homelessness. *Id.* To that end, the 2026 NOFO includes rating criteria for the existence and creation of supportive services. AR44. HUD also anticipates that the vast majority of the 60% in funding reserved for CoCs to rank projects will be used to fund renewals of Permanent Housing. By no means is HUD eliminating Permanent Housing projects: it maintains a significant focus on Permanent Housing. AR47. Just as one part, not the whole, of the Continuum of Care program. *Id.*

### C. To Address the Issues of Housing First and to Restore the Benefits of Transitional Housing and SSO, HUD Issues the 2026 NOFO

Against the backdrop of rising homelessness despite increased spending, HUD implemented various reforms via its 2026 NOFO.

1. Increased Competition

Congress requires the CoC program to be a "national competition between geographic areas." 42 U.S.C § 11386a; AR5034. This is consistent with OMB's requirements that Federal grants be awarded on a competitive, objective basis, even for renewals. 2 C.F.R. §§ 200.204, 200.205.

Yet, prior to 2026, there had been little to no competition. Under the 2024 NOFO, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit. AR48; AR5034-35. Since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition. AR49; AR5034-35.

For FY 2026, Congress directed the Secretary to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care." 140 Stat. at 399 (2026 Appropriations Act). Accordingly, the non-competitive funding rate was set at 60%. AR49; AR5035. This leaves 40% for competition. *Id.* HUD noted that competition drives outcomes, effectiveness, innovation, and accountability. *Id.* Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that best reduce homelessness and optimize self-sufficiency. AR5035.

In drafting the 2026 NOFO, HUD recognized that some organizations rely on HUD funding and could not survive without renewal. AR50. But HUD noted that organizations should not be reliant on one revenue stream, especially not an annual competition. HUD also recognized that the statute directs HUD to score projects on how well they leverage public and private

resources and mainstream funding sources and requires at least a 25% funding match from other sources. *Id.* (citing 42 U.S.C. §§ 11386a(b)(1)(D), 11386d).

In drafting the 2026 NOFO, HUD did recognize that there can be benefits to a high renewal rate, allowing organizations to achieve long-term planning. *Id*. But HUD, in its judgment, decided that these benefits do not outweigh the benefits of competition, especially in light of the statutory requirement for competition and the congressional allowance to set the non-competitive funding rate at 60%. *Id*. Indeed, CoCs can still designate the majority of funding for renewals.

2. <u>Restoring balance to the Continuum of Care</u>

From 2007 to 2009, the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing. AR50; *see also* AR5035. During this time, homelessness decreased. *Id.* Starting in 2013, the share of Permanent Supportive Housing started to rise, culminating in 88% of funding going to Permanent Supportive Housing in 2024 and 1% to Transitional housing projects. *Id*.

Transitional Housing supply has decreased 59% nationwide as Permanent Supportive Housing increased 44%. AR51. But many individuals and families would be better served by Transitional Housing. *Id*. Transitional Housing is limited to two years, and according to HUD's most recent publicly available data, 41.7% of households remain in Permanent Supportive Housing for less than three years. Under the Housing First mandate, grantees were pushed to provide Permanent Supportive Housing to individuals and families who may not require indefinite government subsidized housing: more than 86% of individuals living in PSH are under age 65, and a significant 17.4% of individuals are children under age 18. *Id*.

When HUD pivoted to permanent housing in 2013, many Transitional Housing providers retooled their programs into Permanent Supportive Housing or Rapid Rehousing programs. AR51-52. While the main difference between Permanent Supportive Housing and Transitional Housing is time, Rapid Rehousing is limited to rental assistance and is focused on quickly signing a lease for a homeless individual. AR52. Indeed, the present-day homelessness assistance framework has incentivized the speed at which individuals receive subsidized housing rather than the quality of services individuals receive in order to reach self-sufficiency and independent living. AR5034. In contrast, Transitional Housing is known for being tied to a more robust provision of supportive services. AR52.

The amount of services provided in Transitional Housing (and its associated costs) was a primary driver of HUD's shift toward Permanent Supportive Housing. AR52. A 2010 HUD survey noted that Transitional Housing "is the most expensive model" compared to Permanent Supportive Housing because it "frequently offer[s] more privacy and a comprehensive range of on-site services." AR52-53. In preparing the 2026 NOFO, HUD found these comprehensive on-site services lacking in the current system and seeks to encourage and invest in these services during the competition. AR53. While the initial investment in Transitional Housing may be high, HUD found that the net results of self-sufficiency over indefinite assistance will lower lifetime costs. *Id*.

HUD acknowledges that studies on Transitional Housing are scarce because of the pivot away from Transitional Housing. *Id*. But what studies there are support investing in Transitional Housing: across the general population there was no difference in clinical or community outcomes, but youth had higher employment and stable housing outcomes. *Id*. What's more,

homelessness decreased 8.8% when Transitional Housing was available, whereas homelessness increased 27% when HUD focused on Permanent Supportive Housing. AR54.

HUD data indicates that Rapid Rehousing has the highest rates of increase in earned income. AR53. But HUD attributes this to the different populations: Permanent Supportive Housing is limited to individuals with disabilities, including impairments connected to substance abuse disorder and mental illness. AR54. Rapid Rehousing, then, likely provides for the easiest-to-serve populations. AR54.

Beyond Transitional Housing, the NOFO also expands opportunities for SSO projects. AR51. This includes childcare, workforce development, legal services, behavioral healthcare, street outreach, mobile healthcare clinics, and employment training—a wide array of critical services and care that stakeholders routinely advise is much-needed. *Id*.

HUD carefully considered the impacts of the transition on current providers. AR54-58. HUD recognizes that Permanent Supportive Housing providers rely on a near-guarantee of future funding. AR54. HUD has held forums informing stakeholders of the upcoming changes, discussed changes with CoC recipients, and issued public statements on the changes. *Id*. HUD has also provided guidance that provides a path for both current providers and current participants to maintain funding and assistance under the structure of the NOFO. *Id*. Indeed, the 2026 NOFO provides "transition grant" opportunities for Permanent Housing Providers to shift to Transitional Housing or SSO. AR55.

HUD also considered that state and local governments may have to reallocate local resources to maintain consistent levels of funding. AR56. HUD recognized that state governments are accustomed to and capable of shifting resources. *Id.* In fact, they did so when HUD shifted away from Transitional Housing in 2013.

HUD also considered that some providers may not be selected in their CoC competition, or may not be selected for grants. AR57. HUD recognized that some of these providers may have to end operations or limit services. *Id.* But for every project not selected or awarded, another project will be. *Id.* HUD determined that the benefit of awarding more meritorious projects outweighs the harm of less meritorious projects not receiving renewal. *Id.*

HUD also recognized that many providers operate on multi-year timelines. *Id*. But this competition has nearly always been an annual competition, HUD has communicated the changing policy in advance, and HUD encourages leveraging other funding sources. *Id*.

HUD also considered that Permanent Supportive Housing providers have existing networks. *Id*. But the new awardees can create new networks and, as they are new providers, will be including current and new members of the community within the networks. *Id*.

Finally, HUD considered that a CoC prioritizing SSO projects may therefore provide fewer beds. *Id*. HUD determined that the increased investment in Transitional Housing and SSO together will alleviate any potentially resulting harm from a reduced number of beds. AR57-58. HUD reasoned that, although the number of beds available at any given time might decrease, the overall throughput would increase as homeless individuals transition to self-sufficiency. *Id.* Moreover, the provision of additional services would do more to address the root causes of homelessness. Thus, HUD determined that, on balance, the changes made would improve the achievement of statutory goals.

3. <u>Optimizing Self-Sufficiency through Supportive Services and Treatment</u>

One of the primary purposes of the CoC program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. AR5036. Through the set-aside for new Transitional Housing and SSO

projects, and the merit review scoring criteria, the NOFO offers CoCs opportunities to prioritize and invest in projects that advance economic independence for those who are able to attain it.

For many, recovery from substance abuse disorder is a pathway to self-sufficiency. But the Housing First mandate failed to address this reality. HUD data and studies show that, within Permanent Supportive Housing, 41% of adult-only households self-report a substance use disorder. AR58. And a significant number of homeless individuals served by Permanent Supportive Housing die of overdose. AR58-60. While some CoC grantees provide "safe consumption sites" for the use of deadly illegal drugs and distribute drug paraphernalia, the data shows that these interventions have no impact on overdose death rates. AR60.

According to a nationwide study, 75% of a survey sample of 64,000 unsheltered homeless individuals reported a substance use disorder, and 78% reported a mental health condition. AR5036. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population. *Id*. Another study found that two-thirds of homeless individuals self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. *Id*. Of those, 29% reported wanting treatment but being unable to receive it. *Id*.

The 2026 NOFO encourages CoCs to address substance use disorders to address recovery, not fatal drug use within CoC housing, by partnering with a wide range of treatment providers. AR61; AR5036. HUD considered arguments that treatment must be voluntary to be effective. AR61. But the 2026 NOFO does not mandate that CoCs require treatment. Rather, it advances treatment and recovery by encouraging CoCs to coordinate with behavioral healthcare providers, provide access to detox beds, invest in on-site treatment provision, create recovery

housing, and dedicate units to the purpose of treatment and recovery. AR61. The 2026 NOFO also gives bonus points to projects that do not permit the use of illicit drugs. AR61-62.

HUD considered but rejected arguments that Permanent Supportive Housing without such conditions is more cost-efficient and more effective in improving health outcomes. AR62. HUD finds those arguments unsupported: studies show that the current Permanent Supportive Housing regime without conditions did not improve health outcomes, did not save health care costs, and was not cost effective. *Id*. Indeed, spending on CoC has more than doubled since 2013, yet overdose deaths in Permanent Supportive Housing units are prevalent. *Id*.

HUD also found the current CoC program has not optimized self-sufficiency. AR5037. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. AR62; AR5037. As of 2023, nationwide, 76.1% of Permanent Supportive Housing residents were under age 65 and 17.4% under age 18. AR62; AR5037. Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. AR62; AR5037. Of that percentage, only 12.9%, or 1.7% of total participating households, exited to unsubsidized housing. AR62; AR5037. Nearly twice as many exits were due to death. AR62; AR5037.

HUD therefore designed the 2026 NOFO to emphasize recovery and self-sufficiency. AR62; AR5036-37. The 2026 NOFO awards points to CoCs that demonstrate significant investment in supportive services and participation requirements. AR62; AR5037. And notably, current Rapid Rehousing projects already implement a requirement that residents meet with a case manager at least monthly. 24 C.F.R. § 578.37(a)(1)(ii)(F). Under the NOFO, this existing regulatory requirement sufficiently meets the criteria for participation requirements. AR63.

The 2026 NOFO requirements for supportive services for new Transitional Housing projects are supported by evidence from numerous stakeholders and research evaluating the level of services provided at programs with positive outcomes optimizing self-sufficiency within 24 months. *Id*. For example, the HUD-VASH program ties housing assistance to participation in case management and supportive services, and veteran homelessness has seen significant decline year over year for the last two decades. *Id*.

HUD considered promoting investment in supportive services without encouragement requiring participation in those services. *Id*. HUD found that well-designed participation requirements empower individual choice and are critical to achieving personal goals. *Id*. The evidence for this finding is the HUD-VASH program: HUD-VASH is one of the few programs that have decreased homelessness and it requires veterans who receive housing vouchers to engage with services offered through the program. *Id*. In addition, other Federal social service programs successfully utilize participation requirements. AR5037. For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. AR5037. Unemployment insurance benefits require program participation, including demonstrated participation in job searches. *Id*. And Temporary Assistance for Needy Families requires beneficiaries to work or advance their education. *Id*.

HUD considered that some CoC's may find it difficult to implement the increased supportive service investment due to resource restrictions. AR64. The 2026 NOFO addresses that concern by assigning points not only for CoC investment in supportive services but also for non-CoC investment, so that CoCs can target their funds based on local resources and priorities. *Id.*

HUD also considered that some states have Housing First mandates that create competing obligations for CoC recipients. *Id*. HUD cannot, however, accommodate local conditions in a

nationwide funding competition. *Id.* It is up to the CoCs to determine the best homelessness solutions within their geographic contexts, which include state and local law.

4. Safety and the Impact of Homelessness

A statutory goal of the McKinney-Vento Act is to minimize the trauma of homelessness on individuals, families, and communities. 42 U.S.C. § 11381(2). Accordingly, the 2026 NOFO encourages CoCs to prevent and minimize the trauma of living on the streets or in encampments and related public use of illicit drugs. AR65. The 2026 NOFO provides points for unsheltered homelessness outcomes, as unsheltered homelessness entails living in dangerous environments and exposing the community to danger. AR5034; AR65. The 2026 NOFO provides communities with opportunities to invest in treatment services and recovery housing, and ensures that recipients do not distribute drug paraphernalia or knowingly permit the use and distribution of illicit drugs on their properties. AR5036.

HUD has found that unsheltered homelessness and exposure to substance abuse in childhood are associated with increased occurrences of homelessness in adulthood. AR65. Further, gun crimes tied to homeless encampments have increased, a disproportionate amount of arrests are from homeless encampments, drug overdoses are the most common cause of death among homeless individuals, and up to half of unsheltered homeless individuals are registered sex offenders. AR66; AR5037. HUD recognizes that not all unsheltered homeless individuals are engaged in criminal activity, criminal activity associated with encampments and public illicit drug use just exacerbates the trauma to the homeless population. AR66; AR5037. Indeed, homeless individuals are victims of crime at a higher rate than the general population. *Id.*

HUD found that the public camping is correlated with higher rates of unsheltered homelessness in the area. AR68-69. Bans and restrictions on public camping decreased unsheltered homelessness significantly. *Id.*; AR5038.

HUD further found that encampments are correlated with illicit drug markets, and these markets harm the community and addicted individuals. AR66-67. HUD considered arguments that permissive policies decrease overdoses, but it found that the data underlying these claims does not support them. AR66-68.

HUD further found that there is a high rate of fatal overdoses in Permanent Supportive Housing units. AR69; AR5036. For this reason, the 2026 NOFO prohibits CoC recipients from knowingly permitting the use or distribution of illicit drugs on property under their control, distribute drug paraphernalia, or otherwise assisting individuals in consuming illicit drugs. AR69; AR5036. While this supports HUD's policy of reducing trauma to homeless individuals and improving outcomes, it also separately prevents violation of Federal criminal law. AR69.

HUD adopted this prohibition in the 2026 NOFO even though current CoC recipients providing safe consumption sites might face a challenge from the shift to compliance with Federal criminal drug law. AR70. But the Government generally, and HUD specifically, have informed CoC grantees multiple times of this policy shift, so they have minimal reliance interests. *Id*.

HUD is also emphasizing partnership with first responders, including law enforcement, in addressing homelessness. AR65-66; AR5037. These first responders meet individuals where they are in the midst of a mental health or addiction crisis. AR69. By providing emergency services, first responders often witness and respond to the impacts of encampments and public drug use in a way that service providers do not. *Id.* While research is in its infancy, early adoption of first-

responder and service provider co-response approaches in cities like Seattle have had positive results. *Id.*

HUD considered arguments that law enforcement involvement "criminalizes" homelessness. AR67-68. To the contrary, HUD found that law enforcement involvement and banning encampments led to more beds filled because law enforcement helped match more people to housing opportunities, and first-time offenses were not met with jail time. AR68.

## IV. The Terms of the 2026 NOFO

The NOFO makes approximately $4,040,000,000 available to award. AR5011. The use of funds offered by the NOFO is subject to statutory constraints. *Id.*

Funds will be awarded via the selection process contained in the NOFO. AR5011. Threshold review is the first step. AR5063. This review checks whether the application is timely and complete, and whether the applicant is eligible for funding. AR5063-64. The threshold criteria are:

1. The applicant must meet eligibility requirements as described by statute and regulation
2. The applicant must have the financial and management capacity to carry out the project.
3. The population served must meet eligibility requirements set by statute and regulation.
4. The applicant must use the HMIS system.
5. The applicant must submit the required certifications described in the NOFO
6. The applicant must certify that they will not discriminate based on race, and must certify they will not will not operate drug injection sites or "safe consumption sites" in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or

knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863.

AR5065. HUD will presume that renewals satisfy items 1-4. AR5064. New projects must undergo additional review at the threshold stage to ensure that they advance program effectiveness and efficiency. AR5067-74.

After passing threshold review, projects undergo merit review. AR5074. The merit review process assigns points for various metrics that measure decreases in homelessness, for good stewardship and management, and for advancing the NOFO's goals. AR5074-77. Finally, HUD applies a Risk Review, which evaluates the applicant's past performance, organizational health, and outcomes of past projects. AR5092. HUD may use the Risk Review as an independent and sufficient basis to make adverse funding decisions. *Id*.

Under this review process, all Tier 1 projects that pass eligibility and Risk Review will be awarded funding. AR5093. Tier 1 projects are determined using the list provided by the CoC. AR5095. The CoC provides a ranked priority listing of pre-selected eligible projects. *Id.* From these listings, HUD selects projects in order of the CoC ranking until the funding amounts reach 60 percent of the CoC's Annual Renewal Demand. *Id*. All projects that are not Tier 1 projects are Tier 2 projects.

After Tier 1 projects are funded, projects are selected to provide at least $430,000,000 for Permanent Housing projects for families with children, including those funded in Tier 1. AR5094. Once these are funded, HUD will select new projects with a priority for Transitional Housing and SSO from Tier 2 that meet project eligibility thresholds in the order of project score until $1,300,000,000 of new projects, including Tier 1 projects, has been selected. *Id*. Once that set-aside is used, other Tier 2 projects are selected based on point order. *Id*.

The NOFO provides an opportunity for any applicant denied or provided reduced funding to appeal. AR121-26.[6]

## V. Instant Lawsuit

The NAEH Plaintiffs[7] filed their lawsuit on July 2, 2026, with 12 claims:

1) That certain NOFO provisions are in excess of statutory authority (Count 1); contrary to law (Count 2); arbitrary and capricious (Count 3); and not in observance of procedure required by law (Count 4).
2) That HUD unlawfully withheld information from CoC applicants (Count 5) and unreasonably delayed issuing FY2025 awards (Count 12).
3) That OMB acted contrary to law (Count 6) and arbitrarily and capriciously (Count 7) in requiring HUD to issue awards pursuant to Executive Orders.
4) That certain NOFO provisions and requirements to issue awards pursuant to Executive Orders are unconstitutional (Count 8), violate the separation of powers (Count 9), violate the Spending Clause (Count 10), and violate the First Amendment (Count 11).

[6] On July 24th, HUD also amended its NOFO for reasons unrelated to this litigation and in direct response to separate litigation over the suspension of the Los Angeles Homeless Services Authority and its related CoC from HUD's 2026 NOFO competition. *Los Angeles Homeless Services Authority v. Trump*, No. 2:26-cv-07056 (C.D. Cal.). As HUD explained on its website (https://www.hud.gov/hud-partners/community-coc) and in emails to eligible applicants, the amendment made changes to allow a direct-to-HUD application process for eligible applicants in geographic areas where HUD has determined that a CoC does not meet the requirements of the program in accordance with 24 C.F.R. § 578.13 and 42 U.S.C. § 11360a(c). No changes were made to any of the criteria relevant to this litigation.

[7] These are the plaintiffs in *National Alliance to End Homelessness v. U.S. Department of Housing & Urban Development*, No. 1:26-cv-436 (D.R.I.).

*See Nat'l All. to End Homelessness, et al., v. HUD, et al.,* 1:26-cv-00436 (D.R.I) ("NAEH Litigation"), ECF 1. The State Plaintiffs[8] filed their complaint on July 7, 2026, with three claims:

1) That HUD acted in excess of authority and contrary to law (Count 1) and arbitrarily and capriciously (Count 3) in making the set-aside and awarding points for service requirements in the 2026 NOFO.
2) That HUD did not observe proper procedure by incentivizing service requirements and making the set-aside without notice and comment (Count 2).

*See Washington, et al., v. HUD, et al.*, 1:26-cv-00439 (D.R.I.) ("States Litigation"), ECF 1.

On July 17, both sets of Plaintiffs moved for summary judgment. States Litigation, ECF 36; NAEH Litigation, ECF 30. This Court granted partial summary judgment to Plaintiffs on their claims relating to whether HUD had to go through notice and comment rulemaking to incentivize transitional housing. On September 14, the First Circuit entered a stay of this Court's vacatur, finding that Defendants had "made a strong showing that it is likely to succeed on the merits of its challenge to the district court's holding that the set-aside in the NOFO was subject to notice and comment requirements pursuant to 42 U.S.C. § 11386b(d)." *See, e.g.*, NAEH Litigation, ECF 34. *Washington, et al. v. HUD, et al.*, 26-1922 (1st Cir. 2026), September 16, 2026 Slip Op. The First Circuit also "conclude[d] that HUD is likely to succeed on the argument that the set-aside is not a "bonus or other incentive[]" as that term is used in § 11386b(d)." *Id.* On September 21, Plaintiffs requested the First Circuit vacate this Court's order and remand so that

---

[8] These are the plaintiffs in *State of Washington v. U.S. Department of Housing & Urban Development*, No. 1:26-cv-439 (D.R.I.).

they could withdraw their claims as to notice-and-comment. The First Circuit granted Plaintiff's request on September 24.

On September 30, the NAEH Plaintiffs moved for summary judgment on Counts 1–3, 6–8, and 11. NAEH Litigation, ECF 44 at 2. NAEH Plaintiffs withdrew and dismissed without prejudice Counts 4, 5, 9, and 10. *Id.* Plaintiff States renewed their motion for summary judgment on September 30, 2026, on Count 1 and 3. States Litigation, ECF 51 ("States Br. II").

**LEGAL STANDARDS**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, courts must construe the evidence in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *See Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).[9]

For Administrative Procedure Act (APA) claims, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 190 (D. Mass. 2018) (quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013)). The "traditional Rule 56 standard does not apply" to APA claims "due to the limited role of a court in reviewing the administrative record." *Id.* at 189; *see also Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015) (explaining that summary-judgment review of administrative-law claims is narrower than traditional summary-judgment review). Under the APA, an agency action

[9] Per the parties' joint motions to amend the expedited briefing schedule, the parties have agreed that no statement of undisputed facts is required and proceed without such a statement pursuant to the Court's orders granting those motions.

may not be set aside unless it is "arbitrary, capricious," or "not in accordance with law[.]" 5 U.S.C. § 706(2)(A). And a court may only compel "agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

APA review of final agency action is highly deferential, and the agency's actions are presumed to be valid. *See River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). "[A] court is not to substitute its judgment for that of the agency," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), but instead must only consider whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment[,]" *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Thus, a reviewing court's only role in assessing APA claims is to "determine whether the agency's decision is supported by a rational basis[.]" *River St. Donuts*, 558 F.3d at 114. If so, the court "must affirm." *Id.*

The APA provides that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of . . . review proceedings" where "required and to the extent necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. "The same standard governs" the issuance of a § 705 stay and a preliminary injunction. *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025). Both are "extraordinary and drastic remed[ies] that [are] never awarded as of right." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). And such relief is warranted only if a movant establishes that "(1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'[;] (3) 'the balance of equities tips in [its] favor' and (4) 'an injunction is in the public interest[,]'" *New Jersey v.*

*Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), with the first factor being "the most important," *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## ARGUMENT

### I. The Court Should Grant Summary Judgment to Defendants

Plaintiffs fail to carry their burden for a stay, an injunction, or summary judgment.

#### A. The Secretary Acted Within His Statutory Authority in Issuing the FY 2026 NOFO (NAEH Plaintiffs Counts 1 and 2, State Plaintiffs Count 1)

Congress delegated authority to the HUD Secretary to "award funds to recipients through a national competition between geographic areas *based on criteria established by the Secretary*." 42 U.S.C. § 11386a(a) (emphasis added). And Congress further expressly authorized the HUD Secretary to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part"—*i.e.*, Part C of Title 42, Chapter 119, Subchapter IV of the U.S. Code, *see id.* §§ 11381–11389 ("Continuum of Care Program")—"in an effective and efficient manner." *Id.* § 11386a(b)(1)(G). Thus, HUD is not limited only to explicit congressionally imposed criteria; rather, Congress delegated to HUD the authority to impose additional criteria in its discretion.

The Secretary is not taking actions "outside the bounds of [his] statutory authority," *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). In fact, he is acting *squarely within* an express delegation of power conferred on him by Congress, *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (clarifying that agencies must point to "clear congressional authorization" to exercise "regulatory authority"). And that power—which enables the Secretary to establish criteria if he "determines" they make carrying out the CoC program "effective and efficient," 42

U.S.C. § 11386a(b)(1)(G)—is a broad, discretionary grant of authority. *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that a statute permitting an agency head to take an action whenever he "shall *deem* such termination necessary or advisable in the interests of the United States" was wholly discretionary because it "fairly exude[d] deference" to the agency head). The NOFO's selection criteria are core aspects of effectively carrying out the CoC program and ensuring efficient use of its funds, and are thus expressly authorized by statute.

1. The "Set-Aside"/"De Facto Cap"[10] is not contrary to law or in excess of statutory authority. (NAEH and States)

The Secretary acted within his statutory authority when he created the set-aside for Transitional Housing and SSO projects. Congress delegated authority to the HUD Secretary to "award funds to recipients through a national competition between geographic areas *based on criteria established by the Secretary*." 42 U.S.C. § 11386a(a) (emphasis added). The Secretary, then, can prioritize certain projects over others, and set aside $1.3 billion for those prioritized projects. AR5040-41; AR5094. Indeed, Congress in the 2026 Appropriations Act instructed the Secretary to select projects "totaling not less than 60 percent of the annual renewal demand[11] for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." *Id.* The set-aside falls within the portion of funding that Congress did *not* require HUD to award based on local CoC rankings (and other applicable selection criteria).

[10] NAEH and States Plaintiffs collectively challenge numerous provisions in the 2026 NOFO. For the convenience of the Court, Defendants adopt the shorthand reference of Plaintiffs but do not concede the accuracy of the terms.

[11] The Annual Renewal Demand is the total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition. NOFO 124.

The States point out that Congress separately set aside approximately $52 million for projects addressing domestic violence and youth homelessness, Pl. States' Mot. for Summ. J., or, In the Alternative, Mot. for Prelim. Inj. 21-22, ECF No. 34 ("States Br."),[12] but that tiny earmark cannot plausibly be construed to eliminate HUD's statutory discretion over the balance of the appropriation, *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not . . . hide elephants in mouseholes."). Indeed, Congress's reservation of funds for a particular purpose does not withdraw HUD's separate authority under § 11386a to establish selection priorities among other eligible projects. In the absence of explicit statutory text to the contrary, the Secretary's delegated authority to set additional criteria for awards logically must include the decision to prioritize Transitional Housing and SSO projects.

Further, the statute specifies that national competition criteria "shall include . . . such other factors as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G). As explained by HUD, the set-aside is effective because it expands the scope of applicants and projects, increasing competition and creating potential to find better and higher methods of solving homelessness. AR49; AR5035. Similarly, it is efficient because the competition will remove uncompetitive projects and ensure that only the best performers will receive funds. *Id.*

Plaintiffs argue that the Secretary acted in excess of statutory authority when he created the set-aside for new projects with a priority for Transitional Housing projects and SSO projects because no statute authorizes HUD to set aside funds for new projects. Pls.' Mem. In Supp. of Mot. for Partial Summ. J. and/or Prelim. Relief 15-16, ECF No. 44-2 ("NAEH Br."); States Br.

[12] Plaintiff States, in their renewed motion for summary judgment, expressly incorporated their prior briefing on the merits. *See* States Br. II. Accordingly, Defendants will address the prior briefing.

21-22. Plaintiffs ignore the broad grant of authority that the Secretary may award funds "based on criteria established by the Secretary." 42 U.S.C. § 11386a(a).[13] The Secretary merely made Transitional Housing projects and SSO projects a criterion for selection. This congressional grant of discretion makes sense in context. For example, one goal of the CoC program is to "provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families." *Id.* § 11381(2). If the Secretary had found that individuals were not being quickly rehoused, it would make sense for him to have the discretion to prioritize projects that quickly rehouse individuals. Here, the Secretary found that projects were not "optimiz[ing] self-sufficiency among individuals and families experiencing homelessness." *Id.* § 11381(4). Accordingly, to achieve that goal, he prioritized Transitional Housing and SSO projects. This is consistent with other CoC statutes, which make clear that Transitional Housing is a particular priority of the CoC program. *See id.* § 11386b(c) (noting that nothing in HUD's homelessness-assistance statutes "may be construed to establish a limit on the amount of funding that an applicant may request for acquisition, construction, or rehabilitation activities for the development of permanent housing or transition housing").

Plaintiffs argue that the Set-Aside is outside HUD's statutory authority in three ways, but none has merit. First, Plaintiffs argue that the set-aside "effectively overrides the remainder of § 11386a(b), in which Congress itself imposed a lengthy list of criteria." NAEH Br. at 15-16.

[13] The States' argument that "the Secretary's discretion to implement 'other terms and conditions as [he] may establish to carry out this part in an effective and efficient manner,' is plainly limited to the same type of prosaic administrative conditions explicitly detailed in the statute," States Br. 25 (citing § 11386(b)(8))—is misleading and, at best, a transparent straw man. The separate provision they cite—§ 11386(b)(8)—addresses only agreements that a collaborative applicant must make as a condition of receiving assistance. Plaintiffs cannot erase the Secretary's broad authority under § 11386a to establish selection criteria that he "determines to be appropriate to carry out this part in an effective and efficient manner."

Plaintiffs are wrong because each Transitional Housing or SSO project funded under the set-aside will be evaluated under the statutory criteria. *See* AR5063-5070. Following the exhaustion of the set-aside funds, all other projects will be evaluated under the statutory criteria and funded accordingly, whether Permanent Supportive Housing, Transitional Housing, Rapid Rehousing, or SSO projects. AR5094. Thus, HUD fully effectuates the statutory criteria. Plaintiffs' complaint that funding Transitional Housing Projects and SSO projects first renders § 11386a(b) "dead letter" is merely a restatement of their argument that the Secretary cannot include Transitional Housing or SSO Projects as criteria for selection. But as already shown, *supra* pp. 30-31, this is well within HUD's statutory authority.

Second, Plaintiffs argue that the set-aside exceeds HUD's statutory authority because it "undermines Congress's efforts to protect stability for the program and the people it serves by prioritizing renewals of existing projects." NAEH Br. 16. As an initial matter, this argument is misplaced. Congress dictated funding amounts for specific services and housing types in § 11386b, not § 11386a. But Plaintiffs' argument fails even when read in the context of § 11386a. Plaintiffs rely on 42 U.S.C. § 11386a(b)(2)(B)(i) and (iii), which direct the Secretary to adjust the estimated need amount for geographic area sufficient to fund 1 year of renewal "for all expiring contracts entered into under this part for the geographic area," if necessary. But this instruction falls within subsection (b)(2), in which the Secretary expressly "may" adjust to allow for "new projects." 42 U.S.C. § 11386a(c) ("The Secretary may adjust the formula described in subsection (b)(2) as necessary—to ensure that collaborative applicants are not discouraged from replacing renewal projects with new projects. . ."). This estimated grant amount for each geographic area uses annual renewal demand as a floor for the maximum total award. It does not dictate that awards go to renewals or even that a geographic area receive that amount.

Plaintiffs also rely on the 2026 Appropriations Act as allegedly restricting the Secretary's ability to use funds for new projects. NAEH Br. 16. But the 2026 Appropriations Act granted HUD discretion to disburse up to 40% of a CoC's maximum award according to the requirements in the McKinney-Vento and HEARTH Acts. The only restriction on the use of funds for new projects is that the Secretary must determine that "the continuum of care has demonstrated that projects are evaluated and ranked based on the degree to which they improve the continuum of care's system performance." 140 Stat. 401. The 2026 NOFO sets out how the Secretary will determine whether each proposed new Transitional Project or SSO Project will improve the system's performance. *See* AR5063-5070.

Plaintiffs then incorporate their later argument that HUD acted contrary to law in creating the set-aside because it may only consider two factors when deciding whether to renew existing permanent housing, citing 42 U.S.C. § 11386c(b), and thus may not rely on other consideration to decide not to fund renewals. NAEH Br. 16. But Plaintiffs ignore that 42 U.S.C. § 11386c(b) is preceded by 42 U.S.C. § 11386c(a), which states that renewals "may be funded." 42 U.S.C. § 11386c(a). As explained in more detail, *infra* pp. 36-37, the most natural reading of § 11386c(b) is that it merely prescribes some renewal terms under limited circumstances.

Third, Plaintiffs argue that the set-aside "flouts Congress's judgment, reflected over and over in the statute, that Permanent Housing is effective and should be prioritized." NAEH Br. 16-17. But Plaintiffs overlook that HUD must balance multiple statutory goals, such as "promot[ing] community-wide commitment to the goal of ending homelessness" and "optimiz[ing] self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11361. As Congress has recognized, "there is no single, simple solution to the problem of homelessness

because of the different subpopulations of the homeless, the different causes of and reasons for homelessness, and the different needs of homeless individuals." *Id.* § 11301(a)(4).

More directly, Plaintiffs may not make this argument because the First Circuit already considered and rejected it. *Washington, et al. v. HUD, et al.*, 26-1922 (1st Cir. 2026), September 14, 2026 Slip Op.

Next, Plaintiffs argue that HUD has violated the purpose of the HEARTH Act, NAEH Br. 17, but they fail to provide any authority that the general purposes of a law impose statutory restrictions on an agency with respect to an excess-of-statutory-authority claim.

The set-aside at issue in this case does not conflict with the terms of the set-aside described in 42 U.S.C. § 11386b(a). *See* NAEH Br. 16-17. That provision requires HUD to dedicate Continuum of Care funds totaling at least 30% of the combined amount of Continuum of Care and Emergency Solutions Grants funds to permanent housing for individuals with disabilities or their families, unless doing so would not leave enough funds to renew all existing grants that would otherwise be funded. 42 U.S.C. § 11386b(a). In any event, this grievance is with the HUD's approach to renewals and its invocation of the suspension clause, which is only indirectly related to the set-aside at issue here.

Similarly, Plaintiffs' reliance on the mandate to set aside 10% of funds for Permanent Supportive Housing for families with children, NAEH Br. 17, is unavailing because HUD in fact has done so here. AR5094.

Plaintiffs similarly argue that Congress, in 42 U.S.C. § 11386b(d), "mandated that HUD provide incentives" for certain activities. NAEH Br. 17. But such incentives in one context do not preclude HUD's ability to make a set-aside for other forms of housing. Nor do so-called "special protections" for renewals of Permanent Housing say anything about creating a set-aside

for other forms of housing. NAEH Br. at 17. Moreover, Plaintiffs' argument here apparently merely restates their claims about process for adopting incentives that they represented they have withdrawn. ECF No. 44 at 2.

In sum, although Plaintiffs assert that Permanent Supportive Housing is being defunded, NAEH Br. at 17, HUD is not eliminating Permanent Housing projects but rather maintaining a significant focus on Permanent Housing as one part, not the whole, of the Continuum of Care program. AR47.

For the same reasons that HUD's challenged action did not exceed its authority, HUD did not act contrary to law. Plaintiffs argue that the set-aside conflicts with the statute in three separate ways. NAEH Br. 17-18; States Br. 23. All three fail.

First, they argue that 42 U.S.C. § 11386c(b) requires that funds "*shall* be available for the renewal of contracts in the case of tenant-based assistance, *successive* 1-year terms." States Br. 23 (alteration in original) (quoting and modifying 42 U.S.C. § 11386c(b)). Plaintiffs ignore that 42 U.S.C. § 11386c(b) references "sums made available under subsection (a)" for renewal. 42 U.S.C. § 11386c(b). Subsection(a) is clear that renewal of contracts "may be funded." 42 U.S.C. § 11386c(a). The use of the term "may" grants the Secretary discretion to identify what funds are used for renewal. This discretion is reinforced by 42 U.S.C. § 11386c(c), which bars any construction of 42 U.S.C. § 11386c that would "prohibit[] the Secretary from renewing contracts under this part in accordance with criteria set forth in a provision of this part other than this section." 42 U.S.C. § 11386c(c). Plaintiffs attempt to read this narrow statute to do more than it actually does. When interpreted within its context, § 11386c(b) merely prescribes some renewal terms under limited circumstances.

Where Congress meant to limit the Secretary's discretion, it has done so explicitly, as in the 2026 Appropriations Act, which directs the Secretary to use at least 60% of the funds for non-competitive awards. 140 Stat. at 399. And he has acted consistent with that direction. AR5041 ("Consistent with the 2026 Appropriations Act, Tier 1 is set at 60 percent of the CoC's Annual Renewal Demand (ARD)."). HUD has made this amount available for renewals plus the remainder of Tier 2 after taking out the new project set-aside, totaling about 70% of funds. If this 60% allocation is not sufficient to renew all projects, then the Secretary "may" fund, at his discretion, renewals for additional projects. 42 U.S.C. § 11386c(a). And if he does not, then there are not funds available for those remaining renewals. 42 U.S.C. § 11386c(b).

NAEH Plaintiffs now allege that § 11386c(c) does not grant the Secretary discretion to reject renewals if they meet the statutory factors. NAEH Br. at 17-18. Plaintiffs point to § 11386c(b), *id.*, which directs the Secretary to consider renewal based on the "program requirements" and whether there is a "demonstrated need." 42 U.S.C. § 11386c(b). As an initial matter, § 11386c(b) does not speak to the Secretary's discretion of whether renewals should be made generally: renewal of contracts "may be funded." *Id.* § 11386c(a). The use of the term "may" grants the Secretary discretion to identify what funds are used for renewal. But even under Plaintiffs' reading, § 11386c(b) would grant the Secretary the discretion for the set-aside. HUD determined that there was not a "demonstrated need" for the renewal of every project, and that the CoC program required new Transitional Housing and SSO projects. AR43, AR47. Focusing solely on renewals would not satisfy programmatic requirements: the CoC program is a competition, after all. *Id.*; *see also infra,* pp. 39-40.

Second, Plaintiffs argue that the set-aside conflicts with a "mandate" that HUD "determine whether to renew" permanent housing projects "on the basis of" the CoC's

certification as to two things: that "there is a demonstrated need" and that "the project complies with program requirements and appropriate standards of housing quality and habitability." NAEH Br. 17-18; *see* States Br. 23 (quoting 42 U.S.C. § 11386c(b)). For the same reason, this argument fails. The Secretary "may" fund renewals. And to the extent that the Secretary has funded renewals, renewals are limited to the "sums made available." The Secretary has exercised his discretion to fund beyond the congressionally directed 60%, and that is the sum made available.

These specific allocation limitations only highlight that, when Congress intends to impose a particular allocation breakdown on HUD, it knows how to do so. Pursuant to the statutory canon of *expressio unius est exclusio alterius*, Congress's silence on the total amount HUD must spend Tier 1 projects—aside from its 60% ARD minimum—illustrates that it did not intend to impose any such limitation. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (applying the *expressio unius* canon to conclude that Congress's express inclusion of some statutory limitations implies that it did not intend to impose other limitations); *see also Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions'").

Indeed, HUD's flexibility under this program gave rise to Plaintiffs' funds for Permanent Housing in the first place: HUD previously *chose* to shift the vast majority of its CoC funds to Permanent Housing and Tier 1 projects. It was lawful under the McKinney-Vento Act to make that earlier choice, and HUD's choice now is similarly lawful. The only change has been for HUD to use its discretion to prioritize Transitional Housing more than it had previously. But HUD's historical choices do not convert into congressional mandates with the passage of time.

And, as the Court explained in *Lincoln*, without a congressional-allocation mandate, courts are not the proper arbiters for evaluating the wisdom of such policy choices. *See* 508 U.S. at 192. If HUD previously had the discretion to allocate 87% of its CoC funding on Permanent Housing Tier 1 renewals—which Plaintiffs, of course, do not dispute—it now has the discretion to prioritize Transitional Housing, as long as it complies with the specific applicable statutory requirements. And that it does.

In short—far from mandating renewals at the recipients' discretion—Congress gave the Secretary the discretion to authorize renewals "in accordance with criteria," 42 U.S.C. § 11386c(c), which are, in turn, "established by the Secretary" himself, *id.* § 11386a(a). Plaintiffs' myopic reading of subsection (b) (which merely reserves some funds for renewals) does not defeat the remainder of subsection (b) or subsection (c)'s specific commitment of renewal discretion to the Secretary. This is especially true given the fact that subsection (c), which makes clear that the Secretary's ability to set renewal criteria is not limited by § 11386c, is a rule of construction that explicitly thumbs the scale in favor of the Secretary's discretion to renew contracts (and against any interpretation of subsection (b) to the contrary). *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (following Congress's "mandated . . . constru[ction] in favor of a broad protection of religious exercise").

Notably, Plaintiffs' unduly restrictive interpretation of subsection (b) is also inconsistent with the nature of CoC awards as *competitive* grants. Section 11382(a) provides that "[t]he Secretary shall award grants[] on a competitive basis." 42 U.S.C. § 11382(a). Similarly, § 11386a(a) provides that "[t]he Secretary shall award funds to recipients through a national competition." *Id.* § 11386a(a). Moreover, any new grant recipients from this funding cycle presumably would become entitled to the same renewal. The Court therefore should reject

Plaintiffs' argument that § 11386a mandates renewals, as this reading contradicts Congress' plain mandate that CoC awards be granted on a competitive basis. 42 U.S.C. § 11382(a) *See Lawson v. FMR LLC*, 571 U.S. 429, 435–37 (2014) (interpreting the relevant provision in a manner consistent with assumptions embedded in other provisions of same statute). To be sure, HUD has historically spent a majority of its CoC funds on renewals. But HUD's historical exercise of discretion does not ossify into a legal requirement. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency can change a long-standing policy if it shows "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.").

2. The Safe Drug Use Condition and Certification is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

The Secretary did not act outside his authority or contrary to law in reminding grantees to comply with Federal criminal laws. AR5065. As set out above, the Secretary has explicit authority to establish criteria for awards, 42 U.S.C. § 11386a(a), and to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." *Id.* § 11386a(b)(1)(G). Compliance with Federal criminal law is merely an exercise of this statutory discretion to establish criteria.

Plaintiffs argue that the Secretary has no authority to impose these restrictions because they apply to grantees generally, not just the funded activities. NAEH Br. 30-31. But existing Federal regulations could be read to require such compliance. For instance, grant recipients may not operate drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. § 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21

U.S.C. § 863. 2 C.F.R. § 200.300(a). The regulation requires the Secretary to ensure that all projects supported by Federal funding are implemented in full accordance with Federal statutes. *Id.* The Secretary therefore acted consistent with existing regulatory provisions in requiring applicants to certify compliance with certain Federal laws bearing on "the tragic realities of substance abuse and fatal overdose among those who are homeless or living in Permanent Supportive housing." AR5036. And importantly, the NOFO limits this criterion to those activities and projects funded with CoC funds. AR5090, AR5113.

Plaintiffs argue that the certification is overbroad, because it is not in fact limited to violations of Federal law. NAEH Br. 31. But Plaintiffs do not meaningfully contest that operating drug injection sites or "safe consumption sites" would violate 21 U.S.C. § 856(a)(1), knowingly permitting the use or distribution of illicit drugs on property under their control would violate 21 U.S.C. § 856(a)(2), or knowingly distributing drug paraphernalia would violate 21 U.S.C. § 863. That the certification tracks the specific elements in criminal statutes makes the Secretary's use of his authority more targeted and within the scope of his authority, rather than less.

Plaintiffs also, mistakenly, suggest that the certification requires grantees to evict participants for second-time violation of a drug policy. NAEH Br. 31. But there is no such requirement. It thus could not be the basis to find the Certification unlawful.

Finally, Plaintiffs argue the criminal federal statutes impose criminal penalties only after a court decides guilt. NAEH Br. 31. This is inapposite. The Secretary is required to ensure that grantees follow Federal law, 2 C.F.R. § 200.300(a). The certification is merely an attestation of compliance with Federal law.

3. The Self-Sufficiency Criteria are not contrary to law or in excess of statutory authority. (NAEH and States)

The Secretary did not act outside his authority or contrary to law in setting self-sufficiency criteria in the 2026 NOFO. One of four congressional purposes underlying the CoC program is to "optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381(4). When interpreting the text, courts "begi[n] with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain.'" *Culbertson v. Berryhill*, 586 U.S. 53, 58-59 (2019) (alteration in original). Accordingly, in defining self-sufficiency to mean the "state or condition of not needing or relying on external assistance, support, or aid," HUD appropriately relied on the plain, ordinary meaning of "self-sufficiency" provided by Oxford English Dictionary and confirmed by Merriam-Webster. AR5011. After starting with the plain meaning of self-sufficiency, HUD proceeded to adopt reasonable criteria to award points for ranking projects in the merit review process based on the applicants' plan to promote self-sufficiency among the homeless population. *See, e.g.*, AR5072-73 (awarding points based on "[t]he type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness."). HUD thus logically developed criteria to achieve a statutory purpose for the program.

Plaintiffs' counterarguments fail to persuade. The States first argue essentially that the Secretary has no authority to impose additional selection criteria beyond those explicitly provided in § 11386a(b)(1). *See* States Br. 25. But this argument fails because the Secretary has plain discretion under the statute to impose additional criteria. *See supra* at I.A.1. Nor do

Plaintiffs identify any inconsistency between the statutory criteria and the Secretary's Self-Sufficiency Criteria. 42 U.S.C. § 11386a(a), (b)(1)(G). Next, Plaintiffs assert that Congress's "overall purpose" in establishing the CoC program was to "promote 'efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families,'" and that HUD's Self-Sufficiency Criteria are contrary achieving this goal. States Br. 26 (quoting 42 U.S.C. § 11381(2)). But the States offer no reason to conclude that Congress meant to require HUD to prioritize "quickly rehous[ing] homeless individuals and families" over the other three enumerated statutory goals. *Id.* (quoting 42 U.S.C. § 11381(2)). Congress instead expressly directed HUD both to promote rapid housing placement *and* to optimize self-sufficiency. 42 U.S.C. § 11381(2), (4). In arguing that the statute nonetheless requires HUD to pursue the former by disregarding the latter, Plaintiffs' fail to give "a harmonious, comprehensive meaning" to the McKinney-Vento Act. States Br. 25 (quoting *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987)).

Finally, Plaintiffs argue that defining "self-sufficiency" as the ability to meet basic needs "without public or private assistance" is unlawful because Congress directs that providers should promote access to mainstream benefits and that some homeless individuals cannot achieve self-sufficiency. NAEH Br. 36-37. But the NOFO recognizes that many homeless individuals over time can eventually transition to not needing benefits. AR5034. Nothing in the NOFO assumes or requires all homeless individuals to become self-sufficient. *Id.* Indeed, the NOFO prioritizes providing *more* services to homeless individuals while they are needed, in order to place these individuals in a position where services are no longer needed. AR5037; AR53. And those who can never achieve self-sufficiency can continue to receive assistance. AR53.

4. The "Risk Review" and "Additional Factor" Criteria are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

The Secretary did not act outside his authority or contrary to law in setting criteria for "Risk Review" and "additional factors." *See* 42 U.S.C. § 11386a(a), (b)(1)(G).

The Risk Review is meant to "evaluate each applicant's likelihood of successfully carrying out the project" and "identify risks that may affect the advancement toward or the achievement of a project's goals and objectives." AR5091. The Risk Review looks at past performance, organizational health, and results. *Id.* This review therefore logically promotes the CoC program's efficacy and efficiency in achieving statutory purposes by reducing the likelihood that HUD would award funds to projects that may not be successful or are fraught with risk. *Id.* Moreover, HUD adopted this review to comply with OMB regulations. 2 C.F.R. § 200.206(b)(1).

Similarly, the "additional factors" are statutorily connected to effectiveness and efficiency—for example, reasonableness of estimated cost to the Government, readiness to conduct the proposed work, and the scope of the overall projected impact on the program and administrative goals and priorities in the NOFO. AR5092. These are directly related to impact (effectiveness) and cost (efficiency). Logically, these "additional factors" cannot be contrary to law, because HUD will only consider them "[t]o the extent allowed by law." *Id*.

Indeed, Congress instructed the Secretary to "prioritize funding" for CoCs that "have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects." 140 Stat. at 399. As these factors go toward reallocating funding toward higher performing projects, the 2026 Appropriations Act separately authorizes the Secretary to set the Risk Review and Additional Factors. *Id.*

5. The Discriminatory Disability Policy is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

The Secretary did not act outside his statutory authority because the NOFO does not award points for any alleged "disability prioritization" and tracks the statutory language in the treatment of disabilities. The NOFO states in the opening Goals and Objectives narrative: "Individuals who are likely to never be able to return to the workforce–over 62 years old, physically disabled, developmentally disabled–should be prioritized for Permanent Supportive Housing." AR5035. But the NOFO does not even award points based on whether CoC applicants will prioritize homeless individuals who are over 62 years old, physically disabled, or developmentally disabled. In other words, NAEH is wrong when arguing that the challenged language "imposes a preference." NAEH Br. 37. Indeed, as NAEH now concedes in its renewed MSJ, the 2026 NOFO does not award any points based on this provision. *Id.* Because this statement in the 2026 NOFO does not require applicants or CoCs to take any action, Plaintiffs lack standing to challenge it.

Nevertheless, even if the alleged "disability prioritization" did have a binding, legal effect, the statement is not contrary to law. Congress directed HUD to measure CoCs based on *the extent to which the recipient will address the needs of all relevant subpopulations.* 42 U.S.C. § 11386a(b)(1)(B)(iv)(I); *see also* 24 C.F.R. § 578.7(c)(1) (requiring CoC plans to coordinate "the implementation of a housing and service system . . . that meets the needs of the homeless individuals and families"). By matching the need of one disability with the proper type of service or support, the recipient is addressing the need of that subpopulation. If the provision has any effect, it has the effect of judging whether a recipient is addressing the needs of relevant subpopulations.

Finally, this statement in the NOFO is consistent with HUD regulations, and NAEH is wrong to argue otherwise. *Contra* NAEH Br. 38. Indeed, HUD regulations provide that: "Recipients may limit admission to or provide a preference for the housing to subpopulations of homeless persons and families who need the specialized supportive services that are provided in the housing." 24 C.F.R. § 578.93(b)(7); *see also id.* § 8.4(b)(1)(iv) (barring grantees from "provid[ing] different or separate housing, aid, benefits, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is necessary to provide qualified individuals with handicaps with housing, aid, benefits, or services that are as effective as those provided to others."). Consistent with the regulations, the 2026 NOFO provides preferences to subpopulations who need the specialized supportive services provided in the housing, *i.e.*, a permanent supportive home.

6. The Executive Order Conditions are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

The Secretary did not act in excess of his statutory authority or contrary to law by requiring grants to comply with Executive Orders relevant to the contracted activity. The NOFO states that grantees must "follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2026." AR5111. These requirements and terms explain the applicability of various Executive Orders. The Executive Orders only apply "to the extent they are consistent with the requirements stated by applicable Federal statutes, regulations, and the applicable program NOFO or notice." Dep't of Housing & Urban Dev., *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (2026) at 1, https://www.hud.gov/sites/default/files/CFO/documents/General-Administrative-National-

Departmetal-Policy-Requirements-Terms-Financial-Assistance-Programs.pdf ("Gen. Admin. Requirements"). Accordingly, the Executive Order Conditions do not violate the law. *Contra* NAEH Br. 42-43.

As the D.C. Circuit recognized in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), a directive with a permitted-by-law qualifier cannot violate the law because it explicitly "instructs the agency to follow the law." *Id.* at 33. There, the plaintiffs challenged an executive order that provided that "to the extent permitted by law," no Federal agency and no entity that receives Federal assistance for a construction project could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. As the D.C. Circuit explained, the executive order "directs [agencies] how to proceed in administering Federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Similarly, here, the provision requiring compliance with Executive Orders explicitly constrains its implementation to applicable laws. As was the case in *Allbaugh*, "[i]n the event that an agency does contravene the law in a particular instance," Plaintiffs may challenge that action as inconsistent with an applicable law. 295 F.3d at 33. Notably, this past Term, the Supreme Court stayed an injunction with respect to an Executive Order regarding government

restructuring, which included a similar limited-by-law qualifier. *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Mem.). Writing separately, Justice Sotomayor stated that although "the President cannot restructure Federal agencies in a manner inconsistent with congressional mandates," a stay of the injunction was warranted because "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law.'" *Id.* at 2635 (Sotomayor, J., concurring).

7. The "Judicial Restriction" is not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

NAEH Plaintiffs no longer argue in their briefing that this provision is contrary to law, but have not formally withdrawn their claims with respect to this provision. Out of an abundance of caution, Defendants address NAEH Plaintiffs' allegations.

The Secretary did not exceed his statutory authority or act contrary to law in including severability clauses. The NOFO states that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment." AR5113. The phrase "in any jurisdiction" refers to the scope of the relief, not the geographic location of the court. That is to say, if a court ruled the 2026 NOFO unlawful with respect to Rhode Island CoCs, then the 2026 NOFO would be deemed unlawful only as to those CoC's. But if a court deemed the NOFO unlawful nationally, then the NOFO would in no way restrict that decision by its terms. The purpose of the provision is simply to make clear that the 2026 NOFO can proceed if a portion of it is found invalid and can operate jurisdiction by jurisdiction if needed. Accordingly, this provision of the NOFO does not violate the separation of powers.

8. The Non-Statutory Threshold Criteria are not contrary to law or in excess of statutory authority. (NAEH Plaintiffs)

The Secretary did not act in excess of his authority or contrary to law in establishing threshold criteria for new projects that are not explicitly identified in the statute. The Secretary was empowered under § 11386a to establish criteria to select effective and efficient projects. Each project type, e.g., Permanent Supportive housing, Transitional Housing, SSOs, was given criteria such as how the new project advance statutory goals such as self-sufficiency. *See, e.g.*, AR5068-74. Advancing statutory goals is definitionally effecting the statute.

Plaintiffs respond that, as applied to Tier 1 projects, these conditions conflict with the 2026 Appropriations Act. NAEH Br. 40. Not so. The Appropriations Act does not require HUD to fund every project that a CoC places in Tier 1 and which satisfies requirements stated expressly in statute. Further, the project-specific threshold criteria only apply to new project applications. Insofar as CoCs place renewal projects in Tier 1, those projects are not subject to the project-specific threshold criteria. It rather requires the Secretary to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." 140 Stat. at 399. That language establishes an aggregate funding floor and requires HUD to respect each CoC's ordering of projects; it does not say that awards must be made solely on the basis of those rankings or that local placement in Tier 1 overrides otherwise applicable selection criteria. To the contrary, the requirement that award selection be "consistent with 42 U.S.C. 11381 et seq.[,]" 140 Stat. at 399, incorporates the statutory provisions authorizing HUD to award grants through a national competition "based on criteria established by the Secretary," 42 U.S.C. § 11386a(a), and to consider "such other factors as the Secretary determines to be

appropriate" to administer the program effectively and efficiently, *id.* § 11386a(b)(1)(G). And the substance of the criteria themselves is within HUD's authority, as described above. *Supra* VI.A.

### B. The Challenged Provisions of the 2026 NOFO Are Not Arbitrary and Capricious (NAEH Plaintiffs Count 3, State Plaintiffs Count 3)

Plaintiffs challenge a similarly wide array of provisions in the 2026 NOFO as arbitrary and capricious under the APA. States Br. 28-42. They assert that Defendants failed to adequately explain the provisions, failed to consider important aspects of the decisions they made, failed to consider alternatives to the provisions HUD chose to implement, and failed to account for significant reliance interests. *Id*. But HUD's decisions to implement the provisions of the 2026 NOFO were well explained. And it adequately and reasonably considered—and documented—all relevant aspects of the problem before it. *See supra* Background, Section III.A-C. This challenge is additionally perplexing in light of the fact that in previous pleadings related the CoC funding, Plaintiffs (both NAEH and States) conceded that HUD was within its rights to address these policies in the next (here, FY 2026) funding opportunity.[14]

Underpinning each of the conditions Plaintiffs challenge in the 2026 NOFO are two rational determinations by HUD. First, HUD concluded that a decade of incentivizing permanent housing to the exclusion of Transitional Housing and Supportive Services—above and beyond what Congress required— "fail[ed] to deliver" on the policy's promises. Second, HUD therefore decided to "align [the program] with the CoC program's statutory goals of reducing homelessness, mitigating trauma to individuals and the community, and optimizing self-

[14] *See, e.g.*, NAEH Litigation, ECF 69 at 8 (discussing why, with the 2025 NOFO, HUD "could not instead take a more deliberate approach that would better protect continuity of funding and stability"); *id*. at 10 ("If HUD could not get its replacement NOFO out much earlier, it could have simply waited for FY 2026 to implement its new agenda."); States Litigation, ECF 84 at 9 ("Indeed, each appropriations cycle, HUD has a fresh opportunity to implement lawful policy choices for how to administer the CoC program within the parameters set by Congress.").

sufficiency." AR38-41. Those framing determinations alone provide enough clarity that HUD's path to issuing the 2026 NOFO "may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). But, as explained below, HUD did much more—it provided specific justifications for the changes it made. Consequently, HUD's decision to issue the 2026 NOFO was not arbitrary and capricious.

1. <u>The Set-Aside/De Facto Cap is not arbitrary or capricious (NAEH and State Plaintiffs)</u>

HUD reasonably decided to set-aside a portion of congressional appropriations for the CoC program to fund new projects with a priority for Transitional Housing projects and SSO projects. HUD found that, in the years the CoC program focused on Housing First, chronic homelessness has increased 80.5%, unsheltered homelessness increased 36.1%, and literal homelessness (on the street, in emergency shelters, or in transitional housing) increased 27%, despite a 44% increase nationwide in Permanent Supportive Housing Beds and an increase in CoC spending of 111%. AR42; AR5033. And while the supply of Permanent Housing (which includes Permanent Supportive Housing and Rapid Rehousing) increased by 188% since 2007, the supply of Transitional Housing beds decreased by 59.5%. AR42. By 2024, 88% of funding went to Permanent Supportive Housing and 1% to Transitional Housing projects. *Id*. HUD determined that this decrease of Transitional Housing paired with an increase in homelessness over the same period justifies reprioritized investment in Transitional Housing. *Id.*

HUD identified various benefits of Transitional Housing and SSO projects. First, homelessness decreased 8.8% whenever Transitional Housing was available, whereas homelessness increased 27% when HUD almost exclusively funded Permanent Supportive Housing. AR54. Transitional Housing "frequently offer[s] more privacy and a comprehensive

range of on-site services." AR52-53. In preparing the 2026 NOFO, HUD found these services lacking in the current system now seeks to encourage and invest in these services during the competition. AR53. These benefits separately justify the set-aside.

HUD justified its rationale of the set-aside supporting self-sufficiency. AR58-64. As HUD noted, one of the primary purposes of the CoC program is to optimize self-sufficiency. AR58 (citing 42 U.S.C. § 11381). The set-aside prioritizes and invests in projects that advance economic independence. *Id.* First, HUD found that homeless individuals self-report high rates of substance abuse disorder and mental illness, and that there are high rates of overdose deaths in Permanent Supportive Housing. AR58-60. The 2026 NOFO prioritizes services for the treatment and recovery of individuals with substance abuse disorders and mental illnesses by setting aside funds for these services. AR61. Treatment will remove one obstacle for homeless individuals to achieve self-sufficiency. *Id.* The benefits of treatment and recovery further justify the set-aside. *Id.*

Second, HUD determined that the current program has not optimized self-sufficiency. AR62. In 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned employment income during that reporting period. *Id.* Only 13.2% of all households exited Permanent Supportive housing, and only 1.7% exited to unsubsidized housing. *Id.* Service participation requirements advance self-sufficiency. AR62-63. For example, the HUD-VASH program tied assistance to participation in supportive services, and this subpopulation is the only group that has seen significant year-over-year decline in homelessness over the last two decades. AR63. HUD therefore concluded that creating a set-aside to fund these supportive services would increase self-sufficiency and reduce homelessness. *Id.*

a. *HUD considered the impacts from the set-aside*

Plaintiffs incorporate the Court's findings from the previous litigation wholesale in arguing that HUD has failed to consider the impact of the 2026 NOFO. NAEH Br. 18-22; States Br. 30-32. But the 2026 NOFO addresses those issues the Court identified with respect to the 2025 NOFO.

**First**, the Court held that HUD acted arbitrarily and capriciously in "eliminat[ing] the Housing First approach" without "consider[ing] the impact that its decision . . . would have on the existing system created by Congress and HUD itself." *Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-CV-626-MSM-AEM, 2026 WL 1863886, at *3 (D.R.I. June 29, 2026) ("*Washington I*"). Contrary to Plaintiffs' assertions, States Br. 37-38, HUD has now justified its rationale of the set-aside in the context of the wider program. AR50-58. First, HUD noted that from 2007 to 2009, the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing. AR50. During this time, the number of homeless individuals was decreasing consistently. *Id*. Following HUD's policy change in 2013, Transitional Housing supply has decreased 59% nationwide as Permanent Supportive Housing increased 44%. AR51. And during this time, homelessness increased. AR54. It is reasonable to conclude that the CoC program requires balance by supporting both Transitional Housing and Permanent Supportive Housing based on these disparate outcomes. AR50.

By investing in more Transitional Housing, HUD restores the "continuum" to the "Continuum of Care" program —more Transitional Housing and services diversifies the options based on need and the goal of self-sufficiency to leave homelessness. AR51. Indeed, HUD consistently received feedback from stakeholders that there is a wide array of critically needed services—childcare, workforce development, legal services, behavioral healthcare, street

outreach, mobile healthcare clinics, and employment training—that this set-aside prioritizes. AR51.

In addition, Transitional Housing differs from Permanent Supportive Housing because Transitional Housing naturally facilitates concentrated supportive services and engagement with peers and case managers. AR52.

Based on these factors, HUD reasonably determined that "Transitional Housing is a missing component in the Continuum of Care" and made the reasonable decision to set aside funds to restore that missing component. AR53.

**Second**, the Court held that HUD "failed to substantively consider the impact that a rapid, untimely overhaul would have on the organizations that administer these programs and the individuals that rely upon them." *Washington I*, 2026 WL 1863886, at *3. HUD considered the impacts of the transition on current providers. AR54-58. To address Permanent Supportive Housing providers' asserted reliance on future funding, HUD has held forums informing stakeholders of the upcoming changes, discussed changes with CoC recipients, and issued public statements on the changes. AR54. HUD has also provided guidance that provides a path for both current providers and current participants to maintain funding and assistance under the structure of the NOFO. *Id*. Indeed, the 2026 NOFO provides "transition grant" opportunities for Permanent Housing Providers to transition to Transitional Housing or SSO. AR55. Far from being "rapid" and "untimely," HUD has forecasted and worked with stakeholders over the course of a year to prepare them for the change. And the "transition grant" process provides a full year of transition time. *Id.* In the past, projects utilizing the "transition grant" process have been required to fully reallocate their project from one type to another. In the 2026 NOFO, recipients have increased flexibility to transition projects in whole or in part. AR55, AR5026.

HUD also considered that a CoC prioritizing SSO projects may provide fewer total beds as a result. AR57. But HUD determined that the increased investment in Transitional Housing and SSO together will alleviate potential harm from the reduced number of beds by increasing the number of homeless served and addressing the root causes of homelessness, because despite the fewer number of beds, the provision of services will help transition people into self-sufficiency faster, thereby allowing each grantee to serve more homeless individuals in the end. AR57-58. These same considerations apply to Plaintiffs' concerns that there will be fewer Transitional Housing beds than Permanent Housing beds. *See* NAEH Br. 20.

Plaintiffs accept that HUD explained that Transitional Housing will more effectively address homelessness but disagree with HUD's conclusions. The mere fact that Plaintiffs disagree with the conclusion, however, does not demonstrate that HUD has reached a conclusion that is unsupported by the evidence. *Regents*, 591 U.S. at 16 (as long as the agency's path can be reasonably discerned, "a court is not to substitute its judgment for that of the agency"). And as Plaintiffs concede, Transitional Housing can "adequately serve specific subpopulations." NAEH Br. 22. Although Transitional Housing cannot serve other populations, like those with "severe disabilities," *id.*, HUD acknowledged that "[i]ndividuals who are likely to never be able to return to the workforce–over 62 years old, physically disabled, developmentally disabled–should be prioritized for Permanent Supportive Housing." AR5035. This is why HUD emphasized that the program provides a *continuum* of care. AR47. HUD therefore reasonably increased the number of Transitional Housing units to support specific subpopulations, which Plaintiffs concede it can serve, while preserving Permanent Supportive Housing for those that Transitional Housing cannot serve. AR47. And where the "agency's decision is supported by a rational basis," the court "must affirm." *River St. Donuts*, 558 F.3d at 114.

Finally, Plaintiffs argue that HUD acted arbitrarily and capriciously by "defunding" Permanent Supportive Housing to fund SSO projects, because Permanent Supportive Housing already provides supportive services. NAEH Br. 22. But HUD explained that it wanted to prioritize these services, which includes childcare, workforce development, legal services, behavioral healthcare, street outreach, mobile healthcare clinics, and employment training. AR51. Stakeholders routinely advise that these services are much needed. *Id*. And, notably, Plaintiffs do not contest that homeless individuals need and benefit from these services. So it is entirely reasonably for HUD to divert more funding to services that stakeholders have informed HUD are needed. *See also infra,* pp. 57-58.

**Third**, the Court held that "HUD did not attempt to meaningfully forecast the harm caused by the disruption these NOFOs created at any point, most notably the instability faced by individuals who would undoubtedly experience homelessness because of this breakneck transition." *Washington I*, 2026 WL 1863886, at *3. For the 2026 NOFO, and contrary to NAEH Plaintiffs' arguments, NAEH Br. 19-20, HUD considered whether barriers may be preventing Permanent-Housing residents from moving to Transitional Housing. AR54-55. HUD has provided guidance on eligibility and record-keeping to assist the transition from Permanent Supportive Housing to Transitional Housing. Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., Office of Cmty. Planning & Dev., U.S. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* , https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf (last visited Oct. 6, 2026). According to the guidance, residents currently living in Permanent Housing may be eligible for assistance to Transitional Housing. AR54-55.

Nor are there regulatory bars preventing individuals from moving from Permanent Supportive Housing to Transitional Housing. Transitional Housing is for individuals and families who are "homeless," which includes someone who "will imminently lose their primary nighttime residence," provided that they will lose it within 14 days of applying for assistance, no subsequent residence has been identified, and they lack the resources and support networks to obtain other permanent housing. 24 C.F.R. § 578.3; *see also* 42 U.S.C. § 11032(a)(5)(ii) (defining "homeless individual" to mean "an individual or family who. . . [has] a primary nighttime residence that is a room in a hotel or motel and where they lack the resources necessary to reside there for more than 14 days"). Individuals exiting Permanent Housing due to programmatic changes would qualify for Transitional Housing on this basis. The eligibility requirements of the CoC program should not be construed to prevent an individual from moving from indefinite government assistance to temporary government assistance. HUD considered these regulations when creating the set-aside. AR55.

**Fourth**, the Court held that HUD gave "little to no thought or analysis of the negative externalities created by its transition from a Housing First approach to one that mandates enrollment in various programs designed to address challenges other than a lack of stable housing." *Washington I*, 2026 WL 1863886, at *4. HUD considered this, AR61, and identified a study showing that service requirements have better outcomes with respect to engagement and hospitalization. *Id.* Contrary to Plaintiffs' claims, nothing in the 2026 NOFO "mandates enrollment" in various programs. Where HUD encourages Supportive Services or partnerships with organizations outside the CoC (such as workforce development or healthcare systems), those services and partnerships are designed to address barriers to stable housing, barriers that are identified consistently in research. AR58-62.

**Fifth**, the Court held that "HUD failed to meaningfully balance its new emphasis on fostering a competitive environment for grantees to seek funding against HUD's prior concern with housing stability." *Washington I*, 2026 WL 1863886, at *4. HUD determined that competition drives outcomes, effectiveness, innovation, and accountability. AR49; AR5044. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency. AR5035.

**Finally**, the Court held that "HUD failed to meaningfully consider . . . the benefits it could have achieved from waiting to implement this new policy and rolling out its new priorities on a non-emergency basis." *Washington I*, 2026 WL 1863886, at *4. Here, HUD did not implement the new policy on an emergency basis. As noted above, States and stakeholders have been on notice for at least a year of program changes. AR54.

b. <u>*HUD relied on statutory factors in making the set-aside*</u>

As discussed above, HUD relied on statutory factors when promulgating the set-aside. *Supra* II.A.1. But State Plaintiffs argue that HUD must provide bonuses or incentives for Permanent Supportive Housing and Rapid Rehousing, and not any other activity. States Br. 32. As an initial matter, creating a "set-aside" is not a bonus or incentive. The Secretary can create the set-aside through his separate statutory discretion to establish other selection criteria that, in his judgment, are "appropriate to carry out" the CoC program "in an effective and efficient manner"—including criteria that may influence applicants to propose certain activities. 42 U.S.C. § 11386a(b)(1)(G). But even if the set-aside were a bonus or incentive, *id.* § 11386b(d) sets a floor of what activities the Secretary must incentivize or provide bonuses for, and the Secretary is not limited to those activities. And the Secretary is in fact incentivizing Permanent Housing and Rapid Rehousing—the 2026 NOFO criteria award points for these projects. *See*

AR5088 (awarding 4 points for "at least one RRH or PSH project that prioritizes individuals experiencing chronic homelessness" and 4 points for "at least one RRH or TH project in the CoC that primarily or exclusively serves families with children").

For much the same reason, Plaintiffs complaint that the "McKinney-Vento Act already describes the 'Required Criteria' that must be used to assess grant applications," and HUD thus acted arbitrarily and capriciously by imposing additional considerations, also fails. States Br. 32. These considerations are likewise within the Secretary's statutory discretion. 42 U.S.C. § 11386a(b)(1)(G).

c. *HUD provided a reasonable explanation for the set-aside*

Plaintiffs argue that the set-aside does not support competition. NAEH Br. 19. To the contrary, HUD justified its position. AR48-50. As an initial matter, the statute requires the CoC program to be a "national competition between geographic areas." 42 U.S.C § 11386a. HUD found that under previous NOFOs, such as the 2024 NOFO, nearly 100% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit. AR48. And for the remaining projects, the competition weighted only 15% of the score on merit. AR49. Said another way, only a small fraction of CoC awards were competed on the basis of merit. *Id.*

HUD identified that competition drives outcomes, effectiveness, innovation, and accountability. *Id*. Congress directed that 60% of the funds be set-aside to fund projects based on rankings from CoC applicants, down from HUD's practice of funding around 90% of renewals. 140 Stat. at 399. Accordingly, HUD set aside the remaining 40% of funds for competition. AR49. The set-aside furthers competition by focusing on project types that have been historically underfunded.

Plaintiffs argue that HUD "disregard[s]" the fact that the set-aside could cause formerly homeless individuals to lose their housing assistance. NAEH Br. 19-20. Plaintiffs are simply wrong. To the contrary, HUD planned for these individuals to move to Transitional Housing. AR54. While Plaintiffs may disagree with HUD's assessment of the viability of such a move, NAEH Br. 19-22, they therefore cannot show that HUD failed to consider the issue.

HUD also considered whether there would be shelter capacity shortfalls. AR58. HUD noted that a shift in how and where funding is used does not reflect a change in the number of people served. *Id.* HUD specifically found that there would not be a strain on shelters based on increasing investment in Transitional Housing and services—"[i]f anything, the NOFO provides new opportunity for shelter providers to compete for SSO funding or even funding for Transitional Housing, as many shelters operate both emergency shelter and Transitional Housing" *Id.*

Plaintiffs also argue that Congress "has explicitly found that 'permanent supportive housing' and 'rapid rehousing services' are among the 'activities that have been proven to be effective at reducing homelessness[.]'" States Br. 33 (alteration in original). Plaintiffs fail to account for HUD's expertise in administering Federal programs addressing homelessness, which often involves balancing different strategies to achieve various statutory goals. *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (holding APA review is narrow and the warning of a court not to substitute its own judgment "is especially true when the agency is called upon to weigh the costs and benefits of alternative policies, since '[s]uch cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency.'"). Moreover, HUD has determined that evidence from a decade of Housing First has shown that near-exclusive investment in Permanent Housing without conditions does not

decrease homelessness. AR5033-34; AR41-48. But more importantly, the 2026 NOFO maintains and incentivizes Permanent Supportive Housing and Rapid Rehousing, and also reintroduces Transitional Housing. AR5041.

Plaintiffs allege that homelessness decreased between 2024 and 2025 while Housing First was in effect. States Br. 33-34. But this single data point does not contradict long-term data from the past decade showing that homelessness increased dramatically under Housing First to the highest number on record. AR5033-34; AR41-48.

Plaintiffs also allege that HUD recently stated "considerable research literature" supported a Housing First approach. States Br. 33. But this statement is stale twice over—it was made in 2022, and it was supported by a 2014 study. HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* (2022) at 27, https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf. Since this 2014 study, HUD now has the benefit of over ten years of additional data showing that while the Housing First was in effect, homelessness rose. AR5033.

Plaintiffs assert that HUD failed to establish that Housing First caused a rise in homelessness or can be correlated with a rise in homelessness. States Br. 34-5. But the APA does not require HUD to identify, with particularity, that Housing First was a cause of homelessness in order to change policy; all HUD needs is a reasoned explanation for the change in policy. *FCC v. Fox*, 556 U.S. at 515 (holding that an agency can change a long-standing policy if it shows "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better."). And HUD did so when it cited an increase in homelessness while Housing First was the official policy, as well as a decrease in homelessness when the CoC program included Transitional Housing and SSOs in addition to Permanent Supportive Housing. AR54.

Plaintiffs similarly miss the mark by arguing that there are other causes of homelessness that make it impossible to blame Housing First for increased homelessness. States Br. 35. HUD agrees that "it's difficult to establish causality behind increasing rates of homelessness" and that "there are likely a multitude of factors driving changes in homelessness across the country." AR47-48. But HUD therefore concluded that it is all the more important to avoid a myopic approach to the problem of homelessness: by reinvesting in Transitional Housing and SSO, HUD restores a "true continuum of assistance." AR48.

Plaintiffs then turn to quibbling with studies showing increased overdose deaths in Permanent Supportive Housing. States Br. 35-37. In concluding that Permanent Supportive Housing was conducive to a rise in overdose deaths, HUD relied on its own data, data from the San Francisco Medical Examiner's Office, a JAMA article on San Francisco, New York City government data, and data from the City of Seattle. AR59-60. Out of these, Plaintiffs cherry-pick the JAMA article and the data from the City of Seattle. States Br. 36-37. They leave uncontested the findings from the other sources. *Id.* When considering all the cited data sets together, HUD's conclusion that Permanent Supportive Housing (without service requirements or prohibitions on illicit drugs) is correlated with increased overdose deaths is amply supported.

Moreover, the JAMA article and the City of Seattle data do not undermine HUD's conclusion. First, Plaintiffs place great weight on the JAMA article's statement that "San Francisco's alternative shelter program" "*did not appear* to be associated with increased overdose deaths among people experiencing homelessness." Caroline Cawley, et al., *Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic*, JAMA Network Vol. 5, No. 3 (Mar. 10, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789907 (emphasis added). The

article is equivocal on whether they are related and only focuses that statement on Rapid Rehousing rather than Permanent Housing as a whole. And as for the City of Seattle data, Plaintiffs concede that the 282% increase in overdose deaths within Permanent Supportive Housing is "awful" and merely contrast it with worse outcomes for unsheltered individuals. States Br. 36. But the report indicates that overdose fatalities in Permanent Supportive Housing made up 21% of total fatalities in the County compared to 24% in shelter and among the unsheltered population *combined*. AR59. The fact that unsheltered individuals are also dying of overdose does not in any way detract from the conclusion that, far from protecting or advancing recovery, Permanent Supportive Housing has been accompanied by a near three times increase in overdose deaths within Seattle.

Plaintiffs then point to CDC data showing that overdose deaths have fallen sharply since 2023. States Br. 37. But these are national and statewide statistics for all populations—Plaintiffs make no effort to correlate these numbers against the homeless populations. *Drug Overdose Death Counts*, U.S. Centers for Disease Control and Prevention, National Center for Health Statistics, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited July 22, 2026); States Br. 37. This data can tell the Court nothing about overdose deaths within the homeless population. Even if they could, though, a one- or two-year datapoint does not overrule years of data showing that overdose deaths have increased while HUD and localities adopted a Housing First policy. The very fact that there are significant numbers of overdose death among the homeless is reason enough for HUD to promote treatment and recovery.

Plaintiffs then take issue with HUD's interpretation of studies on Housing First. States Br. 38-39. Plaintiffs make much out of a conclusion in one of the studies that Housing First programs "more effectively reduce homelessness and improve housing stability," but then fail to

emphasize that this in comparison to "*Treatment First or TAU*." *Id.* (emphasis added). This study does not say that Housing First is better than Transitional Housing, or better than offering a continuum of housing support that includes Permanent Supportive Housing, Transitional Housing, and SSO. As Plaintiffs recognize, Permanent Supportive Housing works best when paired with supportive services. States Br. 39. HUD would go further—providing housing works best when paired with services. And the 2026 NOFO incentivizes Transitional Housing, which concentrates services, and SSO projects, to provide homeless populations the support they need.

#### d. *HUD considered reliance interests when making the set-aside*

HUD considered reliance interests of both providers and residents when making the set-aside. AR54-55; *contra* NAEH Br. 21, States Br. 40-42. HUD recognized that, by creating a large set-aside, "renewal projects will be limited." AR54. HUD also acknowledged that Permanent Supportive Housing and Rapid Rehousing have "historically relied on a near-guarantee of future funding and that a significant investment in new Transitional Housing is likely to impact both existing permanent housing providers and the individuals they serve." *Id.*

To ameliorate these impacts, HUD "organized nearly 40 forums with key stakeholders all over the country and had numerous other discussions with CoC recipients and other homelessness providers." AR54. It also "issued numerous public statements in national media outlets, social media, and other outlets about HUD's intent to end Housing First and return the program to diverse solutions that incentivize self-sufficiency and recovery." *Id.* The CoCs were also on notice via the lengthy policy discussion and program requirements contained in the 2025 NOFO. *Id.* Thus, contrary to States Plaintiffs claims that they must "turn on a dime" to "suddenly" transition, States Br. 40-41, the States have been forewarned (and could have forearmed) a year ago. Indeed, Plaintiffs argued in the previous litigation that the problem with the 2025 NOFO was that CoC and States were ill-prepared for changes, and appeared to suggest

that HUD could make policy changes if the changes were broadcast. *See NAEH Litigation*, ECF 69 at 7 ("HUD did not adequately consider or explain . . . why the agency could not wait until a new funding cycle to effectuate changes to the program"); *see also id.* at 8 ("[D]isagreeing with program policy does not explain why HUD's policy goas had to be effectuated by a late-stage rug-pull of the CoC program – or why it could not instead take a more deliberate approach that would better protect continuity of funding and stability"); *id.* at 10 ("If HUD could not get its replacement NOFO out much earlier, it could have simply waited for FY 2026 to implement its new agenda"); *id.* ("Defendants could have chosen a different course altogether; they could have allowed more time for the CoC ecosystem to prepare for potential changes.").

To further ameliorate any alleged, potential harms, HUD provides a "transition grant" opportunity to allow existing Permanent Supportive Housing projects and Rapid Rehousing projects to transition to other project types over the course of a year in order to be eligible for the set-aside. AR55; AR5026-27. Plaintiffs argue that this transitional grant opportunity does not solve all of the harms, NAEH Br. 20-21, but the transitional grants were not the only tool: as described above, HUD informed stakeholders so they could ameliorate harms as well. And HUD published guidance to help program participants in Permanent Housing transition to Transitional Housing. Dep't of Housing & Urban Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)* (2026), https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf.

Plaintiff argues that these transition grants were also ineffective because HUD's regulations prevented some providers from transitioning from existing programs to Transitional Housing. NAEH Br. 21. As Plaintiffs concede, however, HUD issued a waiver on September 18, *id.*, and set applications to be due September 30, 2026. *Continuum of Care Program*

*Competition*, HUD, https://perma.cc/A5QX-4YUL. Plaintiffs also argue that some providers could not transition because of deed restrictions or inability to obtain insurance. NAEH Br. 21. That may be true, but HUD's actions were not arbitrary and capricious simply because not *all* existing providers could meet the new parameters.[15] And HUD considered the fact that some providers may not be selected for renewal, and decided that the benefits outweighed the costs. AR54-58.

HUD also considered whether Transitional Housing is costlier or less effective. AR52-53. HUD recognized that Transitional Housing is traditionally "the most expensive model." AR52. This increased expense is primarily due to the "comprehensive range of on-site services." AR53. But it is these very services that HUD found lacking in the current CoC system. *Id.* While these service investments "may cost more than housing alone," the net results of these services leading to self-sufficiency will outweigh the investment in services and Transitional Housing—with homeless individuals becoming self-sufficient, there will be a decrease in spending on indefinite government housing support per individual. *Id.* If Permanent Housing were a cost-effective option, or if HUD were previously committed to cost-effectiveness, it is unclear why CoC program spending increased 111% in the last decade.

State Plaintiffs speculate about "potential failures of [] jointly funded projects" and "threaten[ed]" destabilization of housing projects from the set-aside, which will then, potentially, "increase utilization of State-funded" resources, which *then* will "inevitably" place financial strain on the States. States Br. 41. But HUD was under no obligation to consider a long string of

[15] HUD has provided applicants and program participants with guidance about transition grants. NOFO at 21-22; U.S. Dep't Hous. & Urb. Dev., *Program Participants' Eligibility to Move from Permanent Supporting Housing (PSH) / Rapid Re-Housing (RRH) To Transitional Housing (TH)*, https://www.hud.gov/sites/default/files/CPD/documents/CoC/PH-to-TH-guidance.pdf (last visited Oct. 5, 2026).

contingencies and hypotheticals several degrees of separation away from their decision. *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency need only consider "relevant" factors and "important" aspects of the problem). Nevertheless, HUD considered that state and local governments may have to reallocate local resources to maintain consistent levels of funding. AR56. HUD concluded that state governments are accustomed to shifting resources and capable of doing so. AR55 Indeed, they did so in 2013 when HUD removed funding from Transitional Housing.

2. The Safe Drug Use Condition and Certification is not arbitrary or capricious (NAEH Plaintiffs)

HUD reasonably determined that a Safe Drug Use Condition and Certification should be included in applications under the 2026 NOFO. AR58-62. HUD found that homeless individuals self-report high rates of substance abuse disorder and mental illness. AR58-60. HUD further found that there is a disproportionate rate of fatal overdose in Permanent Supportive Housing units. AR69; AR5036. HUD also found that, at the same time, CoC-funded Permanent Supportive Housing service providers distributed drug paraphernalia. AR60. HUD determined that there was insufficient evidence to conclude that this practice reduced overdoses and overdose fatalities, but there was sufficient evidence to suggest that "isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis." AR60.

For this reason, HUD is prohibiting CoC recipients from knowingly permitting the use or distribution of illicit drugs on property under their control, distributing drug paraphernalia, or otherwise assisting individuals in consuming illicit drugs. AR69; AR5036. As discussed *supra*,

this prohibition both supports HUD's policy of reducing trauma to homeless individuals and improving outcomes and separately upholds Federal criminal law. AR69.

Plaintiffs conclude, without explanation, that HUD's requirement to end illegal harm reduction activities is unsupported by evidence. NAEH Br. 32. But as stated above, HUD found that CoC providers engaged in illegal harm reduction activities in these units, and that there were higher rates of overdose and persisting substance use disorder in Permanent Supportive Housing. AR60. It is reasonable for HUD to conclude that the former lead to the latter, and that ending these activities will lead to a reduction in the same. By contrast, Plaintiffs merely speculate that HUD's requirement might impact legal harm reduction efforts.

3. The Self-Sufficiency Criteria are not arbitrary or capricious (NAEH and State Plaintiffs)

HUD reasonably decided to include criteria to encourage planning and investment in optimizing self-sufficiency for homeless individuals—one of the four stated statutory goals of the CoC program. AR62-64; 42 U.S.C. § 11381(4). Specifically, the 2026 NOFO assesses the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." AR5066 (threshold review); *see also* AR5092 (similar criteria for Risk Review). HUD reasonably had in mind self-sufficiency as an express statutory purpose of CoC when it adopted the 2026 NOFO.

In any event, HUD separately substantiated its reasons for encouraging self-sufficiency. AR58-64. First, HUD found that homeless individuals self-report high rates of substance abuse disorder and mental illness and that there are high rates of overdose deaths. AR58-60. The 2026 NOFO prioritizes services for the treatment and recovery of individuals with substance abuse disorders and mental illnesses by providing the set-aside to fund these services. AR61. Treatment

will remove one obstacle for homeless individuals to achieve self-sufficiency. *Id.* Thus, it is reasonable to encourage treatment and support.

Second, HUD noted that the current program has not optimized self-sufficiency. AR62. HUD reasonably concluded that incentivizing investment in more of these services would decrease homelessness. *See supra* I.B.1.

Third, HUD reasonably determined that homeless individuals are able to achieve self-sufficiency. HUD identified appropriate investment in and availability of Supportive Services by hearing from numerous stakeholders and evaluating the level of services provided at programs with positive outcomes at optimizing self-sufficiency within 24 months. AR63. In addition, the HUD-VASH program, which tied support to participation in service programs, led to a decline in veteran homelessness. *Id.*

Fourth, HUD designed the self-sufficiency criteria to encourage CoCs to coordinate and partner in service of specific homelessness subpopulations. AR64. HUD is directed by Congress to measure CoCs based on "*the extent to which the recipient will address the needs of all relevant subpopulations.*" 42 U.S.C. § 11386a(b)(1)(B)(iv)(I) (emphasis added). HUD found that robust coordination with partners in the community, both inside and outside the CoC itself, is indicative of the CoC's ability to promote communitywide commitment to the goal of ending homelessness. AR64. By designing the self-sufficiency criteria to encourage robust coordination, HUD acted reasonably.

Plaintiffs argue that HUD did not consider that requiring treatment can cause homeless individuals to disengage from services, and, in general, is less effective than a purely voluntary service model. NAEH Br. 26-27. To the contrary, HUD did not fail to consider this argument but rather relied upon a study that showed service requirements had better outcomes with respect to

engagement and hospitalization. AR61. Nothing in the 2026 NOFO requires recipients to mandate treatment. HUD merely provides an encouragement for CoCs that have treatment-dedicated beds in their community.

Plaintiffs further argue that HUD did not consider the impact to domestic violence victims and their service providers in encouraging service requirements. NAEH Br. 22, 27. But HUD provided a bonus for domestic violence service providers, AR55-56. And the entire review process accommodates domestic-violence victims. The threshold review focuses on what services applicants will offer to eligible participants, which by definition does not include those who are exempt. The merit review criteria have a Violence Against Women Act carveout, *see* AR5022, AR5084, AR5095. And while risk review is focused more on applicants than their programs per se, it does look at an applicant's "[a]bility to follow all required laws and rules," including VAWA. AR5092. Finally, post-award requirements include VAWA compliance, AR5112. Plaintiffs further argue that the Family Violence Prevention and Services Act prevents mandatory service requirements, NAEH Br. 27, but fails to recognize that this restriction applies only to supportive services received "under this chapter," which does not include the CoC program. 42 U.S.C. § 10408(d)(2). In any event, by providing a bonus and a carveout, HUD explicitly considered the impact to domestic violence service providers. *See* AR55-56, AR5022, AR5084, AR5095.

Next, Plaintiffs allege that HUD ignored evidence that Housing First is effective. NAEH at 28-29. As explained above, HUD considered the evidence on Housing First and made a reasoned judgment that Housing First was ineffective. *See supra* at Background, Section III.A.

At most, the evidence on Housing First is mixed and complicated. In such an information environment, courts defer to agencies on how to interpret the data and what conclusions to draw

from it. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) ("Because the analysis of the relevant documents requires a high level of expertise, we must defer to the informed discretion of the responsible Federal agencies.")

Plaintiffs mischaracterize the HUD-VASH program because it is an example of a homelessness program that has been effective while mandating services. NAEH Br. 29. Plaintiffs wrongly argue that under HUD-VASH, services are entirely voluntary. *Id.* Under HUD-VASH, "[a]s a condition of HCV rental assistance, both tenant-based voucher and PBV, a HUD-VASH eligible veteran must receive the case management, services noted above, as needed." *See Section 8 Housing Choice Vouchers: Revised Implementation of the HUD-Veterans Affairs Supportive Housing Program,* 89 Fed. Reg. 65769, 65775 (Aug. 13, 2024). And it is the VA who is "responsible for determining if case management is required and if the case management requirement is satisfied." *Id.* Thus, the veteran does not have a choice with respect to services if the VA deems that services are required.

Finally, Plaintiffs argue that defining "self-sufficiency" as the ability to meet basic needs "without public or private assistance" is arbitrary and capricious because Congress directs that providers should promote access to mainstream benefits and that some homeless individuals cannot achieve self-sufficiency. NAEH Br. 36-37. But these are just repeats of their arguments that this section is unlawful. *See id.* And so, for the same reasons the 2026 NOFO is not unlawful, the 2026 NOFO is not arbitrary and capricious. *See* I.A.3.

4. The Risk Review and Additional Factor Criteria are not arbitrary or capricious (NAEH Plaintiffs)

Plaintiffs challenge the "Risk Review" and "additional factors" together, but they can be treated separately. The basis for Plaintiffs challenge is that HUD can, under Plaintiffs' theory, reject projects for "any reason at all." NAEH Br. 35-36.

HUD cannot reject projects for "any reason at all." The Risk Review contains explicit, concrete factors for evaluating projects, including past performance, organizational health, and results. AR5091-92. These factors mirror the review elements set forth and required under OMB regulations. 2 C.F.R. § 200.206.

As for the "additional factors," HUD also put forward explicit, objective factors to evaluate the cost of a project compared to its expected benefits, so as to select projects that, all things equal, cost less and are more effective. AR5092.

To the extent Plaintiffs speculate that HUD will choose projects based on "irrelevant ideological considerations rather than on the project's effectiveness or community need," NAEH Br. 36, this would be an as-applied challenge and, in any event, would not be ripe for review.

Finally, Plaintiffs state that the Risk Review and Additional Factors were not explained, and then blatantly mischaracterize them. NAEH Br. 35-36. But as explained, *supra* I.A.4., the Risk Review and Additional Factors are explained—either directly in the NOFO or are self-evidently on their face. And these factors are objective—they do not invest HUD with "unbridled discretion." *See id.*; *contra* NAEH Br. 36.

5. The alleged "Discriminatory Disability Policy" is not arbitrary or capricious (NAEH Plaintiffs)

As stated above, the 2026 NOFO does not award points based on any alleged "disability prioritization." *Supra* at I.A.5. The directive to prioritize certain subpopulations of homeless individuals for Permanent Supportive Housing is merely a policy statement by HUD. *Id.* Indeed, the NOFO awards points to Permanent Supportive Housing only if "[t]he project will serve homeless individuals or families with a disability in accordance with 24 C.F.R. § 578.37(a)(1)(i)"—which does not discriminate or prioritize any disability. AR5072.

And HUD provided a reasonable basis for providing this policy statement. In the 2026 NOFO, HUD stated that "[i]ndividuals who are likely to never be able to return to the workforce–over 62 years old, physically disabled, developmentally disabled–should be prioritized for Permanent Supportive Housing." AR30. This is because Permanent Supportive Housing is designed to uniquely fit their needs: Permanent Supportive Housing provides indefinite housing assistance with supportive services. AR51-52, 63. HUD found that certain homeless subpopulations will benefit from indefinite assistance and are likely unable to achieve self-sufficiency. AR53; AR5035. Accordingly, it is reasonable to prioritize these subpopulations for support that fits their needs: Permanent Supportive Housing.

Plaintiffs argue that HUD did not consider that the policy places grantees in violation of Federal law. NAEH Br. 39. But as stated above, the policy comports with law. *See supra* at II.A.5.

Plaintiffs also allege that HUD did not consider the reliance interest of those in Permanent Supportive Housing that do not have a "prioritized" disability and thus may lose Permanent Supportive housing. NAEH Br. 39. HUD did consider these individuals: under the

2026 NOFO, they can move to Transitional Housing and receive supportive services to enable them to recover and achieve self-sufficiency. AR55.

Finally, Plaintiffs state that HUD relied on "stereotypes" to determine which subpopulations could achieve self-sufficiency and which could not. NAEH Br. 38-39. Instead of targeting assistance based on need, Plaintiffs assume across the board that homeless individuals and families cannot attain self-sufficiency and can only remain dependent on Permanent Housing assistance. This is a stereotype. Nor can Plaintiffs cannot meaningfully contest, and HUD's regulations support, that certain subpopulations need certain specialized services. 24 C.F.R. § 578.93(b)(7); *see also id.* § 8.4(b)(1)(iv). Identifying specialized services needed for certain subpopulations is realistic (and required), not arbitrary and capricious.

6. The Executive Order Condition are not arbitrary or capricious (NAEH Plaintiffs)

HUD acted reasonably in informing CoC applicants that various Executive Orders may apply to their grants. The 2026 NOFO stated that grantees "must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2026." AR5111. This document makes clear that "various laws and policies . . . *may* apply to recipients of HUD's financial assistance programs." Gen. Admin. Requirements at 1 (emphasis added). It goes on to say that "[t]he laws and policies in this addendum *may* apply if they are mentioned" in a NOFO. *Id.* (emphasis added). And then the document lists the Executive Orders implicated in this litigation in a table, noting that "[r]ecipients of Federal awards must comply with applicable Executive Orders, as advised by the Department." *Id.* at 4.

As Plaintiffs recognize, "[t]hese executive orders instruct Federal agencies on what to do but do not purport to impose obligations on the public." NAEH Litigation, ¶ 149. Accordingly,

because the terms and conditions only say that these Executive Orders "may apply," and HUD will "advise[]" grantees" and HUD has not provided advice on these Executive Orders, the parties appear to agree that these Executive Orders do not apply to the CoC grantees. Accordingly, HUD did not act arbitrarily and capriciously because it did not "act" on Plaintiffs through this provision.

7. <u>The Judicial Restriction is not arbitrary or capricious (NAEH Plaintiffs)</u>

HUD acted reasonably in including a severability clause and clarification as to the scope of any judicial order. The NOFO states that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment." AR5113. As explained at I.A.7, *supra*, the phrase "in any jurisdiction" refers to the scope of the decision, such that if a court ruled the NOFO unlawful with respect to Rhode Island CoC's, then the NOFO would only be unlawful as to those CoC's. But if a court deemed the NOFO unlawful nationally, the NOFO would in no way restrict that decision by its terms.

8. <u>The Non-Statutory Threshold Criteria are not arbitrary or capricious (NAEH Plaintiffs)</u>

HUD acted reasonably in setting non-statutory threshold criteria. As stated above, the Secretary is empowered to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G). Thus, the Secretary was empowered to establish criteria to select effective and efficient projects. Notably, these criteria only apply to new projects. AR5067.

The non-statutory criteria are closely and reasonably related to select effective and efficient projects. Each new project type, e.g., Permanent Supportive Housing, Transitional

Housing, SSOs, were given criteria that awards points. AR5067-74. A representative sample of various non-statutory threshold criteria are summarized and categorized in the AR according to whether they advance efficacy or efficiency:

| Effectiveness | Efficiency |
|---|---|
| Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 months or has a plan in place to ensure homeless individuals and families will exit homelessness within 24 months. | Demonstrate the average cost per household served for the project is reasonable. 2 CFR 200.404. |
| The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure that at least 50 percent of participants exit to a positive destination within 24 months and at least 50 percent of | |

| | |
|---|---|
| participants exit with employment income as reflected in HMIS or another data system used by the applicant. | |
| Describe how the project will assess the service needs of the participants and provide those services | |
| The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. | |

AR5067-74. In the effectiveness column, each criteria assesses whether the project will provide services that are effective, whether the organization has experience with that type of project, and whether the housing will fit program participants' needs. These are related to effectiveness because (1) incorporating the evaluation of whether services are effective by definition brings in the concept of effectiveness, (2) organizational experience can show the ability to effectively administer programs, and (3) focusing on program needs makes it more effective. Because the criteria are logically related to the statutory ends, the criteria are not arbitrary or capricious. Similarly, keeping costs reasonable and diversifying funding streams make a project more efficient by keeping costs down for the CoC program.

9. The Law Enforcement Criteria are not arbitrary or capricious (NAEH Plaintiffs)

HUD acted reasonably in setting criteria related to cooperating with and not impeding law enforcement. A statutory goal of the McKinney-Vento Act is to minimize the trauma of

homelessness on individuals, families, and communities. 42 U.S.C. § 11381(2). Accordingly, the 2026 NOFO encourages CoCs to prevent and minimize the trauma of living on the streets or in encampments and with related public illicit drug use. AR65; *see also* Background, Section III.C.4 *supra*.

HUD's findings on the trauma caused by encampments, both to homeless individuals and the community, and the statutory mandate to minimize trauma, support the agency's decision to set criteria for CoCs to not impede or prevent law enforcement efforts to clear encampments. AR65-69; AR5037.

10. <u>The Bonus Limits are not arbitrary or capricious (NAEH Plaintiffs)</u>

No statute limits the Secretary's discretion in setting CoC Bonus amounts, and doing so is entrusted to the discretion of HUD by law. 42 U.S.C. § 11386a(b)(1)(G).

Even if these bonus amounts were reviewable, HUD acted reasonably in setting floors and caps on the bonus funds available for projects. AR73-74; AR5041. HUD set the Bonus to be 15% of the CoC's FPRN. AR5041. The Bonuses are subject to a floor of $500,000 and a ceiling of $5,000,000. *Id.* HUD found that previous Bonus amounts that were not subject to a floor or ceiling stifled competition and monopolized Bonus funding amounts. AR73. This is because Bonus amounts were granted based on a percentage of the CoC's FPRN, and larger CoCs would receive larger bonuses. *Id.* This would divert Bonuses to CoC's with larger resources, increasing their renewal demand year after year while steadily decreasing the share received by smaller CoCs. *Id.*

Plaintiffs argue that the original Bonuses advanced competition because CoCs competed for Bonus amounts already. NAEH Br. 41. But these previous Bonuses were determined simply by the size of the CoC. AR74. These Bonuses were not tied in any direct way to CoC

performance, merit, or outcome. By placing a ceiling on the awards, the Bonus amounts available for competition increase. *Id*. Thus, HUD determined that while uncapped bonuses decreased competition, applying caps would achieve Congressional intent for the CoC program to be competitive. *Id.*

Plaintiffs allege that HUD did not consider how Bonus Limits would disadvantage CoCs with relative higher need. NAEH Br. 41. HUD recognized that the change to Bonuses would result in a loss of Bonus resources to a small number of CoCs, but these resources are above and beyond the CoCs' existing renewal demands. AR74. And HUD determined that the loss of these extra resources was more than outweighed by the creation of a more level playing field for Bonus competition among all CoCs. *Id.*

### C. The Apportionment Footnotes Are Lawful and Reasonable

#### 1. <u>Plaintiffs' Claims Regarding the Apportionment Footnotes are Precluded</u>

Plaintiffs advance claims under the APA for apportionment actions allegedly in violation CoC statutes. But the APA does not apply where a "statute[] preclude[s] judicial review[.]" 5 U.S.C. § 701(a)(1). Here, 31 U.S.C. §§ 1512-1513, preclude judicial review.

In *Dep't of State v. Aids Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025) ("AVAC"), the Supreme Court stayed a district court's injunction after concluding that the Government had made a sufficient showing that the ICA precluded Plaintiffs' APA suit to enforce foreign assistance appropriations. *See id*. at 19. The D.C. Circuit has likewise held that the ICA establishes a carefully calibrated process of interbranch notice, congressional consideration, and enforcement by the Comptroller General that precludes review under the APA. *See Global Health Council v. Trump*, 153 F.4th 1, 7, 19 (D.C. Cir. 2025), *r'hg en banc denied*, No. 25-5097, 2025 WL 2709437. The same reasoning precludes review of Plaintiffs' claims.

Congress may impliedly preclude some parties from seeking APA review by enacting a detailed scheme that provides for review only by other parties. For example, in *Block v. Community Nutrition Institute*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain orders. 467 U.S. 340, 346 (1984). In holding that the statute precluded consumers from challenging those orders under the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

The same preclusive reasoning applied by the Supreme Court and D.C. Circuit with regard to the ICA and dairy orders applies to the 31 U.S.C. §§ 1512-1513 as well because of (1) the lack of private "rights creating language" in the statute and (2) the comprehensive remedial scheme set forth by Congress.

In 31 U.S.C. §§ 1512-1513, the statutory language is framed as restrictions on actions by Executive Branch officers—*i.e.*, "The official designated in section 1513 of this title to make apportionments shall . . . ." *See id.* § 1512. Thus, there is no "rights-creating language" present within the statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.") (citation omitted).

Turning to the comprehensive remedial scheme established by Congress: if an Executive Branch employee violates §§ 1512 or 1513, the head of the employee's agency must report the violation to the President, to Congress, and to the Comptroller General. *See* 31 U.S.C. §§ 1351, 1517(b). This comprehensive remedial scheme for addressing violations—through after-the-fact

reporting—confirms that Congress did not also intend for private individuals to pursue alleged violations through civil lawsuits seeking prospective, injunctive relief. *See Alexander*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Rather, reporting to Congress and the political processes are the appropriate means of enforcing its terms.

2. <u>The Apportionment Footnotes are not contrary to law (NAEH Plaintiffs Count 6)</u>

OMB acted within its statutory authority in setting Apportionment Footnotes on Congressional Appropriations. First, appropriations are required to be apportioned before obligation. 31 U.S.C. § 1512(a). The official designated to make apportionments shall apportion "as the official considers appropriate." *Id.* § 1512(b)(2). Originally, the President was the official who made apportionments, *Id.* § 1513(b)(1), but this authority was delegated to the Director of the OMB. Exec. Order No. 6166, § 16, 5 U.S.C. §§ 124–132 note (1953). Accordingly, OMB has the authority to make apportionments as it considers "appropriate."

OMB has issued guidance on apportionments. An apportionment is "an OMB-approved plan to use budgetary resources." OMB, Circular A-11 § 120.1. These apportionments can contain "additional information or direction associated with one or more lines on the request" *Id.* § 120.34. Footnotes that begin with the letter "A" have legal effect. *Id.*

The Apportionment Footnotes are within the statutory authority of OMB. Congress granted the President the extremely broad power to make apportionments as he considers "appropriate," 31 U.S.C. § 1512(b)(2), which was delegated to OMB. Exec. Order No. 6166 § 16. The first footnote directs HUD to obligate funds from the appropriation for competitive grants that include terms and conditions consistent with the directives provided in Executive Order 14332, "Improving Oversight of Federal Grantmaking." Protect Democracy, Homeless

Assistance Grants (May 22, 2026), https://perma.cc/JWZ6-WBGN. The second footnote directs HUD to obligate funds consistent with the directives provided in Executive Order 14321. *Id.* The rationale for both footnotes is that they "specify the purpose(s) for which the funds are available to be obligated." Limiting funds to be used for a certain purpose falls within the broad authority granted by Congress to make apportionments as considered "appropriate."

Nor do incorporating the requirements of these Executive orders fall afoul of any statute underlying the CoC program. The EOs themselves only require compliance as "consistent with applicable law." *See, e.g.,* Executive Order No. 14321 § 6(b), 90 Fed. Reg. at 35,819 ("This order shall be implemented consistent with applicable law"); Executive Order 14332, Improving Oversight of Federal Grantmaking, § 7(b), 90 Fed. Reg. at 38,933 (same). Both Executive Orders likewise preserve statutory authority and require implementation with applicable law.

And similar to Plaintiffs claims relating to the Executive Orders, these Apportionment Footnotes do not impose any obligations on the public, meaning that the Apportionment Footnotes have no effect on this litigation and Plaintiffs do not have standing to challenge them. And in any event, agencies such as HUD are already required to comply with Executive Orders.

Plaintiffs claim that the apportionment power does not authorize "OMB to use this power to implement policy objectives." NAEH Br. 47. Plaintiffs rely on *City of New Haven v. United States* but this case concerned the Anti-Deficiency Act and the impoundment power, not the power to make apportionments. 809 F.2d 900, 906 n.18 (D.C. Cir. 1987). The plain language of the apportionment statutes granted OMB wide latitude in apportioning funds, including for policy reasons.

3. <u>The Apportionment Footnotes are not arbitrary and capricious (NAEH Plaintiffs Count 7)</u>

Nor is OMB's use of the Apportionment Footnotes arbitrary and capricious. First, Executive Order 14332 "strengthen[s] oversight and coordination of, and [] streamline[s], agency grantmaking to address these problems, prevent them from recurring, and ensure[s] greater accountability for use of public funds more broadly." Exec. Order No. 14332, 90 Fed. Reg. 38,929 (Aug. 7, 2025). The Executive Order then sets various requirements on agencies for grantmaking. Because the Executive Order directly implicates grantmaking, and the appropriations are for grants under the CoC program, it was reasonable for OMB to include a footnote directing HUD to obligate funds consistent with Executive Order 14332.

Similarly, the Apportionment Footnote directing HUD to obligate funds consistent with the directives provided in Executive Order 14321 is not arbitrary and capricious. Executive Order 14321 contains directives to HUD to review its discretionary grant programs and prioritize grants to grantees in States and municipalities that enforce prohibitions on illicit drug use, urban camping, urban squatting, and adopt standards to address individuals who are a danger to themselves and others. Exec. Order No. 14321, 90 Fed. Reg. 35817 (2025). The Executive Order also directs HUD to change its homelessness support and transitional living programs to end support for "Housing First" policies, increase competition for grants, and hold grantees to higher standards of effectiveness. *Id.* HUD was also directed to require recipients of Federal housing assistance to increase requirements that persons participating in the recipient's programs who suffer from substance abuse or serious mental illness receive treatment. *Id.* at 35818. These directives each apply with force to how HUD makes grants under the CoC program. Because

Executive Order 14321 directly implicates the CoC program, it was reasonable for OMB to include it on the Apportionment Footnote for the CoC program.

Plaintiffs claim OMB's reliance on the Executive Orders as a justification for the apportionment footnotes is *per se* arbitrary and capricious. NAEH at 48. But Plaintiffs claim isn't supported by precedent. Plaintiffs cite *Woonasquatucket River Watershed Council v. U.S. Department of Agriculture*, but this case concerned an agency's freezing of grants that the court found overly broad and not connected to the E.O. 778 F. Supp. 3d 440 (D.R.I. 2025), *appeal filed,* No. 25-1428 (1st Cir. May 1, 2025). Here, the E.O.s are intimately connected with the appropriations, and the apportionment footnotes do not have any affect on Plaintiffs. Similarly, *National Council of Nonprofits v. OMB* involved freezing all financial assistance overnight and did not explain a connection between E.O.s and the action. 763 F. Supp. 3d 36, 55 (D.D.C. 2025). Again, the E.O.s here are rationally connected to the apportionment footnotes. Same for *King Cnty. v. Turner*, 785 F. Supp. 3d 863, 888-89 (W.D. Wash. 2025) (finding the E.O.s "bear no substantive relation to the agency's underlying action."), *appeal filed,* No. 25-3664 (9th Cir. June 10, 2025).

Moreover, "[a]gencies are bound to follow binding executive orders." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). The President has directed OMB to "coordinat[e]" with the executive agencies on "creating a process to review new funding opportunity announcements and to review discretionary grants to ensure that they are consistent with agency priorities and the national interest[,]" Exec. Order No. 14332 § 3, Improving Oversight of Federal Grantmaking. Consistent

with these Executive Orders, OMB has included footnotes on its apportionments to HUD reiterating the requirements of the Executive Orders. It cannot be arbitrary and capricious for OMB to comply with the Executive Orders in such a manner. Indeed, requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

**D. The 2026 NOFO does not violate the First Amendment (NAEH Plaintiffs Count 8, 11)**

NAEH Plaintiffs raise a First Amendment challenge to the 2026 NOFO's inclusion of standard Executive Order–compliance certifications explaining that the CoC program would be administered in accordance with applicable law—including, where relevant and permitted by law, Executive Orders that govern and bind agency activities. NAEH Plaintiffs also challenge the directive to not "interfere or impede" law enforcement activity.

The Federal government has significant discretion to impose funding conditions in grant programs that "may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *see also Rust v. Sullivan*, 500 U.S. 173, 194 (1991) (dismissing the notion that the "Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals").

With respect to the directive to not "interfere or impede" law enforcement, the condition does not violate the First Amendment. First, this directive is content neutral as "as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S.

781, 791 (1989); *see also United States v. Hicks,* 980 F.2d 963, 971 (5th Cir.1992) (recognizing that statute that prohibited passengers from intimidating any flight crew member or flight attendant so as to interfere with the performance of their duties did not discriminate against protected profanity or vulgarity, but rather incidentally regulated speech irrespective of its content); *CISPES v. FBI,* 770 F.2d 468, 474 (5th Cir.1985) (holding that statute that criminalized the act of willfully intimidating a foreign official in the performance of his duties did "not permit the government to discriminate on the basis of the content of expression. To the extent that it applies . . . at all to protected conduct, it is not a restriction on any particular message. It merely proscribes actions of a [n] . . . intimidating nature directed at any protected official").

A content-neutral restriction that has an incidental effect on speech valid so long as it is narrowly tailored to advance a substantial government interest. *Ward,* 491 U.S. at 796–98; *see also United States v. O'Brien,* 391 U.S. 367, 376–77 (1968). The law-enforcement directive serves a substantial government interest: it prevents CoCs from interfering with law enforcement in the performance of their duties, which ensure the safety of homeless individuals and the community. Moreover, this directive directly and effectively advances the government's interest in ensuring that law enforcement officers are not interfered with in the performance of their duties. *Ward,* 491 U.S. at 800. Finally, the directive is narrowly tailored, as it does "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799. Rather, it regulates speech only in the narrow context of when that speech can reasonably be found to have interfered with a law enforcement officer in the performance of the officer's duties.

With respect to the Executive Order provision, Defendants' significant discretion is magnified by the fact that Plaintiffs have not shown—nor can they show—that this provision

imposes anything on Plaintiffs themselves. All it does is direct agencies like HUD to undertake a series of actions, where "consistent with applicable law," to ensure that Federal funds "not be used to promote gender ideology." Exec. Order No. 14,168 § 3, 90 Fed. Reg. 8615, 8616-18 (Jan. 20, 2025). As both the Order and the NOFO itself make clear, the only obligations under this provision attach to HUD itself, not to any recipient of funding under the substantive provisions of the NOFO and any resulting grant agreement. Indeed, as both the Order and NOFO make clear, to the extent the Order conflicts with applicable law, HUD is not bound by the Order's terms. Gen. Admin. Requirements at 1. NAEH Plaintiffs have failed to show that Defendants have imposed *any* condition—let alone a condition that unconstitutionally burdens a recipient's First Amendment rights—on applicants under the 2026 NOFO. *See Agency for Int'l Dev.*, 570 U.S. at 214. Where no such condition exists, no First Amendment violation exists. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 546 (1983) (rejecting "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State").

1. <u>Because NAEH Plaintiffs cannot establish a constitutional violation, their contrary-to-constitutional-right claim under the APA fails (NAEH Plaintiffs Count 8)</u>

In addition to their substantive constitutional claims, NAEH Plaintiffs brings an independent contrary-to-constitutional-right claim under the APA.

Under the APA, Plaintiffs can succeed on such claims only if they have shown that the relevant agency action was "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Showing a constitutional violation is necessary to the corresponding APA claim—the statutory claims rise and fall with the substantive constitutional claims. *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 786 F. Supp. 3d 237, 256 (D. Mass. 2025) ("An analysis of whether agency action violates the APA because it is contrary to constitutional right

mirrors the analysis of whether the agency action violates the relevant constitutional provision."); *c.f. United States v. District of Columbia,* 897 F.2d 1152, 1158 (D.C. Cir. 1990) ("APA review, it appears to us, even if it were available, would only mirror review under the Constitution.").

As explained above, the 2026 NOFO complies with the substantive constitutional provisions that Plaintiffs cite in this litigation. *See supra* Section D. Defendants are thus entitled to summary judgment on Plaintiffs' APA contrary-to-constitutional right claims.

## II. If the Court Is Inclined to Grant Relief, the Court Should Craft a Narrow Remedy

### A. Defendants Do Not Oppose an Expeditious Ruling

Plaintiffs request that this court expeditiously rule on the motions for summary judgment. Without conceding any of the facts set forth by Plaintiffs, Defendants do not oppose their request.

### B. The Court Should Limit Relief to the Provisions, If Any, On Which Plaintiffs Prevail

Any relief beyond a mere stay or vacatur of the specific challenged conditions in the 2026 NOFO would be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The 2026 NOFO contains a severability provision. AR5113 ("[I]f any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice.").

Plaintiffs and Defendants all agree that, should any term of the 2026 NOFO be held unlawful, that portion should be severed and the rest of the 2026 NOFO should go forward. Such

limited relief would be in accordance with the severability provision. Moreover, such a limited order would properly respect the separation of powers by avoiding judicial "restructur[ing of] the operations of an executive branch of government" and "superintend[ence of] its operations on an ongoing basis." *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018). As the Supreme Court has explained in the statutory context, "[c]onstitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020). So too here. "[T]he tail . . . does not wag the dog[.]" *Id.*

For the Court's convenience in crafting a potential order, the challenged provisions as styled by Plaintiffs are set out below:

1. The Set-Aside Provision/De Facto Cap
2. The Safe Drug Use Condition and Certification
3. The Self-Sufficiency Criteria
4. "Risk Review" and "Additional Factor" Criteria
5. Discriminatory Disability Priority
6. Executive Order Conditions
7. Judicial Restrictions
8. Non-statutory Threshold Criteria
9. Service Criteria
10. Law Enforcement Criteria
11. Bonus Limits

### C. Injunctive Relief Is Not Appropriate

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. 682, at 702. As Defendants have explained above, Plaintiffs' APA claims fail on the merits for several independent reasons. But should the Court hold otherwise, Defendants emphasize that any relief that the Court orders can extend no further than relief from the challenged agency action—*i.e.,* recission of the challenged provisions or footnotes.

Under "settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)). Accordingly, any relief on Plaintiffs' § 706(2) claims should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand, including how to proceed with awarding CoC funds and to whom and how to apportion funds.

An injunction in addition to vacatur would be duplicative, and thus should be denied. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citations omitted). "If a less drastic remedy (such as partial or complete ... vacatur of [the agency's] decision) [is] sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Id*. 165–66 (internal citations omitted).

Plaintiffs ask for an order enjoining any of the vacated provisions. *NAEH Litigation*, ECF 44 at 2; NAEH Br. 46. Even if the Court is inclined to grant some relief, this relief should be denied as duplicative. Here, vacatur of any of the challenged provisions and a judgment

declaring those actions unlawful or arbitrary and capricious would provide the Plaintiffs complete relief *See Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("To 'vacate[ ]' ... means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'") (quoting 91 C.J.S. *Vacate* (1955)). Enjoining Defendants from implementing or enforcing a policy that has been vacated would be duplicative. So too would an injunction of the OMB Footnotes be duplicative of a declaratory judgment that future footnotes imposing those specific apportionments on the 2026 NOFO would be unlawful.

Nor can Plaintiffs establish irreparable harm from the OMB footnotes. As stated, *supra* I.C., the OMB footnotes impose no requirements, determine no legal rights, or cause any effects on Plaintiffs. For the same reason they do not have standing to challenge the OMB footnotes, they do not show irreparable harm.

Plaintiffs also ask for an order enjoining HUD from making Tier 2 awards. *NAEH Litigation*, ECF 44 at 2. Plaintiffs allege that, absent an injunction, HUD could make Tier 2 awards. NAEH Br. 24. This is true, but the Court has no basis to enjoin HUD from making Tier 2 awards. "An injunction requires a relationship between the injury claimed in the motion and the conduct asserted in the complaint." *Vidot v. R.I. Dep't of Corr.*, No. CV 22-305JJM, 2024 WL 4262767, at *4 (D.R.I. Sep. 23, 2024). "Assertions that are entirely different from the claims raised and relief requested in a complaint cannot provide the basis for a preliminary injunction." *Id.* It would not be unlawful for HUD to make these awards with any allegedly unlawful provision stricken, nor has Plaintiff alleged that the act of making Tier 2 awards is arbitrary and capricious. In essence, Plaintiffs' requested injunction has no nexus to any legal claim against HUD.

Nor can Plaintiffs show irreparable harm, because their alleged harm is speculative. Plaintiffs argue that, but for the allegedly lawful provisions, they would have submitted other projects, and those projects would have received funding. NAEH Br. 24. But it is entirely speculative that these other projects would have been awarded funds: the program is a competitive one, and they may not have been selected regardless.

The balance of the equities and the public interest also tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). Plaintiffs' requested injunction would result in Tier 2 funds not being obligated by the required December 1 deadline. *See* 2026 Appropriations Act, 140 Stat. at 400. Running the CoC competition is time-intensive, and if Plaintiffs rerun their competitions, they resubmit their applications, and then HUD re-reviews, it would be long past December 1 by the time HUD is able to resume the competition and make awards. And this could cause funding gaps when existing grants begin to expire on January 1, 2027. Without an injunction, more programs will be funded and there will not be funding gaps: with an injunction, there will be less funding (for at least a time), fewer programs, and possible funding gaps.

### III. The Court Should Not Enter a Preliminary Injunction

Plaintiffs have withdrawn their request for a preliminary injunction in light of the stipulation. ECF 44.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and a preliminary injunction and grant Defendants' motion for summary judgment.

DATED: October 7, 2026

Respectfully submitted,

BRETT A. SHUMATE

Assistant Attorney General

AMBER RICHER
Assistant Branch Director

*/s/ Michael Bruns*
Michael Bruns
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that, on October 7, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Michael Bruns*

Michael Bruns

Trial Attorney