**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*,<br><br>*Defendants*. | Case No. 26-cv-436-MSM-AEM |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


Table of Authorities .......... iii

Introduction .......... 1

Argument .......... 2

I. The Set-Aside Is Invalid .......... 2

A. The Set-Aside exceeds HUD's statutory authority .......... 2

B. The Set-Aside conflicts with 42 U.S.C. § 11386c(b) by improperly disqualifying renewals .......... 4

C. The Set-Aside is arbitrary and capricious .......... 6

II. Multiple Other NOFO Provisions Are Invalid .......... 10

A. Service Requirements Criteria .......... 10

B. Anti-Harm Reduction Provisions .......... 13

1. The Safe Drug Use Certification and Condition exceed Defendants' statutory authority .......... 13

2. All of the NOFO's Anti-Harm Reduction Provisions are arbitrary and capricious .......... 15

C. Law Enforcement Criteria .......... 16

1. The Local Policies Criterion violates the First Amendment .......... 16

2. All of the Law Enforcement Criteria are arbitrary and capricious .......... 16

D. Subjective "Risk Review" and Additional Factor Criteria .......... 17

E. Self-Sufficiency Criteria .......... 18

F. Discriminatory Disability Priority .......... 19

G. Non-Statutory Threshold Criteria .......... 22

H. Bonus Limits .......... 23

I. E.O. Conditions .......... 24

III. The OMB Apportionment Footnotes Are Invalid .......... 27

A. Plaintiffs properly challenge the Apportionment Footnotes under the APA .......... 27

B. The Apportionment Footnotes exceed Defendants' statutory authority .......... 28

C. The Apportionment Footnotes are arbitrary and capricious .......... 30

IV. The Court Should Grant Plaintiffs' Requested Relief .......... 32

A. Defendants do not dispute that vacatur and declaratory relief are appropriate remedies .......... 32

B. Injunctive relief is also warranted .......... 32

1. An injunction blocking HUD from making Tier 2 awards until CoCs have an opportunity to submit new Tier 2 applications is necessary to provide a meaningful remedy for the Set-Aside ........ 33

2. An injunction blocking HUD from reimposing the challenged provisions is necessary to prevent HUD from reapplying those criteria behind the scenes ........ 35

Conclusion ........ 36

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Fed'n of Gov't Emps. v. FLRA*,
470 F.3d 375 (D.C. Cir. 2006) ........ 9

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ........ 26

*Bloate v. United States*,
559 U.S. 196 (2010) ........ 18

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........ 28

*Boston Chapter, NAACP, Inc. v. Beecher*,
371 F. Supp. 507 (D. Mass. 1974) ........ 34

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........ 32

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........ 26

*City of Fresno v. Turner*,
No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. 2025) ........ 26

*City of New Haven v. United States*,
809 F.2d 900 (D.C. Cir. 1987) ........ 29

*Common Cause v. Trump*,
506 F. Supp. 3d 39 (D.D.C. 2020) ........ 26

*Dep't of State v. AIDS Vaccine Advocacy Coal.*,
146 S. Ct. 19 (2025) ........ 28

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........ 11

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 28

*Guckenberger v. Bos. Univ.*,
974 F. Supp. 106 (D. Mass. 1997) ........ 20

*Hosp. Klean of Tex, Inc. v. United States*,
65 Fed. Cl. 618 (2005) ........ 34

*Int'l Refugee Assistance Project v. Trump*,
373 F. Supp. 3d 650 (D. Md. 2019) ........ 31

*Killip v. OPM*,
991 F.2d 1564 (Fed. Cir. 1993) ........ 13

*Mach Mining, LLC v. EEOC*,
575 U.S. 480 (2015) .... 27

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024) .... 8

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .... 35

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .... 6, 8, 15, 31

*Nat'l Alliance to End Homelessness v. HUD*,
No. 26-1923 (1st Cir. Sept. 16, 2026) .... 4

*Nat'l Alliance to End Homelessness v. HUD*,
No. 25-cv-636 (D.R.I.) .... 10

*Nat'l Ctr. for Learning Disabilities v. OMB*,
No. 26-cv-13019, 2026 WL 2754447 (D. Mass. Sept. 17, 2026) .... 27, 31

*Nat'l Endowment for Democracy v. United States*,
795 F. Supp. 3d 63 (D.D.C. 2025) .... 29

*Reisman v. Associated Faculties of Univ. of Me.*,
939 F.3d 409 (1st Cir. 2019) .... 30

*R.R. Ave. Props., LLC v. Acadia Ins. Co.*,
37 F.4th 682 (1st Cir. 2022) .... 23

*Sorenson Comm'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .... 17, 18

*Trump v. Am. Fed'n of Gov't Emps.*,
145 S. Ct. 2635 (2025) .... 26

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) .... 18

*Webster v. Doe*,
486 U.S. 592 (1988) .... 23

**Statutes**

31 U.S.C. § 1512 .... 29, 30

42 U.S.C. § 11302 .... 6, 7

42 U.S.C. § 11313 .... 16

42 U.S.C. § 11360 .... 21

42 U.S.C. § 11381 .... 6, 7, 22

42 U.S.C. §§ 11381–11389 .... 23

42 U.S.C. § 11386a ........ 2, 3, 17, 20, 22

42 U.S.C. § 11386b ........ 4

42 U.S.C. § 11386c ........ 4, 5

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 ........ 12

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 ........ 12

2026 Appropriations Act, Pub. L. No. 119-75, 140 Stat. 173 ........ 12, 17, 22, 23

**Regulations**

2 C.F.R. § 200.300 ........ 13

24 C.F.R. § 578.17 ........ 34

24 C.F.R. § 578.37 ........ 11

24 C.F.R. § 578.53 ........ 21

24 C.F.R. § 578.93 ........ 20, 21

89 Fed. Reg. 65769 (2024) ........ 11

Notice; Delegation of Apportionment Authority, 90 Fed. Reg. 9737 (Feb. 18, 2025) ........ 29

**Executive Orders**

Exec. Order No. 6166, § 16 (June 10, 1933), *reprinted in* 5 U.S.C. § 901 note ........ 29

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ........ 24

Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ........ 24

Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025) ........ 24

Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 25, 2025) ........ 24

**Legislative Materials**

S. Rep. No. 93-688 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3504 ........ 29

**Other Authorities**

Comptroller General of the United States, B-163628 (Jan. 4, 1974), https://perma.cc/KJP5-RKRR ........ 29

HUD, CoC System Performance Measures Data Since FY 2025, https://perma.cc/7WSK-UE5J ........ 8

HUD, *Gen. Admin., Nat'l, and Departmental Pol'y Requirements and Terms for HUD's Fin. Assistance Programs* (2026), https://perma.cc/25EU-TBVW................ 25

OMB, *Approved Apportionments*, https://apportionment-public.max.gov/ (FY 2027 HUD apportionment for Account 086-0192, *available at* https://perma.cc/V9UH-8V27)........................................................................ 27

OpenOMB, *Homeless Assistance Grants*, https://perma.cc/JWZ6-WBGN (captured June 16, 2026)........................................................................... 28

U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations Law* (3d ed. 2006), https://perma.cc/3CWL-WX35 .......................... 30

## INTRODUCTION

Defendants fail to show that the Department of Housing and Urban Development's (HUD's) FY 2026 Notice of Funding Opportunity (NOFO) for the Continuum of Care (CoC) program comports with Congress's commands or the Administrative Procedure Act's (APA's) requirements for reasoned decisionmaking. In radically upending the federal government's primary response to homelessness, Defendants double down on criticizing HUD's own longstanding approach that has prioritized permanent housing. But, try as Defendants might to turn this into a policy debate, Congress set the parameters for the CoC program, and Defendants must abide by them, whether or not it is their preferred approach. As Plaintiffs have shown, many aspects of the FY 2026 NOFO exceed Defendants' statutory authority or even outright conflict with governing laws. Defendants' basic response is that the statute gives HUD extraordinarily broad discretion to do as it pleases. But Defendants' interpretations cannot be squared with the statute's text.

In addition to straying beyond the bounds Congress set, the challenged aspects of the FY 2026 NOFO are also arbitrary and capricious. HUD distorts the facts and evidence and pays nothing more than lip service to—or completely ignores—many important impacts of its decisions. In some instances, Defendants even offer facially illogical justifications for their choices, including by claiming that making huge numbers of projects categorically ineligible for the $1.3 billion Set-Aside—and limiting the applicant pool—somehow *increases* competition. At bottom, Defendants claim they need to transform the program to better address homelessness, but they pursue their predetermined strategy without considering important factors or offering rational explanations. That violates the APA.

Defendants likewise fail to persuasively defend the Apportionment Footnotes that the Office of Management and Budget (OMB) imposed to compel HUD to award funds according to the mandates of two executive orders.

The Court should enter summary judgment for Plaintiffs and grant their requested relief.

## ARGUMENT

### I. The Set-Aside Is Invalid

The Set-Aside is invalid for three independent reasons: It exceeds HUD's statutory authority, conflicts with a governing statute, and is arbitrary and capricious.

#### A. The Set-Aside exceeds HUD's statutory authority

Contrary to Defendants' contentions (at 30–36), 42 U.S.C. § 11386a(g)(1)(B) does not authorize HUD to adopt the Set-Aside. That provision authorizes HUD to impose criteria for making awards only insofar as the criteria are "appropriate to carry out [the CoC program] in an effective and efficient manner." 42 U.S.C. § 11386a(g)(1)(B). The Set-Aside does not meet this requirement.

To start, Defendants' attempts to defend the Set-Aside as advancing effectiveness and efficiency are illogical. Defendants claim (at 31) that the Set-Aside "is effective" because it "increase[es] competition" by "expand[ing] the scope of applicants and projects," but that is demonstrably false. The Set-Aside categorically disqualifies existing projects from consideration (and comes close to outright disqualifying new permanent housing projects as well)—thereby limiting the pool of eligible applications and *decreasing* competition. For similar reasons, Defendants err in contending (at 31) that the Set-Aside is "efficient" because it "remove[s] uncompetitive projects and ensure[s] that only the best performers will receive funds." The Set-Aside disqualifies existing projects and permanent housing projects no matter how competitive

they would be or how well they perform. It fundamentally does not serve effectiveness or efficiency to restrict the applicant pool for nearly all Tier 2 funding.

Beyond that, Defendants also offer no persuasive response to Plaintiffs' point that the Set-Aside impermissibly overrides Congress's own judgment about what makes the CoC program effective and efficient. *See* Mem. i.s.o. Pls.' Am. Mot. for Partial Summ. J. (Pls.' Mem.) at 15–17 (Dkt. No. 44-2). For one, the Set-Aside effectively overrides the remainder of § 11386a(b), in which Congress itself imposed a lengthy list of criteria that HUD "shall" consider when making awards. 42 U.S.C. § 11386a(b)(1)(A)–(F). Because the Set-Aside conclusively favors transitional housing and supportive-services-only projects, the statutorily enumerated criteria are left with little role to play. Defendants protest (at 33) that HUD still considers those other criteria when choosing among transitional housing and supportive-services-only projects, but that hardly gives the statutory criteria meaningful effect. Without question, the Set-Aside overrides the criteria that Congress mandated: Because of the Set-Aside, a permanent housing project that is better on every single criterion that Congress imposed will necessarily lose out to any new transitional housing or supportive-services-only project, no matter how poorly those projects fare under the criteria that Congress deemed important. Congress did not authorize HUD to adopt new criteria that render Congress's own criteria so trivial.

Congress also did not authorize HUD to countermand Congress's own judgment that renewals and permanent housing should be prioritized. Pls.' Mem. at 16–17. Defendants do not (and could not) dispute that the Set-Aside strips funding from renewals and permanent

housing—or that Congress gave those projects special priority.[1] Instead, Defendants go provision by provision to argue (in some cases incorrectly, *see infra* Section I.B) that the Set-Aside does not conflict with individual provisions. But that misses the forest for the trees. Congress undeniably deemed renewals and permanent housing important, *see* Pls.' Mem. at 16–17—and, whatever discretion Congress gave HUD to adopt new criteria for making awards, it did not authorize the agency to undermine the very projects that Congress itself prioritized.[2]

### B. The Set-Aside conflicts with 42 U.S.C. § 11386c(b) by improperly disqualifying renewals

As Plaintiffs' opening brief explains (at 17–18), the Set-Aside also conflicts with the statutory mandate that HUD "determine whether to renew" permanent housing projects "on the basis of" the CoC's certification that two (and only two) specified criteria are satisfied. 42 U.S.C. § 11386c(b). Defendants fail to show otherwise.

Defendants' first response is to claim that the statute grants HUD broad discretion to choose what amounts to make available for permanent housing renewals. Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mots. for Summ. J. (Defs.' Mem.) at 38 (Dkt. No. 46). It does no such thing. The provision that Defendants rely on (at 37–38) provides that permanent housing renewals "may be funded" under "either" of two accounts—the "appropriations account" for the

---

[1] Defendants assert (at 32) that "CoC statutes … make clear that Transitional Housing is a particular priority of the CoC program," but that is mistaken. The provision that Defendants cite clarifies only that nothing in the statute limits the amount of funding an applicant can request for "acquisition, construction, or rehabilitation activities" to develop "permanent housing or transitional housing." 42 U.S.C. § 11386b(c). That provides some protection for the development of new housing (permanent or transitional) but does not reflect any special priority for transitional housing.

[2] Defendants also incorrectly assert (at 35) that "the First Circuit already considered and rejected" this argument. The First Circuit's summary stay order concluded only that "HUD is likely to succeed on the argument that the set-aside is not a 'bonus or other incentive[]'" under the statute. Order, *Nat'l Alliance to End Homelessness v. HUD*, No. 26-1923 (Sept. 16, 2026).

CoC program or a Section 8 account. 42 U.S.C. § 11386c(a). This grants discretion to draw money from a separate appropriation—a particular Section 8 account—to fund permanent housing renewals in the CoC program. It does not grant HUD discretion to make funding that Congress specifically appropriated for the CoC program unavailable for CoC permanent housing renewals. In other words, subsection (a) governs the possible sources of funding, not HUD's discretion to grant or deny renewals. Subsection (b) speaks to that—and provides in no uncertain terms that HUD "shall determine whether to renew" a permanent housing award "on the basis of certification by the [CoC]" that two specified criteria are met. 42 U.S.C. § 11386c(b). That subsection grants HUD no discretion to decide whether to renew such awards based on any other factors.

Defendants relatedly contend (at 38) that Congress did not "impose a particular allocation breakdown" mandating that a specific amount go to renewals. That is non-responsive. Plaintiffs do not contend that Congress mandated that a specific dollar amount go to permanent housing renewals; they claim that Congress specified a narrow set of criteria for HUD to consider when "determin[ing] whether" to grant those renewals—and that the Set-Aside causes HUD to reject such renewals on grounds not authorized by statute. 42 U.S.C. § 11386c(b).

Defendants also claim (at 39) that subsection (c) "commit[s] … renewal discretion" to HUD and allows it to reject renewals based on other "criteria" as well. 42 U.S.C. § 11386c(c). Plaintiffs already explained why that is wrong: That provision clarifies that HUD is not prohibited "*from renewing* contracts" in accordance with other criteria, 42 U.S.C. § 11386c(c), but that does not mean that HUD can also *decline to renew* permanent housing contracts in accordance with other criteria as well. Pls.' Mem. at 18. Defendants do not respond to this point.

Defendants' miscellaneous other arguments also fall flat. For instance, Defendants assert that HUD previously "chose to shift the vast majority of its CoC funds to Permanent Housing

and Tier 1 projects" and that, if that was legal, the Set-Aside for new transitional housing and supportive-services-only projects must be, too. Defs.' Mem. at 38 (emphasis omitted). That makes no sense because § 11386c provides protections for permanent housing renewals—not for the transitional housing and supportive-services-only projects to which Defendants now seek to shift funding. Defendants also contend (at 39–40) that Plaintiffs' interpretation of subsection (b) "is inconsistent with" the "*competitive*" nature of the CoC program. But *the Set-Aside* is inconsistent with the competitive nature of the CoC program: It makes the permanent housing renewals that Congress protected categorically ineligible to compete for $1.3 billion in funding.

**C. The Set-Aside is arbitrary and capricious**

The Set-Aside is also arbitrary and capricious. While Defendants claim that diverting funding to new transitional housing and supportive-services-only projects was a reasonable policy choice, their creation of the Set-Aside flunks arbitrary-and-capricious review for multiple independent reasons: Defendants failed to consider multiple "important aspect[s] of the problem"; "offered an explanation … that runs counter to the evidence"; and failed to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted).

To start, Defendants did not meaningfully consider the impact the Set-Aside would have on providers (whose existing projects would be defunded) or participants (who would lose their housing assistance as a result), and likewise did not consider the reliance interests of those stakeholders. Pls.' Mem. at 19–21. Defendants insist (at 54–55, 60, 64–66) that they did consider those factors—but any consideration was entirely superficial and failed to address key issues. As for the participants, Defendants claim (at 60, 65–66) that participants can just move to transitional housing. But Defendants do not explain how this can be squared with Congress's goals—given that the statute considers people in transitional housing to be homeless and

Congress designed the CoC program to help people *out* of homelessness. *See* 42 U.S.C. §§ 11302(a)(3), 11381. Moreover, as Plaintiffs' opening brief explains (at 20), moving people to transitional housing will generally not be a realistic option in any event, including because transitional housing will often not be available at the right time, in the right geographic area, or at all. Defendants claim (at 60) that this "disagree[ment]" about "the viability" of participants' moving to transitional housing is irrelevant because Defendants "consider[ed] the issue." But they did not. Defendants did not consider the multiple barriers that will prevent many existing participants from remaining stably housed—undeniably an important aspect of the problem.

Moreover, as Defendants themselves concede (at 55), transitional housing will not work for many populations, including the most vulnerable. And while Defendants emphasize (at 55) that some permanent housing will continue to be funded (because CoCs will put permanent housing projects in their Tier 1), Defendants do not and cannot show that it will be enough. Without question, the Set-Aside will cause many of the most vulnerable people to lose their housing. *See* Pls.' Mem. at 19–20. Defendants ignore that aspect of the problem as well.

Defendants also fall short in considering the impact on providers. On that, Defendants tout that the NOFO offers "transition grants" that would allow providers to transition permanent housing projects to transitional housing over the course of a year. *See* Defs.' Br. at 54, 65–66. But, as Plaintiffs explained, this ignores that such transitions are often not workable for a host of reasons—(1) because regulations functionally barred nonprofit providers from offering transitional housing; (2) because insurers may refuse to insure transitional housing properties; and (3) because properties used for permanent supportive housing often have deed restrictions that prevent providers from switching them to transitional housing. Pls.' Mem. at 20–21.

On the first point, HUD protests (at 65) that it waived those regulations on September 18, 2026. But that was too late to make any difference. While Defendants misleadingly point out (at

65) that the waiver came before the deadline for CoCs to apply to HUD, that is not the relevant deadline. The NOFO required individual providers—including the nonprofits that operate a lot of the existing permanent housing—to apply to their CoCs before then. And at that earlier time, regulations still effectively excluded nonprofits from offering transitional housing—meaning they could not apply. On the latter two points, Defendants *now* acknowledge (at 66) that insurance availability and deed restrictions would prevent some existing providers from transitioning to transitional housing. But they did not consider these hurdles when adopting the NOFO, and their post hoc dismissal of them now does not satisfy the APA's requirements for reasoned decisionmaking. *Cf. Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) ("It is a bedrock principle of administrative law that a court reviewing agency action may consider only the agency's explanation given at the time the relevant decision was made, as opposed to its post hoc rationale.").

Defendants' explanation for so radically favoring transitional housing and supportive-services-only projects also "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. While Defendants assert (at 55) that transitional housing will be "more effective[]," they offer no actual support for that belief. They emphasize (at 51–52) that homelessness increased while CoC funding focused principally on permanent housing, but that confuses correlation with causation. There are many other explanations for the rise in homelessness during that period. *See* Pls.' Mem. at 28. And the evidence in fact shows that transitional housing produces worse outcomes than permanent housing. HUD, *CoC System Performance Measures Data Since FY 2025*, https://perma.cc/7WSK-UE5J (HUD spreadsheet with data showing that people exiting transitional housing return to homelessness more frequently than people exiting

permanent housing)[3]; Administrative Record (AR)[4] 53 (HUD memo noting that "Rapid Rehousing [a type of permanent housing] has the highest level of increases in earned income"); AR 1683 (assignment to rapid rehousing led to less psychological distress and substance use than assignment to transitional housing); AR 1680 (permanent housing results in "greater prevention of homelessness" than transitional housing).

Defendants also offer explanations that fail to meet APA standards of rationality. For one, they double down on claiming (at 59) that the Set-Aside "furthers competition." But Defendants do not—and cannot—explain how that is so. The Set-Aside makes existing projects categorically ineligible to compete and conclusively tips the competition in favor of new transitional housing and supportive-services-only projects, no matter their merit. That restricts competition; it does not advance it. Defendants' illogical reasoning alone renders the Set-Aside arbitrary and capricious. *See Am. Fed'n of Gov't Emps. v. FLRA*, 470 F.3d 375, 380 (D.C. Cir. 2006) ("Certainly, if the result reached is illogical on its own terms, the [agency's] order is arbitrary and capricious." (cleaned up)).

Defendants also suggest that they should be able to implement the Set-Aside's shift away from permanent housing because they "forewarned" stakeholders it was coming. Defs.' Mem. at 64; *see also id.* at 54. But that forewarning does not change the fact that Defendants failed to consider key issues and based their decision on irrational reasoning. Nor does it matter that Defendants did not announce these changes quite so abruptly this year as they did last year. *Contra* Defs.' Mem. at 64–65. While Defendants claim (at 50) that Plaintiffs "conceded" that

---

[3] All years for which data is available—2018-2023—show that rates of "Total Persons Returns in 24 m[on]ths" is higher for "Transitional Housing" than for "Permanent Housing."

[4] Relevant excerpts of HUD's administrative record are included in the Consolidated Excerpts of Administrative Record at Dkt. No. 33-1.

HUD could implement these changes if it just waited until this year, Plaintiffs did no such thing. Last year, the extremely last-minute timing alone made it illegal and arbitrary and capricious for HUD to make its desired changes. *See, e.g.*, Pls.' Mem. in Supp. of Mot. for Summ. J. at 33–38, *NAEH v. HUD*, No. 25-cv-636 (D.R.I. filed Jan. 14, 2026) (Dkt. No. 67-1). Plaintiffs pointed out that HUD could avoid that particular timing problem by instead waiting until the following year—but in no way suggested that HUD's changes would not present *other* problems. *See, e.g.*, *id.* at 36 ("Nowhere does the record explain … why the agency could not wait until a new funding cycle to make any *lawful* changes on a timely basis" (emphasis added)).

## II. Multiple Other NOFO Provisions Are Invalid

Multiple other provisions of the FY 2026 NOFO are invalid as well.

### A. Service Requirements Criteria

Defendants do not specifically respond to Plaintiffs' claim that the Service Requirements Criteria are arbitrary and capricious. *Compare* Pls.' Mem. at 25–29, *with* Defs.' Mem. at 50–79. But even extrapolating arguments from their defenses of some of the other challenged provisions, Defendants fail to counter Plaintiffs' arguments that the Service Requirements Criteria are neither reasonable nor reasonably explained.

For example, Defendants submit that it is "reasonable to encourage treatment and support" because treatment "remove[s] one obstacle for homeless individuals to achieve self-sufficiency." Defs.' Mem. at 69. But "encouraging" treatment is different from mandating it, which is what the NOFO's Service Requirements push providers to do. And, as Plaintiffs explained (at 26–27, 28–29), the evidence shows that making treatment voluntary produces better outcomes, including because it meets people where they are and does not cause them to lose trust or disengage. In response, Defendants repeatedly tout a study that they claim "show[s] that service requirements have better outcomes." Defs.' Mem. at 57, 69–70 (citing AR 61). But

their cited study—the linchpin for their factual finding—is entirely off-point: It did not address homeless populations or service requirements for housing at all, much less purport to disagree with studies showing the effectiveness of Housing First. Rather, that study found that a particular state involuntary outpatient commitment program for individuals experiencing severe mental illness led to better hospitalization and engagement outcomes than voluntary treatment. AR 3311. Pointing to that single off-point study does not constitute a "reasoned explanation … for disregarding facts and circumstances that underlay" HUD's prior policy favoring voluntary treatment. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). That failure alone renders the Service Requirements Criteria arbitrary and capricious. *See id.*

Defendants otherwise do not respond to Plaintiffs' contention that the agency "distorts or outright ignores the evidence to justify its departure from Housing First." Pls.' Mem. at 28. Instead, Defendants simply assert (at 70–71) that "the evidence on Housing First is mixed and complicated" and urge the Court to defer to the agency on "how to interpret the data." Missing is any citation to the record or any relevant data. And although Defendants double down on their reliance on the HUD-VASH homeless veterans program as evidence that service mandates work, they remain incorrect that the program imposes mandatory service requirements. *See* Pls.' Mem. at 29. The requirement that participants "receive the case management services … as needed," 89 Fed. Reg. 65769, 65775 (2024); *see* 24 C.F.R. § 578.37(a)(1)(ii)(F), is consistent with a Housing First approach and unlike the more intensive services that the NOFO's Service Requirements mandate. *See, e.g.*, AR 5083 (FY 2026 NOFO awards points for mandating "substance abuse treatment"); AR 5068–69 (FY 2026 NOFO requires "at least 20 hours per week of engagement in services"). HUD thus has not reasonably explained its decision to abandon Housing First and implement the Service Requirements Criteria instead.

Defendants also fail to show that HUD adequately accounted for the enormous disadvantage these criteria inflict on entities that aid survivors of domestic violence and sexual assault—who in most cases cannot lawfully mandate services. *See* Pls.' Mem. at 27. Instead, Defendants respond with non sequiturs. They point out (at 70) that they provided "a bonus for domestic violence service providers," but that bonus is the opportunity to compete for $104 million in funding that Congress specifically earmarked for domestic violence services. AR 5011; 2026 Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399–400; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, tit. I, § 1101, 139 Stat. 9, 12; Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F., tit. II, 138 Stat. 25, 363. Defendants do not explain how following that congressional mandate justifies otherwise systematically disadvantaging domestic violence services—which the Service Requirements Criteria do both (1) by disadvantaging domestic violence providers in the competition for all *other* CoC funding (because they cannot earn the significant points awarded to projects that impose service requirements, *see* AR 5095) and (2) by disadvantaging any CoC that seeks Domestic Violence Bonus funding or any other funding for domestic violence service providers in their applications (because including domestic violence projects will drag down the whole CoC's score because those projects cannot impose service requirements, *see* Declaration of Ann Marie Oliva (Oliva Decl.) ¶¶ 128–29 (Dkt. No. 30-4)).

Defendants also claim (at 70) that they provided a "Violence Against Women Act carveout" from the merit criteria favoring service requirements, but—as Plaintiffs pointed out (at 27)—the carveout does not address the actual problem. The NOFO's "carveout" addresses an unrelated issue and still leaves domestic violence providers unable to earn the many points the NOFO awards for mandating services that domestic violence providers cannot lawfully mandate. AR 5084, 5095. Defendants do not respond to this point—apparently because they have not

considered it. Defendants also note (at 70) that another statute only requires services under *that* statute to be voluntary, but they do not consider or address the practical difficulties providers face in complying with the conflicting mandates when a project receives funding from both of these sources. This failure to consider the impact on domestic violence services is yet another independent reason why the Service Requirements Criteria are arbitrary and capricious.

**B. Anti-Harm Reduction Provisions**

***1. The Safe Drug Use Certification and Condition exceed Defendants' statutory authority***

Defendants fail to effectively rebut Plaintiffs' points (1) that the Safe Drug Use Certification and Condition improperly restrict grantees' harm reduction activities outside the scope of the HUD-funded program, (2) that those provisions are not limited to requiring grantees to comply with federal criminal laws, and (3) that, regardless, HUD lacks authority to enforce the criminal laws that the provisions invoke.

On the first point, Defendants first contend (at 40) that an OMB regulation "could be read" to require agencies to ensure grantees' compliance with federal laws. But a regulation, of course, cannot grant HUD authority that Congress itself has not conferred. *E.g.*, *Killip v. OPM*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) (explaining that "no … regulation can confer on the agency any greater authority than that conferred under the governing statute"). And, in any event, the cited regulation does not reach beyond funded programs—and is instead limited to "ensur[ing] that Federal funding is expended and associated programs are implemented" in accordance with federal laws. 2 C.F.R. § 200.300(a).

As a litigation position in their briefing to this Court, Defendants alternatively assert (at 41), without explanation, that the "the NOFO limits" these provisions "to those activities and projects funded with CoC funds," but that is decidedly not what the NOFO says. The NOFO

requires applicants to certify that "[t]he project applicant" will not engage in the covered activities, and it specifies that awards will not fund any "project, service provider, or organization" that engages in the covered activities. *See* AR 5065, 5113. By their plain text, these provisions thus straightforwardly constrain the "applicant," "service provider," and "organization" generally, not just their HUD-funded activities.

On the second point—that these provisions go beyond requiring grantees to comply with existing laws—Defendants ignore Plaintiffs' showing that, in actually implementing the Safe Drug Use Certification, HUD has abandoned the language referring to federal criminal statutes and instead required applicants to attest that they will not engage in safe consumption or other related activities, period, regardless of whether those activities violate federal law. Pls.' Mem. at 30–31 & n.11. Defendants also do no more than wish away the fact that, even considering the NOFO's language that refers to criminal statutes, these provisions sweep beyond conduct that violates federal law by, for example, strongly implying that the referenced laws require providers to evict participants for second-time drug violations. *See* AR 5065, 5113. Defendants assert (at 41) that the provisions impose "no such requirement," but Defendants do not explain why the NOFO says that there is no "requirement that program participants … be evicted … for a *first-time* violation," if the NOFO does not meant to imply that there is requirement to evict participants for *subsequent* violations. *See* AR 5065, 5113 (emphasis added).

Finally, even if these provisions were limited to barring actual violations of federal criminal laws, Defendants fail to show that they have authority to impose them. Indeed, Congress has not authorized HUD to enforce the laws that these NOFO provisions invoke. Courts impose penalties for violations of those laws after an ordinary criminal process; Congress did not leave it for HUD to separately determine whether organizations have violated these laws

and to deny those organizations funding as a sanction. Defendants have not shown (and could not show) otherwise.

### 2. *All of the NOFO's Anti-Harm Reduction Provisions are arbitrary and capricious*

Defendants likewise fail to rebut Plaintiffs' showing that all the Anti-Harm Reduction Criteria are arbitrary and capricious because HUD "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Defendants assert (at 67) that "there were higher rates of overdose and persisting substance use disorder in Permanent Supportive Housing," but that conclusion says nothing about the effectiveness of harm reduction. Moreover, none of the studies that HUD cites analyzed overdose rates based on the availability or unavailability of harm reduction services. *See* AR 58–60 (citing studies at AR 3089–269). Indeed, the studies HUD cited that do mention harm reduction actually support it: They "[r]ecommend[]" "ensuring that housing options support harm reduction" to "decrease PEH [people experiencing homelessness] mortality," AR 3099, and point to harm reduction as a "well established" strategy for "reducing overdoses," AR 3203–04.

Despite this, Defendants assert (at 67) that "there was sufficient evidence" to conclude that harm reduction caused harm, but the analysis they cite points only to a narrative news report, a policy paper, and an executive order—not any actual evidence—to support that conclusion. *See* AR 60 (citing sources at AR 3270–75, 3289–303). And Defendants fail to consider how the Anti-Harm Reduction Criteria will deter legal harm reduction efforts—because one criterion in the NOFO is by its terms not limited to illegal efforts, AR 5090; because the certification that applicants must sign in the actual application is also not so limited, Supplemental Declaration of Ann Marie Oliva (Suppl. Oliva Decl.) ¶ 7 & Ex. A (Dkt. No. 33-2); and because even the provisions purportedly limited to "illegal" harm reduction strongly suggest that providers will

face liability even for lawful conduct like failing to evict a participant for a second-time drug-related violation, AR 5065, 5113.

**C. Law Enforcement Criteria**

***1. The Local Policies Criterion violates the First Amendment***

Defendants do not dispute that it violates the First Amendment to disadvantage applicants who advocate against HUD's preferred local policies. Instead, they suggest that the Local Priorities Criterion does not disadvantage applicants for their advocacy efforts. But, by the provision's terms, it does. That Criterion awards points to CoCs that "do[] not interfere with or impede *local efforts to advance the objectives*" of quickly clearing encampments, pursuing involuntary commitment, and the like. AR 5085–86 (emphasis added). This does not appear limited to "interfering with law enforcement in the performance of their duties," as Defendants contend. Defs.' Mem. at 86. Rather, CoCs understand it to bar them from interfering in any way with "local efforts to advance [those] objectives," AR 5085, which would include speaking out against those objectives or otherwise advocating against the local policies that the NOFO favors. That violates the First Amendment, and Defendants do not suggest otherwise.

***2. All of the Law Enforcement Criteria are arbitrary and capricious***

More generally, the Law Enforcement Criteria promote overly prescriptive law enforcement responses to homelessness, and Defendants have provided no reasonable explanation for including those criteria. Defendants acknowledge (at 77–78) that a statutory goal of the McKinney-Vento Act is to minimize trauma among homeless individuals and communities, but they ignore that the statute specifically encourages "constructive alternatives to criminalizing homelessness" in service of that goal. 42 U.S.C. § 11313(a)(13). And Defendants fail to respond to Plaintiffs' point that Defendants disregarded the significant evidence showing

that criminalization and encampment clearing may *cause* significant trauma and do not reduce homelessness. *See* Pls.' Mem. at 33–34; Oliva Decl. ¶¶ 134–35.

**D. Subjective "Risk Review" and Additional Factor Criteria**

Defendants grossly mischaracterize Plaintiffs' challenge to the Subjective "Risk Review" and Additional Factor Criteria. Plaintiffs do not challenge all of the criteria at those two stages of the review process—they challenge only the overly subjective criteria that give HUD unbridled discretion to disqualify projects on virtually any ground. *See* Pls.' Mem. at 34–35; *see also* Appendix of Challenged Provisions of the FY 2026 NOFO (Dkt. No. 44-1). Defendants assert (at 72) that the factors are "objective," but that blinks reality. For example, a project's "projected impact" on the NOFO's priorities and "[l]ikelihood" of "result[ing] in the benefits expected," AR 5092, are wholly within the eye of the beholder—and leave it open for HUD to reject projects on any ground at all.

No statute authorizes HUD to leave itself such free-ranging discretion. As Plaintiffs explained (at 35), the statutory provision authorizing HUD to adopt certain selection criteria, 42 U.S.C. § 11386a(b)(1)(G), authorizes only concrete criteria similar in kind to the ones enumerated in the statute—not the open-ended criteria this NOFO adopts. Defendants offer no response to that point. *See* Defs.' Mem. at 44. Defendants also err in suggesting (at 44) that these criteria are authorized by a statutory requirement for HUD to "prioritize funding" for CoCs that "have demonstrated a capacity to reallocate funding from lower performing projects to higher performing projects." Pub. L. No. 119-75, 140 Stat. at 399. The problem with the overly subjective factors is that they do not meaningfully address how projects perform at all—and instead just grant unbridled discretion to HUD.

On Plaintiffs' arbitrary-and-capricious challenge, Defendants cannot overcome their failure to explain these provisions at all. Defendants attempt to justify that failure by saying the

explanations for these provisions are "self-evident[] on their face." But "the wisdom of agency action is rarely so self-evident that no other explanation is required." *Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). And, indeed, this is not such a rare case. Defendants completely ignore Plaintiffs' point that these vague and subjective criteria pressure CoCs to select and prioritize projects based on predictions about what HUD might reject on ideological or other grounds, and in turn chill providers from engaging in entirely lawful (and in some cases constitutionally protected) activity. For example, the factor looking to the provider's "[h]istory of illegal discrimination," AR 5092—given this Administration's orchestrated campaign to end activities promoting diversity, equity, and inclusion that have long been considered lawful—chills providers from engaging in lawful activity honoring diversity.[5] *See also* Oliva Decl. ¶¶ 140–41. Defendants did not consider this impact or explain their reasons for adopting the provisions anyway.

**E. Self-Sufficiency Criteria**

Defendants fail to effectively defend the Self-Sufficiency Criteria, which penalize projects that do not achieve Defendants' particular conception of "self-sufficiency"—which the NOFO defines as the ability to meet basic needs "without public or private assistance," AR 5011—despite the fact that the statute encourages use of other, mainstream assistance. *See* Pls.' Mem. at 36–37. In defending their no-assistance-at-all version of "self-sufficiency," Defendants offer nothing more than a cherry-picked dictionary definition. *See* Defs.' Mem. at 42. But Defendants' reliance on "a dictionary definition" improperly fails to "account for the governing statutory context." *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010); *see also, e.g.*, *United*

---

[5] Defendants suggest (at 72) that this presents an as-applied challenge, but that is wrong. Plaintiffs' claim is that HUD did not consider this impact, and that is inherently a facial challenge to this provision.

*States v. Smith*, 985 F. Supp. 2d 547, 574 (S.D.N.Y. 2014) ("[A] statutory term should be defined by the context of the statute rather than by the dictionary." (cleaned up)). And the statutory context shows that Congress intended to promote usage of other, mainstream assistance, not to discourage it. *See* Pls.' Mem. at 26–37. Defendants respond (at 43) that "those who can never achieve self-sufficiency can continue to receive assistance," but that is a non sequitur. Even if people can continue to receive assistance, the NOFO still disadvantages projects that do not achieve the NOFO's no-assistance-at-all version of self-sufficiency. That conflicts with the statute and exceeds HUD's authority.

It is also arbitrary and capricious. The administrative record nowhere acknowledges the statutory goal of promoting access to mainstream benefits, and that failure of consideration alone makes the Self-Sufficiency Criteria arbitrary and capricious. Further, Defendants failed to consider an important impact that those Criteria will have: They disincentivize CoCs from serving clients who are most in need due to severe disabilities or other circumstances that make it unlikely those clients will support themselves without the help of other benefits programs. *See* Oliva Decl. ¶ 138. On that point, Defendants state only that "[n]othing in the NOFO assumes or requires all homeless individuals to become self-sufficient." Defs.' Mem. at 43. But that is nonresponsive. The NOFO disadvantages CoCs and projects whose participants fail to achieve this level of self-sufficiency—and Defendants did not consider or explain that impact. *See* AR 5066, 5092.

**F. Discriminatory Disability Priority**

Defendants' efforts to defend the Discriminatory Disability Priority also fall flat. At the outset, Defendants err in contending that this provision cannot be challenged because the NOFO "does not award any points" based on the NOFO's statement that individuals with physical and developmental disabilities—but not other types of disabilities—should be "prioritized" for

housing. Defs. Mem. at 45; *see also id.* at 73. The NOFO implements this clearly expressed priority through the Additional Factor Criteria, through which HUD reserves discretion to reject projects based on their "projected impact on the … *priorities in this NOFO*." AR 5092 (emphasis added). Applicants therefore must either adopt a discriminatory policy or risk losing out on funding. Suppl. Oliva Decl. ¶¶ 13–14.

Defendants' arguments on the merits also fail. On this provision's consistency with governing statutes, Defendants offer no response at all to Plaintiffs' arguments that the NOFO's priority violates the Rehabilitation Act and the Americans with Disabilities Act. *See* Pls.' Mem. at 38. Defendants instead claim (at 45–46) that provisions of the CoC statute and regulations justify the Discriminatory Disability Priority, but none does.

First, Defendants invoke (at 45) a statutory provision stating that, in making awards, HUD should consider "the extent to which the recipient will … address the needs of all relevant subpopulations." 42 U.S.C. § 11386a(b)(1)(B)(iv)(I). This does not authorize the Discriminatory Disability Priority because a CoC can address all relevant subpopulations' needs without discriminatorily disadvantaging people with certain disabilities. And individuals with severe mental illnesses have no lesser "need" for a "permanent supportive home" (Defs.' Mem. at 46) simply because their disability is mental health-related instead of physical. The Priority makes an illegal stereotype-based classification about which types of disabilities may achieve "self-sufficiency" rather than simply directing applicants to prioritize individuals with the most intensive needs, regardless of what type of disability they may have. *See Guckenberger v. Bos. Univ.*, 974 F. Supp. 106, 134 (D. Mass. 1997) ("The [Americans with Disabilities Act] and Section 504 specifically prohibit discrimination … based on thoughtlessness, apathy and stereotypes about disabled persons.").

Second, Defendants invoke (at 46) a regulation authorizing grantees to "provide a preference for the housing to subpopulations … who need the specialized supportive services that are provided in the housing." 24 C.F.R. § 578.93(b)(7). Contrary to Defendants' contention (at 46), this provision does not authorize HUD to "provide[] preferences to subpopulations who need … a permanent supportive home." For one, permanent supportive housing is not itself a "specialized supportive service" within the meaning of the regulation; it is a type of program in which different specialized services are offered. 24 C.F.R. § 578.53(b)(2); *see also* 42 U.S.C. § 11360(29) (defining "supportive services"); 24 C.F.R. § 578.53(e). So, the regulation grants no license to provide preferences in accessing permanent supportive housing generally. Instead, the regulation authorizes preferences based on who needs particular supportive services—for example, a project specializing in "substance abuse addiction treatment" could prioritize individuals with substance use disorder, or a project specializing in "domestic violence services" could prioritize survivors of domestic violence. *See* 24 C.F.R. § 578.93(b)(7). The Discriminatory Disability Priority has no such tailoring and excludes individuals without regard to the type of supportive services they may need.

On Plaintiffs' arbitrary-and-capricious claim, Defendants offer nothing more than *ipse dixit*. Defs.' Mem. at 73. Defendants assert that HUD prioritized people with physical and developmental disabilities for permanent supportive housing because it found that those subpopulations "are likely unable to achieve self-sufficiency." Defs.' Mem. at 73 (citing AR 53, 5035). But they offer no explanation or evidence for that "finding," nor for HUD's accompanying conclusion that individuals with severe mental health disabilities necessarily *could* "achieve self-sufficiency." AR 53, 5035. HUD instead improperly relied on stereotypes. In response, Defendants accuse Plaintiffs (at 74) of stereotyping all homeless individuals as unable to attain self-sufficiency, but that distorts Plaintiffs' point. Some individuals can and some

cannot attain self-sufficiency, and HUD's error is to assume that people with mental health-related disabilities can while people with physical and developmental disabilities cannot.

Defendants also fail to show that they adequately considered reliance interests. Defendants suggest (at 73–74) that the people with mental health-related disabilities that this provision deprioritizes for permanent supportive housing can just "move to Transitional Housing." But this fails to account for the fact that individuals currently in permanent supportive housing often have disabilities that require that level of ongoing support, for which transitional housing is no substitute. Declaration of Renee M. Willis (Willis Decl.) ¶ 53 (Dkt. No. 30-5); Declaration of Jelani Jackson (Jackson Decl.) ¶ 17 (Dkt. No. 30-10).

**G. Non-Statutory Threshold Criteria**

The Non-Statutory Threshold Criteria exceed HUD's authority and conflict with the 2026 Appropriations Act by requiring Tier 1 projects to satisfy new, non-statutory criteria to be eligible for funding, even though that Act directs HUD to select Tier 1 projects "based on rankings determined by the local continuum of care." Pls.' Mem. at 39–40 (citing Pub. L. No. 119-75, 140 Stat. at 399).

In response, Defendants mistakenly claim (at 49) that the 2026 Appropriations Act does not actually require HUD to select all projects that CoCs rank in Tier 1 so long as they meet statutory requirements. In Defendants' view, the Act's requirement that selections be "consistent with 42 U.S.C. 11381 *et seq.*" incorporates HUD's authority under 42 U.S.C. § 11386a to establish selection criteria—and, so, the mandate to award funds "based on" local CoCs' rankings does not "override[]" whatever other selection criteria HUD might impose. Defs.' Mem. at 49. Defendants misread the statute. To begin, HUD cannot impose additional criteria on these projects because then it would not be awarding funds "based on" local CoCs' rankings—what the 2026 Appropriations Act requires. In addition, HUD's authority under § 11386a is the

authority to establish criteria governing "a national competition between geographic areas." 42 U.S.C. § 11386a(a); *see also id.* § 11386a(b)(1). But, as Defendants themselves repeatedly acknowledge, the Tier 1 amount specified in the Appropriations Act is not subject to any such national competition. *See, e.g.*, Defs.' Mem. at 37 (noting that the 2026 Appropriations Act directs HUD "to use at least 60% of the funds for non-competitive awards"); *see also id.* at 2, 13, 14. Thus, any criteria that HUD establishes under § 11386a would not be relevant.

Defendants also point out (at 49) that the Non-Statutory Threshold Criteria "only apply to new project applications" and not renewals. But that is irrelevant. The Appropriations Act requires HUD to "select projects" of the specified amount "based on" the local CoCs' rankings, not just to select renewal projects based on those rankings. *See* Pub. L. No. 119-75, 140 Stat. at 399.

**H. Bonus Limits**

Defendants' attempts to defend the Bonus Limits do not withstand scrutiny either. First, Defendants assert in passing (at 78) that the Bonus Limits are committed to HUD's unreviewable discretion. That perfunctory argument, "unaccompanied by some effort at developed argumentation," is waived. *R.R. Ave. Props., LLC v. Acadia Ins. Co.*, 37 F.4th 682, 689 n.6 (1st Cir. 2022). It is also meritless because agency action is committed to unreviewable agency discretion only in those "rare instances" in which there is "no law to apply." *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quotation marks omitted). Here, the CoC statute provides plenty of law to apply. *See* 42 U.S.C. §§ 11381–11389.

Second, on the merits, Defendants double down in claiming (at 78–79) that the Bonus Limits boost competition, but they fundamentally misunderstand the impact the Bonus Limits have—a hallmark of arbitrary and capricious decisionmaking. Defendants do not acknowledge, let alone rebut, Plaintiffs' point that the NOFO's Bonus Limits skew competition in favor of

smaller CoCs with lower relative need, wholly independent from how well they perform. *See* Pls.' Mem. at 41. Defendants likewise offer no response to Plaintiffs' point that HUD entirely failed to consider that the Bonus Limits would systematically disadvantage CoCs with higher relative need in competing for *all* Tier 2 funding, not just in competing for bonus funding. *See id.* Defendants state (at 79) that HUD recognized the Bonus Limits would cause some CoCs to lose "Bonus resources," but those were "above and beyond the CoCs' existing renewal demands." That is wrong. Given how the Bonus Limits interact with the complex system for scoring Tier 2 projects, the Bonus Limits will cause some CoCs to lose *existing* resources, not just the "bonus" resources that are "above and beyond" what is needed to renew their existing projects. Oliva Decl. ¶¶ 73–75. Defendants' argument only confirms that HUD failed to consider this important aspect of the problem.

### I. E.O. Conditions

Defendants do not point to any statutory provision authorizing them to require grantees to follow executive orders,[6] nor do they attempt to argue that the E.O. Conditions are reasonable or reasonably explained. *See* Defs.' Mem. at 46–48, 74–75. And, on the "Gender Ideology" E.O. Conditions, Defendants do not dispute requiring grantees to implement the Administration's view that gender is binary and immutable would both conflict with nondiscrimination laws and violate the First Amendment. *See* Defs.' Mem. at 46–48, 86–87. Instead, Defendants argue that

[6] Defendants baldly assert (at 46) that HUD has authority to "require[e] grants to comply with Executive Orders relevant to the contracted activity." But the executive orders by and large have nothing to do with the CoC program or ending homelessness—and instead advance wholly unrelated ideological and policy goals on topics relating to DEI, gender identity, abortion, and immigration. *See, e.g.*, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025); *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); *Enforcing the Hyde Amendment*, Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 31, 2025); *Ending Taxpayer Subsidization of Open Borders*, Exec. Order No. 14218, 90 Fed. Reg. 10581 (Feb. 25, 2025).

the E.O. Conditions (1) do not actually impose any requirements on grantees and (2) apply only to the extent permitted by law. *See* Defs.' Mem. at 46–48, 74–75, 86–87. Those arguments are mistaken.

To begin, Defendants err in contending (at 74–75) that the NOFO does not purport to make the executive orders "apply to the CoC grantees." That cannot be squared with the NOFO's actual text, which (1) states that grantees "must follow the applicable provisions" in a separate document and (2) goes on to list what those "applicable provisions" are—a list that contains nearly a dozen executive orders. AR 5111–12. And while Plaintiffs agree that the executive orders do not purport to impose any requirements on grantees, that is no help because the NOFO says that grantees "must follow" them. This causes confusion and chills lawful activity—a point to which Defendants offer no response. *See* Pls.' Mem. at 43. At bottom, it makes no sense for HUD to tell grantees they "must follow" the Executive Orders if HUD did not intend for grantees to at least *think* there was some obligation with which they needed to comply. HUD clearly included these conditions to constrain grantees' behavior—even if they do so by misleading grantees to think they are required to implement the executive orders' policies to keep their grants. That exceeds HUD's authority, is arbitrary and capricious, and chills grantees' speech in violation of the First Amendment.

HUD likewise cannot salvage these Conditions by relying on a savings clause that states the conditions apply only "to the extent they are consistent with" federal law. *Contra* Defs.' Mem. at 46–47. For one, the NOFO's conditions are not subject to that caveat. Rather, that caveat appears in a separate document that sets forth conditions that HUD might impose, to the extent consistent with law, on grants in any of the many programs HUD administers. HUD, *Gen. Admin., Nat'l, and Departmental Pol'y Requirements and Terms for HUD's Fin. Assistance Programs* at 1 (2026), https://perma.cc/25EU-TBVW. In the FY 2026 NOFO, HUD imposed

these Executive Order Conditions on the CoC program grants—without any "to the extent consistent with law" caveat. *See* AR 5111–12 (providing, without qualification, that grantees "must follow" the listed executive orders).

In any event, even if the NOFO also included that caveat, it is well established that that sort of savings clause does not "magically ensure" that the condition is lawful. *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10 (N.D. Cal. 2025), *appeal pending*, No. 25-7378. As the Ninth Circuit put it, "[i]f 'consistent with law' precludes a court from examining whether" a challenged action "is consistent with law, judicial review is a meaningless exercise." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018). While Defendants point (at 47–48) to cases suggesting that plaintiffs in some instances cannot challenge mandates to take action only as "permitted by law," those cases addressed situations where the challenged action could be "consistent with the constraints of law." *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring); *accord Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (addressing a "policy that … is above suspicion in the ordinary course of administration"); *Common Cause v. Trump*, 506 F. Supp. 3d 39, 53 (D.D.C. 2020) (noting it was too early to tell "whether the implementation" of a challenged mandate "might cross th[e] line" into unlawfulness). Here, by contrast, the Executive Order Conditions are necessarily not consistent with law because they are not authorized by statute, not supported by reasoned decisionmaking, and (for the "Gender Ideology" Conditions) not consistent with nondiscrimination laws or the First Amendment. *See* Pls.' Mem. at 42–45.

### III. The OMB Apportionment Footnotes Are Invalid

OMB's Apportionment Footnotes are also invalid. Contrary to Defendants' contentions, they are reviewable under the APA, and they fail that review because they both exceed OMB's statutory authority and are arbitrary and capricious.[7]

#### A. Plaintiffs properly challenge the Apportionment Footnotes under the APA

For the first time in this litigation, Defendants present (at 79–81) a half-baked argument that APA review of OMB's Apportionment Footnotes is "precluded." They are mistaken—and, indeed, the District of Massachusetts recently rejected that very argument in reviewing a challenge to materially similar apportionment footnotes. *See Nat'l Ctr. for Learning Disabilities v. OMB*, No. 26-cv-13019, 2026 WL 2754447, at *10 (D. Mass. Sept. 17, 2026).

Courts apply a "'strong presumption' favoring judicial review of administrative action" that agencies bear a "heavy burden" to overcome by "show[ing] that Congress prohibited all judicial review" of the relevant agency actions. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up). Defendants cannot meet that burden here. They wrongly claim (at 80) that the Antideficiency Act (ADA) precludes review of OMB's footnotes restricting appropriations because it (1) does not contain "private rights creating language" and (2) sets forth what Defendants (incorrectly) call a "comprehensive remedial scheme." But, as the District of Massachusetts recently explained, it does not matter that the ADA has no "rights creating language" because "Plaintiffs bring their claims under the APA," not the ADA. *Nat'l Ctr. for Learning Disabilities*, 2026 WL 2754447, at *10. And the ADA remedial scheme that Defendants point to addresses "Executive Branch employees who obligate funds in excess of"

---

[7] The originally challenged Apportionment Footnotes expired on September 30, 2026. But OMB has since reapportioned the funds and imposed the identical footnotes. OMB, *Approved Apportionments*, https://apportionment-public.max.gov/ (FY 2027 HUD apportionment for Account 086-0192, *available at* https://perma.cc/V9UH-8V27).

what is permitted, not the type of agency action that Plaintiffs challenge here—the improper restriction of appropriated funds. *Id.* Where a separate remedial scheme does not even speak to the kind of agency action at issue, it is certainly not so "comprehensive as to preclude judicial review under the APA." *Id.*[8]

**B. The Apportionment Footnotes exceed Defendants' statutory authority**

As Plaintiffs' opening brief explains, OMB lacks statutory authority to impose the Apportionment Footnotes. Pls.' Mem. at 47. Defendants first seek to dodge the issue by claiming (at 82) that the Footnotes "have no effect on this litigation" because they "do not impose any obligations on the public." But Defendants cannot seriously claim that the Footnotes have no impact on Plaintiffs. The Footnotes require HUD (1) to include the Grantmaking E.O.'s ideological terms and conditions in CoC grant agreements and (2) to make CoC awards in accordance with the Homelessness E.O.'s policy directives. OpenOMB, *Homeless Assistance Grants*, https://perma.cc/JWZ6-WBGN (captured June 16, 2026). Those directives will without question significantly affect Plaintiffs' interests—because they purport to prevent HUD from making awards to anyone who does not adhere to the ideological and policy preferences set forth in the relevant executive orders.

Defendants' arguments on the merits also fail. Defendants yank a few statutory words from context to claim that the Apportionment Footnotes are authorized because Congress gave

[8] The cases that Defendants cite are inapposite for this reason (among others). None involves a situation like that here, where no alternative remedial scheme covers the action that the plaintiffs challenge. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349–52 (1984) (holding that APA review of orders setting minimum milk prices was precluded where statute created detailed administrative scheme for reviewing those orders); *Dep't of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19, 19 (2025) ("preliminar[il]y" concluding in summary order that APA review of an executive branch impoundment was precluded by Impoundment Control Act's scheme for addressing executive branch's impoundment of funds); *Global Health Council v. Trump*, 153 F.4th 1, 7, 17–20 (D.C. Cir. 2025) (finding similar preclusion of an APA claim "to enforce the Impoundment Control Act").

the executive "extremely broad power" to apportion funds "'as the official considers appropriate.'"[9] Defs.' Mem. at 81–82 (quoting 31 U.S.C. § 1512(b)(2)). But the statute cannot reasonably be read to grant Defendants the power they claim—the power to impose policy and ideological restrictions on appropriated funds. Indeed, it has long been accepted that the apportionment process is not to be used "for the making of policy or the setting of priorities." S. Rep. No. 93-688, 1974 U.S.C.C.A.N. 3504, 3573 (1974); *see also, e.g.*, Comptroller General of the United States, B-163628, at 2 (Jan. 4, 1974), https://perma.cc/KJP5-RKRR ("[T]he apportionment power may not lawfully be used as a form of executive control or influence over agency functions."); *Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 71 (D.D.C. 2025) (holding that the executive could not use the apportionment power to withhold funds based on a lack of "align[ment] with the Executive's priorities"), *appeal pending,* No. 25-5361; *City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987) (noting that Congress amended apportionment provisions to preclude the executive branch from using them "as authority for implementing 'policy' impoundments").[10]

Instead, the relevant ADA provision makes clear that the executive must apportion funds to serve a particular, statutorily specified purpose: "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a). In other words, apportionment is meant "to prevent an agency from spending its entire appropriation before the end of the fiscal year and then putting Congress in a position in

---

[9] The statute grants the President authority to make apportionments, but the President has delegated this power to OMB. Exec. Order No. 6166, § 16 (June 10, 1933), reprinted in 5 U.S.C. § 901 note; *see also Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025).

[10] Defendants claim (at 82) that *City of New Haven* did not concern "the power to make apportionments," but it did. The relevant passage specifically addresses 31 U.S.C. § 1512 and Congress's amendments "to limit apportionments." *City of New Haven*, 809 F.2d at 906 n.18.

which it must either enact an additional appropriation or allow the entire activity to come to a halt." U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations Law* at 6-119 (3d ed. 2006), https://perma.cc/3CWL-WX35.

The following subsection—(b)(2), the one Defendants focus on—must be read in that context. *See Reisman v. Associated Faculties of Univ. of Me.*, 939 F.3d 409, 412 (1st Cir. 2019) (explaining that courts "must read the individual provisions of the statute … in the context of the statute as a whole and not in isolation"). It provides that the executive "shall apportion an appropriation under paragraph (1) of this subsection as the official considers appropriate." 31 U.S.C. § 1512(b)(2). Far from giving the executive broad power to attach to an apportionment whatever conditions the executive wishes, this provision authorizes the executive to determine how to "appropriate[ly]" dole out funding to ensure agencies do not overspend. *Id.* That is confirmed by the provision's designation of the purpose of apportionment. *See id.* § 1512(a). And it is confirmed by the text of subsection (b)(2) itself, which provides that the official must apportion funds "*under paragraph (1) of this subsection* as the official considers appropriate." *Id.* § 1512(b)(2) (emphasis added). Paragraph (1) addresses the administrative mechanisms by which an official can apportion funds—by "months, calendar quarters, operating seasons, or other time periods," by "activities, functions, projects, or objects," or by "a combination" of any of those ways. *Id.* § 1512(b)(1). In referring to paragraph (1), subsection (b)(2) gives the executive discretion to make apportionments according to whichever of those administrative mechanisms the official "considers appropriate." *Id.* § 1512(b)(2).

### C. The Apportionment Footnotes are arbitrary and capricious

The Apportionment Footnotes requiring adherence to executive orders are also arbitrary and capricious because Defendants failed to consider any aspects of the problem. Pls.' Mem. at 47–48. Indeed, the administrative record literally includes nothing more than the two executive

orders themselves. OMB Administrative Record 1–9.[11] Defendants contend (at 83–84) that "it was reasonable for OMB to include" the Footnotes because they "directly implicate[] grantmaking" or "the CoC program," but that is nonresponsive. The OMB Defendants "entirely failed to consider" the impact these Footnotes' restrictions would have—and, indeed, all other "important aspect[s] of the problem"—so including them was arbitrary and capricious for that reason alone. *State Farm*, 463 U.S. at 43; *accord Nat'l Ctr. for Learning Disabilities*, 2026 WL 2754447, at *15 (holding that similar apportionment footnotes were arbitrary and capricious because "OMB did not articulate any reasoned basis for adding" them).

Defendants protest (at 84–85) that that they did not need to consider the impacts or "articulate a rationale for [OMB's] action" because they were "compl[ying] with the President's directives." But the executive branch cannot "prevent arbitrary and capricious review by having the President direct the agency to take an action." *Nat'l Ctr. for Learning Disabilities*, 2026 WL 2754447, at *15. Indeed, "courts regularly apply APA review to agency actions taken in direct response to a presidential directive, such as an Executive Order." *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 662 (D. Md. 2019) (collecting cases), *rev'd and remanded on other grounds*, 961 F.3d 635 (4th Cir. 2020).

---

[11] The OMB Administrative Record is included in the Consolidated Excerpts of Administrative Record at Dkt. No. 33-1.

## IV. The Court Should Grant Plaintiffs' Requested Relief

### A. Defendants do not dispute that vacatur and declaratory relief are appropriate remedies

Defendants agree with Plaintiffs that if the Court concludes that the NOFO's challenged provisions are unlawful, it should sever and vacate them and declare them unlawful.[12] *See* Defs.' Mem. at 88, 90–91. Defendants likewise do not appear to contest that, if Plaintiffs prevail on their challenge to OMB's Apportionment Footnotes, relief declaring them unlawful is appropriate. *Id.* at 91. Thus, if the Court agrees with Plaintiffs' claims on the merits, it can readily enter the vacatur and declaratory relief Plaintiffs seek. This would involve vacating and declaring unlawful the NOFO provisions identified in Plaintiffs' Appendix of Challenged Provisions of the FY 2026 NOFO (Dkt. No. 44-1) while leaving the remainder of the NOFO in place, and vacating and declaring unlawful OMB's Apportionment Footnotes.

### B. Injunctive relief is also warranted

The Court can and should also enter injunctive relief. Defendants contend that an injunction is not "necessary to provide complete relief to the plaintiffs," but that is badly mistaken. Defs.' Mem. at 90 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Injunctive relief is necessary to provide Plaintiffs with complete relief from the Set-Aside, as well as from the other challenged NOFO provisions. On the OMB Apportionment Footnotes,

---

[12] To be clear, Plaintiffs do not agree that severing and vacating the challenged provisions alone (as opposed to vacating the entire NOFO) provides them with complete relief. *Contra* Defs.' Mem. at 88. Most of the challenged NOFO provisions distorted CoCs' choices about what projects to include in their applications—and only vacatur in full, and a new opportunity to apply for *all* funding, would completely redress that harm. *See, e.g.*, Oliva Decl. ¶¶ 52, 141, 154, 159. Nonetheless, at this late stage, vacatur in full would delay needed funding from going out. Defendants' dogged pursuit of their illegal NOFO has thus put Plaintiffs in a no-win situation. The more limited relief that Plaintiffs now seek—severance and vacatur of the challenged provisions and a new opportunity to apply only for Tier 2 funding—mitigates many of the worst effects of the NOFO's unlawful provisions while also avoiding the worst effects of the funding delays that Defendants have caused.

however, in light of recent events, Plaintiffs no longer seek an injunction so long as the court grants vacatur and declaratory relief.[13]

### *1. An injunction blocking HUD from making Tier 2 awards until CoCs have an opportunity to submit new Tier 2 applications is necessary to provide a meaningful remedy for the Set-Aside*

To obtain complete relief from the Set-Aside, CoCs must have a new opportunity to apply for Tier 2 funding—and, as Defendants effectively concede, an injunction is necessary to provide that relief. Defendants do not dispute that the Set-Aside thoroughly distorted what CoCs included in Tier 2 of their applications. *See* Defs.' Mem. at 90–92. Rather than applying for what their communities actually needed and wanted, CoCs were forced to apply for new transitional housing and supportive-services-only projects to have any shot at receiving Tier 2 funding. *See* Pls.' Mem. at 23. Because of this enormous impact that the Set-Aside had on what local CoCs included in Tier 2 of their applications, Plaintiffs and Plaintiff Associations' members must have a new opportunity to apply for Tier 2 funding without the Set-Aside in place. Without that opportunity, they will not receive anything near complete relief from the Set-Aside—or, indeed, any meaningful relief at all—because they would still have no chance to get funding for permanent housing projects or other projects that the Set-Aside excluded. And Defendants

---

[13] At the time Plaintiffs filed their opening brief, the existing Apportionment Footnotes were set to expire imminently, and it was unclear when there would be any replacement footnotes for the Court to vacate—so Plaintiffs requested an injunction instead. *See* Pls.' Mem. at 48. Since then, however, OMB has reapportioned the CoC program funds and applied the same Apportionment Footnotes. *See supra* p.28 n.8. The Court can and should vacate those identical new footnotes and declare them unlawful. That will obviate the need for an injunction to provide Plaintiffs an effective remedy for their claims challenging the footnotes.

confirm that an injunction is necessary to provide that opportunity because, they say, "absent an injunction, HUD could make Tier 2 awards."[14] Defs.' Mem. at 91.

Defendants nonetheless bizarrely contend (at 91) that an injunction barring HUD from making Tier 2 awards until CoCs have a new opportunity to apply is unwarranted because it "has no nexus to any legal claim against HUD." But such an injunction has a straightforward nexus to Plaintiffs' challenges to the Set-Aside. The illegal Set-Aside thoroughly distorted what CoCs included in Tier 2 of their applications, so an injunction barring HUD from making Tier 2 awards based on the existing applications is necessary to provide relief from the Set-Aside.

Defendants also protest (at 92) that Plaintiffs suffer no irreparable harm from the Set-Aside because there is no guarantee they "would have been awarded funds" even absent the Set-Aside. This misses the point because, absent relief, Plaintiffs will lose the opportunity even to compete for those funds on lawful terms—and the loss of that opportunity is irreparable injury justifying injunctive relief. *Cf., e.g.*, *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507, 520 (D. Mass. 1974) (recognizing "irreparable harm in the nature of a lack of equal opportunity to compete for jobs"); *Hosp. Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("[A] lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm."). In any event, Defendants are wrong that Plaintiffs might not receive funds anyway: Given the funds available and regulatory caps on the amount any single CoC can receive, most CoCs are guaranteed to receive funding for at least some of their Tier 2 projects. *See* 24 C.F.R. § 578.17(b).

---

[14] In theory, vacating the NOFO provisions setting forth the process by which HUD makes Tier 2 awards should prevent HUD from making Tier 2 awards. But that is not free from doubt—and Defendants have now confirmed that only an injunction will stop them.

Finally, Defendants contend (at 92) that the equities disfavor an injunction because running a new Tier 2 application process would mean that HUD could not make Tier 2 awards by the December 1 deadline, and awards would be delayed. Plaintiffs already addressed this. Pls.' Mem. at 25. A statutory deadline does not excuse HUD from complying with other statutory requirements when making awards. Moreover, funding delays are bad, but losing funding altogether is worse—and there is no dispute that, if HUD makes awards without allowing for new Tier 2 applications, a large number of existing projects will lose their funding for good. That loss of funding would be devastating to those projects and to the individuals and families that rely on them for stable housing. *See* Pls.' Mem. at 24–25.

***2. An injunction blocking HUD from reimposing the challenged provisions is necessary to prevent HUD from reapplying those criteria behind the scenes***

Injunctive relief is also necessary to prevent HUD from reapplying the challenged provisions. Defendants protest that an injunction would be "duplicative" because an order vacating and declaring those provisions unlawful would suffice to "provide the Plaintiffs complete relief." Defs.' Mem. at 90–91. It would not.

In some instances, vacatur and declaratory relief suffice because the harmful conduct cannot recur "until such time as a new [agency action] is in place" and any plaintiffs "aggrieved by [such] a hypothetical future [agency action] will have ample opportunity to challenge it." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164 (2010). But, here, HUD could reimpose the restrictions behind the scenes before Plaintiffs have any opportunity to try to stop it. Even if the challenged provisions are vacated and declared unlawful, without an injunction, HUD could adopt those provisions again and apply them when making award decisions. Plaintiffs would be none the wiser until awards went out—at which point, obtaining relief would become substantially more complicated.

It would be one thing if Defendants committed that they would not reimpose the challenged NOFO provisions, or that they would provide notice of the newly imposed provisions before making awards based on them. But, absent such a commitment, it cannot be said that Plaintiffs "will have ample opportunity to challenge" the harmful conduct if it recurs. *See Monsanto*, 561 U.S. at 164. An injunction is therefore necessary to provide Plaintiffs complete relief on their challenges to the other NOFO provisions as well.

**CONCLUSION**

The Court should grant partial summary judgment to Plaintiffs and order the requested relief.

October 14, 2026

Respectfully submitted,

/s/ Kristin Bateman
Kristin Bateman *
(DC Bar No. 90037068)
Madeline H. Gitomer *
(DC Bar No. 1023447)
Christine L. Coogle *
(DC Bar No. 1738913)
Carrie Y. Flaxman *
(DC Bar No. 458681)
Robin Thurston *
(DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

Amy R. Romero
(RI Bar No. 8262)
Kevin Love Hubbard *
(MA Bar No. 704772)
Lawyers' Committee for Rhode Island
56 Pine Street, Suite 200
Providence, RI 02903
(401) 238-3953
amy@lawyerscommitteeri.org
kevin@lawyerscommitteeri.org

*Counsel for All Plaintiffs*

Toby Merrill *^
(MA Bar No. 601071)
Cassandra Crawford *^
(NC Bar No. 45396)
Graham Provost *^
(DC Bar No. 1780222)
Kayla Svihovec *^
(DC Bar No. 1735588)
Public Rights Project

490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, and City of Tucson*

Tony LoPresti *
(CA Bar No. 289269)
County Counsel
Kavita Narayan *
(CA Bar No. 264191)
Chief Assistant County Counsel
Meredith A. Johnson *
(CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson *
(CA Bar No. 314899)
Deputy County Counsel
Leily Arzy *
(CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

John K. Whitaker *
(TN BPR No. 039207)
Senior Counsel

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Lynette Labinger
(RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel, ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

Antonia K. Fasanelli *
(DC Bar No. 481856)
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

Christopher M. Sanders *
(WA Bar No. 47518)
General Counsel to the King County Executive
Cristy J. Craig *
(WA Bar No. 27451)
Senior Deputy Prosecuting Attorney
Mika Rothman *
(WA Bar No. 55870)
Deputy General Counsel
Office of the King County Prosecuting

109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
john.whitaker@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

* Admitted *pro hac vice*
^ Admitted in listed states but not licensed to practice law in California

Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov
mrothman@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*