**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,

*Defendants*.

STATE OF WASHINGTON, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,

*Defendants.*

Case Nos. 26-cv-436-MSM-AEM
26-cv-439-MSM-AEM

District Judge Mary S. McElroy
Magistrate Judge Amy E. Moses

**DEFENDANTS' COMBINED EMERGENCY MOTION FOR A STAY OF THE SUMMARY JUDGMENT ORDERS PENDING APPEAL**

**EXPEDITED RELIEF REQUESTED BY NOON ON NOVEMBER 30, 2026**

**MOTION TO STAY ORDER PENDING APPEAL**

Defendants file this motion pursuant to Federal Rule of Appellate Procedure 8(a)(1) to stay this Court's summary judgment order in these two related cases pending appeal. Defendants respectfully request (1) an immediate stay of the Court's December 1 deadline to make Tier 1 awards, to avoid the need for emergency appellate relief over the holiday weekend, and (2) relief on this motion from this Court before 12:00PM ET on November 30 so that if relief is denied, Defendants can file an emergency appeal in the United States Court of Appeals for the First Circuit on December 1.

**BACKGROUND**

In the 2026 Appropriations Act, Congress mandated that the U.S. Department of Housing & Urban Development (HUD) issue a notice of funding opportunity by June 1, 2026 and issue awards by December 1, 2026 for HUD's Continuum of Care (CoC) program. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 400 (2026 Appropriations Act). In accordance with the 2026 Appropriations Act, HUD issued its Fiscal Year (FY) 2026 Continuum of Care Notice of Funding Opportunity ("NOFO"). Plaintiffs challenged the NOFO on various grounds.

On August 7, 2026, the Court entered partial summary judgment against Defendants HUD and Scott Turner, Secretary of HUD, and partial summary judgment for Defendants in these two related cases. *See* ECF 41, *Washington, et al., v. HUD, et al.*, 1:26-cv-00439 (D.R.I.) ("*State Litigation*"); ECF 34, *Nat'l All. to End Homelessness, et al., v. HUD, et al.,* 1:26-cv-00436 (D.R.I) ("*NAEH Litigation*"), (collectively "MSJ Order"). The MSJ Order set aside the NOFO, in its entirety, as procedurally deficient for not having followed notice-and-comment procedures to implement a set-aside for transitional housing projects and supportive services. *See* MSJ Order at 10. The Court's rationale was two-fold: that the set-aside was an incentive, and that 42 U.S.C.

§ 11386b(d) requires notice-and-comment procedures to identify activities to incentivize. *Id.* The Court declined to permanently enjoin the challenged conditions. *Id.*

On September 14, the First Circuit entered a stay of this Court's vacatur, finding that HUD had "made a strong showing that it is likely to succeed on the merits of its challenge to the district court's holding that the set-aside in the NOFO was subject to notice and comment requirements pursuant to 42 U.S.C. § 11386b(d)." *See, e.g.*, NAEH Litigation, ECF 34. *Washington, et al. v. HUD, et al.*, 26-1922 (1st Cir. 2026), September 16, 2026 Slip Op. The First Circuit also "conclude[d] that HUD is likely to succeed on the argument that the set-aside is not a "bonus or other incentive[]" as that term is used in § 11386b(d)," and that HUD "would suffer irreparable injury absent a stay" because "it would be unable to implement the NOFO in a timely manner—thereby creating funding gaps—unless a stay enters." *Id.* On September 21, Plaintiffs requested the First Circuit vacate this Court's order and remand so that they could withdraw their claims as to notice-and-comment. The First Circuit granted Plaintiffs' request on September 24.

On September 30, the NAEH Plaintiffs moved for summary judgment on Counts 1–3, 6–8, and 11. NAEH Litigation, ECF 44 at 2. The NAEH Plaintiffs withdrew and dismissed without prejudice Counts 4, 5, 9, and 10. *Id.* Plaintiff States renewed their motion for summary judgment on September 30, 2026, on Count 1 and 3. States Litigation, ECF 51 ("States Br. II").

On November 20, the Court granted in part and denied in part Plaintiff States' and the NAEH Plaintiffs' motions for summary judgment. As relevant to this stay motion, the Court found the Secretary exceeded his authority in creating the set-aside. Order at 10-17. The Court next ruled on Plaintiffs' challenges to dozens of separate award criteria and conditions set out in the notice. *See* Appendix: Challenged Provisions of the FY 2026 NOFO, ECF 44-1 (listing challenges). The Court "vacated, severed, and declared unlawful" "many" of these provisions and prohibited HUD

from considering them when evaluating applications for Tier 2 projects. Order at 19-29, 33-43, 45-56. The Court ruled that HUD violated the First Amendment by awarding points to applicants who "provide a plan explaining how" the applicant will navigate local laws and policies. Order at 29-31. The Court opined that the Secretary lacked statutory authority to adopt the definition of "self-sufficiency" provided by the Oxford English Dictionary, Order at 33-37, to consider current policies when evaluating grant requests for new projects, Order at 40-43, and to discourage or prohibit grant recipients from operating drug injection sites, Order at 23-26. It also ruled that HUD had failed to adequately consider the "disadvantag[es]" of awarding points to projects that encourage beneficiaries to receive supportive services, Order at 19-23, and limiting eligibility for "bonus funds," which is money that exceeds what applicants request. Order at 45-48. And it concluded that HUD had failed to adequately explain why it would consider criteria such as the "[l]ikelihood that the proposed project will result in the benefits expected," Order at 37-40, decline to fund projects that facilitate drug use, Order at 26-29, and require grant recipients to follow Executive Orders "affecting federal financial assistance programs," Order at 48-50. Finally, the Court ruled that the Office of Management and Budget (OMB) could not require HUD, "[t]o the extent permitted by law," to condition competitive grant awards on "agreements that include terms and conditions" consistent with existing Executive Orders, because OMB had not adequately considered "the impact" on the program and grant applicants. Order at 50-56.

## LEGAL STANDARD

Courts consider four factors in assessing a motion for a stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and

(4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

A stay is warranted here. Defendants are likely to succeed on the merits of their appeal, because the Court erred in holding that the set-aside and other challenged provisions in the NOFO were unlawful, arbitrary and capricious, and/or unconstitutional. Moreover, the equities support a stay, because the MSJ Order irreparably harms the government and the public. *See Nken*, 556 U.S. at 426. The NOFO represents months of careful research and consideration distilled to a painstakingly calibrated process for entrusting billions of taxpayer dollars to thousands of projects on matters affecting life or death. The MSJ Order prevents HUD from giving effect to its NOFO and therefore prevents HUD, on the eve of winter, from implementing the policy approach that it deems best suited to addressing an ongoing homelessness crisis that has seen years of increasingly negative outcomes for the very people the program is meant to protect. The MSJ Order further harms HUD and the public because, without a NOFO in place, there is a risk of a funding gap, which the First Circuit has already explained would inflict "irreparable injury absent a stay." Order, No. 26-1923 (Sept. 16, 2026). This Court should immediately stay the December 1 deadline to make Tier 1 awards, to avoid the need for emergency appellate relief over the holiday weekend, and grant relief on this motion from this Court before 12:00PM ET on November 30 so that if relief is denied, Defendants can file an emergency appeal in the United States Court of Appeals for the First Circuit on December 1.

**I. Defendants are Likely to Succeed on the Merits**

The Mckinney-Vento Act gives the Secretary broad authority to determine which grants will be most effective and to select among grantees, which is not compatible with the level of review the Court applied in assessing the Secretary's discretionary determinations about which

criteria should be used to award federal funds. The Court erred by second-guessing the agency's assessment of the evidence. The Court's approach leaves it unclear how the Secretary could ever complete the competition that Congress required to award funds, 42 U.S.C. § 11386a(a), much less on an annual basis with funding deadlines.

### A. The Court erred by setting deadlines for HUD to act (Order at 17-18)

The Court erred by compelling HUD to award Tier 1 funds by December 1 and Tier 2 funds by December 31. Plaintiffs have not brought an unreasonable-delay claim under 5 U.S.C. § 706(1) or identified any "ministerial or non-discretionary act" that HUD has failed to carry out as to the 2026 notice or fiscal year 2026 funds. *See Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63 (2004). As the Supreme Court explained in granting the government's application for a stay in *Federal Communications Commission v. Brown*, "[o]ur system of separation of powers does not allow the Judiciary to meddle in the workings of a coordinate branch of the Government" by obligating an agency to act within a timeframe where Congress "does not obligate" the agency to do so. No. 26A477, 610 U.S. ___, at *4 (Oct. 14, 2026) (per curiam) (quotations omitted). That principle applies with all the more force here, where the deadlines this Court set order HUD to act under timelines that bear no resemblance to what Congress contemplated. As HUD's Notice to the Court of November 24, 2026, and the declaration by HUD accompanying this motion explain, the process of evaluating and approving grant applications is complex, multi-layered, and interwoven. Consistent with that reality, the statute requires, for example, that the Secretary "shall" issue funding notices "not later than 3 months after the date of enactment of the appropriate Act making appropriations" for the relevant year, 42 U.S.C. § 11382(b), announce conditional grant awards "within 5 months after the last date for the submission of applications," *id.* § 11382(c)(2)(A), and obligate funds "[n]ot later than 45 days after" conditions are satisfied. *Id.* § 11382(d)(2).

Even if this Court believes that HUD acted unlawfully and invalidates the 2026 NOFO, it should be left to HUD in the first instance to determine a workable timeline for implementing the Court's decision subject to any direction by Congress. "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." See *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *accord Maine Med. Ctr. v. Burwell*, 841 F.3d 1016 (1st Cir. 2016). Any other approach "comes perilously close to involving the Court in reviewing non-final agency actions." *Baystate Med. Ctr. v. Leavitt*, 587 F. Supp. 2d 37, 42 (D.D.C. 2008); *see also Environmental Defense Fund v. EPA,* 898 F.2d 183, 190 (D.C. Cir. 1990) (vacating agency rule and remanding for further action without retaining jurisdiction, and declining to impose two-year deadline even though original statutory deadline for action at issue was two years). Even assuming this Court's ruling was otherwise correct, it had "no jurisdiction to order specific relief"—the imposition of deadlines by which HUD must act—because "unlike a district court managing a garden-variety civil suit, a district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal." *Palisades*, 426 F.3d at 403; *see also Norton*, 542 U.S. at 66-67 (explaining that courts should not be "inject[ed]" into "day-to-day agency management"). The extraordinary speed this Court found "necessary" for "ensuring that the CoC program is lawfully administered," Op. 17, is not tailored to that goal and would instead undermine the agency's deliberative process. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008). "Abort[ing]" that process "is itself an injury that cannot be remedied after the fact." *Brown*, No. 26A477, at *4.

### B. The Court erred in holding the set-aside exceeded statutory authority (Order at 9-18)

The Secretary acted within his statutory authority when he created the set-aside for Transitional Housing and Supportive Services Only (SSO) projects. Congress delegated authority to the HUD Secretary to "award funds to recipients through a national competition between geographic areas *based on criteria established by the Secretary*." 42 U.S.C. § 11386a(a) (emphasis added). The Secretary, then, can prioritize certain projects over others, and set aside $1.300 billion for those prioritized projects. AR5040-41; AR5094. Indeed, Congress in the 2026 Appropriations Act instructed the Secretary to select projects "totaling not less than 60 percent of the annual renewal demand[1] for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." 140 Stat. 399. The set-aside falls within the portion of funding that Congress did *not* require HUD to award based on local CoC rankings (and other applicable selection criteria).

The Court found that the enumerated list of criteria limited the Secretary's authority to create the set-aside. This is hard to square with the Court's recognition that statutory authorities grant the Secretary the ability to create separate criteria for the competition. Order at 11 ("Congress delegated authority to the HUD Secretary to 'award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary.'"); *id.* at 12 ("The statute also allowed HUD to establish 'such other factors' for reviewing CoC applications 'as the Secretary determines to be appropriate to carry out this part in an effective and efficient

[1] The Annual Renewal Demand is the total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition. NOFO 124. For FY26, it is $3.838 billion. So Tier 1 and Tier 2 awards make up $2.303 billion and $1.535 billion, respectively. This does not include $164 million in planning grants that go directly to CoCs to administer their local programs (CoC Planning) and a $102 million bonus for Domestic Violence Bonus (DV Bonus) projects.

manner.'"); *see also id.* ("Congress delegated to the Secretary the power to create additional criteria for awarding funds" (emphasis deleted)); 42 U.S.C. § 11386a. The repeated grant of authority to the Secretary to set additional criteria for the grant competition cuts against any narrow reading that would restrict his ability to create the set-aside.

To reach a contrary conclusion, the Court interpreted the Secretary's authority as rooted in a "residual clause" and held that the set-aside would "nullify the other congressionally established mandatory factors." Order at 12. This reasoning is erroneous in several respects.

First, the Secretary's authority to create criteria for awarding funds in the CoC program stands alone: it is not a residual clause. The statute is unambiguous that "the Secretary shall award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary." In contrast, residual clauses are catchalls at the end of a list. *See Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009). Accordingly, under 42 U.S.C. § 11386a(a), the Secretary may set any criteria that advance the purposes of the statute.

But in any event, the set-aside would be a valid extension of the Secretary's authority even if it had sprung from a residual clause. Each project that meets the set-aside criteria is evaluated under the statutory criteria, and funds are dispersed accordingly. AR5094. Following the exhaustion of the set-aside funds, all other projects will be evaluated under the statutory criteria and funded accordingly, whether Permanent Supportive Housing, Transitional Housing, Rapid Rehousing, or SSO projects. AR5094. Thus, HUD fully effectuates the statutory criteria in every step of its award process and the Court's decision that the set-aside exceeds statutory authority because it "nullifies" congressional factors is therefore in error. Order at 12.

The Court also erred in presupposing that every factor must be applied to every project. In its opinion, the Court explained that the set-aside would result in HUD's failure to apply

"mandatory factors" to projects that did not fit the set-aside, pointing specifically to 42 U.S.C. § 11386a(b)(1)(A), which requires HUD to assess the applicant's previous performance, and § 11386a(b)(1)(F)(ii), which requires HUD to evaluate program goals and outcomes. Order at 12-13. But HUD's obligation is to award funds "based on criteria" that "shall include" factors that Congress specified. 42 U.S.C. § 11386a(a)-(b). If HUD decides to award funds to a new applicant, for example, that decision may permissibly be "based" on the mandatory criteria even where there is no history of previous performance for HUD to assess. If this factor were mandatory in the sense that the Court understood it, HUD could never award funds to new applicants because it would be unable to assess their previous performance.

The Court's reasoning also rested on an erroneous interpretation of 42 U.S.C. § 11386a(b)(1)(F)(ii). The Court held that this criterion is concerned with "provid[ing] permanent housing to homeless families with children and youth from consideration for the vast majority of Tier 2 funding." Order at 13. Under this section, however, HUD must consider "program goals and outcomes, which shall include […] achieving *independent* living in permanent housing." 42 U.S.C. § 11386a(b)(1)(F)(ii) (emphasis added). In other words, independent living in permanent housing is the goal of the CoC program, rather than permanent housing "provided" using taxpayer funding. *Cf.* 42 U.S.C. § 11381(4).

### C. The Court erred in holding that awarding points for imposing service requirements was arbitrary and capricious (Order at 19-23)

HUD reasonably decided to include criteria to encourage planning and investment in optimizing self-sufficiency for homeless individuals—one of the four stated statutory goals of the CoC program. AR62-64; 42 U.S.C. § 11381(4). Specifically, the 2026 NOFO assesses the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." AR5066 (threshold review); *see also* AR5092 (similar criteria for Risk Review).

HUD reasonably had in mind self-sufficiency as an express statutory purpose of CoC when it adopted the 2026 NOFO.

In any event, HUD separately substantiated its reasons for encouraging self-sufficiency. AR58-64. First, HUD found that homeless individuals self-report high rates of substance abuse disorder and mental illness and that there are high rates of overdose deaths. AR58-60. The 2026 NOFO prioritizes services for the treatment and recovery of individuals with substance abuse disorders and mental illnesses by providing the set-aside to fund these services. AR61. Treatment will remove one obstacle for homeless individuals to achieve self-sufficiency. *Id.* Thus, it is reasonable to encourage treatment and support.

Second, HUD noted that the current program has not optimized self-sufficiency. AR62. HUD reasonably concluded that incentivizing investment in more of these services would decrease homelessness.

Third, HUD reasonably determined that homeless individuals are able to achieve self-sufficiency. HUD identified appropriate investment in and availability of Supportive Services by hearing from numerous stakeholders and evaluating the level of services provided at programs with positive outcomes at optimizing self-sufficiency within 24 months. AR63. In addition, the HUD-VASH program, which tied support to participation in service programs, led to a decline in veteran homelessness. *Id.*

Fourth, HUD designed the self-sufficiency criteria to encourage CoCs to coordinate and partner in service of specific homelessness subpopulations. AR64. HUD is directed by Congress to measure CoCs based on "*the extent to which the recipient will address the needs of all relevant subpopulations.*" 42 U.S.C. § 11386a(b)(1)(B)(iv)(I) (emphasis added). HUD found that robust coordination with partners in the community, both inside and outside the CoC itself, is indicative

of the CoC's ability to promote communitywide commitment to the goal of ending homelessness. AR64. By designing the self-sufficiency criteria to encourage robust coordination, HUD acted reasonably.

In its Order, the Court held that HUD acted arbitrarily and capriciously because it did not consider the need to address (1) the disadvantage that domestic violence providers will face in the competition for all non-Domestic Violence Bonus (DV Bonus) CoC funding because they cannot earn the points awarded to projects that impose service requirements, and (2) the chilling effect of the Service Requirement criteria on the provision of domestic violence services caused by limiting points available to CoCs who might choose to provide such services. Order at 21. But HUD provided a bonus for domestic violence service providers, AR55-56. And the entire review process accommodates domestic-violence victims. The threshold review focuses on what services applicants will offer to *eligible* participants, which by definition do not include those who are exempt. The merit review criteria have a Violence Against Women Act carveout, *see* AR5022, AR5084, AR5095. And while risk review is focused more on applicants than their programs per se, it does look at an applicant's "[a]bility to follow all required laws and rules," including VAWA. AR5092. Finally, post-award requirements include VAWA compliance, AR5112. By providing a bonus and a carveout, HUD explicitly considered the impact to domestic violence service providers. *See* AR55-56, AR5022, AR5084, AR5095.

While the Court appeared to acknowledge that HUD considered these factors when making the NOFO, it disagreed with HUD's policy choice. "[A] court is not to substitute its judgment for that of the agency," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), but instead must only consider whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Pres. Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). The Court found that HUD did not adequately consider the impact to domestic violence victims because the bonus was not a "remedial measure." Order at 21. But it is HUD's policy decision whether to include remedial measures, not the Court's. The Court held that the bonus was congressionally required, so it was "therefore not a remedial measure meant to combat DV-unfriendly policies in the 2026 NOFO." Order at 21. But whether or not it is congressionally required, or an adequate remedial measure, is not relevant to whether HUD considered the impact to domestic violence victims.

The Court also held that the carve-out was "unrelated to whether HUD penalizes DV providers for not including mandated service conditions in their applications." Order at 21 (emphasis deleted). Again, whether or not HUD penalizes DV providers is beside the point. The question for the Court is whether HUD considered the impact on DV providers, and the carve-out is further evidence that it had.

In sum, the Court ignored the vast weight of evidence that supported HUD's decision-making on the Service Requirement, and instead erroneously stepped into the agency's shoes in considering how the Service Requirement impacts a small subpopulation.

**D. The Court erred in holding the Safe Drug Use Criteria as unlawful and arbitrary and capricious (Order at 23-29)**

The Secretary did not exceed his authority or contrary to law in reminding grantees to comply with Federal criminal laws. AR5065. As set out above, the Secretary has explicit authority to establish criteria for awards, 42 U.S.C. § 11386a(a), and to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner." *Id.* § 11386a(b)(1)(G). Compliance with Federal criminal law is merely an exercise of this statutory discretion.

The Court found the Secretary did not have the authority to impose these restrictions because "[t]he Certification and Condition extend to conduct beyond such HUD-funded projects." Order at 25-26. But existing Federal regulations are best read as requiring such compliance. For instance, Government-wide regulation requires agencies to ensure that federally funded programs "are implemented in full accordance with . . . applicable Federal statutes and regulations." 2 C.F.R. § 200.300(a). As part of this requirement, the Secretary provided that grant recipients may not operate drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. § 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. § 863. The Secretary therefore acted consistent with existing regulatory provisions in requiring applicants to certify compliance with certain Federal laws bearing on "the tragic realities of substance abuse and fatal overdose among those who are homeless or living in Permanent Supportive housing." AR5036. And importantly, the NOFO limits this criterion to those activities and projects funded with CoC funds. AR5090, AR5113.

The Court also held that the certification is overbroad, because it is not in fact limited to violations of Federal law. Order at 26. But operating drug injection sites or "safe consumption sites" would violate 21 U.S.C. § 856(a)(1), knowingly permitting the use or distribution of illicit drugs on property under their control would violate 21 U.S.C. § 856(a)(2), or knowingly distributing drug paraphernalia would violate 21 U.S.C. § 863. That the certification tracks the specific elements in criminal statutes makes the Secretary's use of his authority more targeted and within the scope of his authority, rather than less.

HUD reasonably determined that a Safe Drug Use Condition and Certification should be included in applications under the 2026 NOFO. AR58-62. HUD found that homeless individuals

self-report high rates of substance abuse disorder and mental illness. AR58-60. HUD further found that there is a disproportionate rate of fatal overdose in Permanent Supportive Housing units. AR69; AR5036. HUD also found that, at the same time, CoC-funded Permanent Supportive Housing service providers distributed drug paraphernalia. AR60. HUD determined that there was insufficient evidence to conclude that this practice reduced overdoses and overdose fatalities, but there was sufficient evidence to suggest that "isolated housing for individuals with SUD and the facilitation of illicit drug use in that housing has only compounded the effects of an opioid crisis." AR60. And it specifically noted that multiple studies supported the effectiveness of structured treatment regimens (Assisted Outpatient Treatment) over the Housing First proposition that "participation in treatment and services must always be voluntary." *Id.* For this reason, HUD is prohibiting CoC recipients from knowingly permitting the use or distribution of illicit drugs on property under their control, distributing drug paraphernalia, or otherwise assisting individuals in consuming illicit drugs. AR69; AR5036. As discussed *supra*, this prohibition both supports HUD's policy of reducing trauma to homeless individuals and improving outcomes and separately upholds Federal criminal law. AR69.

In assessing a challenge under the Administrative Procedure Act (APA), a court should not "reweigh the evidence and come to [its] own conclusion" but should "assess the reasonableness of [the agency]'s conclusion." *Pub. Citizen Health Rsch. Grp. v. Tyson*, 796 F.2d 1479, 1495 (D.C. Cir. 1986); *see also Ind. Mun. Power Agency v. F.E.R.C.*, 56 F.3d 247, 254 (D.C. Cir. 1995) (noting that a reviewing court shall not "reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]."). The Court's finding to the contrary, Order at 27-28, was just such an impermissible reweighing of the comprehensive evidence on which HUD relied.

### E. The Court erred in holding that the Law Enforcement Criteria violates the First Amendment and is arbitrary and capricious (Order at 29-33)

The Federal government has significant discretion to impose funding conditions in grant programs that "may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *see also Rust v. Sullivan*, 500 U.S. 173, 194 (1991) (dismissing the notion that the "Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals").

With respect to the directive not to "interfere or impede" law enforcement, the condition does not violate the First Amendment. First, this directive is content neutral, as "it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989); *see also United States v. Hicks,* 980 F.2d 963, 971 (5th Cir.1992) (recognizing that statute that prohibited passengers from intimidating any flight crew member or flight attendant so as to interfere with the performance of their duties did not discriminate against protected profanity or vulgarity, but rather incidentally regulated speech irrespective of its content); *CISPES v. FBI,* 770 F.2d 468, 474 (5th Cir.1985) (holding that statute that criminalized the act of willfully intimidating a foreign official in the performance of his duties did "not permit the government to discriminate on the basis of the content of expression" and that "[t]o the extent that it applies . . . at all to protected conduct, it is not a restriction on any particular message" because it "merely proscribes actions of a[n] . . . intimidating nature directed at any protected official").

This does not implicate the First Amendment because it is a restriction on action with an incidental, if any, effect on speech. A content-neutral restriction that has an incidental effect on speech is valid so long as it is narrowly tailored to advance a substantial government

interest. *Ward,* 491 U.S. at 796–98; *see also United States v. O'Brien,* 391 U.S. 367, 376–77 (1968). The law enforcement directive serves a substantial government interest: it prevents CoCs from interfering with law enforcement in the performance of their duties, thereby ensuring the safety of homeless individuals and the community. Moreover, this directive directly and effectively advances the government's interest in ensuring that law enforcement officers are not interfered with in the performance of their duties. *Ward,* 491 U.S. at 800. Finally, the directive is narrowly tailored, as it does "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799. Rather, it narrowly regulates speech only when that speech can reasonably be found to have interfered with a law enforcement officer in the performance of their duties. The Court was incorrect that this compels speech. Order at 30-31.

Further, the Court erred in failing to give weight to HUD's limiting construction. The Court "must give weight to the agency's narrowing interpretation of its own regulations—especially since the record contains no evidence that the regulations have been administered in an unfair or discriminatory fashion." *N.E. Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 26 (1st Cir. 2002); *cf. Ward*, 491 U.S. at 795–96 ("In evaluating a facial challenge to a state law, a federal court must consider any limiting construction that a state court or enforcement agency has proffered."). Here, HUD clearly stated that the criteria do not apply to protected expressive activity but rather "regulates speech only in the narrow context of when that speech can reasonably be found to have interfered with a law enforcement officer in the performance of the officer's duties." Defendants Cross Motion for MSJ at 86. This limiting construction is reasonable and should thus be accorded deference.

HUD acted reasonably in setting criteria related to cooperating with and not impeding law enforcement. A statutory goal of the McKinney-Vento Act is to minimize the trauma of homelessness on individuals, families, and communities. 42 U.S.C. § 11381(2). Accordingly, the 2026 NOFO encourages CoCs to prevent and minimize the trauma of living on the streets or in encampments and with related public illicit drug use. AR65.

HUD's findings on the trauma caused by encampments, both to homeless individuals and the community, and the statutory mandate to minimize trauma, support the agency's decision to set criteria for CoCs to not impede or prevent law enforcement efforts to clear encampments. AR65-69; AR5037. As HUD explained, "Minimizing trauma caused to families and communities by homelessness is most closely connected to unsheltered homelessness and encampments, where individuals live in dangerous environments and the community faces the impacts of dangerous environments." AR65. The Court's opinion ignores that the law requires HUD to consider "not just the trauma caused to individuals and families, but also to 'communities'. 42 USC 11381(2)," and that public safety thus reduces trauma to the "entire community." AR64-65. The Court erred in finding that HUD did not consider the trauma of jailing homeless individuals, because, as it explained, it never aimed to jail homeless individuals. ECF No. 33-1 at 49.

### F. The Court erred in finding that HUD's interpretation of "self-sufficiency" is contrary to law (Order at 33-37)

The Secretary did not act outside his authority or contrary to law in setting self-sufficiency criteria in the 2026 NOFO. One of four congressional purposes underlying the CoC program is to "optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381(4). When interpreting the text, courts "begi[n] with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain.'" *Culbertson v. Berryhill*, 586 U.S. 53, 58-59 (2019) (alteration in original). Accordingly, in defining "self-

sufficiency" to mean the "state or condition of not needing or relying on external assistance, support, or aid," HUD appropriately relied on the plain, ordinary meaning of the term provided by Oxford English Dictionary and confirmed by Merriam-Webster. AR5011. After starting with the plain meaning of self-sufficiency, HUD proceeded to adopt reasonable criteria to award points for ranking projects in the merit review process based on the applicant's plan to promote self-sufficiency among the homeless population. *See, e.g.*, AR5072-73 (awarding points based on "[t]he type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness"). HUD thus logically developed criteria to achieve a statutory purpose for the program.

The Court erred by not considering the plain meaning of the statute and compounded the error by misconstruing the statutory context. Order at 35-36. The Court ignored that self-sufficiency is a statutory goal of the program. Congress expressly directed HUD to optimize self-sufficiency. 42 U.S.C. § 11381(4). The Court misconstrued the statutory context by determining that the self-sufficiency criteria do not "promote access to, and effective utilization of, mainstream programs" immediately before the directive that HUD also "optimize self-sufficiency." Order at 35-36 (quoting 42 U.S.C. § 11381(3)). The Court is mistaken. Congress couples the two in both 42 U.S.C. § 11381 and § 11386b(d)(2)(B) to permanently move individuals and families out of homelessness through self-sufficiency. That is why supportive services include "job training" and "employment counseling," § 11360(29)(B), (D), and why one of the proven strategies for reducing homelessness focuses on "improving incomes to pay rent." § 11360b(d)(2)(B). Indeed, HUD cannot "promote communitywide commitment to the goal of ending homelessness," *id.* §

11381(1), if it perpetually aids the homeless without helping them successfully exit the CoC program. Otherwise, the Court's interpretation would mean that every homeless individual should be permanently supported.

The NOFO recognizes that many homeless individuals can eventually transition to not needing benefits. AR5034. Nothing in the NOFO assumes or requires all homeless individuals to become self-sufficient. *Id.* Indeed, the NOFO prioritizes providing *more* services to homeless individuals while they are needed, to place these individuals in a position where services are no longer needed. AR5037; AR53. And those who can never achieve self-sufficiency can continue to receive assistance. AR53.

### G. The Court erred in holding that the Risk Review and Additional Factors Criteria were arbitrary and capricious (Order at 37-40)

The Court erred in holding that the challenged Risk Review and Additional Factors Criteria were arbitrary and capricious based on the mistaken reasoning that HUD did not explain the factors. Order at 37-40. The Supreme Court and the First Circuit have emphasized that courts must be "mindful that an agency's explanation for its action needs only to be clear enough that its path may reasonably be discerned." *New York v. Trump*, 171 F.4th 1, 20 (1st Cir. 2026); *see also Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016) (same). The 2026 NOFO amply satisfies this "minimal level of analysis." *Encino Motorcars LLC*, 579 U.S. at 221.

As HUD explained, the Risk Review is meant to "evaluate each applicant's likelihood of successfully carrying out the project" and "identify risks that may affect the advancement toward or the achievement of a project's goals and objectives." AR5091. The Risk Review looks at past performance, organizational health, and results. *Id.* Exercising its discretion, HUD included the challenged Risk Review criteria dealing with self-sufficiency and illicit drug use. And it considered how these impact program and project success as explained above. It need not provide

a detailed explanation of why HUD must consider these as risk factors, as opposed to any other type of criteria or condition. Further, it is rational and within HUD's lawful discretion to consider any relevant evidence, which includes news reports and other public sources, when assessing risk. This review therefore logically promotes the CoC program's efficacy and efficiency in achieving statutory purposes by reducing the likelihood that HUD would award funds to projects that may not be successful or are fraught with risk. *Id.* Moreover, HUD adopted this review to comply with OMB regulations. 2 C.F.R. § 200.206(b)(1).

Similarly, HUD explained that the "additional factors" are connected to effectiveness and efficiency—for example, reasonableness of estimated cost to the Government, readiness to conduct the proposed work, and the scope of the overall projected impact on the program and administrative goals and priorities in the NOFO. AR5092. These are directly related to impact (effectiveness) and cost (efficiency). That is more than adequate to provide a reasoned basis.

### H. The Court erred in holding that the Threshold Review Criteria were contrary to law (Order at 40-43)

The Court erred in finding that the Threshold Review Criteria were contrary to the Appropriations Act of 2026. The Secretary did not exceed his authority or act contrary to law in establishing for new projects threshold criteria that are not explicitly identified in the statute. Section 11386a authorizes the Secretary to establish criteria to select effective and efficient projects. Each project type—e.g., Permanent Supportive Housing, Transitional Housing, and SSOs—was subject to criteria addressing how the new project advances statutory goals. *See, e.g.*, AR5068-74. By definition, advancing these statutory goals effectuates the statute.

The Appropriations Act does not require HUD to fund every project that a CoC places in Tier 1 and which satisfies requirements stated expressly in statute. Further, the project-specific Threshold Review Criteria only apply to new project applications. Insofar as CoCs place renewal

projects in Tier 1, those projects are not subject to the project-specific criteria. Rather, the Act requires the Secretary to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." 140 Stat. at 399. That language establishes an aggregate funding floor and requires HUD to respect each CoC's ordering of projects; it does not say that awards must be made solely on the basis of those rankings or that local placement in Tier 1 overrides otherwise applicable selection criteria. To the contrary, the requirement that award selection be "consistent with 42 U.S.C. 11381 et seq.," 140 Stat. at 399, incorporates the statutory provisions authorizing HUD to award grants through a national competition "based on criteria established by the Secretary," 42 U.S.C. § 11386a(a), and to consider "such other factors as the Secretary determines to be appropriate" to administer the program effectively and efficiently, *id.* § 11386a(b)(1)(G). Under the Court's reasoning, HUD would be forced to abdicate any responsibility for ensuring that grantees satisfy program requirements and instead rubberstamp CoC priority lists. That is not how federal grants work, much less competitive grants. *See* U.S. Dep't of Hous. & Urb. Dev., *HUD Grants Management Handbook 2210.17*, rev. 3.2, app'x B (Apr. 2023) (Requirement by Award Category), https://perma.cc/Q82W-4BF7. Logically, this cannot be how Congress intended the largest Federal homelessness assistance program to run.

### I. The Court erred in holding that the Bonus Limits were arbitrary and capricious (Order at 45-48)

First, the Court was wrong that HUD's decision-making with respect to bonus limits is reviewable. No statute limits the Secretary's discretion in setting CoC Bonus amounts, which is thus entrusted to HUD's discretion by law. 42 U.S.C. § 11386a(b)(1)(G).

Even if these bonus amounts were reviewable, HUD acted reasonably in setting floors and caps on the bonus funds available for projects. AR73-74; AR5041. HUD set the Bonus to be 15%

of the CoC's FPRN. AR5041. The Bonuses are subject to a floor of $500,000 and a ceiling of $5,000,000. *Id.* HUD found that previous Bonus amounts that were not subject to a floor or ceiling stifled competition and monopolized Bonus funding amounts. AR73. This is because Bonus amounts were granted based on a percentage of the CoC's FPRN, and larger CoCs would receive larger bonuses. *Id.* This would divert Bonuses to CoCs with larger resources, increasing their renewal demand year after year in a feedback loop while consuming the share received by smaller CoCs. *Id.* HUD explained that previous Bonuses were determined simply by the size of the CoC. AR74. These Bonuses were not tied in any direct way to CoC performance, merit, or outcome. By placing a ceiling on the awards, the Bonus amounts available for competition increase. *Id.* Thus, HUD determined that while uncapped Bonuses decreased competition, applying caps would achieve congressional intent for the CoC program to be competitive. *Id.* HUD recognized that the change to Bonuses would result in a loss of Bonus resources to a small number of CoCs, but these resources are above and beyond the CoCs' existing renewal demands. AR74. And HUD determined that the loss of these extra resources was more than outweighed by the creation of a more level playing field for Bonus competition among all CoCs. *Id.*

The Court held that HUD acted arbitrarily and capriciously because it did not consider how the Bonus Limits affected the scoring for Tier 2 applications. Order at 47. To the extent the Bonus Limits would affect scoring, the scoring system show's HUD's careful consideration. And regardless, "[a]n agency need not address every conceivable implication of its decision." *Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n,* 77 F.4th 971, 980 (D.C. Cir. 2023).

### J. The Court erred in finding the Executive Order references arbitrary and capricious (Order at 48-50)

HUD acted reasonably in informing CoC applicants that various Executive Orders may apply to their grants. The 2026 NOFO states that grantees "must follow the applicable provisions

in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2026." AR5111. This Requirements and Terms document makes clear that "various laws and policies . . . *may* apply to recipients of HUD's financial assistance programs." Gen. Admin. Requirements at 1 (emphasis added), https://bit.ly/4AY0Wdj. It goes on to say that "[t]he laws and policies in this addendum *may* apply if they are mentioned" in a NOFO. *Id.* (emphasis added). Finally, the document lists the Executive Orders implicated in this litigation in a table, noting that "[r]ecipients of Federal awards must comply with applicable Executive Orders, as advised by the Department." *Id.* at 4-5.

The Court erred in finding that the Executive Orders impose obligations on the public. Because the terms and conditions say only that these Executive Orders "may apply," that HUD will "advise[]" grantees, and that HUD has not provided advice on these Executive Orders, the Executive Orders do not currently apply to the CoC grantees. Accordingly, HUD did not act arbitrarily and capriciously because it did not "act" on Plaintiffs through this provision.

**K. The Court was incorrect that Plaintiffs have standing to challenge OMB Footnotes (Order at 51-52)**

The Apportionment Footnotes do not impose any obligations on the public, meaning that the Apportionment Footnotes have no effect on this litigation. Accordingly, the Court was incorrect to find standing.

**L. The Court erred in finding the OMB Footnotes reviewable (Order at 52-55)**

The Court found that the OMB Footnotes were reviewable, and noted that other courts had decided the same. Order at 53 (citing *Nat'l Ctr. for Learning Disabilities v. OMB*, No. 26-cv-13019, 2026 WL 2754447, at *10 (D. Mass. Sept. 17, 2026); *Neguse v. U.S. Immigr. and Customs Enf't*, 813 F. Supp. 3d 45, 88 (D.D.C. 2025)). But these cases were wrongly decided.

31 U.S.C. §§ 1512-1513 precludes judicial review. In *Departmentt of State v. Aids Vaccine Advocacy Coalition*, 146 S. Ct. 19 (2025) ("AVAC"), the Supreme Court stayed a district court's injunction after concluding that the Government had made a sufficient showing that the Impoundment Control Act (ICA) precluded the plaintiffs' APA suit to enforce foreign assistance appropriations. *See id*. at 19. The D.C. Circuit has likewise held that the ICA establishes a carefully calibrated process of interbranch notice, congressional consideration, and enforcement by the Comptroller General that precludes review under the APA. *See Global Health Council v. Trump*, 153 F.4th 1, 7, 19 (D.C. Cir. 2025), *r'hg en banc denied*, No. 25-5097, 2025 WL 2709437. The same reasoning precludes review of Plaintiffs' claims.

Congress may impliedly preclude some parties from seeking APA review by enacting a detailed scheme that provides for review only by other parties. For example, in *Block v. Community Nutrition Institute*, Congress provided for dairy "[h]andlers and producers—but not consumers"— to "participate in the adoption and retention of" certain orders. 467 U.S. 340, 346 (1984). In holding that the statute precluded consumers from challenging those orders under the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id*. at 347.

The same preclusive reasoning applied by the Supreme Court and D.C. Circuit with regard to the ICA and dairy orders applies to 31 U.S.C. §§ 1512-1513 as well because of (1) the lack of private "rights creating language" in the statute and (2) the comprehensive remedial scheme set forth by Congress.

In 31 U.S.C. §§ 1512-1513, the statutory language is cfocused on actions by Executive Branch officers—*i.e.*, "The official designated in section 1513 of this title to make apportionments shall . . . ." *Id.* § 1512(b)(2). Thus, there is no "rights-creating language" present within the statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 288-89 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." (citation omitted)). The Court recognized that there was no rights creating language, but nonetheless held that this lack of language does not affect the cause of action in the APA. Order at 53-54. This reasoning is foreclosed by *Block*. 467 U.S. at 346. Otherwise, a citizen could use the APA to circumvent statutes that do not provide private rights of action.

Turning to the comprehensive remedial scheme established by Congress: if an Executive Branch employee violates §§ 1512 or 1513, the head of the employee's agency must report the violation to the President, to Congress, and to the Comptroller General. *See* 31 U.S.C. §§ 1351, 1517(b). This comprehensive remedial scheme for addressing violations—through after-the-fact reporting—confirms that Congress did not also intend for private individuals to pursue alleged violations through civil lawsuits seeking prospective, injunctive relief. *See Alexander*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Rather, reporting to Congress and the political processes are the appropriate means of enforcing its terms. The Court further erred by failing to address the remedial scheme in its opinion.

**M. The Court erred in finding the OMB Footnotes arbitrary and capricious (Order at 55-56)**

Nor is OMB's use of the Apportionment Footnotes arbitrary and capricious. First, Executive Order 14332 recognized that federal dollars have not always been used to improve American lives or advance American interests. Exec. Order No. 14332, § 1 90 Fed. Reg. 38,929,

38,929 (Aug. 7, 2025) To that end, it identified the need to "strengthen oversight and coordination of, and to streamline, agency grantmaking to address these problems, prevent them from recurring, and ensure greater accountability for use of public funds more broadly." *Id.* The Executive Order then sets various requirements on agencies for grantmaking. *Id.* §§ 3-6, 90 Fed. Reg. 38,930-32. Because the Executive Order directly implicates grantmaking, and the appropriations are for grants under the CoC program, it was reasonable for OMB to include a footnote directing HUD to obligate funds consistent with Executive Order 14332.

Similarly, the Apportionment Footnote directing HUD to obligate funds consistent with the directives provided in Executive Order 14321 is not arbitrary and capricious. Executive Order 14321 contains directives to HUD to review its discretionary grant programs and prioritize grants to grantees in States and municipalities that enforce prohibitions on illicit drug use, urban camping, urban squatting, and adopt standards to address individuals who are a danger to themselves and others. Exec. Order No. 14321, § 3, 90 Fed. Reg. 35,817, 35,817-18 (July 24, 2025). The Executive Order also directs HUD to change its homelessness support and transitional living programs to end support for "Housing First" policies, increase competition for grants, and hold grantees to higher standards of effectiveness. *Id.* § 5, 90 Fed. Reg. 35,818-19. HUD was also directed to require recipients of Federal housing assistance to increase requirements that persons participating in the recipient's programs who suffer from substance abuse or serious mental illness receive treatment. *Id.* § 5, 90 Fed. Reg. 35,819. These directives each apply with force to how HUD makes grants under the CoC program. Because Executive Order 14321 directly implicates the CoC program, it was reasonable for OMB to include it on the Apportionment Footnote for that program.

The Court agreed with Plaintiffs that OMB's reliance on the Executive Orders as a justification for the apportionment footnotes is *per se* arbitrary and capricious. Order at 56. But

the Executive Orders are intimately connected with the appropriations, and the apportionment footnotes do not have any effect on Plaintiffs. And here, they are rationally connected to the Apportionment Footnotes.

Moreover, "[a]gencies are bound to follow binding executive orders." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). The President has directed OMB to "coordinat[e]" with the executive agencies on "creating a process to review new funding opportunity announcements and to review discretionary grants to ensure that they are consistent with agency priorities and the national interest." Exec. Order No. 14332, § 3, 90 Fed. Reg. 38,930. Consistent with these Executive Orders, OMB has included footnotes on its apportionments to HUD reiterating the requirements of the Executive Orders. And it is not arbitrary and capricious for OMB to comply with the Executive Orders in such a manner. Indeed, this subjects the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

## II. The Balance of Equities and Public Interest Favor a Stay Pending Appeal

The equitable factors favor a stay pending appeal, because the harm to HUD and the public far outweighs any harm that Plaintiffs can identify from permitting HUD to begin implementation of the NOFO in time to make awards under the NOFO before funding potentially lapses. *See Nken*, 556 U.S. at 435 (holding that the balance of the equities and the public interest "merge when the Government is the opposing party"). There is no dispute that the Court's Order will lead to funding lapses. ECF 51 at 2 ("Plaintiffs recognize that this means that HUD will not make Tier 2 awards until some existing grants have started to expire."). To the extent the Court has tried to avoid

funding gaps by issuing December 1 and 31 deadlines, both HUD and CoCs cannot possibly meet those deadlines. *See id.*; ECF 52.

Even if the Court found HUD's explanation lacking, it was error to issue relief that effectively prevents HUD from delivering grants for months. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 7. The Court's order effectively delays $1.5 billion dollars in Tier 2 funds and $102 million in DV Bonuses for new projects[2] from reaching grantees far beyond the time that communities would typically receive them, causing significant damage to the program and communities across the country. Decl. of Caitlyn J. McKenney ¶ 6. It also disrupts the remaining $2.3 billion for communities, providers, and some of America's most vulnerable citizens, and $164 million in CoC Planning grants,[3] just days before awards were set to be made. *Id.* The harms to grantees, and the homeless individuals they serve, far outweigh any harms from a lack of explanation in the record.

First, the Court has imposed unworkable deadlines on the CoC competition. *Id.* ¶¶ 5, 13. For Tier 1 awards, HUD must conform the criteria to the Court's order before reviewing and scoring applications based on those updated criteria. *Id.* ¶ 7. This process will take several months. *Id.*

For Tier 2 awards, HUD must now reissue a NOFO, re-program a compliant application portal, re-evaluate thousands of applications, re-review all project budgets, recalculate all CoC scores and individual Tier 2 scores, and complete new internal funds controls. In order to remedy the set-aside, all 390 CoCs also would have to re-run their local competitions soliciting and

---

[2] Because DV Bonus funds are for new projects, they are likely to be disbursed with Tier 2 funds. Decl. of Caitlyn J. McKenney ¶ 9.

[3] Because CoC Planning funds are noncompetitive, they are typically disbursed with Tier 1 funding. *Id.* ¶ 7.

selecting projects in several days. *Id.* ¶¶ 5, 14-15. And to meet the deadline, HUD would have to forego legally required processes, such as the legal processes that are required to prepare awards and conduct a fair competition (e.g., 42 U.S.C. § 3545a). *Id.* ¶¶ 5, 13.

The Court's Order should not have imposed any deadlines, given the complexity of the program, legally required processes, inter-departmental approval processes, and the time required to implement practicalities such as updating the electronic grant system.

Even if the Court modifies its Order to extend these deadlines, processing Tier 1 applications and re-running Tier 2 applications would almost certainly generate funding gaps. *Id.* ¶ 28. To even begin the Tier 2 process, HUD must publish a new NOFO. *Id.* ¶ 33. To do so, HUD must draft a NOFO, obtain the required approvals within the Department and from OMB, and manually port the contents of the NOFO into grants.gov for publication. *Id.* ¶ 15. Typically, this process takes weeks to months. *Id.* In an extremely expedited manner, it would take HUD several weeks at the very least. *Id.* In addition to publishing a new NOFO, HUD must reconfigure the e-snaps CoC application portal to accept revised applications, a process that typically takes weeks. *Id.*

Plaintiffs argue that HUD was able to reissue a NOFO in 11 days last year. ECF 53. Even though HUD rescinded and published a new CoC NOFO last year, that situation was different. Decl. of Caitlyn J. McKenney ¶ 16. HUD decided to revise the NOFO in response to the litigation. *Id.* The first lawsuit against the Fiscal Year 2025 NOFO was filed on November 25, and HUD published the revised NOFO on December 19—a span of 3.5 weeks. *Id.* And HUD did not make major substantive changes from the original FY25 NOFO to the revised version. *Id.* In fact, HUD acknowledged that the injunction applied equally to the original NOFO and the revised one. *See* ECF 51, *Nat'l All. to End Homelessness v. HUD*, 1:25-cv-636 (Dec. 19, 2025).

Here, by contrast, HUD must overhaul the NOFO to comply with the Court's Order. *Id.* ¶ 17. Striking the invalidated NOFO provisions is not enough: all provisions work in coordination with one another, so striking one requires evaluating the impact on the rest. *Id.* HUD must therefore not only eliminate the invalidated provisions but also determine how this affects the rest of the NOFO and revise it to ensure coherent criteria and a fair, transparent process. *Id.*

After this, the CoCs must run local competitions, which they have represented to the Court as requiring at least 60 days. *See* ECF 51 at 2 ("Second, Plaintiffs request that the Court modify the deadline for HUD to accept new Tier 2 applications such that CoCs have a 60-day period to apply after HUD makes that announcement."). Once the CoCs run the local competitions, HUD individually reviews each of the approximately 400 CoC consolidated applications and 8,000 new and renewal project applications. McKenney Decl. ¶ 34. This requires HUD to: (1) assess eligibility and threshold requirements, (2) conduct risk reviews, (3) score each CoC application, (4) assign individual scores to Tier 2 projects (5) assign tiers for applications by their scores, review budgets, and calculate award amounts, (6) prepare internal funds control, and (7) conduct quality assurance and quality control throughout these steps and obtain the required approvals from HUD, OMB, and Congress to announce awards. *Id.* HUD thus estimates that, absent timely relief, Tier 2 funds will be delayed at least until late April. *Id.*

These delays cause real harms. These delays will chiefly imperil renewal projects in both Tier 1 and Tier 2, plus CoC Planning and DV Bonus projects, whose prior year funding will begin to expire on January 1, 2027. *Id.* ¶ 40. HUD anticipates that it would award about 70% of funds, or $2.873 billion, to renewal projects. Many of those grants expire in the first quarter of 2027. *Id.* Delays could also generate more problems even for grants expiring later in the calendar year, due to any backlog and the increased compliance burden on HUD. *Id.* ¶ 42.

The delay not only harms renewal or transitioning CoC projects, but also threatens to withhold critical funding from communities nationwide. *Id.* ¶ 44. Each CoC will have 40% of their funding held back until a new local competition and HUD scoring and review is complete. *Id.* CoC funding may be the primary source of homelessness assistance for many communities. *Id.* While large metropolitan areas are better positioned to sustain a delay to 40% of their funds, HUD anticipates that small communities will likely be devastated by the temporary loss in funding. *Id.*

Re-running the Tier 2 competition also upsets established reliance interests. *Id.* ¶¶ 45, 46. CoCs carefully selected projects for their local competitions with the set-aside and existing criteria in mind over the course of four months. *Id.* ¶ 45. And on November 18, HUD announced via the CoC listserv that award notices would be issued on December 11. This means that many pre-existing projects have made preparations not to receive CoC funding, and many new projects have made commitments based on a likelihood of receiving an award. *Id.* Re-running the competition without the set-aside is a serious course change that will disrupt homelessness response systems across the country. *Id.*

Further, significant delays risk projects and their supporters withdrawing from the CoC program. *Id.* ¶ 47. Upsetting these expectations risks turning current and future CoC awardees away from the program permanently, undermining the CoC program's mission and homelessness relief more broadly. *Id.*

The Order also imperils vital program functions like compliance with federal law on controlled substances, which addresses one of the primary contributing factors to homelessness. *Id.* ¶ 10. It also undermines HUD's ability to conduct legally mandated risk reviews, which every federal agency must do for all federal assistance to check for critical issues relating to applicants' capabilities to effectively carry out their grants. *Id.* And it prohibits HUD from effectively

promoting self-sufficiency, a core goal of McKinney-Vento and the biggest driver for permanently reducing homelessness. *Id.*

In addition, the Order harms HUD and the public interest because it effectively bars HUD from implementing its congressional mandate to set housing policies and priorities. "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (first alteration in original); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (invoking *King*). Irreparable harm to the Government can independently justify the stay of an order preventing it from effectuating its chosen policy. *Trump v. CASA, Inc.*, 606 U.S. 831, 859–60 (2025); *see also Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). And because the Order has just that effect, Defendants here "suffer[] a form of irreparable injury." *CASA*, 606 U.S. at 860–61 (quoting *King*, 567 U.S. at 1303).

In particular, after careful research and consideration, including over 40 forums across the nation with interested stakeholders, HUD determined that the CoC program would more effectively achieve its statutory goals of reducing homelessness and improving self-sufficiency if it restored a measure of balance to the program by increasing focus on Supportive Services and Transitional Housing. *See NAEH Litigation*, ECF 46 at 8-24. Since 2013, chronic homelessness has increased 80.5%, unsheltered homelessness has increased 36.1%, and literal homelessness (on the street, in emergency shelters, or in transitional housing) has increased 27%, despite a 44% increase nationwide in Permanent Supportive Housing beds and an increase in CoC spending of 111%. AR42; NOFO 28. And while the supply of Permanent Housing (which includes Permanent Supportive Housing and Rapid Rehousing) has increased by 188% since 2007, the supply of

Transitional Housing beds has decreased by 59.5%. AR42-43. In contrast, from 2007 to 2009 when the supply of bed types nationwide had a nearly equal distribution between Emergency Shelter, Transitional Housing, and Permanent Supportive Housing, homelessness decreased. AR50; *see also* AR5035.

The NOFO is meant to effectuate the policy goal of restoring Transitional Housing and Supportive Services and ultimately address homelessness. AR49; AR5035. As a result of the Court's Order vacating the NOFO (including the set-aside), HUD cannot pursue its policy. And this harms individuals served by the CoC program and the public because the current policy does not meaningfully address homelessness, as the above statistics from the record demonstrate.

Finally, the Order frustrates the will of Congress. In the 2026 Appropriations Act, Congress set a December 1, 2026 deadline to make awards. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026 Appropriations Act). Every day of delay caused by the Court's order further violates Congress's directive.

To avoid such harm, the Court should grant the requested stay, which would allow HUD to issue all funding before the new year.

## CONCLUSION

For the reasons identified above, Defendants respectfully request that this Court stay its Order pending resolution of Defendants' forthcoming appeal to the U.S. Court of Appeals for the First Circuit.

DATED: November 25, 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

AMBER RICHER

Assistant Branch Director

/s/ Michael Bruns
MICHAEL BRUNS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
michael.bruns@usdoj.gov

*Counsel for Defendants*

**Certificate of Service**

I hereby certify that, on November 25, 2026, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule Gen 304.

*/s/ Michael Bruns*

Michael Bruns

Trial Attorney