**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants*. | Case Nos. 26-cv-436-MSM-AEM<br>26-cv-439-MSM-AEM<br><br>District Judge Mary S. McElroy<br>Magistrate Judge Amy E. Moses |
| STATE OF WASHINGTON, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>*Defendants.* | |

**DECLARATION OF CAITLYN J. McKENNEY**

I, Caitlyn J. McKenney, declare as follows:

1. I am the Deputy Assistant Secretary (DAS) for the Office of Special Needs (OSN) within the Office of Community Planning and Development (CPD) of the United States Department of Housing and Urban Development (HUD). I have served in this capacity since December 28, 2025. Immediately before this, I served as a Policy Advisor for CPD. I have been employed continuously at HUD since April 21, 2025.

2. In my current role, I oversee HUD programs that provide funding to state and local governments and nonprofit providers to serve individuals and families across the United States who are affected by homelessness. I do this primarily through HUD's Continuum of Care (CoC) and Emergency Solutions Grants (ESG) programs.

3. My statements in this Declaration are based on my personal knowledge or my evaluation of information provided to me in my official capacity; on reasonable inquiry; information obtained from various records, systems, databases; or program employees and information portals maintained and relied on by HUD in the regular course of business.

4. I have reviewed the Court's Memorandum and Order Granting in Part and Denying in Part Plaintiffs' Motions for Summary Judgment and Granting in Part and Denying in Part Defendants' Cross-Motions for Summary Judgment dated November 20, 2026.

5. The Court's deadlines of December 1 for Tier 1 awards and December 31 for Tier 2 awards are impracticable, as explained further below. HUD has to reissue a NOFO, re-program a compliant application portal, re-evaluate thousands of applications, re-review all project budgets, recalculate all CoC scores and individual Tier 2 scores, complete new internal funds controls, and, in order to remedy the set-aside, all 390 CoCs would have to re-run their local competitions soliciting and selecting projects in several days. Forcing HUD and the CoCs to reverse course and reselect projects would require disregarding all established, and many legally required, processes and checks necessary to make the program administrable and to protect its integrity.

6. Rather, to reissue a lawful NOFO, HUD and the CoCs must take substantially more time, which will delay more than 40% of awards (about $1.602 billion)[1] well beyond the time that communities would typically receive them, causing significant damage to the program and

[1] All dollar figures are rounded to the nearest $1,000,000.

communities across the country. In this scenario, the Court's Order would still disrupt all $4.040 billion for communities, providers, and some of America's most vulnerable citizens, just days before awards were set to be made.

7. This would delay Tier 1 awards by several months, as HUD would have to bring the criteria into compliance with the Court's Order, then review and score applications based on those updated criteria. In addition, the NOFO sets aside funds for CoC Planning totaling $164 million. Because CoC Planning funds are noncompetitive, they are typically disbursed with Tier 1 funding. The Court's order would thus delay this amount by several months as well.

8. Tier 2 awards would face an even longer delay, because HUD would have to run a completely new competition; awards are not likely to come out until late April at the earliest because it is not possible for CoCs to alter whom they selected for funding without re-running completely new local competitions. HUD typically provides CoCs with 3-6 months to run local competitions and prepare an application in response to a NOFO. Even a greatly condensed competition window will upset the reliance interests of all the projects already selected in each local community.

9. The NOFO also sets aside $102 million in Domestic Violence Bonus funds (DV Bonus). Because DV Bonus funds are for new projects, they are likely to be disbursed with Tier 2 funds. As a result, both Tier 2 and DV Bonus funds face a delay until late April. Undoing this fundamental aspect of the CoC competition at this late stage thus threatens to upset homelessness response across the country in the middle of winter and during the holiday season.

10. The Order also imperils vital program functions like compliance with federal law on controlled substances, which addresses one of the primary contributing factors to homelessness. It also undermines HUD's ability to conduct legally mandated risk reviews, which every federal

agency must do for all federal assistance to check for critical issues relating to applicants' capabilities to effectively carry out their grant. *See* 2 C.F.R. § 200.206; Off. of Mgmt. & Budget, Exec. Off. of the Pres., OMB Circular No. A-123, *Management's Responsibility for Enterprise Risk Management and Internal Control* (Mar. 10, 2026). Last, the Order prohibits HUD from effectively promoting self-sufficiency, a core goal of the McKinney-Vento Act and the biggest driver for permanently reducing homelessness. *See* 42 U.S.C. § 11381(4).

11. Consequently, HUD must choose between ignoring the law to issue awards on time, or taking the time needed to correctly issue awards, which would still all but guarantee catastrophic loss to the program because of funding gaps and broken reliance interests.

12. If HUD does not obtain relief by December 10, it will be unable to stop these harms. Further, every day after that that HUD does not have relief risks harms that are increasingly harder to unwind, whether because of rushed award selections, or increasing funding lapses, or both, all over the country.

**The Court's December deadlines are impracticable to meet.**

13. As explained below, it is impracticable for HUD to meet the December 1 and December 31 deadlines in the Court's Order. Even assuming HUD could find a way to pick the awards from a list, doing so would ignore HUD's established processes that are legally required to ensure it properly administers HUD funds. And the legal requirements to conduct these processes are numerous. For example, HUD must conduct risk reviews under 2 C.F.R. § 200.208, must assess required merit criteria under 42 U.S.C. § 11386a, and is bound to the numerous required screenings in its NOFO, such as conducting threshold eligibility checks and requiring adherence to relevant federal laws. On top of this, there are legal processes that are required to prepare awards and conduct a fair competition (e.g. 42 U.S.C. § 3545a), and HUD must obtain numerous approvals

from HUD leadership, the Office of Management and Budget (OMB), and others at various points in the process.

14. As a practical matter, CoCs cannot re-run their local competitions in only a matter of days. The Court's Order requires HUD to let CoCs resubmit applications for Tier 2 funding "until 11:59pm Eastern Time on December 1, 2026." Order at 17–18. Even if HUD had published a revised NOFO on the date of the Order, that would have left CoCs 11 days to re-solicit and select 40% of their local projects. This process normally takes at least 90–120 days, as explained further below.

15. To republish a NOFO governing Tier 2 funding, HUD must draft a NOFO, obtain the required approvals within the Department and from OMB, and manually port the contents of the NOFO into grants.gov for publication. Typically, this process takes weeks to months. In an extremely expedited manner, it would take HUD several weeks at the very least. Publication of the NOFO does not take into account steps needed to update e-snaps, the electronic CoC Program Application and Grants Management System, with the appropriate scripts and coding to support the revised NOFO, a process that would likely take 2–4 weeks for HUD's contractor to complete.

16. Even though HUD rescinded and published a new CoC NOFO last year, that situation was different. HUD decided to revise the NOFO in response to the litigation. The first lawsuit against the Fiscal Year 2025 NOFO was filed on November 25, and HUD published the revised NOFO on December 19—a span of 3.5 weeks. And HUD did not make major substantive changes from the original FY25 NOFO to the revised version. In fact, HUD acknowledged that the injunction applied equally to the original NOFO and the revised one. *See* ECF 51, *Nat'l All. to End Homelessness v. HUD*, 1:25-cv-636 (Dec. 19, 2025).

17. Here, by contrast, HUD must overhaul the NOFO to comply with the Court's Order. Striking the invalidated NOFO provisions is not enough: all provisions work in coordination with one another, so striking one requires evaluating the impact on the rest. HUD must therefore not only eliminate the invalidated provisions but also determine how this affects the rest of the NOFO and revise it to ensure coherent criteria and a fair, transparent process.

18. HUD previously issued an emergency waiver in this competition out of an abundance of caution[2] to account for the time that the NOFO was vacated. U.S. Dep't of Hous. & Urb. Dev., *30-Day Notice Waiver for Continuum of Care Program (CoC); Notice of Waiver*, 91 Fed. Reg. 69,267 (Nov. 3, 2026). But CoCs did not need to solicit new applicants, run new local competitions or submit new applications, only to finalize those they had been working on since June 1. But here, CoCs will need to restructure 40% of their project portfolios in the competitive and transparent manner required in days.

19. HUD has previously spent 4 to 6 months reviewing CoC applications prior to making awards. The shortest review timeframe was 79 days in 2024. The order would require HUD to redo a substantial amount of the reviewing process. HUD would have to rescore all 390 CoC merit applications based on the new criteria, re-evaluate the thousands of new projects submitted in Tier 2 to determine which pass threshold criteria, re-review all Tier 2 project budgets, and redo the process of assigning each Tier 2 project a score and selecting projects based on score. This process would take at least 60 days.

20. Once CoCs have submitted their applications and HUD has begun reviewing them, HUD must also undertake the complex process of preparing funds for distribution. This entails three

[2] HUD's waiver explains that HUD merely reopened an existing application period, not that it opened a new application period that is shorter than 30 days, which would require an emergency waiver.

steps: funds assignment, commitment, and obligation. Each step in the process—and all approvals they entail—are necessary to carry out the CoC program and comply with the Antideficiency Act. *See* 42 U.S.C. § 11382(d); 31 U.S.C. § 1341; s*ee generally* U.S. Dep't of Hous. & Urb. Dev., *Administrative Control of Funds Policies 1830.2*, rev. 6 (Mar. 2016); U.S. Dep't of Hous. & Urb. Dev., *HUD Grants Management Handbook 2210.17*, rev. 3.2 (Apr. 2023), https://perma.cc/Q82W-4BF7 [hereinafter Grants Handbook].

21. To assign funds from CPD Headquarters to the Field Offices, HUD must verify the appropriations apportionment from OMB, confirm the allotment of the apportionment from HUD's Office of the Chief Financial Officer, and work with OSN to align on funds and award plans.

22. Next, CPD's Office of Operations' Budget Office generates and works with the CPD Assistant Secretary to sign the HUD-185 Form, Regional Fund Assignment, and corresponding budget templates for processing in HUD's financial system. This step itself involves interagency and contractor coordination: CPD must submit the budget templates to the Department of the Treasury for processing in HUD's Oracle platform. Oracle then batches the templates overnight into HUD's Line of Credit Control System (LOCCS) and HUD's Central Accounting and Program Systems, which pre-stages the funds for each Field Office in preparation for grant-agreement execution.

23. Once funds are assigned and committed, CPD must clear three external hurdles. First, HUD must notify the House and Senate Appropriations Committees three business days before public announcement, via HUD's Office of Congressional and Intergovernmental Relations. Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(12), 139 Stat. 9, 10 (Mar. 15, 2025) (incorporating requirement at Pub. L. No. 118-42, div. F, tit. II, § 221, 138 Stat. 25, 380 (Mar. 9, 2024)). Once the three-day

embargo ends, HUD issues the public awards announcement. Finally, HUD issues individual award letters in coordination with each of HUD's 66 Field Offices.

24. Post-award compliance has a similar level of complexity. Once HUD issues its public awards announcement, CPD administratively obligates grant funds by memorandum. Grants Handbook at 3-1(D); Gov't Accountability Off., Red Book (3d ed. Feb. 2006), ch. 10, § F(1), https://www.gao.gov/assets/2019-11/202819.pdf (quoting 31 U.S.C. § 1501(a)(5)). CPD verifies the commitment amounts in LOCCS and prepares an obligation memorandum. This memorandum must be approved by the Deputy Assistant Secretary for Special Needs Programs or the General Deputy Assistant Secretary as delegated. Once the memorandum is signed, CPD generates the funding-obligation file and records it in LOCCS. Field Offices are then able to complete, transmit, and execute grant agreements that make funding available for drawdown by grantees.

25. Grant-agreement execution also has many moving parts. Once funds are obligated by the process described above, CPD and the Field Offices work to execute grant agreements. First, HUD conducts quality control and quality assurance, manually reviewing and finalizing every grant agreement for accuracy and completeness. This includes ensuring every grantee has an up-to-date registration in the Government's System for Award Management (SAM) to make sure that each grantee is legally allowed to receive federal funding and is not suspended, debarred, or listed on the Do Not Pay list. *See* www.sam.gov. HUD then transmits the grant agreement to the grantee for signature. *See* Grants Management Handbook at 3-4.

26. After receiving the signed grant agreement back from the grantee, the Field Office must verify that the grant agreement is validly signed, confirm that documentation is complete, and perform additional checks to ensure that the grantee's funds are obligated and available in LOCCS. Once that information is confirmed, HUD countersigns the grant agreement and submits it to the

OCFO Accounting Center for recording and establishing the line of credit for each grant. Once the agreement is recorded, the Field Offices take final actions to move funds into CoC grantees' accounts by specific budget line items (e.g., amounts for supportive services, rental assistance, leasing, administration, etc.). Grantees can then access their funds via LOCCS.

27. Thus, under the Order's deadlines, HUD cannot follow all laws and established processes, and issue awards based on merit and other required CoC criteria.

**The Court's Order will delay one-year funding by months.**

28. Even if the Court modifies its Order to extend these deadlines, processing Tier 1 and CoC Planning applications and re-running Tier 2 and DV Bonus applications would almost certainly generate funding gaps.

29. The CoC competition occurs annually, and most projects operate on one-year grant terms.

30. Congress required HUD to make awards for the CoC Program by December 1, 2026. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 400 (2026 Appropriations Act). HUD has endeavored to meet this deadline even though it was doing so under one of the quickest processing times in the program's history.

31. From June 1 to September 30, CoCs ran local competitions and made decisions regarding Tier 2 both to transition existing grants and to reject existing grants for new recipients. Of the 3,700 new project applications HUD received, more than 20% are from an organization that was not previously receiving CoC funding. On average, a CoC made these changes to about 30% of their projects in response to the set-aside. The Order risks the reliance interests of thousands of new homelessness service projects across the country.

32. The complex, multi-layered, and interwoven process HUD has undergone to prepare awards cannot be unraveled and redone. Undoing the layers of review and selection to disentangle

specific criteria and then re-do the process necessitates a recalculation of all CoC scores to determine how each CoC's Tier 2 projects will perform relative to the rest of the country's, then a fresh review of thousands of Tier 2 projects that changed their applications, and a new budget, scoring, and selection process to ultimately prepare awards.

33. And before all of this, HUD must publish a new NOFO and require all 390 CoCs to re-run the local competitions they began in June under new priorities in a matter of days. In addition to publishing a new NOFO, HUD must reconfigure the e-snaps portal to accept revised applications, a process that typically takes weeks.

34. As a reminder, HUD individually reviews each of the approximately 400 CoC consolidated applications and 8,000 new and renewal project applications. This requires HUD to (1) assess eligibility and threshold requirements, (2) conduct risk reviews, (3) score each CoC application, (4) assign individual scores to Tier 2 projects (5) review all 8,000 project budgets, and calculate award amounts, (6) prepare internal funds control, and (7) conduct quality assurance and quality control throughout these steps and obtain the required approvals from HUD, OMB, and Congress to announce awards.

35. As a result, HUD estimates that, absent timely relief, Tier 1 and CoC Planning funds will be delayed until at least February.

36. The delays for Tier 2 funding, which is likely to include DV Bonus funds, are even more acute. For these funds, about $1.602 billion, HUD must not just re-review applications, it actually has to run the competition afresh. Going from a published NOFO to making awards requires at least six months to properly implement and has historically required 7 to 10 months. And even if HUD could process applications more quickly, it must open at minimum a 30-day application period to let CoCs run their own local competitions. These local competitions are required for

CoCs to solicit new applicants and select and rank projects in a competitive and transparent manner required by HUD. Further, HUD cannot reduce the CoC application period to anything less than 30 days absent an emergency waiver, which an impending deadline does not qualify as.

37. Additionally, HUD would have to select among a vastly oversubscribed set of applicants without applying many of its risk-review factors. Almost all new Transitional Housing projects were in Tier 2, and HUD received applications for an estimated twice the amount of funding that was available for the $1.300 billion set-aside.

38. HUD thus estimates that, absent timely relief, Tier 2 which is likely to include DV Bonus funds will be delayed  at least until late April.

**The delays will cause significant funding gaps and other continuity risks.**

39. HUD was prepared to issue awards in December and start executing grant agreements in January 2027. But with the above anticipated delays, HUD would likely be unable to execute any grant agreements until, at the earliest, February for Tier 1 and CoC Planning, and late April for Tier 2 and DV Bonus.

40. These delays will chiefly imperil renewal projects in both Tier 1, CoC Planning, Tier 2, and DV Bonus, whose prior year funding will begin to expire on January 1, 2027. HUD anticipates that it would award about 70% of funds, or $2.873 billion, to renewal projects. Many of those grants expire in the first quarter of 2027.

41. In Tier 2, many of the new projects eligible for the set-aside are effectively renewal projects that have transitioned from Permanent Housing to Transitional Housing. HUD estimates that these make up 839 projects totaling about $646 million in potential awards. The delay to re-run the Tier 2 competition would make the harms for this group more severe than for renewal projects in Tier 1.

42. Delays could also generate more problems even for grants expiring later in the calendar year, due to any backlog and the increased compliance burden on HUD.

43. These projects rely on renewed CoC funding to continue to serve the individuals relying on their assistance. Gaps in funding may require them to reduce or even cease operations, or take drastic measures to maintain continuity of care for the families they serve.

44. The delay does not only harm renewal or transitioning CoC projects, but also threatens to withhold critical funding from communities nationwide. Each CoC will have 40% of their funding held back until a new local competition and HUD scoring and review is complete. CoC funding may be the primary source of homelessness assistance for many communities. While large metropolitan areas are better positioned to sustain a delay to 40% of their funds, small communities will likely be devasted by the temporary loss in funding.

45. Re-running the Tier 2 competition also upsets established reliance interests. CoCs carefully selected projects for their local competitions with the set-aside and existing criteria in mind over the course of four months. This means that many pre-existing projects have made preparations not to receive CoC funding, and many new projects have made commitments based on a likelihood of receiving an award. Re-running the competition without the set-aside is a serious course change that will disrupt homelessness response systems across the country.

46. This disruption poses real impacts. In King County, Washington, one faith-based organization that has never received CoC funding was put forward by their CoC to serve women and their children in recovery from addiction. In Southeast Tennessee, the CoC put forward a project providing Transitional Housing to men and women going through the local Drug Court system. And in San Francisco, the CoC sought funding for the first time to streamline the City's fragmented street outreach into a single citywide outreach team. HUD believes it received more

applications from faith-based providers this year than ever before, and that the types of projects described here are a direct result of the priorities in HUD's NOFO. CoCs advanced all these new projects in Tier 2, and now all risk losing funding.

47. Further, significant delays risk projects and their supporters withdrawing from the CoC program. After months of intensive planning and preparation, CoCs and awardees have successfully adjusted to the program's revamped priorities, and they are ready to receive funding to serve their local homeless populations. Upsetting these expectations risks turning current and future CoC awardees away from the program permanently, undermining the CoC program's mission and homelessness relief more broadly.

48. Without an emergency stay or other relief by December 10, HUD may not be able to prevent irreparable harm to the CoC program—whether through rushed award selections, or significant lapses in funding, or both. This is compounded by the December 11 deadline for Congress to pass a new budget. Every day after December 10 for which HUD does not obtain relief only further increases the amount of funding at risk, jeopardizing the success of the CoC program and the wellbeing of the men, women, and families it ultimately serves.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed November 25, 2026, in Seattle, Washington:

CAITLYN MCKENNEY
Digitally signed by CAITLYN MCKENNEY
Date: 2026.11.25 16:55:40 -05'00'

Caitlyn J. McKenney